Peter Bibring (SBN 223981)
pbibring@aclu-sc.org
Ahilan T. Arulanantham (SBN 237841)
aarulanantham@aclu-sc.org
Jennifer L. Pasquarella (SBN 263241)
jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-5236
Facsimile: (213) 977-5297

Ameena Mirza Qazi (SBN 250404)
aqazi@cair.com
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California  92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340

Attorneys for Plaintiffs
Continued on next page

FILED
CLERK, U.S. DISTRICT COURT

FEB 2 2 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SACV11-00301 JST (VBK)

YASSIR FAZAGA, ALI UDDIN MALIK, YASSER ABDELRAHIM,

Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION; ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION, in his official capacity; STEVEN M. MARTINEZ,

CASE NO.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

1   ASSISTANT DIRECTOR IN CHARGE,
2   FEDERAL BUREAU OF
    INVESTIGATION'S LOS ANGELES
3   DIVISION, in his official capacity; J.
4   STEPHEN TIDWELL; BARBARA
    WALLS; PAT ROSE; KEVIN
5   ARMSTRONG; PAUL ALLEN;

6          Defendants.

7

8   Additional Plaintiffs' Attorneys:

9

10   Dan Stormer (SBN 101967)
    dstormer@hadsellstormer.com
11   Joshua Piovia-Scott (SBN 22364)
    jps@hskrr.com
12   Reem Salahi (SBN 259711)
13   reem@hskrr.com
    HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
14   128 N. Fair Oaks Avenue, Suite 204
15   Pasadena, California 91103
    Telephone: (626) 585-9600
16   Facsimile: (626) 577-7079

17

18

19

20

21

22

23

24

25

26

27

28

## PRELIMINARY STATEMENT

1.     This case concerns an FBI-paid agent provocateur who, by misrepresenting his identity, infiltrated several mainstream mosques in Southern California, based on the FBI's instructions that he gather information on Muslims.

2.     The FBI then used him to indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans in Southern California.  Over the course of fourteen months, the agents supervising this informant sent him into various Southern California mosques, and through his surveillance gathered hundreds of phone numbers, thousands of email addresses, hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of hundreds of Muslims, thousands of hours of audio recording of conversations — both where he was and was not present — as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques.

3.     This dragnet investigation did not result in even a single conviction related to counterterrorism.  This is unsurprising, because the FBI did not gather the information based on suspicion of criminal activity, instead it gathered the information simply because the targets were Muslim.

4.     Ironically, the operation ended when members of the Muslim communities of Southern California reported the informant to the police because of his violent rhetoric, and ultimately obtained a restraining order against him.

5.     After this, the informant's identity was revealed, first in court documents where the FBI and local law enforcement revealed his role, and then through his own statements which were reported widely in the press.[1]

---

[1] *See, e.g.*, Jerry Markon, *Tension grows between Calif. Muslims, FBI after informant infiltrates mosque*, WASH. POST (Dec. 5, 2010); Gillian Flaccus, *Calif. case highlights use of mosque informants*, ASSOC. PRESS (Mar. 1, 2009); Matt (cont'd)

- 1 -

1    6.    By targeting Muslims in the Orange County and Los Angeles areas

2    for surveillance because of their religion and religious practice, the FBI's operation

3    not only undermined the trust between law enforcement and the Southern

4    California Muslim communities, it also violated the Constitution's fundamental

5    guarantee of government neutrality toward all religions.

6    7.    The First Amendment guarantees that no person should be singled out

7    for different treatment by government because of his or her religion. "The First

8    Amendment mandates governmental neutrality between religion and religion. The

9    State may not adopt programs or practices which aid or oppose any religion. This

10   prohibition is absolute." *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quotations

11   and citations omitted).

12   8.    By this class action, Plaintiffs seek injunctive relief for themselves

13   and the class of individuals whom Defendants subjected to surveillance and

14   gathered identifiable information about because they are Muslim. Specifically,

15   they seek an order requiring the federal government to destroy the information

16   about them which it collected through this unlawful operation. The named

17   Plaintiffs also seek damages for themselves as individuals based on the claims set

18   forth below.

19                              **JURISDICTION AND VENUE**

20   9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.

21   § 1331. Because this lawsuit alleges violation of the United States Constitution

22   and federal statutes, it raises questions of federal law. Because those violations

23   include violations of 42 U.S.C. § 1985 and laws to protect civil rights, this Court

24   also has jurisdiction under 28 U.S.C. § 1343. Because those violations include

25   _____

26   Coker, *A look at Craig Monteilh*, OC WEEKLY (Mar. 4, 2009); Teresa Watanabe
27   and Paloma Esquivel, *L.A. area Muslims say FBI Surveillance has a chilling effect*,
     L.A. TIMES (Mar. 1, 2009).

28

1   violations of the Privacy Act, *see* 5 U.S.C. 552a(e)(7), this Court also has

2   jurisdiction under 5 U.S.C. 552a(g)(1)(D).

3         10.    This Court has the authority to grant damages, declaratory and

4   injunctive relief, and any other appropriate relief pursuant to *Bivens v. Six*

5   *Unknown Agents*, 403 U.S. 388 (1971); 28 U.S.C. 1331; 28 U.S.C. § 1343; 42

6   U.S.C. § 1985; 42 U.S.C. § 2000bb; 5 U.S.C. 552a; and the Declaratory Judgment

7   Act, 28 U.S.C. §§ 2201 and 2202.  A substantial, actual, and continuing

8   controversy exists between the parties, with respect to both the class's claim for

9   injunctive relief in the form of file destruction and the individual claims for

10   damages.

11         11.    Venue is proper in the Central District of California under 28 U.S.C.

12   § 1391(b) because a substantial part of the events or omissions giving rise to the

13   claims herein occurred in this District.

14   **PARTIES**

15         12.    Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen

16   born in Eritrea, who moved to the United States at age fifteen and attended high

17   school in Orange County.  From about 1998 to the present, Plaintiff Fazaga served

18   as an imam, or religious leader, of the Orange County Islamic Foundation, a

19   mosque in Mission Viejo, California.  His duties there have included directing the

20   religious affairs of the mosque, leading prayer, and conducting educational,

21   spiritual, and recreational activities for the entire mosque community and its

22   youth.[2]

23         13.    Plaintiff Ali Malik is a twenty-six year-old U.S. citizen born in

24   Southern California.  Malik's parents came to the United States from Pakistan

25   before he was born.  From the time of his birth through the events alleged herein,

26

27   [2] Plaintiff Fazaga's legal name is Yassir Mohammed; but he uses the name
   "Fazaga" in all his personal and professional dealings.

28

1   Plaintiff Malik resided in and around Orange County, California.  Plaintiff Malik is

2   a practicing Muslim who, from about 2004 through the events alleged herein,

3   regularly attended religious services at the Islamic Center of Irvine ("ICOI"), a

4   mosque in Irvine, California.

5          14.    Plaintiff Yasser AbdelRahim, is a thirty-four year-old lawful

6   permanent resident of the United States, who emigrated from Egypt when he was

7   twenty-one years old.   Plaintiff AbdelRahim first attended business school in

8   Arizona, then moved to Southern California after he obtained his degree in 1999 to

9   work in business consulting.  AbdelRahim is a practicing Muslim and has attended

10  religious services regularly at ICOI since about 2005.

11         15.    Defendant the Federal Bureau of Investigations (FBI) is an agency of

12  the federal government within the meaning of the Privacy Act.  It maintains

13  records on individual whom its agents have investigated, including Plaintiffs and

14  the putative class they seek to represent.  The FBI is sued for injunctive relief only.

15         16.    Defendant Robert Mueller is the Director of the FBI.  In that capacity

16  he is responsible for the direction and oversight of all operations of the FBI,

17  including the retention of records arising out of the investigations of FBI agents.

18  He is sued in his official capacity for injunctive relief only.

19         17.    Defendant Steven M. Martinez is the Assistant Director In Charge of

20  the FBI's Los Angeles Field office.  In that capacity, he is responsible for the

21  direction and oversight of all operations of the FBI in Los Angeles and Orange

22  Counties, including the retention of records arising out of the investigations of FBI

23  agents in his jurisdiction.  He is sued in his official capacity for injunctive relief

24  only.

25         18.    Upon information and belief, Defendant Kevin Armstrong was, at all

26  times relevant to this action, employed as an FBI Special Agent assigned to the

27  Orange County area, and a handler for Craig Monteilh.  Agent Armstrong met with

28  Monteilh repeatedly and on a regular basis during the time period at issue in this

- 4 -

1     lawsuit. He directed Craig Monteilh to indiscriminately gather information on the

2     Muslim community in Orange County, and personally supervised and directed

3     Monteilh's surveillance activities as described herein.

4          19.    Upon information and belief, Defendant Paul Allen was, at all times

5     relevant to this action, employed as an FBI Special Agent assigned to the Orange

6     County area, and a handler for Craig Monteilh. Agent Allen met with Monteilh

7     repeatedly and on a regular basis during the time period at issue in this lawsuit. He

8     directed Craig Monteilh to indiscriminately gather information on the Muslim

9     community in Orange County, and personally supervised and directed Monteilh's

10    surveillance activities as described herein.

11         20.    Defendant J. Stephen Tidwell, at all times relevant to this action, was

12    an employee of the FBI. Defendant Tidwell served as the Assistant Director in

13    Charge of the FBI's Los Angeles Field Office from August 2005 to December

14    2007, in which capacity he supervised operations in the Central District of

15    California. Upon information and belief, Defendant Tidwell authorized the search

16    for an informant to go into mosques in Orange County to collect information on

17    Muslims, authorized the selection of Craig Monteilh as that informant, read

18    Monteilh's notes of his activities, and authorized and directed the actions of Agents

19    Armstrong and Allen in the handling of Monteilh at all times relevant in this

20    action.

21         21.    Upon information and belief, Defendant Barbara Walls was, at all

22    times relevant to this action, employed by the FBI as Special Agent in Charge of

23    the Santa Ana branch office, a satellite office of the FBI's Los Angeles field office.

24    Upon information and belief, Defendant Walls was regularly apprised of the

25    information Agents Armstrong and Allen collected through Montilh; directed the

26    action of FBI agents on various instances based on that information; and actively

27    monitored, directed, and authorized the actions of Agents Armstrong and Allen at

28    all times relevant in this action, for the purpose of surveilling Plaintiffs and other

putative class members because they were Muslim.  Eventually, she ordered that Agents Armstrong and Allen cease using Monteilh as an informant because she no longer trusted him.

22.     Upon information and belief, Defendant Pat Rose was, at all times relevant to this action, employed by the FBI as a Special Agent and acted out of a Santa Ana branch office, a satellite office of the FBI's Los Angeles field office. Upon information and belief, Defendant Rose was apprised of the information Agents Armstrong and Allen collected through Monteilh, and authorized the actions of Agents Armstrong and Allen at all times relevant in this action, for the purpose of engaging in surveillance of the Plaintiffs and the putative class members because they were Muslim.  Agent Rose also sought additional authorization to expand the scope of the surveillance program described herein, in an effort to create a Muslim gym that the FBI would use to gather yet more information about the class.

23.     Defendant Does 1-20 are agents of the Federal Bureau of Investigation and United States Department of Justice, whose identities are not yet known to Plaintiffs, who authorized, directed, and actively monitored the actions alleged herein in order to engage in surveillance of the Plaintiffs and putative class members because they were Muslim.

## FACTUAL ALLEGATIONS

### FBI Focus On Islam Since 2001

24.     Since September 11, 2001, the FBI has focused much of its counterterrorism efforts on broad investigations in the Muslim communities of the United States.  In the weeks and months following 9/11, the United States detained hundreds of "suspects" across the country, the vast majority of whom were Muslim.  Over the next few years, the FBI engaged in a program to conduct interviews of thousands of individuals who had immigrated to the U.S. from countries in which intelligence allegedly indicated al-Qaeda operated, a burden that

fell overwhelmingly on Muslims.[3]

25.     In January 2003, the FBI ordered its field supervisors to count the number of mosques and Muslims in their jurisdictions to aid in counterterrorism investigations.[4]

26.     Starting in 2002 and continuing through 2005, the FBI engaged in a program of monitoring radiation levels across the country, including at more than one hundred "Muslim sites," though officials indicated that religion was not the "only criterion."  According to one official, Muslim sites were picked because, in the past, terrorists or people close to them had tended to live in Muslim areas or attend local mosques.[5]

27.     In a 2006 briefing to reporters, the FBI official second-in-command over the National Security Branch displayed a map of the San Francisco area showing where Iranian immigrants were clustered — and where, he said, an F.B.I. squad was "hunting."[6]

**Evolution of FBI Policies on Use of Religion in Investigation**

28.     The FBI has been accused of targeting people based on their First Amendment activity before.  During the 1960s and 1970s, domestic intelligence-

---

[3] *Homeland Security: Justice Department's Project to Interview Aliens after September 11, 2001*, U.S. Gen. Accounting Office, G.A.O. No. GAO-03-459 (April 2003) *available at* http://www.gao.gov/new.items/d03459.pdf.
[4] Eric Lichtblau, *F.B.I. Tells Offices to Count Local Muslims and Mosques*, N.Y. TIMES (Jan. 28, 2003), available at http://www.nytimes.com/2003/01/28/politics/28MOSQ.html.
[5] Kevin Bohn and Jeanne Meserve, *Officials: Muslim sites subject to secret monitoring for radiation*, C.N.N. (Dec. 24, 2005), *available at* http://articles.cnn.com/2005-12-23/us/nuke.monitoring_1_radiation-levels-radioactive-material-fbi-program; Mary Beth Sheridan, *Mosques Among Sites Monitored for Radiation*, WASH. POST (Dec. 29, 2005).
[6] Scott Shane and Lowell Bergman, *F.B.I. Struggling to Reinvent Itself to Fight Terror*, N.Y. TIMES (Oct. 9, 2006), *available at* http://www.nytimes.com/2006/10/10/us/10fbi.html.

gathering activities by the FBI came under increasing scrutiny, culminating in the "Church Committee," a Senate Select Committee that investigated the FBI's COINTELPRO operation.

29.     In 1976, the Church Committee wrote that "The Government has often undertaken the secret surveillance of citizens on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts on behalf of a hostile foreign power. The Government, operating primarily through secret Informants . . . has swept in vast amounts of information about the personal lives, views, and associations of American citizens. Investigations of groups deemed potentially dangerous – and even of groups suspected of associating with potentially dangerous organizations – have continued for decades, despite the fact that those groups did not engage in unlawful activity. Groups and individuals have been harassed and disrupted because of their political views and their lifestyles. Investigations have been based upon vague standards whose breadth made excessive collection inevitable."[7]

30.     After uncovering rampant abuses in the FBI's domestic intelligence programs, the Church Committee recommended a series of reforms that were ultimately adopted, including new laws to restrict domestic surveillance for national security purposes under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, and guidelines issued by Attorney General Edward Levi (known as "Attorney General's Guidelines") to regulate domestic intelligence-gathering by the FBI.

31.     The Levi Guidelines restricted the FBI's domestic intelligence

---

[7] *Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities*, "Book II: Intelligence Activities and the Rights of Americans," at 5, U.S. Senate, 94th Cong., 2nd Sess. (Apr. 26, 1976), *available at http://www.aarclibrary.org/publib/church/reports/book2/html/ChurchB2_0009a.htm*.

collection authorities to investigations of potential violations of federal law, and limited the use of specific investigative techniques, including informants.  The Guidelines allowed the FBI to conduct full domestic security investigations only on the basis of "specific and articulable facts giving reason to believe that an individual or group is or may be engaged in activities which involve the use of force or violence and which involve or will involve the violation of federal law..."[8] More limited Preliminary Investigations could be authorized for 90 days based on receipt "allegations or other information  that an individual or group is or may be engaged in activities which involve the use of force or violence and which involve or will involve the violation of federal law," but only to determine whether there is a sufficient factual basis for opening a full investigation.[9]

32.    In 2002, Attorney General John Ashcroft revised the Guidelines for General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations, respectively, significantly reducing or eliminating the requirement of a factual basis to believe federal crimes would be committed before the FBI could initiate investigations.[10]  Significant changes to the General Crimes guidelines included expanding the duration and type of investigative techniques that could be utilized in preliminary investigations; and creating new authorities for the FBI to proactively conduct internet and commercial database searches and attend public places and events for the purpose of detecting or preventing terrorist activities, all

---

[8] FBI Statutory Charter: Hearings Before the Senate Committee on the Judiciary, 95th Cong. pt. 1, p. 22 (1978).
[9] Id., at 21.
[10] Attorney General's Guidelines for General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations, (May 2002), available at: http://www.fas.org/irp/agency/doj/fbi/generalcrimes2.pdf and, Attorney General's Guidelines for National Security Investigations and Foreign Intelligence Collection, (Oct. 2003), available at: http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

without any factual basis or allegation indicating a possible violation of federal

law.  Attorney General Ashcroft said terrorism prevention was the key objective of

these new Guidelines, arguing that "Our philosophy today is not to wait and sift

through the rubble following a terrorist attack. Rather, the FBI must intervene early

and investigate aggressively where information exists suggesting the possibility of

terrorism, so as to prevent acts of terrorism. The new guidelines advance this

strategy of prevention by strengthening investigative authority at the early stage of

preliminary inquiries. Also, even absent specific investigative predicates, FBI

agents under the new guidelines are empowered to scour public sources for

information on future terrorist threats."[11]

33.     In June 2003 the Department of Justice issued "Guidance on the Use

of Race by Federal Law Enforcement Agencies," purporting to ban the use of

racial or ethnic profiling.[12]  This Guidance explicitly failed to include religion as an

attribute that could not be used by federal law enforcement officials in making law

enforcement decisions.  In addition, the Guidance contained broad exemptions for

the use of racial profiling in national security and border integrity investigations.[13]

34.     In October 2003 Attorney General Ashcroft revised the Guidelines

for FBI National Security Investigations and Foreign Intelligence Collection, to

authorize the "proactive collection of information concerning threats to the

national security, including information on individuals, groups and organizations

of possible investigative interest, and information on possible targets of

---

[11] Remarks of Attorney General John Ashcroft, Attorney General Guidelines
May 30, 2002, at:
http://www.justice.gov/archive/ag/speeches/2002/53002agpreparedremarks.htm
[12] Department of Justice Civil Rights Division, "Guidance Regarding the Use of
Race by Federal Law Enforcement Authorities, (June 2003), available at:
http://www.scribd.com/doc/22092319/DOJ-Guidance-Regarding-the-Use-of-Race-by-Federal-Law-Enforcement-Agencies-June-2003
[13] Id.

international terrorist activities or other national security threats."[14]  These Guidelines authorized the FBI to conduct "threat assessments" without opening preliminary or full investigations – in other words without the required factual basis to justify such investigations.[15]

35.   The combined effect of these Guidelines and Guidance was to authorize the FBI to engage in intrusive investigations of First Amendment protected activity, and specifically religious practices, without any factual basis to believe any criminal violations or threat to the national security existed.

36.   In 2008, Attorney General Mukasey revised the guidelines further, explicitly eliminating the need for any factual predicate before FBI agents are allowed to conduct a new category of investigation called "assessments."  The 2008 revisions allow FBI agents to use an array of intrusive investigative techniques during assessments, including physical surveillance, recruiting and tasking informants, and pre-textual interviews by FBI agents acting in ruse.  In response, the FBI revised its internal policy, publishing the FBI's *Domestic Intelligence and Operations Guides* ("DIOG")  in December 2008.[16]  The DIOG only requires an "authorized purpose" to conduct an assessment, which is defined broadly as "a national security, criminal or foreign intelligence collection purpose."[17]  Requiring only an authorized purpose rather than a factual predicate means that the authority to conduct investigations in this category is based on the subjective intent of the agent, rather than any factual information regarding the

---

[14] Attorney General Guidelines for FBI National Security Investigations and Foreign Intelligence Collection, (Oct. 2003), available at: http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

[15] Id., at 3.

[16] Federal Bureau of Investigation Domestic Investigations and Operations Guide, (Dec. 2008), available at: http://www.muslimadvocates.org/DIOGs_pt1.pdf

[17] DIOG p. 21.

potential subjects of the assessment establishing suspicion of wrongdoing. Moreover, the DIOG authorizes FBI headquarters and field offices to conduct "Domain Management" assessments to "identify locations of concentrated ethnic communities in the Field Office's domain" and to collect, analyze and map racial and ethnic "behaviors," "cultural traditions," and "life style characteristics" in local communities.   FBI Director Robert Mueller issued a broad mandate for FBI offices to "know your domain," which meant "understanding every inch of a given community—its geography, its populations, its economy, and its vulnerabilities."[18] Domain Management assessments appear to be mandated as a matter of course, and require no specific threat or criminal predicate to justify the collection of information regarding the makeup of American communities.

37.    Upon information and belief, Defendants operated under the principles set forth in the revised Mukasey Guidelines and DIOGs even before the Attorney General formally issued them.  For instance, a 2010 report by the Department of Justice Inspector General revealed that from 2002 to 2006 the FBI engaged in a number of investigations of domestic advocacy groups based on "factually weak" or "speculative" predication.[19]  The Inspector General (IG) determined many of the investigations were opened based upon the FBI agents' mere speculation that the individuals or groups might commit some federal crime in the future.  The IG determined that most of these investigations did not violate the 2002 Attorney General's Guidelines in effect at the time because all that was required to initiate a preliminary inquiry was "information indicating the

---

[18] Robert Mueller, Speech to the International Association of Chiefs of Police, San Diego, CA California, Nov. 10, 2008, at: http://www.fbi.gov/news/speeches/using-intelligence-to-protect-our-communities
[19] Department of Justice Inspector General Review of FBI's Investigations of Certain Advocacy Groups (Sept 2010): http://www.justice.gov/oig/special/s1009r.pdf

possibility of a federal crime," which illustrated "the broad scope of the FBI's authority under the Attorney General's Guidelines to open preliminary inquiries based on extremely limited information, including information about the First Amendment expressions of subjects."[20]  Moreover, the IG noted that while the FBI's collection and retention of First Amendment material in these cases often violated the 2002 Guidelines, it would not have violated the revised 2008 Guidelines: "Therefore, some of the violations of policy we found in this review would not be violations if they occurred today."[21]  Additionally, a 2006 New York Times report indicated that FBI Associate Executive Assistant Director Phil Mudd was "pitching" a vague domestic intelligence program called "Domain Management," which vaguely implied "ethnic targeting."[22]

## FBI Investigation of Muslims in Orange County, California

38.     Approximately 500,000 Muslims live in Southern California, more than 120,000 of them in Orange County, making the area home to the second-largest population of Muslims in the United States.

39.     The FBI has surveilled Muslims in Southern California and Orange County for at least several years.

40.     In about late 2001 or 2002, the FBI approached at least one Muslim leader asking who the Muslim leaders in the Southern California area are and for a list of mosques.

41.     In May 2006, Pat Rose, a supervisor of the FBI's Orange County counterterrorism operations, spoke to the Pacific Club in Irvine about the FBI's counterterrorism efforts.  There, she stated that "[t]here are a lot of individuals of

---

[20] IG report p. 87.
[21] IG report p. 189.
[22] Scott Shane and Lowell Bergman, "FBI Struggling to Reinvent Itself to Fight Terror," NY Times, (Oct. 10, 2006), at:
http://www.nytimes.com/2006/10/10/us/10fbi.html?pagewanted=1&_r=1

1  interest right here in Orange County."[23]  She described recent efforts the FBI had

2  taken in the region: planting bugs and closed-circuit TV cameras, examining

3  computer use and email, and establishing units on both foreigners and domestic

4  suspects.  She indicated that the FBI frequently received calls from people who

5  wanted to tell them about situations like a Muslim neighbor who is changing his

6  license plates or someone who has an apartment with only a mattress and five

7  computers, stating, "I can't tell you how many" tips like that paid off.   When asked

8  whether citizens should be worried about activist Muslim students at University of

9  California at Irvine, Rose characterized that as a "tough question," but indicated

10  the FBI was aware of large numbers of Muslim students at UCI and the University

11  of Southern California.  "We live in Irvine.  I can't tell you how many subjects'

12  names come up, and they live right down the street from me," she stated.  "I think

13  we need to be concerned with everybody, including our next-door neighbor."

14  42.    In 2006 and 2007, authorities arrested reserve officers who worked at

15  the Strategic Technical Operations Center, an intelligence unit at Camp Pendleton,

16  for stealing classified intelligence documents and providing them to local law

17  enforcement.  According to reports, the theft ring had operated since 2001, and the

18  documents seized from the participants included more than 100 FBI and Defense

19  Department files, including documents establishing the existence of programs to

20  surveil Muslim communities and mosques in Southern California.[24]

21  43.    Documents obtained by the ACLU of Southern California via the

22

23  _____

[23] Frank Mickadeit, *Feds warn O.C. of terror lurking 'down the street'*, THE
ORANGE COUNTY REGISTER (May 25, 2005), *available at*
http://www.ocregister.com/news/fbi-194882-county-orange.html (last visited Feb.
10, 2011).

[24] Rick Rogers, *Records detail security failure in base file theft*, SAN DIEGO UNION-
TRIBUNE (May 22, 2008),  *available at* http://www.signonsandiego.com/
uniontrib/20080522/news_1n22theft.html.

Freedom of Information Act show that the FBI has collected information about the membership of the Shura Council (an association of mosques in the Southern California area), as well as information about activities or events organized at or by mosques or Muslim organizations — including individuals handing out flyers for fundraising, events on political issues such as the war in Iraq or immigration reform, and a wide variety of fundraising efforts.

44.   The FBI has sought and continues to seek interviews of hundreds of people in the Southern California Muslim community, often by sending FBI agents to appear unannounced at the homes or workplaces of people to request an interview. During these interviews, FBI agents have often questioned interviewees about religious practices that have no discernible relationship to criminal activity, such as what mosque interviewees attend, how many times a day they pray, who the imam of their mosque is, or what they think of particular religious scholars.

**Monteilh's Role in the FBI's Investigation of Muslims**

45.   In the face of substantial evidence of the FBI's particular focus on investigating Muslims, in June 2006, Los Angeles FBI Assistant Director Stephen Tidwell attended a forum for the Muslim community at ICOI, where he assured an audience of about two hundred people that the FBI would enter mosques only openly to outreach to the community and would not send covert informants into mosques for the purpose of monitoring the Muslim community.[25]

46.   At some time prior to July 2006, the FBI hired Craig Monteilh to

---

[25] At some point during the spring of 2007, Agents Armstrong and Allen told Monteilh that the Assistant Director in Charge of the FBI's Los Angeles Field Office had told the Muslim community that there would be no undercover informants placed in mosques at a meeting held only about a month or so before Monteilh had publicly "converted," on their instructions, at the ICOI mosque. They told him that at the time Tidwell made this statement, they had already been looking for someone to send into the mosques, and that Tidwell had approved recruitment of an informant.

1   become a paid informant for them to covertly gather information about Muslims in

2   the Irvine area.

3        47.   In about July 2006, Monteilh requested a meeting with the imam of

4   the Islamic Center of Irvine ("ICOI").  Monteilh told the imam that he was of

5   French and Syrian descent, and that he wanted to embrace his roots by formally

6   converting to Islam.  The following Friday, Monteilh attended the *jummah* prayer

7   (the Friday afternoon prayer that is the most important service of the week), where

8   he went before the congregation of hundreds and made a public declaration of his

9   Muslim faith.  This declaration, known as *shahadah*, is one of the five pillars of

10   Islam.  After this, Monteilh began going to ICOI on a daily basis, often attending

11   multiple prayers a day.  About a week later, he began using the Muslim name

12   Farouk al-Aziz.

13        48.   After taking *shahadah*, Monteilh attended prayers at ICOI on a daily

14   basis.  He attended prayers at mosque multiple times per day, and was often

15   waiting for the mosque to open before dawn prayers at about 5 a.m.  He also

16   attended classes and special events.  He primarily attended ICOI, but also went

17   with some regularity to about five of the other largest mosques in Orange County.

18        49.   Congregants at ICOI generally welcomed Monteilh.  People

19   introduced themselves, spoke with him about his conversion and their faith, and

20   offered to help him learn about Islam and Muslims in America.  Various

21   congregants offered help by buying him books on Islam, talked with him about the

22   tenets of the religion, and showed him the movements of prayers.  Congregants

23   invited him to have meals or tea outside of the mosque to help welcome him to the

24   mosque's community and discuss questions he might have.

25        50.   After several months, Monteilh began wearing traditional Muslim

26   robes and skull caps both at mosque and in public, in place of his "western"

27   clothes.

28        51.   After Monteilh had attended ICOI for some time, Muslim community

- 16 -

1  leaders began to hear concerns voiced by the congregants about Monteilh's

2  behavior.  Monteilh engaged people in conversations in which he aggressively

3  probed their views on religion and American foreign policy.  Soon leaders began

4  hearing that he was asking people's opinions on *jihad* and its meaning in Islam,

5  and that he was resisting their claims that Islam did not condone terrorism.

6        52.      Among the many people Monteilh met during his time as an FBI

7  informant were Plaintiffs Fazaga, Malik, and AbdelRahim.

**Plaintiff Sheikh Yassir Fazaga**

9        53.      Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen

10 born in Eritrea, who has lived here since he was a teenager.  He attended high

11 school in Orange County.  Sheikh Fazaga has an undergraduate degree in Islamic

12 Studies from the Institute of Islamic and Arabic Sciences in Virginia and a masters

13 degree in marriage and family counseling from the California State University of

14 Long Beach, and has taken coursework toward a masters degree in Christian

15 Theology at Loyola Marymount University.  From about 1998 to the present,

16 Sheikh Fazaga has served as an imam of the Orange County Islamic Foundation

17 (OCIF), a mosque in Mission Viejo, California.  His duties there have included

18 directing the religious affairs of the mosque, leading prayer, and conducting

19 educational, spiritual, and recreational activities for the entire mosque community

20 and its youth.

21       54.      Sheikh Fazaga earned a national reputation for his contemporary

22 American teaching of Islam.  He has spoken at numerous conferences, colleges,

23 and other fora both in the United States and abroad on the topics of Islam and the

24 American Muslim.  In 2007, he traveled to Romania at the invitation and expense

25 of the U.S. State Department to speak on terrorism, radicalism and extremism.

26 He has also been interviewed for print, television and radio media, including for

27 NBC's Today show on spirituality in America and for a New York Times article

28 on American imams in which he was featured.  *See* Neil MacFarquhar, *A*

1   *Growing Demand for the Rare American Imam*, N.Y. Times (June 1, 2007).

2       55.    Over the years, Sheikh Fazaga's mosque conducted a number of

3   events in conjunction with various other mosques in the area, including the Islamic

4   Center of Irvine.  Sheikh Fazaga was, and still is, concerned about the erosion of

5   civil rights for people in the Muslim community, and he often took actions to

6   advocate on behalf of that issue.

7       56.    On one occasion in early 2006 he attended one such event, which

8   Defendant Stephen Tidwell, Assistant Director in Charge of the Los Angeles FBI

9   Field Office, also attended.  At the event, Fazaga asked questions to Tidwell

10   concerning the FBI's use of informants in mosques.

11       57.    Shortly afterward, Sheikh Fazaga came into contact with Craig

12   Monteilh, because Monteilh came to attend prayers and other events at his mosque,

13   OCIF, starting in approximately 2006.

14       58.    Some time after Monteilh began attending his mosque, Sheikh Fazaga

15   hosted a famous Islamic speaker named Yusuf Estes at his mosque.  Estes is a

16   former National Muslim Chaplain for the United States Bureau of Prisons, and was

17   a Delegate to the United Nations World Peace Conference for Religious Leaders

18   several years before being invited to speak at the OCIF.

19       59.    A number of Sheikh Fazaga's congregants, including Monteilh,

20   attended the lecture.

21       60.    Several months after Monteilh first began attending events at OCIF,

22   another member of the OCIF community formally introduced Fazaga to Monteilh.

23       61.    After Monteilh's role as an FBI informant became publicly known in

24   February 2009, a number of Sheikh Fazaga's congregants expressed their dismay

25   to him, because Monteilh had spent a considerable amount of time at the OCIF.

26       62.    Sheikh Fazaga had to spend considerable time counseling his

27   congregants who were afraid that they were being targeted for FBI surveillance

28   because of their faith.  He often conducted this counseling away from the mosque

1    and in person, rather than over the telephone, because of his congregants' fear of

2    surveillance.

3         63.    Sheikh Fazaga also observed the trust within and cohesion of his

4    congregation, and of other Muslim communities in Southern California, to be

5    significantly damaged, and that this damage directly undermined the Islamic

6    practice of *jama'ah*, or worship in a congregation.  In part because of this, he

7    devoted two whole sermons to addressing the fears of the congregation about

8    surveillance, rather than addressing religious subjects.

9    **Plaintiff Ali Uddin Malik**

10        64.    Plaintiff Malik grew up in Orange County, California.   When Malik

11   was growing up, his family were strong supporters of the Republican Party.  Malik

12   started a young Republicans club at his high school.  During high school, Malik

13   aspired to work for the U.S. State Department or elsewhere in government.

14        65.    Plaintiff Malik attended the University of California, Irvine ("UCI")

15   from about 2007 to 2009.  While at Irvine, Malik co-founded the Olive Tree

16   Initiative, a peace-building program through which a culturally and religiously

17   diverse group of UCI students take joint factfinding trips to Israel and Palestine to

18   better understand the Israel-Palestine conflict and report on their findings to the

19   UCI community.  Malik and the other founders were recognized for their work

20   with the University of California President's Award for Outstanding Student

21   Leadership, UCI Chancellor's Living Our Values Award, and recognition by the

22   Orange County Human Relations Commission and the U.S. State Department.

23        66.    When Malik was about twenty years old, he developed an interest in

24   religion.  His family had always attended mosque, but he started attending more

25   regularly and trying to study Islam with more seriousness.  In about summer 2006,

26   he attended a six-week summer course on Islam at Dar al-Mustafa, a seminary in

27   Yemen.  Malik also began wearing traditional robes and head covering when he

28   went to the mosque to pray.  He also grew a full, long beard in a traditional

fashion.  Malik found that wearing his clothes and beard in this way helped serve as a reminder of his faith.

67.    Plaintiff Malik attended ICOI and was present when Monteilh took *shahadah* in about July 2006.  Plaintiff Malik, along with many other congregants, approached Monteilh after he took *shahadah,* offering his well-wishes and assistance.

68.    In about August 2006, the imam at ICOI asked Plaintiff Malik to teach Monteilh how to pray and to guide him through the basics of Islam.

69.    At the imam's request, Plaintiff Malik approached Monteilh.  Malik talked with Monteilh about the basics of Islam, including the basic tenets, how to pray, and the development of faith.  Monteilh asked for Malik's cell phone number and email address, which Malik provided.  He tried to offer Monteilh support and welcome him in the community, and talked about inviting him over to his family's house for dinner.

70.    To help Monteilh learn about Islam, Plaintiff Malik gave him a very basic book on the religion.  The book is commonly used to teach Sunday school classes to children, and Malik knew that his father had taught Sunday school and had used the same book.

71.    Monteilh talked frequently with Malik at the mosque.  He also suggested that they talk at a nearby gym, which they did in part because Monteilh worked out there.  Shortly after their meeting, Monteilh began asking Malik things that made Malik uncomfortable.  At one point Monteilh asked Plaintiff Malik what would happen if someone went up to the imam at ICOI and told him they wanted to blow themselves up.  Plaintiff Malik replied that the imam would think this person was crazy.  Monteilh persisted, and asked Plaintiff Malik if there were other imams in the area that would respond to someone who wanted to blow themselves up.  Plaintiff Malik told Monteilh that there are no such imams or mosques in Southern California as far as he knew.

- 20 -

72.     On another occasion, Monteilh asked Malik about *jihad*, citing specific pages in the children's book Malik had given him that mentioned jihad. When Malik answered that *jihad* meant a "struggle," and that the concept referred to the spiritual struggle to purify oneself, Monteilh pressed him about whether it meant physical violence, and resisted Malik's answer that it did not.

73.     These conversations deeply concerned Malik and made him very uncomfortable around Monteilh.  Malik thought that Monteilh had strange ideas about Islam from movies or media, and urged him to go talk to the imam so that the imam could guide him.

74.     When Monteilh persisted in talking with Malik about his violent ideas, Malik began trying to avoid Monteilh.  He would avoid answering or returning Monteilh's calls, although Monteilh called repeatedly.  Malik also began trying to go to the gym at times Monteilh did not attend.

75.     Malik also noticed that Monteilh spoke with many others at the mosque.  For example, Malik occasionally saw Monteilh praying near meetings of a youth group Malik attended in the mosque's prayer hall.  Malik noticed on several occasions that when Monteilh would pray near the group, he would leave his belongings in the prayer hall while he went elsewhere.

76.     Finally, Malik stopped attending the mosque altogether because Monteilh was there so often.  Malik also stopped attending the mosque in Tustin because he heard that Monteilh had also been seen at that mosque.  Malik resumed attending ICOI only after Monteilh began approaching other people and speaking to him less often.  Even since returning to the mosque, Malik attends less often than he had before he had contact with Monteilh.

In about spring 2007, Monteilh asked Malik about studying Islam abroad. Malik suggested that Monteilh look into the seminary where Malik had studied, Dar al-Mustafa, which Malik had enjoyed very much.

**Plaintiff Yasser AbdelRahim**

78.    Plaintiff AbdelRahim was another victim of Monteilh's dragnet surveillance of Muslims in Irvine. AbdelRahim started attending ICOI in about 2005. Shortly afterwards, he rented a room in a large house where a friend he met through the mosque lived. Over the next few months, two other mutual friends from ICOI, and AbdelRahim's brother, moved into the house as other roommates left. All five of the housemates were, like AbdelRahim, of Egyptian origin.

79.    In about July 2006, one of AbdelRahim's roommates told him about a guy who had taken *shahadah* at the mosque. The following Saturday, they saw Monteilh and introduced themselves, offering to help him learn about Islam if he had any questions. Monteilh said that he appreciated it and took their phone numbers.

80.    Shortly afterward, Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates. They talked, went out to get coffee, and soon AbdelRahim invited Monteilh to their house for *iftar* (a meal eaten during Ramadan). Monteilh began to spend time with them at their house watching TV or playing X-box. AbdelRahim and his roommates also tried to help Monteilh feel welcome by introducing him to other people in the Muslim community.

81.    Initially, Monteilh talked with AbdelRahim and his roommates about a variety of innocuous topics — not only about Islam, but about politics, world affairs, movies, and sports. At some point, however, Monteilh began asking questions about *jihad,* again with a focus on violence. AbdelRahim found this odd, and responded that Monteilh should not concern himself with that, but instead should concentrate on developing his faith, and should talk to the imam at ICOI if he had questions about the meaning of *jihad*. However, Monteilh persisted in raising the subject. AbdelRahim eventually became worried that Monteilh had asked him several times about *jihad*, particularly when he heard from several of his friends at the mosque that Monteilh had made similar inquiries

with them.  AbdelRahim also noticed that Monteilh guided conversations to political subjects like the wars in Iraq and Afghanistan, and would say inflammatory things that seemed aimed at eliciting agreement or angry responses from others.

82.    Shortly afterward, a friend of AbdelRahim reported to him that Monteilh had asked the friend to coffee to discuss a personal issue, but then started asking particularly pointed questions about *jihad*.  Upon hearing this, AbdelRahim confronted Monteilh.  AbdelRahim told Monteilh that if someone was teaching him this view of *jihad*, then he needed to find another teacher.

83.    After this conversation, AbdelRahim stopped speaking with Monteilh or returning his calls.  Over the next several months, AbdelRahim noticed that Monteilh was spending time with different people at the mosque, and AbdelRahim warned a few of them about his concerns regarding Monteilh.

**The FBI's "Dragnet" Approach**

84.    The interactions between Monteilh and Plaintiffs Fazaga, Malik, and AbdelRahim were part of a broader pattern of dragnet surveillance that Monteilh engaged in at the behest of his FBI handlers.  Two FBI Special Agents instructed Monteilh to gather information on Muslims in general, and instructed him to adopt strategies of information-gathering and surveillance that ensured that he would obtain that information in an indiscriminate manner, such that Plaintiffs and numerous other people were surveilled solely due to their religion.  They also provided Monteilh with the tools needed to conduct this indiscriminate surveillance, including sophisticated audio and video recording devices.  Again, their instructions ensured that the surveillance tools would target people solely due to their religion.

85.    Monteilh's handlers at the FBI were FBI Special Agent Kevin Armstrong and FBI Special Agent Paul Allen.  Agents Armstrong and Allen supervised all of Monteilh's work with the FBI.  The FBI paid Monteilh for the

duration of his work for Agents Armstrong and Allen, in amounts ranging from about $6,000 to over $11,000 per month.

86.   Agents Armstrong and Allen told Monteilh that the FBI used the name "Operation Flex" for the surveillance program that used him, and used that term repeatedly.  Agents Armstrong and Allen told him that the name referenced him, since he operated under the cover of a fitness consultant.  But they also told Monteilh that Operation Flex was a broader surveillance program that went beyond just his work.

87.   The central feature of the FBI agents' instructions to Monteilh was their directive that he gather information on Muslims, without any further specification.  Agents Armstrong and Allen did not limit Monteilh to specific targets on which they wanted information.  On the contrary, they repeatedly made clear that they were interested simply in Muslims.  To the extent they differentiated within that group, they held a heightened interest in Muslims who were particularly religious.

88.   When Agents Armstrong and Allen first sent Monteilh to meet the imam at ICOI and began infiltrating the Muslim community, they gave him no specific targets, but instead told him to gather as much information on as many people in the Muslim community as possible.  Agent Allen told Monteilh, "We want to get as many files on this community as possible."  Agents Armstrong and Allen told Monteilh that the United States was five to ten years behind Europe in the extent of Islamic presence, and that they needed to build files on as many individuals as possible so that when things started to happen, they would know where to go.  They said they were building files in areas with the biggest concentrations of Muslim Americans — New York; the Dearborn, Michigan area; and the Orange County/Los Angeles area.

89.   In addition to information about the membership of each mosque, Agents Armstrong and Allen instructed Monteilh to get the names of all board

1   members, imams, people who taught classes at the mosques, and other leadership

2   figures within the mosques.

3      90. Over the course of the investigation, Agents Armstrong and Allen sent

4   Monteilh to about ten mosques to conduct surveillance and audio recording in each

5   one.  Monteilh spent the most time at ICOI, which he attended daily, but spent

6   significant time at other mosques, including the Orange County Islamic Foundation

7   mosque in Mission Viejo, Durul Falah in Tustin, Omar al-Farouq mosque in

8   Anaheim, Islamic Society of Orange County in Garden Grove, Al-Fatiha in the

9   West Covina/Azusa area, the mosque in Lomita, and King Fahd mosque in Culver

10   City.  For about five or six months Monteilh went at least once a week to each of

11   these mosques, and would go to as many as four different mosques in a day to meet

12   with and talk to people, if not to pray.

13      91. Agents Armstrong and Allen initially told Monteilh he would make

14   his first contact with the community by attending services at a mosque in Anaheim,

15   but then instructed him to attend ICOI instead because it was closer to where he

16   lived, so he could spend more time there.

17      92. Agents Armstrong and Allen also informed Monteilh that the

18   surveillance program was itself spread indiscriminately across the area's mosques.

19   Electronic surveillance equipment was installed in at least eight area mosques

20   including ICOI, and mosques in Tustin, Mission Viejo, Culver City, Lomita, West

21   Covina, and Upland.  They told him at one point that they could get in a lot of

22   trouble if people found out what surveillance they had in the mosques, which

23   Monteilh understood to mean that they did not have warrants.  Nonetheless, Agent

24   Armstrong told Monteilh that the FBI had every mosque in the area under

25   surveillance — including both the ones he went to and the ones he didn't.

26      93. Apart from the electronic surveillance program, Agents Armstrong

27   and Allen also directed their surveillance at people on the basis of their religion by

28   instructing Monteilh to look for and identify to them people with certain religious

- 25 -

backgrounds or traits, such as anyone who studied *fiqh* (a strand of Islamic law concerning morals and etiquette), who was an imam or sheikh; who went on *Hajj*; who played a leadership role at a mosque or in the Muslim community; who expressed sympathies to *mujahideen*; who was a "white" Muslim; or who went to an Islamic school overseas.

94.     Even with respect to these categories of Muslims, Monteilh's handlers did not tell him to limit the information he collected to those people. Agents Armstrong and Allen would occasionally instruct Monteilh to spend more time with or find out more about particular people he identified, but these were always people Monteilh had identified to them during the course of the operation, not people who had been targeted from the outset.

95.     Agents Armstrong and Allen also instructed Monteilh to focus on Muslim youth by keeping an eye out for people who tended to attract young Muslims. They instructed him to identify and gather information on such people. For example, Monteilh told them about a popular youth group on Tuesdays at ICOI run by the imam. Students from the Muslim Student Union at the University of California, Irvine ("UCI") would attend. On many occasions, Monteilh recorded the youth group meetings at ICOI by leaving his possessions, including the recording key fob, near where the group met in the prayer hall so that all of their discussions could be recorded. Monteilh did this by going into the prayer hall during their meetings to pray, and then leaving behind his possessions as if he had forgotten them or just chosen to leave them there while he did other things. Monteilh would go to another part of the mosque or the courtyard, and return sometime later to collect his things. Monteilh told his handlers he did this in his written reports. His handlers never instructed him to stop this practice, and instead repeatedly discussed with him the contents of the recordings obtained in this manner.

**The FBI's Surveillance Strategies**

- 26 -

96.    The FBI agents instructed Monteilh to engage in a number of surveillance strategies, all of which served to gather information on Muslims in an indiscriminate manner.

97.    After Monteilh agreed to work as a confidential informant and underwent some training under the supervision Agents Armstrong and Allen, Agents Armstrong and Allen instructed him to make the appointment to see the imam at the ICOI.  Once Monteilh had taken *shahadah* and began attending both ICOI and other mosques, Agents Armstrong and Allen instructed him to gather information on the Muslims at the mosques.

98.    Agents Armstrong and Allen instructed Monteilh to obtain information through various methods.  They told him to take every opportunity to meet people, get their contact information, meet them privately to get to know them, find out their background, find out their religious and political views, and get any information about them that he could to pass on to the FBI.

99.    As a result, over the time he spent at ICOI and other mosques Monteilh did not focus on any particular group of people, such as those who may have engaged in criminal activity or even those from a particular country, but instead socialized widely with different groups and individuals.  ICOI is a multi-lingual, multi-ethnic mosque, with separate social groups that form around common language or country of origin.  Monteilh surveilled people from every social group regardless of their ethnic origin or dominant language.

100.    Pursuant to his handlers' instructions, Monteilh went out of his way to engage all of these different groups, even when he had no natural connection to them.  For example, he attended religion classes given in Arabic even when he did not speak Arabic, and questioned 17 and 18 year olds about religious doctrine and politics, when a stranger in his forties might be expected to ask such questions of adults, not youth.  Similarly, Monteilh spent significant time with a group of Egyptians, a group of Pakistanis and Indians, a group from Syria and Lebanon, and

1    with the younger, second-generation social groups (generally identified as

2    "Muslim Students Union," or MSU, in reference to on-campus Muslim

3    organizations). Within each group, he spoke to large numbers of people so as to

4    probe their views on religion, politics and violence, and then report them back to

5    his handlers at the FBI.

6        101.   Within these groups, Monteilh tended to focus more heavily on people

7    who were more religious; people who came to the mosque only to attend Friday

8    prayers were less likely to be recipients of his attention.

9        102.   Agents Armstrong and Allen also gave Monteilh a standing order to

10   gather information on Muslims' charitable giving. They instructed him to collect

11   any pamphlet or brochure at any mosque that concerned charitable donations, to

12   inquire of Muslims about which charities and Islamic schools to give to, and to

13   then pass on the names of the charities and Islamic schools to them.

14       103.   Monteilh's handlers also instructed him to attend Muslim fundraising

15   events, to interact with the community and gather information, to identify people

16   who attended and who they came with, and, if there were any speakers, to record

17   what those speakers said.

18       104.   Agents Armstrong and Allen also asked Monteilh to collect

19   information on the travel plans of Muslims in the community. They told him that

20   they shared this information with the Department of Homeland Security so as to be

21   able to monitor or search people during their travels.

22       105.   Monteilh's handlers also instructed him to attend lectures by Muslim

23   scholars and other guest speakers. Because Monteilh's handlers wanted to know

24   both what the lecturers said and who attended these lectures, they equipped

25   Monteilh with a video surveillance device that had a camera in a shirt button, so

26   that he could both record lectures and film attendees socializing. Monteilh also

27   collected license plate numbers from the parking lots to identify those who

28   attended.

106.   In keeping with his handlers' orders, Monteilh also attended classes at the mosque so as to obtain more information on Muslim community members. For example, he attended an Arabic language class at ICOI from about December 2006 to March 2007. On his handlers' instructions, he obtained and provided them with the lists of the individuals who attended the class. Monteilh also attended a course in *fiqh*, and obtained and provided the class list to his handlers, as per their instructions.

107.   Agents Armstrong and Allen also instructed Monteilh to attend *fajr* (dawn) prayers, which are held about 4 a.m., or *ishaa* (late) prayers, which are held about 9:30 p.m. Agents Armstrong and Allen told him that people who attended prayers very early in the morning or late at night, and especially both, were very devout and therefore more suspicious. They instructed him to obtain the names and the license plate numbers of individuals who attended these prayers. Agents Armstrong and Allen increased his pay when he agreed to go to *fajr* prayer four days a week.

108.   Agents Armstrong and Allen also instructed Monteilh to memorize certain *ayas* and *surahs* (verses and chapters from the Quran) and to ask Muslims about them. They said they had picked these verses because they believed them to be susceptible to a "jihadist" interpretation, so that people's reactions to them would help discern who was and was not a threat. They told Monteilh that discussions about these verses would elicit responses that could be used to justify additional surveillance measures.

109.   Agents Armstrong and Allen also expressed interest in any Muslims who followed websites that the agents believed were "jihadist," including *MissionIslam.com* and *CagePrisoners.com* (a site devoted to raising awareness about the detainees at Guantanamo Bay). Agent Allen told Monteilh to encourage people he spoke with to go to these websites because they could document people's visits to the website and use that either to pressure them to become

- 29 -

1    informants or to justify further surveillance on them.

2        110.   Agents Armstrong and Allen also encouraged Monteilh to bring up in

3    conversation certain Muslim scholars and thinkers whom they believed were

4    extremist, so as to elicit people's views on them.  The scholars they instructed him

5    to discuss included a number of Islamic scholars who, at the time, were both

6    widely popular and moderate, such as Sheikh Suhaib Webb and Yusef Estes.

7        111.   Monteilh also used his cover as a fitness consultant to gather

8    information on the Muslims with whom he interacted.  During his time working on

9    Operation Flex, Monteilh told people in the Muslim community that he worked as

10   a fitness consultant.  In about November 2006, Agent Allen instructed Monteilh to

11   start going to the gym to work out with people he met from the Muslim

12   community, in order to get close to them and obtain information about them.

13   Again, Monteilh's handlers did not limit the scope of their instructions; the

14   directive included anyone from any mosque without any specific target, for the

15   purpose of collecting as much information as possible about Muslims in the

16   community.  Pursuant to these instructions, Monteilh worked out with Muslims in

17   various gyms around the Orange County area and elicited a wide variety of

18   information, including travel plans, political and religious views.

19       112.   The goal of these conversations was to obtain compromising

20   information that his handlers could use to pressure the Muslims with whom

21   Monteilh interacted into providing information or becoming informants.  Monteilh

22   recorded these conversations using the equipment on his key fob or cell phone.

23   This surveillance was so fruitful that Monteilh's handlers eventually told him they

24   were seeking approval to have him open a Muslim gym.

25       113.   Agents Armstrong and Allen talked repeatedly with Monteilh about

26   obtaining new informants within the Muslim community, primarily by getting

27   information on potential informants that could be used against them if they refused

28   to inform — such as immigration issues, sexual activity, business problems, or

- 30 -

crimes like drug use.  Agents Armstrong and Allen instructed Monteilh to pay attention to people's problems, to talk about and record them, including marital problems, business problems, and petty criminal issues.  Agents Armstrong and Allen on several occasions talked about different individuals that they believed might be susceptible to rumors about their sexual orientation, so that they could be persuaded to become informants through the threat of such rumors being started.

114.  Agents Armstrong and Allen also often spoke with Monteilh about a maxim that "everybody knows somebody."  They explained that if someone is from Afghanistan, that meant that they would likely have some distant member of their family or acquaintance who has some connection with the Taliban.  If they are from Lebanon, it might be Hezbollah; if they are from Palestine, it might be Hamas.  By finding out what connections they might have to these terrorist groups, no matter how distant, they could threaten the individuals and pressure them to provide information, or could justify additional surveillance.

115.  Agents Armstrong and Allen also instructed Monteilh to engage in acts that would build his reputation as a devout Muslim who had access to black market items.  On one occasion, Agents Armstrong and Allen instructed Monteilh to provide Vicodin to a person whose father was sick in a foreign country.  On another occasion, Agent Allen instructed Monteilh to provide prescription anabolic steroids to another two individuals to similarly further his credibility, which he did.

116.  During their regular meetings with Monteilh, Agents Armstrong and Allen also showed him photographs of Muslims from the community, taken from many of the methods identified above (e.g. at the gym, at fajr prayer, etc.), asked him to identify the people in those photographs, and then directed him to provide as much information as possible about each person, including what mosque they attended, their ethnicity or country of origin, the languages they spoke, the people they associated with, what kind of car they drove, their occupation or whether they were a student, as well as any other information Monteilh could obtain.

117.   One theme ran throughout all of these different surveillance gathering strategies.  Agents Armstrong and Allen expressed interest in gathering information only on Muslims, and they set aside any non-Muslims who were identified through surveillance Monteilh performed.  For example, on several occasions when Agents Armstrong and Allen asked Monteilh to identify individuals from photographs taken by surveillance cameras at the entrances to gyms, they presented him with photographs of individuals who were not Muslim — usually Latino — who Monteilh had spoken to or who had simply helped him lift weights.  Each time Monteilh indicated to Armstrong and Allen that the individual identified was not a Muslim, they discarded the picture.

118.   Indeed, both Agent Armstrong and Agent Allen, as well as other agents, explicitly told Monteilh that Islam was a threat to America's national security.

**The FBI's Surveillance Tools**

119.   Agents Armstrong and Allen recorded information about virtually all of the people with whom Monteilh interacted in several different ways – through audio recording, video recording, extensive review of Monteilh's handwritten notes about all aspects of his daily interactions, and a dragnet program to obtain cellphone numbers, email addresses, and information about internet usage.

120.   Upon information and belief, virtually all of Monteilh's interactions with Muslims in the mosques were recorded by audio, video, or both.  The recordings were then transcribed and reviewed by officials within the FBI.  Agent Allen told Monteilh that there was a team transcribing all of his recorded conversations.

121.   Agents Armstrong and Allen instructed Monteilh that because of his criminal background, all information he collected would have to be recorded.  After about September 2006, Armstrong and Allen gave Monteilh a cell phone and two key fobs (which resembled the remote controls for car locks) with audio

1    recording devices in them, and which Monteilh used to record all day, every

2    moment he worked undercover, regardless of whom he was meeting or what was

3    discussed.

4        122.   People at ICOI noticed that Monteilh would often forget his keys, so

5    that they would be delivered to the imam's office.  People joked about Monteilh

6    frequently forgetting his keys, and for having his keys out during lectures and

7    conversations, even if he had to get them out after he sat down.

8        123.   In fact, Monteilh utilized the trick of leaving his keys around the

9    mosque to allow audio recording of conversations to take place even when he was

10   not present.

11       124.   On several occasions, Monteilh also left the recording devices in

12   locations in mosques in the area.  For example, in a large mosque in Culver City,

13   Monteilh several times attended with a friend who changed in the office from

14   business clothes to more traditional dress before they went into the mosque to pray.

15   Monteilh left his keys in the office so that the key fob would record staff and board

16   members who came in and talked, then retrieved his keys from the office when

17   they were finished in the mosque.  Monteilh did this several times, and in several

18   different mosques.  Agents Armstrong and Allen received the notes where

19   Monteilh said he did this but never instructed him to stop.

20       125.   Monteilh's recording activity was not limited to audio.  Beginning in

21   about February 2007, on numerous occasions Agents Armstrong and Allen

22   outfitted Monteilh with video surveillance equipment that recorded through a

23   camera hidden in a button in the front of his shirt, while recording audio as well.

24   Toward the end of his assignment, Agents Armstrong and Allen had equipped

25   Monteilh to use this video surveillance as often as several days per week.

26       126.   Agents Armstrong and Allen instructed Monteilh to use the video

27   camera for various specific purposes, including to capture the internal layout of

28   mosques, to film basketball or soccer games to see who associated with whom, to

- 33 -

1   film guest lectures at mosques to see what was said and who attended, and to

2   record the interiors of people's houses.  Monteilh's handlers at various times

3   instructed him to open particular doors in homes or mosques and film the room

4   behind.

5       127.   Agents Armstrong and Allen also used Monteilh's activities to gather

6   telephone and cell phone numbers, email addresses, and other electronic

7   information for indiscriminate surveillance.

8       128.   Agents Armstrong and Allen told Monteilh they wanted him to collect

9   contact information, particularly email addresses and phone numbers.  At times,

10  they even gave Monteilh quotas to collect contact information for ten new Muslims

11  per day.  Agents Armstrong and Allen told Monteilh that they monitored his email

12  and cell phones to obtain the telephone numbers and email addresses of people

13  with whom he corresponded.  Agent Allen instructed him to give out his cell phone

14  number widely so that people would call him or give their cell numbers in return,

15  so that the FBI could then collect those numbers.  Armstrong and Allen also

16  instructed him to email frequently with people, so that the FBI could collect their

17  email addresses.  Agents Armstrong and Allen told Monteilh that they used the cell

18  phone numbers and email addresses of individuals who contacted him to obtain

19  information from those individuals' phone and email accounts, including the list of

20  people they contacted.

21      129.   Agents Armstrong and Allen told Monteilh that they kept the numbers

22  and emails he collected in a database that could be monitored for international

23  calls, or cross-referenced against phone calls or emails to persons of interest who

24  were believed to be linked to terrorism.  Monteilh's handlers also told him that the

25  emails could be used to determine if the person was visiting certain websites, and

26  with whom they were emailing.  Monteilh joined email distribution lists for many

27  of the mosques he surveilled, and would forward messages from the mosques to

28  the FBI so they would be informed about events and bulletins, and so they would

1   have the email addresses of anybody else who received the message.

2       130.   Agents Armstrong and Allen also instructed Monteilh to gather all

3   available information, including literature, on events occurring at the mosques.

4   Following these instructions, Monteilh would collect brochures on charities that

5   were distributed in the mosques, visit the mosques' libraries or book areas, collect

6   newsletters and bulletins to see what activities were going on in the mosque, and

7   collect the names of individuals who attended, as well as their cell phone numbers

8   and license plates when possible.  He would record this information either

9   electronically or through a system of notes.

10      131.   Agents Armstrong and Allen instructed Monteilh to compose daily

11  notes of his activities and the surveillance he had undertaken.  These notes were

12  extensive — Agents Armstrong and Allen instructed Monteilh to "empty [his]

13  head" about what he had learned that day — so that Monteilh regularly spent an

14  hour or two each evening writing notes.  After a while, these notes became so

15  voluminous that Armstrong and Allen instructed Monteilh to prepare separate

16  "supplemental notes" containing any sensitive or particularly valuable information.

17  These were all handwritten.  Armstrong and Allen took these notes from Monteilh

18  when they met him twice a week.

19      132.   At times, Monteilh reported to Agents Armstrong and Allen that when

20  he was left alone in a mosque office, he had looked in drawers for information.

21  Armstrong and Allen never instructed him not to do this.

22      133.   Agents Armstrong and Allen were well aware that many of the

23  surveillance tools that they had given Monteilh were being used illegally.  Agent

24  Armstrong once told Monteilh that while warrants were needed to conduct most

25  surveillance for criminal investigations, "National security is different.  Kevin is

26  God."  Agent Armstrong also told Monteilh more than once that they did not

27  always need warrants, and that even if they could not use the information in court

28  because they did not have a warrant, it was still useful to have the information.  He

1  said that they could attribute the information to a confidential source if they needed

2  to.

3      134.   Over the course of the fourteen months that Agents Armstrong and

4  Allen supervised Monteilh's work as an informant in the Los Angeles and Orange

5  County Muslim communities, they gathered hundreds of phone numbers and

6  thousands of email addresses of Muslims.  They also obtained background

7  information on hundreds of individuals, gathered hundreds of hours of video

8  recordings that captured the interiors of mosques, homes, businesses, and the

9  associations of hundreds of Muslims.  They also obtained thousands of hours of

10  audio recording of conversations — both where Monteilh was and was not present

11  — as well as recordings of public discussion groups, classes, and lectures

12  occurring in mosques and at other Muslim religious and cultural events.

**The FBI's Oversight, Supervision, and Use of Monteilh**

14      135.   FBI Agents Armstrong and Allen, as well as their superiors Director

15  Tidwell, and Agents Walls and Rose, maintained extremely close oversight and

16  supervision of Monteilh.  Moreover, because they made extensive use of the results

17  of his surveillance, they knew about the methods of surveillance he used in great

18  detail and authorized them.

19      136.   From about August 2006 to October 2007, Agents Armstrong and

20  Allen met with Monteilh about twice per week for meetings to discuss their

21  assignments for him, to give him instructions, to obtain his daily notes, and to

22  either exchange his recording devices for fresh ones or upload the recordings to a

23  computer.  These meetings were held in public places, outside the areas where the

24  Muslim community lived.  About once per month, they met with Monteilh in a

25  room at the Anaheim Hilton Hotel, where they discussed the information he had

26  obtained and gave him instructions in greater detail.

27      137.   Agents Armstrong and Allen monitored and supervised Monteilh's

28  work as an undercover informant closely.  Through the daily notes they collected

from him and the twice-weekly meetings, Monteilh told them about virtually everything he did and all the information he had obtained.  They gave Monteilh instructions, or "tasking orders," regularly.  They gave him both standing instructions on kinds of information to gather whenever possible — for example, to meet and get contact information for a certain number of Muslims per day — and also gave him specific instructions on information they wanted, often in response to information he provided – such as, for example, instructions to get inside a certain house within the week or to have lunch with a particular person two times. Agents Armstrong and Allen also gave Monteilh standing orders to call one of them every day, even on his days off, which Monteilh would do, apprising them on the call of his day's activities.

138.   Agents Armstrong and Allen at various times discussed with Monteilh what happened to these notes.  They said that their supervisors read the notes, that the notes were seen in "the Beltway," that they were seen by people with "a lot of authority," and that the Assistant Director in Charge of the FBI's Los Angeles field office, who at that time was Stephen Tidwell, read all of Monteilh's daily notes.

139.   During the course of the investigation, Agents Armstrong and Allen discussed with Monteilh how the information he collected was actually being used. They assured him that all the information he collected was retained, and that they discarded none of it.  They also told him that the information was used to build files on individuals: that every person he contacted — whose phone number he got, who he emailed, who he identified through photographs — had an individual file in which the information he gathered was retained.

140.   On about four different occasions, during the meetings between Agents Armstrong and Allen and Monteilh at the hotel room, they showed him a huge photo array on a large board consisting of the photos of around two hundred Muslims from the Orange County/Los Angeles area.  Agents Armstrong and Allen used different sets of photographs for each of these meetings, so that Monteilh saw

hundreds of photographs over the four meetings. They instructed him to arrange the photos from the most dangerous to the least based on his knowledge and experience. The entire leadership of the Islamic community were in the photos — sheikhs, imams, board members, prayer leaders, leaders of civic organizations, and youth groups. The process took hours. Agents Armstrong and Allen also asked Monteilh to assist them in organizing the photos according to categories such as financial, operative, and leadership; to divide photos into possible cells according to mosques and ethnicity or nationality. The first of these meetings was in about March 2007, and the last was in about September 2007.

141.   Over the course of several conversations, Agents Armstrong and Allen told Monteilh that they considered the leaders in the Muslim community — board members and leadership at mosques and leaders of Muslim organizations — to be potential threats, and that they regularly surveilled them and maintained more detailed files of information on their background and activities.

142.   In about early spring of 2007, Agents Armstrong and Allen told Monteilh that information he had provided was particularly valuable, and told him he was "gold" in Los Angeles and in Washington. Agent Allen said that information from the operation was followed by people "at the highest levels," and that the operation was among the ten most important intelligence investigations going on in the country. In about March or April 2007, Agent Allen said that he had meetings with Stephen Tidwell and one of his supervisors from Washington, D.C., Joseph Billy, Jr., about the operation. Around the same time period, Agent Allen flew to Washington, D.C. with his supervisor, Pat Rose, in part to meet with high-level FBI officials to get approval to open a gym for Muslims that would function in part as a mosque with a prayer room. Agent Allen told Monteilh that approval to open the gym had been granted.

143.   At around that time, Agents Armstrong and Allen told Monteilh that information from the operation would be shared with other agencies — that

- 38 -

information obtained on people's finances or foreign assets was shared with the Treasury Department, and that information about people's immigration issues would be sent to immigration officials.

**The End of the Monteilh Operation**

144.   Agents Allen and Armstrong had instructed Monteilh to ask general questions about *jihad* from the beginning of the operation.  In early 2007, they instructed him to start asking more pointedly about *jihad* and armed conflict, then to more openly suggest his own willingness to engage in violence.  Pursuant to these instructions, in one-on-one conversations, Monteilh began asking people about violent *jihad*, expressing frustration over the oppression of Muslims around the world, pressing them for their views, and implying that he might be willing or able to take action.

145.   In about May 2007, on instructions from his handlers, Monteilh told a number of individuals that he believed it was his duty as a Muslim to take violent actions, and that he had access to weapons.  Many members of the Muslim community at ICOI then reported these statements to community leaders, including Hussam Ayloush.  Ayloush both called the FBI to report the statements and instructed the individuals who had heard the statements to report them to the Irvine Police Department, which they did.

146.   As a community, ICOI also brought an action for a restraining order against Monteilh to bar him from the mosque.  A California Superior Court granted the restraining order in June 2007.

147.   After the court granted the restraining order, Monteilh continued going to other mosques for a month or two, but then disappeared from the Muslim community.

148.   At around the same time – during the summer of 2007 -- Agents Armstrong and Allen told Monteilh that Defendant Barbara Walls, then the Assistant Special Agent in Charge of the FBI's Santa Ana office, had come to

distrust him and did not want him working any more.  They told him there was
significant conflict between Agent Walls and field agents over how to handle the
operation, and that there had been an audit team sent from Washington, D.C., to
examine Agent Walls' handling of one of the leads from the operation.  Because of
this conflict and complications surrounding the restraining order, Agents
Armstrong and Allen told Monteilh in about September 2007 that he would be
going on hiatus from undercover work in the Orange County Muslim community.

149.   During one of their final meetings with Monteilh in about October
2007, Agent Allen told Monteilh that although his role was over, Operation Flex
and the FBI's operations in Orange County and Los Angeles would continue.  He
said that the information Monteilh had provided was a valuable foundation for the
FBI's continuing work.

150.   During one of the final meetings between Agents Armstrong and
Allen and Monteilh, Agent Walls was also present.  She warned Monteilh to stay
silent about the operation.

151.   In August 2008, Monteilh returned to Irvine and contacted the Irvine
Police Department to voice concerns about his safety because of his role as an
informant.  He spoke with a detective, as well as a sergeant that he recognized as
someone who had once escorted him when he was undercover with his handlers.
The sergeant knew very specific information about individuals Monteilh had
surveilled who he had concerns about, and told Monteilh in this meeting that he
worked for JTTF.  He told Monteilh that several individuals he had asked him
about were still under surveillance.  He also specifically mentioned that
surveillance was ongoing at gyms and at least two mosques.

**Monteilh's Identity Revealed**

152.   On or about about February 20, 2009, a man named Ahmed Niazi was
arrested in Orange County and charged in federal criminal court with immigration
fraud for lying on his naturalization application.

- 40 -

153.   Niazi had met Monteilh at ICOI and had spent a significant amount of time with him.  Niazi had heard Monteilh's most direct statements about *jihad* and had reported those statements to Hussam Ayloush and to the Irvine Police Department.

154.   At Niazi's bail hearing, which occurred on February 24, 2009 in federal district court in Santa Ana, California, FBI Special Agent Thomas Ropel testified that Niazi presented a threat to national security.  Agent Ropel testified that he had heard numerous recordings of conversations between Niazi and a confidential informant.  Agent Ropel stated that this confidential informant was the man Hussam Ayloush had reported to the FBI, and that Niazi and another individual had reported to the Irvine Police Department.  Together, these statements confirmed that the informant was Craig Monteilh, and that he had recorded numerous conversations that he had while an informant.

155.   Charges against Niazi were dismissed at the request of the United States Attorney's office on about September 30, 2010.

156.   Agent Ropel's testimony on February 24, 2009 confirmed for the first time that Monteilh was a confidential informant for the FBI who had recorded numerous conversations.

157.   Prior to that testimony, Plaintiffs did not know and could not reasonably have known that Monteilh was working for the FBI as an informant; that the FBI and Defendants, through Monteilh, had surveilled and gathered information about them from their interactions with Monteilh; and that the FBI had subjected them to this surveillance because of their religion.  Upon information and belief, prior to February 2009, Monteilh never told anyone outside of law enforcement and his immediate family that he was working as an informant for the FBI.

158.   Subsequent to Ropel's testimony, a number of different sources have confirmed that Monteilh worked for the FBI, including Monteilh himself.

159.   In news accounts of the investigation, Monteilh himself has stated to reporters that the FBI paid him more than $170,000 over fifteen months to be an undercover informant in mosques in Orange County, that "he was instructed to infiltrate mosques throughout Orange [County] and two neighboring counties in Southern California," that he was "ordered to randomly surveil and spy on Muslims to ferret out potential terrorists," and that his handlers told him that "Islam is a threat to our national security."[26]

160.   Upon information and belief, on August 20, 2007, the district attorney in a state criminal case against Monteilh from 2003 moved to terminate his probation early.  In the proceeding, the district attorney explained the basis for the termination:

> Apparently, [Monteilh] is working with F.B.I. Agent Kevin Armstrong. He has given Agent Armstrong very, very valuable information that has proven to be essential in an F.B.I. prosecution. It was Agent Armstrong that contacted the head deputy and the head deputy instructed us to ask for termination.[27]

A copy of the transcript is attached hereto as Attachment 1.

161.   Further confirmation comes from court documents filed in a civil action that Monteilh brought against the FBI and the City of Irvine.  In some of those documents, the City of Irvine acknowledged that while a pending criminal investigation of Monteilh was underway, members of the FBI's Orange County Joint Terrorism Task Force approached members of the Irvine police force and

---

[26] *See* Jerry Markon, *Tension grows between Calif. Muslims, FBI after informant infiltrates mosque*, WASH. POST (Dec. 5, 2010).
[27] Transcript of Proceedings held Aug. 20, 2007, Probation Termination, *People v. Monteilh*, L.A. Sup. Ct. No. KA059040, filed in support of Motion to Set Aside Conviction, Exh. I, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-9, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

1     asked them to delay any action against Monteilh.[28]

2     162.   In discovery served by Monteilh in that same federal lawsuit, the City

3 of Irvine admitted that it and its agents "were aware that [Monteilh] was an FBI

4 informant," and that the City of Irvine "[was] informed by the FBI that [Monteilh]

5 was an FBI informant."[29]

6     163.   Correspondence in connection with that lawsuit provides yet more

7 evidence of Monteilh's work as an FBI informant.  Upon information and belief,

8 on June 16, 2010, Associate General Counsel for the FBI, Henry R. Felix, sent a

9 letter to Adam Krolikowsi, an attorney representing Monteilh in his civil action

10 against the FBI, in reply to a letter Krolikowski had sent the previous day.  Felix's

11 June 16 letter indicated that Monteilh had signed a non-disclosure agreement with

12 the FBI on October 5, 2007.   Felix noted that Krolikowsi had sent previous letters,

13 but stated that his most recent letter mentioned "Operation Flex" and that this was

14 "the first letter in which [Krolikowski] reference[d] a particular FBI operation or

15 investigation."  A copy of this letter is attached hereto as Attachment 2.[30]

16     164.   Monteilh himself confirms many of the above-described details of his

17 work as an informant, including that he worked for the FBI to infiltrate the Muslim

18 community of Southern California from about July 2006 until October 2007; that,

19 during this time, he spent about six or seven days a week posing as a Muslim

20 convert named Farouk al-Aziz; that he conducted surveillance and other

21 information-gathering on a wide variety of individuals and organizations in the

---

[28] *See* Answer to Complaint of City of Irvine and Ronald Carr, *Monteilh v. Federal Bureau of Investigation*, Dkt. 23, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).
[29] *See* Motion to Set Aside Conviction, Exh. G, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-7, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.) (exceprts of City of Irvine's responses to requests for admissions).
[30] A copy of the letter was filed by Monteilh in his damages action against the FBI. *See* Motion to Set Aside Conviction, Exh. D, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-4, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

Muslim community, solely because they were Muslim; and that he conducted surveillance of Plaintiffs as alleged below.

### Monteilh's Interactions with Sheikh Yassir Fazaga

165.   Agents Armstrong and Allen instructed Monteilh to conduct surveillance of the Orange County Islamic Foundation (OCIF) mosque in Mission Viejo, California.  The imam of that mosque is Plaintiff Yassir Fazaga.

166.   Agents Armstrong and Allen told Monteilh they believed that Plaintiff Fazaga, the imam of OCIF, was a radical, for several reasons:  They said that Fazaga directed students on how to conduct demonstrations and encouraged them to speak out.  They said that when the FBI Assistant Director in Charge of the Los Angeles Field Office, Stephen Tidwell, attended a meeting at an Orange County mosque in about spring 2006, Fazaga openly pressed Tidwell about FBI informants in mosques, and when Tidwell denied putting informants in mosques, Fazaga had openly said he did not believe Tidwell.  They also said that Fazaga was a person of interest because he was a board member of "In Focus News," a prominent Muslim newspaper that was vocal in speaking out against U.S. government actions that negatively affected Muslims and which Agents Armstrong and Allen believed was anti-American and linked to Muslim civil rights groups.

167.   Agents Armstrong and Allen told Monteilh that OCIF was linked to another mosque they were interested in, the Islamic Center of Irvine, because the two mosques held joint events and jointly organized foreign trips, including the hajj pilgrimage to Mecca.  They referred to OCIF as a "definite hotspot."

168.   Agents Armstrong and Allen also told Monteilh that OCIF was radical because it had certain religious scholars as guest speakers whom they believed were radical —particularly Yusef Estes, Suhaib Webb, and a local imam, Ahmad Sakr.  They said that a moderate mosque would not have chosen these guest speakers.

169.   Agents Armstrong and Allen instructed Monteilh to attend the Yusef

1   Estes lecture which Sheikh Fazaga's mosque hosted.  They equipped him with

2   hidden video equipment that he used to video record the entire lecture, the

3   literature Estes had set out, and the people who attended.

4      170.   Pursuant to Agent Armstrong and Allen's instructions, Monteilh

5   attended OCIF a number of times to conduct surveillance, including during Sheikh

6   Fazaga's sermons.

7      171.   Agent Armstrong and Allen also equipped Monteilh with a video

8   camera hidden in a shirt button that he used to take video of the interior of OCIF.

9   Agents Armstrong and Allen instructed Monteilh to get a sense of the schematics

10   of the place — entrances, exits, rooms, bathrooms, locked doors, storage rooms, as

11   well as security measures and whether any security guards were armed.  Agent

12   Armstrong later told Monteilh that they had used the information he gathered to

13   enter the mosque.

14      172.   On the instructions of Agents Armstrong and Allen, Monteilh made

15   video recordings of an area in the back of OCIF where there were religious books

16   available for congregants to use, so that they could determine if any of the

17   literature there was extremist.

18      173.   Agents Armstrong and Allen also instructed Monteilh to make

19   contacts within Sheikh Fazaga's the Mission Viejo congregation.  To comply,

20   Monteilh worked out on various different occasions with about 40 of their

21   congregants, usually in groups, obtaining the email address and cell phone number

22   of anyone he worked out with and passing that information on to his handlers.

23      174.   Agents Armstrong and Allen instructed Monteilh to gather additional

24   information on a few individuals within the congregation who seemed to have the

25   most direct access to Fazaga — to gather their email addresses, cell phone

26   numbers, and addresses, as well as basic background information such as their

27   occupation, whether they were married or had children, and what prayers they

28   attended.  Monteilh gathered this information and passed it on to Armstrong and

- 45 -

1    Allen.

2        175.   Agents Armstrong and Allen instructed Monteilh to monitor Fazaga at

3    the prayers he conducted:  to record and report on what he said, to talk with him

4    afterwards and see who else talked to him afterwards, and to note individuals who

5    appeared to be close to him.   Monteilh also monitored what was said by a member

6    of the congregation who substituted for Fazaga during one of the prayers.

7        176.   In about April 2007, a member of the community introduced Monteilh

8    to Fazaga while he was recording with a hidden video camera.  Monteilh also

9    obtained Fazaga's cell phone number and email address (not through Fazaga, but

10   through others) and passed those on to Agents Armstrong and Allen, who told him

11   they used the email addresses and telephone numbers gathered to monitor

12   communications and conduct further surveillance.

13       177.   Monteilh also gave Agents Armstrong and Allen the license plate

14   numbers of cars Fazaga traveled in and the people with whom Monteilh saw him

15   associate.

16       178.   Agents Armstrong and Allen instructed Monteilh that whenever he

17   saw Fazaga at another mosque or anywhere outside OCIF, he should call them and

18   let them know immediately.  Monteilh did this at least once when he saw Fazaga at

19   another mosque.

20       179.   On one occasion, during Friday afternoon prayer at OCIF, the mosque

21   had a booth set up to collect donations for a cause for some kind of relief for

22   Muslims abroad.  Pursuant to Agents Armstrong and Allen's orders to monitor

23   donations, Monteilh stood near the booth and used the hidden video camera to

24   make video recordings of people who went up to the booth to contribute money.

25       180.   After Monteilh's role as an FBI informant became publicly known in

26   February 2009, many members of the OCIF congregation were horrified to learn

27   that the man who spent so much time in their mosque was an informant.  This

28   revelation significantly undermined the trust within that community, which in turn

1    deterred members from worshipping as a congregation.

2        181.   Since he had contact with Monteilh, Fazaga has also been subjected to

3    secondary screening and searches upon return to the U.S. from various

4    international trips, being held between 45 minutes and three hours most times he

5    travels.

6        182.   Since discovering the FBI surveilled him and the mosque where he

7    serves as imam, Sheikh Fazaga believes that any of his communications in the

8    mosque and over telephones may be monitored, and indeed that he may be under

9    surveillance at any time.   As an intern therapist as well as an imam, Fazaga

10   provided counseling to congregants and Muslims at the mosque as part of his

11   service to the Muslim community.  Since learning of the FBI's surveillance, he no

12   longer counsels congregants at the mosque for fear that their conversations are

13   monitored and therefore the personal information shared is not confidential, which

14   has limited his capacity to provide such counseling.  The constant fear of being

15   under surveillance, the scrutiny during travel, the effect on the sense of community

16   at his mosque and others, and the additional difficult in providing counseling to

17   clients have all caused Sheikh Fazaga severe and ongoing anxiety and emotional

18   distress.

19   **Monteilh's Interaction with Plaintiff Ali Uddin Malik**

20       183.   In their early meetings with Monteilh, Agents Armstrong and Allen

21   showed Monteilh a picture of a young man who they identified as Plaintiff Ali

22   Malik.  They told him Malik had been a surfer kid in Newport Beach who wore

23   dyed hair, but had travelled to Yemen to attend a religious school, and had returned

24   to the U.S. wearing traditional Muslim dress and a full beard.

25       184.   Agents Armstrong and Allen told Monteilh that Malik's change in

26   behavior in embracing religion and traditional dress was highly suspicious and for

27   that reason they needed to investigate him.  They also told him they were

28   suspicious of Malik because he was involved with people from the "MSU."

("MSU" stands for "Muslim Student Union," which is the name of Muslim student groups at many colleges and universities, including U.C. Irvine.)  Agent Armstrong told Monteilh that before he was assigned to be his handler, he had been assigned to investigate the MSUs and young Muslims, including Ali Malik.

185.   Agents Armstrong and Allen told Monteilh that the way that Malik groomed his beard indicated that he was a radical.

186.   Agents Armstrong and Allen already had information on Malik and his family before they assigned Monteilh to do anything, but they told Monteilh to get more information on one of his brothers; on another individual who Malik was close to; on Malik's associations from the Irvine mosque, and on anyone with whom Malik hung out at the gym.

187.   Agents Armstrong and Allen said that they knew Malik had been to an Islamic religious school in Yemen, and that he had been blocked from entering Saudi Arabia after he had traveled to Yemen.  They tasked Monteilh with finding out what school he had been to and why he had been denied entry into Saudi Arabia.

188.   In about April 2007, Agents Armstrong and Allen began discussing the possibility of sending Monteilh abroad to study Islam and Arabic.  When Monteilh started asking about a school to go to, Malik told him that he had attended Dar al-Mustafa in Tarim, in Yemen.  Monteilh reported this information to Agents Armstrong and Allen.

189.   On several occasions, Monteilh used the key fob or cell phone recording devices provided by Agents Armstrong and Allen to record groups of young Muslims talking in the prayer hall, particularly after *ishaa* prayer.   On these occasions, Monteilh greeted people, left his things — including the recording device — near to where they were talking, then went to another part of the mosque or a different part of the prayer hall to pray so that the recording device would capture their conversation when he was gone.  Several times Ali Malik was one of

- 48 -

the people in the group Monteilh recorded.   Monteilh recorded these conversations when he was not present, then gave notes that detailed the people he saw there to Agents Armstrong and Allen, so they would be able to identify the voices.  Agents Armstrong and Allen received notes in which Monteilh said that he had recorded these conversations without being physically present, and never told him not to do this.

190.   Malik more than once told Monteilh that he heard Monteilh was going regularly to *fajr*, or early morning prayer.  Malik commended Monteilh on his commitment — he said that he had gotten into the routine of attending *fajr* prayers daily when he had been studying abroad, but that, regrettably, it was easy to fall into attending prayers only when it was convenient.  He stated that he wanted to get back to that kind of regimen.  Agents Armstrong and Allen told Monteilh this was significant information that indicated Malik was returning to extremist beliefs, which justified further surveillance.

191.   Agents Armstrong and Allen received significant information on Malik.  In addition to the surveillance described above, including recordings of all Monteilh's conversations with Malik, they several times showed Monteilh photos with people they said had seen with Malik and asked him to identify them.  The pictures sometimes had Malik in them.

192.   Since his contact with Monteilh, Malik has repeatedly been subjected to extended interviews with FBI and Customs upon re-entering the country, including one interview that lasted for several hours, resulted in him missing a connecting flight, and consequently missing a summer school class that made him lose credit for the class and required that he push his college graduation back by several months at considerable financial expense.

193.   Also as a result of the FBI's surveillance, Malik altered his religious practices. Because he understood he was targeted because of his outwardly religious appearance, adherence to Islamic ritual practice, and involvement with

- 49 -

the mosque and Muslim Student Union at UCI, Malik trimmed his beard, does not regularly wear a skull cap any longer, and stopped attending the mosque regularly for an extended period of time.  To this day, he attends mosque less frequently than he did before having contact with Monteilh because of his fear of being monitored at mosque and the effect that this fear has on his sense of the mosque as a place of peace and spiritual refuge.   This interference with his religious practice results from Defendants' actions and has caused Malik severe and ongoing anxiety and emotional distress.

194.   Malik also believes his reputation in the community to have been damaged. He believes that because of his association with Monteilh, people have also assumed that he is a government informant and act as if they are suspicious of him.  He believes that he does not have the full trust of the Muslim community. This belief that others suspect him because of Defendants' actions has caused Malik severe and ongoing anxiety and emotional distress.

195.   Since discovering the FBI surveilled him and the mosque he attended, Malik believes that any of his communications in the mosque and over telephones may be monitored, and indeed that he may be under surveillance at any time.  He curtails phone and email conversations with his friends and family because of his belief that they may be monitored.  He also suspects that any newcomer to a mosque may be an FBI informant, and has refused to be as welcoming to newcomers as he believes his religion requires.  This constant fear of being under surveillance because of Defendants' acts has caused Malik severe and ongoing anxiety and emotional distress.

**Monteilh's Interaction with Yasser AbdelRahim**

196.   A few weeks after Monteilh took *shahadah* at ICOI, a group of young men approached him at mosque, said they were impressed that he attended mosque so regularly and invited him to socialize with them at their house.  Agents Armstrong and Allen told Monteilh that the men's home was already under

- 50 -

surveillance because it was shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and one who handled logistics — and that for that reason they believed they might be a Muslim Brotherhood cell.

197.   A few days after this invitation, Monteilh told Agents Armstrong and Allen that one of the young men who lived at the house, Plaintiff Yasser Abdel AbdelRahim, was a person who seemed to attract and have influence with young Muslims.  Agents Armstrong and Allen told him they thought AbdelRahim was the leader of the cell, and that he should spend time at their house, and with AbdelRahim in particular, and gather as much information as he could.   Monteilh did so, and gave recordings of all the conversations he had with AbdelRahim and the other members of the house to Agents Armstrong and Allen, along with notes about his observations.

198.   Agents Armstrong and Allen told Monteilh to get into every room in AbdelRahim's house to see what was in there, and include that information in his reports.  Later, in about February or March of 2007, Armstrong and Allen equipped Monteilh with a video camera hidden in a shirt button and instructed him to conduct video surveillance of the layout and contents of the house, which he did.

199.   Shortly after first meeting Monteilh, AbdelRahim and one of his roommates bought Monteilh some books on Islam, and later asked he what thought of them.  Some time after that, AbdelRahim agreed to meet with Monteilh to teach him various prayers.  Agents Armstrong and Allen expressed excitement at this, and asked for the first sheet of paper on which AbdelRahim had written a prayer for Monteilh to learn, telling him when they gave it back a few days later that they had lifted AbdelRahim's fingerprints from it.

200.   When Monteilh reported that AbdelRahim always led prayer in the house, Agents Armstrong and Allen said that showed leadership, and confirmed that the surveillance should focus on him.

201.   Pursuant to standing instructions from Agents Armstrong and Allen, Monteilh gathered and provided them information about AbdelRahim's travel plans, particularly when AbdelRahim was going to or from Egypt to see his family or his fiancé's family. After one of these trips to Egypt, AbdelRahim complained that he had questioned for a long time when he re-entered the country – that he expected some delay but this had been way too long. Agents Armstrong and Allen told Monteilh they had been responsible for that questioning.

202.   During this time, AbdelRahim played pick-up soccer with other Muslim youth. Monteilh attended some of these games and took down the license plates of people who attended. On more than one occasion, he made a video recording with a hidden camera Agents Armstrong and Allen provided him, in order to document who was attending and socializing with one another.

203.   After Monteilh learned through conversations that AbdelRahim traveled to a particular city for his job, Agents Armstrong and Allen had a particular group of Muslims in that city surveilled and believed he went there to report or get instructions from this group. As Agents Armstrong and Allen had told Monteilh to report all travel plans, he reported AbdelRahim's travel plans on several occasions. Agents Armstrong and Allen told Monteilh that they had AbdelRahim surveilled when he traveled, based on Monteilh's information.

204.   Monteilh talked to AbdelRahim about his fiancée, who lived in Detroit, and her family, and transmitted what information he learned to Agents Armstrong and Allen — including her email address.

205.   On different occasions, Agents Armstrong and Allen told Monteilh that the FBI had electronic listening devices in AbdelRahim's house, as well as in AbdelRahim's car and phone. For example, one day, one of Monteilh's handlers called to tell him that a friend had driven up to AbdelRahim's house quickly in an agitated state, and asked Monteilh to go down there to find out what was going on. When Monteilh asked how he knew this, he indicated they had video outside the

house.  Another time, Agents Armstrong and Allen asked him about something that happened inside the house that he hadn't yet put in his notes, then told him that they knew because they had audio surveillance in the home.

206.   Agents Armstrong and Allen said that AbdelRahim was donating money to a charitable organization in Egypt and that these donations had been tracked by the Treasury Department.  They said that these donations were not unlawful, but that they could make them seem suspicious in order to threaten him and pressure him to provide information and become an informant.

207.   On many Tuesday nights, an imam from the Garden Grove mosque gave Arabic language teachings at ICOI.  AbdelRahim often attended.  On several occasions, Monteilh used recording devices provided by his handlers to record these teachings and the discussions afterward by going into the prayer hall to pray near the group, then leaving his things — including the recording device (disguised as a key fob or cell phone)  — near to where the group was talking, and then go to another part of the mosque or a different part of the prayer hall to pray.  The recording device would capture their conversation when Monteilh was not within earshot.  AbdelRahim was part of the group when Monteilh recorded on several occasions.

208.   On instructions from Agents Armstrong and Allen, Monteilh asked AbdelRahim questions about *jihad* and pressed him on his views about religious matters and certain religious scholars (particularly Egyptian ones) in order to get him to say something that might be incriminating or provide a way to pressure him to provide information to the FBI.  AbdelRahim told Monteilh that there was more to Islam than *jihad*: that *jihad* is a personal struggle, and that to the extent that there is such thing as a fighting *jihad*, the Quran places very strict rules that prohibit harming plants or trees, infants, elderly or women, and that terrorists who say they are engaged in *jihad* are committing murder.  When Monteilh brought up religious scholars Agents Armstrong and Allen had instructed him to mention, like

- 53 -

1    Hassan al-Banna and Sayid Qutb, AbdelRahim said that he did not agree with
2    them, but thought that the Egyptian government should not have executed them.

3    209.   When Monteilh was reported to the FBI by Muslim community
4    members, AbdelRahim was contacted by FBI agents and met with them to offer
5    information about Monteilh and his extremist rhetoric.  Upon information and
6    belief, one of these agents was Defendant Paul Allen.

7    210.   A few months later, AbdelRahim unexpectedly met the same FBI
8    agents, who were waiting for him outside the office of his chiropractor.  He was
9    surprised to see them there as he had scheduled an appointment with the
10   chiropractor just an hour or so prior.  They went to a coffee shop and showed him a
11   search warrant and told him that his storage unit was searched by the FBI.  Two
12   days later, they met again with AbdelRahim and asked him if he knew of any
13   person engaged in any suspicious activity at the mosque or elsewhere.  They asked
14   AbdelRahim if he minded contacting the agents if he came across any information
15   of anyone doing anything.  AbdelRahim understood that they were asking him to
16   be an informant, and he refused. The FBI agents asked not to mention the offer to
17   anyone.

18   211.   Since he had contact with Monteilh, AbdelRahim has also been
19   subjected to extensive secondary questioning and searches most of the times he has
20   returned to the U.S. from trips abroad.  These interrogations and the fear that he
21   will be subjected to them when he travels have caused AbdelRahim severe anxiety
22   and emotional distress.

23   212.   Since discovering the FBI surveilled him and the mosque he attended,
24   AbdelRahim believes that any of his communications in the mosque and over
25   telephones or email may be monitored, and indeed that he may be under
26   surveillance at any time.   He also suspects that any newcomer to a mosque may be
27   an FBI informant, and has refused to be as welcoming to newcomers as he believes
28   his religion requires.  This constant fear of being under surveillance because of

1    Defendants' acts has caused AbdelRahim severe and ongoing anxiety and
2    emotional distress.

3         213.   Since these incidents, AbdelRahim's confidence in the mosque as a
4    sanctuary has been ruined.  He significantly decreased his attendance to mosque
5    services for fear of surveillance, and as such his donations to mosque institutions
6    also decreased.  This interference with his religious practice has caused
7    AbdelRahim severe and ongoing anxiety and emotional distress.

8                              **CLASS ALLEGATIONS**

9         214.   Plaintiffs, as class representatives, bring claims for injunctive relief on
10   behalf of themselves and all similarly situated persons pursuant to Rule 23(a) and
11   (b)(2).

12        215.   Plaintiffs, as class representatives, bring this action on their own
13   behalf and on behalf of the following class:

14              All individuals targeted by Defendants for surveillance or
15              information-gathering through Monteilh and Operation Flex, on
16              account of their religion, and about whom the FBI thereby gathered
17              personally identifiable information.

18        216.   *Numerosity.* The size of the class makes a class action both necessary
19   and efficient.  Plaintiffs estimate that the class consist of hundreds if not
20   throusands of current and former residents of Southern California.  Members of the
21   class are ascertainable through a review of Defendants' files on Operation Flex, but
22   so numerous that joinder is impracticable.

23        217.   *Typicality.* The claims of the Plaintiffs are typical of the claims of the
24   class as a whole.  Each of the Plaintiffs was subjected to surveillance by
25   Defendants during the relevant period.  As a result of Defendants' practices,
26   Defendants have discriminated against each of Plaintiffs on the basis of their
27   religion and religious practices, in violation of law.  The unlawful policies and
28   practices that have operated to discriminate against the Plaintiffs are typical of the

unlawful practices that operated to discriminate against other class members so as to unlawfully target them for surveillance because of their religion and religious practices.

218. *Common Questions of Law and Fact.* This case poses common questions of law and fact affecting the rights of all members of the class, including, but not limited to:

    a.   Whether Defendants engaged in a program of conducting surveillance of mosques in Orange County, and the Plaintiffs and class members who attended those mosques;

    b.   Whether Defendants targeted Plaintiffs and class members for surveillance through Monteilh because they were Muslims or because of their practice of Islam;

    c.   Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam constitutes impermissible religious discrimination under the First Amendment;

    d.   Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam violates the guarantee of equal protection of the laws under the Fifth Amendment;

    e.   Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam places a substantial burden on the religious exercise of Plaintiffs and class members under the First Amendment;

    f.   Whether Defendant FBI maintains records on Plaintiffs and class members, arising out of the investigation at issue, describing how they exercise rights guaranteed by the First Amendment;

    g.   Whether the maintenance by Defendant FBI of records on Plaintiffs and class members describing how they exercise rights guaranteed by the First Amendment is pertinent to and within the scope of lawful, authorized law enforcement activity;

h.  Whether information gathered by Defendants pursuant to unlawful surveillance should be disgorged and purged from their files;

i.  Whether Defendants conspired for the purpose of depriving Plaintiffs and other class members of their rights for purposes of 42 U.S.C. § 1985;

j.  Whether and what kinds of declaratory and injunctive relief are appropriate.

219.  *Adequacy of Class Representation.*  Plaintiffs can adequately and fairly represent the interests of the class as defined above, because their individual interests are consistent with, and not antagonistic to, the interests of the class.

220.  *Adequacy of Counsel for the Class.*  Counsel for Plaintiffs possess the requisite resources and ability to prosecute this case as a class action and are experienced civil rights attorneys who have successfully litigated other cases involving similar issues.

221.  *Propriety of Class Action Mechanism.*  Class certification is appropriate because the prosecution of separate actions against Defendants by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and because Defendants have acted or refused to act on grounds that apply generally to the class.

## CLAIMS FOR RELIEF

### First Cause of Action

### Violation of the First Amendment Establishment Clause

### Claim under Bivens; 28 U.S.C. § 1331

### (Against All Defendants by all Plaintiffs.)

222.  Plaintiffs incorporate Paragraphs 1- 221 as if fully set forth herein.

223.  As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

religion of Islam. This scheme discriminates against Muslims, in violation of the Establishment Clause of the First Amendment to the United States Constitution.

## Second Cause of Action

## Violation of the First Amendment Establishment Clause

## Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343

## (Against All Defendants by all Plaintiffs.)

224.   Plaintiffs incorporate Paragraphs 1- 223 as if fully set forth herein.

225.   As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam. This scheme discriminates against Muslims, in violation of the Establishment Clause of the First Amendment to the United States Constitution.

226.   Through their scheme, Defendants conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam. Defendants performed these acts with discriminatory animus against Muslims.

## Third Cause of Action

## Violation of the First Amendment Free Exercise Clause

## Claim under Bivens; 28 U.S.C. § 1331

## (Against All Defendants by all Plaintiffs.)

227.   Plaintiffs incorporate Paragraphs 1-226 as if fully set forth herein.

228.   As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam. This scheme discriminates against Muslims, in violation of the Free Exercise of the First Amendment to the United States Constitution.

229.   As set forth above, Defendants' surveillance placed a substantial burden on Plaintiffs' religious exercise in their practice of Islam and is justified by no legitimate government interest.

**Fourth Cause of Action**

**Violation of the First Amendment Free Exercise Clause**

**Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

**(Against All Defendants by all Plaintiffs.)**

230.   Plaintiffs incorporate Paragraphs 1-229 as if fully set forth herein.

231.   As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Free Exercise of the First Amendment to the United States Constitution.

232.   As set forth above, Defendants' surveillance placed a substantial burden on Plaintiffs' religious exercise in their practice of Islam and is justified by no legitimate government interest.

233.   Defendants have conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam.  Defendants performed these acts with discriminatory animus against Muslims.

**Fifth Cause of Action**

**Violation of Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1**

**(Against All Defendants by all Plaintiffs.)**

234.   Plaintiffs incorporate Paragraphs 1-233 as if fully set forth herein.

235.   The actions of Defendants substantially burdened Plaintiffs' exercise of religion, and are neither in furtherance of a compelling governmental interest nor the least restrictive means of furthering any compelling governmental interest.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sixth Cause of Action**

**Violation of Fifth Amendment Equal Protection Clause**

**Claim under Bivens; 28 U.S.C. § 1331**

**(Against All Defendants by all Plaintiffs.)**

236.   Plaintiffs incorporate Paragraphs 1- 235 as if fully set forth herein.

237.   As set forth above, Defendants have engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

**Seventh Cause of Action**

**Violation of the Equal Protection Clause**

**Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

**(Against All Defendants by all Plaintiffs.)**

238.   Plaintiffs incorporate Paragraphs 1-237 as if fully set forth herein.

239.   As set forth above, Defendants have engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

240.   Defendants have conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam.  Defendants performed these acts with discriminatory animus against Muslims.

**Eighth Cause of Action**

**Violation of the Privacy Act, 5 U.S.C. § 552a(e)(7), (g)(1)(D)**

**(Against Defendant FBI by all Plaintiffs.)**

241.   Plaintiffs incorporate Paragraphs 1-240 as if fully set forth herein.

242.   Defendant FBI, through Monteilh, collected and maintained records

- 60 -

describing how Plaintiffs exercise their rights to free speech and free exercise of religion guaranteed by the First Amendment.  The maintenance of these records is neither pertinent to nor within the scope of any legitimate, authorized law enforcement activity.

243.   The collection and maintenance of these records, in violation of 5 U.S.C. § 552a, and has had an adverse effect on Plaintiffs.

## Ninth Cause of Action

## Violation of the Fourth Amendment

## Claim under Bivens; 28 U.S.C. § 1331.

## (Against All Defendants by all Plaintiffs.)

244.   Plaintiffs incorporate Paragraphs 1-243 as if fully set forth herein.

245.   Defendants' actions as set forth above constitute unreasonable searches in violation of the Fourth Amendment to the United States Constitution, including but not limited to Defendants' actions in  audio recording Plaintiffs' communications without a warrant and where no party to the communication consented to the recording; video recording in homes and other places where Plaintiffs had a reasonable expectation of privacy against video recording; and entering and planting electronic listening devices in mosques without a warrant.

## Tenth Cause of Action

## Violation of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1810

## (Against All Defendants by all Plaintiffs.)

246.   Plaintiffs incorporate Paragraphs 1- 245 as if fully set forth herein.

247.   Defendants, under color of law, acting through Monteilh, used electronic, mechanical, and/or other surveillance devices, without a warrant, to monitor Plaintiffs and their communications and/or activities, and to acquire information under circumstances in which Plaintiffs had a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

    a. Certify a Class under Rule 23(b)(2), as described above;

    b. Injunctive relief on behalf of Plaintiffs and all other putative class members ordering Defendants to destroy or return any information gathered through the unlawful surveillance program by Monteilh and/or Operation Flex described above, and any information derived from that unlawfully obtained information;

    c. Compensatory and punitive damages for violations of the laws of the United States and California, in an amount to be proven at trial;

    d. Liquidated damages in an amount to be proven at trial pursuant to 50 U.S.C. §§ 1810(a), 1828(a);

    e. Reasonable attorneys' fees and costs;

    f. Any other relief as this Court deems proper and just.

Dated: February 22, 2011      Respectfully Submitted,

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA

HADSELL STORMER KEENY RICHARDSON & RENICK LLP

By: _____

    Peter Bibring

    Attorneys for Plaintiffs

# ATTACHMENT
# 1

Case 8:11-cv-00301-CJC-VBK Document 89-5 Filed 02/02/15 Page 60 of 58 Page ID #:66
Case 8:10-cv-00102-J-RNB Document 89-5 Filed 02/15 Page 60 of 58 Page ID
#:1600



SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES - WEST COVINA BRANCH

DEPARTMENT 8                    HON. ABRAHAM KHAN, JUDGE


THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
              PLAINTIFF,                   )
                                          )
    VS.                                   )  NO. KA059040
                                          )  PROBATION TERMINATION
CRAIG F. MONTEILH,                        )
                                          )
              DEFENDANT.                   )
_____)


      WEST COVINA, CALIFORNIA; AUGUST 20, 2008

                  2:40 P.M.

      UPON THE ABOVE DATE, THE DEFENDANT NOT

BEING PRESENT IN COURT AND NOT REPRESENTED BY

COUNSEL; THE PEOPLE BEING REPRESENTED BY LINDA

CHILSTROM, DEPUTY DISTRICT ATTORNEY OF

LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS

WERE HELD:

    (DIANA WHITESEL, CSR #6287, OFFICIAL REPORTER.)


                        1                    CERTIFIED COPY

```
 1    CASE NUMBER:                    KA059040
 2    CASE NAME:                      PEOPLE OF THE STATE OF CALIFORNIA
 3                                    VS. CRAIG MONTEILH
 4    WEST COVINA, CALIFORNIA         AUGUST 20, 2007
 5    DEPARTMENT NO. 8                HON. ABRAHAM KHAN, JUDGE
 6    REPORTER:                       DIANA WHITESEL, CSR NO. 6287
 7    TIME:                           2:40 P.M.
 8    APPEARANCES:
 9                   (LINDA CHILSTROM, DEPUTY DISTRICT ATTORNEY
10                   OF LOS ANGELES COUNTY.)
11                             -oOo-
12
13          THE CLERK:  PEOPLE ARE GOING TO MOVE TO MAKE A MOTION TO
14    TERMINATE PROBATION.
15          THE COURT:  CRAIG F. MONTEILH.  KA059040.
16          MS. CHILSTROM:  YOUR HONOR, I HAVE BEEN INFORMED BY
17    MR. SATO OF MY OFFICE THAT HEAD DEPUTY SCOTT CARBAUGH HAS
18    REQUESTED THAT THIS CASE -- THAT THE PROBATION IN THIS MATTER BE
19    TERMINATED.
20          THE COURT:  CAN YOU GIVE ME A REASON?
21          MS. CHILSTROM:  I DON'T KNOW A REASON.  I WAS JUST TOLD IT
22    WAS UPON THE REQUEST OF THE HEAD DEPUTY.
23          THE COURT:  I'M GOING TO CONTINUE THIS UNTIL TOMORROW
24    UNTIL YOU CAN GIVE ME A REASON.  I USUALLY DON'T TERMINATE
25    PROBATION UNLESS THERE IS SOMETHING I CAN RELY ON.
26          MS. CHILSTROM:  NOT A PROBLEM.
27                I TAKE IT, WE'RE WAITING FOR MR. LINDARS.
28                MAY I MAKE A QUICK CALL?
```

1          (PAUSE IN PROCEEDINGS.)

2

3          MS. CHILSTROM:  YOUR HONOR, COULD THE COURT RECALL THE

4    LAST CASE?

5          THE COURT:  OKAY.  WE'RE STILL ON THE RECORD IN CRAIG F.

6    MONTEILH.

7          MS. CHILSTROM:  YOUR HONOR, I JUST SPOKE WITH MR. SATO.

8    INITIALLY I WAS JUST TOLD THAT THE HEAD DEPUTY WANTED THE

9    PROBATION TERMINATED.

10          APPARENTLY THE DEFENDANT IS WORKING WITH F.B.I. AGENT

11   KEVIN ARMSTRONG.  HE HAS GIVEN AGENT ARMSTRONG VERY, VERY

12   VALUABLE INFORMATION THAT HAS PROVEN TO BE ESSENTIAL IN AN F.B.I.

13   PROSECUTION.  IT WAS AGENT ARMSTRONG THAT CONTACTED THE HEAD

14   DEPUTY AND THE HEAD DEPUTY INSTRUCTED US TO ASK FOR TERMINATION.

15          THE COURT:  WELL, OKAY.  I KNOW THE DEFENDANT HIMSELF WAS

16   HERE IN APRIL AND HAD REQUESTED EARLY TERMINATION.  AND I BELIEVE

17   ON RECOMMENDATION OF THE DISTRICT ATTORNEY, I DENIED HIS REQUEST.

18   AND THAT WAS BACK IN APRIL.  THAT'S WHY I WANTED TO FIND OUT WHAT

19   THE REASONS WHY WERE AT THIS TIME BECAUSE IT'S ONLY BEEN FOUR

20   MONTHS AFTER.

21          BUT OTHERWISE HE'S PAID HIS FINANCIAL OBLIGATION AND

22   HE'S OTHERWISE BEEN ON PROBATION -- HOW LONG HAS HE BEEN ON?

23   IT'S KA059040.  IS THAT '03?

24          MS. CHILSTROM:  IT IS '03, YOUR HONOR.

25          THE CLERK:  YES, YOUR HONOR, SINCE MAY 5, '03.

26          THE COURT:  ALL RIGHT.  APPARENTLY HE'S HAD PROBATION

27   EXTENDED.  IT MAY HAVE BEEN BECAUSE OF A WARRANT THAT HAD BEEN

28   ISSUED WHICH IT WOULD OTHERWISE TOLL THE RUNNING OF HIS PERIOD.

3

Case 8:11-cv-00301-CJC-VBK Document 189-5 Filed 03/22/13 Page 69 of 78 Page ID #:69
Case 8:10-cv-00102-VRNB Document 189-5 Filed 02/15 Page 4 of 5 Page #
#:1603

```
1          I'LL GRANT THE REQUEST FOR THE REASONS STATED

2          MS. CHILSTROM:   THANK YOU.

3

4                (THE PROCEEDINGS IN THE ABOVE-ENTITLED

5                MATTER WERE ADJOURNED.)

6

7                          -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
1                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             FOR THE COUNTY OF LOS ANGELES - WEST COVINA BRANCH

3       DEPARTMENT 8                    HON. ABRAHAM KHAN, JUDGE

4

5       THE PEOPLE OF THE STATE OF CALIFORNIA,     )
                                                    )
6                           PLAINTIFF,              )
                                                    )
7               VS.                                 )  NO. KA059040
                                                    )
8       CRAIG F. MONTEILH,                          )  REPORTER'S
                                                    )  CERTIFICATE
9                           DEFENDANT.              )
        _____)

10

11

12              I, DIANA WHITESEL, CSR NO. 6287, OFFICIAL REPORTER OF THE

13      SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF

14      LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

15      CORRECT TRANSCRIPT OF ALL OF THE ADMONITIONS TAKEN AT THE TIME OF

16      THE TAKING OF THE PLEA AND PRONOUNCEMENT OF SENTENCE IN THE

17      ABOVE-ENTITLED CAUSE; AND FURTHER THAT THE VIEWS AND

18      RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN

19      PURSUANT TO SECTION 1203.01 OF THE PENAL CODE THE ABOVE-ENTITLED

20      MATTER.

21

22

23              DATED THE DECEMBER 2, 2009

24

25

26              _____, CSR NO. 6287
                DIANA WHITESEL, OFFICIAL REPORTER
27

28
```

# ATTACHMENT 2



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535-0001

June 16, 2010

Adam J. Krolikowski, Esq.
Woods & Krolikowski
1200 Main Street, Suite H
Irvine, CA 92614

RE: Craig Monteilh [Confidential Communication]
Compliance with NDA Notice Requirement

Dear Mr. Krolikowski:

This office is in receipt of your letter to Steven Kramer dated June 15, 2010. In your letter you state that Mr. Montielh has "been asked to review and sign declarations prepared by the ACLU for a lawsuit they will be filing concerning civil rights violations by the FBI within the Islamic Community during the time period of Operation Flex." I am aware that you have sent previous letters to the FBI concerning the Non-Disclosure Agreement that Mr. Monteilh signed on October 5, 2007, however, this is the first letter in which you reference a particular FBI operation or investigation. In advance of June 17, 2010, please provide us with any information that you intend to include in these declarations that is/or may be covered by the Non-Disclosure Agreement. The FBI maintains that all the obligations created under the Non-Disclosure Agreement remain in effect. Notification by Mr. Monteilh that he intends to disclose information covered by this agreement does not limit or nullify the obligations that he accepted by signing this agreement.

Sincerely,

Henry R. Felix
Associate General Counsel
Civil Litigation Unit II
Office of the General Counsel
Federal Bureau of Investigation
PA 400
935 Pennsylvania Ave., NW
Washington, D.C. 20535
Phone: 202-220-9328
Fax: 202-220-9355

TOTAL P.004

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| YASSIR FAZAGA, ALI UDDIN MALIK, YASSER ABDELRAHIM | FEDERAL BUREAU OF INVESTIGATION; |
| | continued on Attachment |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| See Attachment | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No      ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
See Attachment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

SACV11-00301

| FOR OFFICE USE ONLY: | Case Number: _____ |
|---|---|

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): Islamic Shura Council of Southern California, et al. v. Federal Bureau of Investigation, et al., 07-cv-01088-CJC-(ANx)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
  ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☑ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date February 22, 2011

  **Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT TO CIVIL COVER SHEET

**I(a). Additional Plaintiff's Attorneys:**

Ameena Mirza Qazi (SBN 250404)
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California 92801

Dan Stormer (SBN 101967)
Joshua Piovia-Scott (SBN 22364)
Reem Salahi (SBN 259711)
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103

**I(a). Defendants continued:**

ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF
INVESTIGATION, in his official capacity; STEVEN M. MARTINEZ,
ASSISTANT DIRECTOR IN CHARGE, FEDERAL BUREAU OF
INVESTIGATION'S LOS ANGELES DIVISION, in his official capacity; J.
STEPHEN TIDWELL; BARBARA WALLS; PAT ROSE; KEVIN
ARMSTRONG; PAUL ALLEN;

**VI. Cause of Action:**

*Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971); 42 U.S.C. § 1985: Religious
Discrimination in violation of First and Fifth Amendments. Unreasonable Search
in violation of Fourth Amendment. Privacy Act, 5 U.S.C. § 552a: Unlawful
Maintenance of Records of First Amendment activity. Foreign Intelligence
Surveillance Act, 50 U.S.C. § 1810: Unlawful Electronic Surveillance.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## SACV11- 301 JST (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] Western Division | [X] Southern Division | [_] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address: Peter Bibring, Jennie Pasquarella,
Ahilan Arulanantham, ACLU FOUNDATION OF
SOUTHERN CALIFORNIA, 1313 West Eighth St.,
Los Angeles, California 90017
continued on Attachment

# FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

YASSIR FAZAGA, ALI UDDIN MALIK, YASSER
ABDELRAHIM,

PLAINTIFF(S)

v.

FEDERAL BUREAU OF INVESTIGATION;

continued on Attachment

DEFENDANT(S).

CASE NUMBER

SACV11-00301 JST (VBKx)

**SUMMONS**

TO:   DEFENDANT(S): FEDERAL BUREAU OF INVESTIGATION;  continued on Attachment

A lawsuit has been filed against you.

Within __60__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Peter Bibring_____, whose address is _ACLU Foundation of Southern California,1313 West Eighth St., Los Angeles, CA 90017_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

FEB 2 2 2011

Dated: _____

Clerk, U.S. District Court

JULIE PRADO

By: _____
Deputy Clerk

*(Seal of the Court)*

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT TO SUMMONS

**Additional Plaintiff's Attorneys:**

Ameena Mirza Qazi (SBN 250404)
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California 92801

Dan Stormer (SBN 101967)
Joshua Piovia-Scott (SBN 22364)
Reem Salahi (SBN 259711)
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103

**Defendants continued:**

ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF
INVESTIGATION, in his official capacity; STEVEN M. MARTINEZ,
ASSISTANT DIRECTOR IN CHARGE, FEDERAL BUREAU OF
INVESTIGATION'S LOS ANGELES DIVISION, in his official capacity; J.
STEPHEN TIDWELL; BARBARA WALLS; PAT ROSE; KEVIN
ARMSTRONG; PAUL ALLEN;