# EXHIBIT
# 1

Adam J. Krolikowski (SBN 202946)
Woods & Krolikowski
1200 Main Street, Suite H
Irvine, California 92614
Tel. (949) 269-1869
Fac. (949) 269-1868
E-mail: ajk4law@yahoo.com

ATTORNEYS FOR PLAINTIFF
CRAIG F. MONTEILH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRAIG F. MONTEILH, an individual, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES; IRVINE POLICE DEPARTMENT, a government entity; RON CARR, an individual; BARBARA WALLS, an individual and DOES 1 to 100, inclusive, <br><br> Defendants. | Case Number: SACV10-00102-JVS(RNBx) <br> *CORRECTED* <br> **SECOND AMENDED COMPLAINT FOR DAMAGES OF PLAINTIFF CRAIG F. MONTEILH**: <br><br> **(1) Violation of 42 USC § 1983** <br> **(2) Violation of 42 USC § 1983** <br> **(3) Violation of Civil Rights** <br> **(4) Negligence** <br> **(5) Negligent Infliction of Emotional Distress** <br><br> [CORRECTED] <br><br> DEMAND OVER $10,000,000 <br> JURY TRIAL REQUESTED |

COMES NOW PLAINTIFF CRAIG F. MONTEILH, AN INDIVIDUAL, and pleads and avers the following facts, causes of action and prayer for damages against Defendants and each of them:

**JURISDICTION AND VENUE**

1.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under federal law and the U.S. Constitution. Jurisdiction over the FBI is pursuant to

1  28 U.S.C. § 1346 and 28 U.S.C. § 2679.

2     2.     Venue is proper in this district pursuant to 28 U.S.C. §

3  1391(b) and (e); the acts and omissions alleged herein occurred in

4  this district.

**PARTIES**

6     3.     Plaintiff CRAIG F. MONTEILH is a United States citizen

7  and a resident of the State of California.  Mr. Monteilh was formerly

8  employed by the Federal Bureau of Investigation ("FBI") in the

9  capacity as an undercover informant.

10    4.     Plaintiff is informed, believes and based thereon alleges

11 that Defendant FBI is an agency of the United States.  The FBI's

12 headquarters is located at 935 Pennsylvania Avenue, N.W.,

13 Washington, DC  20535.  The Defendant previously named as the

14 "Federal Bureau of Investigation" is substituted in the caption and

15 herein to reflect accurately the name of the liable party, the United

16 States. All references herein to the Federal Bureau of Investigation

17 or  "FBI" concern the acts and omissions of the FBI as an agency of

18 the United States, for which the United States is liable.

19    5.     Plaintiff is informed, believes and based thereon alleges

20 that Defendant Irvine Police Department is an agency of the City of

21 Irvine, a municipal corporation under its present name, "City of

22 Irvine," organized and operating pursuant to its Charter and the

23 laws of the State of California.  Defendant Irvine Police Department

24 has appeared in this action and Answered as "City of Irvine,"

25 therefore any reference herein to the Irvine Police Department is

26 also intended to include the City of Irvine, and vice versa.

27    6.     Plaintiff is informed, believes and based thereon alleges

28 that Defendant BARBARA WALLS is an individual employed by the

FBI and at all times relevant herein is an Assistant Special Agent in Charge at the Santa Ana branch office of the FBI located at 901 Civic Center Drive West, Santa Ana, California 92701.

7.     Plaintiff is informed, believes and based thereon alleges that Defendant RON CARR is at all times relevant herein is a Detective with the Irvine Police Department and agent of the City of Irvine.

8.     The true identities of Defendants DOES 1 to 100, inclusive, are presently unknown, therefore said Defendants are sued herein pursuant to the Federal Rules of Civil Procedure as fictitious persons.

9.     Plaintiff is informed and believes that DOES 1 to 100, inclusive, are agents and/or assigns of each other and the named Defendants, and each of them, and have committed such wrongful acts and/or conspired to commit such wrongful acts and are directly and vicariously liable for such acts, as complained of below, which caused damages to Plaintiff as alleged in this Complaint.

10.    After ascertaining the true identity of a fictitiously named Defendant sued herein as a 'Doe,' Plaintiff will amend this Complaint accordingly.

11.    Defendants' acts damaged Plaintiff in excess of $10,000,000 Plaintiff prays for damages as set forth below.

## STATEMENT OF FACTS

12.    Mr. Monteilh began working with the FBI as an undercover informant on or about early 2004 in the investigative program known as Violent Crime, and specifically concerning Narcotics operations, Murder for Hire, and Bank Robberies.

13.    Mr. Monteilh worked with the FBI while directly

supervised by his handlers Special Agent Tracy Hanlon and Special
Agent Christopher Gicking.

14.     The FBI initially tasked Mr. Monteilh to perform work
concerning its Narcotics investigative program of the FBI Criminal
Division in early 2004.

15.     The undercover informant work Mr. Monteilh performed
under the Narcotics investigative program kept illicit drugs off the
streets and resulted in arrests and convictions.

16.     The FBI and its agents commended the work performed
by Mr. Monteilh and increased his tasking orders to include the
Murder For Hire investigative program.

17.     The FBI and its agents commended the work performed
by Mr. Monteilh under the Murder For Hire investigative program
and increased his tasking orders to include the Bank Robberies
investigative program.

18.     The undercover informant work Mr. Monteilh performed
under the Bank Robberies investigative program resulted in arrests
and convictions.

19.     The FBI and its agents commended the work performed
by Mr. Monteilh and increased his tasking orders to include the
Murder For Hire investigative program.

20.     Mr. Monteilh was informed that the FBI is part of a vast
national and international campaign dedicated to defeating
terrorism, working hand-in-hand with partners in law enforcement,
intelligence, the military, and diplomatic circles to neutralize
terrorist cells and operatives here in the U.S. and to help dismantle
terrorist networks worldwide.

21.     Specifically, Mr. Monteilh was informed that the work,

should he choose to accept the assignment, would be for the purpose of infiltrating, surveilling and obtaining intelligence to take down high priority targets including but not limited to USAMA BIN LADEN, AYMAN AL-ZAWAHIRI, ABDELKARIM HUSSEIN MOHAMED AL-NASSER, and ADAM GADHAN.

22.     Mr. Monteilh, inspired by the opportunity to assist in the protection of this great nation, agreed to be moved from working with the Violent Crime investigative umbrella to the National Security Branch, Counterterrorism Division, of the FBI.

23.     The FBI assigned two new handlers, Special Agent Kevin Armstrong and Special Agent Paul Allen with the FBI Orange County Joint Terrorism Task Force, to deliver tasking orders to Mr. Monteilh.

24.     From July 2006 to October 2007, the FBI tasking orders for Mr. Monteilh concerning the National Security Branch, Counterterrorism Division, implemented him as a human intelligence operative within a secret surveillance program aimed at spying on the Islamic community in the counties of Orange, Los Angeles and San Bernardino.

25.     Mr. Monteilh was informed the secret surveillance program was called "Operation Flex" and was initiated pursuant to Executive Order 12356.  The FBI tasked Mr. Monteilh with assuming the identity of Farouk al-Aziz, a new Muslim convert of Syrian and French descent, under code name "Oracle." A true and correct copy of correspondence from Mr. Monteilh to SA Allen evidencing the use of code name "Oracle" is attached as Exhibit A.

26.     Operation Flex was implemented through the National Security Branch of the FBI, using Mr. Monteilh as the center piece

1     of this covert surveillance program, to continue and extend its post-

2     9/11 wider surveillance program.

3         27.      The Assistant United States Attorney Dierdra Eliot gave

4     Mr. Monteilh special permission, by and through signed Federal

5     documents, to engage in jihadist rhetoric, including but not limited

6     to conducting terrorist operations, possessing weapons and

7     initiating conversations to further terrorist acts against the United

8     States. The Federal Documents provided complete and operational

9     immunity to Mr. Monteilh for all the work he performed for the FBI.

10     Specifically the Assistant United States Attorney Dierdra Eliot gave

11     Mr. Monteilh immunity from prosecution in all jurisdictions of the

12     United States and its several states for all the work he performed

13     for the FBI.

14         28.      Mr. Monteilh met with Special Agent Kevin Armstrong

15     and Special Agent Paul Allen to receive his tasking orders. Mr.

16     Monteilh was tasked by the FBI with infiltrating mosques in the

17     counties of Orange, Los Angeles and San Bernardino, a task he

18     successfully achieved. A true and correct copy of an article from the

19     LA Times concerning SA Ropel's testimony that Mr. Monteilh

20     successfully infiltrated the Islamic community is attached as

21     Exhibit B.

22         29.      Between July 2006 and October 2007, Mr. Monteilh was

23     tasked by the FBI with learning to read, write and speak Arabic.

24     Mr. Monteilh was informed that this particular tasking order would

25     enhance Mr. Monteilh's stature and believability within the Islamic

26     community. This was a task Mr. Monteilh worked on and achieved

27     through self-instruction, Arabic Language Program(s), and training

28     through Berlitz, even receiving certificate(s) for his success. A true

1    and correct copy of the certificate of achievement from ICOI for

2    Arabic language study is attached as <u>Exhibit C</u>.

3        30.    The handlers, Special Agent Kevin Armstrong and Special

4    Agent Paul Allen, delivered FBI tasking orders to Mr. Monteilh to

5    make detailed notes and supplemental notes of any intelligence

6    gathered while spying on the Islamic community under Operation

7    Flex.  The detailed notes included but are not limited to Muslims he

8    interacted with, content of conversations, and places Mr. Monteilh

9    entered such as mosques, homes, restaurants, businesses, schools,

10   parks, vehicles, offices, gyms and hotels.  The more "sensitive"

11   details, per the tasking orders, were written on a separate sheet

12   entitled "supplemental notes."  The FBI tasking orders further

13   directed Mr. Monteilh to record every action and word he could find

14   out.

15       31.    Mr. Monteilh was highly trained by the FBI to use cutting

16   edge and sophisticated electronic surveillance devices and

17   equipment to assist in the task of spying on the Islamic community.

18   As per the FBI tasking orders, Mr. Monteilh surveilled individual

19   Muslims and the Islamic community in general by using the

20   electronic surveillance devices and equipment by surreptitiously

21   recording Muslims speaking in or around places such as mosques,

22   homes, restaurants, businesses, schools, parks, vehicles, offices,

23   gyms and hotels.  Mr. Monteilh was successful in performing these

24   tasks.  <u>Mr. Monteilh possesses electronic devices as described</u>

25   <u>above and will present those at time of trial as evidence</u>.

26       32.    The FBI and its agents commended the work performed

27   by Mr. Monteilh and increased the scope of the tasking orders given

28   to Mr. Monteilh.

33.     Mr. Monteilh was tasked by the FBI with becoming skilled in the Hadith and the Quran, the five pillars, and the sixth pillar of Islam. A true and correct copy of a tasking order from SA Allen to Mr. Monteilh regarding the tasks is attached as <u>Exhibit D</u>.

34.     Mr. Monteilh was tasked by the FBI with gaining the confidence of high priority targets, leading prayer in the mosques, dating Muslim women and engaging in sexual relations with Muslim women.

35.     Mr. Monteilh questioned the task but was ordered to engage in sexual relations with Muslim women, over his protestations because he is a married man.  Mr. Monteilh followed the orders under duress, and these actions, orders and tasks caused him severe emotional distress which continues to this day.

36.     Further, Mr. Monteilh was ordered to keep his audio and visual recording equipment on at all times, including the time he spent with Muslim women on dates, discussing their private and personal thoughts, and while engaged in various sexual acts and states of coitus.  Mr. Monteilh suffered emotional distress and mental anguish because he was informed that the audio was listened to and the videos watched by many FBI agents and analysts on a daily basis, who had thought and comments about the sexual prowess of Mr. Monteilh and the Muslim women.  Again, Mr. Monteilh followed the orders under duress, and these actions, orders and tasks caused him severe emotional distress and mental anguish which continues to this day.

37.     The FBI and its agents commended the work performed by Mr. Monteilh and increased the scope of the tasking orders given to Mr. Monteilh.  Mr. Monteilh was tasked by the FBI with

1 infiltrating foreign terrorist camps and Islamic schools.

2     38.     On or about March 2, 2007, Mr. Monteilh received a
3 telephone call from his handler Special Agent Paul Allen. Mr.
4 Monteilh was informed by Special Agent Paul Allen that he had
5 received a call from an Irvine Police Officer assigned to the Orange
6 County Joint Terrorism Task Force informing him that there was an
7 active investigation on Mr. Monteilh for grand theft.

8     39.     The FBI, through Special Agent Paul Allen, further
9 instructed Mr. Monteilh that he was by no means to personally
10 divulge his status as a confidential informant to Irvine Police
11 Department or Detective Carr because it would jeopardize
12 "operational security" of Operation Flex and <u>would place his</u>
13 <u>personal safety in jeopardy if the wrong people learned he was an</u>
14 <u>informant</u>. SA Allen said, "Keep this in mind, everyone is watching
15 you on this one."

16     40.     Mr. Monteilh is informed, believes and based thereon
17 alleges that Detective Carr met with Irvine Police Department Chief
18 Dave Maggard on or about March 2007, concerning Mr. Monteilh.
19 Chief Maggard is a member of the Orange County Joint Terrorism
20 Task Force and during the meeting with Detective Carr revealed Mr.
21 Monteilh's status as a confidential informant for the FBI.

22     41.     On or about March 7, 2007, Detective Carr interviewed
23 Mr. Monteilh in Irvine, California. At the beginning of the interview,
24 Mr. Monteilh was asked by Detective Carr "if he told anyone that he
25 was coming" and at the close of the interview, Detective Carr told
26 Mr. Monteilh, "I am going to get you." <u>Mr. Monteilh possesses audio</u>
27 <u>and video recordings of the meeting described above and will</u>
28 <u>present those at time of trial as evidence.</u>

42.     Mr. Monteilh told the FBI about the interview and the statements made by Detective Carr.  The FBI again instructed Mr. Monteilh to mislead detectives and outright lie to detectives for the sake of "operation security" all the while lying to Mr. Monteilh about an exit strategy.  This continued mishandling of Mr. Monteilh as a confidential informant caused and exacerbated the emotional distress suffered by Mr. Monteilh.

43.     Mr. Monteilh is informed, believes, and based thereon alleges that on or about June 2007, the Islamic Center of Irvine sought a restraining order against Mr. Monteilh in the Superior Court of California, County of Orange, Harbor Justice Center, concerning acts he performed under his tasking orders.

44.     Mr. Monteilh was informed the effect of the restraining order would limit his civil rights and become part of his permanent criminal history kept at the Department of Justice for California and the United States.  The restraining order and injunction was granted.  In 2009, Mr. Monteilh had to go to Court on his own to have the restraining order set aside.

45.     During Detective Carr's investigation, Mr. Monteilh was on probation through Case No. KA059040 in the Superior Court of California, County of Los Angeles, West Covina Courthouse.  Mr. Monteilh's Probation Officer, Officer Medina, was aware of Detective Carr's investigation of Mr. Monteilh, but told Mr. Monteilh's handlers he would not arrest Mr. Monteilh because he knew Mr. Monteilh's involvement was that of an FBI informant.

46.     The FBI, through Special Agent Paul Allen, said his problems, including but not limited to the restraining order, would be dissolved in the "exit strategy" of his participation in

1  "Operation Flex" and assured him he would be able to invoke his
2  immunity as provided for in the signed Federal Documents.  In a
3  showing of good faith, SA Allen and SA Armstrong again reassured
4  that Mr. Monteilh's probation would be terminated early, even
5  though he was allegedly being investigated by Irvine Police
6  Department.  A true and correct copy of the hearing transcript
7  terminating the probation of Mr. Monteilh is attached hereto as
8  Exhibit E.  The SA's statements did little to assuage the emotional
9  distress suffered by Mr. Monteilh through his mishandling by the
10 FBI.

11      47.     Mr. Monteilh, nonetheless, was concerned about
12 remaining on probation and went to the West Covina Courthouse
13 on April 13, 2007, to ask for early termination of his probation,
14 which was denied.  Mr. Monteilh reported this to his FBI handlers.
15 Thereafter, Special Agent Kevin Armstrong (a former Assistant
16 United States Attorney) called Los Angeles County District Attorney
17 Steve Cooley directly to have Mr. Monteilh's probation terminated
18 early. See, Exhibit E.  Mr. Monteilh was informed that this was
19 necessary because any felony investigation of a probationer
20 automatically disqualifies them from consideration for early
21 termination of probation.  Mr. Monteilh was further informed by
22 FBI agents that the Judge at the West Covina Courthouse was
23 contacted and told not to revoke probation based upon the
24 investigation conducted by Irvine because the investigation itself
25 concerned work performed by Mr. Monteilh for the FBI, for which
26 he would not and could not be prosecuted due to complete and
27 operation immunity.

28      48.     On August 20, 2007, Deputy District Attorney Linda A.

Chilstrom moved on behalf of the People of the State of California for early termination of the probation of Mr. Monteilh, stating that Mr. Monteilh had given "very, very valuable information that has proven essential in an FBI prosecution." See, Exhibit E.

49. The undercover informant work Mr. Monteilh performed under Operation Flex resulted in arrests and prosecutions, including but not limited to Ahmadullah Sais Niazi. Mr. Monteilh's role as an informant was revealed by testimony of Special Agent Thomas J. Ropel III at the bail hearing of Ahmadullah Sais Niazi. See, Exhibit B.

50. Part of the information discovered by Mr. Monteilh also concerned the storage of suspected bomb making materials at a certain mosque, which Mr. Monteilh reported to Special Agent Kevin Armstrong, Special Agent Paul Allen and Assistant Special Agent in Charge Barbara Walls.

51. Mr. Monteilh is informed that Assistant Special Agent in Charge Barbara Walls did not act on the information concerning bomb making materials for over three (3) weeks. Mr. Monteilh is informed that when Assistant Special Agent in Charge Barbara Walls finally obtained the necessary warrants to investigate the bomb making materials, they were no longer there. Mr. Monteilh is informed that Assistant Special Agent in Charge Barbara Walls was embarrassed and instead of accepting responsibility for her error in judgment, called Mr. Monteilh a liar. Mr. Monteilh is informed it is at that point that Assistant Special Agent in Charge Barbara Walls determined she would remove Mr. Monteilh from the FBI Counterterrorism program and thereafter began to conspire with Detective Ron Carr and DOES 11 through 20 to cause Mr. Monteilh

harm.

52.     On or about, June 2007 and September 2007, Mr.
Monteilh was approached by reporters for the Los Angeles Times
concerning a story about the illegal surveillance activities of the FBI
at Southern California mosques.  Mr. Monteilh was approached
because the media believed he had a connection with the
investigation by the FBI of the Islamic community due to the
restraining order which had been sought by ICOI in Orange
County, California.  True and correct copies of communications
with the reporters are attached as Exhibit F.

53.     On or about September 15, 2007, Barbara Walls, upon
being informed by Mr. Monteilh that Operation Flex was getting
media attention, told him he must sign a new document referred to
as "Non-Disclosure Agreement" which she said would prevent the
media from being able to obtain information from him concerning
the illegal surveillance activities of the FBI.

54.     Mr. Monteilh was forced under duress to sign the "Non-
Disclosure Agreement" on or about October 5, 2007.  Mr. Monteilh
was threatened by the FBI and its agents under the color of the
Non-Disclosure Agreement and thereby caused great emotional
distress and mental suffering.  A true and correct copy of a
communication from Henry R. Felix, Associate General Counsel for
the FBI, evidencing the above-referenced "Non-Disclosure
Agreement" is attached hereto as Exhibit G.

55.     Mr. Monteilh was ordered, under the color of authority
by Barbara Walls, the FBI and its agents, to not invoke his
complete and operational immunity concerning any work performed
at the direction of the FBI.  Mr. Monteilh realized at that point that

1 | he could be prosecuted for any work he previously performed in

2 | Operation Flex and that caused him great emotional distress and

3 | mental suffering for following the orders of the FBI which could be

4 | deemed illegal and unconstitutional.

5 |     56.     Mr. Monteilh's handlers SA Armstrong and SA Allen

6 | instructed Mr. Monteilh to keep copies of documents, despite the

7 | Non-Disclosure Agreement, because "he might need them in the

8 | future" and then presented him with the OCJTTF Coin for their

9 | appreciation of all the work he performed in Operation Flex.  A

10 | photograph which is a true and correct representation of the coin is

11 | attached hereto as <u>Exhibit H</u>.

12 |     57.     Detective Carr recontacted Mr. Monteilh on or about

13 | September 24, 2007, and taunted him, saying I can arrest you

14 | whenever I want for violating your probation.  Detective Carr

15 | became furious when he was informed by Mr. Monteilh that his

16 | probation was terminated in August 2007.

17 |     58.     Mr. Monteilh was concerned and asked the FBI, through

18 | his handlers, how the exit strategy was going to be implemented.

19 | The FBI offered no response and the handlers said, "I don't know."

20 | This continued mishandling of Mr. Monteilh as a confidential

21 | informant caused and exacerbated the emotional distress and

22 | mental suffering of Mr. Monteilh.

23 |     59.     Mr. Monteilh is informed that in October 2007, Assistant

24 | Special Agent in Charge Barbara Walls orchestrated the

25 | diminishing of Mr. Monteilh's involvement in Operation Flex as the

26 | high priority target Ahmadullah Sais Niazi already had a sealed

27 | Federal indictment against him based upon information obtained

28 | through Mr. Monteilh's work.

60.     Mr. Monteilh is further informed that Assistant Special Agent in Charge Barbara Walls became paranoid that Mr. Monteilh would still speak to the press about the illegal activities directed by Assistant Special Agent in Charge Barbara Walls' office of the National Security Branch of the FBI.  Mr. Monteilh is informed that the illegal activities Assistant Special Agent in Charge Barbara Walls was concerned about coming to light were racial profiling, religious profiling, instigating extremist rhetoric to entrap Muslims, blackmailing Muslims to become informants, the breach of security at Berlitz language center, Mr. Monteilh being armed to attend mosques, Mr. Monteilh being ordered to engage in sexual relations with Muslim women, misuse of surveillance devices in the Islamic community and warrantless wiretapping.

61.     In November 2007, the Irvine Police Department SWAT team assembled in strike formation outside the home of Mr. Monteilh.  Mr. Monteilh, alarmed, quickly called his handlers on the telephone and told them what he saw, and moments later heard the words "stand down" and they left.  Mr. Monteilh asked what that was about and the handlers said, "I don't know."  Mr. Monteilh is informed that Detective Carr and Assistant Special Agent in Charge Barbara Walls conspired and were responsible for this SWAT team incident occurring.  This continued mishandling of Mr. Monteilh as a confidential informant caused and exacerbated the emotional distress suffered by Mr. Monteilh.

62.     On December 3, 2007, Detective Carr filed an "Order Requiring Penal Code Section 1275.1 Hearing and Notification of the District Attorney" for a warrant for the arrest of Craig F. Monteilh.  In the filing, Detective Carr requested that Deputy

1  District Attorney Yvette Patko be present at every hearing and that

2  a hold on the release from custody be placed on Mr. Monteilh.  A

3  true and correct copy of the Arrest Application evidencing the

4  above-referenced requests made by Detective Carr is attached

5  hereto as <u>Exhibit I</u>.

6      63.    Mr. Monteilh is informed by FBI agents that the ASAC

7  Barbara Walls spread false rumors about Monteilh to Irvine Police

8  officials.  ASAC Walls communicated to Chief David Maggard that

9  Mr. Monteilh was disrupting FBI business within the covert

10  national security surveillance program called Operation Flex.  Walls

11  also communicated to Chief Maggard that Monteilh was trying to

12  extort the FBI for $100,000.00, the very amount Monteilh agreed

13  upon and was owed in his exit package of Operation Flex.

14      64.    Mr. Monteilh is informed by FBI agents that ASAC

15  Barbara Walls made numerous attempts to have him indicted on

16  extortion charges but FBI legal counsel Steven Kramer, Esq., told

17  ASAC Walls she had no case.  Mr. Kramer communicated to ASAC

18  Walls that Mr. Monteilh committed no crime during the negotiation

19  of his exit package.

20      65.    ASAC Walls was also paranoid and communicated to FBI

21  agents and Irvine Police officials that Mr. Monteilh was probably a

22  former Russian KGB or FSB contact.  Mr. Monteilh is informed by

23  FBI agents Walls believed this because Mr. Monteilh was well

24  versed in Russian politics and history and also well spoken in

25  Russian and Arabic, languages Mr. Monteilh learned at the behest

26  of the FBI.

27      66.    At the direction of Assistant Special Agent in Charge

28  Barbara Walls, Mr. Monteilh was visited by at the Orange County

1 Jail by Special Agent Kevin Armstrong and FBI Legal Counsel

2 Steven Kramer.  During the meeting, FBI Legal Counsel Steven

3 Kramer referred to the "Non-Disclosure Agreement" and told Mr.

4 Monteilh not to reveal his informant status to officials in the jail to

5 obtain protection from the inmates or there would be severe

6 consequences.  The FBI's message was heard and acknowledged by

7 Mr. Monteilh, but caused great consternation, confusion and fear

8 for his safety and what was to come in the jail and later prison.

9 This continued mishandling of Mr. Monteilh as a confidential

10 informant caused and exacerbated the emotional distress suffered

11 by Mr. Monteilh.

12      67.      While incarcerated at the Orange County Jail during

13 2007/2008, Mr. Monteilh was approached by the FBI through

14 Special Agent Tracy Hanlon with tasking orders from the FBI

15 Organized Crime Division, Balkan Criminal Enterprises Group.

16      68.      Mr. Monteilh trusted SA Hanlon and wanted to take the

17 steps he was told would provide income for his wife and children

18 and potentially get him out of jail.  A true and correct copy of the

19 Request for Notification of Release submitted by SA Hanlon is

20 attached hereto as Exhibit J.

21      69.      The FBI Organized Crime Division, Balkan Criminal

22 Enterprises Group, tasked Mr. Monteilh with assisting in an

23 undercover operation and surveillance of Voicu Gheorghe Gruia.

24 Orange County Deputy District Attorney Joe Williams is quoted as

25 saying Voicu Gheorghe Gruia is "a principal figure in the Romanian

26 Mafia."

27      70.      Mr. Monteilh worked undercover using the identity of a

28 Hungarian-French immigrant, the grandson of a man who was a

1 | war hero in the Hungarian Revolution of 1956. Over a period of
2 | weeks, Mr. Monteilh acquired the confidence and trust of Voicu
3 | Gheorghe Gruia, leading to the FBI's first acquisition of a
4 | sophisticated skimming device used to steal money from ATM
5 | machines and the arrests of Gheorghina Gruia and Joseph
6 | Deaconn. Mr. Monteilh is informed they are all involved in the
7 | Romanian Mafia and considered to be extremely dangerous.

8 | 71. Mr. Monteilh, using the intelligence gathered through
9 | Voicu Gheorghe Gruia and his cohorts in jail, was able to thwart
10 | the murder for hire plans to assassinate Chad Taranteau, the
11 | primary witness against Voicu Gheorghe Gruia.

12 | 72. After the successful completion of the tasking orders for
13 | the FBI Organized Crime Division, Balkan Criminal Enterprises
14 | Group concerning Voicu Gheorghe Gruia, Mr. Monteilh was
15 | approached by Special Agent Kevin Armstrong on behalf of the
16 | National Security Branch, Counterterrorism Division, to once again
17 | implement him as a human intelligence operative spying on the
18 | Islamic community within the Orange County Jail.

19 | 73. Mr. Monteilh was reluctant to perform any further
20 | National Security work for the FBI, since they had already dealt
21 | with him treacherously, but was ordered to do so by ASAC Walls
22 | and the FBI or face severe consequences. Under duress, Mr.
23 | Monteilh continued to perform National Security work for the FBI.
24 | This continued mishandling of Mr. Monteilh as a confidential
25 | informant caused and exacerbated the emotional distress and
26 | mental suffering of Mr. Monteilh.

27 | 74. The FBI provided tasking orders that included taking on
28 | the identity of Omar Moussa, an Algerian-French jihadist, and

1   infiltrating, surveilling and gathering intelligence on Muslims in jail.

2   Mr. Monteilh, through his work pursuant to those tasking orders,

3   uncovered the early stages of a terrorist plot involving several

4   persons incarcerated in the Orange County Jail including but not

5   limited to Otto Paul Burgi, Tyrone Rye and Khalil Hamdan.

6       75.    Mr. Monteilh reported this information to Special Agent

7   Kevin Armstrong and later directly to Assistant Special Agent in

8   Charge Barbara Walls.  Despite all the prior completed tasks,

9   valuable information and successful investigations, Assistant

10   Special Agent in Charge Barbara Walls told Mr. Monteilh that she

11   did not believe him.

12       76.    Mr. Monteilh was transported from the OC Jail by 6

13   sheriff's deputies assigned with the OCJTTF and driven to the FBI

14   Santa Ana office to be polygraphed while in wrist and leg restraints.

15   The polygraph was ordered by ASAC Walls, in conjunction with the

16   Irvine Police Department and Detective Ronald Carr, and done

17   without the knowledge of Mr. Monteilh's defense attorney Matthew

18   Missakian, Esq. (Monteilh was represented by the Office of the

19   Public Defender during that time) and Monteilh did not waive the

20   right to counsel.

21       77.    Mr. Monteilh saw that Irvine Police Department Detective

22   Ron Carr and Detective Frough Jahid were present at the polygraph

23   examination.  Mr. Monteilh is informed that Detective Carr and

24   Detective Jahid are assigned to the Intelligence Division of the

25   Irvine Police Department.

26       78.    Mr. Monteilh is informed, believes and based thereon

27   alleges that Detective Carr and Detective Jahid were instructed by

28   Chief Maggard to be present at the polygraph and were both told

that Mr. Monteilh is an FBI informant.

79.     Mr. Monteilh suffered immediate distress and anxiety, especially since he had not yet been tried or judged for the pending case against him, and was afraid this was a ploy to gather false evidence against him. <u>The polygraph evidence was not used in the grand theft case, did not affect the conviction which occurred therein and therefore does not impugn or attack the conviction itself</u>.  However, this continued mishandling of Mr. Monteilh as a confidential informant caused and exacerbated the emotional distress and mental suffering of Mr. Monteilh.

80.     Immediately prior to the polygraph starting, FBI legal counsel Steven Kramer, Esq., informed Mr. Monteilh that he had in his possession a completed document which would cause the immediate release of Mr. Monteilh from custody if he passed the polygraph.  Mr. Monteilh's heart raced and his stress level increased.  This combined with a lack of sleep and no breakfast should have made Mr. Monteilh ineligible for the pre-polygraph test, let alone the full polygraph examination.  This continued mishandling of Mr. Monteilh as a confidential informant caused and exacerbated the emotional distress and mental suffering of Mr. Monteilh.

81.     Mr. Monteilh was later told by FBI agents that the polygraph ordered by Assistant Special Agent in Charge Barbara Walls was done to ascertain the following: unauthorized and/or classified information Monteilh received through his handlers (regarding the method in which Ahmadullah Sais Niazi was blackmailed to become an FBI informant); specific information of the internal working of Operation Flex; terror plots planned at early

1    stages in OC Jail; additional information regarding Ahmadullah
2    Sais Niazi being designated as a high valued target by the FBI if he
3    were to venture outside the continental United States; Information
4    regarding Ashruf Zied, Jarir Saadoun, Mohammed El-sisy, Nabil
5    Houri, the Hadayat family in Michigan, Osman Omarji, Asim Khan,
6    Yasser Abdel-Rahim, Ali Malik, Ayman Soliman, Yasser Ahmed,
7    Mohammed Jaafil, Rehan Jalali, Suhaib Webb, the Muslim Student
8    Union, Otto Paul Burgi, Tyrone Rye and Khalil Hamdan.

9         82.    Also, ASAC Walls used the polygraph to ascertain what
10   Mr. Monteilh knew regarding his participation in an upcoming
11   audit being brought against her by certain disgruntled FBI agents
12   from Operation Flex.

13        83.    ASAC Walls also wanted to know what Monteilh knew
14   about the aborted pre-dawn arrest raids of 27 suspects in Orange
15   and Los Angeles counties in June '07.  The aborted arrest raids
16   came from the office of FBI Director Robert Meuller III.

17        84.    After the polygraph, FBI agent Kevin Armstrong brought
18   Mr. Monteilh lunch from Ralph's grocery store and informed Mr.
19   Monteilh that ASAC Barbara Walls was lying and he was going back
20   to jail.  Mr. Monteilh was not shown the results of the polygraph.
21   This continued mishandling of Mr. Monteilh as a confidential
22   informant caused and exacerbated the emotional distress and
23   mental suffering of Mr. Monteilh.

24        85.    Monteilh is informed by FBI agents that the FBI
25   polygrapher told Agent Tracy Hanlon that Mr. Monteilh never
26   should have been polygraphed under the aforementioned
27   conditions and that Mr. Monteilh has every legal right to sue the
28   Bureau.

86.     Mr. Monteilh is informed, believes and based thereon alleges that immediately following the polygraph, Detectives Carr and Jahid went, at the direction of Chief Maggard, to speak with Otto Paul Burgi, Tyrone Rye and Khalil Hamdan and revealed the very information Mr. Monteilh had obtained from each of them.  At that point, Mr. Monteilh's life was placed in grave danger.

87.     More specifically, Mr. Monteilh observed that Mr. Burgi was called out of his cell and returned about three (3) hours later, white as a sheet.  Mr. Burgi immediately called over Mr. Monteilh and said he was questioned by the Irvine Police Detectives and FBI agents.  Mr. Burgi said, "They asked me questions of exactly everything I told you, almost word for word.  I know you told them everything we discussed."

88.     Mr. Monteilh, fearing for his life at this point, state that was not possible.  Mr. Burgi responded, "They showed me your picture and other pictures of you with other people.  You had a beard.  And they asked me about you.  Then they asked me if I discussed with you anything about terrorism or making bombs."  Then Mr. Burgi stated, "Craig, you are a fucking informant.  They said they know you.  They said they have history with you and you're reliable."

89.     Shortly thereafter, Mr. Monteilh was surrounded by about 20 inmates and a scuffle ensued until a deputy intervened and dispersed everyone.  Mr. Monteilh suffered physical harm, emotional distress and mental suffering as a result.

90.     On February 29, 2008, Mr. Monteilh went to Court and was placed in a holding cell with approximately 50 inmates.  Tyrone Christopher Rye walked in and immediately approached Mr.

Monteilh with the same statements as Mr. Burgi.  Mr. Rye was loud and angry, drawing the attention of the other inmates.  Mr. Rye was yelling, "The Irvine Detectives and FBI agents had banking information, storage units, details only I told you."  Mr. Rye told the 50 inmates, including a close associate of Voicu Gheorghe Gruia named Christopher John Aragon, that Mr. Monteilh was a confirmed "snitch."

91.     Mr. Rye, a ranking member of the Mexican Mafia with several prison priors, was believed and the inmates began to move in on Mr. Monteilh, until the guard called out "Maahn-teeel," which was the notice that it was Mr. Monteilh's turn to appear in Court. That was all that saved him. This caused and exacerbated the emotional distress and mental suffering of Mr. Monteilh.

92.     After the Court proceedings were concluded, Mr. Monteilh returned to the Orange County Jail to learn from other inmates that there was an open "kill order" on him.  Mr. Monteilh asked who ordered it and they said "everybody."  Mr. Monteilh asked who "everybody" was and was told by the inmates that Gruia's people hired P.E.N.1. and the Aryan Brotherhood to kill you and  Tyrone Rye ordered the Southside Mexicans to kill you.

93.     At that point, Mr. Monteilh was not going to let himself die and spoke with the head deputy to be isolated. Deputy Poitress said, "I called the FBI and they said that the FBI does not acknowledge knowing you."  This caused and exacerbated the emotional distress and mental suffering of Mr. Monteilh as he now faced all but certain death.

94.     The conduct of the Irvine Police Department, Detective Carr, ASAC Walls and the FBI caused word to spread through the

1  Orange County Jail that Mr. Monteilh was either an informant or a
2  "snitch."

3      95.    Mr. Rye was transferred to Theo Lacy Jail, where
4  everyone was told by him that Mr. Monteilh was an informant.

5      96.    Alan Larson, Jon Schwartz, and many others were moved
6  from the Orange County Jail to Wasco State Prison, and there they
7  told all the other inmates that Mr. Monteilh was an informant or
8  snitch.

9      97.    The conduct of the Irvine Police Department, Detective
10 Carr, ASAC Walls and the FBI caused word to spread at Wasco
11 State Prison that Mr. Monteilh was either an informant or a snitch.

12     98.    Mr. Monteilh, upon arriving at Wasco State Prison from
13 the Orange County Jail, was immediately told that his life was in
14 danger as the Muslim extremists had ordered a "fatwa" on him, a
15 Romanian Mafia member had ordered a "hit," a Mexican Mafia
16 member had ordered a "hit," and certain White Supremacists gave a
17 "green light" on Craig F. Monteilh, all of which caused Mr. Monteilh
18 extreme emotional and physical stress and mental suffering.

19     99.    Mr. Monteilh communicated his grave concerns over the
20 threats on his life to the FBI and asked for the FBI to arrange for
21 protective custody because he was an informant, but instead he
22 was left in general population, thereby exposed to constant danger
23 of being killed.

24     100.    On April 27, 2008, while at Wasco prison, Mr. Monteilh
25 was attacked several times based upon the FBI, ASAC Walls, Irvine
26 Police Department and Detective Carr telling inmates at the Orange
27 County Jail that Mr. Monteilh was an informant.

28     101.    One attack was a stabbing attack with a shank by

---

1    members of P.E.N.1. ("Public Enemy Number One"), the main white
2    supremacist group in prison.

3       102.    The stabbing attack resulted in deep lacerations to the
4    left and right legs of Mr. Monteilh, which were then sprayed with
5    mace by the prison guards, and left untreated by prison authorities
6    at Wasco.  Resulting from the attack, Mr. Monteilh has permanent
7    scars on his legs and reduced mobility.  Mr. Monteilh suffered
8    emotional distress and mental suffering.

9       103.    On May 2, 2008, a Captain of the Wasco Prison Guards
10   interviewed Mr. Monteilh for Title 115 prison rules violations.  Mr.
11   Monteilh, left with no choice but to try to save his life, told the
12   Captain that he was an FBI informant and needed protective
13   custody.  Mr. Monteilh asked prison Sgt. Aces to call SA Hanlon to
14   confirm he was an FBI informant and in need of protection.  A true
15   and correct copy of the Wasco 115 is attached hereto as <u>Exhibit K</u>.

16      104.    For a short time Mr. Monteilh was placed on the <u>B YARD</u>
17   which is for protective custody of informants, ex-gang members and
18   sex offenders, all of which face being killed in general population.
19   However, the FBI and ASAC Walls called and told the prison
20   officials at Wasco that Mr. Monteilh was not an FBI informant.  Mr.
21   Monteilh was then immediately moved from the <u>B YARD</u> to general
22   population, which placed him in even greater danger than he was to
23   begin with because anyone who comes from <u>B YARD</u> *is* a snitch, sex
24   offender or gang drop-out, making you a target for *everyone.*
25   Simply by being in the  <u>B YARD</u> at all and then moved to general
26   population was a death wish.  This continued mishandling of Mr.
27   Monteilh as a confidential informant caused and exacerbated the
28   emotional distress and mental suffering of Mr. Monteilh.

105.    At that time, despite the statements of ASAC Walls and the FBI, Mr. Monteilh was still an active FBI Informant.

106.    Mr. Monteilh was transferred from Wasco State Prison to Coalinga Community Correctional Facility.  Again, Mr. Monteilh called and asked the FBI to arrange protective custody, because the inmates there also knew he was an informant and he was still in general population and exposed to the constant danger of being killed.

107.    ASAC Walls and the FBI refused to place Mr. Monteilh in protective custody, despite the fact he was still an active FBI informant.  Word spread from Wasco State Prison to Coalinga Community Correctional Facility that he was in the B YARD and was an informant or snitch.  Mr. Monteilh was physically attacked several more times while at Coalinga, each time fighting for his life.  The physical and mental suffering endured by Mr. Monteilh is beyond what any person should be forced to endure.

108.    Mr. Monteilh was finally release from prison on August 16, 2008.  Mr. Monteilh's parole was terminated on September 15, 2009.

109.    By the time of his release from prison August 16, 2008, Mr. Monteilh was well known as an FBI informant among FBI field offices in Los Angeles and Santa Ana was the Snellenberger bank robbery conviction, narcotics arrests and convictions [including Henry Santos and Timothy Gordon James], infiltration of white supremicists groups [including Aryan Brotherhood and P.E.N.1 Death Squad], Voicu Gruia Romanian mafia convictions, thwarting murder-for-hire against a witness, infiltration of the Islamic community in Orange and Los Angeles counties and his ability to

learn foreign languages).

110. At this point, Mr. Monteilh wanted nothing further to do with the Santa Ana Office of the FBI or its National Security Division because they left him to die in prison.

111. However, Mr. Monteilh still had a good relationship with the special agents in the Criminal Division of the FBI working, so he went to work with handler Joey Abelon on a joint FBI/Anaheim P.D./Costa Mesa P.D. Romanian mafia operation. At this point, Mr. Monteilh is without income and has to support his family as best he can.

112. Attached hereto as <u>Exhibit L</u> is a true and correct copy of a California Department of Corrections (CDC) parole division document evidencing Monteilh's active FBI confidential informant status after his release from prison (post-Operation Flex).

113. Mr. Monteilh, using the undercover identity of Russian/Lithuanian born Ivan Chernenko targeted Romanian national "Razvan" at the direction of FBI handlers Joey Abelon and Tracy Hanlon at the 24 Hour Fitness in Laguna Niguel.

114. Mr. Monteilh was also tasked by his FBI/OCJTTF handlers to infiltrate the Romanian restaurant Dunaria in Anaheim where Romanian suspects frequent. And also tasked to infiltrate Middle-Eastern owned Heat Ultra Lounge in Anaheim as drug trafficker Sicilian born Vincent Donato.

115. Because of Mr. Monteilh's successful infiltration the FBI/Anaheim P.D./Costa Mesa P.D. arrested and/or convicted Romanian mafia members Denis Chiciu, Maria Geta Chiciu, Soniard Chiciu, Felix Chiciu, Nicolae Duduian, Florina Welch, Monica Serdaru, Alin Antonescu, Relu Traila and Alberto Crudy.

Case number SA CR09-0071-DOC USA V.

116.    These individuals were from the same Bucharest-based organization as Voicu Gheorghe Gruia, the man Mr. Monteilh successfully infiltrated while in OC Jail in Dec '07.  Through Mr. Monteilh's successful infiltration of "Razvan" and his cohorts the FBI was able to track the whereabouts of the mastermind of the ARCO credit card scam and lead to more arrests and convictions.

117.    Through Mr. Monteilh's successful infiltration of the Romanian mafia group, FBI handlers Tracy Hanlon, Joey Abelon and Anaheim P.D. handler Michael Fernandez were also able secure and implement security measures at the office of the FBI in Bucharest, Romania where suspects had sensitive information about the agents working there.  Also, through information Monteilh obtained from "Razvan" arrested an eastern European high level law enforcement official in Los Angeles giving "Razvan" sensitive information regarding eluding arrest.

118.    Instead of paying compliment to Mr. Monteilh for his successful work, ASAC Walls went to then Assistant Director In Charge of the FBI Los Angeles Field Office Salvadore Hernandez to officially deactivate Mr. Monteilh from the FBI informant program permanently.  Mr. Monteilh is informed by FBI agents that Assistant Director Hernandez declined to grant ASAC Walls' request.  Walls went again a second time to Hernandez's office with the same request and Hernandez responded, "I'll sleep on it."  ASAC Walls again went a third time to Director Hernandez with the same request and Hernandez growing weary of Walls granted her request to deactivate Monteilh in Nov '08.

119.    Mr. Monteilh using email account under his Russian

1  cover name Ivan Chernenko contacted the Office of the Inspector

2  General (OIG), meeting with Special Agent Jim Kirdar and his

3  partner Vince, wanting to address his grievance and civil rights

4  violations without unduly embarrassing the agency or jeopardizing

5  ongoing operations. Exhibit M is a true and correct copy of the

6  email Mr. Monteilh sent the OIG in Washington D.C.

7     120.   Three months later Monteilh emerged as the informant

8  responsible for recording Ahmadullah Sais Niazi, and surveilling

9  the Muslim community at the behest of the FBI. Again, Mr.

10 Monteilh's role as an informant was revealed by testimony of

11 Special Agent Thomas J. Ropel III at the bail hearing of Ahmadullah

12 Sais Niazi.

13    121.   Mr. Monteilh learned on or about January 13, 2010,

14 from local law enforcement that Joseph Deaconn of the Romanian

15 Mafia, who had vowed to cut off the head of Craig Monteilh, had

16 become a fugitive on December 7, 2009. To the date of this

17 Complaint, the FBI has not contacted Mr. Monteilh to make him

18 aware that the man who vowed to cut off his head had become a

19 fugitive and believed to be at large in California, or done anything to

20 protect him. This continued mishandling of Mr. Monteilh as a

21 confidential informant caused and exacerbated the emotional

22 distress and mental suffering of Mr. Monteilh.

23    122.   Mr. Monteilh continues to live in fear for his life and with

24 the mental and physical scars caused by Defendants and each of

25 them. Mr. Monteilh seeks damages for the violation of his rights

26 and injuries, in excess of $10,000,000, as set forth in the prayer

27 below.

28 / / /

## FIRST CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS - 42 USC § 1983

## AGAINST DEFENDANTS CARR AND

## IRVINE POLICE DEPARTMENT AND DOES 1 - 30

123.     Plaintiff incorporates the above stated paragraphs numbered 1 - 121, and each of them, as though set forth in their entirety herein.

124.     Acting under color of law and the authority of federal and state laws Defendants Irvine Police Department, Detective Ronald Carr, and ASAC Barbara Walls intentionally, negligently, and with complete and deliberate indifference for Plaintiff's rights caused Plaintiff to be deprived of his constitutional rights, including but not limited to those under the fourth, fifth, sixth and eighth amendments by:

a.      using a degree of force that was unreasonable under the circumstances, and in violation of Plaintiff's rights to be free of an unreasonable seizure under the fourth amendment by seizing and transporting Mr. Monteilh against his will to a location away from the jail, by chaining and shackling Mr. Monteilh to a chair, by placing other restraints and apparatus upon his body, and by conducting a polygraph examination without his consent;

b.      subjecting Plaintiff to unconsented interrogation without the benefit of counsel concerning various criminal matters for which Mr. Monteilh was involved in, aside from those matters for which he was convicted, in violation of his rights under the sixth and eighth

amendments; and

c.　depriving Plaintiff of his liberty by subjecting him to unwarranted and unreasonable restraints on his person without due process in violation of his rights under the fifth amendment.

125.　Defendants Irvine Police Department and Detective Carr, along with and at the direction of the City of Irvine Police Chief Maggard, under color of law, intentionally, negligently, and with complete and deliberate indifference to Plaintiff's rights, caused Plaintiff to be deprived of his constitutional rights including but not limited to the fourth, fifth, sixth, and eighth amendments, by:

a.　failing to supervise properly the training and conduct of the Irvine Police Department, including but not limited to Defendant Detective Carr and Detective Jahid;

b.　failing to enforce the laws of the State of California and the provisions of the Constitution of the United States concerning use of force and interrogations performed by members of the police force; and

126.　Plaintiff's injuries and deprivations of constitutional rights were proximately caused by Defendants Irvine Police Department and Detective Carr, along with and at the direction of the City of Irvine Police Chief Maggard, because of:

a.　inadequate supervision of the training and conduct of Defendant Detective Carr, Detective Jahid and Does 1 - 10;

b.　failure to enforce the laws of the State of California and the provisions of the Constitution of the United

States; and

    c.    issuance of vague, confusing, and contradictory policies concerning the use of force and interrogations that are inconsistent with the requirements of the fourth, fifth, sixth, and eighth amendments of the United States Constitution.

127.    Defendant City of Irvine, under color of law, intentionally, negligently, and with complete and deliberate indifference for Plaintiff's rights, authorized, permitted, and tolerated the custom and practice of the unconstitutional and excessive use of force and interrogation practices by members of the Irvine Police Department and, in particular by Defendant Carr and at the direction of the City of Irvine Police Chief Maggard, by failing to:

    a.    appoint, promote, train and supervise members of the Irvine Police Department who would enforce the laws in effect in California and who would protect the constitutional rights of the people of California;

    b.    by permitting the policy and custom of using unreasonable force to exist and to be followed by the Irvine Police Department,

    c.    thereby proximately causing the deprivation of Plaintiff's rights under the fourth, fifth, sixth and eighth amendments to the United States Constitution.

128.    Defendants Ron Carr, the Irvine Police Department and DOES 1 - 30 are liable to Mr. Monteilh for damages for the deprivation of his rights in violation of 42 USC § 1983 and 1988 as prayed for below.

/ / /

## SECOND CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS - 42 USC § 1983

## AGAINST DEFENDANTS CARR AND

## IRVINE POLICE DEPARTMENT AND DOES 1 - 30

129.    Plaintiff incorporates the above stated paragraphs numbered 1 - 121, and each of them, as though set forth in their entirety herein.

130.    Shortly after the above-described incidents, Defendants Irvine Police Department, Detective Carr, the FBI and ASAC Barbara Walls appeared at the Orange County Jail where Mr. Monteilh was incarcerated.

131.    While interviewing suspected terrorists, Defendants Irvine Police Department, Detective Carr, the FBI and ASAC Barbara Walls improperly told the suspected terrorists incarcerated at the Orange County Jail that Mr. Monteilh was an informant.

132.    Once a prisoner is labeled as an informant or "snitch" in jail their life in jail and/or prison suddenly changes and is in immediate danger. In jail and prison a "snitch" is frowned upon and is at the bottom of the hierarchy of prison life and subject to the severest verbal and physical attacks, including murder.

133.    There is no real protection for a snitch in jail or prison, except protective custody, which also presents a different type of "hard time."  In protective custody prisoners are confined in units that are separated from the general population and they spend an enormous amount of time (sometimes up to 23 hours a day) confined to a small cell in a separate housing unit. This takes a huge psychological toll on the imprisoned individual because of the existential nature of the punishment. The prisoner becomes fully

1  aware of each moment and is left alone to contemplate his

2  situation, which at times is overwhelming and can lead to suicidal

3  tendencies.

4      134.    After the terrorists and other inmates were told by

5  Defendants that Mr. Monteilh was an informant or "snitch," they

6  published this information by word of mouth to other jails in

7  Orange County, Wasco State Prison and Coalinga Community

8  Correctional Facility.  The Defendants knew or should have known

9  that by telling the terrorists that Mr. Monteilh was an informant,

10 showing his picture and saying that he had previously worked with

11 Defendants, that said information would be published throughout

12 the jails and prisons where Mr. Monteilh would be incarcerated,

13 that his life would be placed in danger and that Mr. Monteilh would

14 suffer great mental and physical harms.

15     135.    Upon information and belief, Defendants further

16 published to other inmates and to the public at large, that Mr.

17 Monteilh was an informant. Defendant published this information

18 knowing it was dangerous and life threatening to Mr. Monteilh, or

19 with reckless disregard as to the effects if the statements.

20     136.    Until Defendants made their statements, there was no

21 information in the jail or prison, rumor or otherwise, to suggest that

22 Plaintiff was an informant. At no time did Plaintiff reveal his status

23 as a confidential informant for the FBI prior to Defendants' above-

24 described acts.

25     137.    As a direct and proximate result of the actions of

26 Defendants, a crisis atmosphere surrounded Plaintiff. Inmates

27 stayed away from Plaintiff and a substantial number of inmates

28 accosted, threatened, attacked and tried to kill Mr. Monteilh.

138.     As a direct and proximate result of the above-described conduct, the Plaintiff was subject to being accosted, threatened, attacked and attempted murder, causing physical injuries, scars, severe embarrassment, humiliation, mental anguish and psychological and emotional distress.

139.     As a further direct and proximate result of the above-described conduct, Plaintiff expressed thoughts of suicide and at times was severely depressed.

140.     As a further direct and proximate result of the above-described conduct, Plaintiff has suffered the deprivation of precious rights, privileges and immunities under the United States Constitution and the Constitution of the State of California, to his great detriment and loss.

141.     The actions of Defendants, in releasing private and confidential information about Mr. Monteilh's status as a confidential informant, was done pursuant to the policy, practice or custom of the Defendants concerning interrogations and investigations, which permitted, condoned and encouraged the release of information which was clearly confidential and private.

142.     As further evidence of said policy, Defendants, along with and at the direction of the City of Irvine Police Chief Maggard have intentionally, willfully or negligently failed to properly train, instruct and discipline Irvine Police Department officers, Detective Carr and other employees, including but not limited to the following:

        a.     failure to properly train and instruct police officers and other employees in the rights of persons, including Plaintiff, and the protection of confidential information;

b.     failure to adequately investigate allegations of improper police and other employees conduct;

c.     failure to discipline, prosecute or remove police officers and other employees who exceed their authority and violate the rights of persons, including Plaintiff.

143.     The actions of Defendants, acting under color of state and local law, custom and usage, deprived Plaintiff of his rights, privileges, and immunities under the laws and Constitution of the United States and the Constitution of the State of California, and in particular, of his right of privacy.

144.     By these actions, Defendants have jointly and severally deprived Plaintiff of his rights under the first, fourth and fourteenth amendments to the United States Constitution, in violation of 42 U.S.C. §§ 1983 and 1988.

### THIRD CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS [*Bivens*]

### AGAINST DEFENDANT BARBARA WALLS, IRVINE POLICE DEPARTMENT, RONALD CARR AND DOES 31 - 60

145.     Plaintiff incorporates the above stated paragraphs numbered 1 - 127, 128 - 143, and each of them, as though set forth in their entirety herein.

146.     Plaintiff is further informed, believes and based thereon alleges that Defendants Irvine Police Department and Detective Ronald Carr were concurrently working as members of the Orange County Joint Terrorism Task Force and were federally deputized at all times mentioned herein.

147.     The actions of Defendant Barbara Walls, acting under

color of federal law, and Defendants Irvine Police Department and Ronald Carr, acting under color of federal and state law, constituted an invasion of plaintiff's right to be secure in his person against unreasonable seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, an invasion of plaintiff's right to be free from deprivation of his liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, a deprivation of the plaintiff's right to the assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and an invasion of plaintiff's right to privacy as guaranteed by the Ninth Amendment to the United States Constitution.

148. The aforesaid actions of defendants further constituted an invasion of his privacy and abuse of process, all in violation of the law of the State of California where the incidents occurred.

149. Defendants Barbara Walls, Ron Carr, the Irvine Police Department and DOES 31 - 60 are liable to Mr. Monteilh for damages for his physical injuries, mental suffering and emotional distress injuries and the deprivation of his rights as prayed for below.

## FOURTH CAUSE OF ACTION
## FTCA - 28 USC § 2679, et seq. [NEGLIGENCE]
## AGAINST DEFENDANTS UNITED STATES AND DOES 61 - 100

150. Plaintiff incorporates all the above stated paragraphs, 1 - 121, as though set forth in their entirety herein.

151. The Federal Tort Claim Act (FTCA) authorizes recovery for personal injury, death, or property damage caused by negligent

1  federal government employees acting within the scope of their

2  federal employment.

3      152.    The liability of the United States and DOES 61 - 100 is

4  determined by the law of the state of California pursuant to 28 USC

5  § 2679.

6      153.    The negligence claims of Craig F. Monteilh against the

7  United States and DOES 61 - 100 are allowed pursuant to 28

8  U.S.C. § 2680.

9      154.    Plaintiff Craig F. Monteilh seeks the remedy of money

10  damages for the negligent acts and/or omissions of federal

11  government employees as set forth in the above-stated paragraphs.

12      155.    Plaintiff Craig F. Monteilh presented an administrative

13  tort claim to the FBI, within two years of accrual of the claim, for

14  adjudication before filing this suit in federal court.

15      156.    In the administrative tort claim presented to the FBI,

16  Plaintiff Craig F. Monteilh demanded $10,000,000, the same

17  amount demanded herein.

18      157.    Plaintiff Craig F. Monteilh has filed the instant Complaint

19  within six months of the agency's denial of the administrative tort

20  claim.

21      158.    Defendant United States, the FBI and DOES 61 - 100

22  were aware Plaintiff Craig F. Monteilh was working as an informant

23  for the FBI.

24      159.    Based upon the five (5) year agency relationship between

25  the FBI and Plaintiff Craig F. Monteilh, the signed Federal

26  documents describing the agency relationship, the guidelines which

27  the FBI is required to follow concerning its confidential informants,

28  and the representation made by the FBI concerning its duties to

Plaintiff Craig F. Monteilh for his work as an informant, Defendant United States, the FBI and DOES 61 - 100 had a legal duty to exercise reasonable care in the handling of Plaintiff Craig F. Monteilh as an informant.

160.    Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused his unconsented rendition from the Orange County Jail to a foreign location, as set forth above.

161.    Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him, under duress, to submit to a polygraph as described above.

162.    Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused his status as an informant to be revealed to terrorists and other inmates at the Orange County Jail, Wasco State Prison and Coalinga Community Correctional Facility.

163.    Until Defendants made their statements, there was no information in the jail or prison, rumor or otherwise, to suggest that Plaintiff was an informant. At no time did Plaintiff reveal his status as a confidential informant for the FBI prior to Defendants' above-described acts.

164.    As a direct and proximate result of the actions of Defendant United States, the FBI and DOES 61 - 100, a crisis atmosphere surrounded Plaintiff whereby many inmates stayed away from Plaintiff and a substantial number of inmates accosted, threatened, attacked and tried to kill Mr. Monteilh.

165.    As a direct and proximate result of the actions of Defendant United States, the FBI and DOES 61 - 100, the Plaintiff

was subject to being accosted, threatened, attacked and attempted murder, causing physical injuries, scars, severe embarrassment, humiliation, mental anguish and psychological and emotional distress.

166. As a further direct and proximate result of the above-described actions of Defendant United States, the FBI and DOES 61 - 100, Plaintiff expressed thoughts of suicide and at times was severely depressed.

167. The actions of Defendants, in releasing private and confidential information about Mr. Monteilh's status as a confidential informant, was done pursuant to the policy, practice or custom of the Defendants concerning interrogations and investigations, which permitted, condoned and encouraged the release of information which was clearly confidential and private.

168. Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him to be removed from protective custody and suffer further physical injuries, mental suffering and emotional distress injuries.

169. Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh caused the foreseeable harm described in the preceding paragraphs, including but not limited being identified in jail and prison as an informant or snitch, being placed in general population in prison, being removed from protective custody and placed back into general population, being attacked and stabbed, and living in fear for his life.

170. The acts and omissions of Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh were the proximate and legal cause of damages to Plaintiff

Craig F. Monteilh, reason by which Defendants must to compensate all the damages they have caused, including but not limited to damages for physical injuries, mental suffering, emotional distress, lost wages, and economic damages.

171. Defendants FBI and DOES 61 - 100 are liable to Mr. Monteilh for damages in excess of $10,000,000 as prayed for below.

**FIFTH CAUSE OF ACTION**

**FTCA - 28 USC § 2679, et seq.**

**[NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS]**

**AGAINST DEFENDANTS UNITED STATES AND DOES 61 - 100**

172. Plaintiff incorporates all the above stated paragraphs, 1 - 121, as though set forth in their entirety herein.

173. The Federal Tort Claim Act (FTCA) authorizes recovery for personal injury, death, or property damage caused by negligent federal government employees acting within the scope of their federal employment.

174. The liability of the United States and DOES 61 - 100 is determined by the law of the state of California pursuant to 28 USC § 2679.

175. The negligence claims of Craig F. Monteilh against the United States and DOES 61 - 100 are allowed pursuant to 28 U.S.C. § 2680.

176. Plaintiff Craig F. Monteilh seeks the remedy of money damages for the negligent acts and/or omissions of federal government employees as set forth in the above-stated paragraphs.

177. Plaintiff Craig F. Monteilh presented an administrative tort claim to the FBI, within two years of accrual of the claim, for adjudication before filing this suit in federal court.

178.    In the administrative tort claim presented to the FBI, Plaintiff Craig F. Monteilh demanded $10,000,000, the same amount demanded herein.

179.    Plaintiff Craig F. Monteilh has filed the instant Complaint within six months of the agency's denial of the administrative tort claim.

180.    Defendant United States, the FBI and DOES 61 - 100 were aware Plaintiff Craig F. Monteilh was working as an informant for the FBI.

181.    Based upon the five (5) year agency relationship between the FBI and Plaintiff Craig F. Monteilh, the signed Federal documents describing the agency relationship, the guidelines which the FBI is required to follow concerning its confidential informants, and the representation made by the FBI concerning its duties to Plaintiff Craig F. Monteilh for his work as an informant, Defendant United States, the FBI and DOES 61 - 100 had a legal duty to exercise reasonable care in the handling of Plaintiff Craig F. Monteilh as an informant.

182.    Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him under duress to engage in illegal activities including but not limited to racial profiling, religious profiling, instigating extremist rhetoric to entrap Muslims, blackmailing Muslims to become informants,  Mr. Monteilh being armed to attend mosques, Mr. Monteilh being told to engage in sexual relations with Muslim women despite being married, and the misuse of surveillance devices in the Islamic community and warrantless wiretapping. This continued mishandling of Mr. Monteilh as a confidential informant caused

and exacerbated the emotional distress and mental suffering of Mr. Monteilh.

183.   Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him under duress to keep his audio and visual recording equipment on at all times, including the time he spent with Muslim women on dates, discussing their private and personal thoughts, and while engaged in various sexual acts and states of coitus.  Mr. Monteilh suffered emotional distress and mental anguish because he was informed that the audio was listened to and the videos watched by many FBI agents and analysts on a daily basis, who had thoughts and comments about the sexual prowess of Mr. Monteilh and the Muslim women.  Again, Mr. Monteilh followed the orders under duress, and these actions, orders and tasks caused him severe emotional distress and mental anguish which continues to this day.

Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused his unconsented rendition from the Orange County Jail to a foreign location, as set forth above.

184.   Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him, under duress, to submit to a polygraph as described above.

185.   Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused his status as an informant to be revealed to terrorists and other inmates at the Orange County Jail, Wasco State Prison and Coalinga Community Correctional Facility.

186.   Until Defendants made their statements, there was no

information in the jail or prison, rumor or otherwise, to suggest that Plaintiff was an informant. At no time did Plaintiff reveal his status as a confidential informant for the FBI prior to Defendants' above-described acts.

187.    As a direct and proximate result of the actions of Defendant United States, the FBI and DOES 61 - 100, a crisis atmosphere surrounded Plaintiff whereby many inmates stayed away from Plaintiff and a substantial number of inmates accosted, threatened, attacked and tried to kill Mr. Monteilh.

188.    As a direct and proximate result of the actions of Defendant United States, the FBI and DOES 61 - 100, the Plaintiff was subject to being accosted, threatened, attacked and attempted murder, causing physical injuries, scars, severe embarrassment, humiliation, mental anguish and psychological and emotional distress.

189.    As a further direct and proximate result of the above-described actions of Defendant United States, the FBI and DOES 61 - 100, Plaintiff expressed thoughts of suicide and at times was severely depressed.

190.    The actions of Defendants, in releasing private and confidential information about Mr. Monteilh's status as a confidential informant, was done pursuant to the policy, practice or custom of the Defendants concerning interrogations and investigations, which permitted, condoned and encouraged the release of information which was clearly confidential and private.

191.    Defendant United States, the FBI and DOES 61 - 100, in breach of their duty of care to Mr. Monteilh, caused him to be removed from protective custody and suffer further physical

1 │ injuries, mental suffering and emotional distress injuries.

2 │     192.    Defendant United States, the FBI and DOES 61 - 100, in
3 │ breach of their duty of care to Mr. Monteilh caused the foreseeable
4 │ harm described in the preceding paragraphs, including but not
5 │ limited being identified in jail and prison as an informant or snitch,
6 │ being placed in general population in prison, being removed from
7 │ protective custody and placed back into general population, being
8 │ attacked and stabbed, and living in fear for his life.

9 │     193.    The acts and omissions of Defendant United States, the
10 │ FBI and DOES 61 - 100, in breach of their duty of care to Mr.
11 │ Monteilh were the proximate and legal cause of damages to Plaintiff
12 │ Craig F. Monteilh, reason by which Defendants must to compensate
13 │ all the damages they have caused, including but not limited to
14 │ damages for physical injuries, mental suffering, emotional distress,
15 │ lost wages, and economic damages.

16 │     194.    Defendants FBI and DOES 61 - 100 are liable to Mr.
17 │ Monteilh for damages in excess of $10,000,000 as prayed for below

18 │ **PRAYER**

19 │     WHEREFORE, Plaintiff Craig F. Monteilh prays for judgment
20 │ against Defendants, and each of them, as follows:

21 │ FIRST CAUSE OF ACTION:

22 │ 1.  For general damages in a sum according to proof at trial in
23 │     excess of $75,000;

24 │ 2.  For special damages in a sum according to proof at trial in
25 │     excess of $75,000;

26 │ 3.  For economic damages in a sum according to proof at trial in
27 │     excess of $75,000;

28 │ 4.  For consequential damages in a sum according to proof at trial

1    in excess of $75,000;

2    5.  For attorneys' fees per statute;

3    6.  For such other relief as the Court deems just and proper.

4    SECOND CAUSE OF ACTION:

5    7.  For general damages in a sum according to proof at trial in
6        excess of $75,000;

7    8.  For statutory damages in a sum according to proof at trial in
8        excess of $75,000;

9    9.  For economic damages in a sum according to proof at trial in
10       excess of $75,000;

11   10. For consequential damages in a sum according to proof at trial
12       in excess of $75,000;

13   11. For attorneys' fees per statute;

14   12. For such other relief as the Court deems just and proper.

15   THIRD CAUSE OF ACTION:

16   13. For general damages in a sum according to proof at trial in
17       excess of $75,000;

18   14. For statutory damages in a sum according to proof at trial in
19       excess of $75,000;

20   15. For economic damages in a sum according to proof at trial in
21       excess of $75,000;

22   16. For consequential damages in a sum according to proof at trial
23       in excess of $75,000;

24   17. For attorneys' fees per statute;

25   **FOURTH CAUSE OF ACTION**

26   18. For such other relief as the Court deems just and proper.

27   19. For general damages in excess of $10,000,000, according to
28       proof.

SECOND AMENDED COMPLAINT
OF CRAIG MONTEILH

USDC, CENTRAL DISTRICT
CASE NO. SACV 10-00102-JVS(RNBx)

-46-

20. For economic damages in a sum according to proof at trial;

21. For consequential damages in a sum according to proof at trial;

22. For attorneys' fees per statute;

23. For such other relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION**

24. For such other relief as the Court deems just and proper.

25. For general damages in excess of $10,000,000, according to proof.

26. For economic damages in a sum according to proof at trial;

27. For consequential damages in a sum according to proof at trial;

28. For attorneys' fees per statute;

**ON ALL CAUSES OF ACTION**

29. Costs of suit;

30. Pre and/or post judgment interest at the maximum legal rate;

31. For such other relief as the Court deems just and proper.

WOODS & KROLIKOWSKI

Dated: September 2, 2010

Adam J. Krolikowski, Esq.
For Plaintiff Craig F. Monteilh