1   TONY WEST
    Assistant Attorney General
2   ANDRE BIROTTE JR.
    United States Attorney
3   VINCENT M. GARVEY
    Deputy Branch Director
4   ANTHONY J. COPPOLINO
    E-mail: tony.coppolino@usdoj.gov
5   LYNN. Y LEE (SBN #235531)
    E-mail: lynn.lee@usdoj.gov
6   U.S. Department of Justice
    Civil Division, Federal Programs Branch
7   20 Massachusetts Avenue, N.W.
    Washington, D.C.  20001
8   Telephone: 202-514-4782
    Facsimile: 202-616-8460
9   *Attorneys for the Federal Bureau of Investigation and*
    *Defendants Mueller and Martinez Sued in their*
10  *Official Capacities*

11              IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                   SANTA ANA DIVISION

13  _____

14  YASSIR FAZAGA *et al.*,          ) CASE:  SA11-CV-00301 CJC (VBKx)
                                     )
15       Plaintiffs,                 ) **NOTICE OF MOTION AND MOTION**
                                     ) **TO DISMISS AND FOR SUMMARY**
16                                   ) **JUDGMENT**
    v.                               )
17                                   ) DATE:    November 14, 2011
    FEDERAL BUREAU OF                ) TIME:    1:30 p.m.
18  INVESTIGATION *et al.*,          ) JUDGE:   Hon. Cormac J. Carney
                                     )
19       Defendants.                 )
    _____ )

20

21          PLEASE TAKE NOTICE that defendants Federal Bureau of Investigation

22  ("FBI"), Robert Mueller, Director of the FBI sued in his official capacity, and

23  Steven Martinez, Assistant Director in Charge of the FBI Los Angeles Field

24  office, sued in his official capacity (hereafter "Government Defendants"), will

25  bring the following Motion to Dismiss before the Honorable Cormac J. Carney,

26  United States District Judge, in his courtroom, U.S. Courthouse, 411 West Fourth

27  Street, Santa Ana, California, on November 14, 2011 at 1:30 p.m., or at such time

28  as the Court may direct that matter be heard.

The Government Defendants move to dismiss the following counts against them pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.  The grounds for this are as follows:

(1) Plaintiffs' Second, Fourth, and Seventh Causes of Action fail to state a claim against the Government Defendants, and the Court lacks jurisdiction to review these claims against the Government Defendants, on the ground that the Congress has not waived sovereign immunity to authorize claims against the United States pursuant to 42 U.S.C. § 1985(3) and 28 U.S.C. § 1343.

(2) Plaintiffs' Eighth Cause of Action fails to state a claim against Defendant FBI under Sections 552a(e)(7) and 552a(g)(1)(D) of the Privacy Act, 5 U.S.C. §§ 552a(e)(7),(g)(1)(D).

(3) Plaintiffs' Tenth Cause of Action fails to state a claim against the Government Defendants, and the Court lacks jurisdiction to review this claim against the Government Defendants, on the ground that the Congress has not waived sovereign immunity to authorize claims against the United States pursuant to Section 110 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810.

(4) The Government Defendants also seek summary judgment with respect to all claims against them on the ground that the sole relief sought against the Government Defendants in the form of the expungement of records is barred by operation of the Privacy Act.

(5) In the alternative, to the extent the claims are not dismissed on other grounds, the Government Defendants also move to dismiss plaintiffs' First, Second, Third, Fourth, Fifth, Sixth Seventh, and Eighth Causes of Action on the ground that certain evidence needed to litigate these claims is properly protected by the Attorney General's assertion of the state secrets privilege.

1    The grounds for this motion are set forth further in the accompanying

2 Memorandum of Points and Authorities.

3    Pursuant to Local Rule 7-3, the parties conferred in connection with the

4 relief sought in this motion.  Plaintiffs oppose this motion.

5                                    Respectfully submitted,

6                                    TONY WEST
                                     Assistant Attorney General
7
                                     ANDRE BIROTTE, JR
8                                    United States Attorney

9                                    VINCENT M. GARVEY
                                     Deputy Branch Director
10
                                        /s/ Anthony J. Coppolino
11
                                     ANTHONY J. COPPOLINO
12                                   E-mail: tony.coppolino@usdoj.gov

13                                      /s/ Lynn Y. Lee

14                                   LYNN Y. LEE (SBN # 235531)
                                     E-mail: lynn.lee@usdoj.gov
15
                                     U.S. Department of Justice
16                                   Civil Division, Federal Programs Branch
                                     20 Massachusetts Avenue, N.W.
17                                   Washington, D.C.  20001
                                     Telephone: 202-514-4782
18                                   Facsimile:   202-616-8460

19                                   *Attorneys for the Federal Bureau of*
                                     *Investigation and Defendants Mueller and*
20                                   *Martinez Sued in their Official Capacities*

21

22

23

24

25

26

27

28                                            3

TONY WEST
Assistant Attorney General
ANDRE BIROTTE JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN. Y LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: 202-514-4782
Facsimile: 202-616-8460
*Attorneys for the Federal Bureau of Investigation and
Defendants Mueller and Martinez Sued in their
Official Capacities*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | CASE:   SA11-CV-00301 CJC (VBKx) |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GOVERNMENT DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT** |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION, *et al.*, | DATE:    November 14, 2011 TIME:    1:30 p.m. JUDGE:  Hon. Cormac J. Carney |
| Defendants. | |

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    Plaintiffs' Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   FBI Post 9/11 Counterterrorism Concerns and Policies. . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED ON
      NON-PRIVILEGE GROUNDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Plaintiffs' Second, Fourth, and Seventh Causes of Action
            Should Be Dismissed Because Sovereign Immunity Bars
            Section 1985(3) Suits Against the United States. . . . . . . . . . . . . . . 10

      B.    Plaintiffs' Tenth Cause of Action Should Be Dismissed
            Because Sovereign Immunity Bars Suit Against the United
            States Under Section 1810 of the Foreign Intelligence
            Surveillance Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    Plaintiffs Fail to State a Claim Upon Which Relief May
            Be Granted Under the Privacy Act.. . . . . . . . . . . . . . . . . . . . . . . . . 15

      D.    FBI Investigative Records Are Exempt from the Amendment
            Provisions of the Privacy Act and Are Therefore Not Subject
            to Expungement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      E.    Because Plaintiffs Are Foreclosed From Obtaining
            Expungement Under the Privacy Act, They Cannot Obtain
            Expungement for Any of Their Causes of Action. . . . . . . . . . . . . . 20

II.   THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS
      CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS'
      ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

A.   The State Secrets Privilege Bars the Use of Privileged Information in Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    1.   Procedural Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.   The Court's Independent Evaluation of the Claim of Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    3.   Impact of Privilege Assertion. . . . . . . . . . . . . . . . . . . . . . . . . . 25

    4.   Attorney General's Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.   The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case. . . . . . . 27

C.   The Exclusion of Properly Privileged Information Requires The Dismissal of the Claims Based on Allegations of Discrimination Based on Religion. . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ii

# TABLE OF AUTHORITIES

## CASES                                                                          PAGE(S)

*Affiliated Professional Home Health Care Agency v. Shalala*,
  164 F.3d 282 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Al-Haramain Islamic Found. v. Bush*,
  507 F.3d 1190 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Arar v. Ashcroft*,
  585 F.3d 559 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Asmar v. U.S. Dep't. of Treasury, I.R.S.*,
  680 F. Supp. 248 (E.D. Mich. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Balser v. Dep't. of Justice, Office of U.S. Trustee*,
  327 F.3d 903 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bareford v. Gen. Dynamics Corp.*,
  973 F.2d 1138 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bassiouni v. FBI*,
  436 F.3d 712 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bush v. Lucas*,
  462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983). . . . . . . . . . . . . . . 31

*Cell Assoc's, Inc. v. Nat'l Inst. of Health*,
  579 F.2d 1155 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*,
  331 F.3d 918 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). . . . . . . . . . . . . . 32

*City of Milwaukee v. Illinois*,
  451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981). . . . . . . . . . . . . . . 20

iii

*Comm. in Solidarity with the People of El Salvador v. Sessions*,
    738 F. Supp. 544 (D.D.C. 1990), *aff'd*, 929 F.2d 742 (D.C. Cir. 1991).. . . . . 17

*Davis v. United States Dep't of Justice*,
    204 F.3d 723 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dep't of Energy v. Ohio*,
    503 U.S. 607, 112 S. Ct. 1627 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Doe v. FBI*,
    936 F.2d 1346 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doe v. United States Air Force*,
    812 F.2d 738 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dunn & Black, P.S. v. United States*,
    492 F.3d 1084 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*El-Masri v. United States*,
    479 F.3d 296 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

*Ellsberg v. Mitchell*,
    709 F.2d 51 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*FDIC v. Meyer*,
    510 U.S. 471, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994). . . . . . . . . . . . . . . . 10

*Farnsworth Cannon, Inc. v. Grimes*,
    635 F.2d 268 (4th Cir. 1980) (*en banc*). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fendler v. United States Bureau of Prisons*,
    846 F.2d 550 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fendler v. United States Parole Commission*,
    774 F.2d 975 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Fitzgerald v. Penthouse Int'l, Ltd.*,
    776 F.2d 1236 (4th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iv

*Gilbert v. DaGrossa*,
   756 F.2d 1455 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Haase v. Sessions*,
   893 F.2d 370 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Halkin v. Helms*,
   690 F.2d 977 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Kasza v. Browner*,
   133 F.3d 1159 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

*Lane v. Pena*,
   518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996). . . . . . . . . . . .   11, 12

*Mohamed v. Jeppesen Dataplan, Inc.*,
   614 F.3d 1070 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

*Mueller v. United States*,
   2009 WL 273283 (C.D. Cal. Feb. 2, 2009). . . . . . . . . . . . . . . . . . . . . . . . .   10, 11

*In re: Nat'l Security Agency Telecomm. Records Litig., Al-Haramain Islamic Found. v. Bush*,
   564 F. Supp. 2d 1109 (N.D. Cal. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Navajo Nation v. United States Forest Svc.*,
   535 F.3d 1058 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*Pit River Home & Agr. Co-op. Ass'n v. United States*,
   30 F.3d 1088 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Presbyterian Church v. United States*,
   752 F. Supp. 1505 (D. Ariz. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32, 33

*Presbyterian Church v. United States*,
   870 F.2d 518 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32, 33

*Roum v. Bush*,
   461 F. Supp. 2d 40 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

v

*Sierra Club v. Whitman*,
   268 F.3d 898 (9th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Socialist Workers Party v. Att'y General*,
   642 F. Supp. 1357 (S.D.N.Y. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sterling v. Tenet*,
   416 F.3d 338 (4th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Totten v. United States*,
   92 U.S. 105, 23 L. Ed. 605 (1875). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Nordic Village, Inc.*,
   503 U.S. 30, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992). . . . . . . . . . . . . . . . 12

*United States v. Reynolds*,
   345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 727 (1953).. . . . . . . . . . . . . . . . . . . . passim

*United States v. Singleton*,
   165 F.3d 1297 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Smith*,
   940 F.2d 395 (9th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Testan*,
   424 U.S. 392, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976). . . . . . . . . . . . . . . . . 10

*Vacek v. U.S. Postal Serv.*,
   447 F.3d 1248 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 2122 (2007). . . . . . . 10

*Vermont Agency of Nat. Res. v. United States*,
   529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000). . . . . . . . . . . . . . . 13

*West v. Fed. Aviation Admin.*,
   830 F.2d 1044 (9th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wilkie v. Robbins*,
   551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007). . . . . . . . . . . . . . . 31

vi

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58, 109 S. Ct. 23094, 105 L. Ed. 2d 45 (1989). . . . . . . . . . . . . . . . . 13

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## **STATUTES**

5 U.S.C. § 552a(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5 U.S.C. § 552a(e)(7).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 552a(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

5 U.S.C. § 552a(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5 U.S.C. § 552a(k).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 2520. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 2712. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 1985(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11

42 U.S.C. § 2000bb-1(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

50 U.S.C. § 1801(m). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

50 U.S.C. § 1806. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1809. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

50 U.S.C. § 1810. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

50 U.S.C. § 1825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1845. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## **RULES AND REGULATIONS**

28 C.F.R. § 16.96.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

## **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 16.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 35

Fed. R. Civ. P. 26.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 35

Fed. R. Civ. P. 56.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1

## **INTRODUCTION**

2          This lawsuit puts at issue whether the Federal Bureau of Investigation

3   ("FBI") engaged in impermissible counterterrorism investigative activity in

4   Southern California.  The defendants are the FBI, two FBI officials sued in their

5   official capacities, FBI Director Robert Mueller and Steven M. Martinez, the

6   Assistant Director in Charge ("ADC") of the FBI's Los Angeles Field Office

7   (collectively, "Government Defendants" or "Government"), and named and

8   unnamed FBI agents sued in their individual capacities.  *See* Compl. (Dkt #1)

9   ¶¶ 15-23.  Plaintiffs are three residents of Southern California who allege that,

10  through an investigation dubbed "Operation Flex," the FBI utilized a paid

11  informant (Craig Monteilh) to "indiscriminately collect personal information on

12  hundreds and perhaps thousands of innocent Muslim Americans in Southern

13  California . . . simply because the targets were Muslim."  *See id.* ¶¶ 1-3, 85-87.

14         Plaintiffs also assert that Operation Flex was part of the FBI's effort, after

15  the terrorist attacks of September 11, 2001, to focus counterterrorism

16  investigations on Muslim communities in the United States under applicable

17  policies issued after 9/11.  *See* Compl. ¶¶ 24, 32-37.  Plaintiffs seek damages

18  against the individual capacity defendants and injunctive relief against the

19  Government Defendants in the form of the disclosure or destruction of the

20  investigative information.  *See id.* ¶¶ 15-17; Prayer for Relief ¶¶ b-d.

21         The FBI has made clear that counterterrorism investigations may not be

22  based solely on religion or First Amendment protected activities; indeed, the very

23  policies plaintiffs cite in their Complaint set forth these FBI policies.  It should be

24  apparent, however, that moving beyond these important general principles to the

25  details of a specific investigation in order to rebut plaintiffs' claims would require

26  the disclosure of sensitive investigative information.

27         While the FBI has previously acknowledged that Mr. Monteilh was a

28  confidential source, a range of details concerning Operation Flex, for which

Monteilh provided information, remains properly protected counterterrorism investigative information.  This includes, principally, evidence detailing the nature and scope of Operation Flex – precisely what that investigation entailed and why it was undertaken, the identity of particular subjects, and the reasons they were investigated.  This evidence is by no means at the margins of this lawsuit.  The purpose of the plaintiffs' claims is to ascertain what Operation Flex entailed and to litigate its alleged unlawfulness.  Accordingly, as set forth in more detail below, the Government has taken the following steps in response to the Complaint, which seek to protect certain evidence that cannot be disclosed in the interests of national security without seeking dismissal of all claims on that basis.

First, the Attorney General has identified and asserted the state secrets privilege over certain investigative information implicated by the allegations in this case – (i) the identities of particular subjects of counterterrorism investigations, including in Operation Flex; (ii) the reasons those investigations occurred; and (iii) particular sources and methods utilized by the FBI in the investigations – because the privilege is "necessary to protect against the risk of significant harm to national security."  *See* Declaration of Eric H. Holder ("Holder Decl.") ¶¶ 3-4.  The basis for the Attorney General's privilege assertion is set forth to the extent possible on the public record in the Attorney General's unclassified declaration, as well as in an unclassified declaration of Mark Giuliano, Assistant Director of the FBI's Counterterrorism Division.  Details concerning why this information is properly protected from disclosure are set forth in the classified declaration of Mr. Giuliano submitted for the Court's *ex parte, in camera* review.[1]

---

[1]  Through this *ex parte, in camera* submission, the Government seeks to inform the Court at the outset of this case as to the sensitive, privileged facts that the Government believes must be protected from disclosure and excluded from the case.  The Government does not consent to the disclosure of the information described in the classified Giuliano Declaration to plaintiffs or their counsel.

In accord with a policy announced on September 23, 2009, the Attorney General's privilege assertion in this case is "necessary to protect against the risk of significant harm to national security."  *See* Holder Decl. ¶ 12 and Exhibit 1 thereto (State Secrets Policy).

Importantly, however, the Attorney General's privilege assertion is limited in nature, and the Government's request for dismissal is narrowly tailored.  The Government does not seek dismissal of all claims at the outset based on the privilege assertion, nor to bar disclosure of all information concerning Operation Flex or Monteilh's activities.  The Government's motion relies first on considerations apart from state secrets that require dismissal of plaintiffs' claims.  The Government's motion then seeks to distinguish between claims for which privileged evidence would be required and claims that may not require such evidence.  Where litigation of a claim would risk or require the disclosure of privileged information, and the claim is not otherwise dismissed on non-privilege grounds, the need to protect properly privileged information would require dismissal of that claim.

With respect to non-privilege grounds for dismissal, the Government Defendants show below that plaintiffs' claims against the FBI and official capacity defendants brought pursuant to two statutory provisions – 42 U.S.C. § 1985(3) and Section 1810 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810 – should be dismissed because sovereign immunity bars these causes of action as to the United States and Government officials sued in their official capacities.  Further, plaintiffs' Privacy Act claim against the FBI should be dismissed for failure to state a claim upon which relief can be granted.  Plaintiffs have failed to sufficiently plead the elements of their claim and, in particular, seek injunctive relief that is not available under the cause of action at issue.  The Government also seeks summary judgment on plaintiffs' Privacy Act claim on the ground that the records at issue in this case are maintained in a system of records

that is exempt by the Act from requests to disclose or amend them.  The Government further contends that operation of the Privacy Act forecloses the injunctive relief of expungement that plaintiffs seek as to all claims, and since this is the *only* relief plaintiffs are seeking for any and all of their claims against the Government Defendants, the Court should dismiss the entire Complaint as to the FBI and Defendants Mueller and Martinez.

Absent dismissal on the non-privilege grounds advanced by the Government (or by individual capacity defendants in their separate motions), the Government does not seek to dismiss plaintiffs' Fourth Amendment and FISA claims based on the state secrets privilege.  At least at this stage of the proceedings, the Government believes that sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive the defendants' motions to dismiss on non-privilege grounds.  The FBI has previously disclosed in a separate criminal proceeding that Mr. Monteilh collected audio and video information for the FBI, and some of that audio and video information was produced in that prior case.  *See* Public Declaration of Mark. F. Giuliano ("Public Giuliano Decl.") ¶ 12. The FBI is reviewing additional audio and video collected by Monteilh for possible disclosure in connection with further proceedings on the issue of whether the FBI instructed or permitted Monteilh to leave recording devices unattended in order to collect non-consenting communications.  *See id.*  The FBI expects that the majority of the audio and video will be available in connection with further proceedings.  Thus, while it remains possible that the need to protect properly privileged national security information might still foreclose litigation of these claims, at present the Government does not seek dismissal of plaintiffs' Fourth Amendment and FISA claims based on the state secrets privilege assertion.

In contrast, however, opposing plaintiffs' allegations of an indiscriminate investigation based solely on religion would risk or require the disclosure of properly privileged information, and the Government Defendants do seek

dismissal at the outset of plaintiffs' claims based on these allegations. *See* Compl.,

Causes of Action 1 to 7.  While presented under various legal theories, plaintiffs'

first seven causes of action raise one issue: whether the FBI, through its agents,

impermissibly investigated and collected information on plaintiffs (and other

putative class members) based solely on their religion.  These claims put at issue

core privileged information concerning the scope and purpose of Operation Flex.

Because plaintiffs allege that the FBI indiscriminately collected information based

solely on religion, any rebuttal of this claim would require disclosure of whom and

what the FBI was investigating under Operation Flex and why.  This is precisely

the kind of sensitive investigative information that cannot be disclosed without

risking significant harm to national security.

The Court should first consider the impact of the privilege assertion on

claims brought against the individual capacity defendants.  These individuals have

threshold legal defenses under the *Bivens* and qualified immunity doctrines.

Moreover, because the individual capacity defendants will need properly protected

information to defend themselves against claims that Operation Flex was based

solely on religion, these claims should be dismissed at the outset as to the

individual capacity defendants. *Mohammed v. Jeppesen Dataplan, Inc.,* 614 F.3d

1070, 1077 (9th Cir. 2010).  Similarly, the Government Defendants would also

require properly privileged information to respond to plaintiffs' claims of religious

discrimination, and dismissal of these claims at this stage based on the privilege

assertion would also be appropriate.  To the extent the Court wishes to evaluate

the impact of the privilege assertion further, it should at least dismiss plaintiffs'

religious discrimination claims against the individual capacity defendants in light

of their unique threshold legal defenses, and require plaintiffs to demonstrate in

proceedings under Fed. R. Civ. P. 16 and 26 what discovery it intends to seek

against the Government Defendants concerning these claims.

Proceeding in the foregoing manner, the Government Defendants seek to

advise the Court at the outset of the underlying national security information that lies at the heart of this case and must be protected, but narrowly tailor their request for dismissal by presenting non-privilege defenses first, seeking dismissal of some but not all claims on privilege grounds, and focusing on the impact of the privilege on the threshold defenses of the individual capacity defendants, before addressing whether any remaining claims against the Government Defendants should also be dismissed on privilege grounds.

## BACKGROUND

## I.   Plaintiffs' Claims

Plaintiffs allege that the FBI, through the use of Craig Monteilh as a confidential informant, indiscriminately collected information on thousands of Muslims, including hundreds of phone numbers, thousands of email addresses, hundreds of hours of video, and thousands of hours of audio.  *See* Compl. ¶ 2. Plaintiffs allege that, as part of Operation Flex, Monteilh was instructed to infiltrate ten mosques in southern California, *see id.* ¶¶ 90, 92, in order to gather information on Muslims due solely to their religion.  *Id.* ¶ 3; *see also id.* ¶¶ 84, 87-88, 96.  The three named plaintiffs – Yassir Fazaga, Ali Uddin Malik, and Yasser AbdelRahim – allege that Monteilh's interactions with them were part of this alleged "dragnet" surveillance.  *Id.* ¶ 84.  These plaintiffs also make specific allegations concerning the FBI's alleged investigative interest in them.  For example, plaintiffs allege that the FBI instructed Monteilh to conduct surveillance at Orange County Islamic Foundation, where plaintiff Fazaga was imam, on the ground that the FBI believed Fazaga was radical.  *See id.* ¶¶ 165-66.  Plaintiffs also allege that the FBI told Monteilh that they were suspicious of Malik because he had gone to a religious school in Yemen and was allegedly involved in the Muslim Student Union.  *See id.* ¶¶ 183-84.  Plaintiffs also allege that the FBI told Monteilh that plaintiff AbdelRahim's home was under surveillance, and that the FBI believed AbdelRahim was the leader of a terrorist cell.  *See id.* ¶¶ 196-97.

The Complaint sets forth alleged instructions provided to Monteilh, *see id.* ¶¶ 96-116, 126-131, and asserts in particular that the FBI acquiesced in Monteilh leaving audio devices unattended to record proceedings inside mosques. *See id.* ¶¶ 121-124.

Plaintiffs sue the FBI and official capacity defendants for injunctive relief in the form of the disclosure or destruction of records on the ground that the FBI is an agency within the meaning of the Privacy Act, that Director Mueller and ADC Martinez are responsible for the direction and oversight of the agency and Los Angeles field office respectively, and maintain records on individuals whom FBI agents have investigated. *See* Compl. ¶¶ 15-17, Prayer for Relief ¶ b. Plaintiffs seek certification of a class of "[a]ll individuals targeted by Defendants for surveillance or information-gathering through Monteilh and Operation Flex, on account of their religion, and about whom the FBI thereby gathered personally identifiable information." *Id.* ¶ 215.

## II.   FBI Post 9/11 Counterterrorism Concerns and Policies

Plaintiffs allege that Operation Flex was part of the FBI's effort to focus counterterrorism investigations after the attacks of September 11, 2001 on Muslim communities in the United States. *See id.* ¶ 24. They assert that investigative activity based on religion is contemplated by and permissible under guidelines issued by the Attorney General and the FBI after the 9/11 attacks and the FBI's *Domestic Intelligence and Operations Guides* ("DIOG") published in December 2008. *See id.* ¶¶ 32-37.

Since the 9/11 attacks, the FBI has made clear that its top priority continues to be the prevention of terrorist attacks against the United States. *See* Public Giuliano Decl. ¶ 7. As the FBI explains, al Qaeda's intent to conduct high-profile attacks inside the United States has been unwavering. *See id.* Threats to the U.S. homeland can be seen, for example, in the August 2006 plan to attack U.S.-bound aircraft using improvised explosive devices, as well as terrorist plans to attack the

New York City subway system and detonate a car bomb in Times Square.  *See id.* ¶¶ 7-9.  The threat of home-grown violent extremists – those who have lived primarily inside the United States and may commit acts of violence in furtherance of the objectives of a foreign terrorist organization – remains a particular concern of the FBI.  *See id.* ¶ 10. The Los Angeles area itself saw such a threat in the exposed 2005 plot of extremists to attack a military recruiting center in Santa Monica and later attack a West Los Angeles temple on Yom Kippur.  *See id.*  It is therefore beyond reasonable dispute that the FBI must remain vigilant in detecting and preventing terrorist attacks in the United States.

At the same time, FBI policy prohibits investigative activity solely on the basis of religion or First Amendment expression.  The Attorney General's Guidelines for FBI National Security Investigation and Foreign Intelligence Collection, effective October 31, 2003, and the Guidelines which superseded them – the Attorney General's Guidelines for Domestic FBI Operation issued by the Attorney General on September 29, 2008 – state: "These guidelines do not authorize investigating or collecting or maintaining information on United States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or law of the United States."  *See* Public Giuliano Decl. ¶ 4, Tab 2 (Excerpts 2008 AG Guidelines) at 13.

Likewise, the FBI's DIOG prohibits investigative activity conducted for the sole purpose of monitoring the exercise of Constitutional rights or on the basis of race, ethnicity, national origin, or religion.  *See* Public Giuliano Decl., Tab 3 (DIOG Excerpts) at 21-38.  Under the DIOG, there must be an authorized purpose for investigative activity that could have an impact on religious practice.  *Id.* at 21. The DIOG explains that this policy does not mean that religious practitioners or religious facilities are completely free from being examined as part of FBI investigative activity.  If such practitioners are involved in – or such facilities are

-8-

1   used for – activities that are the proper subject of FBI-authorized investigative
2   activities, religious affiliation does not immunize such individuals to any degree
3   from FBI investigative action. *Id.* at 27.

4                                            **ARGUMENT**

5                The allegations in this case put squarely at issue whether a specific FBI
6   investigation in Southern California complied with FBI policy and the
7   Constitution and laws of the United States.  The Government has identified at the
8   outset of the case certain information implicated by plaintiffs' claims that the
9   Attorney General has determined is properly subject to exclusion from the case in
10  the interests of national security.  But the Government does not seek to dismiss all
11  claims in this case based on the privilege assertion.  In order to limit the impact of
12  the Attorney General's privilege assertion, the Government first sets forth reasons,
13  independent of the state secrets privilege, as to why plaintiffs' claims against the
14  FBI and official capacity defendants should be dismissed.  To the extent that
15  plaintiffs' Fourth Amendment and FISA claims survive motions to dismiss by the
16  Government and individual capacity defendants, information needed to litigate
17  these claims may be available, and the Government does not seek to dismiss them
18  based on the privilege assertion at this time.  However, plaintiffs' claims that
19  Operation Flex was an indiscriminate investigation based solely on religion would
20  require the disclosure of privileged information, and the Court should dismiss
21  those claims at the threshold at least as to the individual capacity defendants, who
22  have the right to raise threshold legal defenses under *Bivens* and who could not
23  adequately defend against these claims without information properly protected by
24  the Government.

25
26
27
28

-9-

1
2

# I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED ON NON-PRIVILEGE GROUNDS.

3
4

## A.   Plaintiffs' Second, Fourth, and Seventh Causes of Action Should Be Dismissed Because Sovereign Immunity Bars Section 1985(3) Suits Against the United States.

5

Plaintiffs' Second, Fourth, and Seventh Causes of Action purport to assert

6

claims under 42 U.S.C. § 1985(3) against "all defendants."  42 U.S.C. § 1985(3)

7

"prohibits private conspiracies to deprive a person of the equal protection of the

8

laws[], to hinder state authorities from securing equal protection of the laws[], or

9

to interfere with federal elections."  *Mueller v. United States,* 2009 WL 273283,

10

*8 (C.D. Cal. Feb. 2, 2009).  However, actions under § 1985(3) cannot lie against

11

the FBI or official capacity defendants because they are barred by sovereign

12

immunity.

13

"It is well settled that the United States is a sovereign, and as such, is

14

immune from suit unless it has expressly waived such immunity and consented to

15

be sued."  *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  *Accord*

16

*United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976).

17

As a result, courts cannot award relief against officials of the United States unless

18

a statute expressly waives the Federal Government's sovereign immunity.  *FDIC*

19

*v. Meyer,* 510 U.S. 471, 476, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994); *Sierra*

20

*Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) ("suits against officials of the

21

United States . . . in their official capacity are barred if there has been no waiver

22

[of sovereign immunity]").

23

The terms of the United States' waiver of sovereign immunity constitute "an

24

important limitation on the subject matter jurisdiction of federal courts."  *Dunn &*

25

*Black, P.S. v. United States,* 492 F.3d 1084, 1088 & n.2 (9th Cir. 2007) (quoting

26

*Vacek v. U.S. Postal Serv.,* 447 F.3d 1248, 1250 (9th Cir. 2006), *cert. denied,* 127

27

S. Ct. 2122 (2007)).  Absent an explicit waiver, a district court lacks subject matter

28

jurisdiction over any claim against the United States.  *Gilbert,* 756 F.2d at 1458.

-10-

The burden of showing an unequivocal waiver lies with the party who seeks to bring suit against the federal government.  *West v. Fed. Aviation Admin.,* 830 F.2d 1044, 1046 (9th Cir. 1987).  And because "sovereign immunity is a jurisdictional defect, . . . [i]t may be asserted by the parties at any time or by the court *sua sponte.*"  *Pit River Home & Agr. Co-op. Ass'n v. United States,* 30 F.3d 1088, 1100 (9th Cir. 1994).  Any ambiguity in the terms of the waiver is strictly construed in favor of the federal government and therefore a waiver may not be implied, but "must be unequivocally expressed in statutory text."  *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996).

No such waiver can be found in 42 U.S.C. § 1985(3).  Indeed, courts have consistently held that "[s]overeign immunity . . . bars § 1985(3) . . . suits brought against the United States and its officers acting in their official capacity."  *Davis v. United States Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000) (citing *Affiliated Professional Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999)); *see also Roum v. Bush*, 461 F. Supp. 2d 40, 46 (D.D.C. 2006) (dismissing § 1985 claim because "§ 1985 does not waive the federal government's sovereign immunity"); *Mueller*, 2009 WL 273283 at *9 (same).  The Court should therefore dismiss all of plaintiffs' § 1985(3) claims against the Government Defendants.

**B.   Plaintiffs' Tenth Cause of Action Should Be Dismissed Because Sovereign Immunity Bars Suit Against the United States Under Section 1810 of the Foreign Intelligence Surveillance Act.**

Plaintiffs' Tenth Cause of Action, brought against "all defendants," alleges that the defendants, acting through Monteilh, used electronic, mechanical or other surveillance devices without a warrant in violation of Section 110 of the FISA, 50 U.S.C. § 1810 (hereafter "Section 1810").  This claim is apparently based on the allegation that Monteilh left recording devices unattended with the FBI's knowledge and permission.  But Plaintiffs' cause of action under Section 1810

does not apply to the United States.[2]

As noted above, the United States and its officials cannot be sued absent a statutory waiver of sovereign immunity, and the waiver must be "unequivocally expressed in the statutory text" and strictly construed in favor of the government. *Lane*, 518 U.S. at 192.  The bar of sovereign immunity applies to claims such as those at issue here for monetary damages.  *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992).  Section 1810 of Title 50 (FISA Section 110), entitled "Civil Liability," does not waive the United States' sovereign immunity for plaintiffs' claims against the FBI and official capacity defendants.

Section 1810 provides in pertinent part:

> An aggrieved person, other than a foreign power or an agent of a foreign power, as in defined in section 1801 (a) or (b)(1)(A) of this title, respectively, who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have cause of action *against any person* who committed such violation . . .

50 U.S.C. § 1810 (emphasis added).  FISA defines "person" to mean "any *individual*, including any *officer* or *employee* of the Federal Government, or any group, entity, association, corporation, or foreign power."  *See* 50 U.S.C. § 1801(m) (emphasis added).

Section 1810 does not expressly waive sovereign immunity for a damages

---

[2]  A district court in the Northern District of California has ruled that Section 1810 "implicity" waives the sovereign immunity of the United States to suit for alleged unlawful electronic surveillance.  *See In re: Nat'l Security Agency Telecomm. Records Litig., Al-Haramain Islamic Found v. Bush*, 564 F. Supp 2d 1109, 1125 (N.D. Cal. 2008).  This ruling applies a standard of "implicit" waiver that plainly is incorrect.  *See Dunn & Black*, 492 F.3d at 1088 (waiver of sovereign immunity "cannot be implied, but must be unequivocally expressed"); *Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 112 S. Ct. 1627, 118 L. Ed. 2d 255 (1992).  *Al-Haramain* is presently on appeal to the Ninth Circuit.

action against the United States.  There is no mention of the United States among the entities subject to suit in Section 1810 – a highly significant omission because Congress has expressly authorized damage actions "against the United States" for certain violations of FISA, but not in Section 1810.  Specifically, Congress has authorized an action "against the United States to recover money damages" for violations of sections 106(a), 305(a), and 405(a) of FISA, 50 U.S.C. §§ 1806(a), 1825(a), and 1845(a).  *See* 18 U.S.C. § 2712.  Plaintiffs do not seek damages under any of these provisions.[3]  In specifying when damage remedies for FISA violations are available "against the United States," Congress has waived sovereign immunity only as to those violations of FISA.

That Section 1810 authorizes suit against "persons" – defined to include an officer or employee of the United States – does not alter this conclusion.  The general presumption in the law is that term "person" does *not* include the sovereign.  *See Vermont Agency of Nat. Res. v. United States*, 529 U.S. 765, 781, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000).  This presumption may be overcome "only upon some affirmative showing of statutory intent to the contrary."  *Id.*; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.").[4]  No such indication exists here, particularly where Congress has expressly

---

[3]  These provisions of FISA require that information obtained under the FISA concerning any United States person be used only in accordance with minimization procedures established by FISA and for lawful purposes, whether obtained through electronic surveillance, *see* 50 U.S.C. § 1806(a), or a physical search, *see id*. § 1825, or a pen register trap and trace device, *see id*. § 1845.

[4]  *See also Asmar v. U.S. Dep't of Treasury, I.R.S.,* 680 F. Supp. 248, 250 (E.D. Mich. 1987) (18 U.S.C. § 2520, which created a cause of action against "any person or entity" for the unlawful interception of certain communications, did not

identified those FISA causes of actions that may be brought "against the United

States."  Moreover, the phrase "any officer or employee of the Federal

Government" is included within the meaning of term "individual" in the FISA

definition of "person."  *See* 50 U.S.C. § 1801(m).  Most reasonably construed,

Section 1810 authorizes suits against federal officials in their individual capacity.

Indeed, this reading makes complete sense when it is considered that Section 1810

links the *civil* liability of a person under that provision to the person's *criminal*

liability under 50 U.S.C. § 1809.[5]  Even putting all other considerations aside, the

United States is not a "person" who may be guilty of a crime under Section 1809,

and for that reason also cannot be a "person" subject to civil liability under

Section 1810.  *See, e.g., United States v. Singleton*, 165 F.3d 1297, 1299-1300

(10th Cir. 1999) (criminal prohibitions in 18 U.S.C. § 201(c) do not apply to

United States).

Moreover, where, as here, plaintiffs' FISA claim against the Government is

brought against a Federal agency – the FBI – and two officials in their official

capacities, it would be untenable for plaintiffs to contend that this claim is not

being brought against the United States.  *See Balser v. Dep't of Justice, Office of

U.S. Trustee*, 327 F.3d 903, 907 (9th Cir. 2003) ("In sovereign immunity analysis,

any lawsuit . . . against an officer of the United States in his or her official capacity

is considered an action against the United States.").

The absence of an express waiver of sovereign immunity in Section 1810

_____

waive the sovereign immunity of the United States).

[5]  Section 1809(a) provides that a "person is guilty of an offense if he
intentionally (1) engages in electronic surveillance under color of law except as
authorized by this chapter" or "(2) discloses or uses information obtained under
color of law by electronic surveillance, knowing or having reason to know that the
information was obtained through electronic surveillance not authorized by this
chapter."  50 U.S.C. § 1809(a).

-14-

requires the conclusion that sovereign immunity bars monetary damages claims against the Federal Government or its officers acting in their official capacity under this provision.  Accordingly, plaintiffs' claim against the FBI and official capacity defendants under FISA Section 1810 should be dismissed as to these defendants.

### C.    Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted Under the Privacy Act.

Plaintiffs' Eighth Cause of Action, a Privacy Act claim brought against the FBI only, should also be dismissed because the Complaint fails to state a claim for which plaintiffs can obtain relief under the Privacy Act.  Plaintiffs request that the Court order defendants to "destroy or return any information gathered through the unlawful surveillance program by Monteilh and/or Operation Flex . . . and any information derived from that unlawfully obtained information."  *Id.* at 62 (Prayer for Relief ¶ b).  Since this is the only injunctive relief sought by plaintiffs, it is the only relief plaintiffs seek against the FBI.  *See* Compl. ¶ 15.  However, injunctive relief is not available for plaintiffs' Privacy Act claim.

The Privacy Act provides civil remedies for four types of violations:

Whenever any agency

(A)    makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B)    refuses to comply with an individual request under subsection (d)(1) of this section;

(C)    fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D)    fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1).

The Complaint alleges that the FBI collected and maintained records describing how plaintiffs exercise their First Amendment rights, in violation of section (e)(7) of the Privacy Act, 5 U.S.C. § 552a(e)(7).  *See* Compl. ¶ 242.  But of the specific remedy provisions, plaintiffs' Complaint cites only subsection (g)(1)(D), for which damages is the only remedy.  *See* Compl. ¶ 9 (asserting jurisdiction under 5 U.S.C. § 552a(g)(1)(D)); Eighth Cause of Action ("Violation of the Privacy Act, 5 U.S.C. § 552a(e)(7), (g)(1)(D)").  Plaintiffs also allege that "[t]he collection and maintenance of these records . . . has had an adverse effect on Plaintiffs," Compl. ¶ 243 – an apparent reference to one of the required elements for a (g)(1)(D) claim.  Plaintiffs do not, however, request damages for this alleged violation, and indeed have expressly stated that they are seeking only injunctive relief against the FBI.  *See supra*.

Injunctive relief under the Privacy Act is only available for actions for "amendment" and "access," *i.e.*, actions brought under subsections (g)(1)(A) and (g)(1)(B).  The relief for these two types of actions is set forth in subsections (g)(2) and (g)(3), respectively, while subsection (g)(4), by comparison, provides for monetary damages for "any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in manner which was intentional or willful."  Consistent with the plain language of the statute, the Ninth Circuit has held that "Congress limited injunctive relief to the situations described in 5 U.S.C. § 552a(g)(1)(A) and (2) and (1)(B) and (3)." *Cell Assoc's Inc. v. Nat'l Inst. of Health,* 579 F.2d 1155, 1161 (9th Cir. 1978).  Because plaintiffs here have framed their Privacy Act claim as an action under subsection (g)(1)(D), their only possible remedy is damages – which, however, they have expressly disavowed.

That plaintiffs allege a violation of Section (e)(7) does not alter this analysis, since (e)(7) alone, unconnected to an amendment or access claim, does

not confer a right to equitable relief.  *See, e.g., Comm. in Solidarity with the*
*People of El Salvador v. Sessions*, 738 F. Supp. 544, 548 (D.D.C. 1990) (denying
request for disposal of records in suit alleging that FBI investigation for terrorist
activity, pursuant to tip by informant later deemed to be untrustworthy, violated
plaintiffs' rights under First Amendment and Privacy Act), *aff'd*, 929 F.2d 742
(D.C. Cir. 1991); *Socialist Workers Party v. Att'y General*, 642 F. Supp. 1357,
1431 (S.D.N.Y. 1986) (noting that Privacy Act "provides for injunctive relief in
certain circumstances, but an (e)(7) violation alone is not one of these") *but see*
*Haase v. Sessions*, 893 F.2d 370, 374 (D.C. Cir. 1987) (suggesting in dicta that
amendment or expungement might be available "by virtue of (g)(1)(D)'s general
grant of jurisdiction").  The only remedy provision of the Privacy Act that
plaintiffs invoke is subsection (g)(1)(D), for which they have failed to plead
damages, and their Complaint cannot be construed as asserting, in the alternative,
a claim under subsection (g)(1)(A) or (B).  Since it fails to state a claim upon
which the Court can grant relief, plaintiffs' Privacy Act claim should be dismissed.

###### D.   FBI Investigative Records Are Exempt from the Amendment Provisions of the Privacy Act and Are Therefore Not Subject to Expungement.

In the alternative, even if plaintiffs had brought a claim for amendment or
access under the Privacy Act, or if injunctive relief was available under subsection
(g)(1)(D), they would still be foreclosed from the remedy they seek because the
records at issue are exempt from the amendment and access provisions of the Act.
An agency may exempt any system of records from any part of the Act that is not
expressly designated non-exemptible if the system is "maintained by an agency or
component thereof which performs as its principal function any activity pertaining
to the enforcement of criminal laws" and consists of "information compiled for the
purpose of a criminal investigation, including reports of informants and
investigators, and associated with an identifiable individual."  5 U.S.C.
§ 552a(j)(2)(B).  The Act also authorizes additional exemptions from specific parts

-17-

of the Act for systems of records consisting of "investigatory material compiled

for law enforcement purposes, other than material within the scope of subsection

(j)(2)." 5 U.S.C. § 552a(k)(2).  Both subsections 552a(j) and (k) allow for

exemption of qualifying records from subsection (d), which governs the agency's

obligations to grant individuals access to and amendment of records pertaining to

them.  *See* 5 U.S.C. § 552a(d).

The FBI has attested that the records maintained by the FBI containing

information gathered by Monteilh and Operation Flex constitute investigatory

material compiled for law enforcement and criminal investigation purposes, and

that they are contained in the Central Records System (CRS) and Electronic

Surveillance (ELSUR) indices.  Declaration of Christopher N. Morin ("Morin

Decl.") ¶ 6.[6]  Pursuant to § 552a(j) and (k), the FBI has properly exempted the

CRS and ELSUR from the amendment provision of the Privacy Act.  *Id.* ¶ 7; 28

C.F.R. § 16.96(a)(1), (c)(1).  The CRS has been so exempted partly because, given

"the nature of the information collected and the essential length of time it is

maintained," requiring the FBI to amend any information "thought to be incorrect,

irrelevant or untimely . . . would create an impossible administrative and

investigative burden by forcing the agency to continuously retrograde its

investigations attempting to resolve questions of accuracy."  Morin Decl. ¶ 7

(quoting 28 C.F.R. § 16.96(b)(2)(iii)).  The ELSUR indices have also been

_____

[6] Because defendant FBI relies on this declaration to support this argument,
the Court may in the alternative consider this defense pursuant to Rule 56 of the
Federal Rules of Civil Procedure and grant summary judgment for the FBI.  The
sole issue of fact material to this question is whether the records implicated by the
claims reside in a system of records exempt from the amendment provisions of the
Act and, hence from expungement.  If, however, the disclosure of privileged
information is necessary to decide whether the records at issue are subject to an
injunction ordering destruction, this claim for relief should be dismissed based on
the Government's  privilege assertion, discussed *infra*.

exempted from the amendment and access provisions of the Privacy Act.  *See* Morin Decl. ¶ 7; *see also* 28 C.F.R. § 16.96(d)(2).

Because the records at issue in this case are exempt from the amendment provisions of the Privacy Act, it follows that plaintiff cannot obtain the remedy of expungement, which is nothing more than an extreme form of amendment.  *See Doe v. FBI*, 936 F.2d 1346, 1352 (D.C. Cir. 1991) ("[A] determination that a civil claim for expungement may be foreclosed by any agency's exemption rule is not only consistent with, but necessary to effectuate, Congress' intent that certain records systems may truly be sheltered from the Act's amendment procedures.").  Again, plaintiffs' claim that the FBI violated subsection (e)(7) of the Act does not affect this conclusion.  The FBI does not contend that the records at issue are exempt from (e)(7), but rather that they are exempt from amendment and, thus, expungement.  *See Bassiouni v. FBI*, 436 F.3d 712, 723 (7th Cir. 2006) (because CRS "is not subject to the subsection (d) amendment process, the FBI cannot be held liable under (g)(1)(A) for failure to comply with the process" and plaintiff thus had "no avenue for relief under § 552a(g)(1)(A)" for his (e)(7) claim).  The Court is therefore proscribed from ordering expungement of these records.

Moreover, even if the records at issue here were not expressly exempt from the Privacy Act's amendment provisions, they should not be expunged because their destruction could significantly impair the FBI's ability to conduct any ongoing or future investigations.  First, when the FBI receives new information that may relate to a prior investigation, it examines and seeks to verify that information in the context of information it has already received.  Thus, if the FBI's existing records regarding plaintiffs were expunged, and further information relating to the investigative matter at issue were later brought to the FBI's attention, the investigating agent would not have the complete context in which to evaluate the newly received information and properly assess the matter.  Morin Decl. ¶ 9.  Further, the maintenance of investigative records permits the FBI to

-19-

1   assess the reliability of source of information it receives over time.  The

2   destruction of files would severely hinder the FBI's ability to evaluate the

3   accuracy and credibility of information received from the source.  *Id*. ¶ 10.  In

4   addition, the FBI maintains investigative records for historic and accountability

5   purposes.  The destruction of records relating to investigative activity would

6   impede any future inquiry into how the FBI responded to information it received.

7   This consideration is especially crucial where counterterrorism investigations are

8   at issue.  *Id.* ¶ 11.  For these reasons, an order that the records at issue be destroyed

9   would plainly conflict with the FBI's statutorily-based exemption of these records

10  from the amendment provisions of the Privacy Act.

### E. Because Plaintiffs Are Foreclosed From Obtaining Expungement Under the Privacy Act, They Cannot Obtain Expungement for Any of Their Causes of Action.

Finally, to the extent that plaintiffs seek expungement as a remedy for their

other claims against the Government Defendants, they are foreclosed from doing

so because the Privacy Act speaks directly to that issue: injunctive relief is

unavailable for a (g)(1)(D) claim, and the FBI should not be compelled to amend

records that it has exempted pursuant to subsections (j) and (k) of the Act.  The

Complaint fails to identify any other law that clearly overrides or makes exception

to that rule.  Plaintiffs may claim a common law right to the remedy of

expungement based on the court's general equitable powers.  *See Fendler v.*

*United States Parole Comm'n,* 774 F.2d 975, 979 (9th Cir. 1985).  However,

federal common law is "subject to the paramount authority of Congress," such that

"when Congress addresses a question previously governed by a decision rested on

federal common law the need for such an unusual exercise of lawmaking by

federal courts disappears."  *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14,

101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981).

The Privacy Act clearly reflects Congress' intent to limit equitable relief to

-20-

certain types of actions and to allow agencies to exempt records relating to criminal and law enforcement investigation from those parts of the Act requiring that  individuals be permitted to examine and amend those records.  *Cf. Ctr. for Nat'l Sec. Studies v. Dep't of Justice,* 331 F.3d 918, 936-37 (D.C. Cir. 2003) (rejecting plaintiffs' claim of common-law right of access to records on ground that FOIA "has provided a carefully calibrated statutory scheme, balancing the benefits and harms of disclosure").  As such, the Act preempts any common-law right plaintiffs may have to expungement as a remedy for any of their claims.

Even if the common law were not preempted by statute, plaintiffs cannot establish a right to expungement.  As the Ninth Circuit has held, " [c]ourts which have recognized an equitable power to expunge have unanimously observed that it is a narrow power, appropriately used only in extreme circumstances." *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991).  The Court must find that there is a "real and immediate threat of irreparable harm before it can allow expungement." *Fendler,* 774 F.2d at 979 (citation omitted); *see also Fendler v. United States Bureau of Prisons,* 846 F.2d 550, 554-55 (9th Cir. 1988).  The propriety of an expungement order is determined by applying a balancing test in which the harm caused to an individual by the existence of any records is weighed against the utility to the Government of their maintenance.  *Doe v. United States Air Force,* 812 F.2d 738, 741 (D.C. Cir. 1987).  Plaintiffs have not alleged or shown that they are facing any threat of irreparable harm, let alone one that is real and immediate, from the mere existence of the records that were allegedly unlawfully collected by the FBI.  By contrast, the FBI risks substantial harm for the expungement of those records, as described above.  *See supra* Pt. II.D. and Morin Decl. ¶¶ 8-11.

Accordingly, even if plaintiffs had asserted any colorable claims against the official capacity defendants, there would be no basis for the Court to grant the requested injunctive relief as to any claim.  For this reason, the Court should

dismiss all claims against the Government Defendants.

## II.   THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS' ALLEGATIONS.

### A.   The State Secrets Privilege Bars the Use of Privileged Information in Litigation.

"The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely." *Mohamed v. Jeppesen Dataplan, Inc,* 614 F.3d 1070, 1077 (9th Cir. 2010). The ability of the Executive to protect state secrets from disclosure in litigation has been recognized from the earliest days of the Republic, *see id.,* and two broad applications of the doctrine have been recognized.

The first application – based on the Supreme Court's 1875 decision in *Totten v. United States,* 92 U.S. 105, 23 L. Ed. 605 (1875) – permits dismissal of a case on the pleadings where it is apparent that the very subject matter of the action will require the disclosure of state secrets that would result in harm to national security. *Jeppesen,* 614 F.3d at 1077-78 (discussing the *"Totten* bar")*.* The state secrets privilege is also an evidentiary privilege that excludes privileged evidence from the case. *Id.* at 1077 (citing *United States v. Reynolds,* 345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 727 (1953)). Unlike the *Totten* bar, a valid claim of privilege under *Reynolds* does not automatically require dismissal of the case, but may require dismissal where it is apparent that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets. *Jeppesen,* 614 F.3d at 1079.

Analyzing a state secrets privilege claim under the *Reynolds* doctrine involves three steps. *Jeppesen,* 614 F.3d at 1080 (citing *Al-Haramain Islamic Found. v. Bush,* 507 F.3d 1190, 1202 (9th Cir. 2007); *El-Masri v. United States,* 479 F.3d 296, 304 (4th Cir. 2007)). First, the court must ascertain that the

-22-

procedural requirements for invoking the state secrets privilege have been
satisfied. *Id.* Second, the court must make an independent determination whether
the information is privileged. *Id.* Finally, the ultimate question to be resolved is
how the matter should proceed in light of the successful privilege claim. *Id.*

### 1.   Procedural Requirements

The state secrets privilege "'belongs to the Government and must be
asserted by it; it can neither be claimed nor waived by a private party." *Jeppesen,*
614 F.3d at 1080 (quoting *Reynolds,* 345 U.S. at 7 (footnotes omitted)). The
privilege is "'not to be lightly invoked,'" and to ensure that the privilege is
invoked only when necessary, the Government must satisfy three procedural
requirements: (1) there must be a "formal claim of privilege"; (2) the claim must
be "lodged by the head of the department which has control over matter"; and (3)
the claim be made "after actual personal consideration by that officer." *Id.*
(quoting *Reynolds,* 345 U.S. at 7-8). The claim of privilege must reflect "the
certifying official's person judgment. *Id.* The basis for the privilege assertion also
must be presented "in sufficient detail for the court to make an independent
determination of the validity of the claim of privilege and the scope of the
evidence subject to the privilege." *Id*.

The state secrets privilege may be asserted "at any time, even at the pleading
stage." *Jeppesen*, 614 F.3d at 1080. Thus, while the Government may assert
privilege in response to discovery requests seeking information the Government
contends is privileged, *see, e.g. Reynolds,* 345 U.S. at 3; *Kasza v. Browner,* 133
F.3d 1159, 1170 (9th Cir. 1998), the Government need not wait for an evidentiary
dispute to arise during discovery or trial. *Jeppesen,* 614 F.3d at 1081; *see also Al-
Haramain,* 507 F.3d at 1201 (recognizing that *Reynolds* may result in dismissal
even without "await[ing] preliminary discovery"). Where the court is able to
"determine with certainty from the nature of the allegations and the government's
declarations in support of its claim of secrecy that litigation must be limited or cut

-23-

1  off in order to protect state secrets, even before any discovery or evidentiary

2  requests have been made . . . waiting for specific evidentiary disputes to arise

3  would be both unnecessary and potentially dangerous." *Jeppesen*, 614 F.3d at

4  1081 (citing *Sterling v. Tenet,* 416 F.3d 338, 344 (4th Cir. 2005) ("Courts are not

5  required to play with fire and chance further disclosure – inadvertent, mistaken, or

6  even intentional – that would defeat the very purpose for which the privilege

7  exists.").

8           2.       The Court's Independent Evaluation of the Claim of Privilege

9           After the state secrets privilege has been properly invoked, the court "must

10 make an independent determination whether the information is privileged." *Al-*

11 *Haramain,* 507 F.3d at 1202.  The privilege must be sustained when the court is

12 satisfied, "from all circumstances of the case, that there is a reasonable danger that

13 compulsion of the evidence will expose . . . matters which, in the interest of

14 national security, should not be divulged." *Reynolds,* 345 U.S. at 10.  "If this

15 standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs'

16 countervailing need for it." *Jeppesen,* 614 F.3d at 1081 (citing *Reynolds*, 345 U.S.

17 at 11 ("[E]ven the most compelling necessity cannot overcome the claim of

18 privilege if the court is ultimately satisfied that [state] secrets are at stake.")); *see*

19 *also Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982).  In evaluating the need

20 for secrecy, courts must "acknowledge the need to defer to the Executive on

21 matters of foreign policy and national security and surely cannot legitimately find

22 ourselves second guessing the Executive in this arena." *Al-Haramain,* 507 F.3d at

23 1203.  At the same time, the state secrets doctrine does not represent "' a surrender

24 of judicial control over access to the courts," *Jeppesen*, 614 F.3d at 1082 (quoting

25 *El-Masri*, 479 F.3d at 312), and "to ensure that the state secrets privilege is

26 asserted no more frequently and sweepingly than necessary, it is essential that the

27 courts continue critically to examine instances of its invocation." *Id.* (quoting

28 *Ellsberg v. Mitchell,* 709 F.2d 51, 58 (D.C. Cir. 1983)).

3.    Impact of Privilege Assertion

When a court sustains a claim of privilege, it must then resolve "'how the matter should proceed in light of the successful privilege claim.'" *Al-Haramain,* 507 F.3d at 1202 (quoting *El-Masri,* 479 F.3d at 304).  When successfully invoked, the evidence subject to the privilege is "completely removed from the case." *Kasza,* 133 F.3d at 1166.  When possible, the privileged information "'must be disentangled from nonsensitive information to allow for the release of the latter.'" *Id.* (quoting *Ellsberg,* 709 F.2d at 57).  But "when, as a practical matter, secret and nonsecret information cannot be separated," the court must restrict a parties' access "not only to evidence which itself risk the disclosure of a state secret, but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures." *Jeppesen*, 614 F.3 at 1082 (quoting *Bareford v. Gen. Dynamics Corp.,* 973 F.2d 1138, 1143-44 (5th Cir. 1992)); *see also Kasza,* 133 F.3d at 1166 ("[I]f seemingly innocuous information is part of a . . . mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from [secret] information.").

In the normal course, after the privileged evidence is excluded, "the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.'" *Al-Haramain,* 507 F.3d at 1204 (quoting *Ellsberg,* 709 F.2d at 64). In some cases, however, "application of the privilege may require dismissal of the action." *Jeppesen* 614 F.2d at 1083.  First, if  "the plaintiff cannot prove the prima facie elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it with any plaintiff who cannot prove her case." *Kasza*, 133 F.3d at 1166.  Second, "if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant." *Id*. at 1166 (quoting *Bareford*, 973 F.2d at 1141).  Third, even if the claims and defenses might theoretically be

-25-

established without privileged evidence, "it may be impossible to proceed with the litigation because – privileged evidence being inseparable from nonprivileged information that will be necessary to claim or defense – litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083; *see also El-Masri*, 479 F.3d at 308 ("[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure."); *Fitzgerald v. Penthouse Int'l, Ltd.* 776 F.2d 1236, 1241-42 (4th Cir. 1985) ("[I]n some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters."); *accord Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 279-81 (4th Cir. 1980) (*en banc*).

            4.    Attorney General's Policy

      In addition to the foregoing requirements in established case law, on September 23, 2009, the Attorney General announced a new Executive branch policy governing the assertion and defense of the state secrets privilege in litigation.  Under this policy, the U.S. Department of Justice will defend an assertion of the state secrets privilege in litigation, and seek dismissal of a claim on that basis, only when "necessary to protect against the risk of significant harm to national security."  *See* Exhibit 1 to Holder Declaration (State Secrets Policy). Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain completion; or (iv) prevent or delay the release of information the release of which would reasonably be expected to cause significant harm to national security."  *Id*. at 2.

      The Attorney General also established detailed procedures – followed in

-26-

this case – for review of a proposed assertion of the state secrets privileged in a particular case.  Those procedures require submissions by the relevant government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; [and] (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm."  *Id*.  In addition, the Department will only defend an assertion of the privilege in court with the personal approval of the Attorney General following review and recommendations from senior Department officials.  *Id*. at 3.

There can be no dispute that the Government compiled with *Reynolds* procedural requirements by following this policy.  The FBI is a component of the Department of Justice, *see* Public Giuliano Decl. ¶ 1, and the Attorney General of the United States is also the head of the Department of Justice, *see* Holder Decl. ¶ 1.  The Attorney General has determined, upon his personal consideration of the matter, that the requirements for an assertion and defense of the state secrets privilege have been met in this case, in accord with the September 2009 policy, and that disclosure of the information subject to his claim of privilege reasonably could be expected to cause significant harm to national security.  *See* Holder Decl. ¶ 3, 12.

**B.    The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.**

Procedural formalities aside, the next question is whether the privilege should be upheld and the privileged information excluded from the case.  As described in general and unclassified terms, the Attorney General's privilege assertion extends to three categories of information:

(i)    *Subject Identification*: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

-27-

(ii)    *Reasons for Counterterrorism Investigation and Results*: Information that could tend to reveal the predicate for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation.  This includes any information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(iii)   *Sources and Methods*: Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex.  This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.

Holder Decl. ¶ 4; Public Giuliano Decl. ¶ 15.

The Attorney General, supported by the FBI's Assistant Director for the Counterterrorism Division, has explained on the public record why the disclosure of the above information reasonably could be expected to cause significant harm to national security.  *See generally* Holder and Public Giuliano Declarations. Among other concerns identified by these officials, disclosure of the identities of subjects of counterterrorism investigations could alert those subjects to the FBI's interest in them and cause them to attempt to evade detection, destroy evidence, and undertake counter-actions that could put confidential informants or law enforcement officers at risk.  *See* Public Giuliano Decl. ¶ 23.  The disclosure of the subjects of counterterrorism investigations could also cause their associates to take similar steps to avoid FBI scrutiny and hinder investigation.  *See id.*

Disclosure that an individual is *not* a subject of a national security investigation likewise could reasonably be expected to cause significant harm to national security in several ways.  For example, individuals inclined to commit terrorists acts could be motivated to do so while they know they are not being monitored.  Public Giuliano Decl. ¶ 24.  In addition, disclosure that some persons

-28-

are not subject to investigation, while the status of others is left unconfirmed, would enable individuals and terrorists groups alike to manipulate the system to discover whether they or their members are subject to investigation. *See id.*

Similarly, even where an investigation of a subject has been closed, disclosure that an individual was formerly the subject of a counterterrorism investigation could also reasonably be expected to cause significant harm to national security interests. Again, to the extent that an individual had terrorist intentions that were not previously detected, the knowledge that he or she is no longer the subject of investigative interest could embolden him or her to carry out those intentions. *See* Public Giuliano Decl. ¶ 25. And even if the former subjects are entirely law-abiding, disclosure that they had been investigated could still provide valuable information to terrorist and terrorists organizations about the FBI's intelligence and suspicions, particularly where associates of former subjects may still be under investigation. *See id.* ¶ 26. Finally, where new information may arise about a person, the fact that investigations are closed does not mean that the subjects have necessarily been cleared of wrongdoing. *See id.* ¶ 25.

For closely related reasons, disclosure of the reasons for and substance of a counterterrorism investigation reasonably could be expected to cause significant harm to national security by revealing to subjects involved in terrorist activities what the FBI knows or does not know about their plans. *See* Public Giuliano Decl. ¶ 29. Further, disclosure of the reason for an investigation could provide insights to terrorists as to what type of information is sufficient to trigger an inquiry by the FBI, and what sources and methods the FBI employs to obtain information on a person. *See id.* Disclosure of these sources and methods would itself reasonably be expected to cause significant harm not only by revealing the identities of particular subjects, but also by providing a road map to adversaries on how the FBI goes about detecting and preventing terrorist attacks. *See id.* ¶ 31.

The basis for the Attorney General's privilege assertion is set forth further

-29-

in the classified declaration offered by the FBI.  *See generally* Classified
Declaration of Mark F. Giuliano (submitted for *in camera, ex parte* review).  The
Government cannot further explain precisely those matters covered by the
privilege lest the process asserting privilege jeopardize the very information the
privilege is designed to protect.  *Jeppesen*, 614 F.3d at 1086.  But the Court should
find that the Government has fully and sufficiently demonstrated the basis for the
privilege assertion in this case, and thus should exclude the privileged information
from further proceedings in this case.[7]

### C.   The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.

As *Jeppesen* explains, once the state secrets privilege is upheld, the next
question for the Court to decide is what consequences exclusion of the privileged
information will have on further proceeding in the case.  The issue is especially
appropriate for consideration at the pleading stage where it is apparent that
privileged information would be needed to pursue litigation of the case, or at least
certain claims.  This question requires the Court to assess the nature of the proof
needed to decide the claims being raised and the extent to which litigation of those
claims would risk or require the disclosure of privileged information.  *Jeppesen*,
614 F.3d at 1082-83.

(1) *Individual Capacity Claims*: The Court should address the impact of the
privilege assertion on the individual capacity claims first.  Most of the allegations
and claims in the case center on the alleged action of the individual capacity
defendants, and these defendants are entitled to early consideration of whether the

---

[7]  While *ex parte, in camera* classified submissions are not required for an
assertion of the privilege, *see Reynolds*, 345 U.S. at 8, the Government has
commonly provided such submission in order to assist the Court in ascertaining
whether the circumstances for the privilege assertion are appropriate.  *See, e.g.
Kasza*, 133 F.3d at 1169-70; *Jeppesen*, 614 F.3d at 1084 n.6.

-30-

1   lawsuit should proceed against them.  As set forth below, information properly

2   protected by the Attorney General's privilege assertion should foreclose litigation

3   of at least plaintiffs' claims based on an alleged indiscriminate collection of

4   information based solely on religion.

5        First, where constitutional claims are raised against federal officers in their

6   personal capacities, a key threshold question is whether a *Bivens* cause of action

7   against the individual defendants exists in the circumstances presented.

8   Specifically, the Supreme Court has held that there can be no *Bivens* remedy

9   against federal officials where "special factors counseling hesitation" exist.  *Wilkie*

10  *v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (quoting

11  *Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)).

12  National security concerns constitute just such a special factor, *see Arar v.*

13  *Ashcroft*, 585 F.3d 559, 573, 575 (2d Cir. 2009), particularly where litigation of

14  the claims would subject sensitive and classified intelligence information to

15  judicial scrutiny.  *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008).  Permitting

16  the claims to go forward would run the risk of disclosure that might "undermine

17  ongoing covert operations" aimed at protecting national security.  *Id.*  Moreover,

18  to the extent that allowing litigation to proceed would "very likely mean that some

19  documents or information . . . would be redacted, reviewed *in camera*, and

20  otherwise concealed from the public," the Court's potential reliance on such

21  information further counsels "hesitation" that precludes a *Bivens* remedy, "given

22  the strong preference in the Anglo-American legal tradition for open court

23  proceedings."  *Arar*, 585 F.3d at 576-77.  Thus, the Government's assertion of

24  privilege in this case has a particular bearing first on the individual capacity

25  defendants' threshold defenses under the *Bivens* doctrine.

26        Second, even apart from whether plaintiffs have a cause of action under

27  *Bivens* for their constitutional claims, privileged information would be required to

28  fully and effectively defend against these claims, as well as the statutory claims

-31-

plaintiffs have raised against the individual defendants.  Plaintiffs' allegations of a

discriminatory investigation based solely on religion directly put at issue

information that is subject to the Attorney General's privilege assertion.  At their

core is the claim that defendants' alleged surveillance and investigation of

plaintiffs unlawfully burdened plaintiffs' free exercise of their religion.

Defendants would contest, and the court would have to determine, whether, in

fact, defendants' actions were targeted at plaintiffs based on their religion.  If

plaintiffs were able to overcome that hurdle, the Court would have to determine

(1) whether the Government acted pursuant to a compelling state interest, and (2)

whether the government's actions were narrowly tailored to achieve that interest.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113

S. Ct. 2217, 124 L Ed. 2d 472 (1993); *see also Presbyterian Church v. United*

*States*, 752 F. Supp. 1505, 1513 (D. Ariz. 1990).[8]  These are fundamentally fact-

driven determinations that require detailed inquiry into the nature of, and reason

for, any investigative activity undertaken by defendants with respect to plaintiffs.

On this point, *Presbyterian Church* is instructive.  In that case, the plaintiffs

alleged that surveillance of their church services by undercover INS agents

violated their First and Fourth Amendment rights.  The Ninth Circuit held that

plaintiffs had established standing for their First Amendment free exercise claim,

and remanded to the district court to determine whether plaintiffs had standing to

pursue prospective injunctive relief.  *Presbyterian Church v. United States*, 870

---

[8]  Similarly, to evaluate plaintiffs' claims under RFRA, assuming the Court
finds that defendants' actions substantially burdened plaintiffs' exercise of
religion (although defendants do not concede that point), it would have to
determine whether that burden was (1) in furtherance of a compelling interest, and
(2) the least restrictive means of furthering that interest.  *See* 42 U.S.C.
§ 2000bb-1(b); *Navajo Nation v. United States Forest Svc.*, 535 F.3d 1058, 1068
(9th Cir. 2008).

F.2d 518, 528-29 (9th Cir. 1989).  On remand, the district court, finding that plaintiffs had standing and that the case was not moot, proceeded to the free exercise inquiry.  After examining the evidence presented in defendants' summary judgment motion, the court held that the government had a compelling state interest "based on border security and national sovereignty to conduct an investigation into the alleged unlawful activities of the Sanctuary Movement," a network of religious activists that aided Central and South American refugees by bringing them into the United States, and had "demonstrated a significant and intimate relationship between the conduct in which it engaged and the government interest sought to be achieved." *Presbyterian Church*, 752 F. Supp. at 1508 n.1, 1514, 1515.  Of particular note, the facts underlying the INS investigation were made public during the criminal prosecutions of several individuals who were involved with the Sanctuary Movement, and thus there was no issue in that case as to whether disclosure of those facts would harm national security.  *Presbyterian Church v. United States*, 870 F.2d at 520; 752 F. Supp. at 1507-08.

Here, any inquiry into whether the Government had a compelling interest and whether its actions were narrowly tailored would turn on whether defendants were conducting properly predicated investigations or, as alleged in the Complaint, were indiscriminately gathering information on persons based solely on their religion.  Evidence needed to establish that defendants' investigations were, in fact, properly predicated and focused would include the specific parameters of "Operation Flex," including who may have been subject to investigation, why, and how the investigations were carried out by the FBI.  In particular, any defense to these claims would risk or require the disclosure of evidence concerning who was subject to Operation Flex investigations and the reasons these subjects were under investigation, as well as sources and methods used in these investigations.  This information falls squarely within the three categories of information over which the Attorney General has asserted privilege.

-33-

Thus, mounting a full and effective defense against the religious discrimination claims "would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a *prima facie* case . . . with nonprivileged evidence." *Jeppesen*, 614 F.3d at 1088 (collecting cases); *see also Kasza*, 133 F.3d at 1166.

Nor can this risk be averted by the implementation of precautionary procedure by the district court. As the Ninth Circuit has made clear:

> Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases . . . where the relevant secrets are difficult or impossible to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication.

*Jeppesen*, 614 F.3d at 1089. This is just such an exceptional case. As demonstrated further in the classified Giuliano Declaration, even if some non-privileged evidence were available for plaintiffs to present a *prima facie* case or the defendants to respond, properly privileged information would be essential to mounting a full and effective defense to plaintiffs' claims that the FBI's investigations were improperly based solely on religion.[9]

For these reasons, the Court should, at a minimum, dismiss Causes of Action 1-7 as to the individual capacity defendants. Dismissal of these defendants is particularly warranted because they have unique threshold arguments. Moreover, the Government has a separate, independent interest in protecting against the disclosure of properly privileged information that would inherently be

---

[9] In further support of this point, the Government Defendants have lodged with court security officers a classified supplemental brief for the Court's *in camera, ex parte* review that describes the evidence subject to the Attorney General's privilege assertion that would be at risk of disclosure or needed by defendants in responding to plaintiffs' religious discrimination claims.

at risk of disclosure in any litigation of the individual capacity claims.

(2) *FBI and Official Capacity Claims*: Finally, the Court should consider the impact of the privilege assertion on plaintiffs' first seven claims against the FBI and official capacity defendants to the extent they are not dismissed on the non-privileged grounds set forth above.  Ultimately, the same privileged evidence needed to litigate plaintiffs' claims of religious-based discrimination against the individual capacity defendants would be necessary to litigate those claims against the Government Defendants as well.  Dismissal of these claims is therefore appropriate because the Government Defendants cannot present a full and adequate defense without relying on privileged information. *See supra.*

To the extent that the Court wishes to assess the impact of the privilege assertion as to claims against the Government Defendants, it should require plaintiffs to proffer in proceedings under Rules 16 and 26 precisely what discovery it intends to seek against the Government.  At that point, the Government Defendants would again address the extent to which the state secrets privilege precludes litigation of any claims remaining against them.  In the meantime, there should be no doubt that the privilege assertion supports dismissal of the individual capacity claims in light of the additional threshold defenses available to these defendants.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims against the Federal Bureau of Investigation and Defendants Robert Mueller, Director of FBI, and Steven Martinez, Assistant Director in Charge of FBI's Los Angeles Division, sued in their official capacities, should be dismissed.  In addition, plaintiffs' First through Seventh Causes of Action should be dismissed as to the individual capacity defendants on the grounds that these defendants will need properly privileged information to defend against these claims.

-35-

Dated: August 1, 2011                   Respectfully submitted,

                                        TONY WEST
                                        Assistant Attorney General

                                        ANDRE BIROTTE, JR.
                                        United States Attorney

                                        VINCENT M. GARVEY
                                        Deputy Director, Federal Programs Branch

                                            */s/ Anthony J. Coppolino*
                                        ANTHONY J. COPPOLINO
                                        Special Litigation Counsel
                                        E-mail: tony.coppolino@usdoj.gov

                                            */s/ Lynn Y. Lee*
                                        LYNN Y. LEE (SBN#235531)
                                        E-mail: lynn.lee@usdoj.gov

                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W., Room 6102
                                        Washington, DC 20001
                                        Tel: (202) 514-4782
                                        Fax: (202) 616-8460

                                        *Attorneys for the Federal Bureau of Investigation
                                        and Defendants Mueller and Martinez Sued in
                                        their Official Capacities*