1  TONY WEST
   Assistant Attorney General
2  ANDRE BIROTTE, JR.
3  United States Attorney
   VINCENT M. GARVEY
4  Deputy Branch Director
5  ANTHONY J. COPPOLINO
   E-mail: tony.coppolino@usdoj.gov
6  LYNN Y. LEE (SBN #235531)
7  E-mail: lynn.lee@usdoj.gov
   U.S. Department of Justice
8  Civil Division, Federal Programs Branch
9  20 Massachusetts Avenue, N.W.
   Washington, D.C. 20001
10 Telephone: (202) 514-4782
11 Facsimile: (202) 616-8460
   *Attorneys for the Federal Bureau of Investigation and*
12 *Defendants Mueller and Martinez Sued in their*
13 *Official Capacities*

14                   UNITED STATES DISTRICT COURT
15                   CENTRAL DISTRICT OF CALIFORNIA
                         SANTA ANA DIVISION
16

17 ----------------------------------------------

18                                     )
   YASSIR FAZAGA, et al.               )
19                                     )
20            Plaintiffs,              )   Case No. SACV11-00301 CJC (VBKx)
                                       )   Judge Carney
21                                     )
22 v.                                  )        **PUBLIC DECLARATION OF**
                                       )        **MARK F. GIULIANO**
23                                     )        **FEDERAL BUREAU OF**
24 FEDERAL BUREAU OF                   )        **INVESTIGATION**
   INVESTIGATION, et al.               )
25                                     )
26            Defendants.              )
                                       )
27 ----------------------------------------------

28

                                    1

I, Mark F. Giuliano, hereby declare the following:

1.  I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation (the FBI), United States Department of Justice.  I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations. As Assistant Director, I have official supervision and control over the files and records of the Counterterrorism Division, FBI Headquarters, Washington, D.C.  In addition, I have been delegated original classification authority by the Director of the FBI.  *See* Executive Order 13,526, Section 1.3(c).  As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified national security information within the Counterterrorism Division of the FBI, including the sources and methods used by the FBI in the collection of national security information.  I have been authorized by the Director of the FBI to execute declarations and affidavits in order to protect such information.  The matters stated herein are based on my personal knowledge and on information furnished to me in the course of my official duties.

2.  I submit this declaration in support of the Attorney General's assertion of the state secrets privilege in this case.  I describe below, as best I am able to do in unclassified terms, certain information related to FBI counterterrorism investigations that is implicated by the allegations of this lawsuit and which in my judgment should be protected from disclosure to avoid significant harm to national

security.[1]  As an original FBI classification authority and the official charged with general supervisory responsibilities for the FBI's counterterrorism investigations, I have concluded that the unauthorized disclosure of the privileged information described herein reasonably could be expected to cause significant harm to the national security.

## SUMMARY

3.  I have reviewed the Complaint in this matter and I am aware of the allegations it contains that the FBI, through Craig Monteilh acting as an informant for the FBI in an investigation known as Operation Flex, infiltrated mosques in Southern California and indiscriminately collected personal information on hundreds and perhaps thousands of innocent Muslim Americans, including the three named plaintiffs, Yassir Fazaga, Ali Uddin Malik and Yasser AbdelRahim, due solely to their religion.  *See* Complaint, ¶¶ 1-3, 6, 84.  The plaintiffs specifically allege that, after attacks of September 11, 2001, the FBI has improperly focused its counterterrorism efforts on the Muslim community in the United States.  *See id.* ¶¶ 24-27.  The plaintiffs also cite guidelines issued by the Attorney General for counterterrorism investigations and assert that "the combined effect" of these guidelines was to authorize the FBI to engage in intrusive

---

[1]   I am also separately providing a declaration solely for the Court's *ex parte, in camera* review, that discusses these matters in more detail with reference to information that cannot be disclosed on the public record.

investigation of First Amendment protected activity, and specifically religious

practices, without any factual basis to believe any criminal violations or threat to

national security existed.  *See* Compl. ¶¶ 28-35.  Plaintiffs also allege that

guidelines issued by the Attorney General in 2008, as well as the FBI's *Domestic*

*Intelligence and Operations Guides ("*DIOG*")* published in December 2008,

permit investigative activity "based on extremely limited information, including

information about the First Amendment expression of subjects."  *See* Compl.

¶¶ 36-37.  Accordingly, this lawsuit puts at issue whether the FBI has undertaken

counterterrorism investigative activity of Muslim Americans and mosques in

Southern California, and of the three plaintiffs in particular, through the use of

Monteilh as an informant, which was impermissibly based solely on religion or

First Amendment-protected activities.

4.  The Attorney General Guidelines and FBI policies cited by the plaintiffs

in the Complaint include a prohibition on the FBI's undertaking investigative

activity based solely on First Amendment activities.  For example, *The Attorney*

*General's Guidelines for FBI National Security Investigations and Foreign*

*Intelligence Collection*, effective October 31, 2003 (Excerpts at Tab 1) ("AG

2003"), and the Guidelines which superseded them, *The Attorney General's*

*Guidelines for Domestic FBI Operations* issued by the Attorney General on

September 29,  2008 (Excerpts at Tab 2) ("AG 2008"), state: "These guidelines do

not authorize investigating or collecting or maintaining information on United

4

1    States persons solely for the purpose of monitoring activities protected by the First

2    Amendment or the lawful exercise of other rights secured by the Constitution or

3    laws of the United States." *See* Tab 2, AG 2008 at 13; *see also* Tab 1, AG 2003 at

4

5    7-8.

6        5.  Likewise, the FBI's DIOG contains an extensive discussion of the FBI's

7    policy to undertake its investigations with full adherence to the Constitutional

8

9    protections and civil liberties of the American people. *See* Tab 3 (DIOG Excerpts).

10   In particular, the DIOG prohibits investigative activity conducted for the sole

11   purpose of monitoring the exercise of Constitutional rights or on the basis of race,

12

13   ethnicity, national origin, or religion. *See* DIOG at 21-38.  Under the DIOG, there

14   must be an authorized purpose for investigative activity that could have an impact

15   on religious practice. *Id.* at 21.  The DIOG provides that an authorized purpose of

16

17   FBI investigative activity must avoid actual—and the appearance of—interference

18   with religious practice to the maximum extent possible. *Id.* at 27.  The DIOG also

19   explains, however, that this policy does not mean that religious practitioners or

20

21   religious facilities are completely free from being examined as part of FBI

22   investigative activity.  If such practitioners are involved in—or such facilities are

23   used for—activities that are the proper subject of FBI-authorized investigative or

24

25   intelligence collection activities, religious affiliation does not immunize them to

26   any degree from FBI investigative action. *Id.*  Nonetheless, FBI policy states that

27   the authorized purpose of an investigation must be properly documented and that

28

5

investigative activity directed at religious leaders or occurring at religious facilities must be focused in time and manner so as not to infringe on legitimate religious practice by any individual but especially by those who appear unconnected to the activities under investigation. *Id.*

6. Addressing plaintiffs' allegations in this case will risk or require the disclosure of certain sensitive information concerning counterterrorism investigative activity in Southern California, including in particular the nature and scope of Operation Flex. As indicated below, the FBI previously has acknowledged that it utilized Mr. Monteilh as a confidential human source and has disclosed some limited information concerning his actions. However, certain specific information pertinent to the allegations about Operation Flex and Monteilh's activities remains highly sensitive information concerning counterterrorism matters that if disclosed reasonably could be expected to cause significant harm to national security. As described below, this includes:

(i) the identities of individuals who have or have not been the subject of counterterrorism investigations, including in Operation Flex, and the status and results of any such investigations;

(ii) information concerning why particular individuals were subject to investigation, including in Operation Flex; and

(iii) particular sources and methods used in obtaining information for counterterrorism investigations, including in Operation Flex.

# BACKGROUND

## A.   The Continuing Terrorist Threat Since September 11, 2001

7.  Before describing the information that the FBI seeks to protect in this case through the Attorney General's privilege assertion, I set forth some background on the FBI's counterterrorism actions since the 9/11 attacks.  FBI Director Robert Mueller has made clear that the FBI's number one priority continues to be the prevention of terrorist attacks against the United States.[2]  As Director Mueller explained in Congressional testimony, since the 2001 terrorist attacks, al Qaeda's intent to conduct high-profile attacks inside the United States has been unwavering.  Recent investigations reveal that the group has adapted its strategy for conducting such attacks.  In the immediate aftermath of 9/11, al Qaeda's plots and plans primarily focused on using individuals from the Middle East or South Asia for such attacks.  More recent plots—beginning in August 2006 with the attempted plan to commit attacks against U.S.-bound aircraft using improvised explosive devices—suggest al Qaeda is also putting more emphasis on finding recruits or trainees from the West to play key roles for these homeland specific operations.

---

[2]    *See* Testimony of Director Mueller before the Senate Committee on Homeland Security and Governmental Affairs (Sept. 22, 2010) (available at http://www.fbi.gov/news/testimony/ nine-years-after-9-11-confronting-the-terrorist-threat-to-the-u.s (last visited on July 20, 2011).

1   8. Al Qaeda's effort to recruit, train, and deploy operatives to attack

2   worldwide, but specifically in the United States, was demonstrated with the arrest

3   of Najibullah Zazi, who was plotting to attack the New York City subway system.

4

5   The fact that Zazi and his associates had access to the United States and were

6   familiar with the environment here from an operational security and targeting

7   perspective demonstrates how al Qaeda can leverage Americans.  The potential

8   exists for al Qaeda to use and train other Americans for additional homeland

9

10   attacks.  Identifying these individuals is among the FBI's highest counterterrorism

11   priorities.

12

13   9. A similar example may be seen in the May 2010 failed attempt of Faisal

14   Shazad to detonate a car bomb in Times Square, an attack for which Tehrik-e-

15   Taliban in Pakistan (TTP) claimed responsibility.  Like al Qaeda's use of Zazi,

16   TTP's use of Shazad—a naturalized U.S. citizen who had lived for years in the

17

18   United States—to attempt to attack the homeland underscores the operational role

19   people in the United States can play for al Qaeda and its affiliates.  Similarly, al

20

21   Qaeda of the Arabian Peninsula (AQAP) demonstrated its intent to target the U.S.

22   homeland in the failed attempt by Umar Farouk Abdulmutallab to bomb Northwest

23   Flight 253 to Chicago on December 25, 2009.  Much like the other attacks, AQAP

24

25   was able to identify a willing recruit who was committed to attacking the United

26   States and whose background did not raise traditional security scrutiny.

27   10.  The threat of homegrown violent extremists—those who have lived

28

1   primarily inside the United States and may commit acts of violence in furtherance

2   of the objectives of a foreign terrorist organization—also remains a particular

3   concern.  Such individuals may be inspired by the global jihadist movement to

4

5   commit violent acts inside the United States but do not necessarily receive direct

6   guidance from terrorist groups overseas.  A good example of this type of

7   homegrown threat occurred in the Los Angeles area.  On September 11, 2005, a

8

9   group of armed men planned to enter a military recruiting center on a busy street in

10   Santa Monica and kill everyone inside.  Their plan was to then go underground for

11   a month and re-emerge on Yom Kippur.  They plotted to open fire on families

12

13   gathered outside a temple in West Los Angeles, preparing to celebrate the holy

14   day.  The members of this homegrown cell planned these attacks in a jail cell in

15   Folsom Prison.  They had no official connection to al Qaeda, but they had adopted

16

17   its cause.  They had raised the money, recruited the participants, chosen the targets,

18   obtained the weapons, and set the date.  These terrorists were poised to strike, but

19   they made a key mistake by first committing a series of gas station robberies to

20

21   raise money to finance their attacks.  Police in Torrance, California, arrested two of

22   the men for robbery and, when their apartment was searched, documents were

23   discovered that listed the addresses of military recruiting stations and local

24

25   synagogues.  The Torrance police then contacted the Los Angeles Joint Terrorism

26   Task Force (JTTF).  From that point, hundreds of investigators worked at an FBI

27   command post to identify other members of the cell.  Ultimately, the FBI, working

28

through the JTTF, was able to disrupt this particular home grown attack.  But the

threat of such attacks persists, and the FBI continues to devote extensive effort to

detecting and preventing other such attacks.

**B.     The FBI's Use of Monteilh as Confidential Source**

11.   In 2009, the FBI acknowledged that it utilized Monteilh as a

confidential human source during a criminal proceeding in this district involving

Ahmadullah Niazi.[3]  From 2006-2007, Monteilh reported on a group of

counterterrorism investigations that was given the name Operation Flex.  Operation

Flex focused on fewer than 25 individuals and was directed at detecting and

preventing possible terrorist attacks.  The goal of Operation Flex was to determine

whether particular individuals were involved in the recruitment and training of

individuals in the United States or overseas for possible terrorist activity.

12. The FBI has previously disclosed some of the actions Mr. Monteilh

undertook as a confidential informant for the FBI and some of the information he

collected for the FBI.  Specifically, during the *Niazi* criminal case noted above, the

---

[3]     In the criminal case *United States v. Ahmadullah Niazi,* U.S.D.C., C.D.
Cal., No. SACR 09-28-AN, FBI Special Agent Thomas Ropel testified at a
detention hearing in that case that an FBI informant who had provided information
concerning Mr. Niazi was the same person Mr. Niazi had reported to the FBI as a
possible terrorist.  Although SA Ropel did not identify Mr. Monteilh by name, Mr.
Niazi knew that Monteilh was the person he had reported to the FBI as a possible
terrorist.  (The *Niazi* indictment in that criminal case was later dismissed by the
United States without prejudice.)

FBI disclosed to the defendant in that case the content of some of the audio and video recordings containing conversations between Mr. Monteilh and the defendant and others.  The FBI also acknowledged in the *Niazi* case that Mr. Monteilh provided handwritten notes to the FBI, and it produced certain notes provided by Mr. Monteilh concerning Mr. Niazi.  The FBI is presently assessing whether additional audio, video, or notes can be disclosed without risking disclosure of the privileged information described below and significant harm to national security interests in protecting counterterrorism investigations.

13. However, as set forth below, the FBI must protect certain specific information concerning counterterrorism investigative matters related to the allegations of this case, including Operation Flex in which Monteilh was involved. In particular, the FBI cannot publicly disclose the identities of specific subjects of counterterrorism investigations (some of which remain open), the identities of those who have not been subject to investigation, the precise number of Operation Flex subjects, the reasons particular individuals were subject to investigation, or particular sources and methods of investigation used in counterterrorism cases.

14. Monteilh has provided numerous statements to the media discussing his purported activities on behalf of the FBI.  He has also filed his own lawsuit against the FBI and agents in their personal capacity in which he makes allegations related to his work as an FBI source.  *See Monteilh v. FBI*, et al., U.S.D.C., C.D. Cal., Civil Action No. 10-102.  The FBI has not confirmed or denied any of Monteilh's

1   public allegations concerning his work for the FBI, and his allegations do not

2   constitute a disclosure or confirmation by the FBI of any information concerning

3   his activities as an informant.

4

5   **INFORMATION SUBJECT TO STATE SECRETS PRIVILEGE
AND HARM TO NATIONAL SECURITY FROM DISCLOSURE**

6

7   15. The categories of information that the FBI seeks to protect in this case

8   through the Attorney General's privilege assertion are described below. Upon my

9   personal consideration, I have determined that disclosure of information in these

10  categories reasonably could be expected to cause significant harm to national

11

12  security:

13

14          (1)    ***Subject Identification***: Information that could tend to confirm

15          or deny whether a particular individual was or was not the subject of

16          an FBI counterterrorism investigation, including in Operation Flex.

17
          (2)    ***Reasons for Counterterrorism Investigations and Results***:

18
          Information that could tend to reveal the initial reasons (*i.e.* predicate)

19
          for an FBI counterterrorism investigation of a particular person

20
          (including in Operation Flex), any information obtained during the

21
22          course of such an investigation, and the status and results of the

23          investigation. This category includes information obtained from the

24          U.S. Intelligence Community related to the reasons for an

25
26          investigation.

27

28

12

(3)   ***Sources and Methods****:* Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex.  This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods, were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.[4]

## I.   Subject Identification and Reasons for Investigation

16.  The FBI seeks to protect through the Attorney General's privilege assertion information that would confirm or deny whether particular individuals were the subjects of FBI counterterrorism investigations, and the predicate for, information obtained in, and the status and results of any counterterrorism investigations action of particular persons.  I describe below in unclassified terms why the disclosure of such information reasonably could be expected to cause

---

[4]   This description of the broad categories of information subject to the Attorney General's claim of privilege is not meant to foreclose the possibility that other information related to FBI counterterrorism investigations including Operation Flex may be identified in later proceedings as subject to privilege.

significant harm to national security.   I address first the process for approval and oversight of FBI counterterrorism investigations under then-applicable Attorney General Guidelines.

A. **Counterterrorism Guidelines Applicable to Operation Flex**

17.  At the time the investigations at issue in this case were opened, the October 31, 2003 Attorney General Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (NSIG) were in effect.  The NSIG authorized three levels of investigative activity: threat assessments, preliminary investigations and full investigations.

18.  The 2003 AG Guidelines authorized the FBI to undertake threat assessments to proactively draw on available sources of information to identify terrorist threats and activities through non-intrusive investigative techniques, including obtaining publicly available information, accessing information available within the FBI and Department of Justice, requesting information from other government entities, using online resources, interviewing previously established assets, and conducting non-pretextual interviews of members of the public and private entities.  The authority to undertake threat assessments could be used in cases in which information or an allegation concerning possible terrorist activity or other national security threats by an individual, group, or organization were received by the FBI and the matter could be checked promptly through the relatively non-intrusive means described above.

19. A Preliminary Investigation could be initiated under the 2003 guidelines to determine whether a full investigation was appropriate based upon "information or an allegation" indicating a threat to the national security, for example, that an individual is or may be an international terrorist or an agent of a foreign power; an individual, group or organization is or may be engaging, or has or may have engaged, in activities constituting a threat to the national security (or related preparatory or support activities) for or on behalf of a foreign power; or an individual, group or organization is, or may be, the target of a recruitment or infiltration effort by an international terrorist, foreign power, or agent of a foreign power under circumstances related to a threat to the national security. Most Preliminary Investigations could be approved by either the Special Agent in Charge (SAC) of the field office or, as authorized by the Special Agent in Charge, by an Assistant Special Agent in Charge (ASAC) or squad supervisor with responsibility for national security investigations. A field office was required under the 2003 guidelines to notify FBI Headquarters of the initiation of the investigation and to identify the grounds for the investigation. FBI Headquarters, in turn, was required to provide notice of the initiation of the investigation to the Department of Justice's Office of Intelligence Policy and Review (OIPR).[5] All

_____

[5] The Office of Intelligence Policy and Review became part of the National Security Division (NSD) in the Department of Justice and has been renamed the (cont'd)

15

1  lawful investigative techniques could be used in a Preliminary Investigation except

2  for mail opening, physical search, or electronic surveillance requiring judicial

3  order or warrant.

4

5      20.  A Preliminary Investigation was to be completed within six months of

6  the date of initiation, but if warranted by facts or information obtained in the

7  course of the investigation, senior field office managers could authorize a six-

8  month extension.  An extension of a Preliminary Investigation beyond the initial

9  one-year period required FBI Headquarters approval and could be granted in six-

10  month increments.  FBI Headquarters was required to notify OIPR of any

11

12  extensions by FBI Headquarters beyond the initial one-year period.

13

14      21.  A Full Investigation was authorized under the same circumstances as a

15  Preliminary Investigation except that instead of "information or an allegation" of a

16  threat to the national security the NSIG required that "specific and articulable

17  facts" gave reason to believe that a threat to the national security may exist.  Most

18

19  Full Investigations could be approved by either the SAC of the field office or, as

20  authorized by the SAC, by an ASAC.  The notice requirements for the initiation of

21  a Full Investigation were the same as for the initiation of a Preliminary

22

23  Investigation.  All lawful investigative techniques could be used in a Full

24  Investigation.  The FBI was required under the 2003 guidelines to notify OIPR and

25

26  _____

27  Office of Intelligence.

28

16

1  the Criminal Division at the end of each year a full investigation continued and to

2  provide OIPR and the Criminal Division with a summary of the investigation.

3
4      22.  All of the investigations of Operation Flex subjects were opened with

5  supervisory authority and subject to internal FBI and DOJ oversight.

6
7  **B.    Harm to National Security from Disclosure of Counterterrorism Investigation Subjects and Reasons for Investigation**

8      23.   Disclosure of the identity of subjects of counterterrorism investigations

9
10  could reasonably be expected to result in significant harm to national security.

11  First, disclosure of the subjects of open counterterrorism investigations would

12  obviously alert those subjects to the fact of the FBI's current interest in them.

13
14  Such knowledge would cause significant harm to FBI counterterrorism

15  investigations, as subjects could attempt to flee, destroy evidence or take steps to

16  alter their conduct so as to avoid detection of their future activities by law

17
18  enforcement.  In these circumstances, law enforcement and intelligence officers

19  would be significantly hindered in gathering further intelligence on their activities

20  or determine their whereabouts.  In addition, knowledge that they were under

21
22  investigation might enable subjects to anticipate the activities of law enforcement

23  and intelligence officers, perhaps conducting counter-surveillance activities that

24  could place Federal agents at greater risk. Such knowledge would also alert

25
26  associates of the subjects to the fact that the FBI is likely aware of their

27  associations with the subject, causing them to take similar steps to avoid scrutiny.

28

Disclosing the identities of counterterrorism subjects also could enable subjects to ascertain the identities of confidential informants or other sources of intelligence, putting those sources at risk.

24.  Disclosure that an individual is *not* a subject of a national security investigation also reasonably could be expected to cause significant harm to national security.  Individuals or terrorist groups could manipulate the system to discover whether they or their members are subject to investigation.  Disclosure that some persons are not subject to investigation, while the status of others is not confirmed, would inherently reveal that concerns remains as to particular persons. Also, if individuals desire to commit terrorist acts, notification that they are not under investigation would inform them that they can move without detection. Indeed, confirmation that an individual is not under investigation could provide an incentive to those so inclined to commit a terrorist act before becoming subject to investigative interest.

25.  Similarly, even where an investigation has been closed, disclosing that an individual formerly was the subject of a counterterrorism investigation reasonably could be expected to cause significant harm to national security. Disclosure that an individual had been, but is no longer, under investigation might induce that subject to evaluate previous conduct and interactions to determine what information the Government may have obtained about them.  As noted, to the extent that the individual's terrorism-related intentions were not previously

18

detected and the individual later decided to undertake terrorist activity, knowing one was no longer the subject of investigative interest might embolden that person to operate confident that there is not a threat of detection.  In addition, the fact that investigations are closed typically does not indicate that the subjects have been "cleared" of wrongdoing.  Closed cases are often reopened based on new information.

26.  Even if individuals are entirely law-abiding, disclosure that they were once, but no longer are, the subjects of counterterrorism investigations would provide valuable intelligence to suspected terrorists and terrorist organizations regarding the intelligence and suspicions the FBI has regarding them.  Indeed, even if the FBI has closed an investigation on one subject, it may have open investigations on the associates of that subject who are engaged in or still suspected of ties to terrorist activity.  Disclosing that investigations on certain persons are closed where the FBI has not found a current nexus to terrorism could still alert their associates of the FBI interests in *them*, which could lead these associates to destroy evidence or alter their conduct so as to avoid detection of their future activities by law enforcement.

27.  In addition, disclosure that a person had been a subject of a closed counterterrorism investigation would also provide an important insight into the FBI's investigative sources and methods.  The FBI may open a counterterrorism investigation based on an individual's association with a subject of another open

counterterrorism investigation, when the association is close enough to indicate a threat to the national security. If the subjects of FBI investigations were disclosed, individuals closely associated with that subject would be on notice that they may be subjects of investigations, and thus take steps to avoid detection.

28. Even if a person believes that he or she might have been under investigation based on unconfirmed public speculation or other information, confirmation of that fact by the Government in litigation would remove all doubt and would not only confirm who was or was not subject to investigation, but would tend to reveal why the Government had a particular interest or concern with certain individuals. This would inherently reveal the focus (or lack thereof) of investigative action.

29. Similarly, disclosure of the substance of a counterterrorism investigation—whether the initial predicate, information gained during the investigation, status, and results—would reveal a range of sensitive counterterrorism investigative information, even if the investigation does not identify any nexus to terrorism. There is, first, the obvious harm of revealing to subjects who may in fact be bent on terrorist activity what the FBI knows or does not know about their plans and the threat they pose to national security. Even if a person is not intent on committing terrorist acts, the reasons they came under suspicion may involve sensitive intelligence information about them, their associates, or a particular threat, the disclosure of which could harm other pending

or future investigations.  More generally, disclosure of the reasons for an

investigation could indicate what kind of information is sufficient to trigger an

inquiry by the FBI, thus providing insights to those intent on terrorism on how to

avoid detection.  Finally, as discussed further below, disclosure of the reasons for

an investigation may reveal sensitive sources and methods related to how the FBI

may obtain information on a person.

**II.    FBI Investigative Sources, Methods, Techniques in Operation Flex**

30.  The FBI also seeks to protect through the Attorney General's privilege

assertion information that would tend to describe, reveal, confirm or deny the

existence or use of FBI investigative sources, methods, or techniques of

counterterrorism investigations that were utilized in Operation Flex against

particular subjects.  This category includes previously undisclosed information

related to whether court-ordered searches or surveillance, confidential human

sources, and other investigative sources and methods, were used in a

counterterrorism investigation of a particular person, the reasons such methods

were used, the status of the use of such sources and methods, and any results

derived from such methods

31.  The disclosure of the information in this category reasonably could be

expected to cause significant harm to the national security.  The disclosure of

sources and methods used in a particular investigation would reveal not only the

identities of particular subjects but the steps taken by the FBI in counterterrorism

21

investigations.  FBI sources and methods for investigating potential terrorist threats are of the utmost significance, because the FBI's top priority is to detect and prevent terrorist attacks.  The disclosure of sources and methods, such as confidential human sources, the existence of surveillance, and the use of other techniques, would provide a roadmap to adversaries as to how the FBI goes about this vital task.  For these reasons, disclosure of the sources and methods used by the FBI in a particular counterterrorism investigation, including in Operation Flex, reasonably could be expected to cause significant harm to national security.

## CONCLUSION

1

2      32.  For the reasons set forth above, based on my personal consideration of

3
the matter, I have determined that disclosure of the information in the three
4

5   categories described above reasonably could be expected to cause significant harm

6   to national security.  I refer the Court to my classified declaration, submitted solely

7
for *in camera, ex parte* review, for further details concerning the information
8

9   subject to the Attorney General's privilege assertion.

10      I declare under penalty of perjury that the foregoing is true and correct.

11

12

13   DATE:  7/25/11

14                                    Mark F. Giuliano
                                      Assistant Director
15                                    Counterterrorism Division
                                      Federal Bureau of Investigation
16                                    United States Department of Justice

17

18

19

20

21

22

23

24

25

26

27

28