TONY WEST
Assistant Attorney General
ANDRE BIROTTE JR.
United Sates Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN. Y LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: 202-514-4782
Facsimile: 202-616-8460
*Attorneys for the Federal Bureau of Investigation and*
*Defendants Mueller and Martinez Sued in their*
*Official Capacities*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

_____

YASSIR FAZAGA *et al.*,

    Plaintiffs

v.

FEDERAL BUREAU OF
INVESTIGATION *et al.*,

    Defendants.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE:   SA11-CV-00301 CJC (VBKx)

**EXHIBITS TO PUBLIC
DECLARATION OF
MARK F. GIULIANO**

DATE:    November 14, 2011
TIME:    1:30 p.m.
JUDGE:   Hon. Cormac J. Carney

**EXHIBIT 1 TO DECLARATION OF MARK F. GIULIANO**
**FEDERAL BUREAU OF INVESTIGATION**



# THE ATTORNEY GENERAL'S GUIDELINES FOR FBI NATIONAL SECURITY INVESTIGATIONS AND FOREIGN INTELLIGENCE COLLECTION (U)

EFFECTIVE: October 31, 2003

Classified by:  John Ashcroft, Attorney General
Reason:        1.4(c)
Declassify on: October 31, 2028

**Classification Modified by:  Alberto R. Gonzales, Attorney General**
**August 2, 2007**





SECRET/NOFORN

## PREAMBLE (U)

The following Guidelines on national security investigations and foreign intelligence collection by the Federal Bureau of Investigation (FBI) are issued under the authority of the Attorney General as provided in sections 509, 510, 533, and 534 of title 28, United States Code.  They apply to activities of the FBI pursuant to Executive Order 12333 and other activities as provided herein.  (U)

SECRET/NOFORN



TABLE OF CONTENTS  (U)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

A.   NATIONAL SECURITY INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . 2

B.   FOREIGN INTELLIGENCE COLLECTION . . . . . . . . . . . . . . . . . . . . . . . 5

C.   STRATEGIC ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.   RETENTION AND DISSEMINATION OF INFORMATION . . . . . . . . . . . 6

I.   GENERAL AUTHORITIES AND PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . 6

A.   GENERAL AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.   USE OF AUTHORITIES AND METHODS . . . . . . . . . . . . . . . . . . . . . . . . .7

C.   DETERMINATION OF UNITED STATES PERSON STATUS . . . . . . . . 9

D.   NATURE AND APPLICATION OF THE GUIDELINES . . . . . . . . . . . . .10

II.   NATIONAL SECURITY INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . .11

A.   THREAT ASSESSMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

B.   COMMON PROVISIONS FOR PRELIMINARY AND FULL
     INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

C.   PRELIMINARY INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

D.   FULL INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

E.   EXTRATERRITORIAL OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . .17

III.   INVESTIGATIVE ASSISTANCE TO STATE, LOCAL, AND FOREIGN
       GOVERNMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

SECRE**X**OFORN

A.       STATE AND LOCAL GOVERNMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . .18

B.       FOREIGN GOVERNMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

IV.      FOREIGN INTELLIGENCE COLLECTION AND ASSISTANCE TO
         INTELLIGENCE AGENCIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

A.       FOREIGN INTELLIGENCE COLLECTION. . . . . . . . . . . . . . . . . . . .19

B.       OPERATIONAL SUPPORT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

C.       CENTRAL INTELLIGENCE AGENCY AND DEPARTMENT OF DEFENSE
         ACTIVITIES WITHIN THE UNITED STATES. . . . . . . . . . . . . . . . . . . .20

V.       INVESTIGATIVE TECHNIQUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

VI.      STRATEGIC ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

VII.     RETENTION AND DISSEMINATION OF INFORMATION. . . . . . . . . . . . . .23

A.       INFORMATION SYSTEMS AND DATABASES. . . . . . . . . . . . . . . . . . .23

B.       INFORMATION SHARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

C.       SPECIAL STATUTORY REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . .32

VIII.    DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
(U)





## INTRODUCTION  (U)

Following the September 11, 2001, terrorist attack on the United States, the Department of Justice carried out a general review of existing guidelines and procedures relating to national security and criminal matters. These Guidelines reflect the result of that review.  (U)

These Guidelines generally authorize investigation by the FBI of threats to the national security of the United States; investigative assistance by the FBI to state, local, and foreign governments in relation to matters affecting the national security; the collection of foreign intelligence by the FBI; the production of strategic analysis by the FBI; and the retention and dissemination of information resulting from the foregoing activities. This includes guidance for the activities of the FBI pursuant to Executive Order 12333, "United States Intelligence Activities" (Dec. 4, 1981).  (U)

The general objective of these Guidelines is the full utilization of all authorities and investigative techniques, consistent with the Constitution and laws of the United States, so as to protect the United States and its people from terrorism and other threats to the national security. As Executive Order 12333 provides, "[t]imely and accurate information about the activities, capabilities, plans, and intentions of foreign powers, organizations, and persons and their agents, is essential to the national security of the United States," and "[a]11 reasonable and lawful means must be used to ensure that the United States will receive the best intelligence available." At the same time, intelligence gathering activities must be carried out in a "responsible manner that is consistent with the Constitution and applicable law," and information concerning United States persons may be collected, retained, and disseminated "only in accordance with procedures . . . approved by the Attorney General." Executive Order 12333, Preamble, §§ 2.1, 2.3. These guidelines should be implemented and interpreted so as to realize as fully as possible the critical objectives of the Executive Order.  (U)

The activities of the FBI under these Guidelines are part of the overall response of the United States to threats to the national security, which includes cooperative efforts and sharing of information with other agencies, including other entities in the Intelligence Community and the Department of Homeland Security. The overriding priority in these efforts is preventing, preempting, and disrupting terrorist threats to the United States. In some cases, this priority will dictate the provision of information to other agencies even where doing so may affect criminal prosecutions or ongoing law enforcement or intelligence operations. To the greatest extent possible that is consistent with this overriding priority, the FBI shall also act in a manner to protect other significant interests, including the protection of intelligence and sensitive law enforcement sources and methods, other classified information, and sensitive operational and prosecutorial information.  (U)





## A.    NATIONAL SECURITY INVESTIGATIONS  (U)

These Guidelines authorize the investigation by the FBI of threats to the national security. Matters constituting threats to the national security, including international terrorism and espionage, are identified in Part I.A1.  Parts II and V of the Guidelines contain the specific provisions governing the conduct of investigations of these threats.  (U)

The investigations authorized by these Guidelines serve to protect the national security by providing the basis for, and informing decisions concerning, a variety of measures to deal with threats to the national security.  These measures may include, for example, recruitment of double agents and other assets; excluding or removing persons involved in terrorism or espionage from the United States; freezing assets of organizations that engage in or support terrorism; securing targets of terrorism or espionage; providing threat information and warnings to other federal agencies and officials, state and local governments, and private entities; diplomatic or military actions; and actions by other intelligence agencies to counter international terrorism or other national security threats.  In addition, the matters identified by these Guidelines as threats to the national security, including international terrorism and espionage, almost invariably involve possible violations of criminal statutes.  Detecting, solving, and preventing these crimes - and in many cases, arresting and prosecuting the perpetrators - are crucial objectives of national security investigations under these Guidelines.  Thus, these investigations are usually both "counterintelligence" investigations and "criminal" investigations.  (U)

The authority to conduct national security investigations under these Guidelines does not supplant or limit the authority to carry out activities under other Attorney General guidelines or pursuant to other lawful authorities of the FBI.  Thus, matters within the scope of these Guidelines, such as crimes involved in international terrorism and the activities of groups and organizations that aim to commit such crimes, may also be investigated under the guidelines for general crimes investigations and criminal intelligence investigations.  *See* the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations, Part II (general crimes investigations) and Part III.B (terrorism enterprise investigations).  Likewise, the authorization of extraterritorial activities under Part II.E of these Guidelines overlaps at a practical level with other guidelines the Attorney General has issued for extraterritorial criminal investigations and use of extraterritorial criminal informants.  The requirements under these Guidelines to notify FBI Headquarters and other Department of Justice components and officials concerning the initiation and progress of investigations are intended in part to ensure that activities pursuant to these Guidelines are fully coordinated with investigations and activities under other authorities of the FBI.  (U)

Part II of these Guidelines authorizes three levels of investigative activity in national security



**SECRET NOFORN**

investigations: (1) threat assessments, (2) preliminary investigations, and (3) full investigations:  (U)

(1)     Threat assessments.   To carry out its central mission of preventing the commission of terrorist acts against the United States and its people, the FBI must proactively draw on available sources of information to identify terrorist threats and activities.  It cannot be content to wait for leads to come in through the actions of others, but rather must be vigilant in detecting terrorist activities to the full extent permitted by law, with an eye towards early intervention and prevention of acts of terrorism before they occur.  (U)

Part II.A of these Guidelines accordingly authorizes the proactive collection of information concerning threats to the national security, including information on individuals, groups, and organizations of possible investigative interest, and information on possible targets of international terrorist activities or other national security threats (such as infrastructure and computer systems vulnerabilities).  This is comparable to the authorization under Part VI of the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations to engage in information collection for counterterrorism or other law enforcement purposes without any more specific investigative predication.  The particular methods allowed in threat assessments are relatively non-intrusive investigative techniques, including obtaining publicly available information, accessing information available within the FBI or Department of Justice, requesting information from other government entities,  using online informational resources and services, interviewing previously established assets, non-pretextual interviews and requests for information from members of the public and private entities, and accepting information voluntarily provided by governmental or private entities.  (U)

In addition to allowing proactive information collection for national security purposes, the authority to conduct threat assessments may be used in cases in which information or an allegation concerning possible terrorist (or other national security-threatening) activity by an individual, group, or organization is received, and the matter can be checked out promptly through the relatively non-intrusive techniques authorized in threat assessments.  This can avoid the need to open a formal preliminary or full investigation, if the threat assessment indicates that further investigation is not warranted.  In this function, threat assessments under these Guidelines are comparable to the checking of initial leads in ordinary criminal investigations. *See* the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations, Subpart A of the Introduction.  (U)

(2)     Preliminary investigations. Preliminary investigations are authorized, generally speaking, when there is information or an allegation indicating that a threat to the national security may exist.

3

**SECRET NOFORN**



SECRE NOFORN

Preliminary investigations may relate to individuals, groups, organizations, and possible criminal violations, as specified in Part II.B.  (U)

Since the legal predicate for mail opening, physical searches, and electronic surveillance that require a judicial order or warrant generally entails more substantial information or evidence than would be available outside of a full investigation, the Guidelines specify that these methods are not available in preliminary investigations. Otherwise, all lawful investigative techniques may be used in preliminary investigations. A non-exhaustive listing of such techniques, including related review or approval requirements, appears in Part V of these Guidelines. These include all the techniques that may be used in threat assessments; interviews and pretext interviews of the subject of the investigation and other persons; use of previously established assets and recruitment of new assets; physical, photographic, and video surveillance not requiring unconsented entry; mail covers; polygraph examinations; inquiry of law enforcement, intelligence, and security agencies of foreign governments; physical searches not requiring a judicial order or warrant; undercover operations and undisclosed participation in organizations; consensual monitoring of communications, including consensual computer monitoring; National Security Letters; and pen registers and trap and trace devices. (U)

Preliminary investigations are limited in duration. They may initially be authorized for up to six months, subject to a possible six-month extension by the responsible field office. Extensions of preliminary investigations that continue beyond a year must be authorized by FBI Headquarters. (U)

(3)    Full investigations. Full investigations are authorized, generally speaking, when there are specific and articulable facts giving reason to believe that a threat to the national security may exist. Like preliminary investigations, full investigations may relate to individuals, groups, organizations, and possible criminal violations, as specified in Part II.B. (U)

All lawful investigative techniques may be used in full investigations. These include, in addition to the techniques authorized in threat assessments and preliminary investigations, nonconsensual mail opening, physical searches, and electronic surveillance that require judicial orders or warrants. (U)

In investigating threats to the national security, the FBI may request information from foreign law enforcement, intelligence, and security agencies, and may, in certain circumstances, conduct operations outside of the United States. Part II.E of these Guidelines sets out conditions and approval requirements for extraterritorial activities. As provided in Part II.E, these activities require a request

4



SECRE NOFORN

SECRET//NOFORN

from or approval of the Director of Central Intelligence or a designee. This requirement ensures that extraterritorial activities under these Guidelines are properly coordinated with other agencies in the Intelligence Community, so that their authorities and capabilities are also brought to bear as appropriate to protect the national security, consistent with Executive Order 12333 or a successor order. (U)

The FBI may also provide assistance to state and local governments, and to foreign law enforcement, intelligence, and security agencies, in investigations relating to threats to the national security. Part III of these Guidelines specifies standards and procedures for the provision of such assistance. (U)

## B.    FOREIGN INTELLIGENCE COLLECTION (U)

The FBI's functions pursuant to Executive Order 12333 §§ 1.6, 1.14, 2.3, and 2.4 include engaging in foreign intelligence collection and providing operational support for other components of the U.S. Intelligence Community. This role is frequently critical in collecting foreign intelligence within the United States because the authorized domestic activities of other intelligence agencies are more constrained than those of the FBI under applicable statutory law and Executive Order 12333. (U)

Part IV of these Guidelines provides standards and procedures for the provision of such assistance by the FBI to other federal intelligence agencies and the collection of foreign intelligence by the FBI. (U)

## C.    STRATEGIC ANALYSIS (U)

Executive Order 12333 § 1.14(d) states that the FBI shall "[p]roduce and disseminate foreign intelligence and counterintelligence." The Executive Order further provides, in § 1.1(a), that "[m]aximum emphasis should be given to fostering analytical competition among appropriate elements of the Intelligence Community." Given the magnitude and potential consequences of terrorist threats and other threats to the national security, it is imperative that the FBI develop and maintain a strong analytic capacity to identify, examine, assess, and appropriately disseminate information concerning terrorist threats and to produce and disseminate other analysis relating to national security matters. (U)

Part VI of these Guidelines accordingly authorizes the FBI to examine and analyze information to produce and disseminate foreign intelligence and counterintelligence. Part VI provides that the FBI may draw on information from any source permitted by law in carrying out this analytic function, and may supplement the information in its possession, for purposes of these analytic activities, through the use of the methods authorized in threat assessments, such as obtaining publicly available information and

SECRET//NOFORN

**SECRET//NOFORN**

checking government records.  (U)

**D.   RETENTION AND DISSEMINATION OF INFORMATION  (U)**

Part VII of these Guidelines requires the maintenance of adequate records and information relating to investigations and other activities under these Guidelines, and provides standards for the sharing and dissemination of information obtained in such investigations and activities.  (U)

Part VII includes, in Subpart B.2, provisions for sharing of information and consultation with other Department of Justice components, which reflect legal reforms and policies adopted by the Attorney General following the September 11, 2001, terrorist attack.  Consistent with legal norms and standards of effective management, all relevant components, including the Criminal Division, relevant United States Attorneys' offices, and the Office of Intelligence Policy and Review, must be fully informed about the nature, scope, and conduct of national security investigations and other activities under these Guidelines.  The Attorney General can most effectively direct and control such investigations and activities only if all relevant Department of Justice components are able to offer advice and recommendations, both strategic and tactical, about their conduct and goals.  The overriding need to protect the United States and its people from terrorism and other threats to the national security requires a full and free exchange of information and ideas.  (U)

**I.   GENERAL AUTHORITIES AND PRINCIPLES  (U)**

**A.   GENERAL AUTHORITIES  (U)**

1.   The FBI is authorized to conduct investigations to obtain information concerning or to protect against threats to the national security, including investigations of crimes involved in or related to threats to the national security, as provided in Parts II and V of these Guidelines.  Threats to the national security are:

a.   International terrorism.

b.   Espionage and other intelligence activities, sabotage, or assassination, conducted by, for, or on behalf of foreign powers, organizations, or persons.

c.   Foreign computer intrusions.

d.   Other matters as determined by the Attorney General, consistent with Executive

6

**SECRET//NOFORN**



**SECRET//NOFORN**

Order 12333 or a successor order. (U)

2. The FBI is authorized to assist state, local, and foreign governments as provided in Part III of these Guidelines. (U)

3. The FBI is authorized to collect foreign intelligence and to assist federal intelligence agencies as provided in Part IV of these Guidelines. (U)

4. The FBI is authorized to conduct strategic analysis as provided in Part VI of these Guidelines. (U)

5. The FBI is authorized to retain and disseminate information collected pursuant to these Guidelines as provided in Part VII of these Guidelines. (U)

**B. USE OF AUTHORITIES AND METHODS** (U)

**1. Protection of National Security** (U)

The FBI shall fully utilize the authorities provided and the methods authorized by these Guidelines to protect the national security of the United States. (U)

**2. Choice of Methods** (U)

The conduct of investigations and other activities authorized by these Guidelines may present choices between the use of information collection methods that are more or less intrusive, considering such factors as the effect on the privacy of individuals and potential damage to reputation. As Executive Order 12333 § 2.4 provides, "the least intrusive collection techniques feasible" are to be used in such situations. It is recognized, however, that the choice of techniques is a matter of judgment. The FBI shall not hesitate to use any lawful techniques consistent with these Guidelines, even if intrusive, where the degree of intrusiveness is warranted in light of the seriousness of a threat to the national security or the strength of the information indicating its existence. This point is to be particularly observed in investigations relating to terrorism. (U)

**3. Respect for Legal Rights** (U)

These Guidelines do not authorize investigating or maintaining information on United

7



**SECRET//NOFORN**



States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States. Rather, all activities under these Guidelines must have a valid purpose consistent with these Guidelines, and must be carried out in conformity with the Constitution and all applicable statutes, executive orders, Department of Justice regulations and policies, and Attorney General guidelines.  (U)

4.    **Relationship to Other Guidelines and Authorities  (U)**

a.    The authority to conduct national security investigations and other activities under these Guidelines supplements, and does not supplant or limit, the authority to carry out investigations and other activities under other Attorney General guidelines or pursuant to other lawful authorities of the FBI.  These Guidelines accordingly do not limit other authorized law enforcement activities of the FBI, such as those authorized by the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations.  (U)

b.    National security investigations and other activities under these Guidelines shall be carried out in conformity with all applicable Executive Branch directives and policies, including Intelligence Community directives and policies, relating to coordination of intelligence activities, information sharing, or other matters.  (U)

5.    **Maintenance of Records under the Privacy Act  (U)**

Under the Privacy Act, the permissibility of maintaining records relating to certain activities of individuals who are United States persons depends in part on whether the collection of such information is "pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. 552a(e)(7).  By its terms, the limitation of 5 U.S.C. 552a(e)(7) is inapplicable to activities that do not involve the maintaining of records within the meaning of the Privacy Act, or that occur pertinent to and within the scope of an authorized law enforcement activity.  Activities authorized by these Guidelines are authorized law enforcement activities for purposes of the Privacy Act.  As noted in paragraph 4. above, these Guidelines do not provide an exhaustive enumeration of authorized law enforcement activities.  Questions about the application of the Privacy Act to other activities should be addressed to the FBI Office of the General Counsel or the Department of Justice Office of Information and Privacy.  (U)

**SECRET//NOFORN**

## C.   DETERMINATION OF UNITED STATES PERSON STATUS (U)

In some contexts, these Guidelines provide different standards or rules depending on whether investigations or other activities relate to a United States person or to a non-United States person. This Subpart shall be applied in determining whether an individual, group, or organization is a United States person. (U)

### 1.   Meaning of United States Person (U)

A United States person is:

a.   an individual who is a United States citizen or an alien lawfully admitted for permanent residence;

b.   an unincorporated association substantially composed of individuals who are United States persons; or

c.   a corporation incorporated in the United States.

Notwithstanding the foregoing, a foreign power as defined in Part VIII.L.1.-3. of these Guidelines is never to be considered a United States person, including any foreign government or component thereof, any faction of a foreign nation or nations not substantially composed of individuals who are United States persons, or any entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments. (U)

2.

9

**SECRET//NOFORN**

**SECRET//NOFORN**

c.

**3.      Determination Whether Certain Groups are Substantially Composed of United States Persons  (U)**

In determining whether a group or organization in the United States that is affiliated with a foreign-based international organization is substantially composed of United States persons, the relationship between the two shall be considered.  If the U.S.-based group or organization operates directly under the control of the international organization and has no independent program or activities in the United States, the membership of the entire international organization shall be considered in determining if it is substantially composed of United States persons.  If, however, the U.S.-based group or organization has programs or activities separate from, or in addition to, those directed by the international organization, only its membership in the United States shall be considered in determining whether it is substantially composed of United States persons.  (U)

**D.      NATURE AND APPLICATION OF THE GUIDELINES  (U)**

**1.      Status as Internal Guidance  (U)**

These Guidelines are set forth solely for the purpose of internal Department of Justice guidance.  They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice.  (U)

**SECRET//NOFORN**

SECRET/NOFORN

**2.    Departures from the Guidelines** (U)

Departures from these Guidelines must be approved by the Attorney General, the Deputy Attorney General, or an official designated by the Attorney General. If a departure from these Guidelines is necessary without such prior approval because of the immediacy or gravity of a threat to the national security or to the safety of persons or property and the need to take immediate action to protect against such a threat, the Attorney General, the Deputy Attorney General, or an official designated by the Attorney General shall be notified as soon thereafter as practicable. The FBI shall provide timely written notice of departures from these Guidelines to the Office of Intelligence Policy and Review. Notwithstanding this paragraph, all activities in all circumstances must be carried out in a manner consistent with the Constitution and laws of the United States. (U)

**3.    Interpretation** (U)

All significant new legal questions as to the coverage and interpretation of these guidelines will be resolved initially by the Office of Intelligence Policy and Review and reviewed by the Deputy Attorney General or Attorney General as appropriate. (U)

## II.    NATIONAL SECURITY INVESTIGATIONS (U)

The levels of investigative activity in national security investigations are: (1) threat assessments; (2) preliminary investigations; and (3) full investigations. If the available information shows at any point that the threshold standard for a preliminary investigation or full investigation is satisfied, then that level of investigative activity may be initiated immediately, without progressing through more limited investigative stages. (U)

The scope of authorized activities under this Part is not limited to "investigation" in a narrow sense, such as solving particular cases or obtaining evidence for use in particular criminal prosecutions. Rather, these activities also provide critical information needed for broader analytic and intelligence purposes authorized by Executive Order 12333 and these Guidelines to protect the national security, such as strategic analysis under Part VI, dissemination of information to other agencies in the Intelligence Community under Part VII.B, and dissemination of information to appropriate White House officials under Part VII.B. Information obtained at all stages of investigative activity - threat assessments, preliminary investigations, and full investigations - is accordingly to be retained and disseminated for these purposes as provided in these Guidelines, or in FBI policy consistent with these

SECRET/NOFORN

**SECRET//NOFORN**

Guidelines, regardless of whether it furthers investigative objectives in a narrower or more immediate sense. (U)

**A.     THREAT ASSESSMENTS (U)**

The FBI may, without opening a preliminary or full investigation, engage in the following activities to investigate or collect information relating to threats to the national security, including information on individuals, groups, and organizations of possible investigative interest, and information concerning possible targets of international terrorism, espionage, foreign computer intrusion, or other threats to the national security:

1.     Obtain publicly available information. ✖ (U)

2.     Access and examine FBI and other Department of Justice records, and obtain information from any FBI or other Department of Justice personnel. ✖ (U)

3.     Check records maintained by, and request information from, other federal, state, and local government entities. ✖ (U)

4.     Use online services and resources (whether non-profit or commercial). ✖ (U)

5.     Interview previously established assets, informants, and cooperating witnesses (not including new tasking of such persons). ✖ (U)

6.     Interview or request information from members of the public and private entities (other than pretext interviews or requests). ✖ (U)

7.     Accept information voluntarily provided by governmental or private entities. ✖ (U)

The foregoing methods may also be used, without opening a preliminary or full investigation, to identify potential assets, or to collect information to maintain the cover or credibility of an asset or employee, in connection with activities related to a threat to the national security. ✖ (U)

**SECRET//NOFORN**

B.    **COMMON PROVISIONS FOR PRELIMINARY AND FULL INVESTIGATIONS (U)**

1.    **Circumstances for Opening an Investigation  (U)**

The circumstances on which the initiation of a preliminary investigation or full investigation may be based are:

a.    An individual is or may be an international terrorist or an agent of a foreign power. ✖ (U)

b.    A group or organization is or may be a foreign power or an agent of a foreign power. ✖ (U)

c.

d.    An individual, group, or organization is or may be engaging, or has or may have engaged, in activities constituting a threat to the national security (or related preparatory or support activities) for or on behalf of a foreign power. ✖ (U)

e.    A crime involved in or related to a threat to the national security has or may have occurred, is or may be occurring, or will or may occur. ✖ (U)

f.    An individual, group, or organization is, or may be, the target of a recruitment or infiltration effort by an international terrorist, foreign power, or agent of a foreign power under circumstances related to a threat to the national security. ✖ (U)

g.    An individual, group, organization, entity, information, property, or activity is, or may be, a target of international terrorism, espionage, foreign computer intrusion, or other threat to the national security. ✖ (U)

2.    **Authorization and Notice (U)**

a.    An FBI field office or FBI Headquarters may initiate a preliminary or full investigation.  A field office shall notify FBI Headquarters within ten working days of the initiation by the field office of a preliminary or full investigation.  The



SECRE~~X~~OFORN

notice of initiation of a preliminary or full investigation, whether the investigation is initiated by a field office or FBI Headquarters, shall identify the grounds for the investigation and describe any pertinent sensitive national security matter(s). ✖ (U)

b.   FBI Headquarters shall provide the notice of the initiation of a preliminary or full investigation to the Office of Intelligence Policy and Review and to the Criminal Division, and the Office of Intelligence Policy and Review shall notify the Attorney General and the Deputy Attorney General. The notice shall be provided to the Office of Intelligence Policy and Review and the Criminal Division within ten working days of receipt of the notice from a field office by FBI Headquarters or initiation of the investigation by FBI headquarters. The FBI shall also provide the notice of initiation to any relevant United States Attorney's office, subject to authorization by the Criminal Division in an espionage case. Exceptions may be adopted to the requirements of this subparagraph as provided in Part VII.B.2.d.   (U)

c.   The FBI shall notify the Deputy Attorney General if FBI Headquarters disapproves a field office's initiation of a preliminary or full investigation.   (U)

3.   **Investigations of Groups and Organizations**   (U)

a.   Preliminary and full investigations of groups and organizations should (U)    s on activities related to threats to the national security, not on unrelated First Amendment activities. Any information concerning a group or organization that is relevant to the investigation of a threat to the national security may be sought, including information on any relationship of the group or organization to a foreign power; the identity of its members, employees, or other persons who may be acting in furtherance of its objectives; its finances; its geographical dimensions; and its past and future activities and goals. ✖ (U)

b.   In the course of a preliminary or full investigation of a group or organization, it may appear that investigation of an individual or individuals within or associated with the group or organization is warranted, beyond the investigation of the individual's activities related to the group or organization as part of the investigation of the group or organization. A preliminary or full investigation of such an individual may be initiated whenever the requirements for initiating a

14

SECR~~X~~OFORN

SECRET//NOFORN

preliminary or full investigation of an individual are satisfied.  (U)

## C.   PRELIMINARY INVESTIGATIONS (U)

### 1.   Initiation (U)

A field office or FBI Headquarters may initiate a preliminary investigation:

a.   when there is information or an allegation indicating the existence of a circumstance described in Part II.B.1 of these Guidelines, in order to determine whether the basis exists for a full investigation; or

b.   in order to identify potential assets, to determine the suitability or credibility of an individual as an asset, or to collect information to maintain the cover or credibility of an asset or employee, in connection with activities related to a threat to the national security. (U)

### 2.   Approval Levels (U)

A preliminary investigation initiated by a field office must be approved by the Special Agent in Charge if the investigation involves a sensitive national security matter.  Other preliminary investigations may be approved by the Special Agent in Charge or, as authorized by the Special Agent in Charge, by an Assistant Special Agent in Charge or squad supervisor with responsibility for national security investigations. (U)

### 3.   Authorized techniques (U)

All lawful investigative techniques may be used in preliminary investigations, including the techniques listed in Part V of these Guidelines, other than the techniques described in Part V.17.-18. (mail opening, physical search, or electronic surveillance requiring judicial order or warrant). (U)

### 4.   Duration (U)

Preliminary investigations shall be completed within six months of the date of initiation. In a preliminary investigation initiated by a field office, the Special Agent in Charge or, as authorized by the Special Agent in Charge, an Assistant Special Agent in Charge

15

SECRET//NOFORN

SECRE̶̶OFORN

responsible for the investigation, may authorize an extension for an additional six-month period if warranted by facts or information obtained in the course of the investigation. An extension of a preliminary investigation beyond the initial one-year period requires FBI Headquarters approval and may be granted in six-month increments. All extensions shall be in writing and include the reason for the extension. If FBI Headquarters approves an extension of a preliminary investigation beyond the initial one-year period, the FBI shall notify the Office of Intelligence Policy and Review and provide to the Office of Intelligence Policy and Review the extension statement (as described in the preceding sentence) within ten working days of the transmittal of the approval to a field office. ✖ (U)

**D.    FULL INVESTIGATIONS** (U)

**1.    Initiation** (U)

FBI Headquarters or a field office may initiate a full investigation if there are specific and articulable facts that give reason to believe that a circumstance described in Part II.B.l of these Guidelines exists. ✖ (U)

**2.    Approval Levels** (U)

A full investigation initiated by a field office must be approved by the Special Agent in Charge if the investigation involves a sensitive national security matter. A full investigation of a foreign official or visitor from a threat country may be approved by the Special Agent in Charge or, as authorized by the Special Agent in Charge, by an Assistant Special Agent in Charge or squad supervisor with responsibility for national security investigations. All other full investigations may be approved by the Special Agent in Charge or, as authorized by the Special Agent in Charge, by an Assistant Special Agent in Charge with responsibility for national security investigations. ✖ (U)

**3.    Authorized techniques** (U)

All lawful investigative techniques may be used in full investigations, including the techniques listed in Part V of these Guidelines. ✖ (U)

SECRE̶̶OFORN

SECRET//NOFORN

4.    **Reports** (U)

In addition to the notice concerning the initiation of investigations required under Part II.B.2 of these Guidelines, the FBI shall notify the Office of Intelligence Policy and Review and the Criminal Division at the end of each year a full investigation continues, and shall prepare and provide to the Office of Intelligence Policy and Review and the Criminal Division at that time a summary of the investigation that includes the information described in Part VII.A.2 of these Guidelines as it relates to the investigation. The FBI shall also provide the summary to any relevant United States Attorney's office, subject to authorization by the Criminal Division in an espionage case. The Office of Intelligence Policy and Review shall notify the Attorney General and the Deputy Attorney General concerning full investigations that continue a year or more and the annual summaries in such investigations. Exceptions may be adopted to the requirements of this paragraph as provided in Part VII.B.2.d. (U)

E.    **EXTRATERRITORIAL OPERATIONS** (U)

1.

2.

SECRET//NOFORN

SECRE~~X~~//NOFORN

X.

Y.     UNDISCLOSED PARTICIPATION: joining or participating in the activities of an organization
       by an FBI asset or employee without disclosure of FBI affiliation, but not including participation
       with the knowledge and approval of an official of the organization authorized to act in relation to
       the activities in question, attendance at an activity open to the public or to acknowledged U.S.
       Government employees, personal activities not related to FBI employment, or attendance at an
       academic institution to obtain education or training relevant to FBI employment or to a future
       undercover role.  (U)

Z.     UNITED STATES: when used in a geographical sense, means all areas under the territorial
       sovereignty of the United States.  (U)

Date: October 31, 2003

John Ashcroft
Attorney General

SECRE~~X~~//NOFORN

# EXHIBIT 2 TO DECLARATION OF MARK F. GIULIANO
# FEDERAL BUREAU OF INVESTIGATION

# THE ATTORNEY GENERAL'S GUIDELINES FOR DOMESTIC FBI OPERATIONS

## PREAMBLE

These Guidelines are issued under the authority of the Attorney General as provided in sections 509, 510, 533, and 534 of title 28, United States Code, and Executive Order 12333. They apply to domestic investigative activities of the Federal Bureau of Investigation (FBI) and other activities as provided herein.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.    FBI RESPONSIBILITIES – FEDERAL CRIMES, THREATS TO THE
           NATIONAL SECURITY, FOREIGN INTELLIGENCE . . . . . . . . . . . . . . . 6
    B.    THE FBI AS AN INTELLIGENCE AGENCY . . . . . . . . . . . . . . . . . . . . . . 9
    C.    OVERSIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    GENERAL AUTHORITIES AND PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . 12
    A.    SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.    GENERAL AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    C.    USE OF AUTHORITIES AND METHODS . . . . . . . . . . . . . . . . . . . . . . . 12
    D.    NATURE AND APPLICATION OF THE GUIDELINES . . . . . . . . . . . . . 14

II.    INVESTIGATIONS AND INTELLIGENCE GATHERING . . . . . . . . . . . . . . . . . 16
    A.    ASSESSMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    B.    PREDICATED INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    C.    ENTERPRISE INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.    ASSISTANCE TO OTHER AGENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    A.    THE INTELLIGENCE COMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . 25
    B.    FEDERAL AGENCIES GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . 25
    C.    STATE, LOCAL, OR TRIBAL AGENCIES . . . . . . . . . . . . . . . . . . . . 27
    D.    FOREIGN AGENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    E.    APPLICABLE STANDARDS AND PROCEDURES . . . . . . . . . . . . . . . . 28

IV.    INTELLIGENCE ANALYSIS AND PLANNING . . . . . . . . . . . . . . . . . . . . . . . . 29
    A.    STRATEGIC INTELLIGENCE ANALYSIS . . . . . . . . . . . . . . . . . . . . . 29
    B.    REPORTS AND ASSESSMENTS GENERALLY . . . . . . . . . . . . . . . . . . 29
    C.    INTELLIGENCE SYSTEMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

V.    AUTHORIZED METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    A.    PARTICULAR METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    B.    SPECIAL REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    C.    OTHERWISE ILLEGAL ACTIVITY . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.    RETENTION AND SHARING OF INFORMATION . . . . . . . . . . . . . . . . . . . . . 35
    A.    RETENTION OF INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    B.    INFORMATION SHARING GENERALLY . . . . . . . . . . . . . . . . . . . . . 35
    C.    INFORMATION RELATING TO CRIMINAL MATTERS . . . . . . . . . . . 36
    D.    INFORMATION RELATING TO NATIONAL SECURITY AND
           FOREIGN INTELLIGENCE MATTERS . . . . . . . . . . . . . . . . . . . . . . . 37

VII.    **DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4

## INTRODUCTION

As the primary investigative agency of the federal government, the Federal Bureau of Investigation (FBI) has the authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency. The FBI is further vested by law and by Presidential directives with the primary role in carrying out investigations within the United States of threats to the national security. This includes the lead domestic role in investigating international terrorist threats to the United States, and in conducting counterintelligence activities to meet foreign entities' espionage and intelligence efforts directed against the United States. The FBI is also vested with important functions in collecting foreign intelligence as a member agency of the U.S. Intelligence Community. The FBI accordingly plays crucial roles in the enforcement of federal law and the proper administration of justice in the United States, in the protection of the national security, and in obtaining information needed by the United States for the conduct of its foreign affairs. These roles reflect the wide range of the FBI's current responsibilities and obligations, which require the FBI to be both an agency that effectively detects, investigates, and prevents crimes, and an agency that effectively protects the national security and collects intelligence.

The general objective of these Guidelines is the full utilization of all authorities and investigative methods, consistent with the Constitution and laws of the United States, to protect the United States and its people from terrorism and other threats to the national security, to protect the United States and its people from victimization by all crimes in violation of federal law, and to further the foreign intelligence objectives of the United States. At the same time, it is axiomatic that the FBI must conduct its investigations and other activities in a lawful and reasonable manner that respects liberty and privacy and avoids unnecessary intrusions into the lives of law-abiding people. The purpose of these Guidelines, therefore, is to establish consistent policy in such matters. They will enable the FBI to perform its duties with effectiveness, certainty, and confidence, and will provide the American people with a firm assurance that the FBI is acting properly under the law.

The issuance of these Guidelines represents the culmination of the historical evolution of the FBI and the policies governing its domestic operations subsequent to the September 11, 2001, terrorist attacks on the United States. Reflecting decisions and directives of the President and the Attorney General, inquiries and enactments of Congress, and the conclusions of national commissions, it was recognized that the FBI's functions needed to be expanded and better integrated to meet contemporary realities:

> [C]ontinuing coordination . . . is necessary to optimize the FBI's performance in both national security and criminal investigations . . . . [The] new reality requires first that the FBI and other agencies do a better job of gathering intelligence inside the United States, and second that we eliminate the remnants of the old "wall" between foreign intelligence and domestic law enforcement. Both tasks must be accomplished without sacrificing our domestic liberties and the rule of law, and both depend on building a very

5

different FBI from the one we had on September 10, 2001. (Report of the Commission
on the Intelligence Capabilities of the United States Regarding Weapons of Mass
Destruction 466, 452 (2005).)

In line with these objectives, the FBI has reorganized and reoriented its programs and
missions, and the guidelines issued by the Attorney General for FBI operations have been
extensively revised over the past several years. Nevertheless, the principal directives of the
Attorney General governing the FBI's conduct of criminal investigations, national security
investigations, and foreign intelligence collection have persisted as separate documents involving
different standards and procedures for comparable activities. These Guidelines effect a more
complete integration and harmonization of standards, thereby providing the FBI and other
affected Justice Department components with clearer, more consistent, and more accessible
guidance for their activities, and making available to the public in a single document the basic
body of rules for the FBI's domestic operations.

These Guidelines also incorporate effective oversight measures involving many
Department of Justice and FBI components, which have been adopted to ensure that all FBI
activities are conducted in a manner consistent with law and policy.

The broad operational areas addressed by these Guidelines are the FBI's conduct of
investigative and intelligence gathering activities, including cooperation and coordination with
other components and agencies in such activities, and the intelligence analysis and planning
functions of the FBI.

## A.    FBI RESPONSIBILITIES – FEDERAL CRIMES, THREATS TO THE NATIONAL SECURITY, FOREIGN INTELLIGENCE

Part II of these Guidelines authorizes the FBI to carry out investigations to detect, obtain
information about, or prevent or protect against federal crimes or threats to the national security
or to collect foreign intelligence. The major subject areas of information gathering activities
under these Guidelines – federal crimes, threats to the national security, and foreign intelligence
– are not distinct, but rather overlap extensively. For example, an investigation relating to
international terrorism will invariably crosscut these areas because international terrorism is
included under these Guidelines' definition of "threat to the national security," because
international terrorism subject to investigation within the United States usually involves criminal
acts that violate federal law, and because information relating to international terrorism also falls
within the definition of "foreign intelligence." Likewise, counterintelligence activities relating to
espionage are likely to concern matters that constitute threats to the national security, that
implicate violations or potential violations of federal espionage laws, and that involve
information falling under the definition of "foreign intelligence."

While some distinctions in the requirements and procedures for investigations are
necessary in different subject areas, the general design of these Guidelines is to take a uniform

6

approach wherever possible, thereby promoting certainty and consistency regarding the
applicable standards and facilitating compliance with those standards. Hence, these Guidelines
do not require that the FBI's information gathering activities be differentially labeled as "criminal
investigations," "national security investigations," or "foreign intelligence collections," or that
the categories of FBI personnel who carry out investigations be segregated from each other based
on the subject areas in which they operate. Rather, all of the FBI's legal authorities are available
for deployment in all cases to which they apply to protect the public from crimes and threats to
the national security and to further the United States' foreign intelligence objectives. In many
cases, a single investigation will be supportable as an exercise of a number of these authorities –
i.e., as an investigation of a federal crime or crimes, as an investigation of a threat to the national
security, and/or as a collection of foreign intelligence.

1.      **Federal Crimes**

The FBI has the authority to investigate all federal crimes that are not exclusively
assigned to other agencies. In most ordinary criminal investigations, the immediate objectives
include such matters as: determining whether a federal crime has occurred or is occurring, or if
planning or preparation for such a crime is taking place; identifying, locating, and apprehending
the perpetrators; and obtaining the evidence needed for prosecution. Hence, close cooperation
and coordination with federal prosecutors in the United States Attorneys' Offices and the Justice
Department litigating divisions are essential both to ensure that agents have the investigative
tools and legal advice at their disposal for which prosecutorial assistance or approval is needed,
and to ensure that investigations are conducted in a manner that will lead to successful
prosecution. Provisions in many parts of these Guidelines establish procedures and requirements
for such coordination.

2.      **Threats to the National Security**

The FBI's authority to investigate threats to the national security derives from the
executive order concerning U.S. intelligence activities, from delegations of functions by the
Attorney General, and from various statutory sources. See, e.g., E.O. 12333; 50 U.S.C. 401 et
seq.; 50 U.S.C. 1801 et seq. These Guidelines (Part VII.S) specifically define threats to the
national security to mean: international terrorism; espionage and other intelligence activities,
sabotage, and assassination, conducted by, for, or on behalf of foreign powers, organizations, or
persons; foreign computer intrusion; and other matters determined by the Attorney General,
consistent with Executive Order 12333 or any successor order.

Activities within the definition of "threat to the national security" that are subject to
investigation under these Guidelines commonly involve violations (or potential violations) of
federal criminal laws. Hence, investigations of such threats may constitute an exercise both of
the FBI's criminal investigation authority and of the FBI's authority to investigate threats to the
national security. As with criminal investigations generally, detecting and solving the crimes,
and eventually arresting and prosecuting the perpetrators, are likely to be among the objectives of

investigations relating to threats to the national security.  But these investigations also often serve
important purposes outside the ambit of normal criminal investigation and prosecution, by
providing the basis for, and informing decisions concerning, other measures needed to protect the
national security.  These measures may include, for example: excluding or removing persons
involved in terrorism or espionage from the United States; recruitment of double agents; freezing
assets of organizations that engage in or support terrorism; securing targets of terrorism or
espionage; providing threat information and warnings to other federal, state, local, and private
agencies and entities; diplomatic or military actions; and actions by other intelligence agencies to
counter international terrorism or other national security threats.

In line with this broad range of purposes, investigations of threats to the national security
present special needs to coordinate with other Justice Department components, including
particularly the Justice Department's National Security Division, and to share information and
cooperate with other agencies with national security responsibilities, including other agencies of
the U.S. Intelligence Community, the Department of Homeland Security, and relevant White
House (including National Security Council and Homeland Security Council) agencies and
entities.  Various provisions in these Guidelines establish procedures and requirements to
facilitate such coordination.

## 3.    Foreign Intelligence

As with the investigation of threats to the national security, the FBI's authority to collect
foreign intelligence derives from a mixture of administrative and statutory sources. See, e.g.,
E.O. 12333; 50 U.S.C. 401 et seq.; 50 U.S.C. 1801 et seq.; 28 U.S.C. 532 note (incorporating
P.L. 108-458 §§ 2001-2003).  These Guidelines (Part VII.E) define foreign intelligence to mean
"information relating to the capabilities, intentions, or activities of foreign governments or
elements thereof, foreign organizations or foreign persons, or international terrorists."

The FBI's foreign intelligence collection activities have been expanded by legislative and
administrative reforms subsequent to the September 11, 2001, terrorist attacks, reflecting the
FBI's role as the primary collector of foreign intelligence within the United States, and the
recognized imperative that the United States' foreign intelligence collection activities become
more flexible, more proactive, and more efficient in order to protect the homeland and adequately
inform the United States' crucial decisions in its dealings with the rest of the world:

The collection of information is the foundation of everything that the Intelligence
Community does.  While successful collection cannot ensure a good analytical product,
the failure to collect information . . . turns analysis into guesswork.  And as our review
demonstrates, the Intelligence Community's human and technical intelligence collection
agencies have collected far too little information on many of the issues we care about
most.  (Report of the Commission on the Intelligence Capabilities of the United States
Regarding Weapons of Mass Destruction 351 (2005).)

8

These Guidelines accordingly provide standards and procedures for the FBI's foreign intelligence collection activities that meet current needs and realities and optimize the FBI's ability to discharge its foreign intelligence collection functions.

The authority to collect foreign intelligence extends the sphere of the FBI's information gathering activities beyond federal crimes and threats to the national security, and permits the FBI to seek information regarding a broader range of matters relating to foreign powers, organizations, or persons that may be of interest to the conduct of the United States' foreign affairs. The FBI's role is central to the effective collection of foreign intelligence within the United States because the authorized domestic activities of other intelligence agencies are more constrained than those of the FBI under applicable statutes and Executive Order 12333. In collecting foreign intelligence, the FBI will generally be guided by nationally-determined intelligence requirements, including the National Intelligence Priorities Framework and the National HUMINT Collection Directives, or any successor directives issued under the authority of the Director of National Intelligence (DNI). As provided in Part VII.F of these Guidelines, foreign intelligence requirements may also be established by the President or Intelligence Community officials designated by the President, and by the Attorney General, the Deputy Attorney General, or an official designated by the Attorney General.

The general guidance of the FBI's foreign intelligence collection activities by DNI-authorized requirements does not, however, limit the FBI's authority to conduct investigations supportable on the basis of its other authorities – to investigate federal crimes and threats to the national security – in areas in which the information sought also falls under the definition of foreign intelligence. The FBI conducts investigations of federal crimes and threats to the national security based on priorities and strategic objectives set by the Department of Justice and the FBI, independent of DNI-established foreign intelligence collection requirements.

Since the authority to collect foreign intelligence enables the FBI to obtain information pertinent to the United States' conduct of its foreign affairs, even if that information is not related to criminal activity or threats to the national security, the information so gathered may concern lawful activities. The FBI should accordingly operate openly and consensually with U.S. persons to the extent practicable when collecting foreign intelligence that does not concern criminal activities or threats to the national security.

## B.    THE FBI AS AN INTELLIGENCE AGENCY

The FBI is an intelligence agency as well as a law enforcement agency. Its basic functions accordingly extend beyond limited investigations of discrete matters, and include broader analytic and planning functions. The FBI's responsibilities in this area derive from various administrative and statutory sources. See, e.g., E.O. 12333; 28 U.S.C. 532 note (incorporating P.L. 108-458 §§ 2001-2003) and 534 note (incorporating P.L. 109-162 § 1107). Enhancement of the FBI's intelligence analysis capabilities and functions has consistently been recognized as a key priority in the legislative and administrative reform efforts following the

9

September 11, 2001, terrorist attacks:

> [Counterterrorism] strategy should . . . encompass specific efforts to . . . enhance the depth and quality of domestic intelligence collection and analysis . . . . [T]he FBI should strengthen and improve its domestic [intelligence] capability as fully and expeditiously as possible by immediately instituting measures to . . . significantly improve strategic analytical capabilities . . . . (Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, S. Rep. No. 351 & H.R. Rep. No. 792, 107th Cong., 2d Sess. 4-7 (2002) (errata print).)

> A "smart" government would *integrate* all sources of information to see the enemy as a whole. Integrated all-source analysis should also inform and shape strategies to collect more intelligence. . . . The importance of integrated, all-source analysis cannot be overstated. Without it, it is not possible to "connect the dots." (Final Report of the National Commission on Terrorist Attacks Upon the United States 401, 408 (2004).)

Part IV of these Guidelines accordingly authorizes the FBI to engage in intelligence analysis and planning, drawing on all lawful sources of information. The functions authorized under that Part include: (i) development of overviews and analyses concerning threats to and vulnerabilities of the United States and its interests, (ii) research and analysis to produce reports and assessments concerning matters relevant to investigative activities or other authorized FBI activities, and (iii) the operation of intelligence systems that facilitate and support investigations through the compilation and analysis of data and information on an ongoing basis.

## C.    OVERSIGHT

The activities authorized by these Guidelines must be conducted in a manner consistent with all applicable laws, regulations, and policies, including those protecting privacy and civil liberties. The Justice Department's National Security Division and the FBI's Inspection Division, Office of General Counsel, and Office of Integrity and Compliance, along with other components, share the responsibility to ensure that the Department meets these goals with respect to national security and foreign intelligence matters. In particular, the National Security Division's Oversight Section, in conjunction with the FBI's Office of General Counsel, is responsible for conducting regular reviews of all aspects of FBI national security and foreign intelligence activities. These reviews, conducted at FBI field offices and headquarter units, broadly examine such activities for compliance with these Guidelines and other applicable requirements.

Various features of these Guidelines facilitate the National Security Division's oversight functions. Relevant requirements and provisions include: (i) required notification by the FBI to the National Security Division concerning full investigations that involve foreign intelligence collection or investigation of United States persons in relation to threats of the national security, (ii) annual reports by the FBI to the National Security Division concerning the FBI's foreign

intelligence collection program, including information on the scope and nature of foreign intelligence collection activities in each FBI field office, and (iii) access by the National Security Division to information obtained by the FBI through national security or foreign intelligence activities and general authority for the Assistant Attorney General for National Security to obtain reports from the FBI concerning these activities.

Pursuant to these Guidelines, other Attorney General guidelines, and institutional assignments of responsibility within the Justice Department, additional Department components – including the Criminal Division, the United States Attorneys' Offices, and the Office of Privacy and Civil Liberties – are involved in the common endeavor with the FBI of ensuring that the activities of all Department components are lawful, appropriate, and ethical as well as effective. Examples include the involvement of both FBI and prosecutorial personnel in the review of undercover operations involving sensitive circumstances, notice requirements for investigations involving sensitive investigative matters (as defined in Part VII.N of these Guidelines), and notice and oversight provisions for enterprise investigations, which may involve a broad examination of groups implicated in the gravest criminal and national security threats. These requirements and procedures help to ensure that the rule of law is respected in the Department's activities and that public confidence is maintained in these activities.

11

# I.    GENERAL AUTHORITIES AND PRINCIPLES

## A.    SCOPE

These Guidelines apply to investigative activities conducted by the FBI within the United States or outside the territories of all countries. They do not apply to investigative activities of the FBI in foreign countries, which are governed by the Attorney General's Guidelines for Extraterritorial FBI Operations.

## B.    GENERAL AUTHORITIES

1.    The FBI is authorized to conduct investigations to detect, obtain information about, and prevent and protect against federal crimes and threats to the national security and to collect foreign intelligence, as provided in Part II of these Guidelines.

2.    The FBI is authorized to provide investigative assistance to other federal agencies, state, local, or tribal agencies, and foreign agencies as provided in Part III of these Guidelines.

3.    The FBI is authorized to conduct intelligence analysis and planning as provided in Part IV of these Guidelines.

4.    The FBI is authorized to retain and share information obtained pursuant to these Guidelines as provided in Part VI of these Guidelines.

## C.    USE OF AUTHORITIES AND METHODS

### 1.    Protection of the United States and Its People

The FBI shall fully utilize the authorities provided and the methods authorized by these Guidelines to protect the United States and its people from crimes in violation of federal law and threats to the national security, and to further the foreign intelligence objectives of the United States.

### 2.    Choice of Methods

a.    The conduct of investigations and other activities authorized by these Guidelines may present choices between the use of different investigative methods that are each operationally sound and effective, but that are more or less intrusive, considering such factors as the effect on the privacy and civil liberties of individuals and potential damage to reputation. The least intrusive method feasible is to be used in such situations. It is recognized,

12

however, that the choice of methods is a matter of judgment.  The FBI shall not hesitate to use any lawful method consistent with these Guidelines, even if intrusive, where the degree of intrusiveness is warranted in light of the seriousness of a criminal or national security threat or the strength of the information indicating its existence, or in light of the importance of foreign intelligence sought to the United States' interests.  This point is to be particularly observed in investigations relating to terrorism.

b.    United States persons shall be dealt with openly and consensually to the extent practicable when collecting foreign intelligence that does not concern criminal activities or threats to the national security.

**3.    Respect for Legal Rights**

All activities under these Guidelines must have a valid purpose consistent with these Guidelines, and must be carried out in conformity with the Constitution and all applicable statutes, executive orders, Department of Justice regulations and policies, and Attorney General guidelines.  These Guidelines do not authorize investigating or collecting or maintaining information on United States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States.  These Guidelines also do not authorize any conduct prohibited by the Guidance Regarding the Use of Race by Federal Law Enforcement Agencies.

**4.    Undisclosed Participation in Organizations**

Undisclosed participation in organizations in activities under these Guidelines shall be conducted in accordance with FBI policy approved by the Attorney General.

**5.    Maintenance of Records under the Privacy Act**

The Privacy Act restricts the maintenance of records relating to certain activities of individuals who are United States persons, with exceptions for circumstances in which the collection of such information is pertinent to and within the scope of an authorized law enforcement activity or is otherwise authorized by statute.  5 U.S.C. 552a(e)(7).  Activities authorized by these Guidelines are authorized law enforcement activities or activities for which there is otherwise statutory authority for purposes of the Privacy Act.  These Guidelines, however, do not provide an exhaustive enumeration of authorized FBI law enforcement activities or FBI activities for which there is otherwise statutory authority, and no restriction is implied with respect to such activities carried out by the FBI pursuant to other

13

authorities. Further questions about the application of the Privacy Act to authorized activities of the FBI should be addressed to the FBI Office of the General Counsel, the FBI Privacy and Civil Liberties Unit, or the Department of Justice Office of Privacy and Civil Liberties.

## D.   NATURE AND APPLICATION OF THE GUIDELINES

### 1.   Repealers

These Guidelines supersede the following guidelines, which are hereby repealed:

a.   The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations (May 30, 2002) and all predecessor guidelines thereto.

b.   The Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (October 31, 2003) and all predecessor guidelines thereto.

c.   The Attorney General's Supplemental Guidelines for Collection, Retention, and Dissemination of Foreign Intelligence (November 29, 2006).

d.   The Attorney General Procedure for Reporting and Use of Information Concerning Violations of Law and Authorization for Participation in Otherwise Illegal Activity in FBI Foreign Intelligence, Counterintelligence or International Terrorism Intelligence Investigations (August 8, 1988).

e.   The Attorney General's Guidelines for Reporting on Civil Disorders and Demonstrations Involving a Federal Interest (April 5, 1976).

### 2.   Status as Internal Guidance

These Guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

### 3.   Departures from the Guidelines

Departures from these Guidelines must be approved by the Director of the FBI, by the Deputy Director of the FBI, or by an Executive Assistant Director designated

14

by the Director.  If a departure is necessary without such prior approval because of the immediacy or gravity of a threat to the safety of persons or property or to the national security, the Director, the Deputy Director, or a designated Executive Assistant Director shall be notified as soon thereafter as practicable.  The FBI shall provide timely written notice of departures from these Guidelines to the Criminal Division and the National Security Division, and those divisions shall notify the Attorney General and the Deputy Attorney General.  Notwithstanding this paragraph, all activities in all circumstances must be carried out in a manner consistent with the Constitution and laws of the United States.

**4.      Other Activities Not Limited**

These Guidelines apply to FBI activities as provided herein and do not limit other authorized activities of the FBI, such as the FBI's responsibilities to conduct background checks and inquiries concerning applicants and employees under federal personnel security programs, the FBI's maintenance and operation of national criminal records systems and preparation of national crime statistics, and the forensic assistance and administration functions of the FBI Laboratory.

## II.   INVESTIGATIONS AND INTELLIGENCE GATHERING

This Part of the Guidelines authorizes the FBI to conduct investigations to detect, obtain information about, and prevent and protect against federal crimes and threats to the national security and to collect foreign intelligence.

When an authorized purpose exists, the focus of activities authorized by this Part may be whatever the circumstances warrant. The subject of such an activity may be, for example, a particular crime or threatened crime; conduct constituting a threat to the national security; an individual, group, or organization that may be involved in criminal or national security-threatening conduct; or a topical matter of foreign intelligence interest.

Investigations may also be undertaken for protective purposes in relation to individuals, groups, or other entities that may be targeted for criminal victimization or acquisition, or for terrorist attack or other depredations by the enemies of the United States. For example, the participation of the FBI in special events management, in relation to public events or other activities whose character may make them attractive targets for terrorist attack, is an authorized exercise of the authorities conveyed by these Guidelines. Likewise, FBI counterintelligence activities directed to identifying and securing facilities, personnel, or information that may be targeted for infiltration, recruitment, or acquisition by foreign intelligence services are authorized exercises of the authorities conveyed by these Guidelines.

The identification and recruitment of human sources – who may be able to provide or obtain information relating to criminal activities, information relating to terrorism, espionage, or other threats to the national security, or information relating to matters of foreign intelligence interest – is also critical to the effectiveness of the FBI's law enforcement, national security, and intelligence programs, and activities undertaken for this purpose are authorized and encouraged.

The scope of authorized activities under this Part is not limited to "investigation" in a narrow sense, such as solving particular cases or obtaining evidence for use in particular criminal prosecutions. Rather, these activities also provide critical information needed for broader analytic and intelligence purposes to facilitate the solution and prevention of crime, protect the national security, and further foreign intelligence objectives. These purposes include use of the information in intelligence analysis and planning under Part IV, and dissemination of the information to other law enforcement, Intelligence Community, and White House agencies under Part VI. Information obtained at all stages of investigative activity is accordingly to be retained and disseminated for these purposes as provided in these Guidelines, or in FBI policy consistent with these Guidelines, regardless of whether it furthers investigative objectives in a narrower or more immediate sense.

In the course of activities under these Guidelines, the FBI may incidentally obtain information relating to matters outside of its areas of primary investigative responsibility. For example, information relating to violations of state or local law or foreign law may be

incidentally obtained in the course of investigating federal crimes or threats to the national security or in collecting foreign intelligence. These Guidelines do not bar the acquisition of such information in the course of authorized investigative activities, the retention of such information, or its dissemination as appropriate to the responsible authorities in other agencies or jurisdictions. Part VI of these Guidelines includes specific authorizations and requirements for sharing such information with relevant agencies and officials.

This Part authorizes different levels of information gathering activity, which afford the FBI flexibility, under appropriate standards and procedures, to adapt the methods utilized and the information sought to the nature of the matter under investigation and the character of the information supporting the need for investigation.

Assessments, authorized by Subpart A of this Part, require an authorized purpose but not any particular factual predication. For example, to carry out its central mission of preventing the commission of terrorist acts against the United States and its people, the FBI must proactively draw on available sources of information to identify terrorist threats and activities. It cannot be content to wait for leads to come in through the actions of others, but rather must be vigilant in detecting terrorist activities to the full extent permitted by law, with an eye towards early intervention and prevention of acts of terrorism before they occur. Likewise, in the exercise of its protective functions, the FBI is not constrained to wait until information is received indicating that a particular event, activity, or facility has drawn the attention of those who would threaten the national security. Rather, the FBI must take the initiative to secure and protect activities and entities whose character may make them attractive targets for terrorism or espionage. The proactive investigative authority conveyed in assessments is designed for, and may be utilized by, the FBI in the discharge of these responsibilities. For example, assessments may be conducted as part of the FBI's special events management activities.

More broadly, detecting and interrupting criminal activities at their early stages, and preventing crimes from occurring in the first place, is preferable to allowing criminal plots and activities to come to fruition. Hence, assessments may be undertaken proactively with such objectives as detecting criminal activities; obtaining information on individuals, groups, or organizations of possible investigative interest, either because they may be involved in criminal or national security-threatening activities or because they may be targeted for attack or victimization by such activities; and identifying and assessing individuals who may have value as human sources. For example, assessment activities may involve proactively surfing the Internet to find publicly accessible websites and services through which recruitment by terrorist organizations and promotion of terrorist crimes is openly taking place; through which child pornography is advertised and traded; through which efforts are made by sexual predators to lure children for purposes of sexual abuse; or through which fraudulent schemes are perpetrated against the public.

The methods authorized in assessments are generally those of relatively low intrusiveness, such as obtaining publicly available information, checking government records,

and requesting information from members of the public.  These Guidelines do not impose supervisory approval requirements in assessments, given the types of techniques that are authorized at this stage (e.g., perusing the Internet for publicly available information).  However, FBI policy will prescribe supervisory approval requirements for certain assessments, considering such matters as the purpose of the assessment and the methods being utilized.

Beyond the proactive information gathering functions described above, assessments may be used when allegations or other information concerning crimes or threats to the national security is received or obtained, and the matter can be checked out or resolved through the relatively non-intrusive methods authorized in assessments.  The checking of investigative leads in this manner can avoid the need to proceed to more formal levels of investigative activity, if the results of an assessment indicate that further investigation is not warranted.

Subpart B of this Part authorizes a second level of investigative activity, predicated investigations.  The purposes or objectives of predicated investigations are essentially the same as those of assessments, but predication as provided in these Guidelines is needed – generally, allegations, reports, facts or circumstances indicative of possible criminal or national security-threatening activity, or the potential for acquiring information responsive to foreign intelligence requirements – and supervisory approval must be obtained, to initiate predicated investigations.  Corresponding to the stronger predication and approval requirements, all lawful methods may be used in predicated investigations.  A classified directive provides further specification concerning circumstances supporting certain predicated investigations.

Predicated investigations that concern federal crimes or threats to the national security are subdivided into preliminary investigations and full investigations.  Preliminary investigations may be initiated on the basis of any allegation or information indicative of possible criminal or national security-threatening activity, but more substantial factual predication is required for full investigations.  While time limits are set for the completion of preliminary investigations, full investigations may be pursued without preset limits on their duration.

The final investigative category under this Part of the Guidelines is enterprise investigations, authorized by Subpart C, which permit a general examination of the structure, scope, and nature of certain groups and organizations.  Enterprise investigations are a type of full investigations.  Hence, they are subject to the purpose, approval, and predication requirements that apply to full investigations, and all lawful methods may be used in carrying them out.  The distinctive characteristic of enterprise investigations is that they concern groups or organizations that may be involved in the most serious criminal or national security threats to the public – generally, patterns of racketeering activity, terrorism or other threats to the national security, or the commission of offenses characteristically involved in terrorism as described in 18 U.S.C. 2332b(g)(5)(B).  A broad examination of the characteristics of groups satisfying these criteria is authorized in enterprise investigations, including any relationship of the group to a foreign power, its size and composition, its geographic dimensions and finances, its past acts and goals, and its capacity for harm.

A.    **ASSESSMENTS**

1.    **Purposes**

Assessments may be carried out to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence.

2.    **Approval**

The conduct of assessments is subject to any supervisory approval requirements prescribed by FBI policy.

3.    **Authorized Activities**

Activities that may be carried out for the purposes described in paragraph 1. in an assessment include:

a.    seeking information, proactively or in response to investigative leads, relating to:

   i.    activities constituting violations of federal criminal law or threats to the national security,

   ii.   the involvement or role of individuals, groups, or organizations in such activities; or

   iii.  matters of foreign intelligence interest responsive to foreign intelligence requirements;

b.    identifying and obtaining information about potential targets of or vulnerabilities to criminal activities in violation of federal law or threats to the national security;

c.    seeking information to identify potential human sources, assess the suitability, credibility, or value of individuals as human sources, validate human sources, or maintain the cover or credibility of human sources, who may be able to provide or obtain information relating to criminal activities in violation of federal law, threats to the national security, or matters of foreign intelligence interest; and

d.    obtaining information to inform or facilitate intelligence analysis and planning as described in Part IV of these Guidelines.

19

4.      **Authorized Methods**

Only the following methods may be used in assessments:

a.      Obtain publicly available information.

b.      Access and examine FBI and other Department of Justice records, and obtain information from any FBI or other Department of Justice personnel.

c.      Access and examine records maintained by, and request information from, other federal, state, local, or tribal, or foreign governmental entities or agencies.

d.      Use online services and resources (whether nonprofit or commercial).

e.      Use and recruit human sources in conformity with the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources.

f.      Interview or request information from members of the public and private entities.

g.      Accept information voluntarily provided by governmental or private entities.

h.      Engage in observation or surveillance not requiring a court order.

i.      Grand jury subpoenas for telephone or electronic mail subscriber information.

## B.      PREDICATED INVESTIGATIONS

1.      **Purposes**

Predicated investigations may be carried out to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence.

2.      **Approval**

The initiation of a predicated investigation requires supervisory approval at a level or levels specified by FBI policy. A predicated investigation based on paragraph 3.c. (relating to foreign intelligence) must be approved by a Special Agent in Charge or by an FBI Headquarters official as provided in such policy.

3.      **Circumstances Warranting Investigation**

A predicated investigation may be initiated on the basis of any of the following circumstances:

a.      An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.

b.      An individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with criminal activity in violation of federal law or a threat to the national security and the investigation may obtain information that would help to protect against such activity or threat.

c.      The investigation may obtain foreign intelligence that is responsive to a foreign intelligence requirement.

4.      **Preliminary and Full Investigations**

A predicated investigation relating to a federal crime or threat to the national security may be conducted as a preliminary investigation or a full investigation. A predicated investigation that is based solely on the authority to collect foreign intelligence may be conducted only as a full investigation.

a.      **Preliminary investigations**

i.      **Predication Required for Preliminary Investigations**

A preliminary investigation may be initiated on the basis of information or an allegation indicating the existence of a circumstance described in paragraph 3.a.-.b.

ii.     **Duration of Preliminary Investigations**

A preliminary investigation must be concluded within six months of its initiation, which may be extended by up to six months by the Special Agent in Charge. Extensions of preliminary investigations beyond a year must be approved by FBI Headquarters.

21

### iii.   Methods Allowed in Preliminary Investigations

All lawful methods may be used in a preliminary investigation except for methods within the scope of Part V.A.11.-.13. of these Guidelines.

## b.   Full Investigations

### i.   Predication Required for Full Investigations

A full investigation may be initiated if there is an articulable factual basis for the investigation that reasonably indicates that a circumstance described in paragraph 3.a.-.b. exists or if a circumstance described in paragraph 3.c. exists.

### ii.   Methods Allowed in Full Investigations

All lawful methods may be used in a full investigation.

## 5.   Notice Requirements

a.   An FBI field office shall notify FBI Headquarters and the United States Attorney or other appropriate Department of Justice official of the initiation by the field office of a predicated investigation involving a sensitive investigative matter.  If the investigation is initiated by FBI Headquarters, FBI Headquarters shall notify the United States Attorney or other appropriate Department of Justice official of the initiation of such an investigation.  If the investigation concerns a threat to the national security, an official of the National Security Division must be notified. The notice shall identify all sensitive investigative matters involved in the investigation.

b.   The FBI shall notify the National Security Division of:

i.   the initiation of any full investigation of a United States person relating to a threat to the national security; and

ii.   the initiation of any full investigation that is based on paragraph 3.c. (relating to foreign intelligence).

c.   The notifications under subparagraphs a. and b. shall be made as soon as practicable, but no later than 30 days after the initiation of an investigation.

22

d.   The FBI shall notify the Deputy Attorney General if FBI Headquarters disapproves a field office's initiation of a predicated investigation relating to a threat to the national security on the ground that the predication for the investigation is insufficient.

## C.   ENTERPRISE INVESTIGATIONS

### 1.   Definition

A full investigation of a group or organization may be initiated as an enterprise investigation if there is an articulable factual basis for the investigation that reasonably indicates that the group or organization may have engaged or may be engaged in, or may have or may be engaged in planning or preparation or provision of support for:

a.   a pattern of racketeering activity as defined in 18 U.S.C. 1961(5);

b.   international terrorism or other threat to the national security;

c.   domestic terrorism as defined in 18 U.S.C. 2331(5) involving a violation of federal criminal law;

d.   furthering political or social goals wholly or in part through activities that involve force or violence and a violation of federal criminal law; or

e.   an offense described in 18 U.S.C. 2332b(g)(5)(B) or 18 U.S.C. 43.

### 2.   Scope

The information sought in an enterprise investigation may include a general examination of the structure, scope, and nature of the group or organization including: its relationship, if any, to a foreign power; the identity and relationship of its members, employees, or other persons who may be acting in furtherance of its objectives; its finances and resources; its geographical dimensions; and its past and future activities and goals.

### 3.   Notice and Reporting Requirements

a.   The responsible Department of Justice component for the purpose of notification and reports in enterprise investigations is the National Security Division, except that, for the purpose of notifications and reports in an enterprise investigation relating to a pattern of racketeering activity that does not involve an offense or offenses described in 18 U.S.C. 2332b(g)(5)(B), the responsible Department of Justice component is the

Organized Crime and Racketeering Section of the Criminal Division.

b. An FBI field office shall notify FBI Headquarters of the initiation by the field office of an enterprise investigation.

c. The FBI shall notify the National Security Division or the Organized Crime and Racketeering Section of the initiation of an enterprise investigation, whether by a field office or by FBI Headquarters, and the component so notified shall notify the Attorney General and the Deputy Attorney General. The FBI shall also notify any relevant United States Attorney's Office, except that any investigation within the scope of Part VI.D.1.d of these Guidelines (relating to counterintelligence investigations) is to be treated as provided in that provision. Notifications by the FBI under this subparagraph shall be provided as soon as practicable, but no later than 30 days after the initiation of the investigation.

d. The Assistant Attorney General for National Security or the Chief of the Organized Crime and Racketeering Section, as appropriate, may at any time request the FBI to provide a report on the status of an enterprise investigation and the FBI will provide such reports as requested.

24

V.     USE: when used with respect to human sources, means obtaining information from, tasking, or otherwise operating such sources.

Date:     *9/29/08*

Michael B. Mukasey
Attorney General

46

**EXHIBIT 3 TO DECLARATION OF MARK F. GIULIANO FEDERAL BUREAU OF INVESTIGATION**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 07-08-2009 BY UC 60322 LP/STP/SZ

UNCLASSIFIED

FOR OFFICIAL USE ONLY

## Domestic Investigations and Operations Guide



## Federal Bureau of Investigation (FBI)

## December 16, 2008

This is a privileged document that cannot be released in whole or in part to persons or agencies outside the Federal Bureau of Investigation, nor can it be republished in whole or in part in any written form not containing this statement, including general use pamphlets, without the approval of the Director of the Federal Bureau of Investigation.

UNCLASSIFIED

FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

**GENERAL INFORMATION:** Questions or comments pertaining to the DIOG can be directed to:

**The Deputy Director's Office**

or

FBIHQ, Director's Office, Resource Planning Office (RPO), Division [00]

Corporate Policy Office (CPO)

Division Point of Contact: [                    ]          b6
                                                           b7C

(NOTE: Document is a new publication; no previous DIOG versions are available)

PRIVILEGED INFORMATION:

Any use of this document, including direct quotes or identifiable paraphrasing, will be marked with the following statement:

This is a privileged document that cannot be released in whole or in part to persons or agencies outside the Federal Bureau of Investigation, nor can it be republished in whole or in part in any written form not containing this statement, including general use pamphlets, without the approval of the Director of the Federal Bureau of Investigation.

FOR OFFICIAL FBI INTERNAL USE ONLY—DO NOT DISSEMINATE

FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

# Table of Contents

(U) Preamble.................................................................................................................... xi

1. **(U) Scope and Purpose**.....................................................................................1
   1.1.    (U) Scope ...........................................................................................1
   1.2.    (U) Purpose .......................................................................................1

2. **(U) General Authorities and Principles** .........................................................2
   2.1.    (U) Scope of the Attorney General's Guidelines for Domestic FBI Operations ............2
   2.2.    (U) General FBI Authorities under AGG-Dom.....................................3
   2.3.    (U) FBI as an Intelligence Agency .....................................................3
   2.4.    (U) FBI Lead Investigative Authorities ...............................................4
   2.5.    (U) Status as Internal Guidance .........................................................10
   2.6.    (U) Departures from the AGG-Dom....................................................10
   2.7.    (U) Departures from the DIOG............................................................11
   2.8.    (U) Other FBI Activities Not Limited by AGG-Dom .........................11
   2.9.    (U) Use of Classified Investigative Technologies..............................12
   2.10.   (U) Application of AGG-Dom and DIOG.............................................12

3. **(U) Core Values, Roles, and Responsibilities**.................................................13
   3.1.    (U) The FBI's Core Values..................................................................13
   3.2.    (U) Deputy Director Roles and Responsibilities ...............................14
   3.3.    (U) Special Agent/Intelligence Analyst/Task Force Officer/FBI Contractor/Others Roles and Responsibilities..............................................................................14
   3.4.    (U) Supervisor Roles and Responsibilities .......................................15
   3.5.    (U) Chief Division Counsel Roles and Responsibilities.....................18
   3.6.    (U) Office of the General Counsel Roles and Responsibilities ...........18
   3.7.    (U) Corporate Policy Office Roles and Responsibilities .....................19
   3.8.    (U) Office of Integrity and Compliance Roles and Responsibilities ..........19
   3.9.    (U) Operational Program Manager Roles and Responsibilities...........19
   3.10.   (U) Division Compliance Officer Roles and Responsibilities.............20
   3.11.   (U) FBI Headquarters Approval Levels................................................20

4. **(U) Privacy and Civil Liberties, and Least Intrusive Methods**........................21
   4.1.    (U) Civil Liberties and Privacy ..........................................................21
   4.2.    (U) Protection of First Amendment Rights.........................................24
   4.3.    (U) Equal Protection under the Law ...................................................30
   4.4.    (U) Least Intrusive Method ................................................................34

5. **(U) Assessments**..............................................................................................39
   5.1.    (U) Overview ......................................................................................39
   5.2.    (U) Purpose and Scope........................................................................40
   5.3.    (U) Civil Liberties and Privacy...........................................................43
   5.4.    (U) Authorized Purposes (AGG-Dom, Part II.A.2.—Authorized Activities) ...............44
   5.5.    (U//FOUO) Standards for Initiating or Approving an Assessment ................................45
   5.6.    (U) Duration, Approval, Notice, Documentation, File Review and Responsible Entity45

iii
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

5.7.    (U) Sensitive Investigative Matter / Academic Nexus / Buckley Amendment ............57
5.8.    (U//FOUO) Standards for Initiating or Approving the Use of an Authorized Investigative Method ...............................................................................................58
5.9.    (U) Authorized Investigative Methods in Assessments and Predicated Investigations.58
5.10.   (U) Investigative Methods Not Authorized During Assessments.................................71
5.11.   (U//FOUO) FBI National Collection Requirements ....................................................72
5.12.   (U//FOUO) FBI Field Office Collection Requirements ..............................................73
5.13.   (U) Retention and Dissemination of Privacy Act Records ..........................................73
5.14.   (U) Assessment File Records Management and Retention............................................74

6.   (U) Preliminary Investigations..........................................................................................76
6.1.    (U) Overview ...............................................................................................................76
6.2.    (U) Purpose and Scope.................................................................................................76
6.3.    (U) Civil Liberties and Privacy....................................................................................76
6.4.    (U) Legal Authority .....................................................................................................77
6.5.    (U) Predication.............................................................................................................78
6.6.    (U//FOUO) Standards for Initiating or Approving a Preliminary Investigation............78
6.7.    (U) Duration, Approval, Notice, Documentation and File Review ..............................78
6.8.    (U//FOUO) Standards for Initiating or Approving the Use of an Authorized Investigative Method ...............................................................................................80
6.9.    (U) Authorized Investigative Methods in Preliminary Investigations..........................81
6.10.   (U) Sensitive Investigative Matter / Academic Nexus / Buckley Amendment .............83
6.11.   (U) Program Specific Investigative Requirements ......................................................84

7.   (U) Full Investigations .....................................................................................................85
7.1.    (U) Overview ...............................................................................................................85
7.2.    (U) Purpose and Scope.................................................................................................85
7.3.    (U) Civil Liberties and Privacy....................................................................................85
7.4.    (U) Legal Authority .....................................................................................................86
7.5.    (U) Predication.............................................................................................................87
7.6.    (U//FOUO) Standards for Initiating or Approving a Full Investigation .......................88
7.7.    (U//FOUO) Duration, Approval, Notice, Documentation and File Review .................88
7.8.    (U//FOUO) Standards for Initiating or Approving the Use of an Authorized Investigative Method ...............................................................................................90
7.9.    (U) Authorized Investigative Methods in Full Investigations .....................................90
7.10.   (U) Sensitive Investigative Matter / Academic Nexus / Buckley Amendment .............92
7.11.   (U) Program Specific Investigative Requirements ......................................................93

8.   (U) Enterprise Investigations ...........................................................................................94
8.1.    (U) Overview ...............................................................................................................94
8.2.    (U) Purpose, Scope and Definitions.............................................................................94
8.3.    (U) Civil Liberties and Privacy....................................................................................94
8.4.    (U) Legal Authority .....................................................................................................94
8.5.    (U) Predication.............................................................................................................95
8.6.    (U) Duration, Approval, Notice, Documentation and File Review ..............................96

9.   (U) Foreign Intelligence....................................................................................................98
9.1.    (U) Overview ...............................................................................................................98

iv
UNCLASSIFIED-FOR OFFICIAL USE ONLY

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
**Domestic Investigations and Operations Guide**

9.2. (U) Purpose and Scope...................................................................................99
9.3. (U) Civil Liberties and Privacy.......................................................................99
9.4. (U) Legal Authority ......................................................................................100
9.5. (U//FOUO) Duration, Approval, Notice, Documentation, File Review and FBIHQ
      Standards for Approving the Initiation of Positive Foreign Intelligence Investigations101
9.6. (U//FOUO) Standards for Initiating or Approving the Use of an Authorized
      Investigative Method....................................................................................102
9.7. (U) Authorized Investigative Methods in Foreign Intelligence Assessments and
      Predicated Investigations.............................................................................102
9.8. (U//FOUO) Investigative Methods Not Authorized During Foreign Intelligence
      Investigations..............................................................................................104
9.9. (U) Sensitive Investigative Matter...............................................................104
9.10. (U) Approval and Notification......................................................................105
9.11. (U) Retention of Information .......................................................................107

**10. (U) Sensitive Investigative Matter / Academic Nexus.....................................108**
10.1. (U) Overview ..............................................................................................108
10.2. (U) Purpose, Scope and Definitions...........................................................108
10.3. (U//FOUO) Factors to Consider When Initiating or Approving an Investigative
       Activity Involving a Sensitive Investigative Matter.....................................109
10.4. (U) Duration, Approval, Notice and Documentation....................................110
10.5. (U//FOUO) Distinction Between Sensitive Investigative Matter and Sensitive
       Circumstance ............................................................................................111

**11. (U) Investigative Methods .................................................................................112**
11.1. (U) Overview ..............................................................................................112
  11.1.1. (U) Least Intrusive Method..................................................................112
11.2. (U) Authorized Investigative Methods in Assessments and Predicated Investigations113
  11.2.1. (U) Authorized Investigative Methods in Assessments.......................113
  11.2.2. (U) Authorized Investigative Methods in Preliminary Investigations....113
  11.2.3. (U) Authorized Investigative Methods in Full Investigations ...............114
  11.2.4. (U) Particular Investigative Methods..................................................115
11.3. (U) Investigative Method: Mail Covers........................................................116
  11.3.1. (U) Summary .....................................................................................116
  11.3.2. (U) Legal Authority ...........................................................................116
  11.3.3. (U) Definition of Investigative Method ...............................................116
  11.3.4. (U) Standard for Use and Approval Requirements for Investigative Method.....117
  11.3.5. (U) Duration of Approval ...................................................................119
  11.3.6. (U) Specific Procedures ...................................................................119
  11.3.7. (U) Compliance and Monitoring.........................................................119
11.4. (U) Investigative Method: Physical searches of personal or real property where a
       warrant or court order is not legally required because there is no reasonable
       expectation of privacy (e.g., trash covers)................................................120
  11.4.1. (U) Summary .....................................................................................120
  11.4.2. (U) Legal Authority ...........................................................................120
  11.4.3. (U) Definition of Investigative Method ...............................................120

v

**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
**Domestic Investigations and Operations Guide**

11.4.4.    (U//FOUO) Standards for Use and Approval Requirements for Investigative Method ................................................................................................121
11.5.    (U) Investigative Method: Consensual Monitoring of Communications, including consensual computer monitoring ................................................................122
11.5.1.    (U) Summary ....................................................................................122
11.5.2.    (U) Legal Authority ..........................................................................122
11.5.3.    (U) Definition of Investigative Method ...........................................122
11.5.4.    (U) Standards for Use and Approval Requirements for Investigative Method ...123
11.5.5.    (U) Duration of Approval ................................................................127
11.5.6.    (U//FOUO) Specific Procedures .....................................................128
11.5.7.    (U//FOUO) Compliance and Monitoring ........................................129
11.6.    (U) Investigative Method: Use of closed-circuit television, direction finders, and other monitoring devices (Not needing a Court Order) ................................130
11.6.1.    (U) Summary ....................................................................................130
11.6.2.    (U) Legal Authority ..........................................................................130
11.6.3.    (U//FOUO) Definition of Investigative Method ..............................130
11.6.4.    (U//FOUO) Standards for Use and Approval Requirements for Investigative Method ................................................................................................131
11.6.5.    (U) Duration of Approval ................................................................132
11.6.6.    (U//FOUO) Specific Procedures .....................................................132
11.6.7.    (U//FOUO) Compliance and Monitoring ........................................133
11.7.    (U) Investigative Method: Polygraph ....................................................134
11.7.1.    (U) Summary ....................................................................................134
11.7.2.    (U) Legal Authority ..........................................................................134
11.7.3.    (U//FOUO) Definition of Investigative Method ..............................134
11.7.4.    (U//FOUO) Standards for Use and Approval Requirements for Investigative Method ................................................................................................134
11.7.5.    (U) Duration of Approval ................................................................134
11.7.6.    (U//FOUO) Specific Procedures .....................................................135
11.7.7.    (U//FOUO) Compliance and Monitoring ........................................135
11.8.    (U) Investigative Method: Undercover Operations ..............................136
11.8.1.    (U) Summary ....................................................................................136
11.8.2.    (U) Legal Authority ..........................................................................136
11.8.3.    (U//FOUO) Definition of Investigative Method ..............................136
(U//FOUO) Distinction Between Sensitive Circumstance and Sensitive Investigative Matter:137
11.8.4.    (U//FOUO) Standards for Use and Approval Requirements for Investigative Method ................................................................................................137
11.8.5.    (U) Duration of Approval ................................................................139
11.8.6.    (U) Additional Guidance ..................................................................139
11.8.7.    (U//FOUO) Compliance and Monitoring, and Reporting Requirements ..............139
11.9.    (U) Investigative Method: Compulsory process as authorized by law, including grand jury subpoenas and other subpoenas, National Security Letters ................140
11.9.1.    (U) Federal Grand Jury Subpoena ..................................................140
11.9.2.    (U) Administrative Subpoena ...........................................................152
11.9.3.    (U) National Security Letter .............................................................158
11.9.4.    (U) Business Record Under FISA ....................................................165

vi

**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
**Domestic Investigations and Operations Guide**

11.10. (U) Investigative Method: Accessing stored wire and electronic communications and
    transactional records in conformity with chapter 121 of title 18, United States Code167
    11.10.1. (U) Summary .................................................................................167
    11.10.2. (U) Legal Authority .........................................................................168
    11.10.3. (U) Definition of Investigative Method ..............................................168
    11.10.4. (U) Approval Requirements for Investigative Method............................179
    11.10.5. (U) Duration of Approval ................................................................179
    11.10.6. (U//FOUO) Specific Procedures ......................................................179
    11.10.7. (U) Notice and Reporting Requirements .............................................179
    11.10.8. (U) Other Applicable Policies ..........................................................180
    (U) Stored Communications Quick Reference Guide 5/1/2008 ............................180
11.11. (U) Investigative Method: Pen Registers and Trap and Trace devices in conformity
    with chapter 206 of Title 18, United States Code, and the Foreign Intelligence
    Surveillance Act ..........................................................................................181
    11.11.1. (U) Summary .................................................................................181
    11.11.2. (U) Legal Authority .........................................................................181
    11.11.3. (U) Definition of Investigative Method ..............................................181
    11.11.4. (U) Standards for Use and Approval Requirements for Investigative Method ...181
    11.11.5. (U) Duration of Approval ................................................................184
    11.11.6. (U//FOUO) Specific Procedures ......................................................184
    11.11.7. (U) Use and Dissemination of Information Derived from Pen Register/Trap and
    Trace Authorized Pursuant to FISA................................................................185
    11.11.8. (U) Notice and Reporting Requirements .............................................186
    11.11.9. (U) Special Circumstances..............................................................186
11.12. (U) Investigative Method: Electronic Surveillance under Title III and under FISA ...193
    11.12.1. (U) Summary ................................................................................193
    11.12.2. (U) Legal Authority .........................................................................193
    11.12.3. (U) Definition of Investigative Method ..............................................193
    11.12.4. (U) Standards for Use and Approval Requirements for Investigative Method ...193
    11.12.5. (U) Duration of Approval ................................................................196
    11.12.6. (U) Specific Procedures ..................................................................196
    11.12.7. (U) Notice and Reporting Requirements .............................................199
    11.12.8. (U) Compliance and Monitoring........................................................200
    11.12.9. (U) Special Circumstances..............................................................200
    11.12.10. (U) Other Applicable Policies.........................................................200
11.13. (U) Investigative Method: Physical searches, including mail openings, requiring
    judicial order or warrant ...............................................................................201
    11.13.1. (U) Summary .................................................................................201
    11.13.2. (U) Legal Authority .........................................................................201
    11.13.3. (U) Definition of Investigative Method ..............................................201
    11.13.4. (U) Approval Requirements for Investigative Method............................201
    11.13.5. (U) Duration of Approval ................................................................204
    11.13.6. (U) Specific Procedures ..................................................................204
11.14. (U) Investigative Method: Acquisition of foreign intelligence information in
    conformity with Title VII of the Foreign Intelligence Surveillance Act...................213
    11.14.1. (U) Summary .................................................................................213

**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

11.14.2.   (U) Legal Authority ...................................................................213
11.14.3.   (U) Definition of Investigative Method ...........................................213
11.14.4.   (U//FOUO) Standards for Use and Approval Requirements for Investigative Method ..................................................................................213
11.14.5.   (U) Duration of Approval ...........................................................213
11.14.6.   (U//FOUO) Specific Collection Procedures for Title VII.......................213

**12.   (U) Assistance to Other Agencies.............................................................216**
12.1.   (U) Overview ..............................................................................216
12.2.   (U) Purpose and Scope...................................................................216
12.3.   (U//FOUO) Standards for Providing and Approving Investigative Assistance to Other Agencies ..................................................................................217
12.4.   (U) Documentation and Record Retention .........................................217
12.5.   (U) Duration, Approval and Notice for Investigative Assistance to Other Agencies..217
12.6.   (U//FOUO) Standards for Providing and Approving Technical Assistance to Foreign, State, Local and Tribal Agencies .......................................................225

**13.   (U) Extraterritorial Provisions ...........................................................227**
13.1.   (U) Overview ..............................................................................227
13.2.   (U) Purpose and Scope...................................................................227
13.3.   (U) Legal Attache Program.............................................................228

**14.   (U) Retention and Sharing of Information ..........................................229**
14.1.   (U) Purpose and Scope...................................................................229
14.2.   (U) The FBI's Records Retention Plan, and Documentation .................229
14.3.   (U) Information Sharing ................................................................230
14.4.   (U) Information Related to Criminal Matters ...................................231
A.   (U) Coordinating with Prosecutors .................................................231
B.   (U) Criminal Matters Outside FBI Jurisdiction...............................231
C.   (U) Reporting of Criminal Activity.................................................232
14.5.   (U) Information Related to National Security and Foreign Intelligence Matters .......232
(U) Department of Justice................................................................232
(U) White House ..........................................................................232
14.6.   (U) Special Statutory Requirements ...............................................235

**15.   (U) Intelligence Analysis and Planning...............................................236**
15.1.   (U) Overview ..............................................................................236
15.2.   (U) Purpose and Scope...................................................................236
15.3.   (U) Civil Liberties and Privacy.......................................................237
15.4.   (U) Legal Authority .....................................................................237
15.5.   (U//FOUO) Standards for Initiating or Approving Intelligence Analysis and Planning238
15.6.   (U//FOUO) Standards for Initiating or Approving the Use of an Authorized Investigative Method in Intelligence Analysis and Planning....................238
15.7.   (U) Authorized Activities in Intelligence Analysis and Planning ...........238

**16.   (U) Undisclosed Participation (UDP) ..................................................242**
16.1.   (U) Overview ..............................................................................242
16.2.   (U) Purpose, Scope, and Definitions................................................243

viii
UNCLASSIFIED-FOR OFFICIAL USE ONLY

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
**Domestic Investigations and Operations Guide**

16.3.   (U) Requirements for Approval ........................................................................245
16.4.   (U) Supervisory Approval Not Required .......................................................248
16.5.   (U//FOUO) Standards for Review and Approval ..........................................249
16.6.   (U) Requests for Approval of Undisclosed Participation ...........................250
16.7.   (U) Duration ......................................................................................................251
16.8.   (U//FOUO) Sensitive Oversight Review Committee ....................................251
**17.   (U) Otherwise Illegal Activity** ....................................................................**256**
17.1.   (U) Overview ....................................................................................................256
17.2.   (U) Purpose and Scope ...................................................................................256
17.3.   (U//FOUO) OIA in Undercover Activity ........................................................256
17.4.   (U//FOUO) OIA for a Confidential Human Source .....................................257
17.5.   (U//FOUO) Approval of OIA by a Special Agent in Charge .......................257
17.6.   (U//FOUO) Standards for Review and Approval of OIA .............................258
17.7.   (U//FOUO) OIA not authorized .....................................................................258
17.8.   (U//FOUO) Emergency Situations .................................................................258

**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

# List of Appendices

Appendix A: The Attorney General's Guidelines for Domestic FBI Operations ............... A-1

Appendix B: Executive Order 12333...................................................................................B-1

Appendix C: Sensitive Operations Review Committee........................................................ C-1

Appendix D: Superceded Documents and NFIP, MIOG, and MAOP Sections.................. D-1

Appendix E: Key Words, Definitions, and Links .................................................................E-1

Appendix F: Acronyms........................................................................................................F-1

Appendix G: Investigations Manual – Classified Provisions................................................G-1

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

# (U) Preamble

December 1, 2008

(U) As the primary investigative agency of the federal government, the FBI has the authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency. The FBI is further vested by law and by Presidential directives with the primary role in carrying out criminal investigations and investigations of threats to the national security of the United States. This includes the lead domestic role in investigating international terrorist threats to the United States, and in conducting counterintelligence activities to counter foreign entities' espionage and intelligence efforts directed against the United States. The FBI is also vested with important functions in collecting foreign intelligence as a member agency of the United States Intelligence Community (USIC). (AGG-Dom, Introduction)

(U) While investigating crime, terrorism, and threats to the national security, and collecting foreign intelligence, the FBI must fully comply with all laws and regulations, including those designed to protect civil liberties and privacy. Through compliance, the FBI will continue to earn the support, confidence and respect of the people of the United States.

(U) To assist the FBI in its mission, the Attorney General signed *The Attorney General's Guidelines for Domestic FBI Operations* (AGG-Dom) on September 29, 2008. The primary purpose of the AGG-Dom and the Domestic Investigations and Operations Guide (DIOG) is to standardize policy so that criminal, national security, and foreign intelligence investigative activities are accomplished in a consistent manner, whenever possible (e.g., same approval, notification, and reporting requirements). In addition to the DIOG, each FBIHQ substantive Division has a policy implementation guide (PG) that supplements this document. Numerous FBI manuals, electronic communications, letterhead memoranda, and other policy documents are incorporated into the DIOG and the substantive Division policy implementation guides, thus, consolidating the FBI's policy guidance. The FBIHQ Corporate Policy Office (CPO) plays an instrumental role in this endeavor. Specifically, the CPO maintains the most current version of the DIOG on its website. As federal statutes, executive orders, Attorney General guidelines, FBI policies, or other relevant authorities change, CPO will electronically update the DIOG after appropriate coordination and required approvals.

(U) The changes implemented by the DIOG should better equip you to protect the people of the United States against crime and threats to the national security and to collect foreign intelligence. This is your document, and it requires your input so that we can provide the best service to our nation. If you discover a need for change, please forward your suggestion to FBIHQ CPO.

(U) Thank you for your outstanding service!

Robert S. Mueller, III

Director

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

# 4.  (U) Privacy and Civil Liberties, and Least Intrusive Methods

### 4.1.    (U) Civil Liberties and Privacy

A. (U) Overview

(U) The FBI is responsible for protecting the American public, not only from crime and terrorism, but also from incursions into their constitutional rights. Accordingly, all AGG-Dom investigative activities must be carried out with full adherence to the Constitution, federal laws and the principles of civil liberty and privacy.

(U) The FBI has a long-established commitment to protecting the civil liberties of Americans as it investigates threats to national security and public safety. As discussed below, compliance with the FBI's comprehensive infrastructure of legal limitations, oversight and self-regulation effectively ensures that this commitment is honored. Because our ability to achieve our mission requires that we have the trust and confidence of the American public, and because that trust and confidence can be significantly shaken by our failure to respect the limits of our power, special care must be taken by all employees to comply with these limitations.

B. (U) Purpose of Investigative Activity

(U) One of the most important safeguards in the AGG-Dom—one that is intended to ensure that FBI employees respect the constitutional rights of Americans—is the threshold requirement that all investigative activity be conducted for an authorized purpose. Under the AGG-Dom that authorized purpose must be an authorized national security, criminal, or foreign intelligence collection purpose.

(U) Simply stating such a purpose is not sufficient, however, to ensure compliance with this safeguard. It is critical that the authorized purpose not be, or appear to be, arbitrary or contrived; that it be well-founded and well-documented; and that the information sought and the investigative method used to obtain it be focused in scope, time, and manner to achieve the underlying purpose. Furthermore, there are constitutional provisions that set limits on what that purpose may be. It may not be solely to monitor the exercise of rights that are protected by the Constitution, and, equally important, the authorized purpose may not be based solely on race, ethnicity, national origin or religion.

(U) It is important to understand how the "authorized purpose" requirement and these constitutional limitations relate to one another. For example, individuals or groups who communicate with each other or with members of the public in any form in pursuit of social or political causes—such as opposing war or foreign policy, protesting government actions, promoting certain religious beliefs—have a fundamental constitutional right to do so. No investigative activity may be conducted for the sole purpose of monitoring the exercise of these rights. If, however, there exists a well-founded basis to conduct investigative activity for one of the authorized purposes listed above—and that basis is not solely the race, ethnicity, national origin or religion of the participants—FBI employees may assess or investigate these activities, subject to other limitations in the AGG-Dom and the DIOG. In this situation, the investigative activity would not be based solely on Constitutionally-protected conduct or on race, ethnicity, nationality or religion. Finally, although investigative activity would be authorized in this situation, it is important that it be conducted in a manner

21

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

that does not materially interfere with the ability of the individuals or groups to engage in the exercise of Constitutionally-protected rights.

C. (U) Oversight and Self-Regulation

(U) Provisions of the AGG-Dom, other AGG, and oversight from DOJ components are designed to ensure the activities of the FBI are lawful, appropriate and ethical as well as effective in protecting the civil liberties and privacy of individuals in the United States. DOJ and the FBI's Inspection Division, OIC, and OGC, along with every FBI employee, share responsibility for ensuring that the FBI meets these goals.

(U) In the criminal investigation arena, oversight of FBI activities has traditionally come from prosecutors and district courts. Because many national security investigations do not result in prosecutions, other oversight mechanisms are necessary. Various features of the AGG-Dom facilitate the DOJ NSD oversight functions in the national security and foreign intelligence collection areas. Relevant requirements and provisions include: (i) required notification by the FBI to the DOJ NSD concerning a full investigation that involves foreign intelligence collection, a full investigation of a United States person in relation to a threat to the national security; or a national security investigation involving a "sensitive investigative matter;" (ii) an annual report by the FBI to the DOJ NSD concerning the FBI's foreign intelligence collection program, including information reflecting the scope and nature of foreign intelligence collection activities in each FBI Field Office; (iii) access by the DOJ NSD to information obtained by the FBI through national security or foreign intelligence activities; and (iv) general authority for the Assistant Attorney General for National Security to obtain reports from the FBI concerning these activities. (AGG-Dom, Intro.4.C)

(U) The DOJ NSD's Oversight Section and the FBI's OGC are responsible for conducting regular reviews of all aspects of FBI national security and foreign intelligence activities. These reviews, conducted at FBI Field Offices and FBIHQ Divisions, broadly examine such activities for compliance with the AGG-Dom and other applicable requirements.

(U) Further examples of oversight mechanisms include the involvement of both FBI and prosecutorial personnel in the review of undercover operations involving sensitive circumstances; notice requirements for investigations involving sensitive investigative matters; and notice and oversight provisions for enterprise investigations, which involve a broad examination of groups implicated in criminal and national security threats. These requirements and procedures help to ensure that the rule of law is respected in the FBI's activities and that public confidence is maintained in these activities. (AGG-Dom, Intro.4.C)

(U) In addition to the above-mentioned oversight entities DOJ has in place, the FBI is subject to a regime of oversight, legal limitations, and self-regulation designed to ensure strict adherence to civil liberties. This regime is comprehensive and has many facets, including the following:

1. (U) The Foreign Intelligence Surveillance Act of 1978, as amended, and Title III of the Omnibus and Streets Act of 1968. These laws establish the processes for obtaining judicial approval of: electronic surveillance and physical searches for the purposes of collecting foreign intelligence and electronic surveillance for the purpose of collecting evidence of crimes.

22

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

2. (U) The Whistleblower Protection Acts of 1989 and 1998: These laws protect whistleblowers from retaliation.

3. (U) The Freedom of Information Act of 1966: The law provides the public with access to FBI documents not covered by a specific statutory exemption.

4. (U) The Privacy Act of 1974: The purpose of the Privacy Act is to balance the government's need to maintain information about United States citizens and legal permanent resident aliens with the rights of those individuals to be protected against unwarranted invasions of their privacy stemming from the government's collection, use, maintenance, and dissemination of that information. The Privacy Act forbids the FBI and other federal agencies from collecting information about how individuals exercise their First Amendment rights, unless that collection is expressly authorized by statute or by the individual, or is pertinent to and within the scope of an authorized law enforcement activity (5 U.S.C. § 552a[e][7]). Except for collection of foreign intelligence, activities authorized by the AGG-Dom are authorized law enforcement activities or activities for which there is otherwise statutory authority for purposes of the Privacy Act. Foreign intelligence collection is not an authorized law enforcement activity.

(U) Congressional Oversight is conducted by various committees of the United States Congress, but primarily by the Judiciary and Intelligence Committees. These committees exercise regular, vigorous oversight into all aspects of the FBI's operations. To this end, the National Security Act of 1947 requires the FBI to keep the intelligence committees (for the Senate and House of Representatives) fully and currently informed of substantial intelligence activities. This oversight has significantly increased in breadth and intensity since the 1970's, and it provides important additional assurance that the FBI conducts its investigations according to the law and the Constitution.

(U) The FBI's counterintelligence and counterterrorism operations are subject to significant self-regulation and oversight beyond that conducted by Congress. The Intelligence Oversight Board (IOB), comprised of members from the President's Intelligence Advisory Board (PIAB), also conducts oversight of the FBI. Among its other responsibilities, the IOB reviews violations of The Constitution, national security law, E.O. or Presidential Decision Directive (PDD) by the FBI and the other intelligence agencies, and issues reports thereon to the President and the Attorney General.

(U) Internal FBI safeguards include: (i) the OGC's Privacy and Civil Liberties Unit (PCLU), which reviews plans of any record system proposed within the FBI for compliance with the Privacy Act and related privacy protection requirements and policies; (ii) the criminal and national security undercover operations review committees, comprised of senior DOJ and FBI officials, which review all proposed undercover operations that involve sensitive circumstances; (iii) the Sensitive Operations Review Committee (SORC), comprised of

b5

; (iv) all FBI employees have an obligation to report violations of the DIOG to their supervisor, other management officials, or appropriate authorities; and (v) the FBI requirement for training of new FBI employees and periodic training for all FBI employees

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

to maintain currency on the latest guidelines, changes to laws and regulations, and judicial decisions related to constitutional rights and liberties.

(U) The AGG-Dom and DIOG set forth the standards and requirements under which an investigative activity may be initiated and are designed to provide FBI employees with a framework that maintains the proper balance between the public's need for effective law enforcement and protection of the national security and the protection of civil liberties and privacy. Among the provisions that specifically serve to protect civil liberties and privacy are the following: (i) the prohibition against initiating investigations based solely on the exercise of First Amendment rights or other constitutionally protected activity; (ii) the requirement that FBI employees use the least intrusive method reasonable under the circumstances to achieve their investigative goals; and (iii) the prohibition against engaging in ethnic and racial profiling. Further, in the context of collecting foreign intelligence, the FBI is further required to operate openly and consensually with United States persons, to the extent practicable.

### 4.2.    (U) Protection of First Amendment Rights

(U) A fundamental principle of the Attorney General's guidelines for FBI investigations and operations since the first guidelines were issued in 1976 has been that investigative activity may not be based solely on the exercise of rights guaranteed by the First Amendment to the United States Constitution. This principle carries through to the present day in the AGG-Dom. There is a corollary to this principle in the Privacy Act of 1974, 5 U.S.C. § 552a, which prohibits the retention of information describing how a person exercises rights under the First Amendment, unless there is a valid law enforcement purpose.

(U) The First Amendment states:

> *(U) Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people to peaceably assemble, and to petition the Government for redress of grievances.*

(U) Although the amendment appears literally to apply only to Congress, the Supreme Court made it clear long ago that it also applies to activities of the Executive Branch, including law enforcement agencies. Therefore, for FBI purposes, it would be helpful to read the introduction to the first sentence as: "The FBI shall take no action respecting . . ." In addition, the word "abridging" must be understood. "Abridging," as used here, means "diminishing." Thus, it is not necessary for a law enforcement action to destroy or totally undermine the exercise of First Amendment rights for it to be unconstitutional; significantly diminishing or lessening the ability of individuals to exercise these rights without an authorized investigative purpose is sufficient.

(U) This is not to say that any diminishment of First Amendment rights is unconstitutional. The Supreme Court has never held that the exercise of these rights is absolute. In fact, the Court has set forth realistic interpretations of what level and kind of government activity actually violates a First Amendment right. For example, taken to an extreme, one could argue that the mere possibility of an FBI agent being present at an open forum (or an on-line presence) would diminish the right of free speech by, for example, an anti-war protestor because he/she would be afraid to speak freely. The Supreme Court, however, has never found an "abridgement" of First Amendment rights based on such a subjective fear. Rather, it requires an action that, from an

24

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

objective perspective, truly diminishes the speaker's message or his/her ability to deliver it (e.g., pulling the plug on the sound system). For another example, requiring protestors to use a certain parade route may diminish, in a practical sense, delivery of their message. The Court has made it clear, however, that for legitimate reasons (e.g., public safety), the government may impose reasonable limitations in terms of time, place and manner to the exercise of such rights—as long as the ability to deliver the message remains.

(U) While the language of the First Amendment prohibits action that would abridge the enumerated rights, the implementation of that prohibition in the AGG-Dom reflects the Supreme Court's opinions on the constitutionality of law enforcement action that may impact the exercise of First Amendment rights. As stated above, the AGG-Dom prohibits investigative activity for the sole purpose of monitoring the exercise of First Amendment rights. The import of the distinction between this language and the actual text of the First Amendment language is two-fold: (i) the line drawn by the AGG-Dom prohibits even "monitoring" the exercise of First Amendment rights (far short of abridging those rights) as the sole purpose of FBI activity; and (ii) the requirement of an authorized purpose for all investigative activity provides additional protection for the exercise of Constitutionally protected rights.

(U) The AGG-Dom classifies investigative activity that involves a religious or political organization (or an individual prominent in such an organization) or a member of the news media as a "sensitive investigative matter." That designation recognizes the sensitivity of conduct that traditionally involves the exercise of First Amendment rights—i.e., groups who associate for political or religious purposes, and the press. The requirements for opening and pursuing a "sensitive investigative matter" are set forth in Section 10 of this policy document. It should be clear, however, from the discussion just how pervasive the exercise of First Amendment rights is in American life and that not all protected First Amendment activity will fall within the definition of a "sensitive investigative matter." Therefore, it is essential that FBI employees recognize when investigative activity may have an impact on the exercise of these fundamental rights and be especially sure that any such investigative activity has a valid law enforcement or national security purpose, even if it is not a "sensitive investigative matter" as defined in the AGG-Dom and the DIOG.

(U) Finally, it is important to note that United States persons (and organizations comprised of United States persons) do not forfeit their First Amendment rights simply because they also engage in criminal activity or in conduct that threatens national security. For example, an organization suspected of engaging in acts of domestic terrorism may also pursue legitimate political goals and may also engage in lawful means to achieve those goals. The pursuit of these goals through constitutionally-protected conduct does not insulate them from legitimate investigative focus for unlawful activities—but the goals and the pursuit of their goals through lawful means remain protected from unconstitutional infringement.

(U) When allegations of First Amendment violations are brought to a court of law, it is usually in the form of a civil suit in which a plaintiff has to prove some actual or potential harm. Presbyterian Church v. United States, 870 F.2d 518 (9th Cir. 1989). In a criminal trial, a defendant may seek either or both of two remedies as part of a claim that his or her First Amendment rights were violated: suppression of evidence gathered in the alleged First Amendment violation, a claim typically analyzed under the "reasonableness" clause of the Fourth Amendment, and dismissal of the indictment on the basis of "outrageous government conduct" in violation of the Due Process Clause of the Fifth Amendment.

25
UNCLASSIFIED-FOR OFFICIAL USE ONLY

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

(U) The scope of each of the primary First Amendment rights and their impact on FBI investigative activity are discussed below. The First Amendment's "establishment clause,"—the prohibition against the government establishing or sponsoring a specific religion—has little application to the FBI and, therefore, is not discussed here.

A. (U) Free Speech

(U) The exercise of free speech includes far more than simply speaking on a controversial topic in the town square. It includes such activities as carrying placards in a parade, sending letters to a newspaper editor, posting a web site on the Internet, wearing a tee-shirt with a political message, placing a bumper sticker critical of the President on one's car, and publishing books or articles. The common thread in these examples is conveying a public message or an idea through words or deeds. Law enforcement activity that diminishes a person's ability to communicate in any of these ways may interfere with his or her freedom of speech—and thus may not be undertaken by the FBI solely for that purpose.

(U) The line between constitutionally protected speech and advocacy of violence or of conduct that may lead to violence or other unlawful activity must be understood. In Brandenburg v. Ohio, 395 U.S. 444 (1969), the Supreme Court established a two-part test to determine whether such speech is constitutionally protected: the government may not prohibit advocacy of force or violence except when such advocacy (i) is intended to incite imminent lawless action, and (ii) is likely to do so. Therefore, even heated rhetoric or offensive provocation that could conceivably lead to a violent response in the future is usually protected. Suppose, for example, a politically active group advocates on its web site taking unspecified "action" against persons or entities it views as the enemy, who thereafter suffer property damage and/or personal injury. Under the Brandenburg two-part test, the missing specificity and imminence in the message may provide it constitutional protection. For that reason, law enforcement may take no action that, in effect, blocks the message or punishes its sponsors.

(U) Despite the high standard for prohibiting free speech or punishing those who engage in it, the law does not preclude FBI employees from observing and collecting any of the forms of protected speech and considering its content—as long as those activities are done for a valid law enforcement or national security purpose and conducted in a manner that does not unduly infringe upon the ability of the speaker to deliver his or her message. To be an authorized purpose, it must be one that is authorized by the AGG-Dom—i.e., to further an FBI assessment, predicated investigation, or other authorized function such as providing assistance to other agencies. Furthermore, by following the "Standards for Initiating or Approving an Assessment or Predicated Investigation" as contained in the DIOG, the FBI will ensure that there is a rational relationship between that authorized purpose and the protected speech such that a reasonable person with knowledge of the circumstances could understand why the information is being collected.

(U) Returning to the example posed above, because the group's advocacy of action could be directly related by circumstance to property damage suffered by one of the group's known targets, collecting the speech—although lawfully protected—can lawfully occur. Similarly, listening to the public talks by a religious leader, who is suspected of raising funds for a terrorist organization, may yield clues as to his motivation, plan of action, and/or hidden messages to his followers. FBI employees should not, therefore, avoid collecting First

26
**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

Amendment protected speech if it is relevant to an authorized AGG-Dom purpose—as long as they do so in a manner that does not inhibit the delivery of the message or the ability of the audience to hear it, and so long as the method of collection is the least intrusive means feasible to gather the relevant information.

(U) In summary, during the course of lawful investigative activities, the FBI may lawfully collect, retain, and consider the content of constitutionally protected speech, so long as: (i) the collection is logically related to an authorized investigative purpose; (ii) the collection does not actually infringe on the ability of the speaker to deliver his or her message; and (iii) the method of collection is the least intrusive alternative feasible.

B. (U) **Exercise of Religion.**

(U) Like the other First Amendment freedoms, the "free exercise of religion" clause is broader than commonly believed. First, it covers any form of worship of a deity—even forms that are commonly understood to be cults or fringe sects, as well as the right not to worship any deity. Second, protected religious exercise also extends to dress or food that is required by religious edict, attendance at a facility used for religious practice (no matter how unlikely it appears to be intended for that purpose), observance of the Sabbath, raising money for evangelical or missionary purposes, and proselytizing. Even in controlled environments like prisons, religious exercise must be permitted—subject to reasonable restrictions as to time, place, and manner. Another feature of this First Amendment right is that it is a matter of heightened sensitivity to some Americans—especially to devout followers. For this reason, it is a matter that is more likely to provoke an adverse reaction if the right is violated—regardless of which religion is involved. Therefore, when essential investigative activity may impact this right, it must be conducted in a manner that avoids the actual—and the appearance of—interference with religious practice to the maximum extent possible.

(U) While there must be an authorized purpose for any investigative activity that could have an impact on religious practice, this does not mean religious practitioners or religious facilities are completely free from being examined as part of an assessment or predicated investigation. If such practitioners are involved in—or such facilities are used for—activities that are the proper subject of FBI-authorized investigative or intelligence collection activities, their religious affiliation does not "immunize" them to any degree from these efforts. It is paramount, however, that the authorized purpose of such efforts be properly documented. It is also important that investigative activity directed at religious leaders or at conduct occurring within religious facilities be focused in time and manner so as not to infringe on legitimate religious practice by any individual but especially by those who appear unconnected to the activities under investigation.

(U) Furthermore, FBI employees may take appropriate cognizance of the role religion may play in the membership or motivation of a criminal or terrorism enterprise. If, for example, affiliation with a certain religious institution or a specific religious sect is a known requirement for inclusion in a violent organization that is the subject of an investigation, then whether a person of interest is a member of that institution or sect is a rational and permissible consideration. Similarly, if investigative experience and reliable intelligence reveal that members of a terrorist or criminal organization are known to commonly possess or exhibit a combination of religion-based characteristics or practices (e.g., group leaders state that acts of terrorism are based in religious doctrine), it is rational and lawful to consider

27

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

such a combination in gathering intelligence about the group—even if any one of these, by itself, would constitute an impermissible consideration. By contrast, solely because prior subjects of an investigation of a particular group were members of a certain religion and they claimed a religious motivation for their acts of crime or terrorism, other members' mere affiliation with that religion, by itself, is not a basis to assess or investigate—absent a known and direct connection to the threat under assessment or investigation. Finally, the absence of a particular religious affiliation can be used by analysts and investigators to eliminate certain individuals from further investigative consideration in those scenarios where religious affiliation is relevant.

C.  (U) **Freedom of the Press**

(U) Contrary to what many believe, this well-known First Amendment right is not owned by the news media; it is a right of the American people. The drafters of the Constitution believed that a free press was essential to preserving democracy. Although the news media typically seeks to enforce this right, freedom of the press should not be viewed as a contest between law enforcement or national security, on the one hand, and the interests of news media, on the other.

(U) Freedom of the press includes such matters as reasonable access to news-making events, the making of documentaries, and the posting of "blogs." The news gathering function is the aspect of freedom of the press most likely to intersect with law enforcement and national security investigative activities. Within that category, the interest of the news media in protecting confidential sources and the interest of agencies like the FBI in gaining access to these sources who may have evidence of a crime or national security intelligence often clash. The seminal case in this area is Branzburg v. Hayes, 408 U.S. 665 (1977), in which the Supreme Court held that freedom of the press does not entitle a news reporter to refuse to divulge the identity of his source to a federal grand jury. The Court reasoned that, as long as the purpose of law enforcement is not harassment or vindictiveness against the press, any harm to the news gathering function of the press (by revealing source identity) is outweighed by the need of the grand jury to gather evidence of crime.

(U) Partially in response to Branzburg, the Attorney General has issued regulations that govern the issuance of subpoenas for reporter's testimony and telephone toll records, the arrest of a reporter for a crime related to news gathering, and the interview of a reporter as a suspect in a crime arising from the news gathering process. In addition, an investigation of a member of the news media in his official capacity, the use of a reporter as a source, and posing as a member of the news media are all sensitive circumstances in the AGG-Dom and other applicable AG guidelines.

(U) These regulations are not intended to insulate reporters and other news media from FBI assessments or predicated investigations. They are intended to ensure that investigative activity that seeks information from or otherwise involves members of the news media: is appropriately authorized; is necessary for an important law enforcement or national security objective; is the least intrusive means to obtain the information or achieve the goals; and does not unduly infringe upon the news gathering aspect of the constitutional right to freedom of the press.

28
**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

D. (U) Freedom of Peaceful Assembly and to Petition the Government for Redress of Grievances

(U) Freedom of peaceful assembly, often called the right to freedom of association, present unique issues for law enforcement agencies, including the FBI. Individuals who gather with others to protest government action, or to rally or demonstrate in favor of, or in opposition to, a social cause sometimes present a threat to public safety either by their numbers, by their actions, by the anticipated response to their message, or by creating an opportunity for individuals or other groups with an unlawful purpose to infiltrate and compromise the legitimacy of the group for their own ends. The right to peaceful assembly includes more than just public demonstrations—it includes, as well, the posting of group web sites on the Internet, recruiting others to a cause, marketing a message, and fund raising. All are protected First Amendment activities if they are conducted in support of the organization or political, religious or social cause.

(U) The right to petition the government for redress of grievances is so linked to peaceful assembly and association that it is included in this discussion. A distinction between the two is that an individual may exercise the right to petition the government by himself whereas assembly necessarily involves others. The right to petition the government includes writing letters to Congress, carrying a placard outside city hall that delivers a political message, recruiting others to one's cause, and lobbying Congress or an executive agency for a particular result.

(U) For the FBI, covert presence or action within associations, also called "undisclosed participation," has the greatest potential to impact this Constitutional right. The Supreme Court addressed this issue as a result of civil litigation arising from one of the many protests against the Vietnam War. In Laird v. Tatum, 408 U.S. 1 (1972), the Court found that the mere existence of an investigative program—consisting of covert physical surveillance in public areas, infiltration of public assemblies by government operatives or sources, and the collection of news articles and other publicly available information—for the purpose of determining the existence and scope of a domestic threat to national security does not, by itself, violate the First Amendment rights of the members of the assemblies. The subjective "chill" to the right to assembly, based on the suspected presence of government operatives, did not by itself give rise to legal "standing" to argue that their constitutional rights had been abridged. Instead, the Court required a showing that the complained-of government action would reasonably deter the exercise of that right.

(U) Since Laird v. Tatum was decided, the lower courts have examined government activity on many occasions to determine whether it gave rise to a "subjective chill" or an "objective deterrent." The basic standing requirement establish by Laird remains unchanged today. The lower courts, however, have often imposed a very low threshold of objective harm to survive dismissal of the case. For example, plaintiffs who have shown a loss of membership in an organization, loss of financial support, loss to reputation and status in the community, and loss of employment by members have been granted standing to sue.

(U) More significant for the FBI than the standing issue has been the lower courts' evaluation of investigative activity into First Amendment protected associations since Laird. The courts have held the following investigative activities to be constitutionally permissible under First Amendment analysis: undercover participation in group activities; physical and video

29
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

surveillance in public areas; properly authorized electronic surveillance; recruitment and operation of sources; collection of information from government, public, and private sources (with consent); and the dissemination of information for a valid law enforcement purpose. However, these decisions were not reached in the abstract. In every case in which the courts have found government action to be proper, the government proved that it was conducted for an authorized law enforcement or national security purpose and that it was conducted in substantial compliance with controlling regulations. In addition, in approving these techniques, the courts have often considered whether a less intrusive technique was available to the agency, and the courts have balanced the degree of intrusion or impact against the importance of the law enforcement or national security objective.

(U) By contrast, since Laird, the courts have found these techniques to be legally objectionable: initiating an investigation solely on the basis of the groups' social or political agenda (even if the agenda made the group susceptible to subversive infiltration); sabotaging or neutralizing the group's legitimate social or political agenda; disparaging the group's reputation or standing; leading the group into criminal activity that otherwise probably would not have occurred; and undermining legitimate recruiting or funding efforts. In every such case, the court found the government's purpose either was not persuasive, was too remote, or was too speculative to justify the intrusion and the potential harm to the exercise of First Amendment rights.

(U) Once again, the message is clear that investigative activity that involves assemblies or associations of United States persons exercising their First Amendment rights must have an authorized purpose under the AGG-Dom—and one to which the information sought and the technique to be employed are rationally related. Less intrusive techniques should always be explored first and those authorizing such activity (which, as discussed above, will almost always constitute a sensitive investigative matter) should ensure that the investigative activity is focused as narrowly as feasible and that the purpose is thoroughly documented.

**4.3.     (U) Equal Protection under the Law**

A. (U) **Introduction**

(U) The Equal Protection Clause of the United States Constitution provides in part that: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court and the lower courts have made it clear that it applies as well to the official acts of United States government law enforcement agents.[1] Specifically, government employees are prohibited from engaging in invidious discrimination against individuals on the basis of race, ethnicity, national origin, or religious affiliation. This principle is further reflected and implemented for federal law enforcement in the United States Department of Justice's *Guidance Regarding the Use of Race by Federal Law Enforcement Agencies* (hereinafter "DOJ Guidance").

(U) The DOJ Guidance states that investigative and intelligence collection activities must not be based solely on race, ethnicity, national origin, or religious affiliation. Any such activities that are based solely on such considerations are invidious by definition, therefore,

---

[1] See, e.g., Whren v. United States, 517 U.S. 806 (1996); see also Chavez v. Illinois State Police, 251 F.3d 612 (7th Cir. 2001).

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

unconstitutional. This standard applies to all investigative and collection activity, including collecting and retaining information, opening cases, disseminating information, and indicting and prosecuting defendants. It is particularly applicable to the retention and dissemination of personally identifying information about an individual—as further illustrated in the examples enumerated below.

(U) The constitutional prohibition against invidious discrimination based on race, ethnicity, national origin or religion is relevant to both the national security and criminal investigative programs of the FBI. National security investigations often have ethnic aspects; members of a foreign terrorist organization may be primarily or exclusively from a particular country or area of the world. Similarly, ethnic heritage is frequently the common thread running through violent gangs or other criminal organizations. It should be noted that this is neither a new nor isolated phenomenon. Ethnic commonality among criminal and terrorist groups has been relatively constant and widespread across many ethnicities throughout the history of the FBI.

B. (U) **Policy Principles**

(U) To ensure that assessment and investigative activities and strategies consider racial, ethnic, national origin and religious factors properly and effectively and to help assure the American public that the FBI does not engage in invidious discrimination, the following policy principles are established.

1. (U) The prohibition against investigative activity based solely on race or ethnicity is not avoided by considering it in combination with other prohibited factors. For example, a person of a certain race engaging in lawful public speech about his religious convictions is not a proper subject of investigative activity based solely on any one of these factors—or by the combination of all three. Before collecting and using this information, a well-founded and authorized investigative purpose must exist as to which any or all of these otherwise prohibited factors is relevant.

2. (U) When race or ethnicity is a relevant factor to consider, it should not be the dominant or primary factor. Adherence to this standard will not only ensure that it is never the sole factor—it will also preclude undue and unsound reliance on race or ethnicity in investigative analysis. It reflects the recognition that there are thousands and, in some cases, millions of law abiding people in American society of the same race or ethnicity as those who are the subjects of FBI investigative activity, and it guards against the risk of sweeping some of them into the net of suspicion without a sound investigative basis.

3. (U) The FBI will not collect or use behavior or characteristics common to particular racial or ethnic community as investigative factors unless they bear clear and specific relevance to a matter under assessment or investigation. This policy is intended to prevent the potential that collecting ethnic characteristics or behavior will inadvertently lead to individual identification based solely on such matters, as well as to avoid the appearance that the FBI is engaged in ethnic or racial profiling.

31

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

C.  (U) **Guidance on the Use of Race and Ethnic Identity in Assessments and Predicated Investigations**

(U) Considering the reality of common ethnicity or race among many criminal and terrorist groups, some question how the prohibition against racial or ethnic profiling is to be effectively applied—and not violated—in FBI assessments and predicated investigations. The question arises generally in two contexts: (i) with respect to an individual or a group of individuals; and (ii) with respect to ethnic or racial communities as a whole.

1.  (U) **Individual Race or Ethnicity as a Factor**

(U) The DOJ Guidance permits the consideration of ethnic and racial identity information based on specific reporting—such as from an eyewitness. As a general rule, race or ethnicity as an identifying feature of a suspected perpetrator, subject, and in some cases, a victim, is relevant if it is based on reliable evidence or information—not conjecture or stereotyped assumptions. In addition, the DOJ Guidance permits consideration of race or ethnicity in other investigative or collection scenarios if it is relevant. These examples illustrate:

a.  (U) The race or ethnicity of suspected members, associates, or supporters of an ethnic-based gang or criminal enterprise may be collected and retained when gathering information about or investigating the organization.

b.  (U) Ethnicity may be considered in evaluating whether a subject is—or is not—a possible associate of a criminal or terrorist group that is known to be comprised of members of the same ethnic grouping—as long as it is not the dominant factor for focusing on a particular person. It is axiomatic that there are many members of the same ethnic group who are not members of the group; and for that reason, there must be other information beyond race or ethnicity that links the individual to the terrorist or criminal group or to the other members of the group.  Otherwise, racial or ethnic identity would be the sole criterion, and that is impermissible.

2.  (U) **Community Race or Ethnicity as a Factor**

a.  (U) **Collecting and analyzing demographics.** The DOJ guidance and FBI policy permit the FBI to identify locations of concentrated ethnic communities in the Field Office's domain, if these locations will reasonably aid the analysis of potential threats and vulnerabilities, and, overall, assist domain awareness for the purpose of performing intelligence analysis. If, for example, intelligence reporting reveals that members of certain terrorist organizations live and operate primarily within a certain concentrated community of the same ethnicity, the location of that community is clearly valuable—and properly collectible—data. Similarly, the locations of ethnic-oriented businesses and other facilities may be collected if their locations will reasonably contribute to an awareness of threats and vulnerabilities, and intelligence collection opportunities. Also, members of some communities may be potential victims of civil rights crimes and, for this reason, community location may aid

32
**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

enforcement of civil rights laws. Information about such communities should not be collected, however, unless the communities are sufficiently concentrated and established so as to provide a reasonable potential for intelligence collection that would support FBI mission programs (e.g., where identified terrorist subjects from certain countries may relocate to blend in and avoid detection).

(U) _____ ethnic/racial demographics. _____

b2
b7E

c.  (U) **General ethnic/racial behavior**. The authority to collect ethnic community location information does not extend to the collection of cultural and behavioral information about an ethnic community that bears no rational relationship to a valid investigative or analytical need. Every ethnic community in the Nation that has been associated with a criminal or national security threat has a dominant majority of law-abiding citizens, resident aliens, and visitors who may share common ethnic behavior but who have no connection to crime or terrorism (as either subjects or victims). For this reason, a broad-brush collection of racial or ethnic characteristics or behavior is not helpful to achieve any authorized FBI purpose and may create the appearance of improper racial or ethnic profiling.

d.  (U) **Specific and relevant ethnic behavior**. On the other hand, knowing the behavioral and life style characteristics of known individuals who are criminals or who pose a threat to national security may logically aid in the detection and prevention of crime and threats to the national security within the community and beyond. Focused behavioral characteristics reasonably believed to be associated with a particular criminal or terrorist element of an ethnic community (not with the community as a whole) may be collected and retained. For example, if it is known through intelligence analysis or otherwise that individuals associated with an ethnic-based terrorist or criminal group conduct their finances by certain methods, travel in a certain manner, work in certain jobs, or come from a certain part of their home country that has established links to terrorism, those are relevant factors to consider when investigating the group or assessing whether it may have a presence within a community. It is recognized that the "fit" between specific behavioral characteristics and a terrorist or criminal group is unlikely to be perfect—that is, there will be members of the group who do not exhibit the behavioral criteria as well as persons who exhibit the behaviors who are not members of the group. Nevertheless, in order to maximize FBI mission relevance and to minimize the appearance of racial or

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

ethnic profiling, the criteria used to identify members of the group within the larger ethnic community to which they belong must be as focused and as narrow as intelligence reporting and other circumstances permit. If intelligence reporting is insufficiently exact so that it is reasonable to believe that the criteria will include an unreasonable number of people who are not involved, then it would be inappropriate to use the behaviors, standing alone, as the basis for FBI activity.

(U) **Exploitive ethnic behavior.** A related category of information that can be collected is behavioral and cultural information about ethnic or racial communities that is reasonably likely to be exploited by criminal or terrorist groups who hide within those communities in order to engage in illicit activities undetected. For example, the existence of a cultural tradition of collecting funds from members within the community to fund charitable causes in their homeland at a certain time of the year (and how that is accomplished) would be relevant if intelligence reporting revealed that, unknown to many donors, the charitable causes were fronts for terrorist organizations or that terrorist supporters within the community intended to exploit the unwitting donors for their own purposes.

### 4.4.    (U) Least Intrusive Method

A.  (U) **Overview**

(U) The AGG-Dom requires that the "least intrusive" means or method be considered and—if operationally sound and effective—used to obtain intelligence or evidence in lieu of a more intrusive method. This principle is also reflected in Executive Order 12333, which governs the activities of the United States intelligence community. The concept of least intrusive method applies to the collection of all intelligence and evidence. Regarding the collection of foreign intelligence that is not collected as part of the FBI's traditional national security or criminal missions, the AGG-Dom provides that open and overt collection activity must be used with United States persons if feasible.

(U) By emphasizing the use of the least intrusive means to obtain intelligence and evidence, FBI employees can effectively execute their duties while mitigating potential negative impacts on the privacy and civil liberties of all people encompassed within the investigation, including targets, witnesses, and victims. This principle is not intended to discourage FBI employees from seeking relevant and necessary intelligence, information, or evidence, but rather is intended to encourage investigators to choose the least intrusive—but still effective—means from the available options to obtain the material.

(U) This principle is embodied in statutes and DOJ policies on a variety of topics including electronic surveillance, the use of tracking devices, the temporary detention of suspects, and forfeiture. In addition, the concept of least intrusive method can be found in case law as a factor to be considered in assessing the reasonableness of an investigative method in the face of a First Amendment or due process violation claim. See Clark v. Library of Congress, 750 F.2d 89, 94 (D.C. Cir 1984); Alliance to End Repression v. City of Chicago, 627 F. Supp. 1044, 1055 (N.D. Ill. 1985), citing Elrod v. Burns, 427 U.S. 347, 362-3 (1976).

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

B. (U) **General Approach to Least Intrusive Method Concept**

(U) Applying the concept of least intrusive method to an investigative or intelligence collection scenario is both a logical process and an exercise in judgment. It is logical in the sense that the FBI employee must first determine the relative intrusiveness of the method that would provide information:

1. (U) Relevant to the assessment or predicated investigation;

2. (U) Within the time frame required by the assessment or predicated investigation;

3. (U) Consistent with operational security and the protection of sensitive sources and methods; and

4. (U) In a manner that provides confidence in the accuracy of the information.

(U) Determining the least intrusive method also requires sound judgment because it is clear that the factors discussed above are not fixed points on a checklist. They require careful consideration based on a thorough understanding of investigative objectives and circumstances.

C. (U) **Determining Intrusiveness**

(U) In determining intrusiveness, the primary factor should be the degree of procedural protection that established law and the AGG-Dom provide for the use of the method. Using this factor, search warrants, wiretaps, and undercover operations are very intrusive. By contrast, investigative methods with limited procedural requirements, such as checks of government and commercial data bases and communication with established sources, are less intrusive.

(U) The following guidance is designed to assist FBI personnel in judging the relative intrusiveness of different methods:

1. (U) **Nature of the information sought:** Investigative objectives generally dictate the type of information required and from whom it should be collected. This subpart is not intended to address the situation where the type of information needed and its location are clear so that consideration of alternatives would be pointless. When the option exists, however, to seek information from any of a variety of places, it is less intrusive to seek information from less sensitive and less protected places. Similarly, obtaining information that is protected by a statutory scheme (e.g., financial records) or an evidentiary privilege (e.g., attorney/client communications) is more intrusive than obtaining information that is not so protected. In addition, if there exists a reasonable expectation of privacy under the Fourth Amendment (i.e., private communications), obtaining that information is more intrusive than obtaining information that is knowingly exposed to public view as to which there is no reasonable expectation of privacy.

2. (U) **Scope of the information sought:** Collecting information regarding an isolated event—such as a certain phone number called on a specific date or a single financial transaction—is less intrusive or invasive of an individual's privacy than collecting a complete communications or financial "profile." Similarly, a complete credit history is a more intrusive view into an individual's life than a few isolated credit charges. In some cases, a complete financial and credit profile is exactly what the investigation

35
UNCLASSIFIED–FOR OFFICIAL USE ONLY

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

requires (for example, investigations of terrorist financing or money laundering). If so, FBI employees should not hesitate to use appropriate legal process to obtain such information if the predicate requirements are satisfied. It is also recognized that operational security—such as source protection—may dictate seeking a wider scope of information than is absolutely necessary for the purpose of protecting a specific target or source. When doing so, however, the concept of least intrusive alternative still applies. The FBI may obtain more data than strictly needed, but it should obtain no more data than is needed to accomplish the operational security goal.

3. (U) **Scope of the use of the method:** Using a method in a manner that captures a greater picture of an individual's or a group's activities is more intrusive than using the same method or a different one that is focused in time and location to a specific objective. For example, it is less intrusive to use a tracking device to verify point-to-point travel than it is to use the same device to track an individual's movements over a sustained period of time. Sustained tracking on public highways would be just as lawful but more intrusive because it captures a greater portion of an individual's daily movements. Similarly, surveillance by closed circuit television that checks a discrete location within a discrete time frame is less intrusive than 24/7 coverage of a wider area. For another example, a computer intrusion device that captures only host computer identification information is far less intrusive than one that captures file content.

4. (U) **Source of the information sought:** It is less intrusive to obtain information from existing government sources (such as state, local, tribal, international, or federal partners) or from publicly-available data in commercial data bases, than to obtain the same information from a third party (usually through legal process) that has a confidential relationship with the subject—such as a financial or academic institution. Similarly, obtaining information from a reliable confidential source who is lawfully in possession of the information and lawfully entitled to disclose it (such as obtaining an address from an employee of a local utility company) is less intrusive than obtaining the information from an entity with a confidential relationship with the subject. It is recognized in this category that the accuracy and procedural reliability of the information sought is an important factor in choosing the source of the information. For example, even if the information is available from a confidential source, a grand jury subpoena, national security letter (NSL), ex parte order, or other process may be required in order to ensure informational integrity.

5. (U) **The risk of public exposure:** Seeking information about an individual or group under circumstances that create a risk that the contact itself and the information sought will be exposed to the individual's or group's detriment and/or embarrassment— particularly if the method used carries no legal obligation to maintain silence—is more intrusive than information gathering that does not carry that risk. Interviews with employers, neighbors, and associates, for example, or the issuance of grand jury subpoenas at a time when the investigation has not yet been publicly exposed are more intrusive than methods that gather information covertly. Similarly, interviews of a subject in a discrete location would be less intrusive than an interview at, for example, a place of employment or other location where the subject is known.

(U) There is a limit to the utility of this list of intrusiveness factors. Some factors may be inapplicable in a given investigation and, in many cases, the choice and scope of the

36
**UNCLASSIFIED-FOR OFFICIAL USE ONLY**

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

method will be dictated wholly by investigative objectives and circumstances. The foregoing is not intended to provide a comprehensive checklist or even an overall continuum of intrusiveness. It is intended instead to identify the factors involved in a determination of intrusiveness and to attune FBI employees to select, within each applicable category, a less intrusive method if operational circumstances permit. In the end, selecting the least intrusive method that will accomplish the objective is a matter of sound judgment. In exercising such judgment, however, consideration of these factors should ensure that the decision to proceed is well founded.

D.  (U) **Standard for Balancing Intrusion and Investigative Requirements**

(U) Once an appropriate method and its deployment have been determined, reviewing and approving authorities should balance the level of intrusion against investigative requirements. This balancing test is particularly important when the information sought involves clearly established constitutional, statutory, or evidentiary rights or sensitive circumstances (such as obtaining information from religious or academic institutions or public fora where First Amendment rights are being exercised), but should be applied in all circumstances to ensure that the least intrusive alternative feasible is being utilized.

(U) Balancing the factors discussed above with the considerations discussed below will help determine whether the method and the extent to which it intrudes into privacy or threatens civil liberties is proportionate to the significance of the case and the information sought.

(U) Considerations on the investigative side of the balancing scale include the:

1.  (U) Seriousness of the crime or national security threat;

2.  (U) Strength and significance of the intelligence/information to be gained;

3.  (U) Amount of information already known about the subject or group under investigation; and

4.  (U) Requirements of operational security, including protection of sources and methods.

(U) If, for example, the threat is remote, the individual's involvement is speculative, and the probability of obtaining probative information is low, intrusive methods may not be justified, i.e., they may do more harm than good. At the other end of the scale, if the threat is significant and possibly imminent (e.g., a bomb threat), aggressive measures would be appropriate regardless of intrusiveness.

(U) In addition, with respect to the investigation of a group, if the terrorist or criminal nature of the group and its membership is well established (e.g., al Qaeda, Ku Klux Klan, Colombo Family of La Cosa Nostra), there is less concern that pure First Amendment activity is at stake than there would be for a group whose true character is not yet known (e.g., an Islamic charity suspected of terrorist funding) or many of whose members appear to be solely exercising First Amendment rights (anti-war protestors suspected of being infiltrated by violent anarchists). This is not to suggest that investigators should be less aggressive in determining the true nature of an unknown group, which may be engaged in terrorism or other violent crime. Indeed, a more aggressive and timely approach may be in order to determine whether the group is violent or to eliminate it as a threat. Nevertheless, when First Amendment rights are at stake, the choice and use of investigative methods

37

**UNCLASSIFIED - FOR OFFICIAL USE ONLY**
Domestic Investigations and Operations Guide

should be focused in a manner that minimizes potential infringement of those rights. Finally, as the investigation progresses and the subject's or group's involvement becomes clear, more intrusive methods may be justified. Conversely, if reliable information emerges refuting the individual's involvement or the group's criminal or terrorism connections, the use of any investigative methods must be carefully evaluated.

(U) Another consideration to be balanced is operational security. Is it likely that if a less intrusive but feasible method were selected, the subject would detect its use and alter his activities—including his means of communication—to thwart the success of the operation. Operational security—particularly in national security investigations—should not be undervalued and may, by itself, justify covert tactics which, under other circumstances, would not be the least intrusive.

E.  **(U) Conclusion**

(U) The foregoing guidance is offered to assist FBI employees in navigating the often unclear course to select the least intrusive investigative method that effectively accomplishes the operational objective at hand. In the final analysis, the choice of method and balancing of the impact on privacy and civil liberties with operational needs is a matter of judgment, based on training and experience. Pursuant to the AGG-Dom, other applicable laws and policies, and this guidance, FBI employees may use any lawful method allowed, even if intrusive, where the intrusiveness is warranted by the threat to the national security or to potential victims of crime and/or the strength of the information indicating its existence.

**UNCLASSIFIED-FOR OFFICIAL USE ONLY**