Peter Bibring (SBN 223981)
  pbibring@aclu-sc.org
Ahilan T. Arulanantham (SBN 237841)
  aarulanantham@aclu-sc.org
Jennifer L. Pasquarella (SBN 263241)
  jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Ameena Mirza Qazi (SBN 250404)
  aqazi@cair.com
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California  92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340

Attorneys for Plaintiffs
Continued on next page

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

SEP 1 3 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, ALI UDDIN MALIK, YASSER ABDELRAHIM, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION; UNITED STATES OF AMERICA; ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION, in his official capacity; STEVEN M. | CASE NO.: SA CV 11-00301 CJC (VBKx) <br><br> **FIRST AMENDED COMPLAINT** <br><br> **CLASS ACTION** <br><br> Judge: Honorable Cormac J. Carney |

BY FAX

ORIGINAL

MARTINEZ, ASSISTANT DIRECTOR
IN CHARGE, FEDERAL BUREAU OF
INVESTIGATION'S LOS ANGELES
DIVISION, in his official capacity; J.
STEPHEN TIDWELL; BARBARA
WALLS; PAT ROSE; KEVIN
ARMSTRONG; PAUL ALLEN; Does
1-20

Defendants.

Additional Plaintiffs' Attorneys:

Dan Stormer (SBN 101967)
  dstormer@hadsellstormer.com
Joshua Piovia-Scott (SBN 22364)
  jps@hskrr.com
Reem Salahi (SBN 259711)
  reem@hskrr.com
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

1

## **PRELIMINARY STATEMENT**

2    1.    This case concerns an FBI-paid agent provocateur who, by

3    misrepresenting his identity, infiltrated several mainstream mosques in Southern

4    California, based on the FBI's instructions that he gather information on Muslims.

5    2.    The FBI then used him to indiscriminately collect personal

6    information on hundreds and perhaps thousands of innocent Muslim Americans in

7    Southern California.  Over the course of fourteen months, the agents supervising

8    this informant sent him into various Southern California mosques, and through his

9    surveillance gathered hundreds of phone numbers, thousands of email addresses,

10    hundreds of hours of video recordings that captured the interiors of mosques,

11    homes, businesses, and the associations of hundreds of Muslims, thousands of

12    hours of audio recording of conversations — both where he was and was not

13    present — as well as recordings of religious lectures, discussion groups, classes,

14    and other Muslim religious and cultural events occurring in mosques.

15    3.    This dragnet investigation did not result in even a single conviction

16    related to counterterrorism.  This is unsurprising, because the FBI did not gather

17    the information based on suspicion of criminal activity, but instead gathered the

18    information simply because the targets were Muslim.

19    4.    Ironically, the operation ended when members of the Muslim

20    communities of Southern California reported the informant to the police because of

21    his violent rhetoric, and ultimately obtained a restraining order against him.

22    5.    After this, the informant's identity was revealed, first in court

23    documents where the FBI and local law enforcement revealed his role, and then

24    through his own statements which were reported widely in the press.[1]

25

───────────

26    [1] *See, e.g.*, Jerry Markon, *Tension grows between Calif. Muslims, FBI after*

27    *informant infiltrates mosque*, WASH. POST (Dec. 5, 2010); Gillian Flaccus, *Calif.*
*case highlights use of mosque informants*, ASSOC. PRESS (Mar. 1, 2009); Matt

28    (cont'd)

1       6.    By targeting Muslims in the Orange County and Los Angeles areas

2   for surveillance because of their religion and religious practice, the FBI's operation

3   not only undermined the trust between law enforcement and the Southern

4   California Muslim communities, it also violated the Constitution's fundamental

5   guarantee of government neutrality toward all religions.

6       7.    The First Amendment guarantees that no person should be singled out

7   for different treatment by government because of his or her religion. "The First

8   Amendment mandates governmental neutrality between religion and religion. The

9   State may not adopt programs or practices which aid or oppose any religion. This

10  prohibition is absolute." *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quotations

11  and citations omitted).

12      8.    By this class action, Plaintiffs seek injunctive relief for themselves

13  and the class of individuals whom Defendants subjected to surveillance and

14  gathered identifiable information about because they are Muslim. Specifically,

15  they seek an order requiring the federal government to destroy the information

16  about them which it collected through this unlawful operation. The named

17  Plaintiffs also seek damages for themselves as individuals based on the claims set

18  forth below.

19  **JURISDICTION AND VENUE**

20      9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.

21  § 1331. Because this lawsuit alleges violation of the United States Constitution

22  and federal statutes, it raises questions of federal law. Because those violations

23  include violations of 42 U.S.C. § 1985 and laws to protect civil rights, this Court

24  also has jurisdiction under 28 U.S.C. § 1343. Because those violations include

25

26  Coker, *A look at Craig Monteilh*, OC WEEKLY (Mar. 4, 2009); Teresa Watanabe

27  and Paloma Esquivel, *L.A. area Muslims say FBI Surveillance has a chilling effect*,
    L.A. TIMES (Mar. 1, 2009).

28

1   violations of the Privacy Act, *see* 5 U.S.C. 552a(e)(7), this Court also has

2   jurisdiction under 5 U.S.C. 552a(g)(1)(D).

3       10.    This Court has the authority to grant damages, declaratory and

4   injunctive relief, and any other appropriate relief pursuant to *Bivens v. Six*

5   *Unknown Agents*, 403 U.S. 388 (1971); 28 U.S.C. 1331; 28 U.S.C. § 1343; 42

6   U.S.C. § 1985; 42 U.S.C. § 2000bb; 5 U.S.C. 552a; and the Declaratory Judgment

7   Act, 28 U.S.C. §§ 2201 and 2202. A substantial, actual, and continuing

8   controversy exists between the parties, with respect to both the class's claim for

9   injunctive relief in the form of file destruction and the individual claims for

10  damages.

11      11.    Venue is proper in the Central District of California under 28 U.S.C.

12  § 1391(b) because a substantial part of the events or omissions giving rise to the

13  claims herein occurred in this District.

14  **PARTIES**

15      12.    Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen

16  born in Eritrea, who moved to the United States at age fifteen and attended high

17  school in Orange County. From about 1998 to the present, Plaintiff Fazaga served

18  as an imam, or religious leader, of the Orange County Islamic Foundation, a

19  mosque in Mission Viejo, California. His duties there have included directing the

20  religious affairs of the mosque, leading prayer, and conducting educational,

21  spiritual, and recreational activities for the entire mosque community and its

22  youth.[2]

23      13.    Plaintiff Ali Malik is a twenty-six year-old U.S. citizen born in

24  Southern California. Malik's parents came to the United States from Pakistan

25  before he was born. From the time of his birth through the events alleged herein,

26

27  [2] Plaintiff Fazaga's legal name is Yassir Mohammed; but he uses the name "Fazaga" in all his personal and professional dealings.

28

1   Plaintiff Malik resided in and around Orange County, California.  Plaintiff Malik is

2   a practicing Muslim who, from about 2004 through the events alleged herein,

3   regularly attended religious services at the Islamic Center of Irvine ("ICOI"), a

4   mosque in Irvine, California.  ICOI is a mainstream mosque and one of the largest

5   mosques in Southern California, with a congregants at times numbering in the

6   thousands, including Muslims from a wide variety of national and ethnic

7   backgrounds.

8        14.    Plaintiff Yasser AbdelRahim, is a thirty-four year-old lawful

9   permanent resident of the United States, who emigrated from Egypt when he was

10  twenty-one years old.   Plaintiff AbdelRahim first attended business school in

11  Arizona, then moved to Southern California after he obtained his degree in 1999 to

12  work in business consulting.  AbdelRahim is a practicing Muslim and has attended

13  religious services regularly at ICOI since about 2005.

14       15.    Defendant the Federal Bureau of Investigations (FBI) is an agency of

15  the United States government within the meaning of the Privacy Act and the

16  Federal Tort Claims Act.  It maintains records on individual whom its agents have

17  investigated, including Plaintiffs and the putative class they seek to represent.  The

18  FBI is sued for injunctive relief only.

19       16.    Defendant Robert Mueller is the Director of the FBI.  In that capacity

20  he is responsible for the direction and oversight of all operations of the FBI,

21  including the retention of records arising out of the investigations of FBI agents.

22  He is sued in his official capacity for injunctive relief only.

23       17.    Defendant Steven M. Martinez is the Assistant Director In Charge of

24  the FBI's Los Angeles Field office.[3]  In that capacity, he is responsible for the

25  _____

26  [3] In addition to its national headquarters and various specialized facilities

27  operations, the FBI maintains 56 field offices in major cities, nearly 400 smaller
    offices called resident agencies in cities and towns across the nation, and more than

28  (cont'd)

1  direction and oversight of all operations of the FBI in Los Angeles and Orange

2  Counties, including the retention of records arising out of the investigations of FBI

3  agents in his jurisdiction. He is sued in his official capacity for injunctive relief

4  only.

5       18.   Upon information and belief, Defendant Kevin Armstrong was, at all

6  times relevant to this action, employed by the FBI, and acting within the scope of

7  his employment, as a Special Agent assigned to the Orange County area, and a

8  handler for Craig Monteilh. Agent Armstrong met with Monteilh repeatedly and

9  on a regular basis during the time period at issue in this lawsuit. He directed Craig

10  Monteilh to indiscriminately gather information on the Muslim community in

11  Orange County, and personally supervised and directed Monteilh's surveillance

12  activities as described herein.

13       19.   Upon information and belief, Defendant Paul Allen was, at all times

14  relevant to this action, employed by the FBI, and acting within the scope of his

15  employment, as a Special Agent assigned to the Orange County area, and a handler

16  for Craig Monteilh. Agent Allen met with Monteilh repeatedly and on a regular

17  basis during the time period at issue in this lawsuit. He directed Craig Monteilh to

18  indiscriminately gather information on the Muslim community in Orange County,

19  and personally supervised and directed Monteilh's surveillance activities as

20  described herein.

21       20.   Defendant J. Stephen Tidwell, at all times relevant to this action, was

22  an employee of the FBI and acting within the scope of his employment. Defendant

23  Tidwell served as the Assistant Director in Charge of the FBI's Los Angeles Field

24  Office from August 2005 to December 2007, in which capacity he supervised

25  operations in the Central District of California. Upon information and belief,

26

27  60 international offices in U.S. embassies worldwide.

28

- 5 -

1    Defendant Tidwell authorized the search for an informant to go into mosques in

2    Orange County to collect information on Muslims, authorized the selection of

3    Craig Monteilh as that informant, authorized the nature and scope of the operation

4    and its targeting of Muslims, read Monteilh's notes of his activities, and authorized

5    and actively directed the actions of Agents Armstrong, Allen, Rose, Walls and

6    other agents in the handling of Monteilh at all times relevant in this action, for the

7    purpose of surveilling Plaintiffs and other putative class members because they

8    were Muslim.

9        21.    Upon information and belief, Defendant Barbara Walls was, at all

10   times relevant to this action, employed by the FBI, and acting within the scope of

11   her employment as Special Agent in Charge of the Santa Ana branch office, one of

12   ten satellite offices of the FBI's Los Angeles field office, where she was one of the

13   direct supervisors of Agents Allen, Armstrong, and Rose.  Upon information and

14   belief, Defendant Walls was regularly apprised of the information Agents

15   Armstrong and Allen collected through Monteilh; directed the action of FBI agents

16   on various instances based on that information; and actively monitored, directed,

17   and authorized the actions of Agents Armstrong and Allen and other agents at all

18   times relevant in this action, for the purpose of surveilling Plaintiffs and other

19   putative class members because they were Muslim.  Eventually, she ordered that

20   Agents Armstrong and Allen cease using Monteilh as an informant because she no

21   longer trusted him.

22       22.    Upon information and belief, Defendant Pat Rose was, at all times

23   relevant to this action, employed by the FBI and acting in the scope of her

24   employment as a Special Agent.  Upon information and belief, Agent Rose was

25   assigned to the FBI's Santa Ana branch office, where she supervised the FBI's

26   Orange County national security investigations and was one of the direct

27   supervisors of Agents Allen and Armstrong.  Upon information and belief,

28   Defendant Rose was regularly apprised of the information Agents Armstrong and

- 6 -

Allen collected through Monteilh; directed the action of FBI agents on various occasions based on that information; and actively monitored, directed, and authorized the actions of Agents Armstrong and Allen and other agents at all times relevant in this action, for the purpose of surveilling Plaintiffs and other putative class members because they were Muslim.   Agent Rose also sought additional authorization to expand the scope of the surveillance program described herein, in an effort to create a Muslim gym that the FBI would use to gather yet more information about the class.

23.   Defendant Does 1-20 are agents of the Federal Bureau of Investigation and United States Department of Justice, whose identities are not yet known to Plaintiffs, who authorized, directed, and actively monitored the actions alleged herein in order to engage in surveillance of the Plaintiffs and putative class members because they were Muslim.

## FACTUAL ALLEGATIONS

### FBI Focus On Islam Since 2001

24.   Since September 11, 2001, the FBI has focused much of its counterterrorism efforts on broad investigations in the Muslim communities of the United States.   In the weeks and months following 9/11, the United States detained hundreds of "suspects" across the country, the vast majority of whom were Muslim.   Over the next few years, the FBI engaged in a program to conduct interviews of thousands of individuals who had immigrated to the U.S. from countries in which intelligence allegedly indicated al-Qaeda operated, a burden that fell overwhelmingly on Muslims.[4]

25.   In January 2003, the FBI ordered its field supervisors to count the

_____

[4] *Homeland Security: Justice Department's Project to Interview Aliens after September 11, 2001*, U.S. Gen. Accounting Office, G.A.O. No. GAO-03-459 (April 2003) *available at* http://www.gao.gov/new.items/d03459.pdf.

1   number of mosques and Muslims in their jurisdictions to aid in counterterrorism
2   investigations.[5]

3      26.   Starting in 2002 and continuing through 2005, the FBI engaged in a
4   program of monitoring radiation levels across the country, including at more than
5   one hundred "Muslim sites," though officials indicated that religion was not the
6   "only criterion." According to one official, Muslim sites were picked because, in
7   the past, terrorists or people close to them had tended to live in Muslim areas or
8   attend local mosques.[6]

9      27.   In a 2006 briefing to reporters, the FBI official second-in-command
10  over the National Security Branch displayed a map of the San Francisco area
11  showing where Iranian immigrants were clustered — and where, he said, an F.B.I.
12  squad was "hunting."[7]

13  **Evolution of FBI Policies on Use of Religion in Investigation**

14     28.   The FBI has been accused of targeting people based on their First
15  Amendment activity before. During the 1960s and 1970s, domestic intelligence-
16  gathering activities by the FBI came under increasing scrutiny, culminating in the
17  "Church Committee," a Senate Select Committee that investigated the FBI's
18  COINTELPRO operation.

19     29.   In 1976, the Church Committee wrote that "The Government has

20

21  [5] Eric Lichtblau, *F.B.I. Tells Offices to Count Local Muslims and Mosques*, N.Y.
    TIMES (Jan. 28, 2003), available at
22  http://www.nytimes.com/2003/01/28/politics/28MOSQ.html.
    [6] Kevin Bohn and Jeanne Meserve, *Officials: Muslim sites subject to secret
23  monitoring for radiation*, C.N.N. (Dec. 24, 2005), *available at*
24  http://articles.cnn.com/2005-12-23/us/nuke.monitoring_1_radiation-levels-
    radioactive-material-fbi-program; Mary Beth Sheridan, *Mosques Among Sites
25  Monitored for Radiation*, WASH. POST (Dec. 29, 2005).
    [7] Scott Shane and Lowell Bergman, *F.B.I. Struggling to Reinvent Itself to Fight
26  Terror*, N.Y. TIMES (Oct. 9, 2006), *available at*
27  http://www.nytimes.com/2006/10/10/us/10fbi.html.

28

1    often undertaken the secret surveillance of citizens on the basis of their political

2    beliefs, even when those beliefs posed no threat of violence or illegal acts on

3    behalf of a hostile foreign power. The Government, operating primarily through

4    secret Informants . . . has swept in vast amounts of information about the personal

5    lives, views, and associations of American citizens. Investigations of groups

6    deemed potentially dangerous – and even of groups suspected of associating with

7    potentially dangerous organizations – have continued for decades, despite the fact

8    that those groups did not engage in unlawful activity. Groups and individuals have

9    been harassed and disrupted because of their political views and their lifestyles.

10   Investigations have been based upon vague standards whose breadth made

11   excessive collection inevitable."[8]

12        30.    After uncovering rampant abuses in the FBI's domestic intelligence

13   programs, the Church Committee recommended a series of reforms that were

14   ultimately adopted, including new laws to restrict domestic surveillance for

15   national security purposes under the Foreign Intelligence Surveillance Act, 50

16   U.S.C. § 1801 *et seq.*, and guidelines issued by Attorney General Edward Levi

17   (known as "Attorney General's Guidelines") to regulate domestic intelligence-

18   gathering by the FBI.

19        31.    The Levi Guidelines restricted the FBI's domestic intelligence

20   collection authorities to investigations of potential violations of federal law, and

21   limited the use of specific investigative techniques, including informants.  The

22   Guidelines allowed the FBI to conduct full domestic security investigations only

23   on the basis of "specific and articulable facts giving reason to believe that an

24

25   [8] *Final Report of the Select Committee to Study Governmental Operations with
Respect to Intelligence Activities*, "Book II: Intelligence Activities and the Rights

26   of Americans," at 5, U.S. Senate, 94th Cong., 2nd Sess. (Apr. 26, 1976), *available

27   at http://www.aarclibrary.org/publib/church/reports/book2/html/
ChurchB2_0009a.htm.*

28

- 9 -

1   individual or group is or may be engaged in activities which involve the use of

2   force or violence and which involve or will involve the violation of federal law..."[9]

3   More limited Preliminary Investigations could be authorized for 90 days based on

4   receipt of "allegations or other information  that an individual or group is or may

5   be engaged in activities which involve the use of force or violence and which

6   involve or will involve the violation of federal law," but only to determine whether

7   there is a sufficient factual basis for opening a full investigation.[10]

8        32.   In 2002, Attorney General John Ashcroft revised the Guidelines for

9   General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations,

10  respectively, significantly reducing or eliminating the requirement of a factual

11  basis to believe federal crimes would be committed before the FBI could initiate

12  investigations.[11]  Significant changes to the General Crimes guidelines included

13  expanding the duration and type of investigative techniques that could be utilized

14  in preliminary investigations and creating new authorities for the FBI to

15  proactively conduct internet and commercial database searches and attend public

16  places and events for the purpose of detecting or preventing terrorist activities, all

17  without any factual basis or allegation indicating a possible violation of federal

18  law.  Attorney General Ashcroft said terrorism prevention was the key objective of

19  these new Guidelines, arguing that "Our philosophy today is not to wait and sift

20  through the rubble following a terrorist attack. Rather, the FBI must intervene early

21

22  [9] FBI Statutory Charter: Hearings Before the Senate Committee on the Judiciary,

23  95th Cong. pt. 1, p. 22 (1978).
    [10] Id., at 21.

24  [11] Attorney General's Guidelines for General Crimes, Racketeering Enterprise and
    Terrorism Enterprise Investigations, (May 2002), available at:

25  http://www.fas.org/irp/agency/doj/fbi/generalcrimes2.pdf and, Attorney General's

26  Guidelines for National Security Investigations and Foreign Intelligence
    Collection, (Oct. 2003), available at:

27  http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

28

and investigate aggressively where information exists suggesting the possibility of terrorism, so as to prevent acts of terrorism. The new guidelines advance this strategy of prevention by strengthening investigative authority at the early stage of preliminary inquiries. Also, even absent specific investigative predicates, FBI agents under the new guidelines are empowered to scour public sources for information on future terrorist threats."[12]

33.    In June 2003 the Department of Justice issued "Guidance on the Use of Race by Federal Law Enforcement Agencies," purporting to ban the use of racial or ethnic profiling.[13]  This Guidance explicitly failed to include religion as an attribute that could not be used by federal law enforcement officials in making law enforcement decisions.  In addition, the Guidance contained broad exemptions for the use of racial profiling in national security and border integrity investigations.[14]

34.    In October 2003 Attorney General Ashcroft revised the Guidelines for FBI National Security Investigations and Foreign Intelligence Collection, to authorize the "proactive collection of information concerning threats to the national security, including information on individuals, groups and organizations of possible investigative interest, and information on possible targets of international terrorist activities or other national security threats."[15]  These Guidelines authorized the FBI to conduct "threat assessments" without opening

---

[12] Remarks of Attorney General John Ashcroft, Attorney General Guidelines May 30, 2002, at:
http://www.justice.gov/archive/ag/speeches/2002/53002agpreparedremarks.htm
[13] Department of Justice Civil Rights Division, "Guidance Regarding the Use of Race by Federal Law Enforcement Authorities, (June 2003), available at:
http://www.scribd.com/doc/22092319/DOJ-Guidance-Regarding-the-Use-of-Race-by-Federal-Law-Enforcement-Agencies-June-2003.
[14] Id.
[15] Attorney General Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (Oct. 2003), available at:
http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

preliminary or full investigations – in other words without the required factual basis to justify such investigations.[16]

35.   The combined effect of these Guidelines and Guidance was to authorize the FBI to engage in intrusive investigations of First Amendment protected activity, and specifically religious practices, without any factual basis to believe any criminal violations or threat to the national security existed.

36.   In 2008, Attorney General Mukasey revised the guidelines further, explicitly eliminating the need for any factual predicate before FBI agents are allowed to conduct a new category of investigation called "assessments."  The 2008 revisions allow FBI agents to use an array of intrusive investigative techniques during assessments, including physical surveillance, recruiting and tasking informants, and pre-textual interviews by FBI agents acting in ruse.  In response, the FBI revised its internal policy, publishing the FBI's *Domestic Intelligence and Operations Guides* ("DIOG") in December 2008.[17]  The DIOG only requires an "authorized purpose" to conduct an assessment, which is defined broadly as "a national security, criminal or foreign intelligence collection purpose."[18]  Requiring only an authorized purpose rather than a factual predicate means that the authority to conduct investigations in this category is based on the subjective intent of the agent, rather than any factual information regarding the potential subjects of the assessment establishing suspicion of wrongdoing. Moreover, the DIOG authorizes FBI headquarters and field offices to conduct "Domain Management" assessments to "identify locations of concentrated ethnic communities in the Field Office's domain" and to collect, analyze and map racial

---

[16] *Id.*, at 3.
[17] Federal Bureau of Investigation Domestic Investigations and Operations Guide, (Dec. 2008), available at: http://www.muslimadvocates.org/DIOGs_pt1.pdf
[18] DIOG p. 21.

and ethnic "behaviors," "cultural traditions," and "life style characteristics" in local communities.   FBI Director Robert Mueller issued a broad mandate for FBI offices to "know your domain," which meant "understanding every inch of a given community—its geography, its populations, its economy, and its vulnerabilities."[19] Domain Management assessments appear to be mandated as a matter of course, and require no specific threat or criminal predicate to justify the collection of information regarding the makeup of American communities.

 37. Upon information and belief, Defendants operated under the principles set forth in the revised Mukasey Guidelines and DIOGs even before the Attorney General formally issued them.   For instance, a 2010 report by the Department of Justice Inspector General revealed that from 2002 to 2006 the FBI engaged in a number of investigations of domestic advocacy groups based on "factually weak" or "speculative" predication.[20]   The Inspector General (IG) determined many of the investigations were opened based upon the FBI agents' mere speculation that the individuals or groups might commit some federal crime in the future.   The IG determined that most of these investigations did not violate the 2002 Attorney General's Guidelines in effect at the time because all that was required to initiate a preliminary inquiry was "information indicating the possibility of a federal crime," which illustrated "the broad scope of the FBI's authority under the Attorney General's Guidelines to open preliminary inquiries based on extremely limited information, including information about the First

---

[19] Robert Mueller, Speech to the International Association of Chiefs of Police, San Diego, CA California, Nov. 10, 2008, at: http://www.fbi.gov/news/speeches/using-intelligence-to-protect-our-communities (last visited Sept. 13, 2011).
[20] Department of Justice Inspector General Review of FBI's Investigations of Certain Advocacy Groups (Sept 2010) (hereinafter "IG Report"): http://www.justice.gov/oig/special/s1009r.pdf (last visited Sept. 13, 2011).

1  Amendment expressions of subjects."[21]  Moreover, the IG noted that while the

2  FBI's collection and retention of First Amendment material in these cases often

3  violated the 2002 Guidelines, it would not have violated the revised 2008

4  Guidelines: "Therefore, some of the violations of policy we found in this review

5  would not be violations if they occurred today."[22]  Additionally, a 2006 New York

6  Times report indicated that FBI Associate Executive Assistant Director Phil Mudd

7  was "pitching" a vague domestic intelligence program called "Domain

8  Management," which vaguely implied "ethnic targeting."[23]

9        38.    Upon information and belief, trainings offered by the FBI have also

10  reflected broad generalizations about Muslims supporting the view that Islam and

11  those who practice it inherently condone violence and should be regarded with

12  suspicion.  As recently as 2009, the FBI training for newly recruited agents

13  included a power-point presentation that makes gross generalizations about Islam

14  and Muslims.  The presentation included slide entitled "Islam 101" that stated

15  Islam "transforms country's culture into 7th century Arabians ways" and claimed

16  that "it is characteristic of the Arabic mind to be swayed more by words than ideas

17  and more by ideas than by facts." Of the eight books that the training listed as

18  "recommended reading," at least three of them have been widely criticized as

19  setting forth stereotypes about Muslims and Islam.  Two listed were by Robert

20  Spencer, founder of the group "Stop the Islamization of America," including his

21  book, "The Politically Incorrect Guide to Islam," which asserts on its cover

22  (reproduced in the training's slides) that "Islam teaches that Muslims must wage

23  war to impose Islamic law on non-Muslim states" and "American Muslim groups

24  _____

25  [21] IG Report at 87.
    [22] IG Report at 189.

26  [23] Scott Shane and Lowell Bergman, "FBI Struggling to Reinvent Itself to Fight

27  Terror," NY Times (Oct. 10, 2006), available at
    http://www.nytimes.com/2006/10/10/us/10fbi.html (last visited Sept. 13, 2011).

28

- 14 -

are engaged in a huge cover-up of Islamic doctrine and history," and has chapters titled "The Qur'an: Book of War," "Islam: Religion of War" and "Islamic Law: Lie, Steal and Kill," in which it argues that Islam condones violence, criminality, and terrorism.[24]

39.   Upon information and belief, William Gawthrop, an FBI senior intelligence analyst who has presented and continues to present trainings at conferences to local law enforcement, has offered trainings or training materials on the "Sources and Patterns of Terrorism in Islamic Law" in which he takes selected quotes from Quran and other Islamic texts out of context to teach that Islam inherently mandates violent action against non-Muslims.

**FBI Investigation of Muslims in Orange County, California**

40.   Approximately 500,000 Muslims live in Southern California, more than 120,000 of them in Orange County, making the area home to the second-largest population of Muslims in the United States.

41.   The FBI has surveilled Muslims in Southern California and Orange County for at least several years.

42.   In about late 2001 or 2002, the FBI approached at least one Muslim leader asking who the Muslim leaders in the Southern California area are and for a list of mosques.

43.   In May 2006, Defendant Rose, a supervisor of the FBI's Orange County counterterrorism operations, spoke to the Pacific Club in Irvine about the FBI's counterterrorism efforts.  There, she stated that "[t]here are a lot of

---

[24] Spencer Ackerman, *FBI 'Islam 101' Guide Depicted Muslims as 7th-Century Simpletons*, WIRED (July 27, 2011), available at http://www.wired.com/dangerroom/2011/07/fbi-islam-101-guide (last visited Sept. 13, 2011).

individuals of interest right here in Orange County."[25]  She described recent efforts the FBI had taken in the region: planting bugs and closed-circuit TV cameras, examining computer use and email, and establishing units on both foreigners and domestic suspects.  She indicated that the FBI frequently received calls from people who wanted to tell them about situations like a Muslim neighbor who is changing his license plates or someone who has an apartment with only a mattress and five computers, stating, "I can't tell you how many" tips like that paid off. When asked whether citizens should be worried about activist Muslim students at University of California at Irvine, Rose characterized that as a "tough question," but indicated the FBI was aware of large numbers of Muslim students at UCI and the University of Southern California.  "We live in Irvine.  I can't tell you how many subjects' names come up, and they live right down the street from me," she stated.  "I think we need to be concerned with everybody, including our next-door neighbor."[26]

44.   In 2006 and 2007, authorities arrested reserve officers who worked at the Strategic Technical Operations Center, an intelligence unit at Camp Pendleton, for stealing classified intelligence documents and providing them to local law enforcement.  According to reports, the theft ring had operated since 2001, and the documents seized from the participants included more than 100 FBI and Defense Department files, including documents establishing the existence of programs to surveil Muslim communities and mosques in Southern California.[27]

---

[25] Frank Mickadeit, *Feds warn O.C. of terror lurking 'down the street'*, THE ORANGE COUNTY REGISTER (May 25, 2005), *available at* http://www.ocregister.com/news/fbi-194882-county-orange.html (last visited Sept. 13, 2011).

[26] *Id.*

[27] Rick Rogers, *Records detail security failure in base file theft*, SAN DIEGO UNION-TRIBUNE (May 22, 2008), *available at* http://www.signonsandiego.com/ (cont'd)

45.   Documents obtained by the ACLU of Southern California via the Freedom of Information Act show that the FBI has collected information about the membership of the Shura Council (an association of mosques in the Southern California area), as well as information about activities or events organized at or by mosques or Muslim organizations — including individuals handing out flyers for fundraising, events on political issues such as the war in Iraq or immigration reform, and a wide variety of fundraising efforts.

46.   The FBI has sought and continues to seek interviews of hundreds of people in the Southern California Muslim community, often by sending FBI agents to appear unannounced at the homes or workplaces of people to request an interview.  During these interviews, FBI agents have often questioned interviewees about religious practices that have no discernible relationship to criminal activity, such as what mosque interviewees attend, how many times a day they pray, who the imam of their mosque is, or what they think of particular religious scholars.

**Monteilh's Role in the FBI's Investigation of Muslims**

47.   In the face of substantial evidence of the FBI's particular focus on investigating Muslims, in June 2006, Los Angeles FBI Assistant Director Stephen Tidwell attended a forum for the Muslim community at the Islamic Center of Irvine ("ICOI"), where he assured an audience of about two hundred people that the FBI would enter mosques only openly to outreach to the community and would not send covert informants into mosques for the purpose of monitoring the Muslim community.[28]

---

uniontrib/20080522/news_1n22theft.html (last visited Sept 13, 2011).

[28]  At some point during the spring of 2007, Agents Armstrong and Allen told Monteilh that the Assistant Director in Charge of the FBI's Los Angeles Field Office had told the Muslim community that there would be no undercover informants placed in mosques at a meeting held only about a month or so before Monteilh had publicly "converted," on their instructions, at the ICOI mosque. (cont'd)

- 17 -

48.   At some time prior to July 2006, the FBI hired Craig Monteilh to become a paid informant for them to covertly gather information about Muslims in the Irvine area.

49.   In about July 2006, Monteilh requested a meeting with the imam of the Islamic Center of Irvine ("ICOI").  Monteilh told the imam that he was of French and Syrian descent, and that he wanted to embrace his roots by formally converting to Islam.  The following Friday, Monteilh attended the *jummah* prayer (the Friday afternoon prayer that is the most important service of the week), where he went before the congregation of hundreds and made a public declaration of his Muslim faith.  This declaration, known as *shahadah*, is one of the five pillars of Islam.  After this, Monteilh began going to ICOI on a daily basis, often attending multiple prayers a day.  About a week later, he began using the Muslim name Farouk al-Aziz.

50.   After taking *shahadah*, Monteilh attended prayers at ICOI on a daily basis.  He attended prayers at mosque multiple times per day, and was often waiting for the mosque to open before dawn prayers at about 5 a.m.  He also attended classes and special events.  He primarily attended ICOI, but also went with some regularity to about five of the other largest mosques in Orange County.

51.   Congregants at ICOI generally welcomed Monteilh.  People introduced themselves, spoke with him about his conversion and their faith, and offered to help him learn about Islam and Muslims in America.  Various congregants offered help by buying him books on Islam, talked with him about the tenets of the religion, and showed him the movements of prayers.  Congregants invited him to have meals or tea outside of the mosque to help welcome him to the

---

They told him that at the time Tidwell made this statement, they had already been looking for someone to send into the mosques, and that Tidwell had approved recruitment of an informant.

- 18 -

1  mosque's community and discuss questions he might have.

2      52.    After several months, Monteilh began wearing traditional Muslim

3  robes and skull caps both at mosque and in public, in place of his "western"

4  clothes.

5      53.    After Monteilh had attended ICOI for some time, Muslim community

6  leaders began to hear concerns voiced by the congregants about Monteilh's

7  behavior.  Monteilh engaged people in conversations in which he aggressively

8  probed their views on religion and American foreign policy.  Soon leaders began

9  hearing that he was asking people's opinions on *jihad* and its meaning in Islam,

10  and that he was resisting their claims that Islam did not condone terrorism.

11      54.    Among the many people Monteilh met during his time as an FBI

12  informant were Plaintiffs Fazaga, Malik, and AbdelRahim.

13  **Plaintiff Sheikh Yassir Fazaga**

14      55.    Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen

15  born in Eritrea, who has lived here since he was a teenager.  He attended high

16  school in Orange County.  Sheikh Fazaga has an undergraduate degree in Islamic

17  Studies from the Institute of Islamic and Arabic Sciences in Virginia and a masters

18  degree in marriage and family counseling from the California State University of

19  Long Beach, and has taken coursework toward a masters degree in Christian

20  Theology at Loyola Marymount University.  From about 1998 to the present,

21  Sheikh Fazaga has served as an imam of the Orange County Islamic Foundation

22  (OCIF), a mosque in Mission Viejo, California.  His duties there have included

23  directing the religious affairs of the mosque, leading prayer, and conducting

24  educational, spiritual, and recreational activities for the entire mosque community

25  and its youth.

26      56.    Sheikh Fazaga earned a national reputation for his contemporary

27  American teaching of Islam.  He has spoken at numerous conferences, colleges,

28  and other fora both in the United States and abroad on the topics of Islam and the

American Muslim.  In 2007, he traveled to Romania at the invitation and expense
of the U.S. State Department to speak on terrorism, radicalism and extremism.
He has also been interviewed for print, television and radio media, including for
NBC's Today show on spirituality in America and for a New York Times article
on American imams in which he was featured.[29]

57.   Over the years, Sheikh Fazaga's mosque conducted a number of
events in conjunction with various other mosques in the area, including ICOI.
Sheikh Fazaga was, and still is, concerned about the erosion of civil rights for
people in the Muslim community, and he often took actions to advocate on behalf
of that issue.

58.   On one occasion in early 2006 he attended one such event, which
Defendant Stephen Tidwell, Assistant Director in Charge of the Los Angeles FBI
Field Office, also attended.  At the event, Fazaga asked questions to Tidwell
concerning the FBI's use of informants in mosques.

59.   Shortly afterward, Sheikh Fazaga came into contact with Craig
Monteilh, because Monteilh came to attend prayers and other events at his mosque,
OCIF, starting in approximately 2006.

60.   Some time after Monteilh began attending his mosque, Sheikh Fazaga
hosted a famous Islamic speaker named Yusuf Estes at his mosque.  Estes is a
former National Muslim Chaplain for the United States Bureau of Prisons, and was
a Delegate to the United Nations World Peace Conference for Religious Leaders
several years before being invited to speak at the OCIF.

61.   A number of Sheikh Fazaga's congregants, including Monteilh,
attended the lecture.

---

[29] *See* Neil MacFarquhar, *A Growing Demand for the Rare American Imam*, N.Y.
Times (June 1, 2007), available at
http://www.nytimes.com/2007/06/01/us/01imam.html (last visited Sept. 13, 2011).

- 20 -

1       62.     Several months after Monteilh first began attending events at OCIF,

2   another member of the OCIF community formally introduced Fazaga to Monteilh.

3       63.     After Monteilh's role as an FBI informant became publicly known in

4   February 2009, a number of Sheikh Fazaga's congregants expressed their dismay

5   to him, because Monteilh had spent a considerable amount of time at the OCIF.

6       64.     Sheikh Fazaga had to spend considerable time counseling his

7   congregants who were afraid that they were being targeted for FBI surveillance

8   because of their faith.  He often conducted this counseling away from the mosque

9   and in person, rather than over the telephone, because of his congregants' fear of

10  surveillance.

11      65.     Sheikh Fazaga also observed the trust within and cohesion of his

12  congregation, and of other Muslim communities in Southern California, to be

13  significantly damaged, and that this damage directly undermined the Islamic

14  practice of *jama'ah,* or worship in a congregation.  In part because of this, he

15  devoted two whole sermons to addressing the fears of the congregation about

16  surveillance, rather than addressing religious subjects.

17  **Plaintiff Ali Uddin Malik**

18      66.     Plaintiff Malik grew up in Orange County, California.   When Malik

19  was growing up, his family were strong supporters of the Republican Party.  Malik

20  started a young Republicans club at his high school.  During high school, Malik

21  aspired to work for the U.S. State Department or elsewhere in government.

22      67.     Plaintiff Malik attended the University of California, Irvine ("UCI")

23  from about 2007 to 2009.  While at Irvine, Malik co-founded the Olive Tree

24  Initiative, a peace-building program through which a culturally and religiously

25  diverse group of UCI students take joint factfinding trips to Israel and Palestine to

26  better understand the Israel-Palestine conflict and report on their findings to the

27  UCI community.  Malik and the other founders were recognized for their work

28  with the University of California President's Award for Outstanding Student

- 21 -

1   Leadership, UCI Chancellor's Living Our Values Award, and recognition by the

2   Orange County Human Relations Commission and the U.S. State Department.

3   68.   When Malik was about twenty years old, he developed an interest in

4   religion. His family had always attended the mosque, but he started attending

5   more regularly and trying to study Islam with more seriousness. Malik began

6   wearing traditional robes and head covering when he went to the mosque to pray.

7   He also grew a full, long beard in a traditional fashion. Because Islam encourages

8   Muslims to follow the "sunnah" or practices of the Prophet Muhammad,who had a

9   beard and required his followers to grow beards, observant Muslim men commonly

10  grow their beards as a part of their religious practice and as a form of modesty,

11  Most observant Muslim men in Orange County wear beards of some sort, and

12  many or most try to grow long beards at some point in their lives. Similarly, many

13  Muslim men wear traditional clothes to pray as part of their religious practice, as a

14  form of modesty. As such, an emulation of the practices of Muhammad is also

15  "sunnah." Malik also found that wearing his clothes and beard in this way helped

16  serve as a reminder of his faith.

17  69.   In about summer 2006, as part of his efforts to study Islam more

18  seriously, Malik attended a six-week summer course on Islam at Dar al-Mustafa, a

19  seminary in Yemen. Islam emphasizes the importance of gaining religious

20  knowledge, and encourages its adherents to seek knowledge, so much so that for

21  Muslims gaining religious knowledge is a faith practice in and of itself. Dar al-

22  Mustafa is a mainstream religious school whose leaders are internationally known

23  in the Muslim community for advocating justice, equality, and peaceful co-

24  existence between religious groups, and have been active in interfaith efforts in

25  these areas with religious leaders of other faiths. Upon information and belief, the

26  school and its leaders enjoyed a similar reputation with the United States

27  government and the FBI. At the time Malik attended the summer course, both

28  Yemen and Dar al-Mustafa were popular places for American Muslims who

- 22 -

1    wanted to pursue Arabic language or religious studies abroad for a variety of

2    reasons:  Southern Yemen, where Dar al-Mustafa is located, was known for its

3    spiritual Sufi religious scholarship, for having a clear and eloquent form of the

4    Arabic language, and for being scenic and affordable, if slightly rustic.  Plaintiff

5    Malik attended ICOI and was present when Monteilh took *shahadah* in about July

6    2006.  Plaintiff Malik, along with many other congregants, approached Monteilh

7    after he took *shahadah,* offering his well-wishes and assistance.

8        70.    In about August 2006, the imam at ICOI asked Plaintiff Malik to

9    teach Monteilh how to pray and to guide him through the basics of Islam.

10       71.    At the imam's request, Plaintiff Malik approached Monteilh.  Malik

11   talked with Monteilh about the basics of Islam, including the basic tenets, how to

12   pray, and the development of faith.  Monteilh asked for Malik's cell phone number

13   and email address, which Malik provided.  He tried to offer Monteilh support and

14   welcome him in the community, and talked about inviting him over to his family's

15   house for dinner.

16       72.    To help Monteilh learn about Islam, Plaintiff Malik gave him a very

17   basic book on the religion.  The book is commonly used to teach Sunday school

18   classes to children, and Malik knew that his father had taught Sunday school and

19   had used the same book.

20       73.    Monteilh talked frequently with Malik at the mosque.  He also

21   suggested that they talk at a nearby gym, which they did in part because Monteilh

22   worked out there.  Shortly after their meeting, Monteilh began asking Malik things

23   that made Malik uncomfortable.  At one point Monteilh asked Plaintiff Malik what

24   would happen if someone went up to the imam at ICOI and told him they wanted

25   to blow themselves up.  Plaintiff Malik replied that the imam would think this

26   person was crazy.  Monteilh persisted, and asked Plaintiff Malik if there were other

27   imams in the area that would respond to someone who wanted to blow themselves

28   up.  Plaintiff Malik told Monteilh that there are no such imams or mosques in

- 23 -