1   Southern California as far as he knew.

2   74.   On another occasion, Monteilh asked Malik about *jihad*, citing

3   specific pages in the children's book Malik had given him that mentioned jihad.

4   When Malik answered that *jihad* meant a "struggle," and that the concept referred

5   to the spiritual struggle to purify oneself, Monteilh pressed him about whether it

6   meant physical violence, and resisted Malik's answer that it did not.

7   75.   These conversations deeply concerned Malik and made him very

8   uncomfortable around Monteilh.  Malik thought that Monteilh had strange ideas

9   about Islam from movies or media, and urged him to go talk to the imam so that

10   the imam could guide him.

11   76.   When Monteilh persisted in talking with Malik about his violent

12   ideas, Malik began trying to avoid Monteilh.  He would avoid answering or

13   returning Monteilh's calls, although Monteilh called repeatedly.  Malik also began

14   trying to go to the gym at times Monteilh did not attend.

15   77.   Malik also noticed that Monteilh spoke with many others at the

16   mosque.  For example, Malik occasionally saw Monteilh praying near meetings of

17   a youth group Malik attended in the mosque's prayer hall.  Malik noticed on

18   several occasions that when Monteilh would pray near the group, he would leave

19   his belongings in the prayer hall while he went elsewhere.

20   78.   Finally, Malik stopped attending the mosque altogether because

21   Monteilh was there so often.  Malik also stopped attending the mosque in Tustin

22   because he heard that Monteilh had also been seen at that mosque.  Malik resumed

23   attending ICOI only after Monteilh began approaching other people and speaking

24   to him less often.  Even since returning to the mosque, Malik attends less often

25   than he had before he had contact with Monteilh.

26   79.   In about spring 2007, Monteilh asked Malik about studying Islam

27   abroad.  Malik suggested that Monteilh look into the seminary where Malik had

28   studied, Dar al-Mustafa, which Malik had enjoyed very much.

**Plaintiff Yasser AbdelRahim**

80.     Plaintiff AbdelRahim was another victim of Monteilh's dragnet surveillance of Muslims in Irvine. AbdelRahim started attending ICOI in about 2005. Shortly afterwards, he rented a room in a large house where a friend he met through the mosque lived. Over the next few months, two other mutual friends from ICOI, and AbdelRahim's brother, moved into the house as other roommates left. All five of the housemates were, like AbdelRahim, of Egyptian origin.

81.     In about July 2006, one of AbdelRahim's roommates told him about a guy who had taken *shahadah* at the mosque. The following Saturday, they saw Monteilh and introduced themselves, offering to help him learn about Islam if he had any questions. Monteilh said that he appreciated it and took their phone numbers.

82.     Shortly afterward, Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates. They talked, went out to get coffee, and soon AbdelRahim invited Monteilh to their house for *iftar* (a meal eaten during Ramadan). Monteilh began to spend time with them at their house watching TV or playing X-box. AbdelRahim and his roommates also tried to help Monteilh feel welcome by introducing him to other people in the Muslim community.

83.     Initially, Monteilh talked with AbdelRahim and his roommates about a variety of innocuous topics — not only about Islam, but about politics, world affairs, movies, and sports. At some point, however, Monteilh began asking questions about *jihad,* again with a focus on violence. AbdelRahim found this odd, and responded that Monteilh should not concern himself with that, but instead should concentrate on developing his faith, and should talk to the imam at ICOI if he had questions about the meaning of *jihad.* However, Monteilh persisted in raising the subject. AbdelRahim eventually became worried that Monteilh had asked him several times about *jihad,* particularly when he heard from several of his friends at the mosque that Monteilh had made similar inquiries

1    with them.  AbdelRahim also noticed that Monteilh guided conversations to

2    political subjects like the wars in Iraq and Afghanistan, and would say

3    inflammatory things that seemed aimed at eliciting agreement or angry responses

4    from others.

5        84.    Shortly afterward, a friend of AbdelRahim reported to him that

6    Monteilh had asked the friend to coffee to discuss a personal issue, but then

7    started asking particularly pointed questions about *jihad*.  Upon hearing this,

8    AbdelRahim confronted Monteilh.  AbdelRahim told Monteilh that if someone

9    was teaching him this view of *jihad*, then he needed to find another teacher.

10       85.    After this conversation, AbdelRahim stopped speaking with Monteilh

11   or returning his calls.  Over the next several months, AbdelRahim noticed that

12   Monteilh was spending time with different people at the mosque, and AbdelRahim

13   warned a few of them about his concerns regarding Monteilh.

14   **The FBI's "Dragnet" Approach**

15       86.    The interactions between Monteilh and Plaintiffs Fazaga, Malik, and

16   AbdelRahim were part of a broader pattern of dragnet surveillance that Monteilh

17   engaged in at the behest of his FBI handlers.  Two FBI Special Agents instructed

18   Monteilh to gather information on Muslims in general, and instructed him to adopt

19   strategies of information-gathering and surveillance that ensured that he would

20   obtain that information in an indiscriminate manner, such that Plaintiffs and

21   numerous other people were surveilled solely due to their religion.  They also

22   provided Monteilh with the tools needed to conduct this indiscriminate

23   surveillance, including sophisticated audio and video recording devices.  Again,

24   their instructions ensured that the surveillance tools would target people solely due

25   to their religion.

26       87.    Monteilh's handlers at the FBI were FBI Special Agent Kevin

27   Armstrong and FBI Special Agent Paul Allen.  Agents Armstrong and Allen

28   supervised all of Monteilh's work with the FBI.  The FBI paid Monteilh for the

- 26 -

1    duration of his work for Agents Armstrong and Allen, in amounts ranging from

2    about $6,000 to over $11,000 per month.

3        88.    Agents Armstrong and Allen told Monteilh that the FBI used the

4    name "Operation Flex" for the surveillance program that used him, and used that

5    term repeatedly.  Agents Armstrong and Allen told Monteilh that the name

6    referenced him, since he operated under the cover of a fitness consultant.  But they

7    also told Monteilh that Operation Flex was a broader surveillance program that

8    went beyond just his work.

9        89.    The central feature of the FBI agents' instructions to Monteilh was

10   their directive that he gather information on Muslims, without any further

11   specification.  Agents Armstrong and Allen did not limit Monteilh to specific

12   targets on which they wanted information.  On the contrary, they repeatedly made

13   clear that they were interested simply in Muslims.  To the extent they differentiated

14   within that group, they held a heightened interest in Muslims who were particularly

15   religious.

16       90.    When Agents Armstrong and Allen first sent Monteilh to meet the

17   imam at ICOI and began infiltrating the Muslim community, they gave him no

18   specific targets, but instead told him to gather as much information on as many

19   people in the Muslim community as possible.  Agent Allen told Monteilh, "We

20   want to get as many files on this community as possible."  Agents Armstrong and

21   Allen told Monteilh that the United States was five to ten years behind Europe in

22   the extent of Islamic presence, and that they needed to build files on as many

23   individuals as possible so that when things started to happen, they would know

24   where to go.  They said they were building files in areas with the biggest

25   concentrations of Muslim Americans — New York; the Dearborn, Michigan area;

26   and the Orange County/Los Angeles area.

27       91.    In addition to information about the membership of each mosque,

28   Agents Armstrong and Allen instructed Monteilh to get the names of all board

1    members, imams, people who taught classes at the mosques, and other leadership

2    figures within the mosques.

3        92.    Over the course of the investigation, Agents Armstrong and Allen sent

4    Monteilh to about ten mosques to conduct surveillance and audio recording in each

5    one.  Monteilh spent the most time at ICOI, which he attended daily, but spent

6    significant time at other mosques, including the Orange County Islamic Foundation

7    mosque in Mission Viejo, Durul Falah in Tustin, Omar al-Farouq mosque in

8    Anaheim, Islamic Society of Orange County in Garden Grove, Al-Fatiha in the

9    West Covina/Azusa area, the mosque in Lomita, and King Fahd mosque in Culver

10   City.  For about five or six months Monteilh went at least once a week to each of

11   these mosques, and would go to as many as four different mosques in a day to meet

12   with and talk to people, if not to pray.

13       93.    Agents Armstrong and Allen initially told Monteilh he would make

14   his first contact with the community by attending services at a mosque in Anaheim,

15   but then instructed him to attend ICOI instead because it was closer to where he

16   lived, so he could spend more time there.

17       94.    Agents Armstrong and Allen also informed Monteilh that the

18   surveillance program was itself spread indiscriminately across the area's mosques.

19   Electronic surveillance equipment was installed in at least eight area mosques

20   including ICOI, and mosques in Tustin, Mission Viejo, Culver City, Lomita, West

21   Covina, and Upland.  They told him at one point that they could get in a lot of

22   trouble if people found out what surveillance they had in the mosques, which

23   Monteilh understood to mean that they did not have warrants.  Nonetheless, Agent

24   Armstrong told Monteilh that the FBI had every mosque in the area under

25   surveillance — including both the ones he went to and the ones he didn't.

26       95.    Upon information and belief, Agents Allen and Armstrong caused

27   such electronic surveillance equipment to be installed at the Mission Viejo mosque

28   and used it to monitor conversations of Plaintiff Yassir Fazaga, including

- 28 -

1    conversations held in parts of the mosque not open to the public, including Sheikh

2    Fazaga's office.

3         96.    Apart from the electronic surveillance program, Agents Armstrong

4    and Allen also directed their surveillance at people on the basis of their religion by

5    instructing Monteilh to look for and identify to them people with certain religious

6    backgrounds or traits, such as anyone who studied *fiqh* (a strand of Islamic law

7    concerning morals and etiquette), who was an imam or sheikh; who went on *Hajj*;

8    who played a leadership role at a mosque or in the Muslim community; who

9    expressed sympathies to *mujahideen*; who was a "white" Muslim; or who went to

10   an Islamic school overseas.

11        97.    Even with respect to these categories of Muslims, Monteilh's handlers

12   did not tell him to limit the information he collected to those people.  Agents

13   Armstrong and Allen would occasionally instruct Monteilh to spend more time

14   with or find out more about particular people he identified, but these were always

15   people Monteilh had identified to them during the course of the operation, not

16   people who had been targeted from the outset.

17        98.    Agents Armstrong and Allen also instructed Monteilh to focus on

18   Muslim youth by keeping an eye out for people who tended to attract young

19   Muslims.  They instructed him to identify and gather information on such people.

20   For example, Monteilh told them about a popular youth group on Tuesdays at ICOI

21   run by the imam.  Students from the Muslim Student Union at the University of

22   California, Irvine ("UCI") would attend.  On many occasions, Monteilh recorded

23   the youth group meetings at ICOI by leaving his possessions, including the

24   recording key fob, near where the group met in the prayer hall so that all of their

25   discussions could be recorded.  Monteilh did this by going into the prayer hall

26   during their meetings to pray, and then leaving behind his possessions as if he had

27   forgotten them or just chosen to leave them there while he did other things.

28   Monteilh would go to another part of the mosque or the courtyard, and return

1  sometime later to collect his things. Monteilh told his handlers he did this in his

2  written reports. His handlers never instructed him to stop this practice, and instead

3  repeatedly discussed with him the contents of the recordings obtained in this

4  manner.

5  **The FBI's Surveillance Strategies**

6      99.    The FBI agents instructed Monteilh to engage in a number of

7  surveillance strategies, all of which served to gather information on Muslims in an

8  indiscriminate manner.

9      100.    After Monteilh agreed to work as a confidential informant and

10  underwent some training under the supervision Agents Armstrong and Allen,

11  Agents Armstrong and Allen instructed him to make the appointment to see the

12  imam at the ICOI. Once Monteilh had taken *shahadah* and began attending both

13  ICOI and other mosques, Agents Armstrong and Allen instructed him to gather

14  information on the Muslims at the mosques.

15      101.    Agents Armstrong and Allen instructed Monteilh to obtain

16  information through various methods. They told him to take every opportunity to

17  meet people, get their contact information, meet them privately to get to know

18  them, find out their background, find out their religious and political views, and get

19  any information about them that he could to pass on to the FBI.

20      102.    As a result, over the time he spent at ICOI and other mosques

21  Monteilh did not focus on any particular group of people, such as those who may

22  have engaged in criminal activity or even those from a particular country, but

23  instead socialized widely with different groups and individuals. ICOI is a multi-

24  lingual, multi-ethnic mosque, with separate social groups that form around

25  common language or country of origin. Monteilh surveilled people from every

26  social group regardless of their ethnic origin or dominant language.

27      103.    Pursuant to his handlers' instructions, Monteilh went out of his way to

28  engage all of these different groups, even when he had no natural connection to

- 30 -

1   them. For example, he attended religion classes given in Arabic even when he did
2   not speak Arabic, and questioned 17 and 18 year olds about religious doctrine and
3   politics, when a stranger in his forties might be expected to ask such questions of
4   adults, not youth. Similarly, Monteilh spent significant time with a group of
5   Egyptians, a group of Pakistanis and Indians, a group from Syria and Lebanon, and
6   with the younger, second-generation social groups (generally identified as
7   "Muslim Students Union," or MSU, in reference to on-campus Muslim
8   organizations). Within each group, he spoke to large numbers of people so as to
9   probe their views on religion, politics and violence, and then report them back to
10   his handlers at the FBI.

11       104.  Within these groups, Monteilh tended to focus more heavily on people
12   who were more religious; people who came to the mosque only to attend Friday
13   prayers were less likely to be recipients of his attention.

14       105.  Agents Armstrong and Allen also gave Monteilh a standing order to
15   gather information on Muslims' charitable giving. They instructed him to collect
16   any pamphlet or brochure at any mosque that concerned charitable donations, to
17   inquire of Muslims about which charities and Islamic schools to give to, and to
18   then pass on the names of the charities and Islamic schools to them.

19       106.  Monteilh's handlers also instructed him to attend Muslim fundraising
20   events, to interact with the community and gather information, to identify people
21   who attended and who they came with, and, if there were any speakers, to record
22   what those speakers said.

23       107.  Agents Armstrong and Allen also asked Monteilh to collect
24   information on the travel plans of Muslims in the community. They told him that
25   they shared this information with the Department of Homeland Security so as to be
26   able to monitor or search people during their travels.

27       108.  Monteilh's handlers also instructed him to attend lectures by Muslim
28   scholars and other guest speakers. Because Monteilh's handlers wanted to know

1   both what the lecturers said and who attended these lectures, they equipped

2   Monteilh with a video surveillance device that had a camera in a shirt button, so

3   that he could both record lectures and film attendees socializing. Monteilh also

4   collected license plate numbers from the parking lots to identify those who

5   attended.

6        109.   In keeping with his handlers' orders, Monteilh also attended classes at

7   the mosque so as to obtain more information on Muslim community members. For

8   example, he attended an Arabic language class at ICOI from about December 2006

9   to March 2007. On his handlers' instructions, he obtained and provided them with

10   the lists of the individuals who attended the class. Monteilh also attended a course

11   in *fiqh*, and obtained and provided the class list to his handlers, as per their

12   instructions.

13        110.   Agents Armstrong and Allen also instructed Monteilh to attend *fajr*

14   (dawn) prayers, which are held about 4 a.m., or *ishaa* (late) prayers, which are held

15   about 9:30 p.m. Agents Armstrong and Allen told him that people who attended

16   prayers very early in the morning or late at night, and especially both, were very

17   devout and therefore more suspicious. They instructed him to obtain the names

18   and the license plate numbers of individuals who attended these prayers. Agents

19   Armstrong and Allen increased his pay when he agreed to go to *fajr* prayer four

20   days a week.

21        111.   Agents Armstrong and Allen also instructed Monteilh to memorize

22   certain *ayas* and *surahs* (verses and chapters from the Quran) and to ask Muslims

23   about them. They said they had picked these verses because they believed them to

24   be susceptible to a "jihadist" interpretation, so that people's reactions to them

25   would help discern who was and was not a threat. They told Monteilh that

26   discussions about these verses would elicit responses that could be used to justify

27   additional surveillance measures.

28        112.   Agents Armstrong and Allen also expressed interest in any Muslims

1    who followed websites that the agents believed were "jihadist," including

2    *MissionIslam.com* and *CagePrisoners.com* (a site devoted to raising awareness

3    about the detainees at Guantanamo Bay).  Agent Allen told Monteilh to encourage

4    people he spoke with to go to these websites because they could document

5    people's visits to the website and use that either to pressure them to become

6    informants or to justify further surveillance on them.

7        113.   Agents Armstrong and Allen also encouraged Monteilh to bring up in

8    conversation certain Muslim scholars and thinkers whom they believed were

9    extremist, so as to elicit people's views on them.  The scholars they instructed him

10   to discuss included a number of Islamic scholars who, at the time, were both

11   widely popular and moderate, such as Sheikh Suhaib Webb and Yusef Estes.

12       114.   Monteilh also used his cover as a fitness consultant to gather

13   information on the Muslims with whom he interacted.  During his time working on

14   Operation Flex, Monteilh told people in the Muslim community that he worked as

15   a fitness consultant.  In about November 2006, Agent Allen instructed Monteilh to

16   start going to the gym to work out with people he met from the Muslim

17   community, in order to get close to them and obtain information about them.

18   Again, Monteilh's handlers did not limit the scope of their instructions; the

19   directive included anyone from any mosque without any specific target, for the

20   purpose of collecting as much information as possible about Muslims in the

21   community.  Pursuant to these instructions, Monteilh worked out with Muslims in

22   various gyms around the Orange County area and elicited a wide variety of

23   information, including travel plans, political and religious views.

24       115.   The goal of these conversations was to obtain compromising

25   information that his handlers could use to pressure the Muslims with whom

26   Monteilh interacted into providing information or becoming informants.  Monteilh

27   recorded these conversations using the equipment on his key fob or cell phone.

28   This surveillance was so fruitful that Monteilh's handlers eventually told him they

1    were seeking approval to have him open a Muslim gym.

2        116.   Agents Armstrong and Allen talked repeatedly with Monteilh about

3    obtaining new informants within the Muslim community, primarily by getting

4    information on potential informants that could be used against them if they refused

5    to inform — such as immigration issues, sexual activity, business problems, or

6    crimes like drug use.  Agents Armstrong and Allen instructed Monteilh to pay

7    attention to people's problems, to talk about and record them, including marital

8    problems, business problems, and petty criminal issues.  Agents Armstrong and

9    Allen on several occasions talked about different individuals that they believed

10   might be susceptible to rumors about their sexual orientation, so that they could be

11   persuaded to become informants through the threat of such rumors being started.

12       117.   Agents Armstrong and Allen also often spoke with Monteilh about a

13   maxim that "everybody knows somebody."  They explained that if someone is

14   from Afghanistan, that meant that they would likely have some distant member of

15   their family or acquaintance who has some connection with the Taliban.  If they

16   are from Lebanon, it might be Hezbollah; if they are from Palestine, it might be

17   Hamas.  By finding out what connections they might have to these terrorist groups,

18   no matter how distant, they could threaten the individuals and pressure them to

19   provide information, or could justify additional surveillance.

20       118.   Agents Armstrong and Allen also instructed Monteilh to engage in

21   acts that would build his reputation as a devout Muslim who had access to black

22   market items.  On one occasion, Agents Armstrong and Allen instructed Monteilh

23   to provide Vicodin to a person whose father was sick in a foreign country.  On

24   another occasion, Agent Allen instructed Monteilh to provide prescription anabolic

25   steroids to another two individuals to similarly further his credibility, which he did.

26       119.   During their regular meetings with Monteilh, Agents Armstrong and

27   Allen also showed him photographs of Muslims from the community, taken from

28   many of the methods identified above (e.g. at the gym, at fajr prayer, etc.), asked

- 34 -

him to identify the people in those photographs, and then directed him to provide as much information as possible about each person, including what mosque they attended, their ethnicity or country of origin, the languages they spoke, the people they associated with, what kind of car they drove, their occupation or whether they were a student, as well as any other information Monteilh could obtain.

120.   One theme ran throughout all of these different surveillance gathering strategies:  Agents Armstrong and Allen expressed interest in gathering information only on Muslims, and they set aside any non-Muslims who were identified through surveillance Monteilh performed.  For example, on several occasions when Agents Armstrong and Allen asked Monteilh to identify individuals from photographs taken by surveillance cameras at the entrances to gyms, they presented him with photographs of individuals who were not Muslim — usually Latino — who Monteilh had spoken to or who had simply helped him lift weights.  Each time Monteilh indicated to Armstrong and Allen that the individual identified was not a Muslim, they discarded the picture.

121.   Indeed, both Agent Armstrong and Agent Allen, as well as other agents, explicitly told Monteilh that Islam was a threat to America's national security.

**The FBI's Surveillance Tools**

122.   Agents Armstrong and Allen recorded information about virtually all of the people with whom Monteilh interacted in several different ways – through audio recording, video recording, extensive review of Monteilh's handwritten notes about all aspects of his daily interactions, and a dragnet program to obtain cellphone numbers, email addresses, and information about internet usage.

123.   Upon information and belief, virtually all of Monteilh's interactions with Muslims in the mosques were recorded by audio, video, or both.  The recordings were then transcribed and reviewed by officials within the FBI.  Agent Allen told Monteilh that there was a team transcribing all of his recorded

1   conversations.

2       124.   Agents Armstrong and Allen instructed Monteilh that because of his

3   criminal background, all information he collected would have to be recorded.

4   After about September 2006, Armstrong and Allen gave Monteilh a cell phone and

5   two key fobs (which resembled the remote controls for car locks) with audio

6   recording devices in them, and which Monteilh used to record all day, every

7   moment he worked undercover, regardless of whom he was meeting or what was

8   discussed.

9       125.   People at ICOI noticed that Monteilh would often forget his keys, so

10  that they would be delivered to the imam's office.  People joked about Monteilh

11  frequently forgetting his keys, and for having his keys out during lectures and

12  conversations, even if he had to get them out after he sat down.

13      126.   In fact, Monteilh utilized the trick of leaving his keys around the

14  mosque to allow audio recording of conversations to take place even when he was

15  not present.

16      127.   On several occasions, Monteilh also left the recording devices in

17  locations in mosques in the area.  For example, in a large mosque in Culver City,

18  Monteilh several times attended with a friend who changed in the office from

19  business clothes to more traditional dress before they went into the mosque to pray.

20  Monteilh left his keys in the office so that the key fob would record staff and board

21  members who came in and talked, then retrieved his keys from the office when

22  they were finished in the mosque.  Monteilh did this several times, and in several

23  different mosques.  Agents Armstrong and Allen received the notes where

24  Monteilh said he did this but never instructed him to stop.

25      128.   Monteilh's recording activity was not limited to audio.  Beginning in

26  about February 2007, on numerous occasions Agents Armstrong and Allen

27  outfitted Monteilh with video surveillance equipment that recorded through a

28  camera hidden in a button in the front of his shirt, while recording audio as well.

1    Toward the end of his assignment, Agents Armstrong and Allen had equipped

2    Monteilh to use this video surveillance as often as several days per week.

3         129.   Agents Armstrong and Allen instructed Monteilh to use the video

4    camera for various specific purposes, including to capture the internal layout of

5    mosques, to film basketball or soccer games to see who associated with whom, to

6    film guest lectures at mosques to see what was said and who attended, and to

7    record the interiors of people's houses.  Monteilh's handlers at various times

8    instructed him to open particular doors in homes or mosques and film the room

9    behind.

10        130.   Agents Armstrong and Allen also used Monteilh's activities to gather

11   telephone and cell phone numbers, email addresses, and other electronic

12   information for indiscriminate surveillance.

13        131.   Agents Armstrong and Allen told Monteilh they wanted him to collect

14   contact information, particularly email addresses and phone numbers.  At times,

15   they even gave Monteilh quotas to collect contact information for ten new Muslims

16   per day.  Agents Armstrong and Allen told Monteilh that they monitored his email

17   and cell phones to obtain the telephone numbers and email addresses of people

18   with whom he corresponded.  Agent Allen instructed him to give out his cell phone

19   number widely so that people would call him or give their cell numbers in return,

20   so that the FBI could then collect those numbers.  Armstrong and Allen also

21   instructed him to email frequently with people, so that the FBI could collect their

22   email addresses.  Agents Armstrong and Allen told Monteilh that they used the cell

23   phone numbers and email addresses of individuals who contacted him to obtain

24   information from those individuals' phone and email accounts, including the list of

25   people they contacted.

26        132.   Agents Armstrong and Allen told Monteilh that they kept the numbers

27   and emails he collected in a database that could be monitored for international

28   calls, or cross-referenced against phone calls or emails to persons of interest who

- 37 -

were believed to be linked to terrorism.  Monteilh's handlers also told him that the emails could be used to determine if the person was visiting certain websites, and with whom they were emailing.  Monteilh joined email distribution lists for many of the mosques he surveilled, and would forward messages from the mosques to the FBI so they would be informed about events and bulletins, and so they would have the email addresses of anybody else who received the message.

133.   Agents Armstrong and Allen also instructed Monteilh to gather all available information, including literature, on events occurring at the mosques. Following these instructions, Monteilh would collect brochures on charities that were distributed in the mosques, visit the mosques' libraries or book areas, collect newsletters and bulletins to see what activities were going on in the mosque, and collect the names of individuals who attended, as well as their cell phone numbers and license plates when possible.  He would record this information either electronically or through a system of notes.

134.   Agents Armstrong and Allen instructed Monteilh to compose daily notes of his activities and the surveillance he had undertaken.  These notes were extensive — Agents Armstrong and Allen instructed Monteilh to "empty [his] head" about what he had learned that day — so that Monteilh regularly spent an hour or two each evening writing notes.  After a while, these notes became so voluminous that Armstrong and Allen instructed Monteilh to prepare separate "supplemental notes" containing any sensitive or particularly valuable information. These were all handwritten.  Armstrong and Allen took these notes from Monteilh when they met him twice a week.

135.   At times, Monteilh reported to Agents Armstrong and Allen that when he was left alone in a mosque office, he had looked in drawers for information. Armstrong and Allen never instructed him not to do this.

136.   Agents Armstrong and Allen were well aware that many of the surveillance tools that they had given Monteilh were being used illegally.  Agent

1    Armstrong once told Monteilh that while warrants were needed to conduct most
2    surveillance for criminal investigations, "National security is different. Kevin is
3    God." Agent Armstrong also told Monteilh more than once that they did not
4    always need warrants, and that even if they could not use the information in court
5    because they did not have a warrant, it was still useful to have the information. He
6    said that they could attribute the information to a confidential source if they needed
7    to.

8        137.   Over the course of the fourteen months that Agents Armstrong and
9    Allen supervised Monteilh's work as an informant in the Los Angeles and Orange
10   County Muslim communities, they gathered hundreds of phone numbers and
11   thousands of email addresses of Muslims. They also obtained background
12   information on hundreds of individuals, gathered hundreds of hours of video
13   recordings that captured the interiors of mosques, homes, businesses, and the
14   associations of hundreds of Muslims. They also obtained thousands of hours of
15   audio recording of conversations — both where Monteilh was and was not present
16   — as well as recordings of public discussion groups, classes, and lectures
17   occurring in mosques and at other Muslim religious and cultural events.

18   **The FBI's Oversight, Supervision, and Use of Monteilh**

19       138.   Upon information and belief, FBI Agents Armstrong and Allen, as
20   well as their superiors Director Tidwell, and Agents Walls and Rose, maintained
21   extremely close oversight and supervision of Monteilh. Moreover, because they
22   made extensive use of the results of his surveillance, they knew in great detail the
23   nature and scope of the operation, including the methods of surveillance Monteilh
24   used and the criteria used to decide his targets, and continually authorized their
25   ongoing use.

26       139.   From about August 2006 to October 2007, Agents Armstrong and
27   Allen met with Monteilh about twice per week for meetings to discuss their
28   assignments for him, to give him instructions, to obtain his daily notes, and to

1   either exchange his recording devices for fresh ones or upload the recordings to a

2   computer.  These meetings were held in public places, outside the areas where the

3   Muslim community lived.  About once per month, they met with Monteilh in a

4   room at the Anaheim Hilton Hotel, where they discussed the information he had

5   obtained and gave him instructions in greater detail.

6      140.   Agents Armstrong and Allen monitored and supervised Monteilh's

7   work as an undercover informant closely.  Through the daily notes they collected

8   from him and the twice-weekly meetings, Monteilh told them about virtually

9   everything he did and all the information he had obtained.  They gave Monteilh

10  instructions, or "tasking orders," regularly.  They gave him both standing

11  instructions on kinds of information to gather whenever possible — for example, to

12  meet and get contact information for a certain number of Muslims per day — and

13  also gave him specific instructions on information they wanted, often in response

14  to information he provided – such as, for example, instructions to get inside a

15  certain house within the week or to have lunch with a particular person two times.

16  Agents Armstrong and Allen also gave Monteilh standing orders to call one of

17  them every day, even on his days off, which Monteilh would do, apprising them on

18  the call of his day's activities.

19     141.   Agents Armstrong and Allen at various times discussed with Monteilh

20  what happened to these notes.  They said that their supervisors read the notes, that

21  the notes were seen in "the Beltway," that they were seen by people with "a lot of

22  authority," and that the Assistant Director in Charge of the FBI's Los Angeles field

23  office, who at that time was Stephen Tidwell, read all of Monteilh's daily notes.

24     142.   During the course of the investigation, Agents Armstrong and Allen

25  discussed with Monteilh how the information he collected was actually being used.

26  They assured him that all the information he collected was retained, and that they

27  discarded none of it.  They also told him that the information was used to build

28  files on individuals: that every person he contacted — whose phone number he got,

- 40 -

1   who he emailed, who he identified through photographs — had an individual file

2   in which the information he gathered was retained.

3       143.   On about four different occasions, during the meetings between

4   Agents Armstrong and Allen and Monteilh at the hotel room, they showed him a

5   huge photo array on a large board consisting of the photos of around two hundred

6   Muslims from the Orange County/Los Angeles area.  Agents Armstrong and Allen

7   used different sets of photographs for each of these meetings, so that Monteilh saw

8   hundreds of photographs over the four meetings.  They instructed him to arrange

9   the photos from the most dangerous to the least based on his knowledge and

10   experience.  The entire leadership of the Islamic community were in the photos —

11   sheikhs, imams, board members, prayer leaders, leaders of civic organizations, and

12   youth groups.  The process took hours.  Agents Armstrong and Allen also asked

13   Monteilh to assist them in organizing the photos according to categories such as

14   financial, operative, and leadership; to divide photos into possible cells according

15   to mosques and ethnicity or nationality.  The first of these meetings was in about

16   March 2007, and the last was in about September 2007.

17       144.   Over the course of several conversations, Agents Armstrong and

18   Allen told Monteilh that they considered the leaders in the Muslim community —

19   board members and leadership at mosques and leaders of Muslim organizations —

20   to be potential threats, and that they regularly surveilled them and maintained more

21   detailed files of information on their background and activities.

22       145.   In about early spring of 2007, Agents Armstrong and Allen told

23   Monteilh that information he had provided was particularly valuable, and told him

24   he was "gold" in Los Angeles and in Washington.  Agent Allen said that

25   information from the operation was followed by people "at the highest levels,"

26   and that the operation was among the ten most important intelligence

27   investigations going on in the country.  In about March or April 2007, Agent Allen

28   said that he had meetings with Stephen Tidwell and one of his supervisors from

- 41 -

Washington, D.C., Joseph Billy, Jr., about the operation.[30]  Around the same time period, Agent Allen flew to Washington, D.C. with his supervisor, Pat Rose, in part to meet with high-level FBI officials to get approval to open a gym for Muslims that would function in part as a mosque with a prayer room.  Agent Allen told Monteilh that approval to open the gym had been granted.

146.   At around that time, Agents Armstrong and Allen told Monteilh that information from the operation would be shared with other agencies — that information obtained on people's finances or foreign assets was shared with the Treasury Department, and that information about people's immigration issues would be sent to immigration officials.

**The End of the Monteilh Operation**

147.   Agents Allen and Armstrong had instructed Monteilh to ask general questions about *jihad* from the beginning of the operation.  In early 2007, they instructed him to start asking more pointedly about *jihad* and armed conflict, then to more openly suggest his own willingness to engage in violence.  Pursuant to these instructions, in one-on-one conversations, Monteilh began asking people about violent *jihad*, expressing frustration over the oppression of Muslims around the world, pressing them for their views, and implying that he might be willing or able to take action.

148.   In about May 2007, on instructions from his handlers, Monteilh told a number of individuals that he believed it was his duty as a Muslim to take violent actions, and that he had access to weapons.  Many members of the Muslim community at ICOI then reported these statements to community leaders, including Hussam Ayloush.  Ayloush both called the FBI to report the statements and instructed the individuals who had heard the statements to report them to the Irvine

---

[30] Upon information and belief, Billy was at the time the FBI's Assistant Director in Charge of the agency's Counterterrorism Division.

1     Police Department, which they did.

2     149.  As a community, ICOI also brought an action for a restraining order

3 against Monteilh to bar him from the mosque.  A California Superior Court granted

4 the restraining order in June 2007.

5     150.  After the court granted the restraining order, Monteilh continued

6 going to other mosques for a month or two, but then disappeared from the Muslim

7 community.

8     151.  At around the same time – during the summer of 2007 -- Agents

9 Armstrong and Allen told Monteilh that Defendant Barbara Walls, then the

10 Assistant Special Agent in Charge of the FBI's Santa Ana office, had come to

11 distrust him and did not want him working any more.  They told him there was

12 significant conflict between Agent Walls and field agents over how to handle the

13 operation, and that there had been an audit team sent from Washington, D.C., to

14 examine Agent Walls' handling of one of the leads from the operation.  Because of

15 this conflict and complications surrounding the restraining order, Agents

16 Armstrong and Allen told Monteilh in about September 2007 that he would be

17 going on hiatus from undercover work in the Orange County Muslim community.

18     152.  During one of their final meetings with Monteilh in about October

19 2007, Agent Allen told Monteilh that although his role was over, Operation Flex

20 and the FBI's operations in Orange County and Los Angeles would continue.  He

21 said that the information Monteilh had provided was a valuable foundation for the

22 FBI's continuing work.

23     153.  During one of the final meetings between Agents Armstrong and

24 Allen and Monteilh, Agent Walls was also present.  She warned Monteilh to stay

25 silent about the operation.

26     154.  In August 2008, Monteilh returned to Irvine and contacted the Irvine

27 Police Department to voice concerns about his safety because of his role as an

28 informant.  He spoke with a detective, as well as a sergeant that he recognized as

- 43 -

1  someone who had once escorted him when he was undercover with his handlers.
2  The sergeant knew very specific information about individuals Monteilh had
3  surveilled who he had concerns about, and told Monteilh in this meeting that he
4  worked for JTTF.  He told Monteilh that several individuals he had asked him
5  about were still under surveillance.  He also specifically mentioned that
6  surveillance was ongoing at gyms and at least two mosques.

7  **Monteilh's Identity Revealed**

8      155.   On or about about February 20, 2009, a man named Ahmed Niazi was
9  arrested in Orange County and charged in federal criminal court with immigration
10  fraud for lying on his naturalization application.

11      156.   Niazi had met Monteilh at ICOI and had spent a significant amount of
12  time with him.  Niazi had heard Monteilh's most direct statements about *jihad* and
13  had reported those statements to Hussam Ayloush and to the Irvine Police
14  Department.

15      157.   At Niazi's bail hearing, which occurred on February 24, 2009 in
16  federal district court in Santa Ana, California, FBI Special Agent Thomas Ropel
17  testified that Niazi presented a threat to national security.  Agent Ropel testified
18  that he had heard numerous recordings of conversations between Niazi and a
19  confidential informant.  Agent Ropel stated that this confidential informant was the
20  man Hussam Ayloush had reported to the FBI, and that Niazi and another
21  individual had reported to the Irvine Police Department.  Together, these
22  statements confirmed that the informant was Craig Monteilh, and that he had
23  recorded numerous conversations that he had while an informant.

24      158.   Charges against Niazi were dismissed at the request of the United
25  States Attorney's office on about September 30, 2010.

26      159.   Agent Ropel's testimony on February 24, 2009 confirmed for the first
27  time that Monteilh was a confidential informant for the FBI who had recorded
28  numerous conversations.

- 44 -

160.   Prior to that testimony, Plaintiffs did not know and could not reasonably have known that Monteilh was working for the FBI as an informant; that the FBI and Defendants, through Monteilh, had surveilled and gathered information about them from their interactions with Monteilh; and that the FBI had subjected them to this surveillance because of their religion.  Upon information and belief, prior to February 2009, Monteilh never told anyone outside of law enforcement and his immediate family that he was working as an informant for the FBI.

161.   Subsequent to Ropel's testimony, a number of different sources have confirmed that Monteilh worked for the FBI, including Monteilh himself.

162.   In news accounts of the investigation, Monteilh himself has stated to reporters that the FBI paid him more than $170,000 over fifteen months to be an undercover informant in mosques in Orange County, that "he was instructed to infiltrate mosques throughout Orange [County] and two neighboring counties in Southern California," that he was "ordered to randomly surveil and spy on Muslims to ferret out potential terrorists," and that his handlers told him that "Islam is a threat to our national security."[31]

163.   Upon information and belief, on August 20, 2007, the district attorney in a state criminal case against Monteilh from 2003 moved to terminate his probation early.  In the proceeding, the district attorney explained the basis for the termination:

> Apparently, [Monteilh] is working with F.B.I. Agent Kevin Armstrong. He has given Agent Armstrong very, very valuable information that has proven to be essential in an F.B.I. prosecution. It was Agent Armstrong that contacted the head deputy and the head deputy instructed us to ask

---

[31] *See* Jerry Markon, *Tension grows between Calif. Muslims, FBI after informant infiltrates mosque*, WASH. POST (Dec. 5, 2010).

- 45 -

1     for termination.[32]

2   A copy of the transcript is attached hereto as Attachment 1.

3          164.   Further confirmation comes from court documents filed in a civil

4   action that Monteilh brought against the FBI and the City of Irvine.  In some of

5   those documents, the City of Irvine acknowledged that while a pending criminal

6   investigation of Monteilh was underway, members of the FBI's Orange County

7   Joint Terrorism Task Force approached members of the Irvine police force and

8   asked them to delay any action against Monteilh.[33]

9          165.   In discovery served by Monteilh in that same federal lawsuit, the City

10   of Irvine admitted that it and its agents "were aware that [Monteilh] was an FBI

11   informant," and that the City of Irvine "[was] informed by the FBI that [Monteilh]

12   was an FBI informant."[34]

13          166.   Correspondence in connection with that lawsuit provides yet more

14   evidence of Monteilh's work as an FBI informant.  Upon information and belief,

15   on June 16, 2010, Associate General Counsel for the FBI, Henry R. Felix, sent a

16   letter to Adam Krolikowsi, an attorney representing Monteilh in his civil action

17   against the FBI, in reply to a letter Krolikowski had sent the previous day.  Felix's

18   June 16 letter indicated that Monteilh had signed a non-disclosure agreement with

19   the FBI on October 5, 2007.  Felix noted that Krolikowsi had sent previous letters,

20   but stated that his most recent letter mentioned "Operation Flex" and that this was

21

22   [32] Transcript of Proceedings held Aug. 20, 2007, Probation Termination, *People v.*
*Monteilh*, L.A. Sup. Ct. No. KA059040, filed in support of Motion to Set Aside
23   Conviction, Exh. I, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-9, Case
24   No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).
     [33] *See* Answer to Complaint of City of Irvine and Ronald Carr, *Monteilh v. Federal*
25   *Bureau of Investigation*, Dkt. 23, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).
     [34] *See* Motion to Set Aside Conviction, Exh. G, *Monteilh v. Federal Bureau of*
26   *Investigation*, Dkt. 89-7, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.) (exceprts
27   of City of Irvine's responses to requests for admissions).

28

- 46 -

1    "the first letter in which [Krolikowski] reference[d] a particular FBI operation or

2    investigation." A copy of this letter is attached hereto as Attachment 2.[35]

3          167.   Monteilh himself confirms many of the above-described details of his

4    work as an informant, including that he worked for the FBI to infiltrate the Muslim

5    community of Southern California from about July 2006 until October 2007; that,

6    during this time, he spent about six or seven days a week posing as a Muslim

7    convert named Farouk al-Aziz; that he conducted surveillance and other

8    information-gathering on a wide variety of individuals and organizations in the

9    Muslim community, solely because they were Muslim; and that he conducted

10   surveillance of Plaintiffs as alleged below.

11   **Monteilh's Interactions with Sheikh Yassir Fazaga**

12         168.   Agents Armstrong and Allen instructed Monteilh to conduct

13   surveillance of the Orange County Islamic Foundation (OCIF) mosque in Mission

14   Viejo, California.  The imam of that mosque is Plaintiff Yassir Fazaga.

15         169.   Agents Armstrong and Allen told Monteilh they believed that Plaintiff

16   Fazaga, the imam of OCIF, was a radical, for several reasons: They said that

17   Fazaga directed students on how to conduct demonstrations and encouraged them

18   to speak out.  They said that when the FBI Assistant Director in Charge of the Los

19   Angeles Field Office, Stephen Tidwell, attended a meeting at an Orange County

20   mosque in about spring 2006, Fazaga openly pressed Tidwell about FBI informants

21   in mosques, and when Tidwell denied putting informants in mosques, Fazaga had

22   openly said he did not believe Tidwell.  They also said that Fazaga was a person of

23   interest because he was a board member of "In Focus News," a prominent Muslim

24   newspaper that was vocal in speaking out against U.S. government actions that

25   _____

26   [35] A copy of the letter was filed by Monteilh in his damages action against the FBI.

27   *See* Motion to Set Aside Conviction, Exh. D, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-4, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

28

negatively affected Muslims and which Agents Armstrong and Allen believed was anti-American and linked to Muslim civil rights groups.[36]

170.   Agents Armstrong and Allen told Monteilh that OCIF was linked to ICOI, a mosque they were also interested in, because the two mosques held joint events and jointly organized foreign trips, including the hajj pilgrimage to Mecca. They referred to OCIF as a "definite hotspot."

171.   Agents Armstrong and Allen also told Monteilh that OCIF was radical because it had certain religious scholars as guest speakers whom they believed were radical —particularly Yusef Estes, Suhaib Webb, and a local imam, Ahmad Sakr.  They said that a moderate mosque would not have chosen these guest speakers.

172.   Agents Armstrong and Allen instructed Monteilh to attend the Yusef Estes lecture which Sheikh Fazaga's mosque hosted.  They equipped him with hidden video equipment that he used to video record the entire lecture, the literature Estes had set out, and the people who attended.

173.   Pursuant to Agent Armstrong and Allen's instructions, Monteilh

---

[36] Southern California *InFocus News* is the largest Muslim newspaper in California, with a circulation of about 25,000 and distribution at over 350 Muslim businesses and mosques throughout California, including every major mosque in Los Angeles and Orange County.  According to its website, the paper's objective is to provide honest, effective and professional reporting, with a focus on California Muslims that both brings forth issues of concern to the California Muslim communities and provides a window into the American Muslim experience for all Californians.  The paper has not only covered stories on local Muslim events and leaders, but has examined taboo topics such as domestic violence in the Muslim community and written stories to bridge community divides, such as by profiling families of other religions.  Like many other newspapers, *InFocus News* has at times given news coverage or printed opinion pieces that supported or opposed various policies of the United States government.  The paper has never advocated violence against the United States or its citizens or done anything else that would reasonably justify characterizing it as "anti-American."