1   attended OCIF a number of times to conduct surveillance, including during Sheikh

2   Fazaga's sermons.

3        174.   Agent Armstrong and Allen also equipped Monteilh with a video

4   camera hidden in a shirt button that he used to take video of the interior of OCIF.

5   Agents Armstrong and Allen instructed Monteilh to get a sense of the schematics

6   of the place — entrances, exits, rooms, bathrooms, locked doors, storage rooms, as

7   well as security measures and whether any security guards were armed.  Agent

8   Armstrong later told Monteilh that they had used the information he gathered to

9   enter the mosque.

10        175.   On the instructions of Agents Armstrong and Allen, Monteilh made

11   video recordings of an area in the back of OCIF where there were religious books

12   available for congregants to use, so that they could determine if any of the

13   literature there was extremist.

14        176.   Agents Armstrong and Allen also instructed Monteilh to make

15   contacts within Sheikh Fazaga's Mission Viejo congregation.  To comply,

16   Monteilh worked out on various different occasions with about 40 of their

17   congregants, usually in groups, obtaining the email address and cell phone number

18   of anyone he worked out with and passing that information on to his handlers.

19        177.   Agents Armstrong and Allen instructed Monteilh to gather additional

20   information on a few individuals within the congregation who seemed to have the

21   most direct access to Fazaga — to gather their email addresses, cell phone

22   numbers, and addresses, as well as basic background information such as their

23   occupation, whether they were married or had children, and what prayers they

24   attended.  Monteilh gathered this information and passed it on to Armstrong and

25   Allen.

26        178.   Agents Armstrong and Allen instructed Monteilh to monitor Fazaga at

27   the prayers he conducted, to record and report on what he said, to talk with him

28   afterwards and see who else talked to him afterwards, and to note individuals who

- 49 -

1    appeared to be close to him.   Monteilh also monitored what was said by a member

2    of the congregation who substituted for Fazaga during one of the prayers.

3        179.   In about April 2007, a member of the community introduced Monteilh

4    to Fazaga while he was recording with a hidden video camera.  Monteilh also

5    obtained Fazaga's cell phone number and email address (not through Fazaga, but

6    through others) and passed those on to Agents Armstrong and Allen, who told him

7    they used the email addresses and telephone numbers gathered to monitor

8    communications and conduct further surveillance.

9        180.   Monteilh also gave Agents Armstrong and Allen the license plate

10   numbers of cars Fazaga traveled in and the people with whom Monteilh saw him

11   associate.

12       181.   Agents Armstrong and Allen instructed Monteilh that whenever he

13   saw Fazaga at another mosque or anywhere outside OCIF, he should call them and

14   let them know immediately.  Monteilh did this at least once when he saw Fazaga at

15   another mosque.

16       182.   On one occasion, during Friday afternoon prayer at OCIF, the mosque

17   had a booth set up to collect donations for some kind of relief for Muslims abroad.

18   Pursuant to Agents Armstrong and Allen's orders to monitor donations, Monteilh

19   stood near the booth and used the hidden video camera to make video recordings

20   of people who went up to the booth to contribute money.

21       183.   After Monteilh's role as an FBI informant became publicly known in

22   February 2009, many members of the OCIF congregation were horrified to learn

23   that the man who spent so much time in their mosque was an informant.  This

24   revelation significantly undermined the trust within that community, which in turn

25   deterred members from worshipping as a congregation.

26       184.   Since he had contact with Monteilh, Fazaga has also been subjected to

27   secondary screening and searches upon return to the U.S. from various

28   international trips, being held between 45 minutes and three hours most times he

1    travels.

2        185.   Since discovering the FBI surveilled him and the mosque where he

3    serves as imam, Sheikh Fazaga believes that any of his communications in the

4    mosque and over telephones may be monitored, and indeed that he may be under

5    surveillance at any time.   As an intern therapist as well as an imam, Fazaga

6    provided counseling to congregants and Muslims at the mosque as part of his

7    service to the Muslim community.  Since learning of the FBI's surveillance, he no

8    longer counsels congregants at the mosque for fear that their conversations are

9    monitored and therefore the personal information shared is not confidential, which

10   has limited his capacity to provide such counseling.  The constant fear of being

11   under surveillance, the scrutiny during travel, the effect on the sense of community

12   at his mosque and others, and the additional difficult in providing counseling to

13   clients have all caused Sheikh Fazaga severe and ongoing anxiety and emotional

14   distress.

15   **Monteilh's Interaction with Plaintiff Ali Uddin Malik**

16       186.   In their early meetings with Monteilh, Agents Armstrong and Allen

17   showed Monteilh a picture of a young man who they identified as Plaintiff Ali

18   Malik.  They told him Malik had been a surfer kid in Newport Beach who wore

19   dyed hair, but had travelled to Yemen to attend a religious school, and had returned

20   to the U.S. wearing traditional Muslim dress and a full beard.

21       187.   Agents Armstrong and Allen told Monteilh that Malik's change in

22   behavior in embracing religion and traditional dress was highly suspicious and for

23   that reason they needed to investigate him.  They also told him they were

24   suspicious of Malik because he was involved with people from the "MSU."

25   ("MSU" stands for "Muslim Student Union," which is the name of Muslim student

26   groups at many colleges and universities, including U.C. Irvine.)  Agent Armstrong

27   told Monteilh that before he was assigned to be his handler, he had been assigned

28   to investigate the MSUs and young Muslims, including Ali Malik.

- 51 -

188.   Agents Armstrong and Allen told Monteilh that the way that Malik groomed his beard indicated that he was a radical.

189.   Agents Armstrong and Allen already had information on Malik and his family before they assigned Monteilh to do anything, but they told Monteilh to get more information on one of his brothers; on another individual who Malik was close to; on Malik's associations from the Irvine mosque, and on anyone with whom Malik hung out at the gym.

190.   Agents Armstrong and Allen said that they knew Malik had been to an Islamic religious school in Yemen, and that he had been blocked from entering Saudi Arabia after he had traveled to Yemen.  They tasked Monteilh with finding out what school he had been to and why he had been denied entry into Saudi Arabia.  Upon information and belief, Armstrong and Allen already had knowledge of this information.  When re-entering the country in 2006, Malik had been interviewed at length by U.S. officials and had fully disclosed the nature of his travels, including his study at Dar al-Mustafa.  Malik also disclosed that while abroad, he had traveled to Abu Dhabi in hopes of getting a visa to Saudi Arabia for Umrah (the minor pilgrimage in Islam).  However, Malik was informed by individuals both at Dar al-Mustafa and in Abu Dhabi that he needed to apply for a visa with the Saudi embassy in the United States, which was logistically impossible to do during his trip, so that Malik did not attempt to enter Saudi Arabia or even apply for a visa during his 2006 trip.

191.   In about April 2007, Agents Armstrong and Allen began discussing the possibility of sending Monteilh abroad to study Islam and Arabic.  When Monteilh started asking about a school to go to, Malik told him that he had attended Dar al-Mustafa in Tarim, in Yemen.  Monteilh reported this information to Agents Armstrong and Allen.

192.   On several occasions, Monteilh used the key fob or cell phone recording devices provided by Agents Armstrong and Allen to record groups of

- 52 -

1    young Muslims talking in the prayer hall, particularly after *ishaa* prayer.   On these

2    occasions, Monteilh greeted people, left his things — including the recording

3    device — near where they were talking, and then went to another part of the

4    mosque (or a different part of the prayer hall) to pray so that the recording device

5    would capture their conversation when he was gone.   On several of these

6    occasions, Ali Malik was one of the people in the group Monteilh recorded.

7    Monteilh recorded these conversations when he was not present, then gave notes

8    that detailed the people he saw there to Agents Armstrong and Allen, so they

9    would be able to identify the voices.   Agents Armstrong and Allen received notes

10    in which Monteilh said that he had recorded these conversations without being

11    physically present, and never told him not to do this.

12        193.   The prayer hall of a mosque is sacred space where particular rules and

13    expectations apply.   Shoes are prohibited, one must be in a state of ablution,

14    discussing worldly matters is discouraged, and the moral standards and codes of

15    conduct are at their strongest.   Gossiping, eavesdropping, or talebearing (*namima* -

16    revealing anything where disclosure is resented) is forbidden. *Halaqas*, or small

17    group meetings, are understood by attendees of the mosque to be safe

18    environments in which to discuss theology or matters related to the practice of

19    Islam, and that correspondingly ensure some measure of confidentiality among

20    participants.   In addition, audio and video recording without permission were

21    barred at ICOI, and on rare occasions where an outside entity recorded an event or

22    speaker, signs notified congregants of the recording.

23        194.   Malik more than once told Monteilh that he heard Monteilh was going

24    regularly to *fajr*, or early morning prayer.   Malik commended Monteilh on his

25    commitment — he said that he had gotten into the routine of attending *fajr* prayers

26    daily when he had been studying abroad, but that, regrettably, it was easy to fall

27    into attending prayers only when it was convenient.   He stated that he wanted to

28    get back to that kind of regimen.   Agents Armstrong and Allen told Monteilh this

1   was significant information that indicated Malik was returning to extremist beliefs,

2   which justified further surveillance.

3       195.   Agents Armstrong and Allen received significant information on

4   Malik.  In addition to the surveillance described above, including recordings of all

5   Monteilh's conversations with Malik, they several times showed Monteilh photos

6   with people they said had seen with Malik and asked him to identify them.  The

7   pictures sometimes had Malik in them.

8       196.   Since his contact with Monteilh, Malik has repeatedly been subjected

9   to extended interviews with FBI and Customs upon re-entering the country,

10  including one interview that lasted for several hours, resulted in him missing a

11  connecting flight, and consequently missing a summer school class that made him

12  lose credit for the class and required that he push his college graduation back by

13  several months at considerable financial expense.

14      197.   Also as a result of the FBI's surveillance, Malik altered his religious

15  practices. Because he understood he was targeted because of his outwardly

16  religious appearance, adherence to Islamic ritual practice, and involvement with

17  the mosque and Muslim Student Union at UCI, Malik trimmed his beard, does not

18  regularly wear a skull cap any longer, and stopped attending the mosque regularly

19  for an extended period of time.  To this day, he attends mosque less frequently than

20  he did before having contact with Monteilh because of his fear of being monitored

21  at mosque and the effect that this fear has on his sense of the mosque as a place of

22  peace and spiritual refuge.   This interference with his religious practice results

23  from Defendants' actions and has caused Malik severe and ongoing anxiety and

24  emotional distress.

25      198.   Malik also believes his reputation in the community to have been

26  damaged. He believes that because of his association with Monteilh, people have

27  also assumed that he is a government informant and act as if they are suspicious of

28  him. He believes that he does not have the full trust of the Muslim community.

- 54 -

1    This belief that others suspect him because of Defendants' actions has caused

2    Malik severe and ongoing anxiety and emotional distress.

3        199.   Since discovering the FBI surveilled him and the mosque he attended,

4    Malik believes that any of his communications in the mosque and over telephones

5    may be monitored, and indeed that he may be under surveillance at any time.  He

6    curtails phone and email conversations with his friends and family because of his

7    belief that they may be monitored.  He also suspects that any newcomer to a

8    mosque may be an FBI informant, and has refused to be as welcoming to

9    newcomers as he believes his religion requires.  This constant fear of being under

10   surveillance because of Defendants' acts has caused Malik severe and ongoing

11   anxiety and emotional distress.

12   **Monteilh's Interaction with Yasser AbdelRahim**

13       200.   A few weeks after Monteilh took *shahadah* at ICOI, a group of young

14   men approached him at the mosque, said they were impressed that he attended

15   mosque so regularly and invited him to socialize with them at their house.  Agents

16   Armstrong and Allen told Monteilh that the men's home was already under

17   surveillance because it was shared by five young, unmarried Muslim Egyptian men

18   with different skills and backgrounds — including a computer analyst, a

19   pharmacist, an accountant, and one who handled logistics — and that for that

20   reason they believed they might be a Muslim Brotherhood cell.

21       201.   A few days after this invitation, Monteilh told Agents Armstrong and

22   Allen that one of the young men who lived at the house, Plaintiff Yasser Abdel

23   AbdelRahim, was a person who seemed to attract and have influence with young

24   Muslims.  Agents Armstrong and Allen told him they thought AbdelRahim was the

25   leader of the cell, and that he should spend time at their house, and with

26   AbdelRahim in particular, and gather as much information as he could.  Monteilh

27   did so, and gave recordings of all the conversations he had with AbdelRahim and

28   the other members of the house to Agents Armstrong and Allen, along with notes

- 55 -

1   about his observations.

2        202.  Agents Armstrong and Allen told Monteilh to get into every room in

3   AbdelRahim's house to see what was in there, and include that information in his

4   reports. Later, in about February or March of 2007, Armstrong and Allen

5   equipped Monteilh with a video camera hidden in a shirt button and instructed him

6   to conduct video surveillance of the layout and contents of the house, which he did.

7        203.  Shortly after first meeting Monteilh, AbdelRahim and one of his

8   roommates bought Monteilh some books on Islam, and later asked he what thought

9   of them. Some time after that, AbdelRahim agreed to meet with Monteilh to teach

10   him various prayers. Agents Armstrong and Allen expressed excitement at this,

11   and asked for the first sheet of paper on which AbdelRahim had written a prayer

12   for Monteilh to learn, telling him when they gave it back a few days later that they

13   had lifted AbdelRahim's fingerprints from it.

14        204.  When Monteilh reported that AbdelRahim always led prayer in the

15   house, Agents Armstrong and Allen said that showed leadership, and confirmed

16   that the surveillance should focus on him.

17        205.  Pursuant to standing instructions from Agents Armstrong and Allen,

18   Monteilh gathered and provided them information about AbdelRahim's travel

19   plans, particularly when AbdelRahim was going to or from Egypt to see his family

20   or his fiancé's family. After one of these trips to Egypt, AbdelRahim complained

21   that he had questioned for a long time when he re-entered the country – that he

22   expected some delay but this had been way too long. Agents Armstrong and Allen

23   told Monteilh they had been responsible for that questioning.

24        206.  During this time, AbdelRahim played pick-up soccer with other

25   Muslim youth. Monteilh attended some of these games and took down the license

26   plates of people who attended. On more than one occasion, he made a video

27   recording with a hidden camera Agents Armstrong and Allen provided him, in

28   order to document who was attending and socializing with one another.

- 56 -

1    207.   After Monteilh learned through conversations that AbdelRahim

2    traveled to a particular city for his job, Agents Armstrong and Allen had a

3    particular group of Muslims in that city surveilled and believed he went there to

4    report or get instructions from this group. As Agents Armstrong and Allen had

5    told Monteilh to report all travel plans, he reported AbdelRahim's travel plans on

6    several occasions. Agents Armstrong and Allen told Monteilh that they had

7    AbdelRahim surveilled when he traveled, based on Monteilh's information.

8    208.   Monteilh talked to AbdelRahim about his fiancée, who lived in

9    Detroit, and her family, and transmitted what information he learned to Agents

10   Armstrong and Allen — including her email address.

11   209.   On different occasions, Agents Armstrong and Allen told Monteilh

12   that the FBI had electronic listening devices in AbdelRahim's house, as well as in

13   AbdelRahim's car and phone. For example, one day, one of Monteilh's handlers

14   called to tell him that a friend had driven up to AbdelRahim's house quickly in an

15   agitated state, and asked Monteilh to go down there to find out what was going on.

16   When Monteilh asked how he knew this, he indicated they had video outside the

17   house. Another time, Agents Armstrong and Allen asked him about something

18   that happened inside the house that he hadn't yet put in his notes, then told him that

19   they knew because they had audio surveillance in the home.

20   210.   Agents Armstrong and Allen said that AbdelRahim was donating

21   money to a charitable organization in Egypt and that these donations had been

22   tracked by the Treasury Department. They said that these donations were not

23   unlawful, but that they could make them seem suspicious in order to threaten him

24   and pressure him to provide information and become an informant.

25   211.   On many Tuesday nights, an imam from the Garden Grove mosque

26   gave Arabic language teachings at ICOI. AbdelRahim often attended. On several

27   occasions, Monteilh used recording devices provided by his handlers to record

28   these teachings and the discussions afterward by going into the prayer hall to pray

- 57 -

1    near the group, then leaving his things — including the recording device (disguised
2    as a key fob or cell phone) — near to where the group was talking, and then go to
3    another part of the mosque or a different part of the prayer hall to pray.  The
4    recording device would capture their conversation when Monteilh was not within
5    earshot.  AbdelRahim was part of the group when Monteilh recorded on several
6    occasions.

7         212.   On instructions from Agents Armstrong and Allen, Monteilh asked
8    AbdelRahim questions about *jihad* and pressed him on his views about religious
9    matters and certain religious scholars (particularly Egyptian ones) in order to get
10   him to say something that might be incriminating or provide a way to pressure him
11   to provide information to the FBI.   AbdelRahim told Monteilh that there was more
12   to Islam than *jihad*: that *jihad* is a personal struggle, and that to the extent that
13   there is such thing as a fighting *jihad*, the Quran places very strict rules that
14   prohibit harming plants or trees, infants, elderly or women, and that terrorists who
15   say they are engaged in *jihad* are committing murder.  When Monteilh brought up
16   religious scholars Agents Armstrong and Allen had instructed him to mention, like
17   Hassan al-Banna and Sayid Qutb, AbdelRahim said that he did not agree with
18   them, but thought that the Egyptian government should not have executed them.

19        213.   When Monteilh was reported to the FBI by Muslim community
20   members, AbdelRahim was contacted by FBI agents and met with them to offer
21   information about Monteilh and his extremist rhetoric.  Upon information and
22   belief, one of these agents was Defendant Paul Allen.

23        214.   A few months later, AbdelRahim unexpectedly met the same FBI
24   agents, who were waiting for him outside the office of his chiropractor.  He was
25   surprised to see them there as he had scheduled an appointment with the
26   chiropractor just an hour or so prior. They went to a coffee shop and showed him a
27   search warrant and told him that his storage unit was being searched by the FBI.
28   Two days later, they met again with AbdelRahim and asked him if he knew of any

- 58 -

1   person engaged in any suspicious activity at the mosque or elsewhere. They asked

2   AbdelRahim if he minded contacting the agents if he came across any information

3   of anyone doing anything. AbdelRahim understood that they were asking him to

4   be an informant, and he refused. The FBI agents asked not to mention the offer to

5   anyone.

6       215.   Since he had contact with Monteilh, AbdelRahim has also been

7   subjected to extensive secondary questioning and searches most of the times he has

8   returned to the U.S. from trips abroad. These interrogations and the fear that he

9   will be subjected to them when he travels have caused AbdelRahim severe anxiety

10   and emotional distress.

11       216.   Since discovering the FBI surveilled him and the mosque he attended,

12   AbdelRahim believes that any of his communications in the mosque and over

13   telephones or email may be monitored, and indeed that he may be under

14   surveillance at any time.  He also suspects that any newcomer to a mosque may be

15   an FBI informant, and has refused to be as welcoming to newcomers as he believes

16   his religion requires. This constant fear of being under surveillance because of

17   Defendants' acts has caused AbdelRahim severe and ongoing anxiety and

18   emotional distress.

19       217.   Since these incidents, AbdelRahim's confidence in the mosque as a

20   sanctuary has been ruined. He significantly decreased his attendance to mosque

21   services for fear of surveillance, and as such his donations to mosque institutions

22   also decreased. This interference with his religious practice has caused

23   AbdelRahim severe and ongoing anxiety and emotional distress.

24       **CLASS ALLEGATIONS**

25       218.   Plaintiffs, as class representatives, bring claims for injunctive relief on

26   behalf of themselves and all similarly situated persons pursuant to Rule 23(a) and

27   (b)(2).

28       219.   Plaintiffs, as class representatives, bring this action on their own

- 59 -

1   behalf and on behalf of the following class:

2               All individuals targeted by Defendants for surveillance or

3               information-gathering through Monteilh and Operation Flex, on

4               account of their religion, and about whom the FBI thereby gathered

5               personally identifiable information.

6       220.   *Numerosity.* The size of the class makes a class action both necessary

7   and efficient.  Plaintiffs estimate that the class consist of hundreds if not

8   throusands of current and former residents of Southern California.  Members of the

9   class are ascertainable through a review of Defendants' files on Operation Flex, but

10  so numerous that joinder is impracticable.

11      221.   *Typicality.* The claims of the Plaintiffs are typical of the claims of the

12  class as a whole.  Each of the Plaintiffs was subjected to surveillance by

13  Defendants during the relevant period.  As a result of Defendants' practices,

14  Defendants have discriminated against each of Plaintiffs on the basis of their

15  religion and religious practices, in violation of law.  The unlawful policies and

16  practices that have operated to discriminate against the Plaintiffs are typical of the

17  unlawful practices that operated to discriminate against other class members so as

18  to unlawfully target them for surveillance because of their religion and religious

19  practices.

20      222.   *Common Questions of Law and Fact.* This case poses common

21  questions of law and fact affecting the rights of all members of the class, including,

22  but not limited to:

23          a.      Whether Defendants engaged in a program of conducting
24                  surveillance of mosques in Orange County, and the Plaintiffs
                    and class members who attended those mosques;
25
            b.      Whether Defendants targeted Plaintiffs and class members for
26                  surveillance through Monteilh because they were Muslims or
                    because of their practice of Islam;
27

28          c.      Whether Defendants' practice of targeting Plaintiffs and class

- 60 -

members for surveillance because they were Muslim or because of their practice of Islam constitutes impermissible religious discrimination under the First Amendment;

d.   Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam violates the guarantee of equal protection of the laws under the Fifth Amendment;

e.   Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam places a substantial burden on the religious exercise of Plaintiffs and class members under the First Amendment;

f.   Whether Defendant FBI maintains records on Plaintiffs and class members, arising out of the investigation at issue, describing how they exercise rights guaranteed by the First Amendment;

g.   Whether the maintenance by Defendant FBI of records on Plaintiffs and class members describing how they exercise rights guaranteed by the First Amendment is pertinent to and within the scope of lawful, authorized law enforcement activity;

h.   Whether information gathered by Defendants pursuant to unlawful surveillance should be disgorged and purged from their files;

i.   Whether Defendants conspired for the purpose of depriving Plaintiffs and other class members of their rights for purposes of 42 U.S.C. § 1985;

j.   Whether and what kinds of declaratory and injunctive relief are appropriate.

223.   *Adequacy of Class Representation.*  Plaintiffs can adequately and fairly represent the interests of the class as defined above, because their individual interests are consistent with, and not antagonistic to, the interests of the class.

224.   *Adequacy of Counsel for the Class.*  Counsel for Plaintiffs possess the requisite resources and ability to prosecute this case as a class action and are

1    experienced civil rights attorneys who have successfully litigated other cases

2    involving similar issues.

3         225.   *Propriety of Class Action Mechanism.*  Class certification is

4    appropriate because the prosecution of separate actions against Defendants by

5    individual class members would create a risk of inconsistent or varying

6    adjudications that would establish incompatible standards of conduct for

7    Defendants and because Defendants have acted or refused to act on grounds that

8    apply generally to the class.

9                    **CLAIMS FOR RELIEF**

10                   **First Cause of Action**

11        **Violation of the First Amendment Establishment Clause**

12            **Claim under *Bivens*; 28 U.S.C. § 1331**

13   **(Against All Defendants except the FBI and United States by all Plaintiffs.)**[37]

14        226.   Plaintiffs incorporate Paragraphs 1- 225 as if fully set forth herein.

15        227.   As set forth above, Defendants engaged in a scheme to target

16   Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

17   religion of Islam.  This scheme discriminates against Muslims, in violation of the

18   Establishment Clause of the First Amendment to the United States Constitution.

19                   **Second Cause of Action**

20        **Violation of the First Amendment Establishment Clause**

21         **Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

22        **(Against Individual Capacity Defendants by all Plaintiffs.)**

23        228.   Plaintiffs incorporate Paragraphs 1- 227 as if fully set forth herein.

24        229.   As set forth above, Defendants engaged in a scheme to target

25   _____

26   [37] Plaintiffs' claims for damages under *Bivens* are made against those Defendants
     named in their individual capacities, while their claims for injunctive relief under
27   Section 1331 are made against Defendants named in their official capacities.

28

1   Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

2   religion of Islam and for the purpose of discriminating against Plaintiffs, as

3   Muslims, in violation of the Establishment Clause of the First Amendment to the

4   United States Constitution.

5          230.   Through their scheme, Defendants conspired, and conspired to go in

6   disguise on the premises of another, for the purpose of depriving Plaintiffs, directly

7   or indirectly, of the equal protection of the laws, and of equal privileges and

8   immunities under the laws, because of their adherence to and practice of Islam.

9   Defendants performed these acts with discriminatory animus against Muslims.

10                            **Third Cause of Action**

11            **Violation of the First Amendment Free Exercise Clause**

12                  **Claim under *Bivens*; 28 U.S.C. § 1331**

13   **(Against All Defendants except the FBI and United States by all Plaintiffs.)**

14          231.   Plaintiffs incorporate Paragraphs 1-230 as if fully set forth herein.

15          232.   As set forth above, Defendants engaged in a scheme to target

16   Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

17   religion of Islam.  This scheme discriminates against Muslims, in violation of the

18   Free Exercise Clause of the First Amendment to the United States Constitution.

19          233.   As set forth above, Defendants' surveillance placed a substantial

20   burden on Plaintiffs' religious exercise in their practice of Islam and is justified by

21   no legitimate government interest.

22                            **Fourth Cause of Action**

23            **Violation of the First Amendment Free Exercise Clause**

24               **Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

25         **(Against Individual Capacity Defendants by all Plaintiffs.)**

26          234.   Plaintiffs incorporate Paragraphs 1-233 as if fully set forth herein.

27          235.   As set forth above, Defendants engaged in a scheme to target

28   Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

- 63 -

religion of Islam and for the purpose of discriminating against Plaintiffs, as Muslims in violation of the Free Exercise Clause of the First Amendment to the United States Constitution.

236.   As set forth above, Defendants' surveillance placed a substantial burden on Plaintiffs' religious exercise in their practice of Islam and is justified by no legitimate government interest.

237.   Defendants have conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam.  Defendants performed these acts with discriminatory animus against Muslims.

**Fifth Cause of Action**

**Violation of Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1**

**(Against All Defendants by all Plaintiffs.)**

238.   Plaintiffs incorporate Paragraphs 1-237 as if fully set forth herein.

239.   The actions of Defendants substantially burdened Plaintiffs' exercise of religion, and are neither in furtherance of a compelling governmental interest nor the least restrictive means of furthering any compelling governmental interest.

**Sixth Cause of Action**

**Violation of Fifth Amendment Equal Protection Clause**

**Claim under *Bivens*; 28 U.S.C. § 1331**

**(Against All Defendants except the FBI and United States by all Plaintiffs.)**

240.   Plaintiffs incorporate Paragraphs 1-239 as if fully set forth herein.

241.   As set forth above, Defendants have engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

1    **Seventh Cause of Action**

2    **Violation of the Equal Protection Clause**

3    **Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

4    **(Against Individual Capacity Defendants by all Plaintiffs.)**

5    242.   Plaintiffs incorporate Paragraphs 1-241 as if fully set forth herein.

6    243.   As set forth above, Defendants have engaged in a scheme to target

7    Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

8    religion of Islam.  This scheme discriminates against Muslims, in violation of the

9    Equal Protection Clause of the Fifth Amendment to the United States Constitution.

10   244.   Defendants have conspired, and conspired to go in disguise on the

11   premises of another, for the purpose of depriving Plaintiffs, directly or indirectly,

12   of the equal protection of the laws, and of equal privileges and immunities under

13   the laws, because of their adherence to and practice of Islam.  Defendants

14   performed these acts with discriminatory animus against Muslims.

15   **Eighth Cause of Action**

16   **Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)**

17   **(Against Defendant FBI by all Plaintiffs.)**

18   245.   Plaintiffs incorporate Paragraphs 1-244 as if fully set forth herein.

19   246.   Defendant FBI, through Monteilh, collected and maintained records

20   describing how Plaintiffs exercised their First Amendment rights, in violation of

21   5 U.S.C. §552a(e)(7).  Collection and maintenance of these records is not expressly

22   authorized by statute, not authorized by Plaintiffs, and is neither pertinent to nor

23   within the scope of an authorized law enforcement activity.

24   247.   Defendant FBI's collection and maintenance of records of Plaintiffs'

25   First Amendment activities was intentional and willful, insofar as Defendants

26   gathered the information for the purpose of collecting and maintaining records of

27   Plaintiffs' First Amendment activities.

28   248.   On or about September 6 and 12, 2011, Plaintiffs submitted letters to

- 65 -

the FBI requesting that the FBI disclose all records in the possession of the FBI, associated with each Plaintiff, that were "gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any information derived from that information." The letters also requested that the FBI "expunge all records associated with [Plaintiffs] that describe the exercise of [their] rights under the First Amendment of the United States Constitution that were gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any records derived from that information." The FBI has to date failed to provide Plaintiffs with those records or otherwise to respond to their requests.

249.   Defendant FBI has failed to disclose records as required by Section 552a(d)(1). The records requested are not exempt from disclosure pursuant to Section 552a(j-k) or any other applicable law.

**Ninth Cause of Action**

**Violation of the Fourth Amendment**

**Claim under *Bivens*; 28 U.S.C. § 1331.**

**(Against All Defendants except the FBI and United States by all Plaintiffs.)**

250.   Plaintiffs incorporate Paragraphs 1- 249 as if fully set forth herein.

251.   Defendants' actions as set forth above constitute unreasonable searches in violation of the Fourth Amendment to the United States Constitution, including but not limited to Defendants' actions in  audio recording Plaintiffs' communications without a warrant and where no party to the communication consented to the recording; video recording in homes and other places where Plaintiffs had a reasonable expectation of privacy against video recording; and entering and planting electronic listening devices in mosques without a warrant.

**Tenth Cause of Action**

**Violation of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1810**

**(Against All Defendants by all Plaintiffs.)**

252.   Plaintiffs incorporate Paragraphs 1-251 as if fully set forth herein.

253.   Defendants, under color of law, acting through Monteilh, used electronic, mechanical, and/or other surveillance devices, without a warrant, to monitor Plaintiffs and their communications and/or activities, and to acquire information under circumstances in which Plaintiffs had a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

**Eleventh Cause of Action**

**Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.***

**(Against Defendant United States by all Plaintiffs.)**

254.   Plaintiffs incorporate Paragraphs 1-253 as if fully set forth herein.

255.   At all times relevant to the complaint, Defendants Armstrong, Allen, Rose, Tidwell and Walls, were employees of the United States, acting in the scope of their employment through their own actions and their directions to employees and agents, under circumstances that would render the United States, if a private person, liable for damages that their actions caused Plaintiffs under California law. The United States is therefore liable to Plaintiffs, as follows, pursuant to 28 U.S.C. §§ 1346(b) and 2674.

256.   The United States, if a private person, would be liable to Plaintiffs for invasion of privacy under California law.  Defendants' acts in conducting audio and video surveillance of Plaintiffs, through Monteilh and Operation Flex, in situations in which Plaintiffs' had a reasonable expectation of privacy, constitute intrusions into a private place or matter in a manner highly offensive to a reasonable person.

257.   The United States, if a private person, would be liable to Plaintiffs for violations of the California constitutional right of privacy set forth in Article 1,

- 67 -

1   section 1 of the California constitution.  Defendants' conduct in conducting audio

2   and video surveillance of Plaintiffs, both through Monteilh and Operation Flex, in

3   situations in which Plaintiffs' had a reasonable expectation of privacy, and in

4   compiling and maintaining information on Plaintiffs based solely on their religion

5   and religious practice, amounts to a serious invasion of their rights to privacy.

6        258.   The United States, if a private person, would be liable to Plaintiffs for

7   violations of California Civil Code section 52.1.  By subjecting Plaintiffs to

8   constant surveillance because of their religion, then publicly revealing that

9   surveillance, Defendants have interfered, or attempted to interfere, by threats,

10  intimidation, or coercion with the exercise or enjoyment by Plaintiffs of their rights

11  to practice their religion and to be free from religious discrimination under the

12  California Constitution, in violation of California Civil Code § 52.1.

13       259.   The United States, if a private person, would be liable to Plaintiffs for

14  the intentional infliction of emotional distress under California law.  Defendants'

15  acts constitute extreme and outrageous conduct, in which they engaged with the

16  intention of causing, or a reckless disregard for the probability of causing,

17  emotional distress in plaintiffs; which was the actual or proximate cause of severe

18  or extreme emotional distress that Plaintiffs have suffered.

19       260.   Plaintiffs presented the FBI with notification of the above-alleged

20  incidents and claims for monetary damages in claims sent to the FBI using

21  Standard Form 95 on or about February 21, 2011.  The FBI failed to make any

22  response to Plaintiffs' claims within six months after they were filed.

23                               **PRAYER FOR RELIEF**

24       Wherefore, Plaintiffs respectfully request that the Court grant the following

25  relief:

26            a.  Certify a Class under Rule 23(b)(2), as described above;

27            b.  Injunctive relief on behalf of Plaintiffs and all other putative class

28                 members ordering Defendants to destroy or return any information

1    gathered through the unlawful surveillance program by Monteilh
2    and/or Operation Flex described above, and any information derived
3    from that unlawfully obtained information, as well as to comply with
4    their obligations under the Privacy Act, 5 U.S.C. § 552a;

5    c. Compensatory and punitive damages for violations of the laws of the
6    United States and California, in an amount to be proven at trial;

7    d. Liquidated damages in an amount to be proven at trial pursuant to 50
8    U.S.C. §§ 1810(a), 1828(a), and California Civil Code §§ 52(a),
9    52.1(b);

10   e. Reasonable attorneys' fees and costs;

11   f. Any other relief as this Court deems proper and just.

12

13   Dated: September 13, 2011          Respectfully Submitted,

14                                      ACLU FOUNDATION OF SOUTHERN
                                        CALIFORNIA

15                                      COUNCIL ON AMERICAN-ISLAMIC
16                                      RELATIONS, CALIFORNIA

17                                      HADSELL STORMER KEENY RICHARDSON
18                                      & RENICK LLP

19                                      By: _____
20                                          Peter Bibring
                                            Attorneys for Plaintiffs
21

22

23

24

25

26

27

28

# ATTACHMENT 1

Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 23 of 29   Page ID
Case 8:10-cv-00102-JVS-RNB   Document#8034   Filed 02/15/11   Page 1 of 5   Page ID
#:1600



Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 24 of 29   Page ID
Case 8:10-cv-00102-JVS-RNB   Document 86-2   Filed 02/15/11   Page 2 of 5   Page ID
#:1601

```
 1   CASE NUMBER:                      KA059040

 2   CASE NAME:                        PEOPLE OF THE STATE OF CALIFORNIA

 3                                     VS. CRAIG MONTEILH

 4   WEST COVINA, CALIFORNIA           AUGUST 20, 2007

 5   DEPARTMENT NO. 8                  HON. ABRAHAM KHAN, JUDGE

 6   REPORTER:                         DIANA WHITESEL, CSR NO. 6287

 7   TIME:                             2:40 P.M.

 8   APPEARANCES:

 9                    (LINDA CHILSTROM, DEPUTY DISTRICT ATTORNEY

10                    OF LOS ANGELES COUNTY.)

11                                 -oOo-

12

13        THE CLERK:  PEOPLE ARE GOING TO MOVE TO MAKE A MOTION TO

14   TERMINATE PROBATION.

15        THE COURT:  CRAIG F. MONTEILH.  KA059040.

16        MS. CHILSTROM:  YOUR HONOR, I HAVE BEEN INFORMED BY

17   MR. SATO OF MY OFFICE THAT HEAD DEPUTY SCOTT CARBAUGH HAS

18   REQUESTED THAT THIS CASE -- THAT THE PROBATION IN THIS MATTER BE

19   TERMINATED.

20        THE COURT:  CAN YOU GIVE ME A REASON?

21        MS. CHILSTROM:  I DON'T KNOW A REASON.  I WAS JUST TOLD IT

22   WAS UPON THE REQUEST OF THE HEAD DEPUTY.

23        THE COURT:  I'M GOING TO CONTINUE THIS UNTIL TOMORROW

24   UNTIL YOU CAN GIVE ME A REASON.  I USUALLY DON'T TERMINATE

25   PROBATION UNLESS THERE IS SOMETHING I CAN RELY ON.

26        MS. CHILSTROM:  NOT A PROBLEM.

27            I TAKE IT, WE'RE WAITING FOR MR. LINDARS.

28            MAY I MAKE A QUICK CALL?
```

Attachment 1 - page 71

Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 25 of 29   Page ID
Case 8:10-cv-00102-JVS-RNB   Document 80-3   Filed 02/15/11   Page 3 of 5   Page ID
#:1602

1                    (PAUSE IN PROCEEDINGS.)

2

3        MS. CHILSTROM:  YOUR HONOR, COULD THE COURT RECALL THE

4   LAST CASE?

5        THE COURT:  OKAY.  WE'RE STILL ON THE RECORD IN CRAIG F.

6   MONTEILH.

7        MS. CHILSTROM:  YOUR HONOR, I JUST SPOKE WITH MR. SATO.

8   INITIALLY I WAS JUST TOLD THAT THE HEAD DEPUTY WANTED THE

9   PROBATION TERMINATED.

10          APPARENTLY THE DEFENDANT IS WORKING WITH F.B.I. AGENT

11   KEVIN ARMSTRONG.  HE HAS GIVEN AGENT ARMSTRONG VERY, VERY

12   VALUABLE INFORMATION THAT HAS PROVEN TO BE ESSENTIAL IN AN F.B.I.

13   PROSECUTION.  IT WAS AGENT ARMSTRONG THAT CONTACTED THE HEAD

14   DEPUTY AND THE HEAD DEPUTY INSTRUCTED US TO ASK FOR TERMINATION.

15        THE COURT:  WELL, OKAY.  I KNOW THE DEFENDANT HIMSELF WAS

16   HERE IN APRIL AND HAD REQUESTED EARLY TERMINATION.  AND I BELIEVE

17   ON RECOMMENDATION OF THE DISTRICT ATTORNEY, I DENIED HIS REQUEST.

18   AND THAT WAS BACK IN APRIL.  THAT'S WHY I WANTED TO FIND OUT WHAT

19   THE REASONS WHY WERE AT THIS TIME BECAUSE IT'S ONLY BEEN FOUR

20   MONTHS AFTER.

21          BUT OTHERWISE HE'S PAID HIS FINANCIAL OBLIGATION AND

22   HE'S OTHERWISE BEEN ON PROBATION -- HOW LONG HAS HE BEEN ON?

23   IT'S KA059040.  IS THAT '03?

24        MS. CHILSTROM:  IT IS '03, YOUR HONOR.

25        THE CLERK:  YES, YOUR HONOR, SINCE MAY 5, '03.

26        THE COURT:  ALL RIGHT.  APPARENTLY HE'S HAD PROBATION

27   EXTENDED.  IT MAY HAVE BEEN BECAUSE OF A WARRANT THAT HAD BEEN

28   ISSUED WHICH IT WOULD OTHERWISE TOLL THE RUNNING OF HIS PERIOD.

Attachment 1 - page 72

Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 26 of 29   Page ID
Case 8:10-cv-00102-JVS-RNB   Document 89-4   Filed 02/15/11   Page 4 of 5   Page ID
#:1603

```
1        I'LL GRANT THE REQUEST FOR THE REASONS STATED.

2            MS. CHILSTROM:   THANK YOU.

3

4            (THE PROCEEDINGS IN THE ABOVE-ENTITLED

5            MATTER WERE ADJOURNED.)

6

7                           -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

4

Attachment 1 - page 73

Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 27 of 29   Page ID
Case 8:10-cv-00102-JVS-RNB   Document 89-5   Filed 02/15/11   Page 5 of 5   Page ID
#:1604
#:1635

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - WEST COVINA BRANCH

DEPARTMENT 8                    HON. ABRAHAM KHAN, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
                    PLAINTIFF,            )
                                          )
          VS.                             )   NO. KA059040
                                          )
CRAIG F. MONTEILH,                        )   REPORTER'S
                                          )   CERTIFICATE
                    DEFENDANT.            )
_____  )

        I, DIANA WHITESEL, CSR NO. 6287, OFFICIAL REPORTER OF THE

SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF

LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF ALL OF THE ADMONITIONS TAKEN AT THE TIME OF

THE TAKING OF THE PLEA AND PRONOUNCEMENT OF SENTENCE IN THE

ABOVE-ENTITLED CAUSE; AND FURTHER THAT THE VIEWS AND

RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN

PURSUANT TO SECTION 1203.01 OF THE PENAL CODE THE ABOVE-ENTITLED

MATTER.



        DATED THE DECEMBER 2, 2009




        _Diana Whitesel_, CSR NO. 6287
        DIANA WHITESEL, OFFICIAL REPORTER

Attachment 1 - page 74

# ATTACHMENT 2

Case 8:11-cv-00301-CJC-VBK   Document 49-2   Filed 09/13/11   Page 29 of 29   Page ID
JUL-20-2010  19:58      Case 8:10-cv-00102-JVS-RNB   FBI OGC   Document #6087   Filed 02/15/11   202 220 9347   Page 1 of 1   P.004
#:1582   Page ID



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

June 16, 2010

Adam J. Krolikowski, Esq.
Woods & Krolikowski
1200 Main Street, Suite H
Irvine, CA 92614

RE:   Craig Monteilh [Confidential Communication]
Compliance with NDA Notice Requirement

Dear Mr. Krolikowski:

This office is in receipt of your letter to Steven Kramer dated June 15, 2010. In
your letter you state that Mr. Montielh has "been asked to review and sign declarations prepared
by the ACLU for a lawsuit they will be filing concerning civil rights violations by the FBI within
the Islamic Community during the time period of Operation Flex." I am aware that you have sent
previous letters to the FBI concerning the Non-Disclosure Agreement that Mr. Monteilh signed
on October 5, 2007; however, this is the first letter in which you reference a particular FBI
operation or investigation. In advance of June 17, 2010, please provide us with any information
that you intend to include in these declarations that is/or may be covered by the Non-Disclosure
Agreement. The FBI maintains that all the obligations created under the Non-Disclosure
Agreement remain in effect. Notification by Mr. Monteilh that he intends to disclose information
covered by this agreement does not limit or nullify the obligations that he accepted by signing
this agreement.

Sincerely,

Henry R. Felix
Associate General Counsel
Civil Litigation Unit II
Office of the General Counsel
Federal Bureau of Investigation
PA 400
935 Pennsylvania Ave., NW
Washington, D.C. 20535
Phone: 202-220-9328
Fax:   202-220-9355