1   TONY WEST
    Assistant Attorney General
2   ANDRE BIROTTE JR.
    United States Attorney
3   VINCENT M. GARVEY
    Deputy Branch Director
4   ANTHONY J. COPPOLINO
    E-mail: tony.coppolino@usdoj.gov
5   LYNN Y. LEE (SBN #235531)
    E-mail: lynn.lee@usdoj.gov
6   U.S. Department of Justice
    Civil Division, Federal Programs Branch
7   20 Massachusetts Avenue, N.W.
    Washington, D.C.  20001
8   Telephone: 202-514-4782
    *Attorneys for the Federal Bureau of*
9   *Investigation and Defendants Mueller*
    *and Martinez Sued in their Official Capacities*
10
    STEPHEN E. HANDLER
11  Senior Trial Counsel
    E-mail: stephen.handler@usdoj.gov
12  U.S. Department of Justice, Civil Division, Torts Branch
    1331 Pennsylvania Avenue N.W., Rm 8070N
13  Washington, D.C. 20530
    Telephone: (202) 616-4279
14  *Attorney for the United States*

15          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
16                  SANTA ANA DIVISION

17  _____
                                    )
18  YASSIR FAZAGA *et al.*,          ) CASE:   SA11-CV-00301 CJC (VBKx)
                                    )
19          Plaintiffs,              ) **NOTICE OF MOTION AND**
                                    ) **MOTION TO DISMISS**
19  v.                               ) **AMENDED COMPLAINT AND**
                                    ) **FOR SUMMARY JUDGMENT**
20                                   )
    FEDERAL BUREAU OF                )
21  INVESTIGATION *et al.*,          ) DATE:    January 30, 2012
                                    ) TIME:    1:30 p.m.
22          Defendants.              ) JUDGE:   Hon. Cormac J. Carney
    _____)
23
24          PLEASE TAKE NOTICE that Defendants Federal Bureau of Investigation

25  ("FBI"), Robert Mueller, Director of the FBI sued in his official capacity, and

26  Steven Martinez, Assistant Director in Charge of the FBI Los Angeles Field office,

27  sued in his official capacity, and Defendant United States of America, will bring

28  the following Motion to Dismiss and for Summary Judgment before the Honorable

Cormac J. Carney, United States District Judge, in his courtroom, U.S. Courthouse, 411 West Fourth Street, Santa Ana, California, on January 30, 2012 at 1:30 p.m., or at such time as the Court may direct that matter be heard.

Defendants FBI, Mueller and Martinez sued in their official capacities, and Defendant United States of America hereby move to dismiss the claims against them pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.  The grounds for this motion are as follows:

(1) All of plaintiffs' claims against the FBI and official capacity defendants should be dismissed on the ground that the relief sought against these defendants in the form of the disclosure or expungement of records is not available under applicable law.

(a) Plaintiffs fail to state a claim upon which relief can be granted against Defendant FBI under the Privacy Act, 5 U.S.C. § 552a(a)-(l), including under Section 552a(e)(7), Section 552a(d)(1), and Section  552a(g)(1)(B) of the Act, 5 U.S.C. §§ 552a(e)(7),(d)(1), (g)(1)(B).

(b) Plaintiffs have failed to exhaust administrative remedies for their claim under Section 552a(d)(1) of the Privacy Act, 5 U.S.C. § 552a(d)(1).

(c) Plaintiffs cannot obtain the expungement relief they seek because it is not authorized by the Privacy Act.

(d) Plaintiffs cannot obtain the expungement or disclosure relief they seek by operation of statutory exemptions under the Privacy Act.

(e) The expungement and disclosure relief plaintiffs seek is otherwise foreclosed by law as to all claims against the FBI and/or official capacities defendants.

(2) Plaintiffs' Tenth Cause of Action (Foreign Intelligence Surveillance Act) fails to state a claim upon which relief can be granted against Defendants FBI, Mueller and Martinez sued in their official capacities, and against Defendant

United States, and the Court lacks jurisdiction to review this claim against these Defendants, on the ground that the Congress has not waived sovereign immunity to permit claims against the United States and its agencies and officials sued in their official capacities under Section 110 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810 (hereafter "Section 1810").  In addition, plaintiffs also fail to state a claim upon which relief can be granted under FISA Section 1810 against Defendants FBI, Mueller and Martinez sued in their official capacities on the ground that this provision does not authorize the relief sought by the plaintiffs.

(3) Plaintiffs' Eleventh Cause of Action brought against defendant United States should be dismissed for failure to state a claim upon which relief can be granted.

(4) In the alternative, to the extent plaintiffs' claims are not dismissed on other grounds, Defendants FBI, Mueller and Martinez sued in their official capacities, and the United States also move to dismiss plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Eleventh Causes of Action on the ground that litigation of these claims would risk or require the disclosure of certain evidence properly protected by the Attorney General's assertion of the state secrets privilege.

In addition to this Notice of Motion and Motion, the grounds for this motion are set forth further in the accompanying Memorandum of Points and Authorities; the statement of material facts filed herewith by the FBI and official capacity defendants; and the declarations cited therein, including the Declaration of Christopher N. Morin of the Federal Bureau of Investigation filed herewith; the Declaration of Attorney General Eric H. Holder filed on August 1, 2011 (Dkt. 32-3); the Public Declaration of Mark F. Giuliano of the Federal Bureau of Investigation filed on August 1, 2011 (Dkt. 33); the Classified Declaration of Mark F. Giuliano of the Federal Bureau of Investigation lodged for *in camera, ex parte*

3

review on August 1, 2011 (*see* Notice of Lodging at Dkt. 35); the classified

Supplemental Declaration of Mark F. Giuliano lodged for the Court's *in camera,*

*ex parte* review on November 4, 2011 (*see* Government Defendants' Notice of

Lodging filed herewith); and the *In Camera, Ex Parte* Classified Supplemental

Memorandum in Support Of Motion to Dismiss and For Summary Judgment

lodged by the FBI and official capacity defendants on August 1, 2011 (*see* Notice

of Lodging at Dkt. 36).

Pursuant to Local Rule 7-3, the parties have conferred in connection with the

relief sought in this motion.  Plaintiffs oppose this motion.

Date: November 4, 2011          Respectfully submitted,

TONY WEST
Assistant Attorney General

ANDRE BIROTTE, JR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

  */s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov

  */s/ Lynn Y. Lee*
LYNN Y. LEE (SBN # 235531)
E-mail: lynn.lee@usdoj.gov

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: 202-514-4782
Facsimile:  202-616-8460

*Attorneys for the Federal Bureau of Investigation*
*and Defendants Mueller and Martinez Sued in*
*their Official Capacities*

4

1

2          */s/ Stephen E. Handler*
           STEPHEN E. HANDLER
3          Senior Trial Counsel
           E-mail: stephen.handler@usdoj.gov
4          U.S. Department of Justice
           Civil Division, Torts Branch
5          1331 Pennsylvania Avenue N.W.  Room 8070N
           Washington, D.C. 20530
6          Telephone: (202) 616-4279

7          *Attorney for the United States*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TONY WEST
Assistant Attorney General
ANDRE BIROTTE JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN Y. LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: 202-514-4782
*Attorneys for the Federal Bureau of*
*Investigation and Defendants Mueller*
*and Martinez Sued in their Official Capacities*

STEPHEN E. HANDLER
Senior Trial Counsel
E-mail: stephen.handler@usdoj.gov
U.S. Department of Justice, Civil Division, Torts Branch
1331 Pennsylvania Avenue N.W., Rm 8070N
Washington, D.C. 20530
Telephone: (202) 616-4279
*Attorney for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*,<br><br>　　　Plaintiffs,<br><br>v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION, *et al.*,<br><br>　　　Defendants. | CASE:  SA11-CV-00301 CJC (VBKx)<br><br>**MEMORANDUM OF POINTS AND**<br>**AUTHORITIES IN SUPPORT OF**<br>**MOTION TO DISMISS AMENDED**<br>**COMPLAINT AND FOR**<br>**SUMMARY JUDGMENT**<br><br>DATE:　　January 30, 2012<br>TIME:　　1:30 p.m.<br>JUDGE:  Hon. Cormac J. Carney |

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    I.     Plaintiffs' Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    FBI Post 9/11 Counterterrorism Concerns and Policies. . . . . . . . . . . . . . . . .  8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    I.     PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED ON NON-
PRIVILEGE GROUNDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        A.    Plaintiffs' Claims Against the FBI and Official Capacity Defendants
Should be Dismissed Because the Relief Sought Against these

             Defendants is Not Available Under Applicable Law.. . . . . . . . . . . . . .  11

            1.    Plaintiffs Fail to State a Claim Upon Which Relief May Be
Granted Under the Privacy Act. . . . . . . . . . . . . . . . . . . . . . . . . .  11

                a.    Plaintiffs Have Not Exhausted Their Administrative

                    Remedies For a (g)(1)(B) Action.. . . . . . . . . . . . . . . . . . . .  13

                b.    Plaintiffs Cannot Obtain Their Requested Relief Under

                    the Privacy Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

            2.    FBI Investigative Records Are Exempt from the Access and
Amendment Provisions of the Privacy Act and Are Therefore

                Not Subject to Disclosure or Expungement.. . . . . . . . . . . . . .  16

            3.    Because Plaintiffs Are Foreclosed From Obtaining Expungement
Under the Privacy Act, They Cannot Obtain Expungement

                for Any of Their Causes of Action.. . . . . . . . . . . . . . . . . . . .  19

            4.    Even if the Privacy Act Did Not Preempt a General Expungement
Remedy, Plaintiffs Have Pled No Harm that Would Entitle

                Them to Such Relief Here... . . . . . . . . . . . . . . . . . . . . . . . . .  21

        B.    Plaintiffs' Tenth Cause of Action Brought Under Section 1810 of the
Foreign Intelligence Surveillance Act Should Be Dismissed on

             Sovereign Immunity Grounds.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        C.    The Amended Complaint Fails to State Claims Against the United States
Under the Federal Tort Claims Act.. . . . . . . . . . . . . . . . . . . . . . . . . . .  26

            1.    Because California Law Permits Law Enforcement Officers to
Conduct Consensual Monitoring, the Alleged Surveillance

                is Not Actionable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

            2.    The Amended Complaint Fails to State Claims for Relief Under
California Civil Code Section 52.1.. . . . . . . . . . . . . . . . . . . . .  31

3.      Plaintiffs' Claims for Intentional Infliction of Emotional Distress Should Be Dismissed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.   THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS' ALLEGATIONS... . . . . .  37

A.   The State Secrets Privilege Bars the Use of Privileged Information in Litigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

1.   Procedural Requirements.. . . . . . . . . . . . . . . . . . . . . . . . . . .  38

2.   The Court's Independent Evaluation of the Claim of Privilege..  39

3.   Impact of Privilege Assertion.. . . . . . . . . . . . . . . . . . . . . . . . 40

4.   Attorney General's Policy.. . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B.   The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.. . . . . . . . . . . . . . . . .  43

C.   The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

# TABLE OF AUTHORITIES

## CASES

*Al-Haramain Islamic Found. v. Bush*,
    507 F.3d 1190 (9th Cir. 2007). ..................................................................... *passim*

*Andrade v. United States*,
    116 F. Supp. 2d 778 (W.D. Tex. 2000).................................................. 28

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009)........................................................ 46, 47

*Asmar v. U.S. Dep't. of Treasury*,
    680 F. Supp. 248 (E.D. Mich. 1987)...................................................... 25

*Austin B. v. Escondido Union Sch. Dist.*,
    149 Cal. App. 4th 860 (Cal. Ct. App. 2007). ............................................ 31

*Balser v. Dep't of Justice, Office of U.S. Trustee*,
    327 F.3d 903 (9th Cir. 2003). ............................................................ 26

*Bassiouni v. FBI*,
    436 F.3d 712 (7th Cir. 2006). ............................................................ 18

*Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.*,
    No. C-09-0082, 2010 WL 98957 (N.D. Cal. Jan. 5, 2010).................................... 34

*Berkovitz by Berkovitz v. United States*,
    486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988).................................... 51

*Broaddrick v. Exec. Office of the President*,
    139 F. Supp. 2d 55 (D.D.C. 2001). ....................................................... 13

*Bush v. Lucas*,
    462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983).................................... 46

*Cell Assocs., Inc. v. NIH*,
    579 F.2d 1155 (9th Cir. 1978). .......................................................... 15

*Christensen v. Superior Court*,
    54 Cal. 3d 868, 2 Cal. Rptr. 2d 79 (1991)............................................... 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993).................................. 47

*City of Milwaukee v. Illinois,*
  451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981). .................................... 20

*Comm. in Solidarity with the People of El Salvador v. Sessions,*
  738 F. Supp. 544 (D.D.C. 1990), *aff'd*, 929 F.2d 742 (D.C. Cir. 1991). ............... 15

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice,*
  331 F.3d 918 (D.C. Cir. 2003). ................................................................. 21

*Dalrymple v. United States,*
  No. 03-20588, 2005 WL 2456213 (S.D. Fla. May 6, 2005). ................................ 28

*Dep't of Energy v. Ohio,*
  503 U.S. 607, 112 S. Ct. 1627, 118 L. Ed. 2d 255 (1992). .................................... 24

*Dichter-Mad Family Partners, LLP v. United States,*
  707 F. Supp. 2d 1016 (C.D. Cal. 2010). ................................................... 51

*Doe By and Through Doe v. Petaluma City Sch. Dist.,*
  830 F. Supp. 1560 (N.D. Cal. 1993). ........................................................ 32

*Doe v. FBI,*
  936 F.2d 1346 (D.C. Cir. 1991). ............................................................... 18

*Doe v. City of Mateo,*
  No. C 07-5596, 2010 WL 1541279 (N.D.Cal. Apr. 16, 2010). ........................... 29

*Doe v. U.S. Air Force,*
  812 F.2d 738 (D.C. Cir. 1987). .............................................................. 22

*Dunn & Black, P.S. v. United States,*
  492 F.3d 1084 (9th Cir. 2007). .......................................................... 23, 24

*Dyniewicz v. United States,*
  742 F.2d 484 (9th Cir. 1984). ............................................................... 36

*El-Masri v. United States,*
  479 F.3d 296 (4th Cir. 2007). ........................................................ 38, 40, 41

*Exner v. FBI,*
  612 F.2d 1202 (9th Cir. 1980). .............................................................. 18

*FDIC v. Meyer,*
  510 U.S. 471, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994). ...................................... 23

*Farnsworth Cannon, Inc. v. Grimes*,
635 F.2d 268 (4th Cir. 1980). ....................................................... 41

*Fendler v. U.S. Bureau of Prisons*,
846 F.2d 550 (9th Cir. 1988). ....................................................... 21

*Fendler v. U.S. Parole Comm'n*,
774 F.2d 975 (9th Cir. 1985). ................................................... 20, 21

*Fitzgerald v. Penthouse Int'l, Ltd.*,
776 F.2d 1236 (4th Cir. 1985). ..................................................... 41

*Frigard v. United States*,
862 F.2d 201 (9th Cir. 1988). ....................................................... 51

*Galvin v. Hay*,
361 F.3d 1134 (9th Cir. 2004). .................................................. 27, 28

*Gasho v. United States*,
39 F.3d 1420 (9th Cir. 1994). ....................................................... 27

*Gilbert v. DaGrossa*,
756 F.2d 1455 (9th Cir. 1985). ..................................................... 23

*Haase v. Sessions*,
893 F.2d 370 (D.C. Cir. 1990). ..................................................... 16

*Halkin v. Helms*,
690 F.2d 977 (D.C. Cir. 1982). ..................................................... 39

*Hamilton v. Prudential Fin.*,
No. 07-944, 2007 WL 2827792 (E.D. Cal. Sept. 27, 2007)................. 34

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272, 211 P.2d 1063 (Cal. 2009). .............................. 52

*Hinojosa v. City of Terrell*,
834 F.2d 1223 (5th Cir. 1988). ..................................................... 28

*Hoffa v. United States*,
385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)................. 10, 30

*Hughes v. Pair*,
46 Cal. 4th 1035, 95 Cal. Rptr. 3d 636 (2009)......................... 33, 34, 35

*Jasso v. U. S. Dep't of Agric. Forest Serv.,*
   2008 WL 3863503 (E.D. Cal. Aug. 18, 2008). ..................................................... 51

*Kasza v. Browner,*
   133 F.3d 1159 (9th Cir. 1998). ..................................................... *passim*

*Kokkonen v. Guardian Life Ins. Co.,*
   511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)................................... 20

*Lane v. Pena,*
   518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996).................................. 23

*Lewis v. United States,*
   385 U.S. 206 (1966)................................................................................... 30

*Martin v. County of San Diego,*
   650 F. Supp. 2d 1094 (S.D. Cal. 2009)......................................................... 32

*Mayfield v. United States,*
   599 F.3d 964 (9th Cir. 2010). ..................................................................... 26

*McCue v. S. Fork Union Elementary Sch.,*
   2010 WL 3958278 (E.D. Cal. Oct. 8, 2010). ................................................. 31

*Mohammed v. Jeppesen Dataplan, Inc.,*
   614 F.3d 1070 (9th Cir. 2010). ............................................................ *passim*

*Morrison-Knudsen Co. v. CHG Int'l, Inc.,*
   811 F.2d 1209 (9th Cir. 1987). .................................................................... 13

*In re: Nat'l Security Agency Telecomm. Records Litig.,*
*Al-Haramain Islamic Found v. Bush,*
   564 F. Supp 2d 1109 (N.D. Cal. 2008). ....................................................... 24

*Navajo Nation v. U.S. Forest Serv.,*
   535 F.3d 1058 (9th Cir. 2008). .................................................................... 48

*Pa. Bd. of Probation & Parole v. Scott,*
   524 U.S. 357,  118 S. Ct. 2014, 141 L. Ed.2d 344 (1998).................................. 26

*People v. Canard,*
   257 Cal. App. 2d 444, 65 Cal. Rptr. 15 (Cal. Ct. App. 1967)............................. 29

*People v. Fulton,*
   155 Cal. App. 3d 91, 201 Cal. Rptr. 879 (Cal. Ct. App. 1984)............................ 29

*People v. Murphy,*
   8 Cal. 3d 349, 105 Cal. Rptr. 138 (1972)..............................................................29

*People v. Windham,*
   145 Cal. App. 4th 881, 51 Cal. Rptr. 884 (Cal. Ct. App. 2007). .........................29

*Pit River Home & Agr. Co-op. Ass'n v. United States,*
   30 F.3d 1088 (9th Cir. 1994). ...............................................................................23

*Pitman v. City of Oakland,*
   197 Cal. App. 3d 1037 (1988). ...............................................................................34

*Pooler v. United States,*
   787 F.2d 868 (3d Cir. 1986)...................................................................................51

*Potter v. Firestone Tire & Rubber Co.,*
   6 Cal. 4th 965, 25 Cal. Rptr. 2d 550 (1993).............................................33, 34, 52

*Presbyterian Church v. United States,*
   752 F. Supp. 1505 (D. Ariz. 1990). ...............................................................48, 49

*Presbyterian Church v. United States,*
   870 F.2d 518 (9th Cir. 1989). .........................................................................48, 49

*Reeves v. United States,*
   No. 94-1291, 1994 WL 7822235 (E.D. Cal. Nov. 16, 1994).................................13

*Reuber v. United States,*
   750 F.2d 1039 (D.C. Cir. 1985) (Bork, J., concurring)........................................21

*Reynolds v. County of San Diego,*
   84 F.3d 1162 (9th Cir. 1996),. ...............................................................................31

*Reynolds v. United States,*
   927 F. Supp. 91 (W.D.N.Y. 1996). ........................................................................28

*Sabow v. United States,*
   93 F.3d 1445 (9th Cir. 1996). ...............................................................................51

*Sawhney v. Allstate Ins. Co.,*
   No. 95-2784, 1995 WL 500531 (C.D. Cal. June 23, 1995). .................................34

*Scruggs v. United States,*
   929 F.2d 305 (7th Cir. 1991). ...............................................................................20

*Sheehan v. San Francisco 49ers*,
  45 Cal. 4th 992, 201 P.2d 472 (Cal. 2009). ........................................ 52

*Sierra Club v. Whitman*,
  268 F.3d 898 (9th Cir. 2001). ........................................................... 23

*Socialist Workers Party v. Att'y Gen.*,
  642 F. Supp. 1357 (S.D.N.Y. 1986)..................................................... 16

*Spurlock v. FBI*,
  69 F.3d 1010 (9th Cir. 1995). ........................................................... 21

*Stamps v. Superior Court*,
  136 Cal. App. 4th 1441 (Cal. Ct. App. 2006). ..................................... 32

*Taylor v. U.S. Treasury Dep't*,
  127 F.3d 470 (5th Cir. 1997). ........................................................... 13

*Tekle v. United States, No. CV 01-3894*,
  No. 01-3894, 2009 WL 1303357 (C.D. Cal. May 8, 2009). .................. 28

*Totten v. United States*,
  92 U.S. 105, 23 L. Ed. 605 (1875). .................................................... 37

*United States v. Aguilar*,
  871 F.2d 1436 (9th Cir. 1989). ............................................... 10, 29, 30

*United States v. Caceres*,
  440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979)....................... 30

*United States v. Crowell*,
  374 F.3d 790 (9th Cir. 2004). ........................................................... 20

*United States v. Gaubert*,
  499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)................... 51

*United States v. Lee*,
  359 F.3d 194 (3rd Cir. 2004). ........................................................... 10

*United States v. Meyer*,
  439 F.3d 855 (8th Cir. 2006). ........................................................... 20

*United States v. Nerber*,
  222 F.3d 597 (9th Cir. 2000). ........................................................... 10

*United States v. Reynolds*,
    345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 727 (1953). ........................................................ *passim*

*United States v. Singleton*,
    165 F.3d 1297 (10th Cir. 1999). .................................................................................. 25

*United States v. Smith*,
    940 F.2d 395 (9th Cir. 1991). ...................................................................................... 21

*United States v. Sumner*,
    226 F.3d 1005 (9th Cir. 2000). .................................................................................... 20

*United States v. Testan*,
    424 U.S. 392, 96 S. Ct. 948, 47 L. Ed. 114 (1976). ..................................................... 23

*United States v. Varig Airlines*,
    467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984). ............................................. 51

*United States v. White*,
    401 U.S. 745, 91 S.Ct. 1122, 28 L. Ed. 2d 453 ........................................................... 30

*Vacek v. U.S. Postal Serv.*,
    447 F.3d 1248 (9th Cir. 2006). .................................................................................... 23

*Vt. Agency of Natural Res. v. United States*,
    529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000). .......................................... 25

*West v. FAA*,
    830 F.2d 1044 (9th Cir. 1987). .................................................................................... 23

*Westfall v. City of Crescent City*,
    No. 10-5222, 2011 WL 4024663 (N.D. Cal. Sept. 9, 2011). ......................................... 37

*Wilkie v. Robbins*,
    551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007). .......................................... 46

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). ............................................. 25

*Wilson v. Libby*,
    535 F.3d 697 (D.C. Cir. 2008). .................................................................................... 46

*Xue Lu, et al. v. Powell*,
    621 F.3d 944 (9th Cir. 2010). ...................................................................................... 32

# STATUTES AND REGULATIONS

28 C.F.R. § 16.41..................................................................................... 14

28 C.F.R. § 16.45..................................................................................... 14

28 C.F.R. § 16.46..................................................................................... 14

28 C.F.R. § 16.96..................................................................................... 17, 18

5 U.S.C. § 552a...................................................................................... *passim*

28 U.S.C. § 2401(b).................................................................................. 36

28 U.S.C. § 2671...................................................................................... 1

28 U.S.C. § 2674...................................................................................... 27

42 U.S.C. § 2000bb-1(b)............................................................................. 48

50 U.S.C. § 1801(m).................................................................................. 24, 25

50 U.S.C. § 1806(a)................................................................................... 24

50 U.S.C. § 1809....................................................................................... 25

50 U.S.C. § 1810....................................................................................... *passim*

50 U.S.C. § 1825(a)................................................................................... 24

50 U.S.C. § 1845(a)................................................................................... 24

# STATE STATUTES

Cal. Civ. Code § 52.1................................................................................. *passim*

Cal. Pen. Code § 633................................................................................. 29

Cal. Pen. Code § 637.2.............................................................................. 29

Cal. Pen. Code § 835................................................................................. 28

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 16.............................................................................................. 6, 52

Fed. R. Civ. P. 26.............................................................................................. 6, 52

Fed. R. Civ. P. 56................................................................................................ 17

# **INTRODUCTION**

On September 13, 2011, plaintiffs filed a First Amended Complaint (FAC) in this action.  *See* Dkt. 49.  Defendants Federal Bureau of Investigation (FBI), Robert Mueller, Director of the FBI, and Steven Martinez, Assistant Director of the FBI's Los Angeles Field Office, sued in their official capacities, renew their motion to dismiss and for summary judgment, joined by Defendant United States with respect to new claims raised in the FAC under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

This action puts at issue whether the FBI engaged in impermissible counterterrorism investigative activity in Southern California.  Plaintiffs are three residents of Southern California who allege that, through an investigation dubbed "Operation Flex," the FBI utilized a paid informant (Craig Monteilh) to "indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans in Southern California . . . simply because the targets were Muslim."  *See* FAC ¶¶ 1-3, 86, 89.  Plaintiffs also assert that Operation Flex was part of the FBI's effort, after the terrorist attacks of September 11, 2001, to focus counterterrorism investigations on Muslim communities in the United States under applicable policies issued after 9/11.  *See id.* ¶¶ 24, 32-37.

Plaintiffs seek damages against several current and former FBI agents and officials in their individual capacities, *see id.* ¶¶ 18-22; Claims 1-7, 9-10; injunctive relief against the FBI and official capacity defendants in the form of the disclosure or destruction of the investigative information, *see id.* ¶¶ 15-17, Prayer for Relief ¶ b; and damages against the United States of America pursuant to the FTCA, *see* FAC ¶¶ 254-260, Prayer for Relief ¶¶ c-d.  Plaintiffs also seek certification of a class of "[a]ll individuals targeted by Defendants for surveillance or information-gathering through Monteilh and Operation Flex, on account of their religion, and about whom the FBI thereby gathered personally identifiable information."  *Id.* ¶ 219; *see also id.* ¶¶ 220-225.

The FBI has made clear that counterterrorism investigations may not be based solely on religion or First Amendment protected activities; indeed, the very policies plaintiffs again cite in their Amended Complaint set forth these FBI policies.  It should be apparent, however, that moving beyond these important general principles to the details of a specific investigation in order to rebut plaintiffs' claims would risk or require the disclosure of sensitive investigative information.

While the FBI has previously acknowledged that Monteilh was a confidential source, a range of details concerning Operation Flex, for which Monteilh provided information, remains properly protected counterterrorism investigative information.  This includes, principally, evidence detailing the nature and scope of Operation Flex — precisely what that investigation entailed and why it was undertaken, the identity of particular subjects, and the reasons they were investigated.  This evidence is by no means at the margins of this lawsuit.  The purpose of the plaintiffs' claims is to ascertain what Operation Flex entailed and to litigate its alleged unlawfulness.  Accordingly, as set forth in more detail below, the Government renews its response to these allegations by seeking to protect certain evidence that cannot be disclosed in the interests of national security but without seeking dismissal of all claims on that basis.

First, the Attorney General's state secrets privilege assertion of August 1, 2011, identifies and seeks to protect certain investigative information implicated by the allegations in this case – (i) the identities of particular subjects of counterterrorism investigations, including in Operation Flex; (ii) the reasons those investigations occurred; and (iii) particular sources and methods utilized by the FBI in the investigations – because the privilege is "necessary to protect against the risk of significant harm to national security."  *See* Declaration of Eric H. Holder

("Holder Decl.") ¶¶ 3-4, 12 (Dkt. 32-3, filed August 1, 2011).  The basis for the Attorney General's privilege assertion is set forth to the extent possible on the public record in the Attorney General's unclassified declaration, as well as in an unclassified declaration of Mark Giuliano, Assistant Director of the FBI's Counterterrorism Division (Dkt. 33, filed August 1, 2011).  Details concerning why this information is properly protected from disclosure are set forth in the classified declaration of Mr. Giuliano submitted on August 1, 2011, for the Court's *ex parte, in camera* review.  *See* Notice of Lodging at Dkt. 35.[1]  In accord with a policy announced on September 23, 2009, the Attorney General's privilege assertion in this case is "necessary to protect against the risk of significant harm to national security."  *See* Holder Decl. ¶ 12 and Exhibit 1 thereto (State Secrets Policy).

Importantly, however, the Attorney General's privilege assertion is limited in nature, and the Government's request for dismissal is narrowly tailored.  The Government does not seek dismissal of all claims at the outset based on the privilege assertion, nor to bar disclosure of all information concerning Operation Flex or Monteilh's activities.  The Government's motion relies first on considerations apart from state secrets that require dismissal of plaintiffs' claims.  The Government's motion then seeks to distinguish between claims for which

----

[1]  Mr. Giuliano has executed a supplemental classified declaration that updates the status of certain investigations discussed in his prior classified declaration. *See* Notice of Filing Supplemental Classified Declaration filed herewith. Through these classified *ex parte, in camera* submissions, the Government seeks to inform the Court at the outset of this case as to the sensitive, privileged facts that the Government believes must be protected from disclosure and excluded from the case.  The Government does not consent to the disclosure of the information described in the classified Giuliano declarations to plaintiffs or their counsel.

privileged evidence would be required and claims that may not require such evidence.  Where litigation of a claim would risk or require the disclosure of privileged information, and the claim is not otherwise dismissed on non-privilege grounds, the need to protect properly privileged information would require dismissal of that claim.

With respect to non-privilege grounds for dismissal, the United States seeks dismissal of the newly raised FTCA claims for failure to state a claim upon which relief can be granted, for the reasons detailed below.  In addition, the FBI and official capacity defendants first seek dismissal or, in the alternative, summary judgment on the grounds that the relief sought by plaintiffs against these defendants — the disclosure and expungement of alleged records — is not authorized or available under the Privacy Act or other law.  Because this is the only relief plaintiffs seek for all of their claims against these defendants, the Court should dismiss the entire Amended Complaint as to the FBI and Defendants Mueller and Martinez on this ground.  In addition, plaintiffs' claims against the FBI, official capacity defendants, and the United States brought pursuant to Section 1810 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810, should be dismissed because sovereign immunity bars this cause of action as to the United States and Government officials sued in their official capacities.

Absent dismissal on the non-privilege grounds advanced herein, the FBI and official capacity defendants do not seek to dismiss plaintiffs' Fourth Amendment and FISA claims based on the state secrets privilege.  At least at this stage of the proceedings, sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive motions to dismiss on non-privilege grounds. The FBI has previously disclosed in a separate criminal proceeding that Monteilh collected audio and video information for the FBI, and some of that audio and

video information was produced in that prior case.  *See* Public Declaration of Mark. F. Giuliano ("Pub. Giuliano Decl.") ¶ 12 (Dkt. 33).  The FBI has been reviewing additional audio and video collected by Monteilh for possible disclosure in connection with further proceedings on the issue of whether the FBI instructed or permitted Monteilh to leave recording devices unattended in order to collect non-consenting communications.  *See id.*  The FBI expects that the majority of the audio and video will be available in connection with further proceedings.  Thus, while it remains possible that the need to protect properly privileged national security information might still foreclose litigation of these claims, at present the FBI and official capacity defendants do not seek to dismiss these claims based on the privilege assertion.

In contrast, however, litigating plaintiffs' allegations of an indiscriminate investigation based solely on religion would risk or require the disclosure of properly privileged information and, unless these claims are dismissed on non-privilege grounds, the Government seeks their dismissal as to all defendants at the outset based on the state secrets privilege.  While presented under various statutory and constitutional theories, plaintiffs' discrimination claims raise one issue: whether the FBI, through its agents, impermissibly investigated and collected information on plaintiffs (and other putative class members) based solely on their religion.  *See* FAC, Causes of Action 1 to 7, at 62-65; *see also id*. Cause of Action 11 at 67-68 (FTCA).  These claims put at issue core privileged information concerning the scope and purpose of Operation Flex.  Because plaintiffs allege that the FBI indiscriminately collected information based solely on religion, any rebuttal of this claim would risk or require disclosure of whom and what the FBI was investigating under Operation Flex and why.  This is precisely the kind of sensitive investigative information that cannot be disclosed without risking

significant harm to national security.

The Court should first consider the impact of the state secrets privilege assertion on claims brought against the individual capacity defendants.  These individuals have threshold legal defenses under the *Bivens* and qualified immunity doctrines.  Moreover, because litigation of plaintiffs' religious discrimination claims against the individual capacity defendants will inherently put at issue and risk the disclosure of privileged information, these claims should be dismissed at the outset as to the individual capacity defendants.  *Mohammed v. Jeppesen Dataplan, Inc.,* 614 F.3d 1070, 1080-81 (9th Cir. 2010) (state secrets privilege may be asserted at the pleading stage rather than waiting for an evidentiary dispute).  Similarly, because privileged information will also be inherently at risk of disclosure in any litigation of the religious discrimination claims against the FBI, official capacity defendants, and the United States, dismissal of these claims as to these defendants based on the privilege assertion would also be appropriate at this stage.  To the extent the Court wishes to evaluate further the impact of the privilege assertion on claims against the Government, it should at least dismiss plaintiffs' religious discrimination claims against the individual capacity defendants, in light of their unique threshold legal defenses, and require plaintiffs to demonstrate in proceedings under Fed. R. Civ. P. 16 and 26 what discovery it intends to seek against the Government Defendants concerning these claims.

Proceeding in the foregoing manner, the Government seeks to advise the Court at the outset of the underlying national security information that lies at the heart of this case and must be protected, while narrowly tailoring its request for dismissal by presenting non-privilege defenses first, seeking dismissal of some but not all claims on privilege grounds, and focusing on the impact of the privilege on the threshold defenses of the individual capacity defendants, before addressing

whether any remaining claims against the Government Defendants should also be
dismissed on privilege grounds.

## **BACKGROUND**

### I.   **Plaintiffs' Allegations**

Plaintiffs allege that the FBI, through the use of Craig Monteilh as a
confidential informant, indiscriminately collected information on thousands of
Muslims, including hundreds of phone numbers, thousands of email addresses,
hundreds of hours of video, and thousands of hours of audio.  *See* FAC ¶ 2.
Plaintiffs allege that, as part of Operation Flex, Monteilh was instructed to infiltrate
ten mosques in southern California, *see id.* ¶¶ 92, 94, in order to gather information
on Muslims due solely to their religion.  *Id.* ¶ 3; *see also id.* ¶¶ 86, 89-91, 99.  The
three named plaintiffs — Yassir Fazaga, Ali Uddin Malik, and Yasser AbdelRahim
— allege that Monteilh's interactions with them were part of this alleged "dragnet"
surveillance.  *Id.* ¶ 86.  These plaintiffs also make specific allegations concerning
the FBI's alleged investigative interest in them.  For example, plaintiffs allege that
the FBI instructed Monteilh to conduct surveillance at Orange County Islamic
Foundation, where plaintiff Fazaga was imam, on the ground that the FBI believed
Fazaga was radical.  *See id.* ¶¶ 168-69; *see also id*. ¶¶ 170-82.  Plaintiffs also allege
that the FBI told Monteilh that it was suspicious of plaintiff Malik because he had
gone to a religious school in Yemen and was allegedly involved in the Muslim
Student Union.  *See id.* ¶¶ 186-87; *see also id.* ¶¶ 188-92; 194-95.  Plaintiffs also
allege that the FBI told Monteilh that plaintiff AbdelRahim's home was under
surveillance, and that the FBI believed AbdelRahim was the leader of a terrorist
cell.  *See id.* ¶¶ 200-01; *see also id*. ¶¶ 202-14.  The Amended Complaint sets forth
alleged instructions provided to Monteilh, *see id.* ¶¶ 89-119; 129-35, and asserts in
particular that the FBI acquiesced in Monteilh leaving audio devices unattended to

7

record proceedings inside mosques.  *See id.* ¶¶ 124-127.

## II.   **FBI Post 9/11 Counterterrorism Concerns and Policies**

Plaintiffs allege that Operation Flex was part of the FBI's effort to focus counterterrorism investigations after the attacks of September 11, 2001 on Muslim communities in the United States.  *See* FAC ¶ 24.  They assert that investigative activity based on religion is contemplated by and permissible under guidelines issued by the Attorney General and the FBI after the 9/11 attacks and the FBI's *Domestic Investigations and Operations Guides* ("DIOG") published in December 2008.  *See id.* ¶¶ 32-37.

Since the 9/11 attacks, the FBI has made clear that its top priority continues to be the prevention of terrorist attacks against the United States.  *See* Pub. Giuliano Decl. ¶ 7.  As the FBI explains, al Qaeda's intent to conduct high-profile attacks inside the United States has been unwavering.  *See id.*  Threats to the U.S. homeland can be seen, for example, in the August 2006 plan to attack U.S.-bound aircraft using improvised explosive devices, as well as terrorist plans to attack the New York City subway system and detonate a car bomb in Times Square.  *See id.* ¶¶ 7-9.  The threat of home-grown violent extremists — those who have lived primarily inside the United States and may commit acts of violence in furtherance of the objectives of a foreign terrorist organization — remains a particular concern of the FBI.  *See id.* ¶ 10. The Los Angeles area itself saw such a threat in the exposed 2005 plot of extremists to attack a military recruiting center in Santa Monica and later attack a West Los Angeles temple on Yom Kippur.  *See id.*  It is therefore beyond reasonable dispute that the FBI must remain vigilant in detecting and preventing terrorist attacks in the United States.

At the same time, FBI policy prohibits investigative activity solely on the basis of religion or First Amendment expression.  The Attorney General's

Guidelines for FBI National Security Investigation and Foreign Intelligence

Collection, effective October 31, 2003, and the guidelines which superseded them

— the Attorney General's Guidelines for Domestic FBI Operations issued by the

Attorney General on September 29, 2008 — state: "These guidelines do not

authorize investigating or collecting or maintaining information on United States

persons solely for the purpose of monitoring activities protected by the First

Amendment or the lawful exercise of other rights secured by the Constitution or

law of the United States."  *See* Pub. Giuliano Decl. ¶ 4, Ex. 2 (Excerpts 2008 AG

Guidelines) at 13.

Likewise, the FBI's DIOG prohibits investigative activity conducted for the

sole purpose of monitoring the exercise of Constitutional rights or on the basis of

race, ethnicity, national origin, or religion.  *See* Pub. Giuliano Decl., Ex. 3 (DIOG

Excerpts) at 21-38.  Under the DIOG, there must be an authorized purpose for

investigative activity that could have an impact on religious practice.  *Id.* at 21.

The DIOG explains that this policy does not mean that religious practitioners or

religious facilities are completely free from being examined as part of FBI

investigative activity.  If such practitioners are involved in — or such facilities are

used for — activities that are the proper subject of FBI-authorized investigative

activities, religious affiliation does not immunize such individuals to any degree

from FBI investigative action.  *Id.* at 27.

## **ARGUMENT**

The allegations in this case put squarely at issue whether a specific FBI

investigation in Southern California complied with FBI policy and the Constitution

and laws of the United States.  The Government has identified at the outset of the

case certain information implicated by plaintiffs' claims that the Attorney General

has determined is properly subject to exclusion from the case in the interests of

national security.  But the Government does not seek to dismiss all claims in this case based on the privilege assertion.  In order to limit the impact of the Attorney General's privilege assertion, the Government first sets forth reasons, independent of the state secrets privilege, as to why plaintiffs' claims against the FBI and official capacity defendants, as well as against the United States under the FTCA, should be dismissed.  To the extent that plaintiffs' Fourth Amendment and FISA claims survive motions to dismiss by the Government and individual capacity defendants, information needed to litigate these claims may be available, and the Government does not seek to dismiss them based on the privilege assertion at this time.[2]  However, to the extent plaintiffs' claims are not dismissed on non-privilege grounds, the Court should find that litigation of plaintiffs' various claims challenging an alleged discriminatory investigation, *see* FAC, Claims 1-7, 11,

_____

[2] During the conferral process prior to this motion under Local Rule 7-3, plaintiffs indicated that their Fourth Amendment challenge to the alleged collection of communications by Monteilh through an audio device extends solely to the alleged collection of audio in circumstances where a recording device was allegedly left unattended and there was no consent to Monteilh's presence.  *See* FAC ¶¶ 98, 125-128, 192; *see also id*. ¶ 251 (alleging Fourth Amendment violation through alleged audio recordings "without a warrant and where no party to the communication consented").  The law is clear that no Fourth Amendment violation would arise in the warrantless collection of consensual communications by a confidential informant.  *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. E. 2d 374 (1966); *United States v. Aguilar, et al*., 871 F.2d 1436, 1471 (9th Cir. 1989).  This "invited informer" doctrine applies regardless of the means by which communications are collected (including by video surveillance) where there was consent to the informant's presence.  *See, e.g. United States v. Nerber,* 222 F.3d 597 (9th Cir. 2000) (warrantless video surveillance of hotel room does not violate the Fourth Amendment as to communications collected in the consensual presence of a confidential informant); *United States v. Lee*, 359 F.3d 194 (3rd Cir. 2004) (Alito, J.) (same).  Thus, to the extent plaintiffs seek to challenge the alleged collection of communications where they consented to Monteilh's presence, they fail to state a Fourth Amendment claim.

would risk or require the disclosure of properly privileged information and should
be dismissed on that basis, at least as to the individual capacity defendants, who
have the right to raise threshold legal defenses under *Bivens* and who could not
adequately defend against these claims without risking disclosure of information
properly protected by the Government.

## I.   PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED ON NON-PRIVILEGE GROUNDS.

### A.   Plaintiffs' Claims Against the FBI and Official Capacity Defendants Should be Dismissed Because the Relief Sought Against these Defendants is Not Available Under Applicable Law.

Plaintiffs' Amended Complaint seeks the same relief against the FBI and
official capacity defendants as to all of their claims: the destruction or disclosure of
any records pertaining to them allegedly collected by Monteilh as an FBI
confidential informant.  As set forth below, this relief is not available from the FBI
and official capacity defendants and, thus, all claims against these defendants
should be dismissed.  First, even as amended, plaintiffs fail to state a claim for
which the Privacy Act authorizes expungement, and they have failed to exhaust
administrative remedies for their claim for access to any records about them.  In
addition, the records sought by plaintiffs, to the extent they exist, would reside in
systems of records that the FBI has properly exempted from the access and
amendment provisions of the Privacy Act, further foreclosing the relief sought.
Finally, operation of the Act precludes the access and expungement relief plaintiffs
seek as to all claims against the FBI and official capacity defendants.

### 1.   Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted Under the Privacy Act.

Plaintiffs allege that the FBI, "through Monteilh, collected and maintained
records describing how Plaintiffs exercised their First Amendment rights, in
violation of 5 U.S.C. § 552a(e)(7)."  FAC ¶ 246.  Plaintiffs further allege that on or

about September 6 and 12, 2011, they submitted "letters to the FBI requesting that the FBI disclose all records in the possession of the FBI, associated with each Plaintiff, that were 'gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any information derived from that information'" and that the FBI expunge any such records that describe the exercise of their First Amendment rights. *Id.* ¶ 248.  Plaintiffs allege that the FBI has failed to disclose any records in accordance with § 552a(d)(1) of the Privacy Act. *Id.* ¶ 249.  Plaintiffs request that the Court order defendants to "destroy or return any information gathered through the unlawful surveillance program by Monteilh and/or Operation Flex . . . and any information derived from that unlawfully obtained information." *Id.* at 68-69 (Prayer for Relief ¶ b).

The Privacy Act provides civil remedies for certain violations of the Act, including in pertinent part whenever any agency:

> (A)  makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;
>
> (B)  refuses to comply with an individual request under subsection (d)(1) of this section;
>
> . . . or
>
> (D)  fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,
>
> the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1).[3]

In plaintiffs' initial Complaint, the only civil remedies provision their

---

[3] Plaintiffs do not seek any relief under subsection (g)(1)(C), which concerns the accuracy of records.

12

Privacy Act claim invoked was subsection (g)(1)(D).  Although their Amended

Complaint continues to cite that subsection as a source of jurisdiction, *see* FAC

¶ 9, plaintiffs have otherwise dropped all references to any of the civil remedies

provisions except by general inclusion in their citation of the entire Act.  *See* FAC,

Eighth Cause of Action ("Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)").

However, to the extent that plaintiffs are asserting that the FBI violated subsection

(d)(1) of the Act by failing to provide them access to the documents they

requested, *see* FAC ¶ 249, their claim must be construed as an "access" suit under

subsection (g)(1)(B).  As to this claim, plaintiffs have failed to exhaust their

administrative remedies and, in any event, plaintiffs are not entitled to

expungement relief under either (g)(1)(A), (B) or (D).

### a.    Plaintiffs Have Not Exhausted Their Administrative Remedies For a (g)(1)(B) Action.

Although the text of the Privacy Act does not address exhaustion of

administrative remedies for access claims, courts have recognized that requests for

access under subsection (d)(1) must comply with agency procedures and exhaust

all available administrative remedies.  *See, e.g., Taylor v. U.S. Treasury Dep't*, 127

F.3d 470, 476-77 (5th Cir. 1997) (finding that although exhaustion requirement for

access suit was not jurisdictional, "application of the jurisprudential exhaustion

doctrine" mandated dismissal of suit); *Reeves v. United States*, No. 94-1291, 1994

WL 7822235, *3 (E.D. Cal. Nov. 16, 1994) (dismissing Privacy Act access claim

for failure to exhaust administrative remedies), *aff'd*, 108 F.3d 338 (9th Cir. 1997)

(unpublished); *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 61

(D.D.C. 2001) (same); *see also Morrison-Knudsen Co. v. CHG Int'l, Inc.*, 811 F.2d

1209, 1223 (9th Cir. 1987) (in applying discretionary exhaustion requirement,

district court "must balance the agency's interest in applying its expertise,

correcting its own errors, making a proper record, and maintaining an efficient, independent administrative system, against the interests of private parties in finding adequate redress.").  The FBI has a number of regulations governing the submission, handling, and administrative appeal of Privacy Act access requests. *See generally* 28 C.F.R. § 16.41-16.45.

Although the Amended Complaint alleges that the FBI has "to date failed to provide Plaintiffs with [the requested] records or otherwise to respond to their requests," plaintiffs — by their own admission — submitted their requests less than a week before they filed their amended complaint; indeed, one of these requests was submitted on September 12, 2011, *the day before* the amended complaint was filed.  *See* FAC ¶ 248; Declaration of Christopher N. Morin ("Morin Decl."), Ex. A.[4]  Significantly, plaintiffs do not allege that their requests were denied or that they have filed an administrative appeal of any such denial, as required by 28 C.F.R. § 16.45.  Plaintiffs plainly have not exhausted their administrative remedies, and for this reason alone their Privacy Act claim should be dismissed.[5]

---

[4]  On September 22, 2011, the FBI responded to plaintiffs' requests with form letters asking plaintiffs to provide additional information to verify their identities, as required by FBI regulations.  *See* Morin Decl. ¶ 6; 28 C.F.R. §16.41(d).  Plaintiffs provided this information on October 13, 18, and 21, and the FBI is currently processing their requests.  Morin Decl. ¶¶ 6-7.

[5]Although plaintiffs also requested expungement of the same records pursuant to the amendment provisions of the Privacy Act, *see* Morin Decl., Ex. A, their complaint does not purport to bring any claim under subsection (g)(1)(A), and, in any event, plaintiffs have also failed to exhaust their administrative remedies with respect to any such claim.  5 U.S.C. § 552a(d)(2); *see also* 28 C.F.R. § 16.46.

14

### b. Plaintiffs Cannot Obtain Their Requested Relief Under the Privacy Act.

The only relief plaintiffs seek against the FBI under the Privacy Act is for access to or the destruction of any records that may exist about them. *See* FAC ¶ 15. Plaintiffs do not seek damages for their Privacy Act claim. However, injunctive relief under the Privacy Act is only available for "amendment" actions brought under subsection (g)(1)(A) and "access" actions brought under (g)(1)(B). The relief for these two types of actions is set forth in subsections (g)(2) and (g)(3), respectively, while subsection (g)(4), by comparison, provides for monetary damages for "any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful."

Consistent with the plain language of the statute, the Ninth Circuit has held that "Congress limited injunctive relief to the situations described in 5 U.S.C. § 552a(g)(1)(A) and (2) and (1)(B) and (3)." *Cell Assocs. Inc. v. NIH*, 579 F.2d 1155, 1161 (9th Cir. 1978). Plaintiffs have not brought an amendment claim, and their access claim, as discussed above, is precluded for failure to exhaust administrative remedies. Moreover, the remedy for a (g)(1)(B) access claim is limited to an injunction against the agency from withholding the records and production to the complainant of any records improperly withheld; it does not include or contemplate expungement. 5 U.S.C. § 552a(g)(3)(A).

To the extent that plaintiffs continue to rely on subsection (g)(1)(D), the only remedy available to them under that provision is damages, which they have explicitly disavowed. Nor does subsection (e)(7) alone, unconnected to an amendment or access claim, confer a right to equitable relief. *See, e.g., Comm. in Solidarity with the People of El Salvador v. Sessions*, 738 F. Supp. 544, 548 (D.D.C. 1990) (denying request for disposal of records in suit alleging that FBI

15

investigation for terrorist activity, pursuant to tip by informant later deemed to be untrustworthy, violated plaintiffs' rights under First Amendment and Privacy Act), *aff'd*, 929 F.2d 742 (D.C. Cir. 1991); *Socialist Workers Party v. Att'y Gen.*, 642 F. Supp. 1357, 1431 (S.D.N.Y. 1986) (noting that Privacy Act "provides for injunctive relief in certain circumstances, but an (e)(7) violation alone is not one of these"); *but see Haase v. Sessions*, 893 F.2d 370, 374-75 (D.C. Cir. 1990) (suggesting in dicta that amendment or expungement might be available "by virtue of (g)(1)(D)'s general grant of jurisdiction"). In short, plaintiffs' Privacy Act claim should be dismissed for failure to state a claim upon which relief can be granted.

## 2.   FBI Investigative Records Are Exempt from the Access and Amendment Provisions of the Privacy Act and Are Therefore Not Subject to Disclosure or Expungement.

Plaintiffs are further foreclosed from the remedy they seek because the records at issue, to the extent they exist, are exempt from the access and amendment provisions of the Privacy Act. Their assertion to the contrary, *see* FAC ¶ 249, has no support in the law. An agency may exempt any system of records from any part of the Act that is not expressly designated non-exemptible if the system is "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws" and consists of "information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual." 5 U.S.C. § 552a(j)(2)(B). The Act also authorizes additional exemptions from specific parts of the Act for systems of records consisting of "investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2)." 5 U.S.C. § 552a(k)(2). Both subsections 552a(j) and (k) allow for exemption of qualifying records from

16

subsection (d), which, as noted above, governs the agency's obligations to grant

individuals access to and amendment of records pertaining to them.

The FBI has attested that the records maintained by the FBI containing

information gathered by Monteilh and Operation Flex constitute investigatory

material compiled for law enforcement and criminal investigation purposes, and

that they are contained in the Central Records System (CRS) and Electronic

Surveillance (ELSUR) indices.  Morin Decl. ¶ 9.[6]  Pursuant to § 552a(j) and (k),

the FBI has properly exempted the CRS and ELSUR from the access and

amendment provisions of the Privacy Act.  Morin Decl. ¶ 9; 28 C.F.R.

§ 16.96(a)(1), (c)(1).  The CRS has been so exempted because compliance with the

access requirements "could compromise sensitive information classified in the

interest of national security, interfere with the overall law enforcement process by

revealing a pending sensitive investigation, possibly identify a confidential source

or disclose information which would constitute an unwarranted invasion of another

individual's personal privacy, reveal a sensitive investigative technique, or

constitute a potential danger to the health or safety to law enforcement personnel,"

and because requiring the FBI to amend any information "thought to be incorrect,

irrelevant or untimely," given "the nature of the information collected and the

essential length of time it is maintained," would "create an impossible

_____

        [6] Because defendant FBI relies on facts outside the scope of the FAC to
support this argument, the Court may in the alternative consider this defense
pursuant to Rule 56 of the Federal Rules of Civil Procedure and grant summary
judgment for the FBI.  The sole issue of fact material to this question is whether
the records implicated by the claims reside in a system of records exempt from the
amendment provisions of the Act and, hence from expungement.  If, however, the
disclosure of privileged information is necessary to decide whether the records at
issue are subject to an injunction ordering destruction, this claim for relief should
be dismissed based on the Government's privilege assertion, discussed *infra*.

administrative and investigative burden by forcing the agency to continuously

retrograde its investigations attempting to resolve questions of accuracy." *See*

Morin Decl. ¶ 10; 28 C.F.R. § 16.96(b)(2)(i), (iii).  Similarly, the ELSUR indices

have been exempted because "[individual] access to records in this system would

compromise ongoing investigations, reveal investigatory techniques and

confidential informants, and invade the privacy of private citizens who provide

information in connection with a particular investigation." *See* Morin Decl. ¶ 11;

28 C.F.R. § 16.96(d)(2).

　　　　Because the records sought by plaintiffs, to the extent they exist, would be

exempt from the access provisions of the Privacy Act, it follows that they cannot

be disclosed to plaintiffs.  *See Exner v. FBI*, 612 F.2d 1202, 1205 (9th Cir. 1980)

(holding that based on (j)(2)(B) exemption and 28 C.F.R. § 16.96(a) and (b)(2),

plaintiff "was not entitled to disclosure of any of the information concerning her

that appears in the FBI files").  And because any such records would also be

exempt from the amendment provisions of the Privacy Act, it further follows that

they cannot be expunged, which is nothing more than an extreme form of

amendment.  *See Doe v. FBI*, 936 F.2d 1346, 1352 (D.C. Cir. 1991) ("[A]

determination that a civil claim for expungement may be foreclosed by an agency's

exemption rule is not only consistent with, but necessary to effectuate, Congress's

intent that certain records systems may truly be sheltered from the Act's

amendment procedures.").  Again, plaintiffs' claim that the FBI violated subsection

(e)(7) of the Act does not affect this conclusion.  The FBI does not contend that

any responsive records (if any) would be exempt from (e)(7), but rather that they

would be exempt from amendment and, thus, expungement.  *See Bassiouni v. FBI*,

436 F.3d 712, 723 (7th Cir. 2006) (because CRS "is not subject to the subsection

(d) amendment process, the FBI cannot be held liable under (g)(1)(A) for failure to

comply with that process" and plaintiff thus had "no avenue for relief under § 552a(g)(1)(A)" for his (e)(7) claim).  The Court is therefore proscribed from ordering the FBI to return or destroy any such records .

Moreover, even if this remedy were permitted under the Privacy Act, the destruction or removal of records from FBI files could significantly impair the FBI's ability to conduct ongoing or future investigations.  First, when the FBI receives new information that may relate to a prior investigation, it examines and seeks to verify that information in the context of information it has already received.  Thus, if the FBI's existing records regarding Monteilh and Operation Flex were expunged, and further information relating to the investigative matter at issue were later brought to the FBI's attention, the investigating agent would not have the complete context in which to evaluate the newly received information and properly assess the matter.  Morin Decl. ¶¶ 12-13.  Further, the maintenance of investigative records permits the FBI to assess the reliability of source of information it receives over time.  The destruction of files would severely hinder the FBI's ability to evaluate the accuracy and credibility of information received from the source.  *Id.* ¶ 14.  In addition, the FBI maintains investigative records for historic and accountability purposes.  The destruction of records relating to investigative activity would impede any future inquiry into how the FBI responded to information it received.  *Id.* ¶ 15.  This consideration is especially crucial where counterterrorism investigations are at issue.  For these reasons, plaintiffs' request for expungement would plainly conflict with the FBI's statutorily-based exemption of records from the access and amendment provisions of the Privacy Act.

### 3. Because Plaintiffs Are Foreclosed From Obtaining Expungement Under the Privacy Act, They Cannot Obtain Expungement for Any of Their Causes of Action.

Finally, to the extent that plaintiffs seek expungement and disclosure as a

19

1  remedy for their other claims against the FBI and official capacity defendants, they

2  are foreclosed from doing so because the Privacy Act speaks directly to that issue:

3  the FBI should not be compelled to amend records that it has exempted pursuant to

4  subsections (j) and (k) of the Act.  The Amended Complaint fails to identify any

5  other law that clearly overrides or makes exception to that rule.

6      To the extent plaintiffs may claim a common law right to the remedy of

7  expungement based on the court's general equitable powers, *see, e.g., Fendler v.*

8  *U.S. Parole Comm'n*, 774 F.2d 975, 979 (9th Cir. 1985), the Ninth Circuit has

9  more recently called that right into question[7] and, in any event, even

10  assuming, *arguendo*, that the Court has general equitable authority to order

11  expungement, such authority is trumped by the Privacy Act in this case.

12      Federal common law is "subject to the paramount authority of Congress,"

13  such that "when Congress addresses a question previously governed by a decision

14  rested on federal common law the need for such an unusual exercise of lawmaking

15

16      [7]  *See United States v. Sumner*, 226 F.3d 1005, 1014-15 (9th Cir. 2000)

17  (holding that "expungement of the record of a valid arrest and conviction usurps

18  the powers that … the Constitution allocated to Congress, the Executive, and the

19  States" and that "a district court does not have ancillary jurisdiction in a criminal

20  case" to expunge such a record "where the sole basis alleged by the defendant is

21  that he or she seeks equitable relief"); *see also United States v. Crowell*, 374 F.3d

22  790, 796 (9th Cir. 2004) (citing *Sumner* in holding that district court lacked

23  jurisdiction to consider defendant's "solely 'equitable'" claim for expungement).

24  The Ninth Circuit's retreat in *Sumner* and *Crowell* from the notion of "inherent"

25  equitable power to grant expungement relief is based in part on *Kokkonen v.*

26  *Guardian Life Ins. Co.*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994),

27  in which the Supreme Court stressed that federal courts have limited subject matter

28  jurisdiction to hear only independent actions authorized by the Constitution or

statute.  *See Kokkonen*, 511 U.S. at 377; *Sumner*, 226 F.3d at 1010; *Crowell*, 374

F.3d at 792-96; *see also United States v. Meyer*, 439 F.3d 855, 859-62 (8th Cir.

2006); *Scruggs v. United States*, 929 F.2d 305, 306-07 (7th Cir. 1991).

by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981).  The Privacy Act clearly reflects Congress' intent to limit equitable relief to certain types of actions and to allow agencies to exempt records relating to criminal and law enforcement investigation from those parts of the Act requiring that individuals be permitted to examine and amend those records.  Indeed, the Ninth Circuit has held that where Congress has established a statutory remedy for access to or disclosure of records, that authority governs claims for such access.  *See Spurlock v. FBI*, 69 F.3d 1010, 1016 (9th Cir. 1995) (district court lacked statutory or inherent authority to order FBI to produce documents that were exempt from disclosure under the Freedom of Information Act.); *see also Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 936-37 (D.C. Cir. 2003) (rejecting plaintiffs' claim of common-law right of access to records on ground that FOIA "has provided a carefully calibrated statutory scheme, balancing the benefits and harms of disclosure").  As such, the Privacy Act preempts any common-law right plaintiffs may have to access or expungement as a remedy for any of their claims.

      **4.**    **Even if the Privacy Act Did Not Preempt a General Expungement Remedy, Plaintiffs Have Pled No Harm that Would Entitle Them to Such Relief Here.**

Even if the Privacy Act did not operate to foreclose expungement relief for plaintiffs' other claims, plaintiffs still have failed to state a claim for such relief. "Courts which have recognized an equitable power to expunge have unanimously observed that it is a narrow power, appropriately used only in extreme circumstances." *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991).  The Ninth Circuit has held that a court must find that there is a "real and immediate threat of irreparable harm before it can allow expungement." *Fendler*, 774 F.2d at 979 (citation omitted); *see also Fendler v. U.S. Bureau of Prisons*, 846 F.2d 550,

554-55 (9th Cir. 1988); *accord Reuber v. United States*, 750 F.2d 1039, 1068 (D.C. Cir. 1985) (Bork, J., concurring) (even under "inherent authority" doctrine, district court must find "a real and immediate threat of irreparable harm before it can allow expungement"). The propriety of an expungement order is determined by applying a balancing test in which the harm caused to an individual by the existence of any records is weighed against the utility to the Government of their maintenance. *Doe v. U.S. Air Force*, 812 F.2d 738, 741 (D.C. Cir. 1987). Plaintiffs have not alleged or shown that they are facing any threat of irreparable harm, let alone one that is real and immediate, from the mere existence of records that were allegedly unlawfully collected by the FBI. Indeed, the harms alleged by plaintiffs in the Amended Complaint relate only to the alleged impact of their *past* encounter with an FBI informant. Nowhere do plaintiffs allege that they face an imminent threat that any information about them in FBI records will be used against them in the future. By contrast, the FBI risks substantial harm for the expungement of those records, as described above. *See supra* and Morin Decl. ¶¶ 12-15.

**B.    Plaintiffs' Tenth Cause of Action Brought Under Section 1810 of the Foreign Intelligence Surveillance Act Should Be Dismissed on Sovereign Immunity Grounds.**

Plaintiffs' Tenth Cause of Action, brought against "all defendants," alleges that the defendants, acting through Monteilh, used electronic, mechanical or other surveillance devices without a warrant in violation of Section 110 of the FISA, 50 U.S.C. § 1810 (hereafter "Section 1810"). This claim is apparently based on the allegation that Monteilh left recording devices unattended with the FBI's knowledge and permission. But Section 1810 does not permit plaintiffs' cause of action against the United States and its agencies and officials sued in their official capacity.

"It is well settled that the United States is a sovereign, and as such, is

immune from suit unless it has expressly waived such immunity and consented to be sued." *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). *Accord United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976). As a result, courts cannot award relief against officials of the United States unless a statute expressly waives the Federal Government's sovereign immunity. *FDIC v. Meyer,* 510 U.S. 471, 476-77, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994); *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) ("suits against officials of the United States . . . in their official capacity are barred if there has been no waiver [of sovereign immunity]").

The terms of the United States' waiver of sovereign immunity constitute "an important limitation on the subject matter jurisdiction of federal courts." *Dunn & Black, P.S. v. United States,* 492 F.3d 1084, 1088 & n.2 (9th Cir. 2007) (quoting *Vacek v. U.S. Postal Serv.,* 447 F.3d 1248, 1250 (9th Cir. 2006), *cert. denied,* 127 S. Ct. 2122 (2007)).  Absent an explicit waiver, a district court lacks subject matter jurisdiction over any claim against the United States. *Gilbert,* 756 F.2d at 1458. The burden of showing an unequivocal waiver lies with the party who seeks to bring suit against the federal government. *West v. FAA,* 830 F.2d 1044, 1046 (9th Cir. 1987).  And because "sovereign immunity is a jurisdictional defect, . . . [i]t may be asserted by the parties at any time or by the court *sua sponte*." *Pit River Home & Agric. Coop. Ass'n v. United States,* 30 F.3d 1088, 1100 (9th Cir. 1994). Any ambiguity in the terms of the waiver is strictly construed in favor of the federal government and therefore a waiver may not be implied, but "must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996).

Section 1810 of Title 50 (FISA Section 110), entitled "Civil Liability," does not waive the United States' sovereign immunity for plaintiffs' claims against the

23

FBI and official capacity defendants.[8]  Section 1810 provides in pertinent part:

> An aggrieved person, other than a foreign power or an
> agent of a foreign power, as in defined in section 1801(a)
> or (b)(1)(A) of this title, respectively, who has been
> subjected to an electronic surveillance or about whom
> information obtained by electronic surveillance of such
> person has been disclosed or used in violation of section
> 1809 of this title shall have a cause of action *against any*
> *person* who committed such violation . . .

50 U.S.C. § 1810 (emphasis added).  FISA defines "person" to mean "any

*individual*, including any *officer* or *employee* of the Federal Government, or any

group, entity, association, corporation, or foreign power."  *See* 50 U.S.C.

§ 1801(m) (emphasis added).  But this provision does not expressly waive

sovereign immunity for a damages action against the United States or its agencies

or officials in their official capacities.

　　　First, there is no mention of the United States among the entities subject to

suit in Section 1810 – a highly significant omission because Congress has

expressly authorized damage actions "against the United States" for certain

violations of FISA, but not in Section 1810.  Specifically, Congress has authorized

an action "against the United States to recover money damages" for violations of

FISA minimization and use restrictions under 50 U.S.C. §§ 1806(a), 1825(a), and

1845(a).  *See* 18 U.S.C. § 2712.  Plaintiffs do not seek damages under any of these

provisions.  In specifying when damage remedies for FISA violations are available

---

[8]  A district court in the Northern District of California has ruled that Section
1810 "implicitly" waives the sovereign immunity of the United States to suit for
alleged unlawful electronic surveillance.  *See In re: Nat'l Sec. Agency Telecomm.
Records Litig., Al-Haramain Islamic Found v. Bush*, 564 F. Supp 2d 1109, 1125
(N.D. Cal. 2008).  This ruling applies a standard of "implicit" waiver that plainly is
incorrect.  *See Dunn & Black*, 492 F.3d at 1088 (waiver of sovereign immunity
"cannot be implied, but must be unequivocally expressed"); *Dep't of Energy v.
Ohio*, 503 U.S. 607, 615, 112 S. Ct. 1627, 118 L. Ed. 2d 255 (1992).  *Al-Haramain*
is presently on appeal to the Ninth Circuit.

"against the United States," Congress has waived sovereign immunity only as to those violations of FISA.

That Section 1810 authorizes suit against "persons" – defined to include an officer or employee of the United States – does not alter this conclusion.  The general presumption in the law is that term "person" does *not* include the sovereign.  *See Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 781, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000).  This presumption may be overcome "only upon some affirmative showing of statutory intent to the contrary." *Id.*; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.").[9]  No such indication exists here, particularly where Congress has expressly identified those FISA causes of actions that may be brought "against the United States." Moreover, the phrase "any officer or employee of the Federal Government" is included within the meaning of term "individual" in the FISA definition of "person."  *See* 50 U.S.C. § 1801(m).

Most reasonably construed, Section 1810 authorizes suits against federal officials in their individual capacity.  Indeed, this reading makes complete sense when it is considered that Section 1810 links the *civil* liability of a person under that provision to the person's *criminal* liability under 50 U.S.C. § 1809 for unlawful electronic surveillance.  Even putting all other considerations aside, the United States is not a "person" who may be guilty of a crime under Section 1809, and for that reason also cannot be a "person" subject to civil liability under Section

---

[9]  *See also Asmar v. U.S. Dep't. of Treasury,* 680 F. Supp. 248, 250 (E.D. Mich. 1987) (remedy against "any person or entity" for unlawful interception did not waive the sovereign immunity of the United States).

1810.  *See, e.g., United States v. Singleton*, 165 F.3d 1297, 1299-1300 (10th Cir. 1999) (criminal prohibitions in 18 U.S.C. § 201(c) do not apply to United States).

Moreover, where, as here, plaintiffs' FISA claim is brought against not only against the United States by name, but also against a federal agency — the FBI — and two officials in their *official* capacities, it would be untenable for plaintiffs to contend that this claim is not being brought against the United States.  *See Balser v. Dep't of Justice,* 327 F.3d 903, 907 (9th Cir. 2003) (lawsuit against an officer of the United States in his or her official capacity is considered an action against the United States for sovereign immunity purposes).  The absence of an express waiver of sovereign immunity in Section 1810 requires the conclusion that sovereign immunity bars monetary damages claims under this provision against the United States, and the FBI and Defendants Mueller and Martinez in their official capacities and, thus, that plaintiffs' FISA claim should be dismissed against these defendants.[10]

**C.    The Amended Complaint Fails to State Claims Against the United States Under the Federal Tort Claims Act**.

As set forth below, plaintiffs' claims asserted against the United States under the FTCA should be dismissed for the following reasons. First, to the extent that the claims are based upon the audio and video surveillance of plaintiffs'

---

[10] Even if FISA Section 1810 did authorize a cause of action against the United States, it does not authorize the *relief* plaintiffs seek in this case against the FBI and official capacity defendants: the disclosure or destruction of records, rather than a claim for damages.  *See* 50 U.S.C. § 1810.  Indeed, even where a Fourth Amendment violation is established, while the Government may not use unlawfully obtained evidence in a particular proceeding pursuant to the exclusionary rule, the law does not require that it destroy or return such evidence but, rather, permits the Government to retain it for other purposes.  *See Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (citing *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362 (1998)).

-26-

communications that occurred in Monteilh's presence, this conduct is not actionable because there is no analogous state law liability.  Second, with respect to claims brought under California Civil Code Section 52.1, the Amended Complaint fails to allege facts that, if proven, would establish that the United States acted violently or threatened violence and, therefore, fails to state claims for relief.  Third, with respect to plaintiffs' claims for intentional infliction of emotional distress, the Amended Complaint fails to allege facts that, if proven, would establish that plaintiffs suffered severe or extreme emotional distress and, therefore, fails to state claims for relief.  In addition, to the extent the emotional distress claims are based on allegations that Monteilh's conduct directly caused plaintiffs' emotional distress, they are barred by the FTCA's two-year statute of limitations.  Finally, plaintiffs fail to state an emotional distress claim based on alleged surveillance.  Each ground for dismissal of the FTCA claims is discussed in turn below.

> **1.     Because California Law Permits Law Enforcement Officers to Conduct Consensual Monitoring, the Alleged Surveillance is Not Actionable**.

To the extent that plaintiffs' claims are based upon the alleged audio and video surveillance of their communications that occurred in Monteilh's presence, this conduct is not actionable against the United States.  Because law enforcement officers in California are permitted to monitor communications in situations where one party to the communications provides his consent, the FBI's alleged audio and video surveillance of the Plaintiffs' activities with Monteilh's consent was privileged and, therefore, these particular FTCA claims must be dismissed.

Pursuant to 28 U.S.C. § 2674, "[l]iablity is determined by the tort law of the state where the claim arose."  *Galvin v. Hay*, 361 F.3d 1134, 1152 (9th Cir. 2004), citing *Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994).  As this Court has held, in an action under the FTCA, a district "court must apply the law that the state courts would apply in the analogous tort action, including federal law." *Tekle*

*v. United States*, No. 01-3894, 2009 WL 1303357, at *7 (C.D. Cal. May 8, 2009) (citation omitted).

Law enforcement officers are commonly afforded a privilege under state law to engage in conduct that would be tortious if committed by a private citizen.  In such instances, the conduct of law enforcement officers is privileged.  *See, e.g., Hinojosa v. City of Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988) (privilege to use force when necessary in the performance of police officer duties), *cert. denied*, 493 U.S. 822 (1989); *Dalrymple v. United States*, No. 03-20588, 2005 WL 2456213, *7, 12 (S.D. Fla. May 6, 2005) (privilege to use reasonable force, including tear gas); *Andrade v. United States*, 116 F. Supp. 2d 778, 787-88 (W.D. Tex. 2000) (privilege to engage in certain conduct which could be considered tortious where police officer acts in furtherance of the public interest); *Reynolds v. United States*, 927 F. Supp. 91, 97 (W.D.N.Y. 1996) (right to enter private property where officer acted for a public purpose).

For example, in *Galvin v. Hay*, the Ninth Circuit affirmed dismissal of an FTCA suit based on a finding that California law protects law enforcement officers from liability for false arrest if they are acting within the scope of their authority and had a reasonable belief the arrest was lawful.  *Galvin*, 361 F.3d at 1152. Likewise, in *Tekle*, this Court found that "the routine and lawful exercise of law enforcement privileges" of the California penal code are available to the United States as a defense in FTCA actions.  *Tekle*, 2009 WL 1303357 at *12.  It specifically found that "[u]nder California law, law enforcement officers are entitled to use reasonable force to effectuate an arrest or detention, even a temporary detention."  *Id.* (citing Cal. Penal Code § 835).  The court also found that because this privilege covered conduct alleged against the federal agents, the "Plaintiff's FTCA claims are privileged under California law."  *Id.*

As pertinent to the instant case, in California, law enforcement officials and agents are permitted to overhear or record communications in situations where a

-28-

party to the communications has provided his consent. *See Doe v. City of Mateo*, No. C 07-5596, 2010 WL 1541279, *5 (N.D. Cal. Apr. 16, 2010) (finding that officer's recording of telephone conversations with plaintiff was privileged under Cal. Pen. Code § 633, court denied request to amend complaint to add privacy claims under California Constitution, Article 1, section 1, and Cal. Pen. Code "§ 637.2 that provides for a private right of action by any person injured under Section 632"), quoting *People v. Windham*, 51 Cal. Rptr. 3d 884, 889-90 (Cal. Ct. App. 2007) ("[California] courts expressly held that statutory and constitutional prohibitions against the recording of telephone communications did not apply where law enforcement recorded calls with the consent of one of the parties to the conversation,'" relying on *People v. Murphy*, 8 Cal. 3d 348, 358-61 (1972) (monitoring of telephone conversations by police was not unlawful because witnesses agreed to monitoring and to wear a transmitter); *People v. Fulton*, 201 Cal. Rptr. 879, 882, 886 (Cal. Ct. App. 1984) (monitoring of communications by police was not unlawful because informant agreed to wear a "secret transmitter"); and *People v. Canard*, 65 Cal. Rptr. 15 (Cal. Ct. App. 1967)).

Moreover, the California law enforcement privilege is consistent with 18 U.S.C. § 2511(2)(c) (permitting the interception of wire or oral communications where one party has given prior consent to such interception) and "the so-called 'invited informer' cases; the cases permitting consensual recording of conversations without warrants." *United States v. Aguilar*, 871 F.2d 1436, 1471 (9th Cir. 1989). In *Aguilar*, the defendants were convicted on immigration violations for participating in smuggling, transporting, and harboring illegal aliens. "The government stipulated at trial that it had used undercover agents and informants . . . to infiltrate various church meetings and activities." *Id.* at 1470. On appeal, the appellants' principal objection was that government agents tape recorded their activities without a warrant in violation of their constitutional rights, particularly the First Amendment, which rendered the invited informer rationale

-29-

inapplicable.  Rejecting the appellants' arguments, the Ninth Circuit stated:

> In approving this investigative technique the Supreme Court unmistakably declared that persons have no expectation of privacy or confidentiality in their conversations and relations with other persons, no matter how secretive the setting.  While privacy, trustworthiness, and confidentiality are undoubtedly at the very heart of many instances of free association and religious expression and communication, the Court has recognized that legitimate law enforcement interests require persons to take the risk that those with whom they associate may be government agents.

*Id.* at 1472 (relying on *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971); *Hoffa v. United States*, *supra*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966)).

Here, the Amended Complaint alleges that a substantial portion of the communications Monteilh agreed to record[11] occurred "in the [mosques] by invitation, and every conversation which he heard was either directed at him or knowingly carried on in his presence," *Hoffa*, 385 U.S. at 302.  *See* FAC at ¶ 51("Congregants . . . generally welcomed Monteilh . . ., invited him to have meals or tea outside of the mosque . . . and discuss questions he might have"); ¶¶ 73-76 ("Monteilh talked frequently with Malik at the mosque"); ¶ 77 ("Malik noticed that Monteilh spoke with many others at the mosque"); ¶¶ 82-84 ("Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates");  ¶¶ 100-115 (Monteilh collected information by speaking to large numbers of people, attending events open to the public, collecting literature, and using email); ¶¶ 122-124, 128-129, 200-202 (Monteilh recorded conversations and videotaped in public places or places where he was invited).

---

[11]  *See* FAC ¶ 48 (alleging the FBI hired Monteilh as an informant to covertly gather information).

-30-

Because law enforcement officers in California are permitted to conduct consensual monitoring of communications, the FBI's alleged audio and video surveillance of plaintiffs' communications with Monteilh's consent that occurred in his presence was privileged and not actionable against the United States under the FTCA.

### 2. The Amended Complaint Fails to State Claims for Relief under California Civil Code Section 52.1.

Because the Amended Complaint fails to allege that the Defendants acted violently or threatened plaintiffs with violence, the claims brought under California Civil Code Section 52.1 fail to state claims for relief and, therefore, must be dismissed.

Section 52.1, colloquially known as the Bane Act, "does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assoc. Inc.*, 114 F.3d 999 (9th Cir. 1997).

The prerequisites for maintaining a claim under section 52.1 are as follows:

> (1) that the defendant interfered with or attempted to interfere with the plaintiff's constitutional or statutory right by threatening or committing violent acts; (2) that the plaintiff reasonably believed that if she exercised her constitutional right, the defendant would commit violence against her or her property; that the defendant injured the plaintiff or her property to prevent her from exercising her right or retaliate against the plaintiff for having exercised her right; (3) that the plaintiff was harmed; and (4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*McCue v. S. Fork Union Elementary Sch.*, No. 10-cv-233, 2010 WL 3958278, at *3 (E.D. Cal. Oct. 8, 2010) (quoting *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 882 (Cal. Ct. App. 2007)).

Subsection j of section 52.1 "explicitly provides that violence is a required element where the 'threat, intimidation or coercion' is based purely upon a

-31-

defendant's statement." *Martin v. County of San Diego*, 650 F. Supp. 2d 1094, 1108 (S.D. Cal. 2009).  Therefore, "to prevail on a claim under section 52.1, plaintiff must prove that the defendant(s) interfered (or attempted to interfere) with her rights by threats, intimidations, or coercion (and that the defendant(s) did so other than by speech alone, unless the speech itself threatened violence)." *Doe By and Through Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1582 (N.D. Cal. 1993); *see also Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010) (asylum officer who allegedly sexually assaulted plaintiffs may have interfered with their civil rights under section 52.1); Order, *Xue Lu v. Powell*, No. 01-1758, filed 05/13/2011, at 7 (C.D. Cal. May 13, 2011) (threat of violence is a required element of a section 52.1 claim).

The violence or threat of violence element is congruent with the purpose of a section 52.1 claim.  Promulgated as a hate crimes bill, the Tom Bane Civil Rights Act "was intended to supplement the Ralph Civil Rights Act as an additional legislative effort to deter violence.  The stated purpose of the bill was 'to fill in the gaps left by the Ralph Act' by allowing an individual to seek relief to prevent the violence from occurring before it was committed and providing for the filing of criminal charges." *Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1447 (Cal. Ct. App. 2006), quoting Assem. Comm. on Ways and Means, Analysis of Assem. Bill No. 63 (1987-1988) as amended Apr. 6, 1987, p. 2, internal citation omitted. The "broad and plain language of sections 51.7 and 52.1 was chosen to provide protection from discriminatory violence and intimidation, and from threats, intimidation and coercion that denied the civil rights of others." *Id.* at 1448.

Here, in support of their constitutional claim under section 52.1, the Amended Complaint alleges that the "Defendants have interfered, or attempted to interfere, by threats, intimidation, or coercion with the exercise or enjoyment by Plaintiffs of their rights" by subjecting them to "constant surveillance" and "publicly revealing that surveillance."  FAC ¶ 258.  However, the Amended

Complaint does not allege that the surveillance was anything other than covert or involved any physical or verbal confrontations threatening the Plaintiffs.  Other than conclusory statements, the Amended Complaint does not allege that the FBI (or any other federal employee) actually committed a violent act or threatened violence against the Plaintiffs.[12]

Accordingly, because the Amended Complaint fails to allege that the United States acted violently or threatened the Plaintiffs with violence, the claims asserted under California Civil Code Section 52.1 should be dismissed.

3.    **Plaintiffs' Claims for Intentional Infliction of Emotional Distress Should Be Dismissed.**

Because the Amended Complaint fails to allege facts that, if proved, would establish that the Plaintiffs suffered severe or extreme emotional distress, their claims for intentional infliction of emotional distress must be dismissed.  In addition, these claims are barred by the FTCA's two-year statute of limitations or are fatally defective because they are based on pure speculation.

In California, a plaintiff must prove the following elements to establish a claim for intentional infliction of emotional distress: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiffs' suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *Hughes v. Pair*, 46 Cal. 4th 1035, 1050, 95 Cal. Rptr. 3d 636, 651 (Cal. 2009) (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001, 25 Cal. Rptr. 2d 550 (1993)); *Christensen v. Superior Court*, 54 Cal. 3d 868, 903, 2 Cal. Rptr. 2d 79 (1991).

---

[12]  Although Plaintiffs Malik and AbdelRahim specifically allege that they discussed *jihad* with Monteilh, these conversations only pertained to general, non-specific, threatened violence towards individuals other than the Plaintiffs.  *See* FAC ¶¶ 73-76, 83-84, 147-148, and 212.

-33-

The California Supreme Court has "set a high bar" with respect to "the requirement that the plaintiff show severe emotional distress. " *Hughes*, 46 Cal. 4th at 1051. "Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Id.* (quoting *Potter*, 6 Cal. 4th at 1004). In *Hughes*, the California Supreme Court found "discomfort, worry, anxiety, upset stomach, concern, and agitation" did not rise to the level of severe emotional distress. *Id.* This tort "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hughes*, 46 Cal. 4th at 1051 (citing Restatement (Second) of Torts § 46.)

A cause of action for intentional infliction of emotional distress is inadequately pled where there is "the mere allegation that the plaintiffs suffered severe emotional distress, without facts indicating the nature or extent of any mental suffering." *Pitman v. City of Oakland*, 197 Cal. App. 3d 1037, 1047, 243 Cal. Rptr. 306 (Cal. Ct. App. 1988); *see also Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.*, No. C-09-0082, 2010 WL 98957, *2 (N.D. Cal. Jan. 5, 2010) (allegations that plaintiff "suffered severe anxiety and emotional distress" were insufficient); *Hamilton v. Prudential Fin.*, No. 07-cv-944, 2007 WL 2827792, *4 (E.D. Cal. Sept. 27, 2007) (allegations that plaintiff "suffered from 'depression,' 'frustration,' 'nervousness anxiety' [were] conclusory statements [and] lack the necessary specific facts to show their nature or extent" to support the claim); *Sawhney v. Allstate Ins. Co.*, No. 95-cv-2784, 1995 WL 500531, *5 (C.D. Cal. June 23, 1995) (plaintiff's conclusory allegations that they "suffered extreme emotional distress without stating any facts to support these allegations" were insufficient).

Here, the Amended Complaint alleges that plaintiffs' emotional distress is based on covert surveillance that allegedly occurred in 2006-2007 and surveillance that <u>may</u> be ongoing, which allegedly made and is making their lives more

-34-

difficult.  In particular, plaintiff Fazaga alleges that he suffered "severe and ongoing anxiety and emotional distress" as a result of the "constant fear of being under surveillance, the scrutiny during travel, the effect on the sense of community at his mosque and others, and the additional difficulty in providing counseling to clients."  FAC ¶ 185.  Plaintiff Malik alleges that he has suffered "severe and ongoing anxiety and emotional distress" from the "constant fear of being under surveillance because of Defendants' acts," based on his belief that his "communications in the mosque and over telephones may be monitored" and his decision to "curtail[]phone and email conversations with friends and family."  FAC ¶ 199.  Plaintiff AbdelRahim alleges that he has suffered "severe and ongoing anxiety and emotional distress" from the "constant fear of being under surveillance because of the Defendants' acts," based on his belief "that any of his communications in the mosque and over the telephones or email may be monitored, and indeed that he may be under surveillance at any time."  FAC ¶¶ 216-17.

These allegations, however, are complaints of  discomfort, worry, anxiety, concern, annoyance, and/or agitation, which do not constitute severe emotional distress  "of such substantial quality or enduring quality that no reasonable [person] in civilized society" could endure it.  *Hughes*, 46 Cal. 4th at 1051.  For this reason alone, the claims for intentional infliction of emotional distress should be dismissed.

Separate and apart from plaintiffs' failure to satisfy the severe emotional distress element of these claims, the intentional infliction of emotional distress claims are barred on two independent grounds.

First, the Amended Complaint alleges that plaintiffs suffered emotional distress as a result of Monteilh's activities as an informant.  To the extent that these claims arise from Monteilh's conduct, *e.g.*, in discussing *jihad* or otherwise directly causing their distress, the emotional distress claims are barred by the

-35-

FTCA's two-year statute of limitations.  *See* 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues.").  *See also Dyniewicz v. United States*, 742 F.2d 484 (9th Cir. 1984).  In *Dyniewicz*, the decedents' children did not discover that the negligence of national park rangers might have been responsible for their parents' death until over two years after the fatal accident.  Then-Judge Anthony Kennedy wrote for the court that the claim accrued as soon as "the immediate physical cause of the injury is discovered," and that "[a plaintiff's] ignorance of the involvement of United States employees is irrelevant."  *Id.* at 486-87.

Here, the Amended Complaint is replete with allegations that plaintiffs were aware of Monteilh's activities, if not the surveillance, in 2006 and 2007.  *See* FAC ¶¶ 51, 53, 54, 59, 61, 70-79, 81-85, 147-149.  Because plaintiffs failed to present their administrative claims until February 21, 2011, *see* FAC ¶ 260, the claims based on Monteilh's activities directly causing their emotional distress are barred by 28 U.S.C. § 2401(b).

Second, the intentional infliction of emotional distress claims based on audio and video surveillance are also defective because they are speculative and therefore do not state a claim for relief.  The Amended Complaint alleges that the surveillance occurred in 2006 and 2007 and it was covert.  *See* FAC ¶¶ 48,160.  The Amended Complaint also alleges that plaintiffs did not know that the surveillance had taken place until the end of February 2009, which was several years after Monteilh had "disappeared from the Muslim community," *i.e.*, in July or August 2007.  *See* FAC ¶¶ 148-150, 160.  The prior covert surveillance, by definition, could not by itself have caused plaintiffs any emotional distress.   In addition, to the extent that these claims are based on plaintiffs' current *beliefs* and *suspicion* that they are under surveillance, *see* FAC ¶¶ 185, 199, 216-217, based on the 2009 disclosure, they are "unsupported by any factual allegations (and indeed,

-36-

pleaded on information and belief . . . ), and need not be taken as true by this Court on a motion to dismiss." *See Westfall v. City of Crescent City*, No. 10-cv-5222, 2011 WL 4024663, *10 (N.D. Cal. Sept. 9, 2011) (court dismissed intentional infliction of emotional distress claim based on defendants' alleged "intimidation tactics" and intent to charge plaintiff with "bogus felony counts," finding that plaintiff's allegations relating her beliefs were "pure speculation").

Because the Amended Complaint fails satisfy the requisite elements of an intentional infliction of emotional distress cause of action, or the claims are otherwise barred by the FTCA's two-year statute of limitations or are fatally defective because they are based on pure speculation, these claims must be dismissed.

## II.   THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS' ALLEGATIONS.

### A.   The State Secrets Privilege Bars the Use of Privileged Information in Litigation.

"The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely." *Jeppesen,* 614 F.3d at 1077.  The ability of the Executive to protect state secrets from disclosure in litigation has been recognized from the earliest days of the Republic, *see id.,* and two broad applications of the doctrine have been recognized.

The first application — based on the Supreme Court's 1875 decision in *Totten v. United States,* 92 U.S. 105, 23 L. Ed. 605 (1875) — permits dismissal of a case on the pleadings where it is apparent that the very subject matter of the action will require the disclosure of state secrets that would result in harm to national security.  *Jeppesen,* 614 F.3d at 1077-78 (discussing the *"Totten* bar"*).* The state secrets privilege is also an evidentiary privilege that excludes privileged evidence from the case.  *Id.* at 1077 (citing *United States v. Reynolds,* 345 U.S. 1,

73 S. Ct. 528, 97 L. Ed. 727 (1953)).  Unlike the *Totten* bar, a valid claim of privilege under *Reynolds* does not automatically require dismissal of the case, but may require dismissal where it is apparent that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets.  *Jeppesen,* 614 F.3d at 1079.

Analyzing a state secrets privilege claim under the *Reynolds* doctrine involves three steps.  *Jeppesen,* 614 F.3d at 1080 (citing *Al-Haramain Islamic Found. v. Bush,* 507 F.3d 1190, 1202 (9th Cir. 2007); *El-Masri v. United States,* 479 F.3d 296, 304 (4th Cir. 2007)).  First, the court must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied.  *Id.* Second, the court must make an independent determination whether the information is privileged.  *Id.*  Finally, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.  *Id.*

1.   Procedural Requirements

The state secrets privilege "'belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *Jeppesen,* 614 F.3d at 1080 (quoting *Reynolds,* 345 U.S. at 7 (footnotes omitted)).  The privilege is "'not to be lightly invoked,'" and to ensure that the privilege is invoked only when necessary, the Government must satisfy three procedural requirements: (1) there must be a "formal claim of privilege"; (2) the claim must be "lodged by the head of the department which has control over matter"; and (3) the claim be made "after actual personal consideration by that officer."  *Id.* (quoting *Reynolds,* 345 U.S. at 7-8).  The claim of privilege must reflect the certifying official's *personal* judgment."  *Id.* (emphasis in original).  The basis for the privilege assertion also must be presented "in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege."  *Id.*

The state secrets privilege may be asserted "at any time, even at the pleading stage." *Id.* Thus, while the Government may assert privilege in response to discovery requests, *see, e.g. Reynolds,* 345 U.S. at 3; *Kasza v. Browner,* 133 F.3d 1159, 1170 (9th Cir. 1998), the Government need not wait for an evidentiary dispute to arise during discovery or trial. *Jeppesen,* 614 F.3d at 1081; *see also Al-Haramain,* 507 F.3d at 1201 (recognizing that *Reynolds* may result in dismissal even without "await[ing] preliminary discovery"). Where the court can "determine with certainty from the nature of the allegations and the government's declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made . . . waiting for specific evidentiary disputes to arise would be both unnecessary and potentially dangerous." *Jeppesen,* 614 F.3d at 1081 (citing *Sterling v. Tenet,* 416 F.3d 338, 344 (4th Cir. 2005)) ("Courts are not required to play with fire and chance further disclosure — inadvertent, mistaken, or even intentional — that would defeat the very purpose for which the privilege exists.").

    2.   The Court's Independent Evaluation of the Claim of Privilege

After the state secrets privilege has been properly invoked, the court "must make an independent determination whether the information is privileged." *Al-Haramain,* 507 F.3d at 1202. The privilege must be sustained when the court is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds,* 345 U.S. at 10. "If this standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs' countervailing need for it." *Jeppesen,* 614 F.3d at 1081 (citing *Reynolds,* 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake.")); *see also Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982). In evaluating the need for secrecy, courts must "acknowledge the need to defer to the Executive on

-39-

matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena." *Al-Haramain,* 507 F.3d at 1203. At the same time, the state secrets doctrine does not represent "'a surrender of judicial control over access to the courts,'" *Jeppesen*, 614 F.3d at 1082 (quoting *El-Masri*, 479 F.3d at 312), and "to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation." *Id.* (quoting *Ellsberg v. Mitchell,* 709 F.2d 51, 58 (D.C. Cir. 1983)).

　　　3.　　Impact of Privilege Assertion

　　When a court sustains a claim of privilege, it must then resolve "'how the matter should proceed in light of the successful privilege claim.'" *Al-Haramain,* 507 F.3d at 1202 (quoting *El-Masri,* 479 F.3d at 304). When successfully invoked, the evidence subject to the privilege is "completely removed from the case." *Kasza,* 133 F.3d at 1166. When possible, the privileged information "'must be disentangled from nonsensitive information to allow for the release of the latter.'" *Id.* (quoting *Ellsberg,* 709 F.2d at 57). But "when, as a practical matter, secret and nonsecret information cannot be separated," the court must restrict a parties' access "not only to evidence which itself risks the disclosure of a state secret, but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures." *Jeppesen*, 614 F.3d at 1082 (quoting *Bareford v. Gen. Dynamics Corp.,* 973 F.2d 1138, 1143-44 (5th Cir. 1992)); *see also Kasza,* 133 F.3d at 1166 ("[I]f seemingly innocuous information is part of a . . . mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from [secret] information.").

　　In the normal course, after the privileged evidence is excluded, "the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.'" *Al-Haramain,* 507 F.3d at 1204 (quoting *Ellsberg,* 709 F.2d at 64). In

-40-

some cases, however, "application of the privilege may require dismissal of the action." *Jeppesen* 614 F.3d at 1083.  First, if "the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it with any plaintiff who cannot prove her case." *Kasza*, 133 F.3d at 1166.  Second, "if the privilege deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant." *Id*. at 1166 (quoting *Bareford*, 973 F.2d at 1141) (emphasis in original).  Third, even if the claims and defenses might theoretically be established without privileged evidence, "it may be impossible to proceed with the litigation because — privileged evidence being inseparable from nonprivileged information that will be necessary to claim or defense — litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083; *see also El-Masri*, 479 F.3d at 308 ("[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure."); *Fitzgerald v. Penthouse Int'l, Ltd.* 776 F.2d 1236, 1241-42 (4th Cir. 1985) ("[I]n some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters."); *accord Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 279-81 (4th Cir. 1980) (*en banc*).

    4.  <u>Attorney General's Policy</u>

      In addition to the foregoing requirements in established case law, on September 23, 2009, the Attorney General announced a new Executive branch policy governing the assertion and defense of the state secrets privilege in litigation.  Under this policy, the U.S. Department of Justice will defend an assertion of the state secrets privilege in litigation, and seek dismissal of a claim on that basis, only when "necessary to protect against the risk of significant harm to

national security." *See* Exhibit 1 to Holder Declaration (State Secrets Policy) at 1. Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." *Id*. at 2.

The Attorney General also established detailed procedures — followed in this case — for review of a proposed assertion of the state secrets privileged in a particular case. Those procedures require submissions by the relevant government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; [and] (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm." *Id*. In addition, the Department will only defend an assertion of the privilege in court with the personal approval of the Attorney General following review and recommendations from senior Department officials. *Id*. at 3.

There can be no dispute that the Government compiled with *Reynolds*' procedural requirements by following this policy. The FBI is a component of the Department of Justice, *see* Pub. Giuliano Decl. ¶ 1, and the Attorney General of the United States is also the head of the Department of Justice, *see* Holder Decl. ¶ 1. The Attorney General has determined, upon his personal consideration, that the requirements for an assertion and defense of the state secrets privilege have been met in this case, in accord with the September 2009 policy, and that disclosure of the information subject to his claim of privilege reasonably could be expected to cause significant harm to national security. *See* Holder Decl. ¶¶ 3, 12.

-42-

**B.    The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.**

Procedural formalities aside, the next question is whether the privilege should be upheld and the privileged information excluded from the case.  As described in general and unclassified terms, the Attorney General's privilege assertion extends to three categories of information:

(i)      _Subject Identification_: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

(ii)     _Reasons for Counterterrorism Investigation and Results_: Information that could tend to reveal the initial reasons (i.e., predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation.  This category includes any information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(iii)    _Sources and Methods_: Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex. This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.

Holder Decl. ¶ 4; Pub. Giuliano Decl. ¶ 15.

The Attorney General, supported by the FBI's Assistant Director for the Counterterrorism Division, has explained on the public record why the disclosure of the above information reasonably could be expected to cause significant harm to national security.  _See generally_ Holder and Pub. Giuliano Decls.  Among other concerns identified by these officials, disclosure of the identities of subjects of counterterrorism investigations could alert those subjects to the FBI's interest in them and cause them to attempt to evade detection, destroy evidence, and undertake counter-actions that could put confidential informants or law

-43-

enforcement officers at risk.  *See* Pub. Giuliano Decl. ¶ 23.  The disclosure of the subjects of counterterrorism investigations could also cause their associates to take similar steps to avoid FBI scrutiny and hinder investigation.  *See id.*

Disclosure that an individual is *not* a subject of a national security investigation likewise could reasonably be expected to cause significant harm to national security in several ways.  For example, individuals inclined to commit terrorists acts could be motivated to do so while they know they are not being monitored.  Public Giuliano Decl. ¶ 24.  In addition, disclosure that some persons are not subject to investigation, while the status of others is left unconfirmed, would enable individuals and terrorists groups alike to manipulate the system to discover whether they or their members are subject to investigation.  *See id.*

Similarly, even where an investigation of a subject has been closed, disclosure that an individual was formerly the subject of a counterterrorism investigation could also reasonably be expected to cause significant harm to national security interests.  Again, to the extent that an individual had terrorist intentions that were not previously detected, the knowledge that he or she is no longer the subject of investigative interest could embolden him or her to carry out those intentions.  *See* Public Giuliano Decl. ¶ 25.  And even if the former subjects are entirely law-abiding, disclosure that they had been investigated could still provide valuable information to terrorist and terrorists organizations about the FBI's intelligence and suspicions, particularly where associates of former subjects may still be under investigation.  *See id.* ¶ 26.  Finally, where new information may arise about a person, the fact that investigations are closed does not mean that the subjects have necessarily been cleared of wrongdoing.  *See id*. ¶ 25.

For closely related reasons, disclosure of the reasons for and substance of a counterterrorism investigation reasonably could be expected to cause significant harm to national security by revealing to subjects involved in terrorist activities what the FBI knows or does not know about their plans.  *See* Pub. Giuliano Decl.

-44-

¶ 29.  Further, disclosure of the reason for an investigation could provide insights to terrorists as to what type of information is sufficient to trigger an inquiry by the FBI, and what sources and methods the FBI employs to obtain information on a person.  *See id.*  Disclosure of these sources and methods would itself reasonably be expected to cause significant harm not only by revealing the identities of particular subjects, but also by providing a road map to adversaries on how the FBI goes about detecting and preventing terrorist attacks.  *See id.* ¶ 31.

The basis for the Attorney General's privilege assertion is set forth further in the classified declaration offered by the FBI.  *See generally* Classified Declaration of Mark F. Giuliano dated August 1, 2011(submitted for *in camera, ex parte* review).  The Government cannot further explain precisely those matters covered by the privilege lest the process asserting privilege jeopardize the very information the privilege is designed to protect.  *Jeppesen*, 614 F.3d at 1086.  But the Court should find that the Government has fully and sufficiently demonstrated the basis for the privilege assertion in this case, and thus should exclude the privileged information from further proceedings in this case.[13]

### C.   The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.

As *Jeppesen* explains, once the state secrets privilege is upheld, the next question for the Court to decide is what consequences exclusion of the privileged information will have on further proceeding in the case.  The issue is especially appropriate for consideration at the pleading stage where it is apparent that privileged information would be needed to pursue litigation of the case, or at least

---

[13]  While *ex parte, in camera* classified submissions are not required for an assertion of the privilege, *see Reynolds*, 345 U.S. at 8, the Government has commonly provided such submission in order to assist the Court in ascertaining whether the circumstances for the privilege assertion are appropriate.  *See, e.g. Kasza*, 133 F.3d at 1169-70; *Jeppesen*, 614 F.3d at 1084 n.6.

-45-

certain claims.  This question requires the Court to assess the nature of the proof

needed to decide the claims being raised and the extent to which litigation of those

claims would risk or require the disclosure of privileged information.  *Jeppesen*,

614 F.3d at 1082-83.

(1) *Individual Capacity Claims*: The Court should address the impact of the

privilege assertion on the individual capacity claims first.  Most of the allegations

and claims in the case center on the alleged action of the individual capacity

defendants, and these defendants are entitled to early consideration of whether the

lawsuit should proceed against them.  As set forth below, information properly

protected by the Attorney General's privilege assertion should foreclose litigation

of at least plaintiffs' claims based on an alleged indiscriminate collection of

information based solely on religion.

First, where constitutional claims are raised against federal officers in their

personal capacities, a key threshold question is whether a *Bivens* cause of action

against the individual defendants exists in the circumstances presented.

Specifically, the Supreme Court has held that there can be no *Bivens* remedy

against federal officials where "special factors counselling hesitation" exist.  *Wilkie

v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (quoting

*Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)).

National security concerns constitute just such a special factor, *see Arar v.

Ashcroft*, 585 F.3d 559, 573, 575 (2d Cir. 2009), particularly where litigation of the

claims would subject sensitive and classified intelligence information to judicial

scrutiny.  *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008).  Permitting the

claims to go forward would run the risk of disclosure that might "undermine

ongoing covert operations" aimed at protecting national security.  *Id.*  Moreover, to

the extent that allowing litigation to proceed would "very likely mean that some

documents or information . . . would be redacted, reviewed *in camera*, and

otherwise concealed from the public," the Court's potential reliance on such

-46-

information further counsels "hesitation" that precludes a *Bivens* remedy, "given the strong preference in the Anglo-American legal tradition for open court proceedings." *Arar*, 585 F.3d at 576-77.  Thus, the Government's assertion of privilege in this case has a particular bearing first on the individual capacity defendants' threshold defenses under the *Bivens* doctrine.

Second, even apart from whether plaintiffs have a cause of action under *Bivens* for their constitutional claims, full and effective litigation of these claims, as well as the statutory claims plaintiffs have raised against the individual capacity defendants, would risk or require the disclosure of privileged information. Plaintiffs' allegations of a discriminatory investigation based solely on religion directly put at issue information that is subject to the Attorney General's privilege assertion.  At their core is the claim that defendants' alleged surveillance and investigation of plaintiffs unlawfully burdened plaintiffs' free exercise of their religion.  To advance their claims, plaintiffs would need to proffer evidence in support of their allegations concerning the nature and scope of Operation Flex, including evidence that the FBI impermissibly engaged in indiscriminate surveillance based solely on religion.  Any defense would likewise put at issue and thereby risk or require the disclosure of information concerning how Operation Flex was conducted — including who may have been subject to investigation and why, as well as how and why the FBI collected information on the matter.  The Court, in turn, would have to determine, whether, in fact, defendants' actions were targeted at plaintiffs based on their religion.  If plaintiffs were able to overcome that hurdle, the Court would then have to determine (1) whether the Government acted pursuant to a compelling state interest, and (2) whether the government's actions were narrowly tailored to achieve that interest.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *see also Presbyterian Church v. United States*, 752 F. Supp. 1505,

1513 (D. Ariz. 1990).[14]  These are fundamentally fact-driven determinations that require detailed inquiry into the nature of, and reason for, any investigative activity undertaken by defendants with respect to plaintiffs, and thus risk or require disclosure of the privileged information.

On this point, *Presbyterian Church* is instructive.  In that case, the plaintiffs alleged that surveillance of their church services by undercover INS agents violated their First and Fourth Amendment rights.  The Ninth Circuit held that plaintiffs had established standing for their First Amendment free exercise claim, and remanded to the district court to determine whether plaintiffs had standing to pursue prospective injunctive relief.  *Presbyterian Church v. United States*, 870 F.2d 518, 528-29 (9th Cir. 1989).  On remand, the district court, finding that plaintiffs had standing and that the case was not moot, proceeded to the free exercise inquiry.  After examining the evidence presented in defendants' summary judgment motion, the court held that the government had a compelling state interest "based on border security and national sovereignty to conduct an investigation into the alleged unlawful activities of the Sanctuary Movement," a network of religious activists that aided Central and South American refugees by bringing them into the United States, and had "demonstrated a significant and intimate relationship between the conduct in which it engaged and the government interest sought to be achieved."  *Presbyterian Church*, 752 F. Supp. at 1508 n.1, 1514, 1515.  Of particular note, the facts underlying the INS investigation were made public during the criminal prosecutions of several individuals who were

---

[14]  Similarly, to evaluate plaintiffs' RFRA claim, assuming the Court finds that defendants' actions substantially burdened plaintiffs' exercise of religion (although defendants do not concede that point), it would have to determine whether that burden was (1) in furtherance of a compelling interest, and (2) the least restrictive means of furthering that interest.  *See* 42 U.S.C. § 2000bb-1(b); *Navajo Nation v. U.S. Forest Svc.*, 535 F.3d 1058, 1068 (9th Cir. 2008).

involved with the Sanctuary Movement, and thus there was no issue in that case as to whether disclosure of those facts would harm national security.  *Presbyterian Church v. United States*, 870 F.2d at 520; 752 F. Supp. at 1507-08.

Here, any inquiry into whether the Government had a compelling interest and whether its actions were narrowly tailored would turn on whether defendants were conducting properly predicated investigations or, as alleged in the Amended Complaint, were indiscriminately gathering information on persons based solely on their religion.  Evidence needed to establish that defendants' investigations were, in fact, properly predicated and focused again would include the specific parameters of "Operation Flex," including who may have been subject to investigation, why, and how the investigations were carried out by the FBI.  Thus, litigation of plaintiffs' discrimination claims inherently would risk or require the disclosure of evidence concerning who was subject to Operation Flex investigations and the reasons these subjects were under investigation, as well as sources and methods used in these investigations.  This information falls squarely within the three categories of information over which the Attorney General has asserted privilege.  Thus, for plaintiffs to support their claims of religious discrimination, or for the defendants to mount a full and effective defense against the religious discrimination claims "would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case . . . with nonprivileged evidence."  *Jeppesen*, 614 F.3d at 1088 (collecting cases); *see also Kasza*, 133 F.3d at 1166.

Nor can this risk be averted by the implementation of precautionary procedures by the district court.  As the Ninth Circuit has made clear:

> Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable.  Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases . . . where the relevant secrets are difficult or impossible

-49-

> to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication.

*Jeppesen*, 614 F.3d at 1089.  This is just such an exceptional case.  As demonstrated further in the classified August 1, 2011, Giuliano Declaration, even if some non-privileged evidence were available for plaintiffs to present a *prima facie* case or the defendants to respond, properly privileged information would remain at issue and would either be required to litigate the case or at the very least be at risk of disclosure in further proceedings on the issues raised by plaintiffs' claims that the FBI's investigations were improperly based solely on religion.[15]

For these reasons, the Court should, at a minimum, dismiss Causes of Action 1-7 as to the individual capacity defendants.  Dismissal of these defendants is particularly warranted because they have unique threshold arguments.  Moreover, the Government has a separate, independent interest in protecting against the disclosure of properly privileged information that would inherently be at risk of disclosure in any litigation of the individual capacity claims.

(2) *Government Defendants*: Finally, the Court should consider the impact of the privilege assertion on plaintiffs' claims against the FBI and official capacity defendants, as well as against the United States under the FTCA, to the extent they are not dismissed on the non-privileged grounds set forth above.  The same privileged evidence at issue in plaintiffs' claims of religious discrimination against the individual capacity defendants is at issue in the same claims against the Government.  In either case, litigation of the claims would either require that

---

[15] In further support of this point, the Government previously lodged a classified supplemental brief for the Court's *in camera, ex parte* review that describes the evidence subject to the Attorney General's privilege assertion that would be at risk of disclosure or needed by defendants in responding to plaintiffs' religious discrimination claims. *See* Notice of Lodging of Classified *In Camera, Ex Parte* Supplemental Memorandum (Dkt. 36, filed August 1, 2011).

evidence or create an "unacceptable risk of disclosing" this information. *Jeppesen*, 614 F.3d at 1083.

With respect to the FTCA claims in particular, newly added by the Amended Complaint, information subject to the privilege assertion would be at issue with respect to least two specific issues.  First, judicial review of the FBI's decisions to initiate counterterrorism investigations and how those investigations should be handled, including the decisions to conduct audio and video surveillance, may be barred by the discretionary function exception to the FTCA.  *See e.g.*, *Sabow v. United States*, 93 F.3d 1445, 1453-54 (9th Cir. 1996); *Frigard v. United States*, 862 F.2d 201, 203 (9th Cir. 1988); *Pooler v. United States*, 787 F.2d 868 (3d Cir. 1986).  To determine whether the discretionary function exception applies, the appropriate inquiry is "whether the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability."  *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S. Ct. 2755, 2764, 81 L. Ed. 2d 660, 674 (1984); *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016, 1034 (C.D. Cal. 2010).  To assist in this determination, the Supreme Court has prescribed a two-part test.  First, the challenged conduct must involve an "element of judgment or choice."  *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L. Ed. 2d 335, 346 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *see also Dichter-Mad Family*, 707 F. Supp. 2d at 1027. Second, the challenged conduct must involve policy considerations.  *See Gaubert*, 499 U.S. at 322; *Dichter-Mad Family*, 707 F. Supp. 2d at 1027.  The test's first part is satisfied when there are no mandatory directives that specifically prescribe a course of action for an employee to follow.  *Gaubert*, 499 U.S. at 322; *see Jasso v. U.S. Dep't of Agric. Forest Serv.*, No. S-07-2769, 2008 WL 3863503, *7 (E.D. Cal. Aug. 18, 2008) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.").  Here, the Amended Complaint alleges that the FBI violated plaintiffs' constitutional rights

-51-

by engaging in impermissible counterterrorism investigations "simply because the targets were Muslim" and "that Plaintiffs . . . were surveilled solely due to their religion." *See* FAC §§ 1-3, 83, 86.  Thus, in order to litigate the question of whether the discretionary function exception to the FTCA applies in this case, facts concerning the nature and scope of Operation Flex—including who may have been subject to investigation, for what reasons, and how the investigation was undertaken—would be at issue or at risk of disclosure.

In addition, litigating the key issues for the invasion of privacy and intentional infliction of emotional distress claims asserted against the United States would risk or require the disclosure of privileged information.  For example, litigation of these claims entails an inquiry into whether the alleged intrusions were highly offensive and/or constituted serious invasions of privacy, which may depend upon the degree and setting of each intrusion and the explanation, justification, motive, and objective.  *See generally Hernandez v. Hillsides, Inc.,* 47 Cal. 4th 272, 286-87, 211 P. 2d 1063 (Cal. 2009); *Sheehan v. San Francisco 49ers*, 45 Cal. 4th 992, 998, 201 P. 2d 472 (Cal. 2009).  An essential element the plaintiffs must prove to establish intentional infliction of emotional distress claims is whether the conduct was extreme and outrageous with the intention of causing, or reckless disregard of the probability of causing, their emotional distress.  The resolution of this element may depend on the explanation and justification for the alleged conduct.  *See generally Potter,* 6 Cal. 4th at 1001.  Here again, to litigate these issues, evidence concerning what occurred under Operation Flex—who was subject to investigation, why, and how—would be at issue or at risk of disclosure.

\* \* \*

To the extent that the Court wishes to assess the impact of the privilege assertion as to claims against the Government Defendants, it should require plaintiffs to proffer in proceedings under Rules 16 and 26 precisely what discovery it intends to seek against the Government.  At that point, the Government

Defendants would again address the extent to which the state secrets privilege precludes litigation of any claims remaining against them.  In the meantime, there should be no doubt that the privilege assertion supports dismissal of the individual capacity claims in light of the additional threshold defenses available to these defendants.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims against the Federal Bureau of Investigation and Defendants Robert Mueller, Director of FBI, and Steven Martinez, Assistant Director in Charge of FBI's Los Angeles Division, sued in their official capacities, and against the United States under the FTCA, should be dismissed.  In addition, plaintiffs' First through Seventh Causes of Action should be dismissed as to the individual capacity defendants based on the state secrets privilege.

Date: November 4, 2011          Respectfully submitted,

TONY WEST
Assistant Attorney General

ANDRE BIROTTE, JR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

*/s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov

*/s/ Lynn Y. Lee*
LYNN Y. LEE (SBN # 235531)
E-mail: lynn.lee@usdoj.gov

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Telephone: 202-514-4782
Facsimile:   202-616-8460

*Attorneys for the Federal Bureau of Investigation and Defendants Mueller and Martinez Sued in their Official Capacities*

1

2            _/s/ Stephen E. Handler_____
   STEPHEN E. HANDLER
3  Senior Trial Counsel
   E-mail: stephen.handler@usdoj.gov
4  U.S. Department of Justice
   Civil Division, Torts Branch
   1331 Pennsylvania Avenue N.W.  Room 8070N
5  Washington, D.C. 20530
   Telephone: (202) 616-4279
6
   _Attorney for the United States_
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              -54-