Peter Bibring (SBN 223981)
  *pbibring@aclu-sc.org*
Ahilan T. Arulanantham (SBN 237841)
  *aarulanantham@aclu-sc.org*
Jennifer L. Pasquarella (SBN 263241)
Mohammad Tajsar (SBN 280152)
Laura Moran  (bar admission pending)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Attorneys for Plaintiffs

(Additional Counsel listed on next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FEDERAL BUREAU OF INVESTIGATION *et al.*,<br><br>                    Defendants. | CASE NO.: SA CV 11-00301 CJC (VBKx)<br><br>**PLAINTIFFS' COMBINED OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:        January 30, 2012<br>Time:        1:30 p.m.<br>Judge:       Hon. Cormac J. Carney |

Additional Plaintiffs' Attorneys:


Ameena Mirza Qazi (SBN 250404)
  *aqazi@cair.com*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California  92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340


Dan Stormer (SBN 101967)
  *dstormer@hadsellstormer.com*
Joshua Piovia-Scott (SBN 222364)
  *jps@hskrr.com*
Reem Salahi (SBN 259711)
  *reem@hskrr.com*
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………1

FACTS………………………………………………………………………..2

ARGUMENT……………………………………………………………5

I.    THE CONSTITUTION PROVIDES A DAMAGES REMEDY
      FOR RELIGIOUS DISCRIMINATION AND UNLAWFUL
      SURVEILLANCE UNDER *BIVENS*………………………………… 6

      A.    This Case Does Not Present an Extension of *Bivens*……………...8

            1. Claims Alleging Discrimination by Law Enforcement
               Officers Lie at the Core of *Bivens*………………………….. 8

            2. 'National Security' Does Not Make This a New Context……… 11

      B.    Even If This Case Is an Extension, a *Bivens* Remedy Is
            Available………………………………………………… 13

            1. No Statutory Scheme Indicates Congress's Intent to
               Displace *Bivens* Remedies…………………………… 13

                  a.  Privacy Act……………………………………………15

                  b.  RFRA…………………………………………..17

                  c.  FISA…………………………………………… 19

            2. No Special Factors Justify Precluding a *Bivens* Remedy……….19

                  a.  National Security………………………………………21

                  b.  State Secrets…………………………………………26

II.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
      IMMUNITY…………………………………………………………28

      A.    Defendants Are Not Entitled to Qualified Immunity
            on Plaintiffs' First Amendment Claims……………………………29

i

1. Under Clearly Established Law, Facial Discrimination on the Basis of Religion Triggers Strict Scrutiny...................31

    a. Establishment Clause.....................................................33

    b. Free Exercise Clause.................................................... 35

    c. The Ban on Religious Discrimination Is Clearly Established....................................................................40

2. The Complaint Alleges Facial Discrimination Against Muslims. ...................................................................... 40

    a. The Complaint Suggests No Legitimate Basis to Investigate the Three Individual Plaintiffs.....................42

3. Defendants' Facial Discrimination Fails Strict Scrutiny...........46

B. The Complaint Establishes that the Supervisory Defendants Are Liable For Intentional Discrimination and Unlawful Searches............................................................................ 47

1. The Supervisors Are Liable For Intentional Discrimination.......48

2. The Supervisors Are Liable For Unlawful Searches...............53

C. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' RFRA Claims.................................................55

D. Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Claim under 42 U.S.C. 1985(3)........................... 58

1. Application of the Antitrust "Intracorporate Conspiracy" Doctrine To § 1985 Claims Would Be Wholly Inappropriate........................................................58

2. Plaintiffs' Adequately Allege a Conspiracy Under § 1985....................................................................... 60

E. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' Equal Protection Claims........................................ 63

ii

F.   Defendants Are Not Entitled To Qualified Immunity on............. 64
     Plaintiffs' Fourth Amendment and FISA Claims

     1.  Warrantless Audio Recording Outside Informant's
         Presence..................................................................................65

     2.  Video Recording by the Informant...............................70

     3.  Conversations to Which the Informant Was a Party............... 71

     4.  Plaintiffs State a Plausible Claim For Violation of
         the Foreign Intelligence Surveillance Act.......................... 72

CONCLUSION..............................................................................73

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. National Sec. Agency,*
   493 F.3d 644 (6th Cir. 2007) ...................................................................... 72

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200 (1995) ........................................................................... 30, 50

*Al-Kidd v. Ashcroft,*
   580 F.3d 949 (9th Cir. 2009) ............................................................... passim

*Allegheny v. ACLU,*
   492 U.S. 573 (1989) ............................................................................ 33, 35

*Allen v. Wright,*
   468 U.S. 737 (1984) .................................................................................. 57

*Alpha Delta Chi-Delta Chapter v. Reed,*
   648 F.3d 790 (9th Cir. 2011) ..................................................................... 40

*Am. Comm. Ass'n, C.I.O. v. Douds,*
   339 U.S. 382 (1950) ............................................................................ 56, 57

*Am. Family Ass'n v. City and County of San Francisco,*
   277 F.3d 1114 (9th Cir. 2002) ................................................................... 37

*Anderson v. Creighton,*
   483 U.S. 635 (1987) .................................................................................. 10

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ....................................................................... passim

*Ass'n of Christian Sch. Intern. v. Stearns,*
   362 Fed. Appx. 6406 (9th Circ. 2010) ....................................................... 63

*Azar v. Conley,*
   456 F.2d 1382 (6th Cir. 1972) ................................................................... 61

*Ball v. Massanari,*
   254 F.3d 817 (9th Cir. 2001) ..................................................................... 63

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 5, 44, 60

*Bernal v. Fainter*,
    467 U.S. 216 (1984) ............................................................................ 46

*Berry v. Hollander*,
    925 F.2d 311 (9th Cir. 1991) .............................................................. 14

*Bivens v. Six Unknown Fed. Narcotics Agents*,
    403 U.S. 388 (1971) ................................................................... passim

*Black v. United States*,
    62 F.3d 1115 (8th Cir. 1995) .............................................................. 26

*Bond v. United States*,
    529 U.S. 334 (2000) ..................................................................... 65, 68

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ............................................................................ 22

*Bowen v. Rubin*,
    2002 U.S. Dist. LEXIS 25283 (E.D.N.Y. May 17, 2002) ............... 61, 62

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ..................................................................... 35, 38

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ................................................... 42, 59, 61, 62

*Brown v Ent. Merch. Ass'n*,
    131 S. Ct. 2729 (2011) ...................................................................... 46

*c.f. Wirzburger v. Galvin*,
    412 F.3d 271 (1st Cir. 2005) .............................................................. 39

*Carlson v. Green*,
    446 U.S. 14 (1980) .................................................................. 6, 16, 19

*Castaneda v. United States*,
    546 F.3d 682 (9th Cir. 2008) ............................................................... 9

*Catholic League for Religious and Civil Rights v. City and County of San
    Francisco*,
    624 F.3d 1043 (9th Cir. 2010) ........................................................... 34

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Chappell v. Wallace*,
   462 U.S. 296 (1983) ......................................................................... 23

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ......................................................................... 18

*Colorado Christian Univ. v. Weaver*
   534 F.3d 1245 (10th Cir. 2008)........................................................ 63

*Community House, Inc. v. City of Boise*,
   623 F.3d 945 (9th Cir. 2010) ........................................................... 29

*Consol. Edison Co. v. Public Service Commission of New York*,
   447 U.S. 530 (1980) ......................................................................... 46

*Cooper v. Pate*,
   378 U.S. 546 (1964) ......................................................................... 38

*Correctional Servs. Corp. v Malesko*,
   534 U.S. 61 (2001) .............................................................. 8, 13, 16, 20

*Davis v. Passman*,
   442 U.S. 228,229 (1979) ...........................................................passim

*Dellums v. Powell*,
   566 F.2d 167 (D.C. Cir. 1977) ......................................................... 11

*Denney v. Drug Enforcement Admin.*,
   508 F.Supp.2d 815 (E.D. Cal. 2007) ................................................ 11

*Deorle v. Rutherford*,
   272 F.3d 1272 (9th Cir. 2001) ......................................................... 29

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ......................................................................... 23

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) (en banc) ......................................... 29

*Diem v. City and County of San Francisco*,
   686 F.Supp. 806 (N.D. Cal. 1988.) .................................................. 60

*DiMartini v. Ferrin*
   889 F.2d 922, *amended on pet. for rehearing en banc*, 906 F.2d 465 (9th
   Cir. 1990).......................................................................................... 10

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Downie v. Middleburg Heights*,
   301 F.3d 688 (6th Cir. 2002) ............................................................ 16

*Edgerly v. City and County of San Francisco*,
   599 F.3d 946 (9th Cir. 2010) ........................................................... 53

*Employment Division v. Smith*,
   494 U.S. 872 (1990) ................................................................ passim

*Erickson v. United States*,
   976 F.2d 1299 (9th Cir. 1992) ......................................................... 11

*Everson v. Board of Ed.*,
   330 U.S. 1 (1947) ..................................................................... 33

*Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*,
   308 F.3d 523 (6th Cir. 2002) .......................................................... 47

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ................................................................... 20

*Fobbs v. Holy Cross Health Sys. Corp.*,
   29 F.3d 1439 (9th Cir. 1994) .......................................................... 62

*Fowler v. Rhode Island*,
   345 U.S. 67 (1953) ........................................................... 37, 38, 40

*Freeman v. Arpaio*,
   125 F.3d 732 (9th Cir. 1997) .......................................................... 63

*Gary S. v. Manchester School Dist.*,
   374 F.3d 15 (1st Cir. 2004) ........................................................... 39

*Gibson v. United States*,
   781 F.2d 1334 (9th Cir. 1986) ............................................... 11, 19, 25

*Gillette v. United States*,
   401 U.S. 437 (1971) ................................................................... 35

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ......................................................... 2, 30, 43

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) .................................................................... 62

*Groh v. Ramirez*,
    540 U.S. 551 (2004) ........................................................................... 10

*Hafer v. Melo*,
    502 U.S. 21 (1991) ............................................................................. 55

*Haig v. Agee*,
    453 U.S. 280 (1981) ..................................................................... 22, 46

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ..................................................................... 22, 27

*Handschu v. Special Services Div.*,
    349 F.Supp. 766 (S.D.N.Y. 1972) ..................................................... 72

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ........................................................................... 28

*Harris v. Roderick*,
    126 F.3d 1189 (9th Cir. 1997) ........................................................... 10

*Hartman v. Moore*,
    547 U.S. 250 (2006) ........................................................................... 11

*Hartmann v. Stone*,
    68 F.3d 973 (6th Cir.1995) ........................................................... 18, 39

*Hayden v. County of Nassau*,
    180 F.3d 42 (2nd Cir. 1999) ......................................................... 32, 50

*Hernandez v. C.I.R.*,
    490 U.S. 680 (1989) ........................................................................... 34

*Holder v. Humanitarian Law Project*,
    130 S. Ct. 2705 (2010) ...................................................................... 22

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) ........................................................................... 22

*Hutton v. Law Offices of Collins & Lamore*,
    668 F.Supp.2d 1251 (S.D. Cal. 2009) ................................................. 6

*Ibrahim v. Dep't of Homeland Sec.*,
    538 F.3d 1250 (9th Cir. 2008) .................................................... 8, 9, 12

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re John Doe Trader*,
   894 F.2d 240 (7th Cir. 2003) ................................................................. 69

*Internat'l Union, United Auto., Aerospace and Agr. Implement Workers of
America, UAW v. Johnson Controls, Inc.*,
   499 U.S. 187 (1991) .............................................................. 42, 61

*Jama v. I.N.S.*,
   343 F.Supp.2d 338 (D.N.J. 2004) ...................................... 55, 56

*Jimmy Swaggart Ministries v. Bd. of Eqal. of Cal.*,
   493 U.S. 378 (1990) ...................................................................... 36

*Johnson v. California*,
   207 F.3d 650 (9th Cir. 2000) ....................................................... 62

*Kee v. City of Rowlett*,
   247 F.3d 206 (5th Cir. 2001) ....................................................... 69

*Keen v. Noble*,
   2007 WL 2789561 (E.D. Cal. Sept. 20, 2007) ............................ 56

*Kreisner v. City of San Diego*,
   1 F.3d 775 (9th Cir. 1993) ........................................................... 34

*Kwai Fun Wong v. United States*,
   373 F.3d 952 (9th Cir. 2004) ....................................................... 10

*Kyllo v. United States*,
   533 US 27 (2001) ......................................................................... 67

*Labadie v. United States*,
   2011 WL 1376235 (W.D. Wa. Apr. 12, 2011) ............................ 11

*Lacey v. Maricopa Cnty.*,
   2011 WL 2276198 (9th Cir. 2011) .............................................. 53

*Larson v. Valente*,
   456 U.S. 228 (1982) ............................................................passim

*Lee v. Gregory*,
   363 F.3d 931 (9th Cir. 2004) ....................................................... 10

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) ........................................................ 29, 33,34

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Lepp v. Gonzales*,
   2005 WL 1867723 (N.D. Cal. Aug. 2, 2005) .................................................... 56

*Little v. Barreme*,
   2 Cranch (6 U.S.) 170 (1804) .................................................................... 12

*Locke v. Davey*,
   540 U.S. 712 (2004) ................................................................................ 33

*Lonegan v. Hasty*,
   436 F. Supp. 2d 419 (E.D.N.Y. 2006) ......................................................... 65

*Lyall v. City of Los Angeles*,
   2011 WL 61626 (C.D. Cal. Jan. 6, 2011) ..................................................... 69

*Lyng v. Northwest Indian Cemetery Protective Assn.*,
   485U.S. 439 (1988) .................................................................................. 32

*Marbury v. Madison*,
   1 Cranch (5 U.S.) 137 (1803) .............................................................. 2, 21

*Mayfield v. Gonzales*,
   2005 WL 1801679 (D. Or. July 28, 2005) .............................................. 9, 12

*Maynard v. City of San Jose*,
   37 F.3d 1396 (9th Cir. 1994) .................................................................... 62

*McCreary County v. ACLU*,
   545 U.S. 844 (2005) ........................................................................ 31, 35

*McDaniel v. Paty*,
   435 U.S. 618 (1978) ................................................................................ 38

*Mendocino Envtl. Ctr. v. Mendocino Cnty*,
   14 F.3d 457 (9th Cir. 1994) ...................................................................... 11

*Miller v. Johnson*,
   515 U.S. 900 (1995) ................................................................................ 63

*Miller v. Reed*,
   176 F.3d 1202 (9th Cir. 1999) .................................................................. 37

*Mirmehdi v. United States*,
   __ F.3d __, 2011 WL 5222884 (9th Cir. Nov. 3, 2011) .......................... 23, 24

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985) ...................................................................................passim

*Mockaitis v. Harcleroad,*
   104 F.3d 1522 (9th Cir. 1997)........................................................................ 69

*Mora v. Arpaio,*
   2011 WL 1562443 (D.Ariz. Apr. 25, 2011)............................................. 53, 67

*Moss v. Secret Service,*
   572 F.3d 962 (9th Cir. 2009) ......................................................................... 11

*Moss v. U.S. Secret Service,*
   750 F.Supp.2d 1197 (D.Or. 2010).............................................................. 54, 66

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,*
   429 U.S. 274 (1977) ....................................................................................... 43

*Murdock v. Pennsylvania,*
   319 U.S. 105 (1943) ....................................................................................... 33

*Native American Council of Tribes v. Solem,*
   691 F.2d 382 (8th Cir. 1982).......................................................................... 64

*Navajo Nation v. U.S. Forest Service,*
   535 F.3d 1058 (9th Cir. 2008)........................................................................ 56

*Niemotko v. Maryland,*
   340 U.S 268 (1951) ............................................................................. 37, 38, 40

*NLRB v. Hanna Boys Ctr.,*
   940 F.2d 1295 (9th Cir. 1991)........................................................................ 37

*Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993) ................................................................................. 15, 57

*Nunez v. Duncan,*
   591 F.3d 1217 (9th Cir. 2010)........................................................................ 53

*Nurre v. Whitehead,*
   580 F.3d 1087 (9th Cir. 2009)........................................................................ 34

*Nurse v. United States,*
   226 F.3d 996 (9th Cir. 2000)....................................................................... 9, 25

xi

*O.H. v. Oakland Unified School Dist.*
  2000 WL 33376299 (N.D. Cal. 2000)..........................................................59, 60

*O'Connor v. Ortega*,
  480 U.S. 709 (1987) .................................................................................... 69

*Orin v. Barclay*,
  272 F.3d 1207 (9th Cir. 2001) ..................................................................... 64

*Padilla v. Yoo*,
  633 F.Supp.2d. 1005 (N.D. Cal. 2009)....................................................passim

*Paton v. La Prade*,
  524 F.2d 862 (3d Cir. 1975) ........................................................................ 11

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ..................................................................................... 28

*Peter v. Wedl*,
  155 F.3d 992 (8th Cir. 1998)........................................................................ 63

*Portman v. County of Santa Clara*,
  995 F.2d 898 (9th Cir. 1993) ....................................................................... 59

*Rashdan v. Geissberger*,
  2011 WL 197957 (N.D. Cal. Jan. 11, 2011) ...........................................59, 60

*Rebel Van Lines v. City of Compton*,
  663 F.Supp. 786 (C.D. Cal. 1987)................................................................ 60

*Resnick v. Adams*,
  348 F.3d 763 (9th Cir. 2003) ....................................................................... 10

*Rouser v. White*,
  630 F.Supp.2d 1165 (E.D. Cal. 2009) .......................................................... 34

*Saenz v. Roe*,
  526 U.S. 489 (1999) ..................................................................................... 57

*Safford Unif. Sch. Dist. v. Redding*,
  129 S. Ct. 2633 (2009) ................................................................................ 40

*Saucier v. Katz*,
  533 U.S. 194 (2001) ..................................................................................... 28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Schweiker v. Chilicky,*
  487 U.S. 412 (1988) .................................................................................. 14, 20

*Schwenk v. Hartford,*
  204 F.3d 1187 (9th Cir. 2000) .................................................................. 61

*Scott v. Rosenberg,*
  702 F.2d 1263,1266 (9th Cir. 1983) ........................................................ 10

*Scott v. Ross,*
  140 F.3d 1275 (9th Cir. 1998) .............................................................. 58, 62

*Sherbert v. Verner,*
  374 U.S. 398 (1963) ............................................................................... 36, 38

*Sklar v. C.I.R.,*
  549 F.3d 1252 (9th Cir. 2008) .................................................................. 34

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) .................................................................. 53

*Sutton v. Providence St. Joseph Medical Ctr,*
  192 F.3d 826 (9th Cir.1999) ...................................................................... 55

*Sweet v. Sec'y, Dept. of Corr.*
  467 F.3d 1311 (11th Cir. 2006) ................................................................ 63

*Swierkiewicz v. Sorema N.A.,*
  534 U.S. 506 (2002) .................................................................................. 44

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
  309 F.3d 144 (3rd Cir. 2002) .................................................................... 39

*Thomas v. Independence Township.,*
  463 F.3d 285 (3rd Cir. 2006) .................................................................... 62

*Thomas v. Review Bd. of Indiana Employment Sec. Div.,*
  450 U.S. 707 (1981) .................................................................................. 36

*Trevino v. Gates,*
  99 F.3d 911 (9th Cir. 1996) ...................................................................... 29

*Trujillo v. City of Ontario,*
  428 F.Supp.2d 1094 (C.D. Cal. 2006) ................................................ 68, 71

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*United States ex rel. Moore v. Koelzer,*
   457 F.2d 892 (3rd Cir. 1972)................................................................9

*United States v. Aguilar,*
   883 F.2d. 662 (9th Cir. 1989)...........................................................71

*United States v. Armstrong,*
   517 U.S. 456 (1996) ...............................................................40, 63

*United States v. Gonzalez,*
   328 F.3d 543 (9th Cir. 2003)...........................................................69

*United States v. Heckenkamp,*
   482 F.3d 1142 (9th Cir. 2007)........................................................65

*United States v. Koyomejian,*
   970 F.2d 536 (9th Cir. 1992)......................................................71, 72

*United States v. Little,*
   753 F.2d 1420 (9th Cir. 1984).........................................................69

*United States v. Martinez-Fuerte,*
   428 U.S. 543 (1976) .......................................................................71

*United States v. Mayer,*
   503 F.3d 740 (9th Cir. 2007)......................................................71, 72

*United States v. McIntyre,*
   582 F.2d 1221 (9th Cir. 1978).........................................................66

*United States v. Mesa-Rincon,*
   911 F.2d 1433 (10th Cir. 1990).......................................................71

*United States v. Montero-Camargo,*
   208 F.3d 1122, 1134 -1135 (9th Cir. 2000)……………………….………47

*United States v. Nerber,*
   222 F.3d 597 (9th Cir. 2000).................................................68, 70, 71

*United States v. Stanley,*
   483 U.S. 669 (1987) ...............................................................14, 20, 23

*United States v. Taketa,*
   923 F.2d 665 (9th Cir. 1991).................................................66, 68, 69

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*United States v. Torres*,
    751 F.2d 875 (7th Cir. 1984) ............................................................ 71

*Van Orden v. Perry*,
    545 U.S. 677 (2005) ......................................................................... 33

*Vance v. Rumsfeld*,
    694 F.Supp.2d 957 (N.D. Ill. 2010) ................................................ 25

*Vernon v. City of Los Angeles*,
    27 F.3d 1385 (9th Cir. 1994) ..................................... 34, 36, 37, 56, 57

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ......................................................................... 43

*Vinning-El v. Evans*,
    657 F.3d 591 (7th Cir. 2011) ........................................................... 39

*Vision Church v. Village of Long Grove*,
    468 F.3d 975 (7th Cir. 2006) ........................................................... 39

*W. Radio Servs. Co. v. U.S. Forest Service*,
    578 F.3d 1116 (9th Cir. 2009) .................................................... 14, 20

*Wallace v. Jaffree*,
    472 U.S. 38 (1985) ........................................................................... 33

*Walz v. Tax Comm'n*,
    397 U.S. 664 (1970) ................................................................... 33, 36

*Washington v. Duty Free Shoppers*,
    696 F.Supp. 1323 (N.D. Cal. 1988) ................................................. 60

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975) ........................................................................... 9

*Whren v. United States*,
    517 U.S. 806 (1996) ......................................................................... 47

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ......................................................................... 33

*Wilkie v. Robbins*,
    551 U.S. 537 (2007) ................................................................. passim

*Wilson v. Layne,*
    526 U.S. 603 (1999) ................................................................. 10

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) ........................................... 17, 24

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ............................................................ 32, 36

*Word of Faith Fellowship, Inc. v. Rutherford County Dep't Social Services,*
    329 F. Supp. 2d 675 (W.D.N.C. 2004) .................................... 63

*Yendes v. McCulloch,*
    2010 WL 3339505 (S.D. Cal. Aug. 23, 2010) ...................... 66, 68

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .............................................................. 23


**STATUTES**

5 U.S.C. 552a(e)(7) ...................................................................... 15

8 U.S.C. 1324 ................................................................................ 71

18 U.S.C. 2510 *et seq* ................................................................. 66

42 U.S.C. 1983 .............................................................................. 55

42 U.S.C. 1985 ........................................................................ 42, 58

42 U.S.C. 2000bb-2(1), 2000bb-1(c) .......................................... 55

42 U.S.C. 2000bb-4 ...................................................................... 18

42 U.S.C. 2000bb(a)(4) ........................................................... 18, 19

42 U.S.C. § 2000bb–1(a), (b) ...................................................... 17

50 U.S.C. 1801(f)(4) .................................................................... 72

50 U.S.C. 1809(a) ........................................................................ 73

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8(a)(2) ...................................................... 5

Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681, 683-84 (2009) ............................................................................................... 20

S. Rep. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 1892 ................................. 18

Sir William Blackstone, 3 COMMENTARIES ON THE LAWS OF ENGLAND 109 (Worcester: Isiah Thomas 1790) ........................................................ 20

Spencer Ackerman, *Attorney General: FBI Hurt Terror Fight With 'Violent Muslim' Training* ............................................................................ 4

Spencer Ackerman and Noah Shachtman, *Video: FBI Trainer Says Forget 'Irrelevant' al-Qaida, Target Islam* ................................................ 4

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

# **INTRODUCTION**

Plaintiffs have pled with remarkable specificity — borne of detailed statements from an informant who worked for the government — that Defendants engaged in a program of intentional religious discrimination by singling out Plaintiffs for intrusive surveillance because of their religion.  Plaintiffs have also pled, with equal specificity, that Defendants used surveillance tactics that plainly violate existing Fourth Amendment law — including most obviously the warrantless use of recording devices to tape conversations to which the informant was not a party.  Plaintiffs assert that these egregious tactics violate no fewer than five different federal statutes and four constitutional provisions.[1]

Yet, remarkably, according to Defendants not a single one of these statutes or constitutional provisions gives the Court authority even to address whether their egregious conduct was unlawful.  Defendants' responses, taken together, evoke images of a game of Three-card Monte — each and every federal statute or constitutional provision provides no cause of action against these defendants, addresses some slightly different harm, or provides no remedy in this particular context.  The resulting whirl deflects attention from the obvious violations, until at the end, no means for the Court to address the legality of this egregious conduct is left on the table.[2]  In Defendants' view, despite the deep commitments to religious liberty and privacy enshrined in our laws, neither Congress nor the Framers of the Constitution intended for the federal government to be held accountable for adopting a program to intrusively surveil law-abiding American citizens because of their religion; and even if they did, they intended to allow the government to foreclose any legal challenge to such conduct simply by labeling it secret.

Defendants' view is not the law.  As Chief Justice Marshall recognized,

---

[1] As clarification, Plaintiffs have submitted a Claims Chart, identifying each claim, the relief sought, and the general defenses raised, as Attachment A to this brief.

[2] For a visual depiction of this sleight of hand, *see* http://youtu.be/o2kO_5cNF5k.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 163 (1803) (quoted in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971)).  And as Plaintiffs set forth in detail, Defendants' analysis of each statute and constitutional provision is as unsupportable as the result is unacceptable.

Most important, Defendants misunderstand Plaintiffs' discrimination claims by arguing that Plaintiffs' allegations do not plausibly show discriminatory intent, or that litigating them will require revealing secret motives to show that Defendants were not motivated "solely" by religion.  But Plaintiffs' complaint alleges that Defendants explicitly used religion as a factor in deciding whom to surveil by instructing their informant to target *Muslims* for surveillance.  A government action that expressly classifies persons on the basis of a suspect classification constitutes facial discrimination.  Such facial classifications – even if they employ religion as only one factor (rather than the sole factor) — are impermissible unless they satisfy strict scrutiny.  *See Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (holding use of race as one factor in college admissions unconstitutional); *Emp't Div. v. Smith*, 494 U.S. 872, 886 n.3 (1990) ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion.").  And when government uses facial classifications, there is no further need to infer discriminatory intent, nor to examine whether the classification was adopted out of disdain for the suspect class.

Defendants have engaged in precisely this kind of facial discrimination against Plaintiffs.  Federal law and our Constitution forbid it.

## **FACTS**

Plaintiffs' 69-page First Amended Complaint ("FAC" or "complaint") paints down to the fine details a picture of an investigation that explicitly and

intentionally discriminated against Muslims because of their religion: FBI officers ran an undercover operation, the central and explicit purpose of which was to conduct surveillance and gather information on Muslims in Orange County. *See, e.g.*, FAC ¶¶ 88, 89 (agents did not limit informant to specific targets, but "repeatedly made clear that they were interested simply in Muslims"), ¶ 90 (gave informant no specific targets but "told him to gather as much information on as many people in the Muslim community as possible"), ¶ 100. Defendants told their informant, "We want to get as many files on [the Muslim] community as possible." FAC ¶ 90. They told him that "the United States was five to ten years behind Europe in the extent of Islamic presence, and that they needed to build files on as many individuals as possible so that when things started to happen, they would know where to go." FAC ¶ 90. They told him that "Islam is a threat to our national security." FAC ¶¶ 121, 162. They told him to focus on Muslims who appeared more devout (for example, as demonstrated by a willingness to attend late evening or early morning prayers) because they were "more suspicious." FAC ¶ 110; *see also id.* ¶¶ 89, 96, 104. They instructed him to get the names of any leadership figures within mosques, and told him that they considered the leaders in the Muslim community — board members and leadership of mosques and leaders of Muslim organizations — to be potential threats. FAC ¶¶ 91, 96, 144.

The complaint alleges that Defendants consistently gave instructions that made religion the primary criterion for suspicion by focusing explicitly on Muslims and the Muslim community: they gave the informant daily quotas on the number of Muslims he should get contact information from, FAC ¶ 131; told him to work out at the gym with members of the Muslim community in order to get close to them and obtain information, FAC ¶ 114; gave him a standing order to report on Muslims' charitable giving, travel plans, or fundraising activities, FAC ¶¶ 105, 106, 107, as well as any lectures, classes or any other events held at mosques, FAC ¶¶ 108, 109, 133. And while they discarded information

inadvertently gathered on non-Muslims, FAC ¶ 120, within the targeted group of Muslims they were indiscriminate: they instructed the informant to unearth as much information about as many Muslims as possible through as many methods as possible, without specific targets.  FAC ¶¶ 101, 102, 103.

Although more detailed allegations would not be necessary to establish the plausibility of Plaintiffs' discrimination claims, the FAC also contains information about the government's internal policies and training that provide yet further support to these claims — describing how, over the last several years, the Attorney General's Guidelines and FBI internal policies have moved towards policies and practices that explicitly focus on Muslims and Islam, *see, e.g.*, FAC ¶¶ 24-37, and how the FBI has trained its agents that Islam inherently mandates violent action against non-Muslims.  The FBI even recommended to its agents readings that instructed that "Islam teaches that Muslims must wage war to impose Islamic law on non-Muslim states" and "American Muslim groups are engaged in a huge cover-up of Islamic doctrine and history," FAC ¶¶ 38, 39.[3]

With respect to the privacy and search allegations, the FAC alleges that Defendants told the informant they did not need warrants for national security investigations, FAC ¶ 136, and engaged in several types of clearly unlawful warrantless surveillance.  Defendants' instructed the informant to take secret video of the interior of mosques, including any security, and used the information to enter mosques.  FAC ¶ 174.  Defendants secretly planted electronic surveillance in mosques, including in Plaintiff Fazaga's office, FAC ¶ 95.  Defendants also

---

[3] The FBI's discriminatory trainings were widely exposed just days after Plaintiffs filed their FAC, and have since been roundly condemned.  *See* Spencer Ackerman, *Attorney General: FBI Hurt Terror Fight With 'Violent Muslim' Training*, Wired (Nov. 8, 2011), available at *http://www.wired.com/dangerroom/2011/11/holder-fbi-islamophobia*; Spencer Ackerman and Noah Shachtman, *Video: FBI Trainer Says Forget 'Irrelevant' al-Qaida, Target Islam*, Wired (Sept. 20, 2011), available at *http://www.wired.com/ dangerroom/2011/09/fbi-islam-qaida-irrelevant*.

1  allowed the informant to use recording devices to capture private conversations at

2  the mosque when he was not present, FAC ¶¶ 98, 126, 192, 211; to obtain

3  warrantless video surveillance of mosques (including private areas) and even the

4  inside of Plaintiff AbdelRahim's home, FAC, at ¶¶ 106, 108, 129, 172-73, 182,

5  192, 202; and to record every conversation the informant had with members of the

6  Muslim community in his daily contact over more than a year, amassing personal

7  information on hundreds if not thousands of Muslims.  FAC ¶ 2.

8                                    **ARGUMENT**

9          Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint

10  contain " 'a short and plain statement of the claim showing that the pleader is

11  entitled to relief,' in order to give the defendant fair notice of what the claim is and

12  the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555

13  (2007) (quotation omitted).  "To survive a motion to dismiss," this plain statement

14  of facts "must contain sufficient factual matter, accepted as true, to state a claim to

15  relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

16  In *Twombly* and *Iqbal*, the Supreme Court identified a two-part approach in order

17  to ensure that the allegations of a complaint give rise to more than a "sheer

18  possibility" of wrongdoing.  *Iqbal,* 129 S. Ct. at 1949–50.

19          First, a court reviews the complaint for any "bare assertions" of liability that

20  "amount to nothing more than a 'formulaic recitation of the elements'" of a claim,

21  as such assertions are "conclusory and not entitled to be assumed true." *Id.*  Next,

22  the court examines the remaining factual allegations, and, in doing so, "should

23  assume their veracity and then determine whether they plausibly give rise to an

24  entitlement to relief." *Id.* at 1950.  To do so, the allegations must "nudge[]" a

25  plaintiff's claims "across the line from conceivable to plausible," by "allow[ing]

26  the court to draw the reasonable inference" that Defendants may be liable.  *Id.* at

27  1951, 1949.  Even under *Iqbal*, Rule 8 does not require "detailed factual

28  allegations," but requires only "more than an unadorned, the-defendant-

1   unlawfully-harmed-me accusation." *Id.* at 1949. *See Padilla v. Yoo*, 633

2   F.Supp.2d. 1005, 1018-19 (N.D. Cal. 2009) ("The issue is not whether a plaintiff

3   will ultimately prevail but whether the claimant is entitled to offer evidence to

4   support the claims. . . . [T]o survive a motion to dismiss, a plaintiff's burden is

5   limited to setting forth factual allegations sufficient to raise the right to relief above

6   the speculative level. . . . That is, a plaintiff must allege facts that, taken as true, are

7   suggestive of illegal conduct.").

8        When a court considers a motion to dismiss, it must construe all allegations

9   of the complaint in the plaintiff's favor. *Hutton v. Law Offices of Collins &*

10  *Lamore*, 668 F.Supp.2d 1251, 1254 (S.D. Cal. 2009).

11  **I.     THE CONSTITUTION PROVIDES A DAMAGES REMEDY FOR**

12  **RELIGIOUS DISCRIMINATION AND UNLAWFUL**

13  **SURVEILLANCE UNDER *BIVENS***

14       In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), the

15  Supreme Court held that an individual alleging a Fourth Amendment violation by

16  federal officers could sue those officers for damages directly under the

17  Constitution. The Court has subsequently held that *Bivens* allows damages

18  remedies for discrimination in violation of the Fifth Amendment's Due Process

19  Clause, *Davis v. Passman*, 442 U.S. 228, 229 (1979), and violations of the Eighth

20  Amendment, *Carlson v. Green*, 446 U.S. 14, 25 (1980). Under *Bivens*, the

21  Supreme Court and Ninth Circuit have repeatedly addressed damages claims

22  arising out law enforcement conduct, including discrimination and First

23  Amendment retaliation.

24       The Individual Capacity Defendants argue that this case should be different

25  — that even if they engaged in facial religious discrimination by targeting Muslims

26  in violation of the First Amendment and Equal Protection Clause, and even if they

27  repeatedly violated the Fourth Amendment with unlawful surveillance, this Court

28  should nonetheless dismiss Plaintiffs' constitutional claims without reaching the

merits for two reasons.  Both are meritless.[4]

First, Defendants argue that Congress has provided remedies in three federal statutes — the Religious Freedom and Restoration Act (RFRA), the Foreign Intelligence Surveillance Act (FISA) and the Privacy Act — that preclude a damages remedy for constitutional violations.  But Defendants' argument rests on a misunderstanding of Plaintiffs' discrimination claims — Plaintiffs claim that Defendants expressly used religion as a basis to target them for surveillance.  This harm is not addressed by RFRA (which addresses burdens placed on religious practice by neutral laws, not facial discrimination), the Privacy Act (which provides limited remedies for the maintenance of records of First Amendment activity, but does not limit the retention of records gathered under a policy that discriminates on the basis of religion), and certainly not by FISA, which addresses only discrete Fourth Amendment-related harms concerning electronic surveillance.

Second, Defendants TW argue that no damages are available for any constitutional violation, no matter how egregious, as long as the government officer who caused it was acting in the name of "national security."  Contrary to Defendants' assertions, the Supreme Court has *never* held national security to be a special factor to consider in withholding a *Bivens* remedy.  And in the one *Bivens* case to address national security, *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Court rejected the argument that "national security" justified absolute immunity from damages actions under *Bivens*, reasoning that "[t]he danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute

---

[4] For clarity and brevity, Plaintiffs refer to Defendants FBI, United States, Mueller, and Martinez (the latter two of whom are sued in their official capacities) as the "Government."   Plaintiffs refer to Defendants Tidwell and Walls as "TW," and to Armstrong, Allen and Rose as "AAR," and to Defendants TW and AAR collectively as "Individual Capacity Defendants."

7

1   immunity." *Id.* at 523.  The Ninth Circuit and district courts within it have

2   addressed *Bivens* claims under the First Amendment in cases involving national

3   security.  *See Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1253-54, 1259

4   (9th Cir. 2008); *Padilla*, 633 F.Supp.2d at 1019. The lower court cases on which

5   Defendants rely involve matters of foreign policy or military activity expressly

6   delegated to the Executive by the Constitution; they do not control this case, which

7   challenges the investigation of civilian American citizens and residents by a

8   domestic law enforcement agency on U.S. soil.

9       Most important, to deny a *Bivens* remedy here the Court would have to

10  conclude either that discrimination on the basis of religion is the only

11  constitutionally forbidden discrimination for which a damages remedy is

12  unavailable, or that "national security" concerns grant unfettered immunity to the

13  FBI in an investigation of Americans in Orange County.  Governing law forecloses

14  both of these unsavory results.

15      **A.     This Case Does Not Present An Extension Of *Bivens***

16      A court considering whether a *Bivens* remedy should proceed must first

17  determine whether the case presents a "new context" or "new category of

18  defendants." *Corr. Servs. Corp. v Malesko*, 534 U.S. 61, 68 (2001).  The present

19  case is not an extension of *Bivens*; it involves the type of unconstitutional law

20  enforcement conduct that lies at the heart of *Bivens* jurisprudence.

21          1.  ***Claims Alleging Discrimination By Law Enforcement Officers***

22              ***Lie at the Core of* Bivens**

23      The basic facts of Plaintiffs' claims — the FBI targeted them for

24  investigation because of their religion and unlawfully surveilled them — put this

25  case in the heartland of *Bivens* actions by raising claims of discrimination and

26  challenging unlawful conduct by law enforcement during an investigation.

27      Courts have routinely allowed *Bivens* claims alleging discrimination,

28  including on the basis of religion.  *Davis* held that *Bivens* allows damages claims

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

by plaintiffs alleging unconstitutional discrimination by federal officials under the equal protection component of the Fifth Amendment.[5] 442 U.S. at 229. As set forth in detail below, courts have generally recognized that classification on the basis of religion violates equal protection. *See infra* Part II.E. Plaintiffs' claim for religious discrimination therefore can be brought directly under *Davis*.[6] Indeed, the *Davis* Court contemplated its holding would encompass religious discrimination. It explicitly followed *U. S. ex rel. Moore v. Koelzer*, 457 F.2d 892 (3rd Cir. 1972), which held a plaintiff could bring claims under *Bivens* that FBI agents procured false testimony because of his race and religion. *See Davis*, 442 U.S. at 244 n.22.

Moreover, courts have consistently adjudicated *Bivens* claims asserting religious discrimination and violations of the Free Exercise Clause. Both the Ninth Circuit and district courts within it have addressed *Bivens* claims for religious discrimination and Free Exercise violations, including in cases that raise national security concerns. *See Ibrahim*, 538 F.3d at 1254 n.4 (addressing *Bivens* claim of religious discrimination in detention by police and federal airport authorities); *Padilla*, 633 F.Supp.2d at 1019 (allowing *Bivens* remedy for, *inter alia*, First Amendment religion claims against alleged architect of the policies that led to plaintiff's detention as "enemy combatant"); *Mayfield v. Gonzales*, 2005 WL 1801679, at *1 & n.1, *9-10 (D. Or. July 28, 2005) (addressing *Bivens* claim

---

[5] The analysis for claims of discrimination against federal officials under the Fifth Amendment's Due Process Clause is "precisely the same" as that for discrimination claims against state officials under the Equal Protection Clause. *Weinberger v. Wiesenfeld* 420 U.S. 636, 638 n.2 (1975).

[6] The Ninth Circuit allowed *Bivens* actions challenging discrimination on the basis of race, *see Nurse v. United States*, 226 F.3d 996, 999-1000 (9th Cir. 2000) (reversing dismissal of *Bivens* action against U.S. Customs agents who plaintiff alleged detained, arrested and searched her solely on the basis of her race without reasonable suspicion or probable cause), and national origin, *see Castaneda v. United States*, 546 F.3d 682, 688 n.6 (9th Cir. 2008), *reversed on other grounds sub nom. Hui v. Castaneda*, 130 S.Ct. 1845 (2010).

9

against FBI agents that arrested plaintiff on suspicion he participated in the Madrid train bombings, allegedly "based upon his Muslim religion"); *see also Kwai Fun Wong v. United States*, 373 F.3d 952, 959, 961 (9th Cir. 2004) (addressing *Bivens* claim of religious discrimination, though reserving question whether immigration laws created comprehensive remedial scheme that precludes *Bivens* remedy); *Resnick v. Adams*, 348 F.3d 763, 765 (9th Cir. 2003) (addressing federal prisoner's *Bivens* claim that obstacles to obtaining kosher food violated First Amendment); *Scott v. Rosenberg*, 702 F.2d 1263,1266 (9th Cir. 1983) (assuming that church president could file damages action against FCC officers alleging violation of Free Exercise Clause arising out of FCC investigation into television and radio programs). In light of these cases, Defendants' argument that a claim for religious discrimination requires an "extension" of *Bivens* is meritless.

In addition, courts have consistently found *Bivens* applicable in the factual context of misconduct by law enforcement officers during an investigation, ever since *Bivens* itself recognized a damages remedy to address claims of an unconstitutional search and detention by "*Six Unknown Federal Narcotics Agents*," *see Bivens*, 403 U.S. at 389. Courts have allowed *Bivens* remedies for a range of constitutional violations by law enforcement, including a variety of claims under the Fourth Amendment,[7] as well as violations of the Fifth Amendment's Due Process Clause,[8] and the First Amendment's speech protections.[9] Courts have long

---

[7] *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (execution of facially unreasonable warrant); *Wilson v. Layne*, 526 U.S. 603, 608 (1999) (unreasonable search due to presence of media); *Anderson v. Creighton*, 483 U.S. 635, 637 (1987) (warrantless search of home); *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004) (wrongful arrest); *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997) (excessive force and conspiracy to blame plaintiff for shootout).

[8] *See, e.g.*, *DiMartini v. Ferrin* 889 F.2d 922, *amended on pet. for rehearing en banc*, 906 F.2d 465, 466 (9th Cir. 1990) (*Bivens* due process claim against FBI agent plaintiff claimed caused him to be fired from his job with a private employer because agent believed plaintiff had not cooperated with investigation).

allowed *Bivens* actions charging that law enforcement acted based on illegal motives, including discrimination, *supra*, and retaliation in violation of the First Amendment. *See Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986) (holding plaintiff could bring *Bivens* claim under First Amendment against FBI agents who allegedly sought to discourage her political activities by wiretapping her telephone, passing defamatory information to her employers, and seeking to entrap her in contraband drug transactions); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) (stating First Amendment retaliation claim proper "on the authority of *Bivens*").[10]

## 2. *'National Security' Does Not Make This a New Context*

Defendants argue that this case is transformed to a new context by national security, asserting that "no court has inferred a damages cause of action under the Fourth or Fifth Amendment to remedy alleged injuries" in a similar context, but that assertion cannot be reconciled with *Mitchell*. Leaving aside that Defendants

---

[9] *Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (permitting First Amendment *Bivens* claim alleging federal officers prevented plaintiffs from engaging in war protest); *Paton v. La Prade,* 524 F.2d 862, 870 (3d Cir. 1975) (providing *Bivens* relief to plaintiffs on First Amendment claims that FBI agents conducted unlawful surveillance of plaintiffs' lawful political correspondence).

[10] Following *Gibson*, the Ninth Circuit has repeatedly entertained *Bivens* challenges to law enforcement investigations as retaliation for protected First Amendment speech. *See, e.g.*, *Moss v. Secret Service*, 572 F.3d 962, 967 n.4 (9th Cir. 2009) (*Bivens* claim by protestors that secret service relocated demonstration because protestors were critical of the president, in violation of their First Amendment rights); *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 461-64 (9th Cir. 1994) (*Bivens* claims against FBI officers for chilling plaintiffs' First Amendment free speech rights by unlawfully arresting them, releasing false accusations about their responsibility for a bombing of the plaintiffs' own car, and interrogating their associates); *Erickson v. United States*, 976 F.2d 1299, 1301 (9th Cir. 1992); *Labadie v. United States*, 2011 WL 1376235, 3 (W.D. Wa. Apr. 12, 2011); *Denney v. Drug Enforcement Admin.*, 508 F.Supp.2d 815, 835 (E.D. Cal. 2007) (*Bivens* claim DEA investigated plaintiff in retaliation for his advocacy of medical marijuana).

---

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

have not defined the contours of the "national security" category of potential

*Bivens* case and explained why this case fits within it, *see* Pl. Opp. to Gov't MTD

41 n.24, *Mitchell* allowed a *Bivens* action  to proceed where the plaintiff sought

damages for being subject to warrantless phone wiretaps during investigation of a

group plotting to blow up parts of federal buildings and kidnap then-National

Security Advisor Henry Kissinger.  472 U.S. at 513.  In *Mitchell*, the Court

explicitly rejected the notion that officials acting in the interests of "national

security" should enjoy absolute immunity from *Bivens* claims, reasoning that "[t]he

danger that high federal officials will disregard constitutional rights in their zeal to

protect the national security is sufficiently real to counsel against affording such

officials an absolute immunity." *Id.* at 523.  While *Mitchell* framed the issue as one

of absolute immunity, rather than an inquiry under the *Bivens* special factors, the

Court rejected the same argument that Defendants offer here: that plaintiffs should

be categorically barred from bringing damages actions against law enforcement in

national security investigations.[11]

More recently, a California district court in *Padilla v. Yoo* explicitly held

that *Bivens* claims under the First, Fourth and Fifth Amendments could proceed to

challenge the treatment of an American detained as an enemy combatant.  633

F.Supp.2d at 1019-30.  Other courts, including the Ninth Circuit, have assumed

that *Bivens* creates a cause of action to address claims of religious discrimination in

response to government action in the name of national security.  *See Ibrahim*, 538

F.3d at 1259 (allowing *Bivens* claim of religious discrimination to proceed against

Transportation Security Intelligence Service officer); *Mayfield*, 2005 WL 1801679,

---

[11] Neither national security nor interference with foreign affairs deterred the
Supreme Court more than 200 years ago from allowing a damages action against
the commander of an American warship who seized cargo on the President's
orders blockading French ports, where those orders exceeded congressional
authorization. *Little v. Barreme*, 2 Cranch (6 U.S.) 170 (1804).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1  at *1 & n.1, *9-10 (addressing *Bivens* claim that FBI agents arrested plaintiff in

2  connection with Madrid train bombings because he was Muslim).

3      **B.      Even If This Case Is an Extension, a *Bivens* Remedy Is Available**

4          Even were the Court to conclude that this case does raise a new context for

5  *Bivens* actions, it should still recognize a damages remedy for the constitutional

6  violations alleged here.  A court considering whether a *Bivens* remedy is

7  appropriate in a new context asks first "whether any alternative, existing process

8  for protecting the interest amounts to a convincing reason for the Judicial Branch

9  to refrain from providing a new and freestanding remedy." *Wilkie v. Robbins*, 551

10  U.S. 537, 550 (2007).  If the court concludes that "[i]t would be hard to infer that

11  Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract

12  any clear lesson that *Bivens* ought to spawn a new claim," step two of the analysis

13  directs the court to "weigh[] reasons for and against the creation of a new cause of

14  action, the way common law judges have always done," "paying particular heed,

15  however, to any special factors counselling hesitation before authorizing a new

16  kind of federal litigation," *Id.* at 554, 550.  Courts have undertaken this analysis in

17  light of *Bivens'* two primary purposes.  As Chief Justice Rehnquist wrote in

18  *Malesko*, "*Bivens* from its inception has been based …on the deterrence of

19  individual officers who commit unconstitutional acts." 534 U.S. at 71.  *Bivens* also

20  "provide[s] a cause of action for a plaintiff who lack[s] any alternative remedy for

21  harms caused by an individual officer's unconstitutional conduct." *Id.* at 70

22  (emphasis omitted).  Only where "such circumstances are not present" has the

23  Court "consistently rejected invitations to extend *Bivens*." *Id.*

24          1.  ***No Statutory Scheme Indicates Congress's Intent to Displace***

25              **Bivens** *Remedies*

26          Although several statutes address harms tangentially related to those at issue

27  here, no statutory scheme indicates Congress's intent to displace the *Bivens*

28  remedies that Plaintiffs seek.  As *Wilkie* made clear, the existence of statutory

schemes figures into the *Bivens* analysis in two ways.  First, at step one of the *Bivens* analysis, the Court examines whether there is a statutory scheme sufficiently comprehensive that, from its enactment, a court can "infer that Congress expected the Judiciary to stay its *Bivens* hand." *Wilkie*, 551 U.S. at 554; *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (*Bivens* action  not warranted "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations"); *W. Radio Servs. Co. v. U.S. Forest Service*, 578 F.3d 1116, 1122 (9th Cir. 2009) (Administrative Procedure Act, which "expressly declares itself to be a comprehensive remedial scheme," precluded *Bivens* challenge to unfavorable agency actions).  At the first stage, courts should decline to recognize a *Bivens* remedy only where "Congress' failure to provide money damages, or other significant relief, has not been inadvertent."  *Berry v. Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (quotations omitted).  In *Wilkie*, even where the plaintiff had "an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," 551 U.S. at 553, the Court held that because the available remedies were "a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes, and common law rules," *id.* at 554, "[i]t would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand," *id.*, and the Court should proceed to the second step of the analysis.

Second, when the Court "weighs reasons for and against the creation of a new cause of action, the way common law judges have always done," at step two of the *Bivens* analysis, the existence of alternative remedies again arises and (contrary to Defendants' assertion, *see* TW Br. 19) the absence of a statutory remedy weighs *in favor* of allowing a constitutional one.[12]  In *Wilkie*, although the

---

[12] Defendants on this point cite *Stanley*, in which the Court held that the absence of remedies for the plaintiff was irrelevant to its particular determination in that case that "the unique disciplinary structure of the Military Establishment and Congress'

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Court noted that the plaintiff "had ready at hand a wide variety of administrative

2   and judicial remedies to redress his injuries," 551 U.S. at 562; *see also id.* at 555,

3   the "inadequacy of discrete, incident-by-incident remedies" in addressing the

4   plaintiff's complaints about "the course of dealing as a whole" ultimately weighed

5   in favor of creating a remedy.  *See id.* at 554 ("Here, the competing arguments boil

6   down to one on a side: from [plaintiff], the inadequacy of discrete, incident-by-

7   incident remedies; and from the Government and its employees, the difficulty of

8   defining" a workable standard for the cause of action).

9                          a.  Privacy Act

10          Defendants argue that the Privacy Act precludes Plaintiffs' First and Fifth

11  Amendment claims, because, they assert, Congress fashioned the statute to remedy

12  "precisely the injury" Plaintiffs allege: that a federal agency "maintain no record

13  describing how any individual exercises rights guaranteed by the First

14  Amendment." 5 U.S.C. 552a(e)(7).

15          Defendants simply misunderstand the injury Plaintiffs allege in their

16  Constitutional claims.  Plaintiffs' primary constitutional claims are that the FBI

17  "gathered the information [about Plaintiffs] simply *because* the targets were

18  Muslim."  FAC ¶ 3. (emphasis added).  The constitutional injury is discrimination

19  — not just that their religious activities were burdened because they were

20  monitored, but that all of their activities – both religious and non-religious — were

21  subjected to investigation because of their religion.  *Cf. Northeastern Fla. Chapter*

22  *of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666

23  (1993) ("The 'injury in fact' in an equal protection case ... is the denial of equal

24  _____

25  activity in the field," and the "explicit constitutional authorization for *Congress*" to
    regulate the Military, nonetheless precluded a *Bivens* remedy.  483 U.S. at 683,

26  682-83 (emphasis in original).  *Wilkie* makes clear, however, that as a general

27  matter the absence of a full remedy (even where a partial one exists) weighs in
    favor of creating one.  *Wilkie*, 551 U.S. at 554 (weighing "inadequacy" of remedies

28  in favor of recognizing remedy).

treatment . . . ”). Section (e)(7) of the Privacy Act restricts federal officials from maintaining records of religious activity, but it does not purport to provide remedies for law enforcement who act for constitutionally forbidden reasons.  If it did, it would preclude *Bivens* remedies for law enforcement actions in retaliation for protected speech, a *Bivens* action the Ninth Circuit has repeatedly recognized.  *See supra* Part I.B.1.a.[13]

Even if the Privacy Act did address the harms of which plaintiffs complain, its remedies do not serve *Bivens*' twin purposes of deterring individual officers and providing a meaningful remedy.  *See Malesko*, 534 U.S. at 70, 71.  Like the Federal Tort Claims Act (FTCA), it provides a remedy only against the agency, not against the federal officer responsible for the violation.  In *Carlson*, the Court relied in part on this very reason to conclude that the FTCA does not create a sufficient deterrent to justify denial of a *Bivens* remedy.  *See Carlson*, 446 U.S. at 21; *Padilla*, 633 F.Supp.2d at 1021.  *Carlson*'s reasoning applies with equal force here, particularly given the Government's arguments that the FBI's records are entirely exempt from the Privacy Act and that Section (e)(7) provides no enforceable remedy at all.  *Compare Malesko*, 534 U.S. at 70, and *Carlson*, 446 U.S. at 22, *with* Gov't Br. 15-16.

Defendants point to two cases that find the Privacy Act a basis to refuse a *Bivens* remedy, but both are distinguishable because they involve very different harms (both related to the disclosure of information) which are specifically regulated by the Privacy Act. *Downie v. Middleburg Heights*, 301 F.3d 688 (6th Cir. 2002), held a *Bivens* remedy was unavailable because the Privacy Act

---

[13] In keeping with this theory, while Plaintiffs bring a claim under Section (e)(7) of the Privacy Act seeking expungement of records which describe their religious activities, they also make a separate and distinct claim under the Constitution for expungement of records that the government gathered simply because they were Muslim.  *See* Plfs. Opp. to Gov't Defs., Part I.B.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   provided a damages remedy for the precise wrongs alleged, and the plaintiff

2   needed only to sue under the statute, rather than the Constitution.  *See id.* at 696,

3   696-97.  In *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), the court held that the

4   Privacy Act generally regulated the precise injury of which plaintiffs complained

5   (disclosure of information), but intentionally omitted a damages action against the

6   particular defendants Wilson had sued, exhibiting Congressional intent to preclude

7   a damages remedy.  Even accepting the logic of *Wilson* (which is not binding and

8   is strongly questioned by the dissent), it does not bar a *Bivens* remedy here.  Unlike

9   *Wilson*, plaintiffs' constitutional claim is not for "improper [collection] of

10  information subject to the Privacy Act's protections," *id.* at 707, but rather for

11  collection of information based on a discriminatory purpose.

12      Because the Privacy Act neither provides any meaningful remedy for

13  religious discrimination by law enforcement nor evinces any intent by Congress to

14  preclude one, it does not bar a *Bivens* remedy.

15              b.  RFRA

16      Defendants TW argue that the enactment of RFRA indicates "Congress's

17  intent that it, rather than the judiciary, should decide whether to create a damages

18  remedy" for the claims Plaintiffs present.  TW Br. 18.  Defendants' argument is

19  plainly meritless given the clear text and purpose of RFRA.  Indeed, Defendants

20  cite no case holding that RFRA precludes any kind of *Bivens* action, let alone a

21  discrimination action, and this Court should not be the first to adopt that rule.[14]

22      First, Congress made its intent in enacting RFRA clear and explicit: to

23  *expand* the remedies available for plaintiffs by overruling *Emp't Div. v. Smith*, 494

24

25  [14] RFRA provides that "[g]overnment shall not substantially burden a person's
26  exercise of religion even if the burden results from a rule of general applicability,"
    unless the government demonstrates a "compelling governmental interest" and
27  uses the "least restrictive means" of furthering that interest.  42 U.S.C. § 2000bb–
    1(a), (b).  *See infra*, Part I.B.1.b.
28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

U.S. 872 (1990), which "virtually eliminated the requirements that the government
justify burdens on religious exercise imposed by laws neutral toward religion," 42
U.S.C. 2000bb(a)(4), and "to restore the compelling interest test as set forth" in
pre-*Smith* cases." *Id.* § 2000bb(b).  The Senate report explains further that "the
purpose of this act is only to overturn the Supreme Court's decision in *Smith*," and,
"[t]o be absolutely clear, the act does not expand, contract or alter the ability of a
claimant to obtain relief in a manner consistent with the Supreme Court's free
exercise jurisprudence under the compelling governmental interest test prior to
*Smith*."  S. Rep. No. 103-111, pt. V(f), at 12 (1993), *reprinted in* 1993
U.S.C.C.A.N. 1892, 1902.  The report noted this to quell concerns that the act
could have "unintended consequences and unsettle other areas of the law."  *Id.*

Similarly, RFRA contains a provision entitled "Establishment Clause
unaffected," which states that "Nothing in this chapter shall be construed to affect,
interpret, or in any way address that portion of the First Amendment prohibiting
laws respecting the establishment of religion (referred to in this section as the
'Establishment Clause')." 42 U.S.C. 2000bb-4.  It establishes beyond dispute that
RFRA did not extinguish a *Bivens* remedy for Establishment Clause violations.

Finally, RFRA does not provide a remedy for most of the unlawful conduct
Plaintiffs' allege.  As set forth in detail *infra*, Part II.A, the core of Plaintiffs'
complaint is not burden by neutral law or conduct, but intentional discrimination
through facial classification on the basis of religion, which RFRA does not
address.  Indeed, the Supreme Court has never analyzed such facial classifications
under the "substantial burden" test, but always instead under strict scrutiny.  As the
Supreme Court has concluded, Congress in passing RFRA simply was not
concerned with intentional discrimination.  *See City of Boerne v. Flores*, 521 U.S.
507, 530-31 (1997); *cf.* 42 U.S.C. 2000bb(a)(4); *id.* § 2000bb(a)(4) (RFRA restores
protection for "burdens on religious exercise imposed by laws neutral toward
religion"); *see also Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir.1995).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

c. <u>FISA</u>

Defendants TW suggest that FISA provides sufficient evidence of Congress' intent to preclude *Bivens* claims under the Fourth Amendment. But because FISA's cause of action is not limited to national security cases, Defendants must explain why courts have addressed *Bivens* claims for electronic surveillance regularly in the past thirty years. *See, e.g.*, *Mitchell*, 472 U.S. at 513; *Gibson*, 781 F.2d at 1342. Unsurprisingly, then, Defendants point to no case holding that FISA precludes a *Bivens* remedy, and this Court should not be the first to do so.

\*       \*       \*

None of the statutory schemes to which Defendants point either set forth an "elaborate remedial scheme" comprehensive enough to demonstrate that "Congress expected the Judiciary to stay its *Bivens* hand," *Wilkie*, 551 U.S. at 554, or provide an alternative remedy for religious discrimination that constitutes a "special factor counseling hesitation." *Id.*

## 2. *No Special Factors Justify Precluding a Bivens Remedy*

If the Court agrees that no statute evinces Congress's intent to preclude a *Bivens* remedy, it must then "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done," "paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 554, 550.[15]

Defendants vastly overstate the reluctance of courts to allow *Bivens* remedies. While the Supreme Court has extended *Bivens* twice, to claims of discrimination under the Due Process Clause in *Davis* and cruel and unusual punishment under the Eighth Amendment in *Carlson*, the Court has relied on only two "special factors" to deny a *Bivens* remedy (other than the congressional

---

[15] Contrary to the suggestion of Defendants TW, the mere existence of a special factor does not mean no *Bivens* remedy is available, TW Br. 14, as the Supreme Court's balancing analysis in *Wilkie* shows.  551 U.S. at 555.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    preclusion that the *Wilkie* Court recast as step one of the *Bivens* analysis)[16] —

2    intrusion on "'the unique disciplinary structure of the Military Establishment and

3    Congress' activity in the field'" pursuant to an "explicit Constitutional

4    authorization for *Congress*" to regulate the military, *United States v. Stanley*, 483

5    U.S. 669, 683, 682-83 (1987) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304

6    (1983) and citing U.S. Const. Art. I, § 8, cl. 14); and "difficulty in defining a

7    workable cause of action," *Wilkie*, 551 U.S. at 555. Neither factor is present here.

8        While the Court has at various times declined to extend *Bivens* to defendants

9    other than individual federal officers, *see, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 473

10   (1994) (holding federal agency could not be named as a defendant in a *Bivens*

11   action); *Malesko*, 534 U.S. at 71-74 (holding *Bivens* did not provide constitutional

12   damages action against private prison corporation), those holdings obviously say

13   little if anything about the applicability of *Bivens* to individual federal law

14   enforcement officers, who were also the defendants in *Bivens* itself.

15       It also bears noting that, contrary to Defendants' suggestion, the rule that

16   courts should hesitate to infer a private action from a statute (when Congress failed

17   to do so), is not applicable to the Constitution, where the founders would not have

18   included causes of action among the document's broad statements of principles,

19   but nonetheless clearly intended the rights conferred to be enforced by the

20   judiciary. *See* Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative*

21   *Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681, 683-84

22   (2009) ("[S]tatutory causes of action (particularly so-called implied causes of

23   action) and direct, affirmative constitutional claims are largely distinct and are not

24   usefully analyzed as though they were the same."); Sir William Blackstone, 3

25   COMMENTARIES ON THE LAWS OF ENGLAND 109 (Worcester: Isiah Thomas 1790)

26

27   ---
[16] *See, e.g.*, *W. Radio Servs.*, 578 F.3d at 1123 (citing *Schweiker* and other cases

28   involving comprehensive remedial schemes in *Wilkie* step-one analysis).

1  ("[I]t is a settled and invariable principle in the laws of England, that every right,

2  when withheld, must have a remedy, and every injury its proper redress.").

3      Fundamentally, *Bivens* preserves the Constitution's careful balance of power

4  by establishing a means for courts to enforce the individual rights (and limitations

5  on government power) the Constitution already sets forth.  As *Davis* reasoned,

6  "unless such rights are to become merely precatory, the class of those litigants who

7  allege that their own constitutional rights have been violated, and who at the same

8  time have no effective means other than the judiciary to enforce these rights, must

9  be able to invoke the existing jurisdiction of the courts for the protection of their

10  justiciable constitutional rights." *Davis*, 442 U.S. at 242; *see also Marbury v.

11  Madison*, 1 Cranch (5 U.S.) 137, 163 (1803) ("The very essence of civil liberty

12  certainly consists in the right of every individual to claim the protection of the

13  laws, whenever he receives an injury.") (quoted in *Bivens*, 403 U.S. at 397).

14      Defendants point to only two "special factors" that they argue justify

15  denying Plaintiffs a remedy for their constitutional injuries — national security

16  issues and the assertion of state secrets privilege.  TW Br. 14.  Neither suffices.

17                    a.  <u>National Security</u>

18      Defendants TW argues that "national security" is a special factor that

19  justifies denial of a *Bivens* remedy because the case "probes into the predicates,

20  subjects, and methods of an FBI counterterrorism investigation."  TW Br. 16. *See*

21  TW Br. 14-16.  This argument is based on several distortions of the law.

22      First, Defendants ignore the only *Bivens* action involving national security at

23  the Supreme Court.  *See supra* Part I.A.2 (discussing *Mitchell v. Forsyth*).  Indeed,

24  *Mitchell* held that qualified immunity would provide adequate protection from

25  frivolous lawsuits in a case involving national security, and that "[w]here an

26  official could be expected to know that his conduct would violate statutory or

27  constitutional rights, he *should* be made to hesitate. This is as true in matters of

28  national security as in other fields of governmental action." *Id.* (emphasis in

21

1   *Mitchell*).  Although *Mitchell* framed the issue as absolute immunity from suits for

2   damages, rather than the absence of a damages remedy, its rationale forecloses

3   Defendants' argument here.

4          Even apart from *Mitchell*, Defendants' bold assertion that "[t]he Supreme

5   Court consistently has held that *Bivens* should not be extended in cases involving

6   'determinations relating to national security'" is flatly incorrect.  *Id*.  The Supreme

7   Court has *never* so held, and recent cases give little indication it would do so.  The

8   cases Defendants cite that mention "national security" are not *Bivens* cases.[17]

9   Indeed, in one case on which they rely, *Boumediene v. Bush*, 553 U.S. 723 (2008),

10  notwithstanding the Court's observation (quoted by Defendants) that judges do not

11  "begin the day with briefings" on "serious threats to our Nation," the Court

12  *rejected* the argument that courts should defer to the political branches.  The Court

13  found that "Security subsists, too, in fidelity to freedom's first principles," *id*. at

14  797, and held that the Constitution required judicial oversight of enemy combatant

15  detention through habeas corpus.  In many other contexts, too, the Court has

16  rejected the notion that issues of national security bar judicial scrutiny.  *See, e.g.*,

17  *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality) ("Whatever power the

18  United States Constitution envisions for the Executive in its exchanges with other

19  nations or with enemy organizations in times of conflict, it most assuredly

20  envisions a role for all three branches when individual liberties are at stake.");

21  *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war

22

23  [17] *See Haig v. Agee*, 453 U.S. 280 (1981) (addressing, on claim for declaratory and

24  injunctive relief only, whether Passport Act conferred on Secretary of State the
    authority to revoke a passport upon determining that passport hold's foreign

25  activities damaging to national security); *Holder v. Humanitarian Law Project*,
    130 S. Ct. 2705, 2727 (2010) (adjudicating whether statute prohibiting provision of

26  "material support or resources" to groups designated as foreign terrorist

27  organizations was unconstitutionally vague or impermissibly burdened speech and

28  association); TW Br. 1, 15 (citing *Haig* and *HLP*).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

power does not remove constitutional limitations safeguarding essential liberties."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Defendants cite to *Stanley* and *Chappell* as if those cases addressed "national security" as a special factor, but they did not.  Those cases declined to extend *Bivens* to claims arising from military service because the Constitution expressly commits authority over military matters to Congress, and because alternate remedies exist within the military system.  *See Stanley*, 483 U.S. at 681-82 (declining to make *Bivens* available for incidents arising out of military service because of "explicit constitutional authorization for Congress 'to make Rules for the [military]'" and "the insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches" (quoting U.S. Const. art. I, § 8, cl. 14)); *Chappell*, 462 U.S. at 300-04 (declining *Bivens* remedy in military context, relying on "the unique disciplinary structure of the military establishment and Congress' activity in the field").  Nothing in these opinions justifies withholding a *Bivens* remedy based on a generalized invocation of "national security," or that Americans give up their constitutional rights when FBI agents claim to be acting in the name of "counterterrorism."

Finally, three circuit cases mention "national security" in discussing special factors under *Bivens*, but all of them arise in very different factual circumstances and reflect a concern with "national security" primarily as related to interference with foreign affairs.[18]  In *Mirmehdi v. United States*, __ F.3d __, 2011 WL 5222884 (9th Cir. Nov. 3, 2011), the Ninth Circuit held that four unlawfully

---

[18] Defendants also cite *Beattie v. Boeing Co.*, in which the Tenth Circuit refused to allow a *Bivens* challenge to Boeing's revocation of an employee's security clearance, on not on generalized grounds of "national security," but because the Supreme Court had explicitly held (in another context) the grant of security clearances to be committed by law to the discretion of the Executive Branch and beyond review.  43 F.3d 559, 564-65 (10th Cir. 1994) (relying on *Dep't of Navy v. Egan*, 484 U.S. 518 (1988)).

23

present non-citizen plaintiffs could not bring a *Bivens* action to challenge their

allegedly wrongful detention pending removal proceedings under the Immigration

and Nationality Act ("INA").  But *Mirmehdi* based its holding in major part on the

context of removal proceedings and its conclusion (under the first step of *Wilkie*)

that the INA and habeas remedies constituted a "substantial, comprehensive, and

intricate remedial scheme" that indicated Congressional intent to foreclose

damages remedies.  *See id.* at *4 (quotation omitted).  The court mentioned

"national security" only briefly, noting that immigration issues "have the natural

tendency to affect diplomacy, foreign policy, and the security of the nation" that

further "counsel[ed] hesitation." *Id*.  This passing reference emphasizes

"diplomacy and foreign policy," more than "national security," and in any event

cannot be read to foreclose *Bivens* remedies for domestic surveillance given

*Mitchell* and various other challenges to law enforcement action.

     In *Wilson v. Libby*, a panel of the D.C. Circuit (over a vigorous dissent)

declined to recognize a *Bivens* remedy for claims by a CIA agent that officials

from the Vice President's office had leaked her identity as a CIA officer,

effectively ending her career.  As in *Mirmehdi*, the court relied chiefly on its

conclusion that a statute (the Privacy Act) provided a "comprehensive scheme"

that precluded "additional remedies under *Bivens*." 535 F.3d at 707.  The court

further noted the difficulty inherent in "inquiry into . . . the job risks and

responsibilities of covert CIA agents," and that such intrusion into "matters of

national security and sensitive intelligence information" provided "further support"

for its refusal to allow a *Bivens* remedy.  *Id.* at 710.  Here, unlike in *Wilson*, there is

no comprehensive remedial scheme, and Plaintiffs' have not pled claims that

directly involve the inner workings of the CIA.

     Defendants also point to *Arar*, in which the Second Circuit (over vigorous

dissents) used the term "national security" in discussions of *Bivens* special factors.

Again, however, the court referred to the foreign policy aspects of a challenge to

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

the treatment of a foreign citizen abroad by cooperating foreign governments, none of which are applicable here. *See Arar*, 585 F.3d at 575-76 (citing President's plenary "international relations" power, judicial incompetence in foreign policy, and unique context concerning treatment of "foreign subjects abroad" by "military and foreign policy officials" in light of "[t]he special needs of foreign affairs."). None of these concerns apply to a claim of religious discrimination by a law enforcement agency investigating Americans on American soil — a context in which courts regularly inquire into the discriminatory motives of law enforcement investigations. *See e.g.*, *Mitchell*, *Gibson*, *Nurse, supra* Part I.A.1.[19]

In sum, none of the authority on which Defendants rely suggests that generalized concerns for "national security" should preclude *Bivens* remedies for American citizens and residents harmed by federal officials on American soil, and indeed, *Mitchell* strongly counsels against such a conclusion. District courts have found *Bivens* remedies available in cases involving American civilians harmed in the name of national security, even when the harm occurred at the hands of the military abroad. *See Padilla*, 633 F.Supp.2d at 1019 (American citizen subjected to prolonged detention as enemy combatant); *Vance v. Rumsfeld*, 694 F.Supp.2d 957, 975 (N.D. Ill. 2010) (American citizens detained under harsh conditions by the military while working as contractors in Iraq could bring *Bivens* action).

---

[19] Framing the *Arar* court's analysis was its conclusion that the plaintiff was challenging the "'policy' of extraordinary rendition," 585 F.3d at 575. Defendants suggest that this action similarly challenges counterterrorism policies. TW Br. 16. But this is not true — Plaintiffs claims arise solely from the one investigation, Operation Flex, alleged to have occurred Orange County. Plaintiffs do point to various FBI policies and training showing an increasing tolerance of racial and religious profiling, *see* FAC ¶¶ 24-37, but do not in challenge these policies or bring claims against their drafters, but include them only to demonstrate a climate supports the plausibility of allegations of religious discrimination in this particular operation. *Cf. also Iqbal* (challenging detention policies); *Padilla* (claim against architect of policy allowing plaintiff to be detained as an "enemy combatant").

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

### b. State Secrets

Defendants TW also offer "state secrets" as a separate factor counseling hesitation, arguing that because they could not defend themselves without risking disclosure of information the government has asserted is a state secret, no remedy should be recognized. TW Br. 16. Aside from the fact that the state secrets privilege should not apply in this case, *see* Plfs. Opp. to Gov't Defs., Part III, no court has counted the assertion of state secrets as a special factor, for good reason: this argument is simply the *Reynolds* privilege analysis, dressed as a *Bivens* special factor. The court should address the argument under the framework set forth in *Reynolds*. *See Black v. United States*, 62 F.3d 1115, 1118 (8th Cir. 1995) (addressing state secrets privilege in *Bivens* case under state secrets analysis, not as *Bivens* special factor).[20]

Indeed, if anything, the state secrets privilege provides a reason to allow a remedy under *Bivens*. To the extent that Defendants raise the specter that litigation could potentially lead to public disclosure of information that might pose some threat to law enforcement safety or "national security," the Court should address that evidence as it arises through state secrets privilege, and utilize protective orders, *in camera* hearings, and other mechanisms to protect any relevant but secret information, rather than dismissing the action at the outset because of the mere *possibility* that the case may touch on national security. *See* Plfs. Opp. to Gov't Defs., Part IV.B (addressing state secrets and established procedures allowing courts to address classified materials in litigation). Such an approach would give the Court much more fine-grained control over the balance between the

---

[20] *Arar* is not to the contrary. Although *Arar* referred in passing to the fact that the government had asserted the state secrets privilege in conducting its *Bivens* analysis, the court focused on the foreign policy implications of recognizing a cause of action, and did not suggest that the fact that the government had invoked the privilege was itself a special factor counseling hesitation.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

need for secrecy and its duty to enforce core constitutional rights. Both law and history establish that courts can and should scrutinize assertions of the need for secrecy and deference to the executive with skepticism. *See, e.g.*, *Hamdi*, 542 U.S. at 535 (plurality) ("[W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts" in establishing procedures for designating enemy combatants).

Finally, the Supreme Court has already recognized that concerns that are adequately addressed by other doctrines and privileges should not be weighed as "special factors." In *Davis*, the Court recognized that the plaintiff's "suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation" under *Bivens*, but held that "these concerns are coextensive with the protections afforded by the Speech or Debate Clause," 442 U.S. at 246, which "shields federal legislators with absolute immunity," *id*. at 236 n.11. Thus, the Court rejected it as a special factor. Similarly, here, this Court can fully address issues of sensitive "national security" information through the state secrets privilege. That fact counsels *against* allowing Defendants to treat national security and any accompanying need for secrecy as a "special factor."

*          *          *

Even if this Court determines this case presents a new context for *Bivens*, the reasons set forth above weigh strongly in favor of recognizing a *Bivens* remedy: binding authority already recognizes *Bivens* actions for unlawful discrimination, including First Amendment retaliation; many courts have already addressed religious discrimination claims under *Bivens* or § 1983, making such a claim familiar and workable, rather than novel; a damages remedy for religious discrimination would provide needed deterrence and a remedy in keeping with the purposes of *Bivens*; no other statutory scheme provides a remedy for religious discrimination; and the FBI should not be permitted to avoid judicial scrutiny

1    under *Bivens* merely because it claims to be acting in the name of national security.

2    The Court should hold that Plaintiffs can seek damages for their religious

3    discrimination and Fourth Amendment claims.

4    **II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

5         Defendants advance a separate argument (against both the statutory and the

6    constitutional claims) that they should escape liability under the qualified

7    immunity doctrine.  Although "[d]amages actions against high officials are . . . an

8    important means of vindicating constitutional guarantees," *Harlow v. Fitzgerald*,

9    457 U.S. 800, 809 (1982) , a government official defendant may obtain qualified

10   immunity if: (1) taken in the light most favorable to plaintiff, the official's conduct

11   did not "violate a constitutional right;" or (2) "[t]he contours of the right [were not]

12   sufficiently clear that a reasonable official would understand that what he is doing

13   violates that right."  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  Courts have

14   discretion either to first determine whether the conduct at issue violated a federal

15   right or to proceed directly to the question whether the defendant violated clearly

16   established law.  *Pearson v. Callahan*, 555 U.S. 223 (2009).[21]

17        The Ninth Circuit has repeatedly held that there need not be a case directly

18   _____

19   [21] Defendants mistakenly argue that, even if they have intentionally violated a
     statutory or constitutional norm, they should be entitled to qualified immunity if

20   the law is not clearly established as to procedural aspects of the claim, such as
     whether § 1985 provides a right of action for unconstitutional religious

21   discrimination, TW Br. 23 n.12, or whether FISA allows a damages remedy

22   against officials, AAR Br. 34-35.  But it would not serve the purposes of qualified
     immunity to protect an official who knowingly violated the law simply because it

23   was not clear whether the victim of such conduct would have a cause of action or
     remedy.  As the Court explained in *Harlow*, "Where an official could be expected

24   to know that certain conduct would violate statutory or constitutional rights, he
     should be made to hesitate; and a person who suffers injury caused by such

25   conduct may have a cause of action."  457 U.S. 800, 819 (1982); *see also Saucier*,

26   533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right
     is clearly established is whether it would be clear to a reasonable officer that *his*

27   *conduct was unlawful* in the situation he confronted.") (emphasis added).

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    on point for law to be "clearly established."  *See, e.g.*, *Deorle v. Rutherford*, 272

2    F.3d 1272, 1286 (9th Cir. 2001).  Federal law can be clearly established by general

3    constitutional principles that provide "fair warning" that conduct is

4    unconstitutional.  *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (en

5    banc).  "In the absence of binding precedent, courts should look to available

6    decisions of other circuits and district courts to ascertain whether the law is clearly

7    established."  *Community House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir.

8    2010); *see also Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

9        **A.    Defendants Are Not Entitled To Qualified Immunity on Plaintiffs'**

10            **First Amendment Claims**

11        The Complaint sets forth detailed allegations of intentional discrimination:

12    an investigation designed to target Muslims, because of their religion, out of FBI

13    agents' belief that "Islam is a threat to national security." Unsurprisingly, this stark

14    facial discrimination on the basis of religion clearly violates core First Amendment

15    principles.  Defendants' arguments to the contrary fail for three reasons.

16        First, Defendants AAR apply the wrong legal framework for the First

17    Amendment.  They apply the *Lemon* test to evaluate Plaintiffs' Establishment

18    Clause claim, but that analysis is "intended to apply to laws affording a uniform

19    benefit to *all* religions, and not to provisions . . . that discriminate *among*

20    religions." *Larson v. Valente*, 456 U.S. 228, 252 (1982).  Similarly, they apply the

21    "substantial burden" test for the Free Exercise claim, even though that test applies

22    to *facially neutral* government conduct.  Under long-established precedent, facial

23    discrimination against a given religious group is subjected to strict scrutiny under

24    either Clause.  *Smith*, 494 U.S. at 886 n.3.  Defendants' treatment of Islam as itself

25    suspicious and the resulting dragnet surveillance of an entire religious group

26    cannot survive strict scrutiny.

27        Second, Defendants fundamentally mistake the nature of Plaintiffs'

28    discrimination claims, and therefore draw a mistaken parallel between the religious

discrimination claim in *Iqbal* and the claim here.  Defendants miss an enormous difference between *Iqbal* and the present case: the plaintiffs in *Iqbal* asked the Court to *infer* discriminatory intent from the disparate impact on Muslims created by the investigation into the 9/11hijackings.  Here, in contrast, Plaintiffs plead ample nonconclusory facts that provide *direct evidence* that Defendants explicitly used religion as a factor deciding who to target.  Defendants gave Monteilh instructions to target people on the basis of their religion; they repeatedly told him to target Muslims and the Muslim community, to target more devout Muslims because they were more suspicious, and that targeting Muslims was necessary because "Islam is a threat to national security."  Such explicit use of religion needs no inference of intent; it is direct evidence of discrimination. *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) ("[T]his case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose.").

Defendants point to factual allegations that they argue show legitimate reasons to target the three Plaintiffs in this action, but they are wrong both factually and legally.  Factually, the allegations to which they point are actually prime examples of religious discrimination – they show Defendants using religious activity as a basis for suspicion.  Legally, the purportedly legitimate reasons are irrelevant, because Plaintiffs need not allege facts that show that religious discrimination was the *sole* basis for the government's actions.  Rather, *any* use of religion as a facial classification is subject to strict scrutiny, *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003), and plaintiffs on a motion to dismiss need plead only sufficient facts to "nudge[] [their] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 129 S.Ct. at 1950-51.

Finally, Defendants Tidwell, Walls and Rose again draw unsupportable parallels to the Supreme Court's analysis in *Iqbal* to argue that the complaint does

1  not show that they, as supervisors of the operation, acted with the requisite

2  discriminatory intent.  But unlike *Iqbal*, in which the Court held plaintiffs had not

3  alleged facts that showed that the Attorney General and Director of the FBI were

4  motivated by discrimination against Muslims when they set policies on the

5  detention of suspects in the September 11 investigations, Tidwell, Walls and Rose

6  are not heads of agencies, but instead are relatively low-level supervisors who were

7  directly involved in the operation.[22]  And unlike in *Iqbal*, their involvement is not

8  alleged to be merely in setting policy — the complaint alleges that they were

9  involved in the ongoing oversight of a months-long, highly sensitive and (within

10 the FBI) high-profile investigation.  The complaint alleges, for example, that

11 Tidwell approved the action in advance and read all the informant's daily notes,

12 that Walls monitored the operation and was involved enough to be audited for her

13 handling of leads from the case, and that Rose (the supervisor of counterterrorism

14 in the Orange County branch office) sought to expand the investigation and flew to

15 D.C. for that purpose.  On these facts, it is easily plausible that these supervisors

16 also knew the instructions being given to the informant and understood that the

17 "central feature" of the operation was that it targeted Muslims.

18          1.  ***Under Clearly Established Law, Facial Discrimination on the***

19              ***Basis of Religion Triggers Strict Scrutiny***

20          The Supreme Court has repeatedly held that one of the First Amendment's

21 central purposes is to guarantee government neutrality by barring governments

22 from favoring or disfavoring particular religions.  *See, e.g.*, *McCreary Cnty. v.*

---

23

24 [22] Indeed, in *Iqbal*, the Court distinguished its analysis of the supervisory liability of the Attorney General and FBI director from that for lower level supervisors.  *See*

25 *Iqbal*, 129 S. Ct. at 1952 ( "Though respondent alleges that various other defendants, who are not before us, may have labeled him a person 'of high interest'

26 for impermissible reasons, his only factual allegation against petitioners accuses them of adopting a policy approving restrictive conditions of confinement for post-

27 September-11 detainees until they were cleared by the FBI." (quotations omitted)).

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    *ACLU*, 545 U.S. 844, 860 (2005).  This principle of neutrality is contained within

2    both the Establishment Clause and the Free Exercise Clause.  While the law

3    governing facially neutral laws that have a disparate impact on particular religions

4    is more complex, the law governing facial discrimination is clear: any facial

5    classification is unconstitutional unless it can survive strict scrutiny.

6        *Iqbal* establishes that "the plaintiff must plead and prove that the defendant

7    acted with discriminatory purpose" to establish a claim of intentional religious

8    discrimination, *Iqbal*, 129 S.Ct. at 1948.  But there are several ways to plead such

9    discriminatory purpose.  As one court has described it:

10        A plaintiff could point to a law or policy that expressly classifies persons

11        on the basis of [a suspect classification]. . . . Or, a plaintiff could identify

12        a facially neutral law or policy that has been applied in an intentionally

13        discriminatory manner. . . . A plaintiff could also allege that a facially

14        neutral statute or policy has an adverse effect and that it was motivated

15        by discriminatory animus.

16    *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2nd Cir. 1999).  In *Iqbal*, the

17    plaintiffs advanced the third theory — that a facially neutral policy was motivated

18    by discrimination and had a discriminatory effect.  Here, Plaintiffs plead facts

19    establishing the first: that Defendants had an express policy of surveilling Muslims

20    on the basis of their religion.  Once a plaintiff shows that a government official has

21    made a facially discriminatory classification on the basis of religion, that

22    intentional discrimination action is subject to strict scrutiny under either the

23    Establishment Clause or the Free Exercise Clause.[23]

---

24    [23] As *Lukumi* recognized, facial religious discrimination is "not often at issue" in

25    the cases addressed by the Court.  508 U.S. at 533.  Indeed, most of the Court's

26    Free Exercise cases have not involved religious discrimination at all, but the

27    burdens placed on religious exercise by neutral laws that plaintiffs did not suggest

28    were discriminatorily motivated, s*ee, e.g.*, *Smith*, *supra*; *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988); *Wisconsin v. Yoder*, 406 U.S.

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

a. Establishment Clause

The Establishment Clause clearly forbids the type of explicit discrimination on the basis of religion at issue in this case.  "In the course of adjudicating specific cases, [the Supreme Court] has come to understand the Establishment Clause to mean that government . . . *may not discriminate among persons on the basis of their religious beliefs and practices . . . .*" *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 590-91 (1989) (emphasis added); *see also Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

Defendants AAR devote several pages to application of the familiar, three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *see* AAR Brief at 24-28, but the Supreme Court has clearly stated that the *Lemon* test simply does not apply to facial discrimination against a particular religion.  "[T]he [*Lemon*] 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." *Larson*, 456 U.S. at 252 (emphasis in original).  Such "denominational preferences . . . must be invalidated unless [they are] justified by a compelling governmental interest, and . . . closely

---

205 (1972); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).  Similarly, most of the Court's Establishment Clause cases do not involve religious discrimination, but rather funding provisions (that are either neutral or address religion generally) that involve "play in the joints" between Establishment and Free Exercise clauses, *Locke v. Davey*, 540 U.S. 712, 718 (2004); *see also Widmar v. Vincent*, 454 U.S. 263 (1981); *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970); *Everson v. Board of Ed.*, 330 U.S. 1 (1947); or religious display and similar cases that balance recognition of "the strong role played by religion and religious traditions throughout our Nation's history" with the principle that government may not endorse any religion or religion generally, *Van Orden v. Perry*, 545 U.S. 677, 683 (2005).  Of the few cases that do address religious discrimination, most involve claims that facially neutral policies were motivated by discriminatory animus, *see Lukumi, supra*; or applied in a discriminatory manner, or cases that addressed facial preferences for religion generally, rather than between religions, *see, e.g., Wallace v. Jaffree*, 472 U.S. 38 (1985).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

fitted to further that interest." *Id.* at 246-47; *see also Sklar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008) ("*Larson* [] established an analytical framework to assess the constitutionality of statutes granting denominational preferences.  To survive an Establishment Clause challenge under *Larson*, a statute which grants a denominational preference must be justified by a "compelling governmental interest" to which it is "closely fitted"); *Rouser v. White*, 630 F.Supp.2d 1165, 195 (E.D. Cal. 2009) ("Under *Larson*, when a plaintiff shows that a law or other state action grants a denominational preference among religions, the court must "treat the law as suspect and . . . apply strict scrutiny in adjudging its constitutionality.").  Courts should employ the three-part *Lemon* test only if a government practice does not "facially differentiate[] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989). Because Defendants explicitly targeted Muslims on the basis of their religion, strict scrutiny applies.[24]

Moreover, even if the *Lemon* test did apply, the allegations more than satisfy it.  First, while fighting terrorism may be a valid secular purpose, the dragnet

---

[24] None of the cases on which Defendants rely for application of the *Lemon* test involved the allegations of facial discrimination against a particular religious group that are presented here.  Rather, in each case, the government acted in pursuit of anti-establishment interests that were neutral between religions. *See Nurre v. Whitehead*, 580 F.3d 1087, 1089 (9th Cir. 2009) (holding school officials' refusal to allow school band to play religious-themed songs in graduation program did not violate Establishment Clause); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) (investigation into whether assistant police chief's on-duty conduct violated the Establishment Clause did not target religion); *Kreisner v. City of San Diego*, 1 F.3d 775, 779 (9th Cir. 1993) (city did not violate Establishment Clause by allowing private group to put on overtly religious holiday display in park's public forum through permit available on first-come, first-serve basis). While the Ninth Circuit employed *Lemon* in one case that arguably involves discrimination against a religious group, *see Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1047 (9th Cir. 2010) (addressing denunciation of Catholic church's stance on same sex adoption), the plaintiffs appear not to have disputed the test, as none of the fragmented opinions in that case mention *Larson* or address whether it commands a different test.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

investigation of all members of a religious group (absent any indication of criminal or terrorist activity) that is alleged here does not clearly advance such a secular purpose and raises the specter of that it is a "sham," *see McCreary Cnty*, 545 U.S. at 864; *see also, id.* at 859 ("the secular purpose requirement alone may rarely be determinative"); second, the investigation's sweeping target of all Muslims on the basis of their religion conveys the message of disapproval of the religion violates the Establishment Clause's prohibition on "making adherence to a religion relevant in any way to a person's standing in the political community," *Cnty. of Allegheny*, 492 U.S. at 594, which the agents' statements that "Islam is a threat to national security" simply confirms; and the Ninth Circuit has continually noted that "comprehensive, discriminating, and continuing surveillance of religion" of the type entailed in this operation that spanned years constitutes the kind of entanglement forbidden by *Lemon*'s third prong. *See Vernon*, 27 F.3d at 1399.

### b. Free Exercise Clause

Similarly, allegations of facial religious discrimination trigger strict scrutiny under the Free Exercise Clause. Indeed, *Iqbal* itself relied on *Lukumi*, in which the Court held that the Free Exercise Clause requires that government action that is not "neutral and of general applicability . . . must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." 508 U.S. at 532; *see also Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion."); *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) ("If the purpose or effect of a law . . . is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden [on the observance of religion] may be characterized as being only indirect."); *accord Gillette v. United States*, 401 U.S. 437, 462 (1971). Were there any doubt, *Lukumi* held that the inquiry into "neutrality" under the Free Exercise Clause can follow the equal protection

analysis of discriminatory intent.  *See id.* at 540-41 ("[n]eutrality in its application requires an equal protection mode of analysis) (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S 664, 696 (1970) (Harlan, J., concurring)).[25]

Defendants AAR again apply the wrong analysis by engaging in the "substantial burden" test for Free Exercise claims.  That test was originally crafted in *Sherbert v. Verner*, 374 U.S. 398 (1963) and held that "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 717 (1981); *accord Jimmy Swaggart Ministries v. Bd. of Eqal. of Cal.*, 493 U.S. 378, 384 (1990); *Wisconsin v. Yoder*, 406 U.S. 205, 219 (1972).  But the Supreme Court in *Smith* sharply narrowed applicability of the "substantial burden" test to two situations: first, circumstances (applicable to unemployment compensation and perhaps little else) "where the State has in place a system of individual exemptions" such that "it may not refuse to extend that system to cases of 'religious hardship' without compelling reason," 494 U.S. at 884; and second, "hybrid" claims, where the government intrusion implicated not just the Free Exercise Clause but another constitutional right as well. *Id.* at 881-82.[26]

---

[25] While Justices Scalia and Thomas did not join this section of the *Lukumi* opinion out of concern for the difficulty in determining of a "the singular 'motive' of a collective legislative body" *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring), no such concern prevents examination of executive officers' motives, as is confirmed by Justices Scalia and Thomas joining the *Iqbal* opinion that cites this standard.
[26] While the Ninth Circuit in *Vernon* applied the "substantial burden" test in a challenge to a government conduct that was not "regulatory, proscriptive, or compulsory in nature," 27 F.3d 1385, 1394 (9th Cir. 1994), that case did not involve the facial discrimination against a particular religion that is clearly alleged here.  *See id.* at 1398 (noting that investigation aimed whether specific person's on-duty conduct violated the Establishment Clause).  Additionally, while the Court rejected Vernon's argument that his claims should be analyzed as a non-neutral law under *Smith*, see *id.* at 1393 n.1, it did so on the ground the Ninth Circuit had

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    But the "substantial burden" test has never applied to facial, intentional

2  discrimination.  Where the Supreme Court has confronted explicit, facial

3  discrimination against a particular religious sect, it has applied strict scrutiny.  In

4  *Fowler v. Rhode Island*, 345 U.S. 67 (1953), the Court held that discriminatory

5  application of an ordinance barring public preaching in parks to Jehovah's

6  Witnesses, when the same law was not enforced against Catholics or Protestants,

7  violated the Free Exercise Clause.  Because the evidence "plainly show[ed] that a

8  religious service of Jehovah's Witnesses is treated differently than a religious

9  service of other sects.  That amounts to the state preferring some religious groups

10  over this one." *See id.* at 69.  In *Niemotko v. Maryland*, 340 U.S 268, 272 (1951),

11  the court held that denial of a permit to Jehovah's Witnesses based on religious

12  discrimination constituted an unconstitutional prior restraint; *see also Fowler*, 345

13  U.S. at 69 ("[In *Niemotko*,] a public park, open to all religious groups, was denied

14  Jehovah's Witnesses because of the dislike which the local officials had of these

15  people and their views.  That was a discrimination which we held to be barred by

16

17  earlier held Smith inapplicable to non-criminal cases.  *See id.*  (citing *NLRB v.*

18  *Hanna Boys Ctr.*, 940 F.2d 1295, 1305 (9th Cir. 1991)).  But the Ninth Circuit has
   since rejected the rule on which the Vernon court relied.  *See Miller v. Reed*, 176

19  F.3d 1202, 1207 (9th Cir. 1999) (characterizing *Hanna Boys* as dicta and holding
   "*Smith* is not limited to challenges to criminally prohibited conduct").

20
       The Ninth Circuit in *Am. Family Ass'n v. City and County of San Francisco*,

21  277 F.3d 1114, 1124 (9th Cir. 2002), relied on *Vernon* to apply the "substantial

22  burden" test to a Free Exercise challenge to a letter and two resolutions by San
   Francisco's Board of Supervisors denouncing anti-gay rhetoric and television

23  announcements sponsored, in part, by religious groups, that did not discriminate
   against any particular religion.  The court in *Am. Family Ass'n* declined to bypass

24  the "substantial burden" test for the resolutions on grounds that courts had not

25  applied *Lukumi* to a case addressing a "non-regulatory or non-compulsory
   government action." But the present case can be distinguished in that certainly

26  presents government action beyond mere issuance of a resolution, and the Supreme

27  Court's subsequent citation to *Lukumi* in *Iqbal* makes clear that *Lukumi* governs in
   cases addressing religious discrimination by law enforcement.

28

the First and Fourteenth Amendments.").  In *McDaniel v. Paty*, 435 U.S. 618, 626 (1978), the Court held that a statute barring ministers from holding public office violated the Free Exercise Clause, reasoning that "[i]f the Tennessee disqualification provision were viewed as depriving the clergy of a civil right *solely because of their religious beliefs, our inquiry would be at an end*.  The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." (emphasis added).  And in *Cooper v. Pate*, 378 U.S. 546, 546 (1964) (*per curiam*), the Court held that a prisoner's allegations that he was denied privileges enjoyed by other prisoners solely because of his religious beliefs stated a First Amendment claim.

No Supreme Court case in decades has addressed the kind of explicit discrimination against a particular religion as the Court perceived in *Niemotko* and *Fowler*.  *See Lukumi*, 508 U.S. at 533 (noting that principles barring facial discrimination are "not often at issue in [the Court's] Free Exercise Clause cases").  However, the Court has repeatedly stated that facial classifications based on religion are subject to strict scrutiny, often on the basis of these early cases.  *See, e.g., Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion." (citing *McDaniel*)); *id.* at 877 (government may not "impose special disabilities on the basis of religious views or religious status" (citing *McDaniel* and *Fowler*)); *Braunfeld* , 366 U.S. at 607 ("If the purpose or effect of a law . . . is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden [on the observance of religion] may be characterized as being only indirect."); *Sherbert*, 374 U.S. at 402 (citing *Fowler* for proposition that under Free Exercise Clause, government may not "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities").

Federal appellate courts have also recognized that strict scrutiny, not the

"substantial burden" test, applies in cases that involve facial or intentional discrimination against a particular religious group. *See Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011) ("*Smith* does not apply to such a policy [discriminating against those who hold particular religious beliefs]; it did not change the norm forbidding materially different treatment of different religious faiths."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3rd Cir. 2002) ("Under *Smith* and *Lukumi*, however, there is no substantial burden requirement when government discriminates against religious conduct."); *Hartmann v. Stone*, 68 F.3d 973, 979 & n.3 (6th Cir. 1995) (holding substantial burden test applicable to "situations in which a neutral and generally applicable regulation imposes an indirect, albeit substantial, burden on the practice of religion," and applying strict scrutiny where regulation is not neutral and generally applicable); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006) (describing Free Exercise analysis as applying strict scrutiny to any law that is not neutral and generally applicable); *c.f. Wirzburger v. Galvin*, 412 F.3d 271, 281 & n.4 (1st Cir. 2005) (holding challenged statute would not be subject to strict scrutiny in part because it did not "discriminate on the basis of religious belief or status"); *Gary S. v. Manchester School Dist.*, 374 F.3d 15, 18 (1st Cir. 2004) (holding substantial burden test "limited . . . to the unemployment compensation field"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804 (9th Cir. 2011) (reversing grant of summary judgment for defendants where there was evidence plaintiffs had been "treated differently because of their religious status").

Accordingly, under the Free Exercise Clause, as with the Establishment Clause, Plaintiffs must show that the FBI's actions were not neutral, in that they intentionally discriminate on the basis of religion, and that they were not justified by a compelling interest.[27]

---

[27] Even if the plaintiffs required to show a "substantial burden," they satisfy that

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

c.  The Ban on Religious Discrimination is Clearly Established

There can be no argument that the First Amendment's prohibition on facial

religious discrimination is not clearly established.  Supreme Court cases dating

back sixty years to *Fowler* and *Niemotko* establish that government actors may not

intentionally discriminate against a religious group because of its religion —

period.  The Supreme Court has announced this principle in denouncing religious

discrimination in contexts as diverse as the issuance of permits, *Niemotko*,

enforcement of criminal laws, *Fowler*, and selective prosecution, *United States v.

Armstrong*, 517 U.S. 456, 464, (1996) (citing *Oyler v. Boles*, 368 U.S. 448, 456

(1962)), and has repeated throughout its cases the mantra that classifications on the

basis of religion are subject to strict scrutiny.  *See, e.g.*, *Smith*, 494 U.S. at 886 n.3.

The fact that the Supreme Court has never squarely held that intentional

religious discrimination is also forbidden in undercover law enforcement

investigations does not entitle Defendants to qualified immunity, where their

explicit targeting based on religion is so egregious. "To be established clearly, . . .

there is no need that the very action in question have previously been held

unlawful.  The unconstitutionality of outrageous conduct obviously will be

unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest

cases don't even arise.' But even as to action less than an outrage, "officials can

still be on notice that their conduct violates established law . . . in novel factual

circumstances." *Safford Unif. Sch. Dist. v. Redding*, 129 S. Ct. 2633, 2643 (2009)

(citing *K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990)).

### 2.  *The Complaint Alleges Facial Discrimination Against Muslims*

Defendants AAR make a half-hearted argument that it is not clearly

established that facial religious discrimination is unlawful in the context of an

undercover investigation where there is "no allegation that the investigation was

requirement.  *See infra*, Part II.C (addressing "substantial burden" under RFRA).

1   pursued for the purpose of discrimination rather than a neutral, investigative

2   reason." AAR Br. 24.  Defendants AAR are wrong on the law, *see supra*, but also

3   the facts: the complaint is replete with allegations that the discrimination was facial

4   and, therefore, intentional.

5       As set forth in the summary of facts *supra*, Plaintiffs' lengthy complaint

6   alleges the details an investigation that explicitly and intentionally discriminated

7   against Muslims because of their religion.  Indeed, the central and explicit purpose

8   of Defendants' undercover operation was to conduct surveillance and gather

9   information on Muslims in Orange County.  *See, e.g.*, FAC ¶¶ 88, 89 (agents did

10  not limit informant to specific targets, but "repeatedly made clear that they were

11  interested simply in Muslims"); ¶ 162 ("Islam is a threat to our national security.").

12  To the extent they differentiated between targets, they told him to focus on

13  Muslims who appeared more devout (for example, as demonstrated by a

14  willingness to attend late evening or early morning prayers) because they were

15  "more suspicious." FAC ¶ 110; *see also id.* ¶¶ 89, 96, 104.

16      The complaint also alleges that Defendants consistently gave instructions

17  that made religion the primary criterion for suspicion by focusing explicitly on

18  Muslims and the Muslim community, including through daily quotas on the

19  number of Muslims he should get contact information from, FAC ¶ 131, and

20  through spying on lectures, classes or any other events held at mosques, FAC

21  ¶¶ 108, 109, 133.  They discarded information inadvertently gathered on non-

22  Muslims.  FAC ¶ 120.  Overall, the complaint alleges with great specificity that

23  Defendants were indiscriminate: they instructed the informant to unearth about as

24  much information about as many Muslims as possible through as many methods as

25  possible, without specific targets.  *See, e.g.*, FAC ¶¶ 101, 102, 103.

26      These allegations are not mere "labels and conclusions" or "formulaic

27  recitation of the elements of a cause of action," *cf. Iqbal*, 129 S. Ct. at 1949, but

28  rather detailed facts about what Defendants did, what Defendants said, and how the

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

investigation proceeded.  While *Iqbal* requires only facts that "allow the court to draw the reasonable inference" that Defendants intentionally discriminated against Muslims, *see id*, here no inference is necessary, because the complaint alleges that Defendants explicitly told the informant to discriminate against Muslims, and that he followed these instructions in numerous ways.

Importantly, while a plaintiff alleging a *neutral* policy is actually discriminatory must plead facts from which a court can infer that it was adopted "not for a neutral, investigative reason but for the purpose of discriminating on account of … religion." *Iqbal*, 129 S. Ct. at 1949, for the *facial* discrimination at issue here, it does not matter whether Defendants intended to harm Plaintiffs.  As the Supreme Court has recognized, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.  Whether [a practice] involves disparate treatment through explicit facial discrimination does not depend on why the [actor] discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 271-72 (1993) (while noting that "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences," rejecting argument that "animus" requirement of 42 U.S.C. 1985 "can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination").  Thus, it does not matter whether Defendants were motivated by a desire to prevent terrorism.  The goal of preventing terrorism, though laudable in the abstract, is neither incompatible with nor justification for the singling out of Muslims in a counterterrorism investigation.

      a.  <u>The Complaint Suggests No Legitimate Basis to Investigate the Three Individual Plaintiffs</u>

Defendants AAR argue that even if the FBI's entire Operation was premised

on discriminatory goals, the FBI did not discriminate against these particular Plaintiffs because they had "at least *some* basis, apart from religious discrimination, for investigating *these Plaintiffs*." AAR Br. 2 (emphasis in orig.). This is wrong both legally and factually.

First, facial distinctions drawn on the basis of constitutionally suspect classifications receive strict scrutiny, even if the suspect classification is only one factor considered.  In *Gratz*, the Court struck down a state university's admissions scheme where the race of applicants was only one of many factors considered.  The Court applied strict scrutiny to the use of race as any part of the admissions decision, even though it was not the sole or even primary factor, reasoning that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized," such that a plaintiff "has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny." 539 U.S. at 270.  Facial classifications on the basis of religion are treated no differently. *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion.").

Even if this case did not involve an explicit, facial classification, the Supreme Court has repeatedly held, in varying contexts, that if discrimination on a forbidden basis was a "substantial" or "motivating" factor for Defendants' decision targeting them, the burden shifts to Defendants to demonstrate that Plaintiffs would have been targeted even without consideration of religion.  *See, e.g.*, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (First Amendment retaliation); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 271 (1977) (racial discrimination under the Equal Protection Clause).  Even on this lower standard, for purposes of a motion to dismiss, Plaintiffs need not prove all the facts required to prevail at trial on this

43

burden-shifting analysis, but only those facts sufficient to render it plausible that they were subject to religious discrimination.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *Twombly*, 550 U.S. at 569 (reaffirming *Swierkiewicz* under the pleading standard later adopted in *Iqbal*).  Thus, this Court could only dismiss the claim if the facts of the complaint render it implausible that plaintiffs were treated differently on the basis of religion.  Given that the entire premise of Defendants' operation was to target Muslims, that cannot be the case.

Second, Defendants point to no factual allegations that actually provide a legitimate basis to target Plaintiffs: Defendants AAR argue that the complaint acknowledges that they targeted Fazaga because they suspected he was a "radical," but the complaint alleges their reasons for that conclusion are either insubstantial or themselves based on religious discrimination — that he encouraged students to speak out and helped teach them about political demonstrations, FAC ¶ 169; that he served on the board of the largest Muslim newspaper in California which, like most papers, has occasionally printed pieces that opposed various policies of the United States government (but which is and has never advocated violence or done anything that would reasonably justify characterizing it as "anti-American"), FAC ¶ 169 & n.36; and that his mosque invited scholars to speak who Defendants believed were radical, but were in fact "widely popular and moderate," FAC ¶ 60, 113, 170.  Moreover, Defendants AAR simply ignore that Sheikh Fazaga has a national reputation as a moderate and contemporary teacher of Islam, and that he traveled to Europe at the invitation and expense of the U.S. State Department to speak on radicalism.  *See* FAC ¶ 56.

Similarly, Defendants AAR argue that they were justified in targeting AbdelRahim because they believed he was part of a Muslim Brotherhood cell, but the complaint clearly alleges they believed so simply because he lived in a house "shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and

1    one who handled logistics." FAC ¶ 200.  Defendants' conclusion that five Muslims

2    living together must be terrorist cell is an example of religious discrimination, not

3    an alternative explanation.[28]

4         Defendants supposed basis for targeting Malik again underscores their

5    discriminatory motives: the complaint alleges that Defendants targeted Malik

6    because he went from dressing as a "surfer kid" to wearing traditional clothes and

7    growing his beard, and "his behavior in embracing religion and traditional dress

8    was highly suspicious," and he was friendly with people from Muslim student

9    groups.  FAC ¶ 186, 187.  This is simply an example of Defendants' focus on more

10   religious Muslims: Malik behaved this way because he developed an interest in

11   religion, and Islam encourages Muslims to grow beards and wear traditional

12   clothes as a way of following the practices of the Prophet Muhammad.[29] FAC ¶ 68.

13

14   [28] Defendants AAR argue that the allegation that FBI agents searched
     AbdelRahim's storage unit shows that they had probable cause.  This is untrue.
15   First, the mere allegation that two agents showed AbdelRahim a warrant does not
     mean Plaintiffs concede that the warrant was supported by probable cause; second,
16   the search occurred months after community members reported Monteilh and his
     investigation concluded — even if they had probable cause to search
17   AbdelRahim's storage unit a few months, it would not mean they had a legitimate
     basis to target him for surveillance more than a year before.
18
     [29] Defendants also cite as a basis for investigating him that Malik studied a six-
19   week summer program at a religious school in Yemen and was "blocked" from
     entering Saudi Arabia.  This provides no basis for investigation: Malik was not
20   "blocked" from entering Saudi Arabia; he had hoped to go on a pilgrimage there
21   while abroad, but never tried to enter after realizing he could not get the requisite
     visas — a fact that Armstrong and Allen already knew.  FAC ¶ 190.  Defendants
22   also knew that Malik attended a school, Dar al-Mustafa , which is a mainstream
     religious school whose leaders are internationally known in the Muslim
23   community and to the FBI for advocating justice, equality, and peaceful co-
24   existence between religious groups. FAC¶¶ 69, 190.  Malik attended this school at
     a time when both Yemen and Dar al-Mustafa were popular places for American
25   Muslims who wanted to pursue Arabic language or religious studies abroad
26   because of its spiritual Sufi religious scholarship, its clear and eloquent form of the
     Arabic language, and for being scenic and affordable, if slightly rustic.  FAC ¶69.
27

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

Defendants also ignore that Malik co-founded an interfaith peace-building program around the Israel-Palestine conflict, for which he received awards and recognition from the University of California, the Orange County Human Rights Commission, and the U.S. State Department.  FAC ¶ 67.  Finally, Defendants distort the complaint by suggesting that what was suspicious was that Malik changed his dress when he was not "particularly religious," an unfounded conclusion they squeeze from the fact that Malik once indicated to Monteilh that he had gotten out of the habit of attending dawn prayers, but wanted to start again (a statement that Armstrong and Allen interpreted as indicating Malik was returning to extremist beliefs).  FAC ¶ 194.

### 3.  *Defendants' Facial Discrimination Fails Strict Scrutiny*

The First Amendment requires strict scrutiny of the kind of facial, intentional religious discrimination evident from the complaint — such actions are prohibited unless "justified by a compelling government interest" and "closely fitted to further that interest." *Larson*, 456 U.S. at 247; *see also Lukumi*, 508 U.S. at 546 (non-neutral government action subject to "the most rigorous of scrutiny" such that they must be "narrowly tailored in pursuit of" "interests of the highest order").  Defendants AAR argue that Defendants had a compelling interest, because their investigation was related to terrorism and "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation," AAR Br. 23 (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)), and suggest that the complaint does not allege that the investigation was not "narrowly tailored" to the government's interest in preventing terrorism.  *Id.* at 23-24.

While the "security of this nation" may be compelling in the abstract, under strict scrutiny, "ambiguous proof will not suffice," *Brown v Ent. Merch. Ass'n*, 131 S. Ct. 2729, 2739 (2011), and "[m]ere speculation of harm does not constitute  a compelling state interest," *Consol. Edison Co. v. Public Service Commission of New York*, 447 U.S. 530, 543 (1980); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S.

216, 227-28 (1984) ("Without a factual underpinning, the State's asserted interest lack s the weight we have required of interests properly denominated as compelling.").  Nothing in the complaint suggests Defendants had any factual basis to believe there was any threat to the security of the nation before the investigation was launched, nor did any prosecution arise from the investigation other than a single charge of naturalization fraud, which was subsequently dismissed by the government.  FAC ¶¶ 155-158.

More importantly, even were the government interests at stake compelling, the dragnet surveillance of all Muslims — without other basis to believe them involved in criminal or terrorist activity — cannot be said to be "closely fitted to further" the government's interest in preventing terrorism.  *Larson*, 456 U.S. at 247; *see also Lukumi*, 508 U.S. at 546; *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1134 -1135 (9th Cir. 2000) (rejecting use of race as factor in law enforcement stops).[30]  Plaintiffs have clearly pled facts sufficient to establish that Defendants' actions were not narrowly tailored.

## B.   The Complaint Establishes that the Supervisory Defendants Are Liable For Intentional Discrimination and Unlawful Searches

Defendants Rose, Walls and Tidwell each argue that while the allegations

---

[30] Defendants AAR's suggestion that the investigation is narrowly tailored to fight terrorism because use of an informant does not violate the Fourth Amendment defies logic — religious discrimination is barred by the First Amendment, whether or not the investigative techniques used also violate the Fourth Amendment.  *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) (noting that "of course the Constitution prohibits selective enforcement of the law based on considerations such as race" but that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment"); *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 533 (6th Cir. 2002) ("[A]n officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment.").

1    may demonstrate that the other individual defendants (Armstrong and Allen)

2    violated intentionally discriminated against Muslims and engaged in unlawful

3    searches, they do not show that Rose, Walls, and Tidwell, as supervisors, should be

4    held liable for these violations, because the complaint does not "allow[] the court

5    to draw the reasonable inference" that these supervisors had the requisite intent to

6    be liable for religious discrimination or unlawful searches.  TW Br. 27-29; AAR

7    Br. 18-20.  This argument ignores the detailed allegations establishing the

8    supervisors' personal role in the operation that caused Plaintiffs' injuries.

9         While supervisors may not be held liable under a *respondeat superior*

10   theory, "direct, personal participation is not necessary to establish liability for a

11   constitutional violation." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009),

12   *rev'd on other grounds*, 131 S. Ct. 2074 (2011).  Under *Bivens*, "[s]upervisors can

13   be held liable for the actions of their subordinates (1) for setting in motion a series

14   of acts by others, or knowingly refusing to terminate a series of acts by others,

15   which they knew or reasonably should have known would cause others to inflict

16   constitutional injury; (2) for culpable action or inaction in training, supervision, or

17   control of subordinates; (3) for acquiescence in the constitutional deprivation by

18   subordinates; or (4) for conduct that shows a reckless or callous indifference to the

19   rights of others." *Id.* (quotations omitted).

20        1.   ***The Supervisors Are Liable For Intentional Discrimination***

21        For a claim of intentional discrimination, a plaintiff must plead and prove

22   that the supervising defendant possessed the requisite intent by acting with

23   discriminatory purpose.  *Iqbal*, 129 S. Ct. at 1948.  Defendants' rest their argument

24   primarily on *Iqbal*, arguing that Plaintiffs' allegations about the involvement of

25   Rose, Walls, and Tidwell mirror the allegations in *Iqbal* against Attorney General

26   Ashcroft and FBI director Mueller, which the Court held insufficient to state a

27   claim of religious discrimination.  In *Iqbal*, the plaintiff claimed he had been held

28   in restrictive conditions because of his religion.  He alleged that "the [FBI], under

48

1  the direction [Mueller], arrested and detained thousands of Arab Muslim men . . .
2  as part of its investigation of the events of September 11," and that Mueller and
3  Ashcroft approved a policy of holding detainees in highly restrictive conditions
4  until they were cleared by the FBI.  The Court gave two reasons this failed to
5  provide a basis to infer discriminatory intent on the part of Mueller and Ashcroft.

6       First, the Court reasoned that given that the September 11 hijackers and the
7  organization to which they belonged, Al Qaeda, were overwhelmingly Arab
8  Muslims, "it should come as no surprise" that those detained in connection with
9  the incident were also overwhelmingly Arab and Muslim, and that the allegations
10  that the investigation had a disparate effect on Arab Muslims did not plausibly
11  suggest that the effect was due to discriminatory intent.  *See id.* at 1951-52.
12  Second, the *Iqbal* court reasoned that Plaintiff had not alleged that Ashcroft and
13  Mueller had participated in the decision of how to classify his detention, only that
14  they had approved the policies pursuant to which that classification took place.
15  And the Court held that even if the officials who had made that decision had done
16  so for "impermissible reasons," the allegations that Ashcroft and Mueller had
17  approved a policy of housing detainees in restrictive conditions until cleared did
18  not give rise to the inference they did so for the purpose of discriminating against
19  Muslims.  *Iqbal*, 129 S. Ct. at 1952.

20       Plaintiffs' religious discrimination claim differs fundamentally from the one
21  discussed in *Iqbal* in at least one critical respect: Plaintiffs do not ask this Court to
22  *infer* discriminatory intent from disparate impact.  Rather, they provide allegations
23  that, if proven, would provide *direct evidence* that the FBI intentionally
24  discriminated: FBI agents explicitly instructed their informant over and over to
25  target Muslims and only Muslims, to pay special attention to more devout
26  Muslims, and to do so because "Islam is a threat to national security."  *See* Facts,
27  *supra*. There is no question from the factual allegations that Armstrong and Allen
28  ran an investigation that, on its face, discriminated on the basis of religion.  This

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    case would be comparable to *Iqbal* only if the plaintiff there had alleged that an

2    agent working in Mr. Ashcroft's office stated that the plan Ashcroft approved

3    explicitly called for targeting Muslims for harsh treatment while in detention.

4        That fundamental factual difference narrows greatly the Court's supervisory

5    liability analysis.  The only question the Court need answer is whether the

6    complaint pleads facts sufficient to render it "plausible" that Tidwell, Walls, and

7    Rose knew of and approved the "central feature" of the operation — that it

8    explicitly and intentionally focused on Muslims.  That is intentional

9    discrimination, *Adarand*, 515 U.S. at 213; *Hayden*, 180 F.3d at 48, and

10   Tidwell, Walls and Rose are liable if they approved, acquiesced in, or knowingly

11   refused to terminate such a facially discriminatory program by their subordinates.

12   *Al-Kidd*, 580 F.3d at 965.

13       The complaint alleges far more about the roles of Rose, Walls and Tidwell

14   than what plaintiffs in *Iqbal* pled about Mueller and Ashcroft.  The complaint

15   alleges that Tidwell, Walls, and Rose "actively monitored, directed, and authorized

16   the actions of Agents Armstrong and Allen and other agents at all times relevant in

17   this action, for the purpose of surveilling Plaintiffs and other putative class

18   members because they were Muslim," and "maintained extremely close oversight

19   and supervision of Monteilh." *See* FAC ¶¶ 20-22.  Defendants suggest that these

20   allegations are conclusory, but in fact they are based on evidence that Plaintiffs

21   possess.  *See generally* Monteilh Decs. (filed concurrently herewith).

22       The complaint also provides ample supporting allegations to render these

23   conclusions plausible.  First, the complaint alleges a major undercover

24   counterterrorism investigation that stretched over more than a year and which

25   resulted in the payment of tens or hundreds of thousands of dollars to a convicted

26   felon sent into a Muslim community to pose as a convert.  FAC ¶¶ 87, 90, 137,

27   162, 167.  The cost, duration, and sensitivity of the operation would alone render

28   "plausible" that the immediate supervisors would review and approve the

50

1    instructions given the informant.  The complaint also alleges that the lead agents

2    stated that the informant was "gold" in Los Angeles and Washington, that

3    information from the operation was followed by people "at the highest levels," and

4    that the operation was among the ten most important intelligence investigations

5    going on in the country.  FAC ¶ 145.  The FAC alleges that the informant recorded

6    all his conversations, which were subsequently transcribed, and provided detailed

7    daily notes of his activities that contained "virtually everything he did and all the

8    information he had obtained." FAC ¶¶ 123, 124, 140. Not only is it plausible that

9    supervisors would review these notes to monitor the operation, but the complaint

10   alleges that Defendants did, in fact, read those notes.  FAC ¶¶ 21, 22, 141.

11       Second, the complaint alleges specific instances of direct involvement in the

12   operation by Tidwell, Walls and Rose that go far beyond the mere setting of policy

13   alleged in *Iqbal*:  Defendant Tidwell approved the operation in advance and the

14   recruitment of an informant, FAC ¶ 47 & n.28.  Armstrong and Allen also told the

15   informant that Tidwell, specifically, read all his daily notes. FAC ¶ 141.

16       Defendant Walls was a "direct supervisor" of the agents involved, and as

17   such read the informant's daily notes.  FAC ¶¶ 21, 141.  She was involved enough

18   that an audit team was at one point sent to examine her handling of the

19   investigation.  FAC ¶ 151.  By summer 2007, there was conflict between Walls and

20   field agents over how to handle the operation.  Walls had come to distrust Monteilh

21   and did not want him working for them.  *Id.* Eventually, Walls ordered that Agents

22   Armstrong and Allen cease using Monteilh as an informant because she no longer

23   trusted him.  FAC ¶ 21.  After Armstrong and Allen told Monteilh he would be

24   going on hiatus, although Operation Flex would continue, Agent Walls attended

25   one of the final meetings between Monteilh and Armstrong and Allen and warned

26   Monteilh to stay silent about the operation.  FAC ¶¶ 152, 153.

27       Defendant Rose was also a "direct supervisor" of the agents involved, and as

28   such read the informant's daily notes.  FAC ¶¶ 20, 141.  Rose also sought

51

1   authorization to expand the scope of the surveillance program, in an effort to create

2   a Muslim gym that the FBI would use to gather yet more information about the

3   class.  FAC ¶ 22.  Agent Allen flew to Washington, D.C. with Rose, to meet with

4   high-level FBI officials to get approval to open a gym for Muslims that would

5   function in part as a mosque with a prayer room.  Agent Allen told Monteilh that

6   approval to open the gym had been granted.  FAC ¶ 145.

7        Third, there are significant structural differences between the positions of

8   Tidwell, Walls and Rose here and Mueller and Ashcroft in *Iqbal*.  Rather than

9   being the heads of agencies allegedly involved only in setting policy, they were the

10  supervisors directly over the operation in question: Rose supervised counter-

11  terrorism operations in the FBI's Santa Ana Branch office, Walls supervised the

12  FBI's Santa Ana branch office, and Tidwell headed the Los Angeles field office.

13  FAC ¶¶ 20-22. As the complaint alleges, the L.A. field office is a small part of the

14  FBI, one of the 56 field offices that the agency maintains in addition to its national

15  headquarters, specialized facilities, and more than 400 smaller "resident agencies"

16  and 60 international offices.  FAC ¶ 17 n.3.  The Santa Ana branch office is one of

17  ten satellite branch offices in the Los Angeles Field Office.  FAC ¶ 21.  The fact

18  that they were much closer in the chain of command to the prolonged

19  discrimination renders plausible the allegations they were directly involved.

20       Finally, Plaintiffs' claim that supervisors approved an operation with a

21  facially discriminatory focus cannot be itself implausible in light of allegations that

22  the FBI has, over the last several years, moved towards policies and practices that

23  explicitly focus on Muslims and Islam,[31] *see, e.g.*, FAC ¶¶ 24-37, and training that

24  equates Islam with terrorism, FAC ¶¶ 38, 39; *supra,* n.3.

25

26  _____

    [31] Defendants TW say the FAC alleges that Defendants adhered to policies that bar
27  religious profiling. TW Br. 25. This is an unsupportable distortion. The FAC
    clearly describes FBI policy changes eroding requirements for investigations'
28  factual predicate and allowing use of race and religion.  *See* FAC ¶¶ 24-39.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

### 2.   *The Supervisors Are Liable For Unlawful Searches*

Defendants their arguments on supervisory liability in the context of the Plaintiffs' Fourth Amendment claims. TW Br. 27-29; AAR Br. 18-20. Defendants arguments are even weaker with respect to this claim.

Nothing in *Iqbal* changes the intent required to find supervisors liable for a constitutional violation, which as that court recognizes, turns on the constitutional violation at issue. *Iqbal*, 129 S. Ct. at 1948; *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011). Because an officer's subjective intent is irrelevant for a Fourth Amendment analysis, *Nunez v. Duncan*, 591 F.3d 1217, 1228 (9th Cir. 2010), the test set forth in *Al-Kidd* governs without any additional intent requirement.

Defendants TW nonetheless argue that the complaint does not show a "sufficient causal connection exists" to show the supervisors' liability. TW Br. 27. But they rely on cases that refused to hold supervisors liable only where plaintiffs were unable to allege *any* knowledge of or personal involvement in constitutional violations. *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (supervisor not aware of challenged arrest and not responsible for police that governs challenged conduct); *Lacey v. Maricopa Cnty.*, 2011 WL 2276198, at *13 (9th Cir. 2011) (supervisor unaware of faulty nature of challenged subpoenas and not involved in ordering challenged raids).

Here, the detailed allegations with respect to Tidwell, Walls, and Rose on the religious discrimination claim make it equally possible for the court "to draw the reasonable inference" that those Defendants knew of and approved ongoing Fourth Amendment violations. Indeed, the complaint alleges specifically that in the informant's daily notes (which Tidwell, Walls and Rose read), he specifically wrote down that he recorded conversations where he was not present, and searched through the drawers at mosque offices where he found himself alone there. *Id.* ¶¶ 192, 135. Courts have refused to dismiss claims against supervisors on far less specific allegations than these. *See Mora v. Arpaio*, 2011 WL 1562443, at *8

1  (D.Ariz. Apr. 25, 2011) (allowing pleadings that merely alleged "supervisory

2  authority" and "the ultimate responsibility for and decision-making authority over

3  all" challenged conduct); *Moss v. U.S. Secret Service*, 750 F.Supp.2d 1197, 1238-

4  40 (D.Or. 2010) (mere allegations of "final decision-making authority,"

5  authorization of the unconstitutional conduct, and inappropriately trained and

6  supervised their subordinates sufficient to state plausible claim of supervisory

7  liability).

8                    *              *              *

9          On these facts, this Court cannot conclude that that it is not "plausible" that

10  Tidwell, Walls, and Rose knew of and approved the "central feature" of the

11  operation — its focus on Muslims — or the unlawful searches the operation

12  entailed.  To conclude that Tidwell, Walls, and Rose lacked intent to allow this

13  facially discriminatory operation would mean that these FBI supervisors allowed

14  "one of the ten most important investigations in the country" to go on under their

15  watch for more than a year, an investigation that garnered the attention of

16  management in Washington, D.C. and that involved the sensitive matters of

17  placing a criminal convict into mosques to pose as a convert and recording

18  conversations on hundreds if not thousands of people — all without knowing the

19  "central feature" of the informant's orders, or ever reviewing to see whether the

20  agents had obtained warrants.  It would mean Tidwell, Walls, and Rose lacked this

21  knowledge about the basic focus of the operation on Muslims despite Tidwell

22  approving in advance the recruitment of an informant to be placed in mosques,

23  despite Tidwell and other supervisors reading Monteilh's daily reports and

24  monitoring the operation closely; despite Rose flying to Washington to expand the

25  operation; despite Walls being involved enough that she was audited for her

26  handling of leads, monitoring closely enough that she came to distrust Monteilh

27  and eventually ordered the operation to close, and meeting with Monteilh

28  personally to order him to remain silent about the operation.  In stark contrast to

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    *Iqbal*, it is this alternative that is implausible.

2    **C.    Defendants Are Not Entitled To Qualified Immunity on Plaintiffs'**
3    **RFRA Claims**

4    Defendants argue that they are entitled to qualified immunity from the

5    RFRA claims for three reasons, but their arguments are meritless.

6    Defendants TW argument that RFRA does not provide suits for damages

7    against government individuals in their individual capacities, TW Br. 31-32, runs

8    contrary to the statutory text and the holdings of most courts to address the

9    question.  RFRA permits "a person whose religious exercise has been burdened" to

10   "assert that violation as a claim or defense in a judicial proceeding" and to "obtain

11   appropriate relief against a government, "and defines government as "a branch,

12   department, agency, instrumentality, and official (or other person acting under

13   color of law)."  42 U.S.C. 2000bb-2(1), 2000bb-1(c).  As several courts have

14   recognized, the phrase "person acting under color of law" tracks the language of 42

15   U.S.C. 1983, which provides liability for officials in their individual capacities.

16   *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "When a legislature borrows an already

17   established individual phrase from an old statute to use it in a new statute, it is

18   presumed that the legislature intends to adopt not merely the old phrase but the

19   judicial construction of that phrase." *Sutton v. Providence St. Joseph Medical*

20   *Center*, 192 F.3d 826, 834-35 (9th Cir.1999).  Moreover, providing a damages

21   remedy is consistent with RFRA's remedial purpose.  *See Jama v. I.N.S.*, 343

22   F.Supp.2d 338, 374-75 (D.N.J. 2004) ("[A] conclusion that RFRA does not allow

23   for suits for money damages would seem to be at odds with the general

24   Congressional purpose that animates the statute.  Congress enacted RFRA because

25   it wanted to re-invigorate protection of free exercise rights after the Supreme Court

26   in *Smith* diluted the standard used to evaluate claimed violations of those rights…It

27   seems unlikely that Congress would *restrict the kind of remedies* available to

28   plaintiffs who challenge free exercise violations in the same statute it passed to

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*elevate the kind of scrutiny* to which such challenges would be entitled."). Finally, while Defendants cite one district court opinion from another circuit in support of their view, most district courts to address the question have held that RFRA allows damages against officers in their individual capacities. *See Jama*, 343 F.Supp.2d at 374-75; *Padilla*, 633 F.Supp.2d at 1039 (following *Jama* to hold that "RFRA allows for individual capacity suits for money damages against federal officers"); *Keen v. Noble*, 2007 WL 2789561, at *9 (E.D. Cal. Sept. 20, 2007); *Lepp v. Gonzales*, 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005) (following *Jama*).

Defendants also argue that their conduct did not impose a "substantial burden" because it did not force Plaintiffs "to choose between following the tenets of their religion and receiving a governmental benefit" or coerce them "to act contrary to their religion under the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1070 (9th Cir. 2008).

As the Supreme Court has recognized, "[u]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes. A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature." *Am. Comm. Ass'n, C.I.O. v. Douds*, 339 U.S. 382 (1950).[32] By conducting surveillance on anyone who attends mosques, engages in certain religious practices, or identifies as a Muslim, the FBI imposed just such a "discouragement" to mosque attendance and religious practice. While alleging a "subjective chilling effect" may not be sufficient to constitute a substantial burden under *Vernon*, 27 F.3d at 1394, plaintiffs here allege more than a mere chilling effect.

First, by subjecting Muslims to surveillance at mosques, the FBI effectively

---

[32] Because RFRA expressly adopted and restored federal court rulings on the "substantial burden" inquiry prior to *Smith*, those cases properly govern a RFRA analysis. *See Navajo Nation*, 535. F.3d at 1069.

1   made surveillance a *condition* of religious practice.  A Muslim who wanted to

2   practice at his or her chosen mosque would face the choice of refraining from

3   religious practice or submitting to government surveillance.  Under an

4   investigation that targets all Muslims, investigation is effectively compulsory for

5   those who choose to exercise their religion.  *Cf. Vernon*, 27 F.3d at 1394.  This

6   burden is objective, not subjective.

7            Second, plaintiffs do not allege only a chilling effect from some neutral

8   government action (such as the improper religious influence in employment in

9   *Vernon*) — they allege that the chill arises from explicit religious discrimination.

10  In other constitutional contexts, such discrimination constitutes injury in itself

11  sufficient for standing.  *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 505 (1999) (noting

12  that where right "to be treated equally" is at stake, "discriminatory classification is

13  itself a penalty"); *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am.*,

14  508 U.S. at 666 ("The 'injury in fact' in an equal protection case . . . is the denial

15  of equal treatment resulting from the imposition of [a] barrier, not the ultimate

16  ability to obtain the benefit."); *Allen v. Wright*, 468 U.S. 737, 755 (1984) ("There

17  can be no doubt that [stigmatic injury caused by discrimination] is one of the most

18  serious consequences of discriminatory government action and is sufficient in

19  some circumstances to support standing.").  As the Supreme Court recognized in

20  *Douds*, being subject to such explicit religious discrimination, even where the

21  result is a harmless as wearing an armbands, is itself a burden on religious practice.

22           Finally, Plaintiffs experienced burdens on their religious activity.  Because

23  of Monteilh's intrusive questioning, Malik tried to avoid him to the point of

24  staying away from the mosque.  FAC ¶¶ 197-199.  Both Malik and AbdelRahim

25  have altered their religious practice rather than risk continued surveillance, by

26  decreasing their attendance at mosque and altering religiously motivated dress and

27  grooming (Malik) and religiously prescribed donations (AbdelRahim).  FAC

28  ¶¶ 197, 217.  After Monteilh's status as an informant was revealed, Fazaga spent

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    time that he would have spent in religious ministry addressing his congregants'

2    fears about attending and participating in the mosque's services and activities.

3    FAC ¶ 185. Even under Defendants' cramped view of what constitutes a burden

4    on free exercise, these allegations suffice.

5        **D.    Defendants Are Not Entitled to Qualified Immunity on Plaintiffs'**

6            **Claim under 42 U.S.C. 1985(3)**

7        Plaintiffs' lengthy and detailed allegations that Defendants targeted them for

8    surveillance solely on the basis of their religion easily state a claim that defendants

9    "conspire[d] . . . for the purpose of depriving, either directly or indirectly, any

10   person or class of persons of the equal protection of the laws, or of equal privileges

11   and immunities under the laws." 42 U.S.C. 1985(3). To state a claim § 1985(3),

12   Plaintiffs must allege four elements: (1) a conspiracy (2) for the purpose of

13   depriving, either directly or indirectly, Plaintiffs of the equal protection of the laws

14   and (3) an act in furtherance of the conspiracy (4) that causes injury to plaintiffs.

15   *Scott v. Ross*, 140 F.3d 1275 (9th Cir. 1998).

16       Defendants argue that plaintiffs have not adequately alleged a meeting of the

17   minds to violate Plaintiffs' constitutional rights, for two different reasons.

18   Defendants TW assert this is so because the factual allegations are insufficient,

19   TW Br. 20-21, while AAR argues that a conspiracy among government officials

20   from the same agency does not violate § 1985. Neither is correct.

21       1.   ***Application of the Antitrust "Intracorporate Conspiracy"***

22           ***Doctrine To § 1985 Claims Would Be Wholly Inappropriate***

23       Defendants argue that this Court should apply, in the § 1985(3) context, the

24   "intracorporate conspiracy" doctrine that courts have developed in antitrust law.

25   Under that doctrine, employees of a single entity, acting within the scope of

26   employment, generally cannot be held culpable for conspiring with each other to

27   violate antitrust law. AAR Br. 7-9. However, the Ninth Circuit has held that the

28   applicability of intracorporate conspiracy doctrine to other types of conspiracies

58

1    (other than antitrust) depends upon the type of activity the statute at issue is

2    designed to prohibit.  In *Webster v. Omnitrition Intern., Inc.*, the Ninth Circuit held

3    the intracorporate conspiracy doctrine should not apply to conspiracies under

4    RICO, because while "a conspiracy 'in restraint of trade' between [a subsidiary

5    and its parent] poses no threat to the goals of antitrust law-protecting

6    competition . . . [,] intracorporate conspiracies do threaten RICO's goals of

7    preventing the infiltration of legitimate businesses by racketeers and separating

8    racketeers from their profits" 79 F.3d 776, 787 (9th Cir. 1996) (*quoting Ashland

9    Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989)).

10         While the Ninth Circuit has not explicitly addressed whether the

11   intracorporate conspiracy doctrine extends to civil rights claims under §1985, *see

12   Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993) (noting circuit

13   split and reserving question), *Webster*'s logic clearly compels the conclusion that it

14   does not apply here.  Section 1985, known as the Ku Klux Klan Act of 1871, was

15   designed to "prevent[] . . . deprivations which shall attack the equality of rights of

16   American citizens."  *Bray*, 506 U.S. at 268.  Unlike antitrust law, which prohibits

17   anticompetitive conduct by corporate entities, "the conspiracy in a § 1985(3) claim

18   is focused on the discriminatory conduct of the individuals involved" and therefore

19   remains actionable "regardless of whether the defendants were acting as

20   individuals or in the course and scope of their employment." *Rashdan v.

21   Geissberger*, 2011 WL 197957, at *7 (N.D. Cal. Jan. 11, 2011).  Indeed, applying

22   the doctrine to § 1985 would have the effect of putting discriminatory law

23   enforcement conspiracies outside the reach of § 1985 — a goal that Congress

24   cannot possibly have intended in 1866, when it passed the statute in the wake of

25   massive civil rights violations by state actors. *See O.H. v. Oakland Unified Sch.

26   Dist.*, 2000 WL 33376299, at *8 (N.D. Cal. Apr. 17, 2000) (recognizing that

27   application of intracorporate conspiracy doctrine to § 1985 "would immunize

28   official policies of discrimination from scrutiny").  District courts have recognized

1   this distinction and rejected application of the intracorporate conspiracy doctrine to

2   § 1985 conspiracies.[33]  This Court should do likewise.

3              2.  ***Plaintiffs' Adequately Allege A Conspiracy Under § 1985***

4          Defendants TW argue that Plaintiffs' complaint lacks the factual specificity

5   to establish that they entered an agreement to violate Plaintiffs' constitutional

6   rights.  TW Br. 21.  This assertion verges on the absurd.  As discussed with respect

7   to supervisory liability, *supra* Part II.B.1, Plaintiffs allege that Tidwell and Walls

8   approved, oversaw, and supervised an investigation whose "central feature" was

9   that it targeted Muslims on the basis of religion.  And as set forth above, *see id.*,

10  Plaintiffs have pled detailed, nonconclusory facts about the nature and importance

11  of the investigation, these supervisors' specific roles and actions, and the climate at

12  the FBI that easily satisfy the requirement that Plaintiff plead facts "plausibly

13  suggesting . . . agreement." *Twombly*, 550 U.S. at 557; *see also Scott*, 140 F.3d at

14  1284 ("A conspiracy can be inferred from conduct and need not be proven by

15  evidence of an express agreement." (quotation omitted)).  Indeed, it is hard to

16  know what facts a plaintiff could plead to satisfy the standard that Defendants

17  suggest governs – a standard far beyond what § 1985 requires.

18         Defendants AAR contend that Plaintiffs do not adequately plead that

19  Defendants acted "for the purpose of depriving, either directly or indirectly,

20

---

21  [33] *See Rashdan,* 2011 WL 197957; *Washington v. Duty Free Shoppers*, 696

22  F.Supp. 1323, 1326 (N.D. Cal. 1988) ("In the area of civil rights, a real danger

23  exists from the collaboration among agents of a single business to discriminate.

    There is no reason to believe that discrimination by an individual business is less

24  harmful than discrimination by multiple businesses, or that discrimination by a

    single business deserves to be protected because it confers any benefit on

25  society."); *O.H. v. Oakland Unified School Dist.* 2000 WL 33376299 at 8 (N.D.

26  Cal. 2000) (recognizing that application of intracorporate conspiracy doctrine to

    § 1985 "would immunize official policies of discrimination from scrutiny"); *Rebel

27  Van Lines v. City of Compton*, 663 F.Supp. 786, 792-793 (C.D. Cal. 1987); *Diem v.

28  City and County of San Francisco*, 686 F.Supp. 806, 810 (N.D. Cal. 1988).

---

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Plaintiffs of the equal protection of the laws." *Carpenters*, 463 U.S. at 828-29;

2   AAR Br. 9-12.  However, as described above, Plaintiffs have alleged that

3   Defendants employed a facial classification on the basis of religion.  *See supra*

4   II.A.2.  Thus, Plaintiffs allege "that some racial, or perhaps otherwise class-based,

5   invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v.*

6   *Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993).  *Bray* stated that

7   the "discriminatory animus" required for a § 1985(3) claim need not be malicious.

8   *Id.* at 269-70 (stating that the "assertedly benign (though objectively invidious),

9   discrimination against women" would be actionable because it "focuses upon

10   women by reason of their sex").  *See also Johnson Controls*, 499 U.S. at 199;

11   *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (citing *Bray* and

12   concluding that "an 'animus' requirement can be met not just by acts that are

13   maliciously motivated, but also by acts arising out of assertedly benign or even

14   affectionate (though objectively harmful) impulses.").

15       Courts have repeatedly applied this analysis to allow § 1985(3) claims to

16   proceed beyond the pleadings stage where plaintiffs have alleged that defendants

17   were motivated by plaintiffs' membership in a protected class.  *See, e.g., Bowen v.*

18   *Rubin*, 2002 U.S. Dist. LEXIS 25283, at *8 (E.D.N.Y. May 17, 2002) (holding that

19   plaintiffs "sufficiently alleged the required animus by alleging that they were

20   targeted for the very reason of their group characteristic"); *see also Azar v. Conley*,

21   456 F.2d 1382, 1386 (6th Cir. 1972) (specific intent need not be alleged in

22   connection with § 1985(3) claims).  Plaintiffs' allegation that Defendants targeted

23   them for surveillance solely because of their religion is sufficient to establish the

24   required animus for Plaintiffs' § 1985(3) claim.

25       Plaintiffs' allegation that Defendants targeted them for surveillance because

26   of their religion is also sufficient to establish that Defendants intended to interfere

27   with a legal right — namely, Plaintiffs' right to be free from religious

28   discrimination.  Defendants AAR seem to misunderstand this, and place great

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

weigh on their argument that the complaint alleges "no deliberate disruption of their religious activities to dissuade members from attending services."  AAR Br. 11.  But the Supreme Court and the Ninth Circuit have repeatedly held that allegations of intentional discrimination constitute allegations of interference with a protected right sufficient to survive a motion to dismiss.[34]  *See, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 90-91 (1971) (holding § 1985(3) claim sufficiently pled where African-American plaintiffs alleged that defendants engaged in a conspiracy to prevent them "from seeking the equal protection of the laws" on the basis of race); *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1450 (9th Cir. 1994), *overruled on other grounds as stated in Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (African-American's allegations that employer deprived him of equal protection by discriminating against him on the basis of race satisfied both the animus requirement and the denial of "his right to be free from improper racial discrimination").  Recent decisions in other circuits have also concluded that such allegations are sufficient to survive dismissal.  *See, e.g.*, *Thomas v. Independence Township.*, 463 F.3d 285 (3rd Cir. 2006); *Bowen*, 2002 U.S. Dist. LEXIS 25283 at*8; *Word of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't Social Services*, 329 F. Supp. 2d 675, 689-90 (W.D. N.C. 2004).

Defendants cite at length the Supreme Court's decision in *Bray*, which notes that "the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it."

---

[34] *See also, e.g.*, *Maynard v. City of San Jose*, 37 F.3d 1396 (9th Cir. 1994) (allowing § 1985 claim to proceed to trial where plaintiff alleged he was intentionally discriminated against on the basis of race); *Johnson v. State of California*, 207 F.3d 650, 655 (9th Cir. 2000) (reversing dismissal of § 1985(3) claim where plaintiff alleged policy of racial segregation of prisoners); *Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998) (affirming jury verdict for plaintiff on § 1985 claim that he was targeted because of his religious affiliation).

1   506 U.S. at 275-76.  But the FAC easily passes this test, as it alleges in great detail

2   that Defendants intentionally discriminated against them by targeting them for

3   investigation and surveillance solely because of their religion, as discussed above.

4   *See supra* Part II.A (discussing intentional discrimination under First Amendment).

5       **E.**    **Defendants are Not Entitled To Qualified Immunity on Plaintiffs'**

6           **Equal Protection Claims**

7          Courts have repeatedly recognized that classification on the basis of religion

8   violates equal protection.  *Armstrong*, 517 U.S. at 464 (holding that government

9   may not base decision to prosecute on "an unjustifiable standard such as race,

10  religion, or other arbitrary classification"); *Miller v. Johnson*, 515 U.S. 900, 911

11  (1995) (at the "heart" of equal protection "lies the simple command that the

12  Government must treat citizens as individuals, not as simply components of a

13  racial, religious, sexual or national class.") (quotations omitted)); *Ball v.*

14  *Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) (under Equal Protection Clause,

15  where government "employs a suspect class (such as race, religion, or national

16  origin) . . . , then courts must apply strict scrutiny"); *Freeman v. Arpaio*, 125 F.3d

17  732, 737 (9th Cir. 1997) ("The Constitution's equal protection guarantee ensures

18  that [government] officials cannot discriminate against particular religions."),

19  *overruled on other grounds as recognized in Shakur v. Schriro*, 514 F.3d 878,

20  884-85 (9th Circ.  2008); *Ass'n of Christian Sch. Intern. v. Stearns*, 362 Fed. Appx.

21  640, 646 (9th Circ. 2010) (unpub.) (under Equal Protection Clause, courts "apply

22  strict scrutiny when distinctions are made on the basis of a suspect class, like

23  religion"); *Colorado Christian Univ.  v. Weaver* , 534 F.3d 1245, 1257 (10th Cir.

24  2008) ("The [Supreme] Court has called neutral treatment of religions 'the clearest

25  command of the Establishment Clause.' Such discrimination is forbidden by the

26  Free Exercise Clause as well.  The Court has suggested that the Equal Protection

27  Clause's requirement is parallel."); *Sweet v. Sec'y, Dept.  of Corrections* 467 F.3d

28  1311, 1319 (11th Cir. 2006); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998)

1   (holding that facial classification on the basis of religion violated Equal

2   Protection); *Native American Council of Tribes v. Solem*, 691 F.2d 382, 384 (8th

3   Cir. 1982) (holding that complaint made out a "violation of equal protection by

4   means of religious discrimination").

5       Defendants AAR argue that the claim should be dismissed because courts

6   have recognized that "[i]t is generally unnecessary to analyze laws which burden

7   the exercise of First Amendment rights by a class of persons under the equal

8   protection guarantee, because the substantive guarantees of the [First] Amendment

9   serve as the strongest protection against the limitation of these rights." *Orin v.*

10  *Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001).  But it does not follow that

11  plaintiffs' Equal Protection claim must be dismissed.  Rather, as the *Orin* court

12  concluded, a plaintiff's Equal Protection claim is "subsumed by, and co-extensive

13  with, his First Amendment claim." *Id.*; *see supra, Part II.A* (First Amendment

14  claims also require strict scrutiny).  Because Plaintiffs have stated a claim for

15  religious discrimination under the First Amendment, *see supra*, Part II.A, they

16  have also stated an Equal Protection claim.

17      **F.   Defendants Are Not Entitled To Qualified Immunity on Plaintiffs'**

18          **Fourth Amendment and FISA Claims**

19      The complaint sets forth detailed allegations that Defendants planted

20  electronic listening devices in one Plaintiff's home and another's office, that their

21  informant left recording devices to capture intimate religious discussion at the

22  mosque, that the informant routinely took video in mosques and in private homes,

23  and that the informant acted pursuant to broad instructions to gather as much

24  information on Muslims as possible.  All of this took place without warrants,

25  because, as defendant Armstrong told the informant, while warrants might be

26  required for criminal cases, "National security is different.  Kevin [Armstrong] is

27  God."  FAC ¶ 136.  Defendants nonetheless argue that none of these activities

28  violated clearly established Fourth Amendment law.

1    Defendants are wrong.  Established law clearly holds that the FBI cannot go

2    around dropping listening devices in places of worship or private homes without a

3    warrant or suspicion of illegal activity, cannot videotape the interiors of a person's

4    home without consent or a warrant, and cannot engage in a fishing expedition

5    targeting an entire religious group without a proper law enforcement purpose.

6        The Fourth Amendment protects against unreasonable searches and seizures.

7    In the absence of a warrant, a court must assess whether any particular action by

8    the government invades an individual's reasonable expectation of privacy by

9    considering both whether the individual exhibited an actual expectation of privacy,

10   and whether the individual's expectation is one society "is prepared to recognize as

11   reasonable." *Bond v. United States*, 529 U.S. 334, 338 (2000).  Courts have been

12   hesitant to create bright line rules governing expectations of privacy in any

13   particular places – rather, a careful Fourth Amendment analysis must take into

14   account the specific circumstances of the communications at issue.  *United States*

15   *v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007); *see also Lonegan v. Hasty*,

16   436 F. Supp. 2d 419, 434 (E.D.N.Y. 2006) ("the question of whether society is

17   prepared to accept as reasonable plaintiffs' expectation of privacy . . . requires an

18   analysis that considers not only where the conversations occurred, but, also, the

19   nature of the conversations, the specific circumstances in which they occurred, and

20   the relationships of the participants.").

21        1.   ***Warrantless Audio Recording Outside Informant's Presence***

22        The most obvious Fourth Amendment (and FISA) violation alleged in the

23   FAC arises from the informant's warrantless recording of conversations to which

24   he was *not* a party.  Although Defendants argue that the informants' surveillance

25   was reasonable under the invited informer doctrine, the FAC alleges Defendants

26   conducted audio surveillance of Plaintiffs *outside the presence of the informant* in

27   at least three ways: (1) by installing warrantless audio surveillance in Fazaga's

28   office, FAC ¶ 95; (2) by installing warrantless audio surveillance in AbdelRahim's

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   home, FAC ¶ 209; and (3) through the informant leaving recording devices around

2   the mosque, outside his presence, to record intimate religious discussions to which

3   he was not a party, FAC ¶¶ 127, 137, 192, 211.  The law clearly establishes that the

4   Fourth Amendment does not permit audio surveillance of communications without

5   consent or a warrant.  *Yendes v. McCulloch*, 2010 WL 3339505, at *7 (S.D. Cal.

6   Aug. 23, 2010); 18 U.S.C. 2510 *et seq.*

7       *Fazaga's Office:*  Defendants do not contest that under clearly established

8   law Fazaga had a reasonable expectation of privacy against audio recording his

9   office, nor could they.  *See United States v. Taketa*, 923 F.2d 665, 673 (9th Cir.

10  1991); *United States v. McIntyre*, 582 F.2d 1221, 1223-24 (9th Cir. 1978).  Instead,

11  they argue that the allegation is "conclusory" and falls short of plausible under

12  *Iqbal*.  This contention is absurd.  First, the allegation that "Agents Allen and

13  Armstrong caused . . . electronic surveillance equipment to be installed at the

14  Mission Viejo mosque and used it to monitor conversations of Plaintiff Yassir

15  Fazaga, including conversations held in parts of the mosque not open to the public,

16  including Sheikh Fazaga's office," FAC ¶ 95, is not conclusory, as it contains

17  specific factual allegations and is not merely a "formulaic recitation of the

18  elements of a constitutional discrimination claim." *Iqbal*, 129 S.Ct. at 1951.

19  Second, even if it could somehow be described as conclusory, it is plausible in

20  light of other, detailed allegations: that Agents Allen and Armstrong had developed

21  a specific interest in Fazaga (based, as set forth *supra*, Part II.A.2, on innocuous

22  and protected First Amendment activity) and had instructed the informant to gather

23  more information on him, FAC ¶¶ 168-180; that they told the informant that

24  electronic surveillance equipment had been installed at Fazaga's Mission Viejo

25  mosque, in a way that "could get [them] in a lot of trouble," which he understood

26  to mean that they did not have warrants, FAC ¶ 94; and that they told him they did

27  not need warrants for national security investigations, FAC ¶ 136.  Courts have

28  refused to dismiss claims on far less specific allegations.  *See, e.g.*, *Moss*, 750

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   F.Supp. 2d at 1236-1240; *Mora*, 2011 WL 1562443, at * 8.

2       *AbdelRahim's Home:*  The complaint alleges that Defendants Armstrong and

3   Allen told the informant that "the FBI had electronic listening devices in

4   AbdelRahim's house, as well as in AbdelRahim's car and phone," and cites a

5   particular instance in which they told him they had knowledge of something that

6   happened in the house because they had audio surveillance in it.  FAC ¶ 209.  It is

7   clearly established that warrantless surveillance of homes violates the Fourth

8   Amendment. *See Kyllo v. United States*, 533 US 27, 31 (2001) ("With few

9   exceptions, the question whether a warrantless search of a home is reasonable and

10  hence constitutional must be answered no.").  Defendants TW argue that Plaintiffs

11  fail to allege who is responsible and whose conversations were recorded.  TW Br.

12  27 n.14.  The allegations that Armstrong and Allen had instructed Monteilh to

13  gather extensive information on AbdelRahim and had knowledge about the

14  surveillance, *see* FAC ¶ 200-213, easily render plausible the claim that Defendants

15  were responsible for the surveillance and recorded AbdelRahim's conversations.

16      Defendants AAR also argue that this portion of the claim should be

17  dismissed on state secrets grounds as it would expose "sources and methods."

18  AAR Br. 33-34 n.7.  But the individual defendants cannot assert the state secrets

19  privilege — only the government can, and it has chosen not to do so with respect to

20  the Fourth Amendment claims.  *See* Plfs. Opp. to Gov't Defs., Part IV.C.3.

21      *Surveillance In Mosques Outside the Informant's Presence:* The FAC

22  alleges instances in which the informant left recording devices in the mosque so as

23  to record communications during *halaqas*, or intimate religious discussion groups,

24  while he went elsewhere, and that he specifically recorded conversations of

25  Plaintiffs Malik and AbdelRahim in this manner.  *See* FAC ¶¶ 127, 137, 192, 211.

26  The invited informant doctrine does not apply to situations where no informant is

27  present, and warrantless audio recording in circumstances where an individual

28  enjoys a reasonable expectation of privacy violates clearly established Fourth

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Amendment law.  *United States v. Nerber*, 222 F.3d 597, 604-05 (9th Cir. 2000).

2      Defendants argue that no reasonable expectation of privacy exists in

3   recordings made at mosques because Plaintiffs do not allege that these spaces were

4   closed to the public.  TW Br. 26, 28-31; AAR Br. 29-31.  But even if Plaintiffs

5   knew their communications could be heard by other participants in the *halaqa*,

6   they retained a reasonable expectation of privacy against having them audio

7   recorded. "What a person seeks to preserve as private, even in an area accessible to

8   the public, may be constitutionally protected." *Katz*, 389 U.S. at 351-52 (finding

9   reasonable expectation of privacy in public phone booth).  Similarly, even where

10   the public nature of a space involves some degree of exposure, people may still

11   retain reasonable expectations of privacy against more serious intrusions. *See*

12   *Bond*, 529 U.S. at 338-39 (holding that although passenger on public bus "clearly

13   expects that his bag [placed in overhead bin] may be handled," he nonetheless had

14   reasonable expectation of privacy against agents "feel[ing] the bag in an

15   exploratory manner").  Courts have repeatedly recognized that even where people

16   expect to be seen and heard by a limited number of others, they retain a reasonable

17   expectation of privacy against audio or video recording.  As the Ninth Circuit has

18   recognized, "[p]rivacy does not require solitude. . . . [a]ccess of others does not

19   defeat [people's] expectation of privacy." *Taketa*, 923 F.2d at 673;  *Nerber*, 222

20   F.3d at 604 ("Even if one cannot expect total privacy . . . , [a] diminished privacy

21   interest does not eliminate society's expectation to be protected from" severe

22   intrusion); *Trujillo v. City of Ontario*, 428 F.Supp.2d 1094, 1105 & n.6 (C.D. Cal.

23   2006) (holding police officers retained reasonable expectation of privacy against

24   videotaping in station locker room, even though they could be seen by other

25   officers), *aff'd sub nom. Bernhard v. City of Ontario*, 270 Fed.Appx. 518, 519 n.1

26   (9th Cir. 2008) (unpublished) ("That Plaintiffs expected to undress in front of their

27   colleagues does not mean that they expected to undress for the camera."); *Yendes*,

28   2010 WL 3339505, at *6 (fact that plaintiffs met with other people while

1  defendants recorded them in conference room without a warrant "not fatal" to

2  Fourth Amendment claim, "as '[p]rivacy does not require solitude'" (quoting

3  *Taketa*)).  Certainly, from the allegations of the complaint, it is clear that the prayer

4  groups were not "so open to . . . the public that no expectation of privacy is

5  reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987).

6      Defendants TW rely on cases where no expectation of privacy was found

7  due to the purely commercial nature of the locations involved.  *See Lyall v. City of*

8  *Los Angeles*, 2011 WL 61626, *4-7 (C.D. Cal. Jan. 6, 2011); *United States v.*

9  *Gonzalez*, 328 F.3d 543, 547 (9th Cir. 2003); *United States v. Little*, 753 F.2d

10  1420, 1436 (9th Cir. 1984); *In re John Doe Trader*, 894 F.2d 240, 243-45 (7th Cir.

11  2003) (relying on both "noisy and frantic" environment of trading floor presence

12  and of agents in and near the recorded conversations).  These cases are

13  inapplicable to the noncommercial sanctuary a mosque provides.

14      Here, the allegations show that Plaintiffs had a reasonable expectation of

15  privacy that the *halaqa* would not be recorded.  Mosque prayer halls are not

16  ordinary public spaces, as various rules and customs apply, including a religious

17  prohibition on eavesdropping or tale-bearing, and an explicit rule against audio and

18  video recording.  FAC ¶ 193.  The *halaqa* where Defendants recorded Plaintiffs are

19  intended to be safe environments for religious discussion that are afforded "some

20  measure of confidentiality." *Id.*  Defendant TW argues that these customs must be

21  ones that "*society* is prepared to recognize as reasonable," TW Br. 30 (quoting

22  *Katz*, 389 U.S. at 361 (emphasis in brief)), but the Ninth Circuit has recognized

23  that expectations of privacy arising out of religious custom are based on "the

24  nation's history of respect for religion in general."[35]  *Mockaitis v. Harcleroad*, 104

25

26  [35]  Defendants AAR rely on *Kee v. City of Rowlett*, 247 F.3d 206 (5th Cir. 2001), in
which the Fifth Circuit held no reasonable expectation of privacy had been shown

27  at a gravesite where local police had planted a hidden microphone.  But there,
plaintiffs "adduced no evidence regarding the context of the communications that

28

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    F.3d 1522, 1533 (9th Cir. 1997) (holding that plaintiff had objectively reasonable

2    expectation of privacy in communications made during confession), *overruled on*

3    *other grounds as recognized by United States v. Antoine*, 318 F.3d 919, 923 (9th

4    Cir. 2003) (recognizing overruling on RFRA claim).

5         At the motion to dismiss stage, under *Iqbal*, Plaintiffs need only plead facts

6    sufficient to "nudge [their claims] across the line from conceivable to plausible."

7    *Iqbal*, 129 S.Ct. at 1951.  Plaintiffs' allegations more than suffice to make

8    plausible their claims of a reasonable expectation of privacy in the prayer hall.

9               2.  ***Video Recording by the Informant***

10         In addition to the installation of listening devices, the FAC alleges serious

11    violations of the Fourth Amendment arising out of warrantless video surveillance:

12    in particular, that the informant took warrantless video recording inside Plaintiff

13    AbdelRahim's home, FAC ¶ 202.  Defendants argue that the presence of an

14    informant renders this a reasonable search.  TW Br. 28-29, AAR Br. 32.

15         However, in *Nerber*, the Ninth Circuit expressly disclaimed the blanket rule

16    that "video surveillance is justifiable whenever an informant is present," holding

17    that the presence of informants justified video surveillance only because

18    "defendants' privacy expectations were already substantially diminished."  222

19    F.3d at 604 n.5.  Indeed, the Court specifically noted, "[W]e suspect an informant's

20    presence and consent is insufficient to justify the warrantless installation of a

21    hidden video camera in a suspect's home."  *Id.  Nerber*'s position is grounded in

22    the view, clearly established in the Ninth Circuit, that video surveillance is "one of

23    the most intrusive investigative mechanisms available to law enforcement."  *Id.* at

24

25    they now seek to characterize as private," and the facts indicated that

26    "representatives of the media and . . . third parties were in close proximity to the
grave site."  *Id.* at 213.  Here, plaintiffs' allegations of the rules and customs of the

27    prayer hall and the *halaqa* easily render plausible that they had a reasonable

28    expectation of privacy.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   603; *see also United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992)

2   (Kozinski, J., concurring); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442

3   (10th Cir. 1990); *United States v. Torres*, 751 F.2d 875, 885 (7th Cir. 1984)

4   ("Television surveillance is identical in its indiscriminate character to wiretapping

5   and bugging.  It is even more invasive of privacy, just as a strip search is more

6   invasive than a pat-down search . . . ."); *Trujillo*, 428 F.Supp.2d at 1107.

7          *Nerber* held that individuals lacked an expectation of privacy against video

8   recording by informants when they visited a hotel room "solely to conduct a

9   business transaction at the invitation of the occupants, with whom they were only

10   minimally acquainted."  222 F.3d at 604.  In contrast to this "substantially

11   diminished" expectation of privacy, *id.* at 604 n.5, private homes like

12   AbdelRahim's are subject to "the most stringent Fourth Amendment protection,"

13   *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976), and Defendants' video

14   surveillance there violated the Fourth Amendment.

15          3.   ***Conversations to Which the Informant Was a Party***

16          The complaint also alleges a Fourth Amendment violation arising from that

17   Defendants' use of the informant to gather "thousands of hours of audio recording

18   of conversations . . . as well as recordings of religious lectures, discussion groups,

19   classes, and other Muslim religious and cultural events occurring in mosques."

20   FAC ¶ 2.  Defendants argue that the vast majority of this recording was permissible

21   without a warrant under the "invited informer" doctrine.  *See* TW Br. 28-30;

22   AAR Br. 29-32.  But the Ninth Circuit has been clear that for the invited informer

23   doctrine to apply, the "the government's investigation must be conducted in good

24   faith; i.e., not for the purpose of abridging first amendment freedoms." *United*

25   *States v. Aguilar*, 883 F.2d. 662, 705 (9th Cir. 1989), *superseded on other grounds*

26   *by* 8 U.S.C. 1324; *see also United States v. Mayer*, 503 F.3d 740, 751 (9th Cir.

27   2007) ("Good faith has been an implicit requirement for investigations under the

28   Fifth Amendment and searches under the Fourth Amendment.").  Under this good

1    faith requirement, law enforcement must not investigate individuals for the purpose

2    of violating First Amendment rights, and must do so with a legitimate law

3    enforcement purpose.  *Mayer*, 503 F.3d at 752.  The allegations in the FAC paint a

4    detailed portrait of a dragnet surveillance operation undertaken by Defendants' to

5    survey the entire Muslim community in Southern California.  *See supra* Part II.A.

6    Based on the allegations, the Court could conclude that the requisite good faith was

7    absent here, given that the investigation was motivated by the perception, stated by

8    Defendants Allen and Armstrong, that "Islam is a threat to national security."  FAC

9    ¶¶ 121, 162. This is a classic example of a police operation conducted in bad faith

10   that would preclude the applicability of the invited informant doctrine.  *See also*

11   *Handschu v. Special Services Div.*, 349 F.Supp. 766, 770 (S.D.N.Y. 1972) (no

12   legitimate law enforcement purpose in infiltration of anti-war group).

### 4.   *Plaintiffs State A Plausible Claim For Violation Of The Foreign Intelligence Surveillance Act*

15       Defendants argue that Plaintiffs lack standing on their FISA claim because

16   the statute provides relief only for plaintiffs subject to "electronic surveillance"

17   employed "under circumstances in which a person has a reasonable expectation of

18   privacy and a warrant would be required for law enforcement purposes."  50

19   U.S.C. 1801(f)(4); *see also Koyomejian*, 946 F.2d at 1453-54 (holding that FISA's

20   protections cover video surveillance).  For the reasons discussed in connection

21   with the Fourth Amendment claims, *see supra* Part II.F.1-3, the complaint pleads

22   detailed facts that render plausible the allegations that Plaintiffs were monitored

23   without a warrant in circumstances where they had a reasonable expectation of

24   privacy.  *See ACLU v. National Sec. Agency*, 493 F.3d 644, 657 n.16 (6th Cir.

25   2007) (noting FISA's "aggrieved person" status coextensive with Fourth

26   Amendment) (Batchelder, J.).

27       Defendants TW also misread § 1809's *mens rea* for liability, arguing that it

28   requires "intent to violate the law." *See* TW Br. 34.  The complaint sets forth

1    ample facts to render plausible that Defendants' intentionally authorized and

2    engaged in constitutional violations.  But Defendants' reading of the law is wrong

3    — it is unsupported by the statute's text, which renders liable any person who

4    "intentionally engages in electronic surveillance under color of law except as

5    authorized by [statute]" or "intentionally discloses or uses information obtained . . .

6    by electronic surveillance, knowing or having reason to know that the information

7    was obtained through electronic surveillance not authorized by [statute]." 50

8    U.S.C. 1809(a).  Plaintiffs are aware of no case to apply such an intent

9    requirement, and Defendants cite none.

10                               **<ins>CONCLUSION</ins>**

11           For the foregoing reasons, Plaintiffs respectfully request that this Court deny

12   the Individual Capacity Defendants' motions to dismiss.

13                                      Respectfully submitted,

14   Dated:  December 23, 2011          ACLU FOUNDATION OF SOUTHERN
15                                         CALIFORNIA

16                                      COUNCIL ON AMERICAN-ISLAMIC
17                                         RELATIONS, CALIFORNIA

                                        HADSELL STORMER KEENY
18                                         RICHARDSON & RENICK, LLP

19                                      By: _s/ Peter Bibring_____
20                                          Peter Bibring

21                                          Attorneys for Plaintiffs

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS