Peter Bibring (SBN 223981)
 *pbibring@aclu-sc.org*
Ahilan T. Arulanantham (SBN 237841)
 *aarulanantham@aclu-sc.org*
Jennifer L. Pasquarella (SBN 263241)
Mohammad Tajsar (SBN 280152)
Laura Moran  (bar admission pending)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297


Attorneys for Plaintiffs

(Additional Counsel listed on next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, *et al.*,<br><br>                    Plaintiffs,<br><br>         v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION *et al.*,<br><br>                    Defendants. | CASE NO.: SA CV 11-00301 CJC (VBKx)<br><br>**PLAINTIFFS' OPPOSITION TO GOVERNMENT DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT**<br><br>Date:       January 30, 2012<br>Time:       1:30 p.m.<br>Judge:      Hon. Cormac J. Carney |

1 | Additional Plaintiffs' Attorneys:

2

3 | Ameena Mirza Qazi (SBN 250404)

4 | *aqazi@cair.com*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA

5 | 2180 W. Crescent Avenue, Suite F

6 | Anaheim, California  92801
Telephone: (714) 776-1847

7 | Facsimile: (714) 776-8340

8

9 | Dan Stormer (SBN 101967)
*dstormer@hadsellstormer.com*

10 | Joshua Piovia-Scott (SBN 222364)

11 | *jps@hskrr.com*
Reem Salahi (SBN 259711)

12 | *reem@hskrr.com*

13 | HADSELL STORMER KEENY RICHARDSON & RENICK, LLP

14 | 128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103

15 | Telephone: (626) 585-9600
Facsimile: (626) 577-7079

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION

I.   PLAINTIFFS ARE ENTITLED TO EXPUNGEMENT OF
     RECORDS UNDER THE PRIVACY ACT AND THE
     CONSTITUTION……………………………………………………1

     A.   Plaintiffs State a Claim for Expungement Under the
          Privacy Act……………………………………………………2

     B.   Plaintiffs State a Claim for Expungement Under the
          Constitution……………………………………………......7

II.  PLAITIFFS STATE CLAIMS UNDER THE FEDERAL TORT
     CLAIMS ACT……………………………………………………10

     A.   Plaintiffs State an FTCA Claim Under Invasion of Privacy………11

     B.   The Plaintiffs State a Claim for Relief Under Civil Code
          § 52.1……………………………………………………14

     C.   Plaintiffs Have Sufficiently Alleged a Claim for Intentional
          Infliction of Emotion Distress………………………………..16

III. THE COURT MAY NOT DISMISS PLAINTIFFS' FISA CLAIM
     AGAINST THE OFFICIAL CAPACITY DEFENDANTS……………...19

IV.  THE COURT MAY NOT DISMISS THIS ACTION UNDER THE
     STATE SECRETS PRIVILEGE…………………………………….20

     A.   The Procedural Context of the Government's State Secrets
          Assertion……………………………………………………22

     B.   The Foreign Intelligence Surveillance Act Governs the
          Treatment of Any Secret Evidence at Issue in This Case………….26

     C.   Litigation of This Case Likely Does Not Require Disclosure
          of State Secrets………………………………………………...31

          1.   Subject Identification………………………………………..31

i

2.   Reasons for and Results of Investigations……………………..35

3.   Sources and Methods………………………………………..39

D.   The Constitution Forbids Dismissal of This Case on State
Secrets Grounds Because it Seeks Injunctive Relief from
On-Going Constitutional Violations………………………………40

1.  Where it Has Jurisdiction, the Court May Not Dismiss
a Case Seeking Injunctive Relief for Constitutional
Violations Without Addressing Its Claims on the Merits………42

2.  The Government's Practice in Other National Security
Cases Makes Clear That the State Secrets Privilege Does
Not Permit Dismissal of Constitutional Claims for
Injunctive Relief………………………………………………45

3.  Existing State Secrets Doctrine Does Not Resolve
Whether the Privilege Permits Dismissal of Constitutional
Claims for Injunctive Relief……………………………………..47

CONCLUSION………………………………………………………...52

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. NSA,*
   493 F.3d 644 (6th Cir. 2007) ........................................................... 51

*Al-Aulaqi v. Obama,*
   727 F.Supp.2d 1 (D.D.C. 2010) ...................................................... 41

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
   507 F.3d 1190 (9th Cir. 2007).................................................... passim

*American Civil Liberties Union v. Brown,*
   619 F.2d 1170 (7th Cir. 1980)...................................................... 50

*Andrade v. United States,*
   116 F. Supp. 2d 778 (W.D. Tex. 2000) ........................................ 12

*Arar v. Ashcroft,*
   585 F.3d 559 (2d Cir. 2009) ........................................................ 52

*Ashcroft v. Iqbal,*
   129 S.Ct. 1937 (2009) .................................................................. 17

*Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.,*
   2010 WL 98957 (N.D. Cal. Jan. 5, 2010) .................................... 18

*Bismullah v. Gates,*
   501 F.3d 178 (D.C. Cir. 2007) .................................................... 46

*Boccato v. City of Hermosa Beach,*
   29 Cal.App.4th 1797 (1994) ........................................................ 15

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ............................................................... 45, 46

*Burnsworth v. Gunderson,*
   179 F.3d 771 (9th Cir. 1999)...................................................... 7, 8

*Cabesuela v. Browning-Ferris Industries of Cal., Inc.,*
   68 Cal.App.4th 101 (1998)........................................................... 15

iii

*Carlson v. Green*,
   446 U.S. 14 (1980) ................................................................ 43

*Cell Assocs. Inc. v. NIH*,
   579 F.2d 1155 (9th Cir. 1978) ............................................... 6

*Center for Nat. Sec. Studies v. DOJ*,
   331 F.3d 918 (D.C. Cir. 2003) ............................................... 9

*Christensen v. Sup. Ct.*,
   54 Cal.3d 868 (1991) ............................................................ 16

*City of Milwaukee v. Illinois and Michigan*,
   451 U.S. 304 (1981) .......................................................... 8, 26

*Clarkson v. IRS*,
   678 F.2d 1368 (10th Cir. 1982) .............................................. 5

*Committee in Solidarity with the People of El Salvador v. Sessions*,
   738 F.Supp. 544 (D.D.C. 1990) ................................... 6, 24, 40

*Dalrymple v. U.S.*,
   2005 WL 2456213 (S.D. Fla. May 6, 2005) ....................... 12

*Demery v. Kupperman*,
   735 F.2d 1139 (9th Cir. 1984) ............................................... 2

*Doe By and Through Doe v. Petaluma City Sch. Dist.*,
   830 F. Supp. 1560 (N.D. Cal. 1993) .................................... 16

*Doe v. CIA*,
   576 F.3d 95 (2d Cir. 2009) .................................................. 49

*Doe v. City of Mateo*,
   2010 WL 1541279 (N.D. Cal. Apr. 16, 2010) .................... 13

*Dyniewicz v. United States*,
   742 F.2d 484 (9th Cir. 1984) ............................................... 18

*Edmonds v. United States Dep't of Justice*,
   323 F.Supp.2d 65 (D.D.C. 2004) ........................................ 49

*El Masri v. United States*,
   479 F.3d 296 (4th Cir. 2007) .............................................. 49

iv

*Ellsberg v. Mitchell,*
    709 F.2d 51 (D.C. Cir. 1983) ........................................................31, 34, 39, 50

*Ellsberg v. Mitchell,*
    807 F.2d 204 (C.A.D.C. 1986) ........................................................49

*Esteem v. City of Pasadena,*
    2007 WL 4270360 (C.D. Cal. Sept. 11, 2007) ................................17

*Ex Parte Milligan,*
    4 U.S. (4 Wall.) 2 (1866) ........................................................46

*Ex Parte Quirin,*
    317 U.S. 1 (1942) ........................................................46

*Ex Parte Young,*
    209 U.S. 123 (1908) ........................................................43, 44

*Fletcher v. Western National Life Ins. Co.,*
    10 Cal.App.3d 376 (1970) ........................................................17

*Galvin v. Hay,*
    374 F.3d 739 (9th Cir. 2004) ........................................................12

*General Dynamics Corporation v. United States,*
    131 S.Ct. 1900 (2011) ........................................................22, 47, 48

*Guaranty Nat. Ins. Co. v. Gates,*
    916 F.2d 508 (9th Cir. 1990) ........................................................44

*Haase v. Sessions,*
    893 F.2d 370 (D.C. Cir. 1990) ........................................................5, 6

*Halkin v. Helms,*
    598 F.2d 1 (D.C. Cir. 1979) ........................................................50, 51

*Hamilton v. Prudential Financial,*
    2007 WL 2827792 (E.D. Cal. Sept. 27, 2007) ................................18

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ........................................................43

*Hess v. United States,*
    361 U.S. 314 (1960) ........................................................10

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  7 Cal.4th 1 (1994) ...................................................................... 11

*Hinojosa v. City of Terrell*,
  834 F. 2d 1223 (5th Cir. 1988) .................................................. 12

*Hughes v. Pair*,
  46 Cal.4th 1035 (2009) .............................................................. 17

*Imbler v. Pachtman*,
  424 U.S. 409 (1976) ................................................................... 42

*In re Golinski*,
  587 F.3d 901 (9th Cir. 2009) (Kozinski, C.J.) .......................... 25

*In Re National Sec. Agency Telecommunications Rec.*,
  564 F. Supp. 2d 1109 (N.D.Cal. 2008) ....................... 19, 26, 29

*In re Sealed Case*,
  310 F.3d 717 (FISA Ct. Rev. 2002) ........................................... 27

*Jabara v. Webster*,
  691 F.2d 272 (6th Cir. 1982) ................................... 30, 34, 50, 51

*Kasza v. Browner*,
  133 F.3d 1159 (9th Cir. 1998) .................................................. 49

*Kincaid v. City of Fresno*,
  2008 WL 2038390 (E.D. Cal. 2008) .......................................... 15

*Korematsu v. United States*,
  323 U.S. 214 (1944) ................................................................... 41

*Leonardo v. Crawford*,
  646 F.3d 1157 (9th Cir. 2011) ..................................................... 4

*MacPherson v. IRS*,
  803 F.2d 479 (9th Cir. 1986) ........................................... 3, 5, 8, 9

*Maurer v. Pitchess*,
  691 F.2d 434 (9th Cir. 1982) ............................................. 7, 8, 9

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ............................................................. 4, 44

vi

*Menard v. Saxbe,*
   498 F.2d 1017 (D.C. Cir. 1974) ........................................................ 9

*Mohamed v. Jeppesen Dataplan, Inc.,*
   614 F.3d 1070 (9th Cir. 2010) ................................................... passim

*Molerio v. FBI,*
   749 F.2d 815 (D.C. Cir. 1984) ....................................................... 49

*Moreno v. Town of Los Gatos,*
   267 Fed.Appx. 665 (9th Cir. Feb. 21, 2008) ................................. 15

*Nagel v. U.S. Dept. of Health, Educ. and Welfare,*
   725 F.2d 1438 (D.C. Cir. 1984) .......................................... 3, 4, 6, 8

*Padilla v. Hanft,*
   432 F.3d 582 (4th Cir. 2005) ......................................................... 46

*Parhat v. Gates,*
   532 F.3d 834 (D.C. Cir. 2008) ...................................................... 46

*Patterson v. FBI,*
   893 F.2d 595 (3d Cir. 1990) .......................................................... 51

*Pickard v. Department of Justice,*
   653 F.3d 782 (9th Cir. 2011) ......................................................... 32

*Pitman v. City of Oakland,*
   197 Cal.App.3d 1037 (1988) ......................................................... 17

*Presbyterian Church v. U.S.,*
   870 F. 2d 518 (9th Cir. 1989) .............................................. 2, 41, 44

*Reynolds v. United States,*
   927 F. Supp. 91 (W.D.N.Y. 1996) ......................................... 12, 29

*Sawhney v. Allstate Ins. Co.,*
   1995 WL 500531 (C.D. Cal. June 23, 1995)................................ 18

*Shipp v. Todd,*
   568 F.2d 133 (9th Cir. 1978) ............................................... 7, 8, 9

*Spurlock v. FBI,*
   69 F.3d 1010 (9th Cir. 1995) ........................................................ 9

vii

*Sterling v. Tenet*,
 416 F.3d 338 (4th Cir. 2005) ................................................................ 49

*Tekle v. United States*,
 511 F.3d 839 (9th Cir. 2007) ................................................................ 14

*Tenenbaum v. Simonini*,
 372 F.3d 776 (6th Cir. 2004) ................................................................ 51

*Tenet v. Doe*,
 544 U.S. 1 (2005) ........................................................................ 47, 48

*Totten v. United States*,
 92 U.S. 105 (1876) ....................................................................... 47, 48

*United States v. Abu-Jihaad*,
 630 F.3d 102 (2d Cir. 2010) ................................................................ 28

*United States v. Cavanagh*,
 807 F.2d 787 (9th Cir. 1987) ................................................................ 28

*United States v. Crowell*,
 374 F.3d 790 (9th Cir. 2004) ................................................................. 8

*United States v. James*,
 No. 05-0214 (C.D.Cal. 2009) ............................................................... 33

*United States v. Olson*,
 546 U.S. 43 (2005) ...................................................................... 13, 14

*United States v. Ott*,
 827 F.2d 473 (9th Cir. 1987) ................................................................ 28

*United States v. Reynolds*,
 345 U.S. 1 (1953) ........................................................................ 29, 47

*United States v. Samana*,
 No. 05-1662 (C.D.Cal. 2005) ............................................................... 33

*United States v. Sumner*,
 226 F.3d 1005 (9th Cir. 2000) ................................................................ 8

*Venegas v. County of Los Angeles*,
 32 Cal.4th 820 (2004) ...................................................................... 15

*Webster v. Doe*,
   486 U.S. 594 (1988) ......................................................................... 48

*Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*,
   454 U.S. 139 (1981) ......................................................................... 48

*Weston v. Lockheed Missiles & Space Co.*,
   881 F.2d 814 (9th Cir. 1989) ........................................................... 49

*Wilson v. Webster*,
   467 F.2d 1282 (9th Cir. 1972) ........................................................... 9


**FEDERAL STATUTES**

28 C.F.R. 16.96(a) ................................................................................. 6

5 U.S.C. 552a(d) ................................................................................... 4

5 U.S.C. 552a(d)(2) .............................................................................. 4

5 U.S.C. 552a(d)(3) .............................................................................. 4

5 U.S.C. 552a(e)(7) ........................................................................... 1, 3

5 U.S.C. 552a(g) ................................................................................... 5

5 U.S.C. 552a(j) ................................................................................... 6

5 U.S.C. 702 ..................................................................................... 2, 44

28 U.S.C. 1346(b)(1) .......................................................................... 10

28 U.S.C. 2674 .................................................................................... 10

50 U.S.C. 1801(f) ................................................................................ 19

50 U.S.C. 1801(k) ................................................................................ 27

50 U.S.C. 1801(m) ............................................................................... 19

50 U.S.C. 1804(a)(6)(B) ...................................................................... 27

50 U.S.C. 1804(a)(6)(E)(ii) .................................................................. 27

50 U.S.C. 1806(f) ........................................................................... 27, 28

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

50 U.S.C. 1810 ........................................................................................ 19, 27

Fed. R. App. P. 32.1 ...................................................................................... 15


**CALIFORNIA STATUTES**

Civil Code § 51.7 ........................................................................................... 15

Civil Code § 52.1(a) ...................................................................................... 14

Civil Code § 1708.8 ....................................................................................... 13

Civil Code § 52.1 ....................................................................... 10, 11, 14, 15

Penal Code § 632 ........................................................................................... 13

Penal Code § 633 ........................................................................................... 13


**COURT RULES**

Ninth Circuit Rule 36-3 ................................................................................. 15


**OTHER AUTHORITIES**

Akhil Reed Amar, THE CONSTITUTION AND CRIMINAL PROCEDURE: FIRST
    PRINCIPLES (1997) ............................................................................. 43

*Bill Seeks to Designate Drug Cartels as Terrorists*, N.Y. TIMES (April 21,
    2011) ..................................................................................................... 41

David Freed, *The Wrong Man*, THE ATLANTIC (May 2010),
    http://www.theatlantic.com/magazine/archive/2010/05/the-wrong-
    man/8019/ ........................................................................................... 34

Drug Trafficking Violence in Mexico: Implications for the U.S. Before the
    Senate Caucus on International Narcotics Control 111th Cong. (May 5,
    2010) ..................................................................................................... 41

Eric Lichtblau, *U.S. Will Pay $2 Million to Lawyer Wrongly Jailed*, N.Y.
TIMES (NOV. 30 2006),
http://www.nytimes.com/2006/11/30/us/30settle.html ..................................... 34

*Jewell Cleared of Olympic Park Bombing* (Oct. 26, 1996),
http://articles.cnn.com/1996-10-6/us/9610_26_olympic.bombing_1_park
-bombing-richard-jewell-1996olympic-park?_ .................................................. 34

Richard Fallon, *Jurisdiction Stripping Reconsidered*, 96 VA. L. REV. 1043,
1107 (2010)................................................................................................... 43

Richard H. Fallon, Jr. et al., HART AND WECHSLER'S THE FEDERAL COURTS
AND THE FEDERAL SYSTEM 845 (6th ed. 2009) .................................................. 44

S. REP. NO. 93-1183....................................................................................... 6

Scott Glover, *Federal prosecutors seek dismissal of perjury and fraud
charges against Tustin man*, L.A. TIMES (Oct. 1, 2010),
http://articles.latimes.com/2010/oct/01/local/la-me-niazi-20101001. .............. 33

Spencer Ackerman, *FBI 'Islam 101' Guide Depicted Muslims as 7th-
Century Simpletons*, WIRED (July 27, 2011),
http://www.wired.com/dangerroom/2011/07/fbi-islam-101-guide................... 37

Spencer Ackerman and Noah Shachtman, *Video: FBI Trainer Says Forget
'Irrelevant' al-Qaida, Target Islam*, WIRED (Sept. 20, 2011),
http://www.wired.com/ dangerroom/2011/09/fbi-islam-qaida-irrelevant.......... 37

*Statement on Brandon Mayfield Case* (May 24, 2004),
http://www.fbi.gov/news/pressrel/press-releases/statement-on-brandon-
mayfield-case.................................................................................................. 34

*Statement of Brian Roehrkasse, Director of Public Affairs, on Department's
Settlement with Steven Hatfill in Hatfill v. Ashcroft*, (June 27, 2008)
http://www.justice.gov/opa/pr/2008/June/08-opa-576.html  ........................... 34

xi

## INTRODUCTION

As explained in the accompanying Opposition to Individual Defendants' Motion to Dismiss, Plaintiffs are law-abiding Muslim American residents of Southern California whom the FBI surveilled because of their religion, and in violation of their reasonable expectations of privacy. As a result, the FBI now maintains files on each of them that contain information obtained in violation of federal constitutional and statutory law.

This brief addresses four distinct issues that concern the federal government and official capacity defendants. Section I addresses Plaintiffs' claims for injunctive relief – for the expungement of the files obtained in violation of the Privacy Act and the Constitution. Section II addresses Plaintiffs' claims for damages against the United States under the Federal Tort Claims Act. Section III briefly addresses the federal government's and official capacity defendants' liability under the Foreign Intelligence Surveillance Act. Finally, Section IV addresses the state secrets privilege.

## I.   PLAINTIFFS ARE ENTITLED TO EXPUNGEMENT OF RECORDS UNDER THE PRIVACY ACT AND THE CONSTITUTION

Plaintiffs seek disclosure and expungement of two somewhat different (albeit overlapping) types of records, under two different theories. First, they seek expungement of records documenting their free exercise of religion (e.g., of them praying, of their sermons, etc.) under 5 U.S.C. 552a(e)(7) of the Privacy Act. *See, e.g.*, FAC ¶ 178; ("Agents Armstrong and Allen instructed Monteilh to monitor Fazaga at the prayers he conducted, to record and report on what he said"); FAC ¶ 246 (defendants "collected and maintained records describing how Plaintiffs exercised their First Amendment rights" and such collection was "neither pertinent to nor within the scope of an authorized law enforcement activity."). Second, they seek expungement of any records pertaining to them – whether or not depicting religious activity – if the FBI gathered those records because of Plaintiffs' religion

1

or in violation of their reasonable expectations of privacy.  They seek that relief directly under the Constitution.  *See, e.g.*, FAC ¶ 86 (Defendants "instructed Monteilh to gather information on Muslims in general, and instructed him to adopt strategies of information-gathering and surveillance that ensured that he would obtain that information in an indiscriminate manner, such that Plaintiffs and numerous other people were surveilled solely due to their religion."); Exhs. 1, 2.[1]

Contrary to Defendants' claims, there can be no serious dispute that both sets of claims are cognizable.  The Ninth Circuit has held that individuals alleging that the government maintains records of their First Amendment activity may seek expungement under the Privacy Act.  And the Ninth Circuit has made equally clear that courts retain inherent power under the Constitution to order expungement when a federal agency maintains records in violation of the Constitution.[2]

_____

[1] Plaintiffs seek expungement of records describing their First Amendment activities under Section 552a(e)(7) of the Privacy Act because it expressly bars the government from maintaining such records.  The Privacy Act contains no comparable provision expressly barring the maintenance of records gathered in violation of other constitutional provisions (such as the anti-discrimination protections of the Establishment Clause).  Therefore, Plaintiffs seek expungement of those records under the Constitution itself.  To the extent that the Court concludes that the Privacy Act itself permits an action to expunge records obtained in violation of any constitutional provision beyond that permitted by Section (e)(7), Plaintiffs request leave to amend their pleadings accordingly.

[2] To the extent that the liability of particular Defendants is relevant for purposes of injunctive relief, Plaintiffs here clarify that they bring their expungement claims under Section 552a(e)(7) against the FBI, and bring their expungement claims under the Constitution against both the official capacity Defendants and against the United States.  *See Demery v. Kupperman,* 735 F.2d 1139, 1146 (9th Cir. 1984) ("a suit against a state official seeking injunctive relief from unconstitutional state action is not a suit against the state") (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *Presbyterian Church v. U.S.*, 870 F. 2d 518 (9th Cir. 1989) (holding that Congress waived the United States' sovereign immunity for claims seeking injunctive relief for both statutory and constitutional violations in 5 U.S.C. 702).

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

## A.      Plaintiffs State a Claim for Expungement Under the Privacy Act

The Privacy Act creates various rules governing how federal agencies collect and maintain records.  Amongst these, the Act requires agencies to refrain from maintaining records under certain circumstances, to refrain from disclosing records under certain circumstances, and to correct certain records upon request.

Of central concern here, Section (e)(7) establishes that an agency may "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. 552a(e)(7).  This free expression rule constitutes a separate statutory requirement within the Privacy Act. Plaintiffs clearly allege that Defendants maintain records of their First Amendment activity that those records are not pertinent, and that they gathered them through unauthorized (that is, unconstitutional) law enforcement activity. Defendants do not argue either that the records are not maintained or that they were gathered through authorized law enforcement activity under Section(e)(7).  *See, e.g.*, FAC ¶ 246; Gov't Br. 16-22 (making various arguments about why the records should be exempt, but never asserting that the records fall within Section (e)(7)'s law enforcement exemption).

Although Defendants fail to cite it, binding Ninth Circuit authority governs Plaintiffs' Section (e)(7) claim.  The Ninth Circuit unambiguously exercised jurisdiction in a case alleging a violation of Section (e)(7), although it rejected the claim on the merits in a very narrow ruling.  *MacPherson v. IRS*, 803 F.2d 479, 485 n.9 (9th Cir. 1986).  Most of Defendants' arguments against the Privacy Act claim are foreclosed by *MacPherson*.

Defendants make three arguments against the Privacy Act claim, each of which is meritless.  First, Defendants claim that Plaintiffs have failed to exhaust administrative remedies.  Gov't Br. 13, 14 n.5.  However, the statute probably does

3

1   not require exhaustion under Section (e)(7), *see Nagel v. U.S. Dept. of Health,*

2   *Educ. and Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984) (holding that "appellant

3   is not barred from asserting a violation of Section (e)(7) by virtue of his failure to

4   exhaust"), and obviously the Constitution does not require it.

5        Even if there is an exhaustion requirement, it is prudential. Gov't Br. 13, 14

6   (characterizing the exhaustion requirement as "not jurisdictional" and

7   "discretionary"). Therefore, the Court may excuse the requirement for various

8   reasons, including where the administrative response is untimely and where

9   exhaustion would be futile. *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992);

10  *Leonardo v. Crawford*, 646 F.3d 1157, 1160-61 (9th Cir. 2011) (citing *Madigan*).

11       Here, the Court should excuse the exhaustion requirement. Plaintiffs filed

12  their request for expungement in September and have received no substantive

13  response to date, even though the statute required Defendants to "promptly"

14  respond. *See* 5 U.S.C. 552a(d)(2). Plaintiffs treated this as a constructive denial

15  and filed appeals shortly before filing this brief. *See* Exh. 2.[3] Plaintiffs should not

16  have to wait further for a ruling on their claims. In addition, any appeal would

17  surely be futile. The Government's brief makes clear that the FBI believes it need

18  not disclose or expunge any records. Indeed, Attorney General Holder is

19  apparently of the view that the request, if otherwise meritorious, should be

20  dismissed under the state secrets privilege. *See* Gov't Br. 17 n. 6. While the Court

21  could, consistent with the governing law, enter a brief stay of the Section (e)(7)

22  claims to permit the FBI to reach its own conclusion as to Plaintiffs' claims, it is

23  hard to imagine that such a delay would serve any purpose.

24       Defendants next argue that the Court has no authority to remedy violations

25

26  [3] The statute contemplates that when an individual appeals from such a "prompt"
    response the agency must resolve the appeal within 30 days. 5 U.S.C. 552a(d)(3).

27  Therefore, although "prompt" is not defined in the statute, the context makes clear

28  that the FBI's failure to respond for four months (and counting) makes it untimely.

4

of the free expression requirement of Section (e)(7) because a different provision of the statute that confers jurisdiction for some violations of the Act – Section (g) – does not confer jurisdiction to entertain claims under Section (e)(7).  Thus, Defendants claim, the Court has no authority to order a remedy for a violation of the free expression provision of the statute.  Gov't Br. 15.

Defendants' argument is foreclosed by binding precedent and the weight of other applicable authority.  In *MacPherson*, the Ninth Circuit addressed on the merits a claim under Section (e)(7) seeking expungement of records of free expression.  The court noted that the plaintiff could have brought a separate action under Section (g) to remedy any *inaccuracies* in the IRS's records, but did not analyze the free expression claim under Section (g).  *Id*. at 485 n. 8 ("To the extent that MacPherson alleges that the IRS notes on his speeches are inaccurate, we note that the Privacy Act makes specific provision for access to and correction and amendment of inaccurate records, *see* 5 U.S.C. § 552a(d), and provides a civil remedy if the agency does not comply, 5 U.S.C. § 552a(g).").  Given that *MacPherson* separately addressed the Section (e)(7) claim on the merits, it definitively refutes Defendants' argument that Section (e)(7) is unenforceable. Several other circuits have also held that injunctive relief is available under (e)(7). *See Nagel*, 725 F.2d at 1441 (D.C. Cir. 1984) ("The appropriate relief for violations of Section (e)(7) includes damages as well as amendment or expungement of unlawful records"); *Clarkson v. IRS*, 678 F.2d 1368, 1376-77 (10th Cir. 1982) (holding that expungement is available for (e)(7) violations).[4]

Even were *MacPherson* not dispositive, Defendants' interpretation would

---

[4] In a later case, the D.C. Circuit assumed that expungement for (e)(7) violations was available under the Privacy Act's "catch-all" provision at Section (g)(1)(D). *See Haase v. Sessions*, 893 F.2d 370, 374 n.6 (D.C. Cir. 1990).  Plaintiffs assume this argument is foreclosed by *MacPherson* in the Ninth Circuit, but if the Court disagrees it should permit amendment to conform to the statute's requirement.

5

1  fail because it is inconsistent with the statute's structure, history, and purpose.

2  Section (g) authorizes injunctive relief and, in some cases, damages, when an

3  agency refuses to correct certain inaccurate records.  Nothing in its language

4  suggests that Congress wrote it to foreclose relief under Section (e)(7), which

5  contains strong mandatory language imposing an independent duty on federal

6  agencies.  Moreover, Congress passed Section (e)(7) out of fear that the

7  government might monitor the First Amendment activity of law-abiding

8  Americans and thereby chill the public's exercise of civil rights.  *See* S. REP. NO.

9  93-1183, at 53 (discussing the first draft of (e)(7)) ("This Section's restraint is

10 aimed particularly at preventing collection of protected information not

11 immediately needed, about law-abiding Americans, on the off-chance that

12 Government or the particular agency might possibly have to deal with them in the

13 future.").  Strikingly, the FBI's argument that it must maintain these records

14 advances precisely that rationale.  Gov't Br. 19 (citing Morin Decl.).  It is hard to

15 imagine that despite Congress' strong opposition to the collection of records "not

16 immediately needed," it intended to make Section (e)(7) unenforceable in court.[5]

17     Next, Defendants make a closely related argument that because the FBI has

18 exempted its databases from certain obligations under the Privacy Act, it need not

19 comply with Section (e)(7).  Gov't Br. 16.  But this argument is foreclosed not

---

20 [5] Defendants' cases provide no support for their claim.  Gov. Br. 15-16.  *Cell*

21 *Assocs. Inc. v. NIH*, 579 F.2d 1155, 1158-1162 (9th Cir. 1978) holds that
   injunctive relief is unavailable for a different provision – Section (b) – which

22 concerns the disclosure rather than the retention of records.  It makes no mention

23 of Section (e)(7).  *Committee in Solidarity with the People of El Salvador v.*
   *Sessions*, 738 F.Supp. 544, 547-48 (D.D.C. 1990), involves Section (e)(7), but its

24 holding concerning the availability of injunctive relief was inconsistent with the

25 D.C. Circuit's own law governing that provision.  *See Nagel*, 725 F.2d at 1441;
   *Haase*, 893 F.2d at 374 n.6.  The district court erred by citing a D.C. Circuit case

26 that involved a different provision of the Privacy Act.  *Sessions*, 738 F.Supp. at

27 548 (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988) (denying
   injunctive relief for violation of Section (b)).

28

---

6

1   only by the authority above holding that injunctive relief is available under Section

2   (e)(7), but also by the plain text of the statute.  The statute permits agencies to

3   exempt themselves from *some* of the Act's requirements, but notably missing from

4   the list is the free expression constraint imposed by Section (e)(7).  *See* 5 U.S.C.

5   552a(j) (allowing agency to exempt itself from sections *other* than, *inter alia*,

6   (e)(7)); 552a(k) (listing sections that are exempt, but not listing (e)(7)).  The

7   Government's convoluted argument to the contrary – "the FBI does not contend

8   that any responsive records (if any) would be exempt from (e)(7), but rather that

9   they would be exempt from amendment, and, thus, expungement," Gov. Br. 18 –

10  would render those carve-outs meaningless, violate the Government's own

11  regulations, *see* 28 C.F.R. 16.96(a), (c), and contravene the cases holding that

12  injunctive relief is available for violations of (e)(7).

13      **B.      Plaintiffs State a Claim for Expungement Under the Constitution.**

14          Plaintiffs also seek expungement of all records obtained in violation of the

15  Constitution.  Contrary to the Government's claim, Gov't Br. 19, it is well settled

16  that federal courts have equitable power to order "the expungement of local arrest

17  records as an appropriate remedy in the wake of police action in violation of

18  constitutional rights."  *Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982)

19  (reversing dismissal of suit brought directly under Constitution for expungement of

20  arrest records that occurred without probable cause); *Shipp v. Todd*, 568 F.2d 133,

21  134 (9th Cir. 1978) ("It is established that the federal courts have inherent power to

22  expunge criminal records when necessary to preserve basic legal rights.");

23  *Burnsworth v. Gunderson*, 179 F.3d 771, 774-75 (9th Cir. 1999) (ordering

24  expungement of prison disciplinary record where "no evidence" supported the

25  disciplinary sanction).  As *Todd* explains, while the inherent expungement power is

26  "reserved for unusual or extreme cases," those include cases "where the arrest

27  itself was an unlawful one, or where the arrest represented harassing action by the

28  police, or where the statute under which the arrestee was prosecuted was itself

7

unconstitutional." *Id*. at 134 n.1.  For obvious reasons, the same rule applies with even greater force to people who were *not* arrested, but about whom the Government has collected information in violation of their constitutional rights. *Cf. MacPherson*, 803 F.2d at 484 ("The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise."); *Nagel*, 725 F.2d at 1441 (same).

The Government discerns a "retreat" from this rule in two more recent Ninth Circuit cases, but neither case holds that courts lack inherent authority to expunge records under the Constitution.  Gov't Br. 20 n.7 (citing *United States v. Sumner*, 226 F.3d 1005, 1014-15 (9th Cir. 2000) (rejecting claim that court could expunge conviction in the interests of justice even when it violated no statute or constitutional provision)) and *United States v. Crowell*, 374 F.3d 790, 796 (9th Cir. 2004) (denying motion to expunge conviction where it was used "as a post-conviction vehicle to challenge" conviction).  Indeed, *Sumner* itself cites a variety of authority for the power to expunge records, including "the Constitution itself." *Sumner*, 226 F.3d at 1012.  Nor did the Ninth Circuit signal any retreat in *Burnsworth*, a more recent case ordering expungement of prison disciplinary records directly under the Constitution.  *Burnsworth*, 179 F.3d at 775.

The Government also argues that, even if the Constitution creates inherent power to expunge records, Congress has displaced that power through the Privacy Act.  Gov't Br. 20-21.  This argument borders on the frivolous.  All of the cases on inherent authority cited above post-date the Privacy Act.  *See, e.g.*, *Burnsworth*, 179 F.3d 771 (decided in 1999); *Maurer*, 691 F.2d 434 (1982); *Shipp*, 568 F.2d 133 (1978).  In addition, while Congress can displace federal *common law* through legislation, it cannot eliminate an injunctive remedy created by the *Constitution*. *See infra* Section I.A.  Unsurprisingly then, the cases cited in this section do not

1    come close to supporting the proposition for which they are cited.[6]

2            Finally, Defendants make a distinct argument that Plaintiffs must show

3    "immediate and irreparable injury" to obtain expungement.  Gov't Br. 21.

4    However, courts have repeatedly held that Plaintiffs need not show any definitive

5    harm that may come from the maintenance of unconstitutionally-obtained records

6    in order to obtain expungement.  Rather, the maintenance of records obtained in

7    violation of the Constitution itself constitutes a legal injury.  *Menard v. Saxbe*, 498

8    F.2d 1017, 1023-24 (D.C. Cir. 1974) (holding that maintenance of file alleges

9    "cognizable legal injury" even though plaintiff "cannot point with mathematical

10   certainty to the exact consequences of his criminal file").  *Maurer*, 691 F.2d at 437

11   (citing *Menard*); *Todd*, 568 F.2d at 133 ("the maintenance of his criminal records

12   continues to operate to his detriment.");  *Wilson v. Webster*, 467 F.2d 1282, 1283-

13   84 (9th Cir. 1972) (holding that arrest records' "continued existence may seriously

14   and unjustifiably serve to impair fundamental rights of the persons to whom they

15   relate.").  That rule gains even greater force when the record is not an arrest record,

16   but rather a record of First Amendment activity, the mere collection of which can

17   chill the exercise of First Amendment rights.  *See MacPherson*, 803 F.2d at 484

18   ("mere compilation" of "records describing the exercise of First Amendment

19   freedoms" creates "a chilling effect on such exercise.").[7]

---

20   [6] Defendants cite *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 312-17

21   (1981), but that case concerns the displacement of federal common law, not

22   constitutional law.  It is relevant to the state secrets analysis below, but not relevant

23   here.  Defendants also cite *Spurlock v. FBI*, 69 F.3d 1010 (9th Cir. 1995) and

24   *Center for Nat. Sec. Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003), but these are

25   FOIA cases that never mention the Privacy Act.

26   [7] Defendants cite no case in which a court permitted the continued maintenance of

27   records obtained in violation of the Constitution on the ground that the plaintiff

28   could not show harm, and the language in the cases they cite suggests that they

     would not have endorsed such a rule.  Gov't Br. 21-22 (citing *Fendler v. U.S.

     Parole Com'n*, 774 F.2d 975, 979 (9th Cir. 1985) (holding that "Federal courts

     have the equitable power to order the expungement of Government records where

     *(cont'd)*

---

9

1    In any event, Plaintiffs have alleged that the maintenance of these records

2  has led to their placement on various security lists, such as at airports, which result

3  in intensive interrogation, long delays, and concomitant anxiety.  *See* FAC ¶ 107,

4  184-85, 205, 215.  Although such a showing is not necessary to establish injury,

5  Plaintiffs continue to suffer such harms, separate and apart from the harm inherent

6  in the maintenance of records gathered in violation of the Constitution.

7    For these reasons, this Court has authority to consider on the merits

8  Plaintiffs' claims for expungement of records under the Privacy Act and the

9  various constitutional provisions that Defendants allegedly violated.

## II.   PLAINTIFFS STATE CLAIMS UNDER THE FEDERAL TORT CLAIMS ACT

12   Plaintiffs allege three claims for damages against the United States under the

13  Federal Tort Claims Act ("FTCA"), which provides that "the United States shall be

14  liable […] in the same manner and to the same extent as a private individual under

15  like circumstances." 28 U.S.C. 2674.   Liability under the FTCA is determined "in

16  accordance with the law of the place where the act or omission occurred."  28

17  U.S.C. § 1346(b)(1); *see Hess v. United States*, 361 U.S. 314, 318 (1960) (applying

18  state tort law to determine liability under FTCA).

19   Plaintiffs claim that the United States is liable under California's common

20  law and constitutional tort of invasion of privacy, under California Civil Code

21  § 52.1 for interference or attempted interference with Plaintiffs' civil rights, and

22  for intentional infliction of emotional distress.  The Government's arguments in

23  response are meritless.  With respect to the invasion of privacy, it does not argue

---

necessary to vindicate rights secured by the Constitution or by statute"), *Fendler v.
U.S. Bureau of Prisons*, 846 F.2d 550, 554-555 (9th Cir. 1988) (same), and *United
States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) (denying plaintiffs' request for
expungement not because he failed to show irreparable harm, but because no
constitutional violation was found)).

10

1  that Plaintiffs failed to establish the elements for the tort of invasion of privacy

2  under California law.  Instead, it argues only a so-called "law enforcement"

3  privilege, but the Government is premature in raising this defense without first

4  establishing that all of its agents' conduct was within the bounds of legal law

5  enforcement behavior.  The Court obviously cannot dismiss the claim on that basis

6  without adjudicating the merits.  With respect to Section 52.1, the Government

7  again makes only one argument – claiming that because violence or the threat of

8  violence is necessary to bring a claim under Section 52.1, Plaintiffs have failed to

9  state a claim.  But a careful examination of California law reveals that they are

10  incorrect.  Finally, the Government fails to show that Plaintiffs are unable to meet

11  the elements of the tort of intentional infliction of emotional distress under

12  California state law.

13  **A.      Plaintiffs State an FTCA Claim Under Invasion of Privacy**

14  The Government does not contest that Plaintiffs have set forth a *prima facie*

15  case establishing an invasion of privacy under California tort law, including

16  Section 1 of the California Constitution.[8]  Rather, it seeks dismissal of the privacy

17  claim only on its assertion that the "law enforcement privilege" applies.

18  ───────────────────────────────

[8] Plaintiffs have pled that the California Constitution's privacy protection also forbids the Government from compiling and maintaining records based on Plaintiffs' religion.  FAC ¶ 257.  Defendants have not disputed this aspect of Plaintiffs' FTCA claim.  This concession is significant.  Even if the *methods* by which the FBI gathered information might be protected by a law enforcement privilege from a common law invasion of privacy tort, the continued *maintenance* of information about Plaintiffs, based on their religion and without articulable suspicion, still violates the right to privacy in Article I, Section 1 of the California Constitution.  That provision "prevents government and business interests from collecting and stockpiling unnecessary information."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 17 (1994) (quoting ballot language); *see also id*. at 16 (noting that ballot language provides indication of intent behind right to privacy) and 20-21 (noting that the initiative's "principal focus" was on "unnecessary information gathering" that suggests "government snooping, computer stored and generated 'dossiers' and 'cradle-to-grave' profiles on every American").

1  Specifically, the Government argues that because liability under the FTCA is

2  determined by state law, and because "law enforcement officers in California are

3  permitted to monitor communications in situations where one party to the

4  communications provides his consent," dismissal is required "[t]o the extent that

5  plaintiffs' claims are based upon the alleged audio and video surveillance of their

6  communications that occurred in [the informant's] presence."  Gov't Br. 27-31.

7  The argument fails for two independent reasons.

8      First, Plaintiffs' privacy tort claims are not based only upon the audio

9  surveillance taken *in the informant's presence*.  Rather, Plaintiffs allege in great

10  detail a much broader pattern of privacy invasion that includes audio and video

11  surveillance placed in homes and mosques, even when the informant was *not*

12  *present*.  Plaintiffs separately allege video recording, which can violate the right to

13  privacy even when the informant is present.  *See* Plfs. Opp. to I.C. Defs., Part II.F;

14  FAC ¶¶ 108, 123, 128, 129, 202, 209.  The Government offers *no argument* for

15  dismissing the privacy challenge to audio recording done outside the informant's

16  presence, nor any argument against the video surveillance claim under the FTCA.

17      Second, even if a "law enforcement privilege" is available, Defendants

18  overstate its scope under the FTCA.  As the FTCA looks to state law to establish

19  liability, so too it looks to state law to establish any privileges, immunities, or

20  affirmative defenses.  *See, e.g.*, *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004)

21  (looking to California law on false arrest by law enforcement in order to determine

22  liability for IRS agents under FTCA).  Apart from any privileges provided under

23  state law, there is no general law enforcement privilege under the FTCA.[9]

24  _____

25  [9] The Government's citation to *Hinojosa v. City of Terrell*, 834 F. 2d 1223 (5th Cir. 1988), *Dalrymple v. U.S.*, 2005 WL 2456213 (S.D. Fla. May 6, 2005), *Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), and *Reynolds v. United States,* 927 F. Supp. 91 (W.D.N.Y. 1996) are inapposite, Gov't Br. 28, as none of the cases arise under California law.  Each therefore examines the law enforcement privilege under the law of the state in which the claim arose and is therefore not

26  

27  

28  

*(cont'd)*

12

1   The Government points to only one such state law privilege: a privilege to

2   record conversations with the consent of one party.  It cites *Doe v. City of Mateo*,

3   2010 WL 1541279, at *5 (N.D. Cal. Apr. 16, 2010), which recognizes that while

4   California Penal Code § 632 bars recording confidential conversations "without the

5   consent of all parties," Penal Code § 633 provides that the provision does not

6   prohibit law enforcement from "recording any communication that they could

7   lawfully . . . record" before the provision's enactment, when California courts had

8   held that law enforcement could record conversations with one party's consent.

9   But importantly, any privilege under § 633 is limited to *lawful* recording – so while

10   recording conversations in which an informant participated might be lawful, the

11   privilege does not extend to any recording that might *otherwise* violate state or

12   federal law.  *See* Plfs. Opp. to I.C. Defs., Part II.F.3 (arguing that informant's

13   recordings violated Fourth Amendment even when he was present, because

14   investigation lacked good faith).  Nor does the Government argue that there is any

15   privilege applicable to video recording, which is governed by a separate statute.

16   *See* Cal. Civ. Code § 1708.8 (rendering law enforcement "liable for constructive

17   invasion of privacy when the [officer] attempts to capture" video images "in a

18   manner that is offensive to a reasonable person," unless "supported by an

19   articulable suspicion").  Thus, under California law, the "invited informer"

20   doctrine cannot shield the Government from liability for video surveillance.

21   Finally, although the Government's brief presupposes that federal officials

22   may obtain the benefit of the privilege law governing state law enforcement

23   officers for purposes of determining liability under the FTCA, recent Supreme

24   Court and Ninth Circuit law have called that assumption into doubt.  *See United*

25   *States v. Olson*, 546 U.S. 43, 45-46 (2005) (holding that relevant question for

26
27   applicable here.  In addition, these cases support Plaintiffs' argument because to
   the extent any of these cases recognize a law enforcement privilege, it is only for
28   law enforcement conduct that falls within state and Constitutional constraints.

purposes of FTCA liability was whether private party would be liable under state law, not whether state official would be liable); *Tekle v. United States*, 511 F.3d 839, 841 (9th Cir. 2007) (opinion of Tashima, J.) (arguing that *Olson* reverses pre-existing Ninth Circuit authority permitting federal law enforcement officials to benefit from state law enforcement privileges); *id.* at 857 (Fisher, J., concurring) (agreeing with Judge Tashima as to *Olson*, but arguing that the FTCA may nonetheless incorporate federal privilege law).  Here, the federal government has not argued that any federal privilege shields them from liability.

**B.**     **The Plaintiffs state a claim for relief under Cal. Civil Code § 52.1**

Section 52.1 provides for a civil action against a defendant who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws" of California or the United States.  Cal. Civ. Code § 52.1(a).  By indiscriminately surveilling plaintiffs based solely upon their religious practices, beliefs and affiliation, Defendants used intimidation and coercion to interfere with Plaintiffs' rights under the First and Fourteenth Amendments, as well as the analogous rights to religious freedom under the California constitution.

Plaintiffs allege that Defendants targeted Plaintiffs for investigation based on their religious practices and affiliations, creating a fear in Plaintiffs that they would be subjected to increased law enforcement scrutiny if they continued to exercise their First Amendment rights.  *See, e.g.*, FAC ¶ 185 (describing Plaintiff's "constant fear of being under surveillance" and anxiety over "the scrutiny during travel"), ¶ 215 (describing how Plaintiff "has also been subjected to extensive secondary questioning and searches most of the times he has returned to the U.S. from trips abroad").

The Government's sole argument in opposition to Plaintiffs' FTCA claim under § 52.1 is that such a claim requires an allegation of violence or the threat of

14

1  violence, which Plaintiffs fail to satisfy because they have asserted only

2  intimidation by speech.  A careful reading of the applicable state law as well as the

3  complaint makes clear that the Government is wrong on both the law and the facts.

4       First, the most comprehensive federal authority on the issue has squarely

5  rejected the argument that § 52.1 imposes liability only where a defendant has

6  acted with violence or a threat of violence.  *See Moreno v. Town of Los Gatos*, 267

7  Fed.Appx. 665, 666 (9th Cir. Feb. 21, 2008) ("The district court erred in holding

8  that a valid section 52.1 claim requires a plaintiff to allege violence or threats of

9  violence."); *accord Kincaid v. City of Fresno*, 2008 WL 2038390, at *15

10  (E.D. Cal. May 15, 2008).[10]  As *Moreno* explained, there had been confusion on

11  this issue because some California courts had read § 52.1 as the enabling statute

12  and cause of action for Civil Code § 51.7, a hate crime prevention act aimed at

13  eliminating "violence, or intimidation by threat of violence, committed against

14  their persons or property because of" political views or suspect classifications.  *See*

15  *Boccato v. City of Hermosa Beach*, 29 Cal.App.4th 1797, 1808-09 (1994).

16  Because courts read § 52.1 as enabling § 51.7, they imported the requirements of

17  § 51.7 – that the plaintiff be a member of a protected class and be subject to

18  violence or the threat of violence – into § 52.1.  *See Cabesuela v. Browning-Ferris*

19  *Industries of Cal., Inc.*, 68 Cal.App.4th 101, 111 (1998).

20       However, the California Supreme Court resolved this confusion in *Venegas*

21  *v. County of Los Angeles*, 32 Cal.4th 820, 841 (2004).  *Venegas* expressly rejected

22  the rule announced in cases such as *Boccato*.  *See Moreno*, 267 Fed. App'x. at 666.

23  Thus, § 52.1 requires no showing of violence or threat thereof.

24       Relatedly, the Government misconstrues the factual basis for the § 52.1

25  claim, and therefore applies the requirements of subdivision (j) of § 52.1, which

26  _____

27  [10] While *Moreno*, as an unpublished opinion is not precedent, it may be cited under Fed. R. App. P. 32.1 and Ninth Circuit Rule 36-3.  Plaintiffs rely only on the

28  opinion's logic, and adherence to it by the district court in *Kincaid*, *supra*.

1   provides that "[s]*peech alone* is not sufficient to support an action [under

2   subdivision (a) or (b)], except upon a showing that the speech itself threatens

3   violence against a specific person or group of persons."  Cal. Civ. Code § 52.1;

4   Gov't Br. 31. But the cases the Government cites for this rule involve situations

5   where only defendants' speech is at issue. *See* Gov't Br. 31-32 (citing *Martin v.*

6   *County of San Diego*, 650 F. Supp. 2d 1094, 1108 (S.D. Cal. 2009) (noting that

7   § 52.1(j) "explicitly provides that violence is a required element . . . where the

8   [claim] is based *purely upon a defendant's statement*" (emphasis added)); *Doe By*

9   *and Through Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1582 (N.D. Cal.

10  1993) (noting that under § 52.1(j), plaintiff must base claim on conduct by

11  defendant "*other than by speech alone*, unless the speech itself threatened

12  violence" (emphasis added)).  Because Plaintiffs' complaint is not premised on

13  "[s]peech alone," but an extended course of conduct, over more than a year, that

14  involved intrusive surveillance by various methods, the requirements of § 52.1(j)

15  do not apply, and Plaintiffs need not plead that Defendants threatened violence.

16      **C.**    **Plaintiffs have sufficiently alleged a claim for Intentional**

17                **Infliction of Emotional Distress**

18        The Government's argument that Plaintiffs have failed to plead sufficient

19  facts to show they suffered severe or extreme emotional distress is meritless.[11]

20        As the Government seems to recognize, the complaint alleges in detail the

21  nature and severity of emotional distress Plaintiffs suffer.  *See* Gov't Br. 34-35;

22  FAC ¶ 185 (describing how Plaintiff Fazaga "has suffered severe and ongoing

23  anxiety and distress" from his "constant fear of being under surveillance" ), ¶ 197-

---

[11] Under California law, the tort of intentional infliction of emotional distress has three elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Sup. Ct.*, 54 Cal.3d 868, 903 (1991).

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

99  (describing how Plaintiff  Malik "has suffered severe and ongoing anxiety and distress"  from the "interference with his religious practice" and his "constant fear of being under surveillance"), ¶215-217 (describing how Plaintiff AbdelRahim "has suffered severe and ongoing anxiety and distress"  from the "interference with his religious practice" and his "constant fear of being under surveillance").

The Government argues these allegations are nonetheless insufficient because the distress is insufficiently severe under California law and alleged with insufficient particularity, but it misstates the governing law on the emotional distress element.  California courts have long recognized that an IIED plaintiff need not demonstrate that he or she has suffered "traumatic emotional distress of the character of shock, horror or nausea;" rather, "requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397 (1970); *Esteem v. City of Pasadena*, 2007 WL 4270360, at *18 (C.D. Cal. Sep. 11, 2007) (citing *Fletcher* for the IIED standard).  Plaintiffs' allegations more than satisfy this standard, particularly given that "the duration of the emotional distress is one of the factors to be considered in determining its severity." *Fletcher*, 10 Cal.App.3d at 398.

Moreover, allegations of government conduct as outrageous as those here certainly "allow[] the court to draw the reasonable inference" that Plaintiffs' allegations of severe emotion al distress are "plausible." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  In cases with less serious conduct, more specific allegations of emotional distress may be required. The cases on which the Government relies involve far less egregious conduct and thus the burden on the plaintiff to establish that severe emotional distress did in fact occur is higher. Gov't Br. 33-34; *see Hughes v. Pair,* 46 Cal.4th 1035, 1051 (2009) (denying the plaintiff's IIED claim based on "defendant's inappropriate comments" about defendant's physical attraction to plaintiff); *Pitman v. City of Oakland,* 197

17

1   Cal.App.3d 1037, 1047-48 (1988) (dismissing plaintiff's IIED claim when plaintiff

2   was fired after the defendant learned of the plaintiff's criminal history), *Beijing*

3   *Tong Ren Tang (USA), Corp. v. TRT USA Corp.*, 2010 WL 98957, at *3 (N.D. Cal.

4   Jan. 5, 2010) (dismissing a claim for IIED based on vague threats made during a

5   business dispute); *Hamilton v. Prudential Financial*, 2007 WL 2827792, at *4

6   (E.D.Cal. 2007) (denying plaintiff's IIED claim based on defendant's cessation of

7   disability benefits for plaintiff's alcoholism); *Sawhney v. Allstate Ins. Co.*, 1995

8   WL 500531, at *5-6 (C.D. Cal. 1995) (dismissing plaintiff's IIED claim based on

9   defendant's denial of the plaintiff's home insurance claim).

10        The Government also makes a narrow argument regarding the statute of

11   limitations, that "[t]o the extent that [Plaintiffs' IIED] claims arise from [the

12   informant's] conduct, *e.g.*, in discussing *jihad* or otherwise directly causing their

13   distress," that this suit should have been filed within two years of that conduct, and

14   is not tolled because Plaintiffs did not know that the informant was, in fact, an

15   informant working for the FBI.  Gov't Br. 35-36.  But the harm Plaintiffs suffer

16   stems not primarily from the outrageous conduct that the informant engaged in by

17   itself, but rather from the knowledge that he did so at the direction of the federal

18   government.  Defendants cite *Dyniewicz v. United States*, 742 F.2d 484 (9th Cir.

19   1984) to the contrary, but there the harm stemmed from the underlying accident

20   (deaths caused by flooding), not from the knowledge of the government's

21   involvement.  Applied here, *Dyniewicz* would bar only claims based on the

22   informant's openly outrageous conduct that Plaintiffs could observe at the time.

23   But the Government does not argue (nor could it) that the statute of limitations bars

24   Plaintiffs' IIED claim to the extent it is based on the course of discriminatory

25   surveillance and investigation – outrageous government conduct that Plaintiffs did

26   not know about (and even with the exercise of reasonable diligence could not

27   reasonably have known about) for which the claim did not accrue until the FBI

28   revealed it in February 2009.   FAC ¶ 159; *Dyniewicz*, 742 F.2d at 487.

1   Finally, the Government argues that Plaintiffs' claim for IIED are

2   "speculative" – because Plaintiffs did not discover the surveillance until nearly

3   two years after the informant left the Muslim community, the Government

4   concludes that "[t]he prior covert surveillance, by definition, could not by itself

5   have caused plaintiffs any emotional distress." Gov't Br. 36.  The Government's

6   argument defies logic.  Plaintiffs discovered in February 2009, and in the months

7   thereafter, that they had been the targets of an elaborate and prolonged surveillance

8   program because of their religious beliefs and religious practices.  The fact that

9   that this outrageous government causes them severe emotional distress (including

10   distress over whether the government might again subject them to similar

11   treatment) is neither implausible nor "speculative."

12   **III.    THE COURT MAY NOT DISMISS PLAINTIFFS' FISA CLAIM**

13   **AGAINST THE OFFICIAL CAPACITY DEFENDANTS**

14   Contrary to Defendants' characterization, Plaintiffs' FISA claim seeks

15   damages for all actionable "electronic surveillance" to which they were subject by

16   Defendants.  FAC ¶ 253; 50 U.S.C. 1810 (allowing actions to redress "electronic

17   surveillance"); 50 U.S.C. 1801(f) (defining electronic surveillance).  This claim

18   encompasses all surveillance to which Plaintiffs were subjected by Defendants

19   without a warrant and in violation of a reasonable expectation of privacy.

20   Both the Government and Individual Defendants AAR argue that Section

21   1810 does not permit suit against them.  Gov't Br. 22-26, AAR Br. 34-35.

22   Obviously, both sides cannot be correct.  Plaintiffs' primary position is that 50

23   U.S.C. 1810 waives the federal government's sovereign immunity and thereby

24   permits the damages remedy specified therein against the United States.  The

25   Government argues otherwise, but does not dispute that the only case to address

26   the issue held that FISA waives the Government's sovereign immunity.  *See In Re*

27   *National Sec. Agency Telecommunications Rec.*, 564 F. Supp. 2d 1109, 1124-25

28   (N.D.Cal. 2008).  Plaintiffs also contend that the individual defendants must be

19

1  liable under Section 1810, insofar as they constitute "persons" under the statute.

2  50 U.S.C. 1801(m).  In any event, it is clear that Congress intended someone –

3  either the official or the individual defendants – to be liable under Section 1810.

4  **IV.   THE COURT MAY NOT DISMISS THIS ACTION UNDER THE**

5  **STATE SECRETS PRIVILEGE**

6        Defendants' attempt to dismiss Plaintiffs' discrimination-related claims

7  based on the state secrets privilege at this preliminary stage constitutes a

8  remarkable assertion of power.  Permitting the Government to categorize as secret

9  all "reasons for" its counterterrorism investigations and all "methods" used in them

10  would effectively exempt the vague and undefined category of "counterterrorism"

11  investigation from virtually all constitutional constraints.  Under the Government's

12  theory, the courthouse doors would be closed to *all* constitutional claims against

13  government conduct – even claims for injunctive relief against blatantly illegal

14  activity that remains on-going – so long as the Government conducted itself in

15  secret under the banner of counterterrorism.  That position is at war with the most

16  fundamental principles of our constitutional system, unauthorized by any

17  controlling authority, and irreconcilable with the Government's practice in other

18  cases, including most obviously the habeas corpus cases involving alleged enemy

19  combatants.  Thus, should the Court need to address the question, it must hold that

20  the state secrets privilege cannot justify dismissal of Plaintiffs' claims on the

21  merits, given that they seek injunctive relief against on-going constitutional

22  violations.  *See infra* Section IV.D.

23        However, despite these massive defects in the Government's argument and

24  the serious constitutional problems it raises, the Court can avoid the constitutional

25  problem raised by the Government's privilege assertion here by rejecting it on two

26  narrow grounds.  First, because most, if not all, of the conduct at issue involves

27  electronic surveillance in the name of foreign intelligence gathering in the

28  domestic context, this Court should follow the procedures that Congress has set

1   forth for the treatment of secret evidence in the Foreign Intelligence Surveillance

2   Act (FISA).  FISA preempts the state secrets privilege.  While Plaintiffs'

3   discrimination-related claims address a harm distinct from that covered by FISA,

4   and while it is conceivable that some of the evidence that could arise in discovery

5   may not constitute "electronic surveillance" under FISA, the Court should not

6   dismiss any portion of this case, given that it must address substantial portions of

7   the purportedly secret evidence through the specialized procedures for addressing

8   the FISA claim.  Were there any doubt on this issue, the Court would be obligated

9   to construe FISA in this manner so as to avoid the serious constitutional problems

10   raised by the Government's privilege assertion.  *See infra* Section III.B.

11          Second, because Defendants misunderstand the nature of Plaintiffs' religious

12   discrimination claim, they err in asserting that litigation of this case would

13   undoubtedly require disclosure of state secrets, at least at this preliminary stage.

14   Plaintiffs argue that Defendants adopted a *facially discriminatory classification* by

15   targeting them for surveillance because of their religion.  Plaintiffs' theory does not

16   require that they prove that religion is the "sole" reason for their having been

17   targeted for intrusive surveillance, but rather only that religion was "a" reason that

18   they were targeted.  Put simply, Plaintiffs' claim is that religion should be treated

19   like race for purposes of anti-discrimination law – its use must always be justified

20   by strict scrutiny.  *See* Plfs. Opp. to I.C. Defs., Part II.A.  Plaintiffs need no

21   discovery at all to establish a *prima facie* case that Defendants surveilled them

22   because of their religion.  *See generally* Monteilh Dec. (filed concurrently

23   herewith).  Similarly, the Government need not reveal much, if indeed anything,

24   about its counterterrorism policies in order to admit or deny whether religion was *a*

25   *factor* in deciding to surveil Plaintiffs.  Thus, litigation of this case may well not

26   require disclosure of state secrets at all.  Indeed, when narrowed to their proper

27   breadth, most of the Government's claims of secrecy involve information that has

28   already been disclosed, is not properly categorized as a state secret, or need not be

21

1   disclosed in light of Plaintiffs' merits claims.  Any residual secret information at

2   issue will likely be limited in scope, and can be addressed by the Court if and when

3   it arises during the course of discovery.  It is undoubtedly premature to seek

4   dismissal of this case now, when it is unclear whether state secrets will have to be

5   revealed during the litigation.  *See infra* Section IV.C.

6        Plaintiffs first analyze the procedural context in which the Court should

7   address the state secrets privilege in light of the nature of the argument the

8   Government has made and, correspondingly, which of Plaintiffs' claims the

9   Government has sought to dismiss.  *See infra* Section IV.A.  Afterward, Plaintiffs

10  advance their three principle objections to dismissal under the privilege.

11       **A.    The Procedural Context of the Government's State Secrets**

12            **Assertion.**

13       Four procedural features of the state secrets assertion here bear mention at

14  the outset.  First, as Defendants recognize, Gov't Br. 37, the concept of the state

15  secrets doctrine encompasses two very distinct common law rules – a justiciability

16  bar that requires dismissal of lawsuits "where the very subject matter of the action

17  is a matter of state secret," *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070,

18  1078 (9th Cir. 2010) (en banc), and an evidentiary privilege "against revealing

19  military [or state] secrets."  *Id.* at 1079; *see also General Dynamics Corporation v.*

20  *United States*, 131 S.Ct. 1900, 1906 (2011) (distinguishing between state secrets

21  justiciability bar, which invokes the court's "common-law authority to fashion

22  contractual remedies in Government-contracting disputes," and state secrets

23  evidentiary privilege, which protects the Government's "sometimes-compelling"

24  interest in secrecy through "a Government privilege against court-ordered

25  disclosure of state and military secrets").  Assertion of the evidentiary privilege

26  also may lead to dismissal of a lawsuit, but only where "the plaintiff cannot prove

27  the prima facie elements of her claim with non-privileged evidence . . . the

28  privilege deprives the defendant of information that would otherwise give the

1   defendant a valid defense to the claim . . . [or it is] impossible to proceed with the

2   litigation because . . . litigating the case to a judgment on the merits would present

3   an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083.

4           Here, the Government concedes that only the evidentiary privilege is at

5   issue; it has not sought to dismiss this action on the ground that its very subject

6   matter is secret, but instead only on the grounds that litigating Plaintiffs'

7   allegations "will risk or require the disclosure" of state secrets.  Giuliano Dec. ¶ 6;

8   *see also* Gov't Br. 3 ("The Attorney General's privilege assertion is limited in

9   nature").  As explained below, this concession is critical, because Congress has

10  preempted the state secrets evidentiary privilege in cases involving electronic

11  surveillance through passage of FISA.  Here, the Government relies only on that

12  evidentiary privilege; it does not argue that this case is non-justiciable because it

13  involves secret subject matter.  Indeed, the Government agrees that Plaintiffs'

14  Fourth Amendment-related challenges need *not* be dismissed on state secrets

15  grounds at this stage, *id.* at 4; it follows from this concession that the very subject

16  matter of this action is *not* a state secret.

17          Second, as the federal government's brief acknowledges, the state secrets

18  privilege "belongs to the government and must be asserted by it."  Gov't Br. 38.

19  The Government has asserted the state secrets privilege over three extremely broad

20  types of evidence: 1) evidence identifying whether anyone "was or was not the

21  subject of an FBI counterterrorism investigation," 2) the "reasons for" and

22  "results" of any FBI counterterrorism investigation, and 3) information "that could

23  tend to reveal whether particular sources and methods were used in a

24  counterterrorism investigation."  Gov't Br. 43.  Although the third category

25  appears by its terms to be nearly all-encompassing, the Government states that it

26  does not include evidence about a large amount of "audio and video information"

27  that the informant collected for the FBI, as well as information concerning

28  "whether the FBI instructed or permitted Monteilh to leave recording devices

23

1   unattended in order to collect non-consenting communications."  Gov't Br. 4-5.[12]

2          It follows from the Government's description that the Court may not dismiss

3   Counts Nine and Ten based on the privilege.  While the individual defendants have

4   sought immunity broader than that sought by the federal government, *see, e.g.*,

5   AAR Br. 33 (arguing for dismissal of the Fourth Amendment claims with respect

6   to the unlawful installation of listening devices); *id.* at 33 n.7 (arguing for dismissal

7   of certain Fourth Amendment claims), such claims fail because individual

8   defendants have no authority to seek expansion of the scope of the Government's

9   privilege assertion, as the state secrets privilege "can neither be claimed nor

10  waived by a private party."  Gov't Br. 38.[13]

11         Third, because the Government has raised only an evidentiary privilege, the

12  Court may only dismiss Plaintiffs' claims at this stage if it can "determine *with*

13  *certainty* from the nature of the allegations and the Government's declarations in

14  support of its claim of secrecy that litigation must be limited or cut off in order to

15  protect state secrets, even before any discovery or evidentiary requests have been

16  made."  *Jeppesen*, 614 F.3d at 1081 (emphasis added).  Moreover, the Court must

17  arrive at such certainty even as it "critically [] examine[s]" the government's

18

19  _____

    [12] The Government's position is unclear, both within its own brief and in relation

20  to the individual Defendants' briefs, concerning the scope of the "sources and

    methods" assertion of the privilege.  Its explanation of what subjects are covered

21  by that assertion says very little, *see* Gov't Br. 43, but makes clear that information

22  about the informant's nonconsensual audio and video recording is *not* part of the

    secret information, despite the fact that these are "methods" that were utilized in

23  this counterterrorism investigation.  Gov't Br. 4.  However, later in its brief the

    Government suggests that some methods used by the informant are secret,

24  including some that may be relevant to the FTCA.  *See* Gov't Br. 51.

25  [13] Although the Government claims that litigating portions of the privacy claim

26  under Count Eleven (the FTCA claim) will require revelation of state secrets, it

    fails to explain how this can be so given its concession that litigation of the Fourth

27  Amendment claims does not require dismissal on state secrets grounds, at least at

28  this stage.  *Compare* Gov't Br. 4 *with* Gov't Br. 51.

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

1   invocation, viewing the government's proof with a "skeptical" eye. *Id*. at 1082.

2   As explained below, careful examination leaves substantial doubt as to whether

3   litigating this case requires disclosure of state secrets.

4        Finally, it bears mention that in most cases where the state secrets privilege

5   has been applied, the consequences have been draconian.  If the court

6   "determines[s] with certainty," *Jeppesen*, 614 F.3d at 1081, that the litigation

7   requires disclosure of state secrets, it generally dismisses the suit without regard to

8   whether or not the plaintiff has a valid claim.  Indeed, on the Government's view,

9   even if the secret evidence shows that the Government *has violated the law*, the

10  court still must dismiss, because "even the most compelling necessity cannot

11  overcome the claim of privilege if the court is ultimately satisfied that [state]

12  secrets are at stake." *Jeppesen*, 614 F.3d at 1081.

13       As explained below, *infra* Section IV.D., that draconian result cannot be

14  reconciled with this Court's fundamental constitutional obligation to address

15  claims seeking to enjoin on-going constitutional violations, thus creating a serious

16  constitutional problem concerning how to apply the state secrets privilege to claims

17  seeking injunctive relief against on-going constitutional violations.  The Court can

18  avoid that difficult constitutional problem by construing FISA to govern the

19  treatment of the secret evidence at issue here, because FISA, unlike the state

20  secrets privilege, authorizes this Court to consider the secret evidence for purposes

21  of resolving the merits of the underlying dispute.  *See generally In re Golinski*, 587

22  F.3d 901, 904 (9th Cir. 2009) (Kozinski, C.J.) ("When a statute admits two

23  constructions, one of which requires a decision on a hard question of constitutional

24  law, it has long been our practice to prefer the alternative.") (citing *Ashwander v.

25  TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass

26  upon a constitutional question although properly presented by the record, if there is

27  also present some other ground upon which the case may be disposed of.")).  This

28  avoidance canon provides further reason to construe FISA to govern the treatment

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

1  of secret evidence in this case, as explained below.

2  **B. The Foreign Intelligence Surveillance Act Governs the Treatment**

3  **of Any Secret Evidence at Issue in This Case.**

4  Because the state secrets privilege is a common law doctrine, Congress can

5  displace it by legislation.  All federal common law exists only as "a necessary

6  expedient . . . until the field has been made the subject of comprehensive

7  legislation or authorized administrative standards."  *City of Milwaukee v. Illinois*

8  *and Michigan*, 451 U.S. 304, 314 (1981).[14]

9  Congress has preempted the common law governing the treatment of secret

10 evidence in cases involving electronic surveillance undertaken in the name of

11 national security.  "Congress through FISA established a comprehensive, detailed

12 program to regulate foreign intelligence surveillance in the domestic context."  *In*

13 *re National Security Agency Telecommunications Records Litigation*, 564

14 F.Supp.2d 1109, 1118 (N.D.Cal. 2008) (holding that FISA preempts the state

15 secrets privilege with respect to such surveillance).  Thus, to the extent that

16 litigation of this case will require consideration of any information concerning the

17 "subjects" of electronic surveillance, the "reasons for [this] counterterrorism

18 investigation," the "sources and methods" utilized in it, or any other information

19 concerning electronic surveillance that falls within the Government's state secrets

20 assertion, the procedures for dealing with such requests are set forth in FISA.

21 In FISA, Congress specifically contemplated litigation by people subject to

22 electronic surveillance in the name of national security.  Congress defined

23 "aggrieved persons" broadly to include any "person who is the target of an

---

[14] Because this form of "preemption" does not involve federal displacement of state law, but rather federal legislative displacement of federal judge-made common law, no clear statement rule applies.  *City of Milwaukee*, 451 U.S. at 315 ("Our commitment to the separation of powers is too fundamental to continue to rely on federal common law by judicially decreeing what accords with common sense and the public weal when Congress has addressed the problem.").

26

electronic surveillance or any other person whose communications or activities were subject to electronic surveillance," 50 U.S.C. 1801(k), authorized such persons to sue over unlawful surveillance, 50 U.S.C. 1810, and permitted them to "request[] discovery of materials relating to electronic surveillance." *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1205 (9th Cir. 2007).

That Congress would have permitted discovery into the areas that the Government seeks to treat as secret here is unsurprising, because Congress explicitly made analysis of the reasons for and methods used in counterterrorism investigations – the very subjects the Government argues here are secret – the central elements for determining their legality under FISA. The Government may engage in electronic surveillance pursuant to FISA only if "a significant purpose of the surveillance is to obtain foreign intelligence information." 50 U.S.C. 1804(a)(6)(B); *In re Sealed Case*, 310 F.3d 717, 735 (FISA Ct. Rev. 2002) (explaining purpose inquiry under FISA as amended by the PATRIOT Act). Thus, FISA contemplates that Plaintiffs will be permitted to litigate as to *who* was the subject of the investigation and *why* they were targeted. Similarly, Congress contemplated inquiry into the sources and methods used in counterterrorism investigations by placing extensive constraints on the methods used in electronic surveillance. They required, *inter alia*, "minimization" of the information recorded, Section 1804(a)(4), justification for a FISA warrant through description of "the means by which the surveillance will be effected," Section 1804(a)(7), and explanation of why the desired information "cannot reasonably be obtained by normal investigative techniques." 50 U.S.C. 1804(a)(6)(E)(ii); *see generally Al-Haramain*, 507 F.3d at 1206-07 (explaining FISA procedures).

Most important for present purposes, FISA sets forth a clearly-defined procedure for the treatment of assertedly-secret evidence that governs cases in which an "aggrieved person" requests information concerning his or her electronic surveillance. *See* 50 U.S.C. 1806(f). When a litigant makes such an assertion, the

1   court must review "materials relating to the surveillance as may be necessary to

2   determine whether the surveillance of the aggrieved person was lawfully

3   authorized and conducted." *Id*.  While a court conducting a review of the

4   Government's reasons for its investigation under FISA may conduct such review *in*

5   *camera* and *ex parte*, (and in practice generally does, when requested), the court

6   must permit the target of the surveillance to review portions of the secret materials

7   "where such disclosure is necessary to make an accurate determination of the

8   legality of the surveillance." 50 U.S.C. 1806(f); *Al-Haramain*, 507 F.3d at 1205.

9   And, unlike the procedure for *in camera* review under the state secrets privilege,

10  the purpose of a court's review of secret evidence under FISA is *not* to determine

11  whether the Government's information is properly labeled secret, but rather to

12  determine the merits of the claim: whether the surveillance was *lawful*.

13      FISA's procedure for dealing with secret information is not novel.  Courts

14  conducted review under FISA as a matter of course both before and after passage

15  of the PATRIOT Act, and routinely focused their inquiry on the reasons for the

16  counterterrorism investigation at issue.  *See, e.g.*, *United States v. Ott*, 827 F.2d

17  473, 475-76 (9th Cir. 1987) (conducting review of government information

18  concerning FISA investigation and concluding that "we are satisfied after our own

19  *in camera* review of the materials examined by the district court that the purpose of

20  the surveillance, both as proposed and actually conducted, was to secure foreign

21  intelligence information and not to aid in criminal investigations as Ott surmises");

22  *United States v. Cavanagh*, 807 F.2d 787, 789 (9th Cir. 1987) (reviewing sealed

23  materials for compliance with statute); *United States v. Abu-Jihaad*, 630 F.3d 102,

24  120 (2d Cir. 2010) ("identification of purpose is necessary to assess the

25  reasonableness of the probable cause standards at issue.").

26      As this scheme's parameters make clear, the Government has no authority to

27  obtain dismissal of a FISA challenge based on the state secrets privilege whenever

28  a litigant argues that the Government's counterterrorism investigation arose

1   pursuant to an invalid purpose or utilized an unlawful method.  While the

2   Government may introduce secret evidence, its treatment is subject to carefully-

3   defined procedures, and those procedures do not permit dismissal merely because

4   secret evidence is at issue.

5          The Ninth Circuit suggested in *Al-Haramain* that FISA may preempt the

6   state secrets privilege, and on remand to the District Court, Judge Vaughn Walker

7   concluded that in fact it does so: "Section 1806(f) is Congress's specific and

8   detailed prescription for how courts should handle claims by the government that

9   the disclosure of material relating to or derived from electronic surveillance would

10  harm national security; it leaves no room in a case to which section 1806(f) applies

11  for a *Reynolds*-type process. . . the *Reynolds* protocol has no role where section

12  1806(f) applies."  *In re NSA*, 564 F.Supp.2d at 1119.[15]  Judge Walker's

13  comprehensive opinion reviews the pertinent statutory provisions, legislative

14  history, and constitutional doctrine, and rejects the government's objections.  *See,*

15  *e.g.*, *id*. at 1133 (discussing in great detail and then rejecting the government's

16  argument that Section 1806 applies only to criminal proceedings); *id*. at 1120

17  (rejecting suggestion that President has inherent power to surveil outside of FISA).

18  This Court should follow Judge Walker's ruling and conclude that because FISA

19  preempts the state secrets privilege in this case, it defines the procedures by which

20  the Court should address any secret evidence at issue here.

21         Finally, the Government may argue that some of the allegedly-secret

22  information that may arise during discovery will not involve electronic

23  surveillance (or perhaps will not involve surveillance with respect to which the

24  targets had a reasonable expectation of privacy), and therefore will not be pre-

25  empted by FISA.  While Plaintiffs cannot know at this stage whether such claims

26

27  _____

[15] *In re NSA*'s references to a "*Reynolds*-type process" refer to the state secrets

28  evidentiary privilege as set forth in *United States v. Reynolds*, 345 U.S. 1 (1953).

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

would be correct (and the Court certainly cannot "determine with certainty" that they are, *Jeppesen*, 614 F.3d at 1081), even if true they would not justify dismissal at this preliminary stage.[16]  Even if only a portion of the disputed conduct implicates evidence subject to FISA's procedures, adjudicating the legality of that conduct will require some inquiry into the targets of the surveillance, the purpose and nature of the investigation, the methods utilized, and whether alternative sources and methods would have sufficed.  For example, Plaintiffs allege that Defendants employed warrantless electronic eavesdropping devices in Fazaga's office and AbdelRahim's home, that they instructed the informant to record the conversations of Malik and AbdelRahim – even when he was not present, and that they video recorded AbdelRahim at his home.  The Court will have to determine the legality of this conduct under FISA.  It would be anomalous, to say the least, to consider evidence on these topics (as the Court must) pursuant to FISA, but then to dismiss Plaintiffs' other claims because the state secrets privilege bars review of the very same evidence that the Court is considering under FISA.

Given that the state secrets privilege is a common law doctrine, the Court would have ample authority to employ the same procedures set forth in FISA for any residual non-FISA evidence at issue.  Alternatively, it could utilize procedures borrowed from the habeas context or elsewhere.  The Sixth Circuit followed such an approach in *Jabara v. Webster*, 691 F.2d 272, 274-76 (6th Cir. 1982), by choosing to consider the evidence over which the Government had asserted the state secrets privilege *in camera* and *ex parte*, but doing so in order to rule on the merits rather than dismiss on the ground that the information was secret.  The critical point for present purposes is that the Court cannot dismiss the lawsuit at

---

[16] It is unlikely that there will be a large amount of such information given Plaintiffs' allegation that "because of his criminal background . . . Monteilh used to record all day, every moment he worked undercover, regardless of whom he was meeting or what was discussed." FAC ¶ 124.

this preliminary stage merely because some of the secret information that may arise may not be covered by FISA.

## C.     Litigation of This Case Likely Does Not Require Disclosure of State Secrets

Even if the Court were to determine that FISA does not govern the treatment of secret evidence that may be at issue in this case, it still need not dismiss any claims based on the state secrets privilege at this early stage, because none of the three extremely broad areas over which the Government has asserted the state secrets privilege can properly be characterized as state secrets, particularly when understood in light of Plaintiffs' merits claims.  While Plaintiffs do not argue that no evidence in these categories could ever be categorized as secret, a "rigorous" and "skeptical" review of the Government's claims makes clear that its attempt to obtain dismissal on this basis at this early stage is meritless.[17]

### 1.  *Subject Identification*

The deficiency in the Government's state secrets showing appears most obviously with respect to the first area, concerning its broad, categorical claim that all evidence regarding subject identification is a state secret.  The most serious problem with this claim is that, as the Government concedes, it has already

---

[17] With respect to the procedural requirements for invocation of the state secrets privilege, Attorney General Eric Holder's declaration strongly suggests that he has not reviewed the actual evidence that the government alleges to be secret, but instead has only reviewed Mr. Giuliano's declarations.  *See* Holder Dec. ¶ 3. Because Plaintiffs have no access to Mr. Giuliano's classified declaration, they cannot assess whether it describes the secret information with sufficient specificity to allow Mr. Holder to have exercised his "*personal* judgment," *Jeppesen*, 614 F.3d at 1080 (emphasis in original), as is required for assertion of the privilege. Neither Mr. Giuliano's nor Mr. Holder's public declarations come close to describing the allegedly privileged information with sufficient specificity to meet the standard.  *See infra* Section IV.C.3; *see also Ellsberg v. Mitchell*, 709 F.2d 51, 63-64 (D.C. Cir. 1983) (holding that government must justify state secrets assertion with maximum feasible public explanation).

1   officially acknowledged that its informant conducted audio and video surveillance

2   for the FBI, some of which has already been produced in other litigation, Gov't Br.

3   4-5.  Thus, Plaintiffs already know that they were the subjects of a

4   counterterrorism investigation, because the informant made repeated, intense

5   contact with all of them.  *See generally* FAC ¶¶ 59, 70-76, 81-84.  Because that

6   fact is not a secret, nothing more need be shown to resolve the first portion of the

7   Government's state secrets assertion.  *See Al-Haramain*, 507 F.3d at 1200

8   (rejecting government's assertion that subject matter of warrantless wiretapping

9   program was a state secret because, although "there are details about the program

10   that the Government has not yet disclosed," the program was no longer a state

11   secret because of official disclosure); *cf. Pickard v. Department of Justice*, 653

12   F.3d 782 (9th Cir. 2011) (holding that government could not provide Glomar

13   response to FOIA request seeking information otherwise covered by Section

14   552(c) where government had officially disclosed informant in court proceeding).

15       Notwithstanding the elephant in the room regarding subject identification –

16   that everyone who had contact with Craig Monteilh already knows they were a

17   target – the Government makes various broad, abstract claims about the dangers

18   involved in disclosing whether or not a given individual is the subject of a

19   counterterrorism investigation.  These claims are implausible, at least in this

20   context, and do not come close to justifying the state secrets assertion.  The

21   Government claims that disclosure could affect the behavior of "individuals

22   inclined to commit terrorist acts" who have some connection to Plaintiffs, and that

23   it could therefore threaten national security if the individuals were a target, were

24   not a target, had been but were no longer a target, and indeed even if they were

25   "entirely law-abiding" – because "associates of former subjects" who "may still be

26   under investigation" could somehow harm us once armed with the knowledge that

27   their entirely law-abiding friends are (or are not) targets of FBI surveillance.  Gov't

28   Br. 43-44.  But the Government's extremely abstract fears are belied by the facts,

32

both as pled and as borne out by the years since the FBI's use of the informant became public.  The Court must assume for purposes of this motion to dismiss that Plaintiffs are peaceful Americans who have no intent to harm this country, and as of today, five years after the informant surveilled and instigated members of the Southern California Muslim community for an extended period of time and then was publicly revealed as an informant, not a single individual has even been charged with a terrorism-related offense as a result of his investigation.  *See* FAC ¶ 3 ("This dragnet investigation did not result in even a single conviction related to counterterrorism.  This is unsurprising, because the FBI did not gather the information based on suspicion of criminal activity, but instead gathered the information simply because the targets were Muslim.").  Thus, the parade of horribles that should have accompanied their identification as targets of FBI counterterrorism surveillance has not come to pass.[18]

Similarly, the Government proves far too much by its categorical assertion that the release of any information "that could tend to confirm or deny" whether any particular individual is or is not the subject of a counterterrorism investigation

---

[18] Indeed, the only federal crime of any kind that was charged through the informant's work was a naturalization fraud case that the government dismissed.  *See* FAC ¶¶ 155-58; Scott Glover, *Federal prosecutors seek dismissal of perjury and fraud charges against Tustin man*, L.A. TIMES (Oct. 1, 2010), http://articles.latimes.com/2010/oct/01/local/la-me-niazi-20101001.  Mr. Giuliano's declaration also makes reference to one plot by three prisoners in Los Angeles that sought to storm a military recruiting center and, afterward, attack people at a nearby temple.  But there is no suggestion that they were discovered through counterterrorism investigation of the Muslim community.  In fact, Torrance police arrested the men because they tried to rob a gas station and then discovered the plot because they had written their plans down on papers left at their homes.  The only one of the plotters with any connection to Southern California's resident Muslim community was never convicted, as he was found incompetent to stand trial due to mental illness.  *See* Complaint, *United States v. Samana*, No. 05-1662 (C.D.Cal. Aug. 2, 2005); *United States v. James*, No. 05-0214 (C.D.Cal. Aug. 18, 2009) (judgment and probation/commitment order).

---

33

would threaten national security.  The Government has repeatedly confirmed that individuals were or were not subjects of investigation on numerous occasions, including in extremely sensitive investigations.  For example, the Department of Justice publicly identified Steven Hatfill as a "person of interest" in its investigation of the 2001 anthrax attacks, which occurred within months of the 9/11 attacks.  *See* David Freed, *The Wrong Man*, THE ATLANTIC (May 2010), http://www.theatlantic.com/magazine/archive/2010/05/the-wrong-man/8019/.[19] More recently, the FBI disclosed documents in response to a FOIA lawsuit revealing that Naji Hamdan – an American citizen from Southern California who was detained in the United Arab Emirates, allegedly at the behest of the United States government – had been the target of an FBI investigation.  *See* Exh. 3. Conversely, the government publicly disclosed that Brandon Mayfield was *not* a target as part of a settlement agreement for the FBI's unlawful surveillance and detention of him in 2004.[20]  Indeed, every time the government has detained or released any of the several thousand people it has held at Guantanamo Bay,

---

[19] The government later paid Mr. Hatfill over $2.8 million to settle his case.  *See Statement of Brian Roehrkasse, Director of Public Affairs, on Department's Settlement with Steven Hatfill in Hatfill v. Ashcroft*, http://www.justice.gov/opa/pr/2008/June/08-opa-576.html (June 27, 2008).

[20] The government also agreed to destroy documents relating to its surveillance of Mr. Mayfield, apologize to him, and pay him $2 million.  *See* Eric Lichtblau, *U.S. Will Pay $2 Million to Lawyer Wrongly Jailed*, N.Y. TIMES (NOV. 30 2006), http://www.nytimes.com/2006/11/30/us/30settle.html; *Statement on Brandon Mayfield Case*, (May 24, 2004), http://www.fbi.gov/news/pressrel/press-releases/statement-on-brandon-mayfield-case.  Along the same lines, the Department of Justice sent a public letter "clearing" Richard Jewell of suspicion in connection with the Atlanta Olympics bombing in 1996, after the FBI had wrongly suspected him of that terrorist act.  *See Jewell Cleared of Olympic Park Bombing*, (Oct. 26, 1996), http://articles.cnn.com/1996-10-26/us/9610_26_olympic.bombing_1_park -bombing-richard-jewell-1996olympic-park?_s=PM:US.  And the government disclosed that it had targeted particular individuals for surveillance in both *Jabara* and *Ellsberg*.  *See infra* Section IV.D.3.

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

1   Bagram Air Force Base, and other foreign detention sites, it has disclosed to

2   associates of the detainees that the individual either is or is no longer a target of

3   investigation.  The claim that each such disclosure so threatens national security

4   that American citizens living in Southern California should be denied the ability to

5   challenge the government's deprivation of their constitutional rights is absurd.

6        In light of the allegations in the complaint, the fruits of the informant's

7   surveillance to date, and the various counter-examples to the Government's claim,

8   its public justification comes nowhere near satisfying the rigorous requirements of

9   a state secrets assertion.  Indeed, its public justification concerning subject

10  identification consists of nothing more than recycled boilerplate familiar to anyone

11  who litigates FOIA cases.  The Court should reject its assertion with respect to this

12  category of information.[21]

13              **2.   *Reasons for and Results of Investigations***

14       The Government's second privilege assertion claims that it cannot reveal

15  any "reasons for" or the "status and results of" any counterterrorism investigation,

16  including "any information obtained during the course" of it.  These categorical

17  assertions also fail for several reasons.

18       First, as explained earlier, the Government cannot plausibly claim that this

19  

20  [21] It is disappointing that a personal review by the Attorney General appears to
    have resulted in nothing more than standard FOIA boilerplate by way of explaining
21  the state secrets assertion, at least to the public.  To give one particularly egregious
    example, the government asserts that "disclosure that some persons are not subject
22  to investigation, while the status of others is left unconfirmed, would enable
    individuals and terrorists groups [sic] alike to manipulate the system to discover
23  whether they or their members are subject to investigation."  Gov't Br. 44.  While
    this statement is comprehensible in a FOIA context, where such individuals could
24  in theory file their own FOIA requests, it makes no sense here, where no individual
    could bring a civil lawsuit against the federal government like this one without
25  having knowledge that they had been the target of surveillance.  Such statements
26  do not reflect well on the allegedly rigorous review that preceded the assertion of
    the state secrets privilege in this case.  *See infra* n.33.
27  

28

1    case must be dismissed because all "reasons for" its counterterrorism investigation

2    must remain secret, because the reasons for such investigations are routinely

3    disclosed in FISA cases, and indeed will be disclosed (at least to the Court)

4    through litigation of the FISA claims in this case.  *See supra* Section IV.B.

5            Second, Defendants have misconstrued Plaintiffs' religious discrimination

6    claims, and therefore incorrectly assessed the degree to which state secrets

7    concerning their "reasons for" investigations are at issue.  While Plaintiffs have

8    asserted that the FBI targeted them, along with many other Southern California

9    residents, based on nothing more than their religion, the legal theory pled in the

10   complaint does not require proof that religion was the "sole" predicate for the

11   investigation.  Instead, Plaintiffs claim that *any* use of religion as part of the basis

12   for an investigation constitutes a facially discriminatory classification that triggers

13   the proscription against religious discrimination created by the Establishment

14   Clause, the Free Exercise Clause, and the Equal Protection component of the Fifth

15   Amendment.  Put simply, Plaintiffs' merits claim is essentially that religion must

16   be treated like race for purposes of anti-discrimination law.  Like race, religion

17   cannot play *any* role in a Government classification unless its use satisfies strict

18   scrutiny.  *See* Plfs. Opp. to I.C. Defs., Part II.A.

19           Defendants' misunderstanding of Plaintiffs' discrimination claims has

20   profound implications for their state secrets argument.  While Defendants state that

21   the "disclosure of the reason for an investigation could provide insights to terrorists

22   as to what type of information is sufficient to trigger an inquiry by the FBI," Gov't

23   Br. 45, this surely cannot be true for the only reason that the Court need inquire

24   into here – that *being Muslim* was a reason to trigger an investigation by the FBI.

25           Similarly, although Defendants imagine intensive discovery to uncover the

26   reasons that the FBI targeted each Plaintiff, such discovery will likely prove

27   unnecessary.  Defendants argue that Plaintiffs' discovery would have to examine

28   "why" individuals were targeted by Operation Flex and "how and why the FBI

36

1   collected information," Gov't Br. 47, but Plaintiffs already have evidence

2   sufficient to reveal that the FBI engaged in intentional discrimination against

3   Muslims as a matter of official policy.  *See generally* Monteilh Dec. (filed

4   concurrently herewith); *see* Spencer Ackerman and Noah Shachtman, *Video: FBI*

5   *Trainer Says Forget 'Irrelevant' al-Qaida, Target Islam*, WIRED (Sept. 20, 2011),

6   *available at* http://www.wired.com/dangerroom/2011/09/fbi-islam-qaida-

7   irrelevant.  Indeed, Attorney General Mukasey's 2008 FBI Guidelines, which

8   Plaintiffs have alleged were effectively in force at the time of these events, FAC

9   ¶ 37, already states that the "FBI can consider [the] role that religion plays in the

10   membership or motivation of criminal or terrorist group[s]," and that "religious

11   behavior [is] relevant if practiced by a target group."  Recently revealed

12   information about the FBI's training materials with respect to Islam provide

13   remarkable detail as to how the Government has implemented these directives by

14   treating Islam itself as a threat.  *See, e.g.*, Spencer Ackerman, *FBI 'Islam 101'*

15   *Guide Depicted Muslims as 7th-Century Simpletons*, WIRED (July 27, 2011),

16   *available at* http://www.wired.com/dangerroom/2011/07/fbi-islam-101-guide.

17   And while of course the Government is entitled to present its own evidence to

18   rebut Plaintiffs' showing, extremely limited discovery would likely be sufficient

19   either to establish or refute the claim that the FBI considers an individual's Muslim

20   faith and religious practices as one relevant consideration in determining whether

21   to target someone for surveillance in the name of counter-terrorism.

22        The Government also makes a distinct argument that, even if Plaintiffs can

23   establish (as they surely can) that the Government has engaged in facial

24   discrimination on the basis of religion, the Court would still have to consider

25   whether the use of religion in this context could satisfy strict scrutiny.  Gov't Br.

26   47.  While this is correct, it does not constitute a reason to dismiss this suit, and

27   certainly not at this preliminary stage.  While the Government's interest in

28   counterterrorism investigation as a general matter constitutes a compelling state

interest, it does not follow that the particular interest that underlay Operation Flex met the compelling interest standard; the Court must make that determination through appropriate use of *ex parte* procedures just as it would in any other FISA case.  With respect to narrow tailoring, it is hard to imagine how the Government could even argue, let alone prove, that a policy that treats one's status as a Muslim and one's practice of the Muslim religion as itself a basis for suspicion could be narrowly tailored.  But if the Government were to make such a claim, it would have to prove it through general information about *all Muslims*, not information specific to any particular counter-terrorism investigation.  And, again, if secret evidence does somehow arise in this context, the Court can handle it through appropriate use of *ex parte* procedures.

Therefore, contrary to Defendants' claim, it is not at all clear at this stage of the proceedings that Plaintiffs need even to learn what reasons *other than religion* were employed by Defendants in their decision to target Plaintiffs, and similarly unlikely that other purportedly secret information would have to be disclosed to determine whether the Government's use of religion would satisfy strict scrutiny.  Proof that the Government utilized religion as *one* criterion for investigation suffices to state an anti-discrimination injury unless its use is justified by strict scrutiny, and nothing more would be required for Plaintiffs to prevail.  *See* Plfs. Opp. to I.C. Defs., Part II.A.  While the parties may disagree about the details of how the expungement remedy might function in cases where there was evidence justifying the surveillance, that problem would arise only at the remedy stage.  The Court cannot say "with certainty" at this preliminary stage that "litigation must be cut off in order to protect state secrets."  *Jeppesen*, 614 F.3d at 1081.[22]

---

[22] The strength of the non-discriminatory reasons for the maintenance of files on Plaintiffs may be relevant for purposes of an injunctive remedy.  For example, files whose maintenance was justified under Fourth Amendment standards may not have to be expunged merely because they were obtained in violation of the First

*(cont'd)*

1          Finally, Plaintiffs almost certainly need to know nothing about the "results

2    of" counterterrorism investigations to prevail on their claim of facial

3    discrimination – if Plaintiffs show that Defendants intentionally and explicitly

4    targeted Muslims, the fact that some of the discriminatory investigations may have

5    yielded evidence would not justify the discrimination (any more than a roadblock

6    in which police stopped and searched only African-Americans would be

7    constitutional as to those searches that happened to uncover contraband).

8    Moreover, Defendants' claim that all "results of" counterterrorism investigations

9    must remain secret cannot be reconciled with the substantial public disclosure that

10   often occurs about such results, particularly given that the underlying events at

11   issue here occurred four to five years ago.

12         **3.   *Sources and Methods***

13         The Government's final claim for secrecy concerns the need for its sources

14   and methods to remain secret, but that claim is inconsistent with their official

15   acknowledgment that the informant conducted audio and video surveillance for the

16   FBI and, relatedly, their concession that the Fourth Amendment claims need not be

17   dismissed at this stage.  Gov't Br. 4.  After all, the informant is a "source" and his

18   surveillance activity used various "methods," yet these are not secret.

19         Defendants provide no account for how to reconcile the informant's

20   disclosures with the "sources and methods" portion of their state secrets assertion.

21   Both the briefing and Mr. Holder's declaration make only conclusory statements

22   with respect to that portion of the claim.  *See* Gov't Br. 45; Holder Dec. at ¶ 4(iii);

23   *compare Ellsberg*, 709 F.2d at 64 (holding that "before conducting an in camera

24   examination of the requested materials, the trial judge should be sure that the

25   Government has justified its claim in as much detail as is feasible").  Mr.

26

27   and Fifth Amendments.  Nor is it clear at this preliminary stage whether Plaintiffs

28   or their attorneys would have to be present at any hearing concerning that issue.

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

1    Giuliano's declaration says slightly more, but what he says flatly contradicts the

2    official acknowledgment concerning the informant.  *Compare* Giuliano Dec. ¶ 31

3    ("The disclosure of sources and methods, such as confidential human sources, the

4    existence of surveillance, and the use of other techniques, *would* provide a

5    roadmap to adversaries") (emphasis added) *with* Gov't Br. 4 ("The FBI has

6    previously disclosed in a separate criminal proceeding that Monteilh collected

7    audio and video information for the FBI, and some of that audio and video

8    information was produced in that prior case.").

9         In any event, Plaintiffs likely will not require information about whether or

10   how any particular sources and methods – other than Monteilh himself and the

11   surveillance he assisted in conducting – were employed as part of Operation Flex.

12   Therefore, the Court cannot say with "certainty" at this stage of the proceeding that

13   no alternative method short of dismissal would suffice to deal with any secret

14   information that arises concerning any sources or methods.

15   **D.    The Constitution Forbids Dismissal of This Case on State Secrets**

16   **Grounds Because it Seeks Injunctive Relief from On-Going**

17   **Constitutional Violations.**

18        Should the Court conclude "with certainty," notwithstanding the arguments

19   above, that litigating the discrimination claims would require disclosure of state

20   secrets, it must hold that application of the rule requiring dismissal would be

21   unconstitutional in this case, at least as applied to the claims seeking injunctive

22   relief from on-going constitutional violations.  The Government's claim that this

23   case may be dismissed on the basis of the state secrets privilege ignores the fact

24   that Plaintiffs seek not only damages, but also a form of injunctive relief: the

25   destruction of files whose continued maintenance violates the Constitution.  In

26   other words, Plaintiffs allege (and the Court must assume, for purposes of this

27   motion) that the Government is engaged in an on-going violation of their

28   constitutional rights.  The Constitution does not permit the Court to dismiss

40

1    Plaintiffs' constitutional claims without addressing their merits, even if doing so

2    would require the disclosure of state secrets.[23]

3    　　　While the doctrine discussed below provides ample support for Plaintiffs'

4    constitutional argument, it is worth pausing to note the obvious problem with the

5    Government's view.  If it were correct, then the Government could shield itself

6    from litigation to challenge a policy to arrest people solely on the basis of their

7    race, nationality, or political opinion, *see Korematsu v. United States*, 323 U.S. 214

8    (1944), or even a policy to summarily murder American citizens suspected of

9    posing a threat to the present administration, simply by asserting that the policy

10   was secret.  *Cf. Al-Aulaqi v. Obama*, 727 F.Supp.2d 1, 54 (D.D.C. 2010) (noting

11   that the government had invoked state secrets to dismiss challenge to government's

12   program of targeted killing abroad, but deciding on other grounds).[24]

13   　　　The Government's position is that literally any practice, no matter how

14   abusive, can be immunized from legal challenge by being labeled

15   _____

16   [23] If the Court agrees that it cannot dismiss the claims for injunctive relief, it should
     also decline to dismiss the damage claims, because the underlying evidence
17   involved in both requests for relief is virtually identical.

18   [24] The fact that the privilege assertions would be limited to cases involving
     "national security" or "counterterrorism" provides little comfort.  One need look
19   no further than the government's discussion of *Presbyterian Church*.  Gov't Br.
     48-49.  The government strongly suggests that information there could also have
20   implicated "national security," even though it involved an investigation by the INS
     of churches assisting Central American refugees seeking asylum.  For other
21   evidence of the malleability of those terms, *see* Drug Trafficking Violence in
     Mexico: Implications for the U.S. Before the Senate Caucus on International
22   Narcotics Control, 111th Cong. (May 5, 2010) (joint statement of Kevin Perkins,
     Ass't Dir., Crim. Invest. Div., FBI and of Anthony Placido, Ass't Admin. and
23   Chief of Intel., DEA) (describing drug trafficking and related problems as "a
     serious threat to the national security" that is not "a traditional criminal justice
24   problem."); *see also*, *Bill Seeks to Designate Drug Cartels as Terrorists*, N.Y.
     TIMES, April 21, 2011 (describing proposed legislation that would designate seven
25   cartels as "foreign terrorist organizations" to "give law enforcement in the United
     States enhanced tools to combat the cartels.").

26

27

28

1    "counterterrorism" and being conducted in secret.  Indeed, even if the Court

2    reviewed the secret evidence and determined that the Government's conduct was

3    *unlawful*, it still would have to dismiss, so long as it determined with certainty that

4    the evidence was properly labeled secret and would risk disclosure during the

5    course of the litigation.  *See Jeppesen*, 614 F.3d at 1081.  The Government cannot

6    explain how challenges to the horrific practices described above could ever be

7    litigated against its counterterrorism policies and practices if it can assert the

8    privilege in cases like this one.  In this respect, its position is at war with the most

9    fundamental principles of our constitutional system, irreconcilable with the

10   Government's practice in other cases involving secret information, and

11   unsupported by any controlling authority from the state secrets context.  At the

12   very least, it presents a serious constitutional question that this Court should avoid

13   deciding if at all possible.

14                 **1.    *Where it Has Jurisdiction, the Court May Not Dismiss a Case***

15                 ***Seeking Injunctive Relief for Constitutional Violations Without***

16                 ***Addressing Its Claims on the Merits.***

17          The Government's application of the state secrets privilege here is

18   fundamentally misguided because Plaintiffs seek injunctive relief from

19   constitutional violations.  Courts have long taken two radically divergent

20   approaches to enforcing the Constitution's provisions depending on whether the

21   relief sought involves injunctive relief against on-going violations or instead

22   damages for violations that occurred in the past.  With respect to the latter, courts

23   have long held that not every victim of a completed constitutional violation is

24   entitled to monetary compensation.  The most obvious examples arise from

25   immunity doctrine.  Select government officials are given absolute immunity from

26   damage actions for some types of conduct, *see, e.g.*, *Imbler v. Pachtman*, 424 U.S.

27   409, 427 (1976).  A broader range of officials receive qualified immunity, such

28   that they need not compensate victims of their constitutional violations unless the

rule they broke was clearly established. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). Similarly, as the individual defendants have argued, in some cases the existence of "special factors" may foreclose damages relief for constitutional violations even where the violation at issue is clear, *see* AAR Br. 24 & 28, while suits against the United States itself, even for constitutional violations, are only actionable if permitted under the Federal Tort Claims Act or another statute waiving sovereign immunity. *See generally Carlson v. Green*, 446 U.S. 14 (1980).

In contrast, no doctrines permit the courts to refrain from affording injunctive relief in the face of on-going constitutional violations when they have jurisdiction to consider such claims. *See generally* Richard Fallon, *Jurisdiction Stripping Reconsidered*, 96 VA. L. REV. 1043, 1107 (2010) (arguing, based largely on Professor Hart's views, that "congressional attempts to preclude all possible remedies for the systematic or ongoing violation of constitutional rights . . . should be deemed intolerable. It would be incompatible with the Constitution's evident aspiration to establish a government subject to the rule of law for Congress to be able to license ongoing lawbreaking through the device of a jurisdictional withdrawal."); Akhil Reed Amar, THE CONSTITUTION AND CRIMINAL PROCEDURE: FIRST PRINCIPLES 115 & n.112 (1997) (arguing that to permit only damages remedies for constitutional violations would transform constitutional rights into "takings-clause-like 'liability' rights" that allow the government to "cynically treat violations of sacred constitutional rights merely as the cost of doing business").[25]

Indeed, the rationale behind the *Ex Parte Young* "fiction" that suits seeking injunctive relief against on-going unconstitutional conduct must be treated as suits against individual officers in their official capacities, notwithstanding any

---

[25] While much of the scholarly literature on this topic concerns Congressional attempts to strip the courts of jurisdiction to hear constitutional claims, the same rationale applies with at least as much force to attempts by the Executive Branch to close the courthouse doors through the use of secret policies and practices.

immunity the Government may assert, arises from the Constitution's promise that the political branches will not eliminate the rights of individuals to seek judicial relief from unconstitutional official action by asserting their sovereign immunity. *See Guaranty Nat. Ins. Co. v. Gates*, 916 F.2d 508, 512 (9th Cir. 1990) ("[T]he best explanation of *Ex parte Young* [209 U.S. 123, 156 (1908)] and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.") (quoting C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3566, at 102 (1984));  *see generally* Richard H. Fallon, Jr. et al., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 845 (6th ed. 2009) ("[I]t was historically taken for granted that sovereign immunity did not always or perhaps even typically bar suits against governmental officers.").[26]

And, of course, where Article III grants this Court jurisdiction to consider claims seeking to remedy on-going constitutional violations, the Court has no authority to abstain from deciding those claims based on a common law doctrine. *See McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) ("[F]ederal courts are vested with a virtually unflagging obligation to exercise the jurisdiction given them." (citing *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution.")).

The principles set forth in such cases give life to perhaps the most

---

[26] Even after *Ex Parte Young*, Congress resolved any ambiguity concerning the ability of the courts to grant injunctive relief against the United States by explicitly waiving sovereign immunity with respect to all actions undertaken by federal agencies, where the relief sought is injunctive relief. 5 U.S.C. § 702 (the Administrative Procedures Act); *see Presbyterian Church v. United States*, 870 F.2d 518, 524 (9 Cir. 1989) (describing Section 702's history and purpose). Although much of the sovereign immunity caselaw concerns federal court power to issue injunctive relief against unconstitutional state action, the rationale of those cases applies equally to the federal government's sovereign immunity.

1   fundamental protection of our legal system: where Article III gives the courts

2   authority to do so, they are responsible for ensuring that the other branches of

3   government comply with the Constitution.  *See Boumediene v. Bush*, 553 U.S. 723,

4   765 (2008) (striking down jurisdiction stripping provision in national security

5   context because it would "lead[] to a regime in which Congress and the President,

6   not this Court, say 'what the law is.') (citing *Marbury v. Madison*, 1 Cranch 137,

7   177 (1803)).

8       **2.   *The Government's Practice in Other National Security Cases***

9           ***Makes Clear That the State Secrets Privilege Does Not Permit***

10          ***Dismissal of Constitutional Claims for Injunctive Relief.***

11          The vast majority of the state secrets caselaw, including all of the Supreme

12  Court and Ninth Circuit cases that bind this Court, comport with the basic principle

13  that the state secrets privilege does not permit dismissal of claims seeking

14  injunctive relief from constitutional violations.  The simplest way to illustrate the

15  constitutional problem Plaintiffs identify is by examining the cases in which the

16  Government does *not* assert the state secrets privilege.  Although the Government

17  asserted in preliminary briefing in this case that "the applicability of the state

18  secrets privilege does not turn on the nature of the claim asserted or the relief

19  sought," Gov't Opp. to Ex Parte App. (Dkt. No. 43) , that claim is entirely

20  indefensible given the Government's practice in habeas cases.

21          No court has ever dismissed a habeas case based on the state secrets

22  privilege, despite the fact that many of those cases involved highly secret

23  counterterrorism information, and despite the fact that the courts have repeatedly

24  required disclosure of such information, subject to various procedural safeguards,

25  as part of the habeas process.  There should be no serious dispute that the

26  Government could not obtain dismissal of a habeas case based on the fact that

27  litigating it would require disclosure of state secrets.  Indeed, the D.C. Circuit has

28  gone so far as to order disclosure of classified information to defense counsel in

45

cases involving enemy combatants.  *See Boumediene v. Bush*, 553 U.S. 723, 783-84 (2008) (finding that Combatant Status Review Tribunals were an inadequate substitute for habeas corpus in part because they failed to provide detainees with sufficient access to classified information).[27]  Indeed, courts have even entertained habeas petitions brought by people alleged to have engaged in war against the United States on U.S. soil.  *Ex Parte Quirin*, 317 U.S. 1, 9 (1942) (habeas petition resolved on merits involving U.S. citizens engaged in war on behalf of a foreign power); *Ex Parte Milligan*, 4 U.S. (4 Wall.) 2, 76 (1866) (same, for citizen plotting insurrection); *Padilla v. Hanft*, 432 F.3d 582, 584 (4th Cir. 2005) (U.S. citizen on U.S. soil captured in United States allegedly plotting to detonate a "dirty bomb").  None of these cases were dismissed under the state secrets privilege, even though they obviously put at issue equally or more secret categories of information than may be at issue here.  As these cases make clear, the state secrets privilege does not permit dismissal in at least some cases that involve highly secret information.[28]

---

[27] *Boumediene* reached that result even after the D.C. Circuit had ordered the disclosure of classified information to defense counsel in combatant classification review actions under the Detainee Treatment Act on the ground that "unless a petitioner's counsel has access to as much as is practical of the classified information regarding his client . . . Counsel simply cannot argue, nor can the court determine, whether a preponderance of the evidence supports the Tribunal's status determination." *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007).  *Bismullah* also held that counsel presumptively has a "need to know" all Government Information concerning his client." *Id.*  In doing so, the D.C. Circuit dictated the terms under which the government could refuse to disclose information to counsel.  *See also Parhat v. Gates*, 532 F.3d 834, 837 n.1 (D.C. Cir. 2008) (permitting counsel to see classified information contained in court's decision).  While *Bismullah* denied access to information labeled "Top Secret," that limitation may not have survived *Boumediene*.

[28] The government may argue that the failure to assert the state secrets privilege in these cases can be explained by the distinction between using it as a "sword" and as a "shield."  See Opp. to Ex Parte 4-5 (Dkt. No. 43).  However, that distinction cannot explain its use in habeas cases, which are civil actions brought by victims of on-going illegal conduct seeking injunctive relief.

1    The Government may argue that it has declined to assert the state secrets

2    privilege in habeas cases because individuals in such cases face a loss of liberty,

3    which is protected under the Suspension Clause, among other provisions.  Yet the

4    constitutional rights that Plaintiffs seek to vindicate here – grounded in the First,

5    Fourth, and Fifth Amendments – are of no lesser importance, and certainly no

6    doctrine permits their relegation to second class status.

7         Ultimately, the Government simply has no explanation for how the Court

8    will vindicate the Constitution's command that this Court "say what the law is" if

9    the Government can obtain dismissal through its assertion in this case.

10        **3.   *Existing State Secrets Doctrine Does Not Resolve Whether the***

11             ***Privilege Permits Dismissal of Constitutional Claims for***

12             ***Injunctive Relief***

13        Although most of the existing state secrets doctrine does not speak explicitly

14   in terms of the distinction between injunctive relief and damages described above,

15   the cases overwhelmingly comport with that distinction.  The Government has

16   rarely even asserted the state secrets privilege in cases seeking injunctive relief

17   from on-going constitutional violations, and no Supreme Court or Ninth Circuit

18   case has ever accepted such an assertion.

19        The Supreme Court has explicitly addressed the state secrets doctrine –

20   whether the justiciability bar or the evidentiary privilege – in only four cases.  Each

21   of them involved government contracts for secret employment or services.  *See*

22   *General Dynamics Corp. v. United States*, 131 S.Ct. 1900, 1903-04 (2011)

23   (defense contract with United States military); *Totten v. United States*, 92 U.S. 105

24   (1876) (contract for espionages services); *Tenet v. Doe*, 544 U.S. 1, 8 (2005)

25   (contract for espionage services); *United States v. Reynolds*, 345 U.S. 1, 2-3 (1953)

26

27

28

1  (wrongful death action by widows of civilians observing secret military flight).[29]

2      Language from the most recent of these cases strongly suggests that the

3  evidentiary privilege does not apply in injunctive relief cases raising constitutional

4  claims.  *In General Dynamics*, the Court rejected as unhelpful the "false analogy"

5  to criminal cases, where the Government cannot proceed against the defendant

6  through use of secret evidence, because *General Dynamics* was a damage action

7  brought against the United States "in a civil forum where the Government is not

8  the moving party, but is a defendant *only on terms to which it has consented*." 131

9  S.Ct. at 1906 (emphasis added) (citing *Reynolds*).  In contrast, the Constitution

10  itself permits Plaintiffs' claims for expungement against Government officials sued

11  in their official capacity; no waiver of sovereign immunity is required.

12      Three published Ninth Circuit cases apply the state secrets doctrine – either

13

14  [29] While the plaintiffs in *Tenet* framed the claim as one seeking "injunctive relief"
   under "procedural and substantive due process," *Tenet*, 544 U.S. at 5, the Court

15  dismissed these claims under the state secrets jurisdictional bar because *Totten*
   "precludes judicial review . . . where success depends on the existence of

16  [Plaintiffs'] secret espionage relationship with the Government." *Id*. at 8.  To be
   clear, Plaintiffs acknowledge that *Tenet* dismissed a claim for injunctive relief

17  from a constitutional violation, but it did so under the *justiciability bar*, not the
   *evidentiary privilege*.  Thus, *Tenet* holds that the Court lacked jurisdiction over the

18  extremely narrow category of suits where "the very subject matter of the action" is
   a state secret.  *Jeppesen*, 614 F.3d at 1078.  *See also Tenet*, 544 U.S. at 10 ("Only

19  in the case of an alleged former spy is *Totten*'s core concern implicated: preventing
   the existence of the plaintiff's relationship with the Government from being

20  revealed.").  Here, the government has conceded that the very subject matter of this
   case is not a state secret.  Two other Supreme Court cases likely concern state

21  secrets, but neither is inconsistent with Plaintiffs' argument.  *Weinberger v.*
   *Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 145, 147 (1981)

22  (holding that Navy's Environmental Impact Statement could be withheld under
   FOIA if properly classified, and that Navy's compliance with environmental law

23  was non-justiciable due to need to protect military secrets, but not addressing any
   constitutional claims); *Webster v. Doe*, 486 U.S. 594, 603 (1988) (construing

24  National Security Act to not preclude review of constitutional challenge to CIA
   agent's employment termination).

25

26

27

28

48

1  the privilege or the justiciability bar – and while these cases apply the doctrine

2  outside the government contracts context, none have ever dismissed an action

3  based on the evidentiary privilege where the plaintiffs sought injunctive relief from

4  constitutional violations.  *Jeppesen* was a suit for damages under the Alien Tort

5  Statute.  614 F.3d at 1075.  *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998)

6  involved no constitutional claims, *id.* at 1164, and appears to have involved the

7  justiciability bar.  *Id.* at 1166.  *Al-Haramain* involved no claim for injunctive relief

8  on appeal, and in any event the Court strongly suggested that the state secrets

9  privilege did not govern the case because it was preempted by FISA.  *See*

10  *Al-Haramain*, 507 F.3d at 1195 ("Al-Haramain sought damages and declaratory

11  relief"); *id.* at 1205 (suggesting that FISA preempts state secrets privilege).  *See*

12  *also Weston v. Lockheed Missiles & Space Co.*, 881 F.2d 814, 816 (9th Cir. 1989)

13  (state secrets privilege waived on appeal).

14       Similarly, the vast majority of out-of-circuit state secrets cases involve

15  damage actions or actions seeking to enforce employment or contract law rules for

16  secret services with the Government.[30]  While a handful of cases do involve claims

17  for injunctive relief – most arising out of the same set of revelations concerning

18  illegal government spying against political activists – the different approaches

19  adopted in those cases (and the vehement disagreements amongst the judges

20

21  [30] For damage actions, *see, e.g.*, *El Masri v. United States*, 479 F.3d 296, 300 (4th

22  Cir. 2007); *Ellsberg v. Mitchell*, 807 F.2d 204, (C.A.D.C. 1986).  For cases

23  involving actions to enforce secret employment or contract rules, *see, e.g.*, *Doe v. CIA*, 576 F.3d 95, 108 (2d Cir. 2009) (suit by CIA agent's family that appears to be

24  employment action, in which plaintiffs conceded that the case could not proceed

25  without disclosure of state secrets); *Edmonds v. United States Dep't of Justice*, 323 F.Supp.2d 65, 70 (D.D.C. 2004) (suit by contract translator who worked for FBI in

26  aftermath of 9/11 attacks); *Sterling v. Tenet*, 416 F.3d 338, 347 (4th Cir. 2005)

27  (Title VII suit by CIA employee); *Molerio v. FBI*, 749 F.2d 815, 821 (D.C. Cir. 1984) (discrimination action alleging constitutional violations by individual who

28  was refused employment by FBI).

1  involved) reveal the seriousness of the constitutional problem presented.

2  Two cases accept that state secrets are at issue, but nonetheless review the

3  evidence *in camera* in order to reach a determination on the merits (as Plaintiffs

4  request here). *Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982); *American Civil*

5  *Liberties Union v. Brown*, 619 F.2d 1170 (7th Cir. 1980) (en banc). *Jabara*

6  involved individuals who, like Plaintiffs, had official confirmation that the

7  government had spied on them. They also asserted claims for injunctive relief to

8  halt the on-going constitutional violations. The government sought dismissal

9  because litigating the case would require disclosure of state secrets. The Sixth

10 Circuit accepted the government's privilege assertion, 691 F.2d at 274, but

11 nonetheless considered the evidence *in camera* and ruled on the merits (against the

12 plaintiffs). *Id*. at 276. Similarly, in *ACLU v. Brown* a set of Chicago activists

13 sought relief from a similar spying program, and the government again invoked the

14 state secrets privilege in response to certain discovery requests. After the panel

15 held that the government could ignore the requests based on the state secrets

16 privilege, the en banc Seventh Circuit reversed, ruling that large portions of the

17 evidence likely were not so secret as to require dismissal, particularly given that

18 the district court could consider the evidence *in camera*. 619 F.2d at 1173-74. In

19 doing so, the court stressed that "judicial scrutiny of government domestic security

20 claims is particularly appropriate."[31]

21 In contrast, the strongest case for the Government's approach is undoubtedly

22 *Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1979), in which the D.C. Circuit dismissed

23 a claim for injunctive relief against allegedly unconstitutional surveillance based

24 on the state secrets privilege. *Halkin* is distinguishable insofar as the plaintiffs

25 _____

26 [31] Similarly, although *Ellsberg* involved only damages, it adopted an approach
   similar to *Jabara* and *Brown*, insofar as it advocated *in camera* review of the state

27 secrets material to allow a determination on the merits, at least with respect to

28 those individuals who knew they had been targeted for surveillance. *Id*. at 69.

there did not know they had been surveilled.  More importantly, three judges dissented from denial of rehearing en banc.  The dissent argues that the state secrets privilege "cannot and should not be a device for the government to escape the strictures of the Fourth Amendment," criticized the majority for "carv[ing] out an exception to this basic principle of constitutional limitations on government," and advocated instead the method endorsed by the Sixth Circuit in *Jabara*, which upheld the privilege but without "foreclosing the plaintiff's suit."  *Halkin*, 598 F.2d at 14 (Bazelon, J., dissenting from denial of rehearing en banc).  The *Halkin* majority made no attempt to reconcile its holding with the basic principles requiring judicial review of constitutional claims for injunctive relief or the longstanding practice governing secret evidence in habeas cases.

More recently, the ACLU's challenge to the warrantless wiretapping program in *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) (seeking injunctive relief from on-going unconstitutional surveillance), produced no opinion for the court, even though plaintiffs conceded that the information over which the government asserted privilege could remain secret, because they believed they did not need it to prove that the program was unconstitutional.  *Id.* at 651 n.3.[32]

As these cases make clear, the question whether the Constitution permits dismissal of this suit is, at minimum, a serious constitutional problem which no binding authority resolves, and over which judges have disagreed vehemently in the past.  The Court should avoid resolution of that question if at all possible.

---

[32] The only other published appellate court cases involving the state secrets privilege (rather than the jurisdictional bar) that may have involved claims for injunctive relief for constitutional violations are *Tenenbaum v. Simonini*, 372 F.3d 776 (6th Cir. 2004), an extremely short opinion that nowhere mentions the relief sought, and *Patterson v. FBI*, 893 F.2d 595 (3d Cir. 1990), in which the opinion makes unclear whether the state secrets assertion was challenged at all and whether the dismissal of the claims for injunctive relief was on the merits or instead based on the privilege.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully submit that the Court should not dismiss their claims for expungement under the Privacy Act or the Constitution, and that it should not dismiss their claims under the FTCA or FISA. With respect to the state secrets privilege, Plaintiffs request that the Court either hold that FISA governs the treatment of secret evidence in this case or defer a ruling on the privilege until such time as the parties have propounded discovery.[33]

Respectfully submitted,

DATED:  December 23, 2011

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA

HADSELL STORMER KEENY RICHARDSON & RENICK, LLP

By: _s/ Ahilan Arulanantham___
Ahilan Arulanantham

Attorneys for Plaintiffs

---

[33] The government also suggests that the Court should take comfort because the Attorney General now has a policy of reviewing all assertions of the privilege. Gov't Br. 41-42.  However, that policy had a poor track record even before the government invoked the state secrets privilege in this case, insofar as the Obama Administration does not appear to have disavowed any of the privilege assertions made by the Bush Administration.  Its behavior in this regard reflects a more general reality that government – regardless of the administration in power – tends to shroud its programs in secrecy even when doing so is not necessary to protect national security.  *See generally Arar v. Ashcroft*, 585 F.3d 559, 610-23 (2d Cir. 2009) (Parker, J., dissenting) (describing various instances in which history has revealed that assertion of state secrets privilege was not undertaken to protect national security).

52