Peter Bibring (SBN 223981)
  *pbibring@aclu-sc.org*
Ahilan T. Arulanantham (SBN 237841)
  *aarulanantham@aclu-sc.org*
Jennifer L. Pasquarella (SBN 263241)
Mohammad Tajsar (SBN 280152)
Laura Moran  (bar admission pending)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Attorneys for Plaintiffs

(Additional Counsel listed on next page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FEDERAL BUREAU OF INVESTIGATION *et al.*,<br><br>                    Defendants. | CASE NO.: SA CV 11-00301 CJC (VBKx)<br><br>**DECLARATIONS OF CRAIG MONTEILH SUBMITTED BY PLAINTIFFS IN SUPPORT OF THEIR OPPOSITIONS TO MOTIONS TO DISMISS**<br><br>Date:        January 30, 2012<br>Time:        1:30 p.m.<br>Judge:      Hon. Cormac J. Carney |

Additional Plaintiffs' Attorneys:

Ameena Mirza Qazi (SBN 250404)
  *aqazi@cair.com*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California  92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340


Dan Stormer (SBN 101967)
  *dstormer@hadsellstormer.com*
Joshua Piovia-Scott (SBN 222364)
  *jps@hskrr.com*
Reem Salahi (SBN 259711)
  *reem@hskrr.com*
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

1

INDEX OF DECLARATIONS

2

3    1.    Declaration of Craig Monteilh (April 23, 2010) . . . . . . . . . . . . . . . . . . . . . . 1

4    2.    Declaration of Craig Monteilh re Fazaga (October 11, 2011) . . . . . . . . . . 30

5    3.    Declaration of Craig Monteilh re Malik (October 11, 2011) . . . . . . . . . . . 34

6    4.    Declaration of Craig Monteilh re AbdelRahim (August 11, 2011) . . . . . . 40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Craig Monteilh (April 23, 2010)

### DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.      From about July 2006 until October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.  During this time, I spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.

**Background, Training, and Placement as an Undercover Informant**

2.      In around early 2004, I met some police officers in Orange County who were working on a FBI narcotics task force, and discovered that I knew information from time I had spent in prison that was relevant to some of their investigations.  I began working for the task force as a confidential informant, under the supervision of an FBI agent assigned to the task force, Special Agent Christopher Gicking, and his supervisor, Special Agent Tracy Hanlon, who worked in the FBI's criminal division in Santa Ana.  Over the next two years, I continued to work for the FBI, supervised by Agents Gicking and Hanlon, on a series of assignments as an undercover informant on different criminal enterprises.

3.      In about May 2006, Agents Hanlon and Gicking asked if I wanted to work in a new type of assignment for the national security division of the FBI, investigating potential terrorists and infiltrating mosques.  I said I was interested and they arranged a meeting in or around June 2006 with FBI Special Agent Kevin Armstrong and another FBI agent, also named Kevin.  They told me they worked for the FBI's counterterrorism division in Santa Ana, California, and were assigned to the Orange County Joint Terrorism Task Force ("JTTF").  Agent Armstrong told me that the head of their team, FBI Special Agent Paul Allen, was in Washington, D.C., but wanted to meet with me the following week.  Agent

Armstrong told me I would no longer be working with criminal division, but would work for counterterrorism from then on and that he and Agent Allen would be assigned to supervise and direct my work, or to be my "handlers." (References to "my handlers" here mean Agents Armstrong and Allen.)

4.     The next week I met with Agent Armstrong and Agent Allen, who showed me FBI credentials and identified himself as the head of a counterterrorism team at the JTTF.  During this meeting, we discussed my physical appearance and skin tone, and Agents Allen and Armstrong suggested that I could pass as Syrian or Algerian.  I had another meeting with Agents Armstrong and Allen, just a few days later, where Agent Allen asked me various questions about my background and knowledge of politics and world affairs, which I understood was to gauge my suitability to work as an informant.

5.     When Agents Armstrong and Allen hired me to work for the counterterrorism division, the FBI increased my pay from the $3,000 to $4,000 per month I made working for the criminal division to about $6,000 per month.  Over the course of the next fourteen months, the FBI, through my handlers, increased my compensation as I became more accepted by the Muslim community and more useful as an informant, so that my compensation topped out at about $11,200 per month.

6.     Eventually, my handlers told me that the FBI used the name "Operation Flex" for the surveillance program that used me.  My handlers told me this repeatedly, and I heard other agents refer to it as well.  My handlers told me that this was a reference to me, since I conducted informant work in gyms under the cover of working as a fitness consultant, both when I worked for the criminal division and for counterterrorism.  But my handlers told me that Operation Flex was a broader surveillance program that went beyond just my work.

7.     In about July 2006, my FBI handlers put me through a training program in which they had me learn the basics of the Arabic language and the

DECLARATION OF CRAIG F. MONTEILH

religion of Islam.  They explained that the purpose of this training was to make the account of my background more credible.  Agent Armstrong also trained me in the martial art of Krav Maga.  My handlers also talked to me extensively about how, once I began my assignment, I should progress in exhibiting the culture and customs of Islam.  This training lasted approximately two weeks of twelve to fourteen hour days, with little time off, and took place in a large warehouse that my handlers drove me to while I was blindfolded.  Agents Armstrong and Allen supervised the training.

8.     In about late July 2006, my handlers told me to make an appointment to see Sheikh Sadullah Khan, an imam at the Islamic Center of Irvine ("ICOI"), a mosque in Irvine, California.  My handlers told me to tell Khan that I was of Syrian and French descent and that I wanted to embrace my Islamic roots and formally convert to Islam.  My handlers gave me no background on Khan, but just told me to stick to this story.  I made the appointment and then met with Khan a few days later in his office at ICOI, in the presence of two imams from mosques in Garden Grove and Anaheim.  After a conversation with Khan, he told me I could take *shahaddah* (make a public declaration of my faith) the next day at the *jummah* prayer (the Friday prayer that is the most important service of the week).  I reported this to Agent Allen and he instructed me to do so, so I came back to ICOI the next day and took *shahaddah* before a congregation of hundreds of Muslims.  I immediately began to attend the mosque on a daily basis.

9.     About a week after I took *shahaddah*, I took the Muslim name Farouk al-Aziz.  I attended prayers daily, often multiple times a day.  At first I attended prayers only at ICOI, but as time went on, my handlers encouraged me to go to other mosques around the area as well.  Muslims who met me in the mosque generally embraced me as a new convert.  On my handlers' instructions, I took every opportunity to meet people, get their contact information, meet them privately to get to know them, find out their background, find out their religious

and political views, and get any information on them I could for the FBI.

10.     My handlers told me that because of my criminal background, any information I collected would have to be recorded.  My handlers told me, "If it isn't recorded, it didn't happen."   My handlers initially gave me a small audio recording device called an "f-bird," but in about September 2006 replaced that with a cell phone and two key fobs (which looked like remote controls for car locks) with audio recording devices in them that could be used to record conversations that went on around me.  I used these recording devices to record all day, every moment I worked undercover, regardless who I was meeting or what was discussed.  I would turn on one of the devices in the car before I left my house, and not turn it off until I arrived home.  My handlers instructed me to record everything, without any limitations.  Agent Allen told me later on that there was a team transcribing all the conversations I recorded, and although I frequently discussed recordings with my handlers, they never stated or even suggested that they attempted to minimize intrusions by listening only to snippets of conversations to see if they were relevant.

11.     Beginning in about February 2007, on various occasions, my handlers outfitted me with video surveillance equipment that recorded through a camera hidden in a button in the front of my shirt.  They told me that the video surveillance equipment also recorded audio.  In the beginning, the video equipment was somewhat difficult to set up, and required my handlers' assistance, so I did not use it regularly.  By about April 2007, my handlers had improved the design of the video equipment and I would use video surveillance several days per week.  My handlers instructed me to use the video camera for various specific purposes to capture the internal layout of mosques, to film basketball or soccer games to see who associated with whom, to film guest lectures to see what was said and who attended, or when I went into people's houses.  My handlers would also instruct me to go open particular doors in homes or mosques and film the

4

DECLARATION OF CRAIG F. MONTEILH

room behind.

12.     On my handlers' instructions, I also composed daily notes of my activities and the surveillance I had undertaken.  These notes were extensive — my handlers instructed me to "empty my head" about what I had learned that day — so that I regularly spent an hour or two each evening writing my notes.  After a while, these notes became voluminous, and my handlers instructed me to prepare separate "supplemental notes" containing any sensitive or particularly valuable information.  These were all handwritten.  I gave them to my handlers when I met them twice a week.

13.     Over the course of my work for the FBI, my handlers at various times discussed with me what happened to these notes.  Agent Armstrong once told me that these notes were used as part of packages to obtain warrants for further surveillance on the individuals or organizations about whom I wrote.  Both handlers talked to me at various times about federal judges reading my notes.  My handlers also told me that their supervisors were reading the notes:  Agent Allen once told me that my notes were seen in "the Beltway," that they were seen by people with "a lot of authority," and that the Assistant Director in Charge in the FBI's Los Angeles field office, who at that time was Stephen Tidwell, read all my notes.

14.     From about August 2006 to October 2007, I met with Agents Allen and Armstrong about twice per week for meetings to discuss my assignments, for me to read through my notes with them so they could ask further questions, for them to give me instructions based on the information I provided, so I could give them my daily notes, and so they could either exchange my recording devices for fresh ones or upload the recordings to a computer while we spoke.  These meetings were held in public places, outside the areas where the Muslim community lived.  About once per month, I met with my handlers in a room at the Anaheim Hilton Hotel, where they questioned me on the information I provided

DECLARATION OF CRAIG F. MONTEILH

1   and gave me instructions in greater detail.  I would also receive my payment at

2   these monthly meetings.  I would sign off on these payments under my code

3   name, Oracle.  At the meetings in the hotel, other agents were sometimes present.

4     15. My handlers also gave me an email address under an alias to use to

5   send time-sensitive information that could not wait until our next meeting, such as

6   a Muslim's imminent travel plans.

7     16. Agents Allen and Armstrong monitored and supervised my work as

8   an undercover informant quite closely.  Through my notes and our twice weekly

9   meetings, I told them everything I was doing and every piece of information I

10  could recall.  They gave me instructions, or "tasking orders," regularly.  They

11  gave me both standing instructions on kinds of information to gather whenever I

12  could – for example, to meet and get contact information for a certain number of

13  Muslims per day – and also gave me specific instructions either in response to

14  information I provided or based on information they wanted – such as, for

15  example, instructions to get inside a certain house within the week or to have

16  lunch with a particular person two times.  My handlers also gave me standing

17  orders to call one of them every day, even on my days off.  I did this, and I would

18  call one or both of them each day to apprise them of my day's activities.

19    17. Agents Allen and Armstrong did not, however, limit me to specific

20  targets on which they wanted information.  When I first met with Sadullah Khan

21  at ICOI and began infiltrating the community, my handlers did not give me any

22  specific targets, but instead told me to gather as much information on as many

23  people in the Muslim community as possible.  For example, my handlers at first

24  told me I would make my initial contact with the community by attending services

25  at a mosque in Anaheim, but eventually advised me to attend ICOI instead

26  because it was closer to where I lived, so I could spend more time there.

27    18. My handlers told me to look for and identify to them people with

28  certain backgrounds or traits, such as anyone who studied *fiqh*, who openly

DECLARATION OF CRAIG F. MONTEILH

1   criticized U.S. foreign policy, including the U.S. military's presence in Muslim

2   countries; who had any kind of military training; who was an imam or sheikh;

3   who went on *Hajj*; who played a leadership role at a mosque or in the Muslim

4   community;  who expressed sympathies to *mujahideen*; who was a quiet loner;

5   who was a "white" Muslim; or who went to a *madrassa* overseas.  But my

6   handlers did not tell me to limit the information I collected to those people.  They

7   would occasionally take people I identified and tell me to spend more time with

8   them or find out more about them, but these were always people I identified to

9   them during the course of the operation, not people who had been targeted from

10  the outset.  I had no specific targets at the outset.  To the contrary, my handlers

11  tasked me with immersing myself in the Muslim community and gathering as

12  much information on as many people and institutions as possible.

13  **My Assignments and Activities as an Undercover Informant**

14          19.     My handlers gave me a standing tasking order that applied

15  throughout the duration of my undercover work to get as much information as

16  possible on any Muslim I came into contact with at the mosques or in the Muslim

17  community.  Agent Allen told me, "We want to get as many files on this

18  community as possible."  My handlers explained to me that the United States was

19  five to ten years behind Europe in the extent of Islamic presence, and that they

20  needed to build files on as many individuals as possible so that when things

21  started to happen, they would know where to go.  They said they were building

22  files in areas with the biggest concentrations of Muslim Americans — New York;

23  the Dearborn, Michigan area; and the Orange County/Los Angeles area.

24          20.     One thing my handlers wanted me to collect was contact

25  information, particularly email addresses and phone numbers.  At times, my

26  handlers even gave me a quota to collect contact information for ten new Muslims

27  per day.  I reported this information in my daily notes.  My handlers also told me

28  that they monitored my email and cell phones to obtain the telephone numbers and

1   email addresses of people with whom I corresponded.  Agent Allen instructed me

2   to give out my cell phone number widely so that people would call me or give me

3   their cell numbers in return, so that the FBI could collect those numbers.  My

4   handlers also instructed me to email frequently with people, so that the FBI could

5   collect their email addresses.  My handlers told me that they used the cell phone

6   numbers and email addresses of individuals who contacted me to obtain

7   information from those individuals' phone and email accounts, including the list

8   of people they contacted.  My handlers gave me a particular email address under

9   an alias to which they instructed me to forward these emails.

10        21.    Agents Allen and Armstrong told me that they kept the numbers and

11   emails I collected in a database that could be monitored for international calls, or

12   cross-referenced against phone calls or emails to persons of interest who were

13   believed to be linked to terrorism.  They also told me that the emails could be used

14   to determine if the person was visiting certain websites, and with whom they were

15   emailing.  I also joined email distribution lists for many of the mosques I

16   surveilled so that I could obtain the mosque membership lists and all of the email

17   addresses.  I would forward messages from the mosques to the FBI so they would

18   be informed about events and bulletins, and so they would have the email

19   addresses of anybody else who received the message.

20        22.    During the course of my work, I had discussions with my handlers

21   about whether what I was doing was productive, and whether the information I

22   collected was actually being used.  They assured me that all the information I

23   collected was retained, and that they didn't discard any of the information.  My

24   handlers also told me that this information was used to build files on individuals.

25   My handlers told me that every person who I contacted — whose phone number I

26   got, who I emailed, who I identified through photographs — had an individual

27   file in which the information I gathered was retained.

28        23.    My handlers also tasked me with gathering information on mosques

8

DECLARATION OF CRAIG F. MONTEILH

in the Orange County and Los Angeles areas.  They instructed me, among other things, to map the mosques by locating entrances, exits, rooms, bathrooms, locked doors, storage rooms, as well as security measures and whether any security guards were armed.  In some mosques, I used hidden video equipment attached to a camera in my shirt button to take images of the layout of the mosque.  My handlers informed me that this information would be used by the FBI to enter the mosques in case they needed to raid it or if they needed to enter and place electronic surveillance equipment in them.  My handlers also instructed me to try to get the security codes for the alarm systems at several mosques.  I managed to obtain the codes for one mosque by arriving early for dawn prayer and watching the person who opened the mosque punch the code in.  I gave this information to my handlers.  My handlers told me that they had the security codes to at least one other mosque, as well.  They told me that they used the security codes to send agents into these two mosques at night.

24.     My handlers also tasked me with getting brochures on charities that were distributed in the mosques, visiting the mosques' libraries or book areas to look for extremist books, collecting newsletters and bulletins to see what activities were going on in the mosque, and collecting names of individuals who attended, as well as their cell phone numbers and license plates.

25.     In addition to information about the membership of each mosque, my handlers also wanted the names of all board members, imams, people who taught classes at the mosques, and other leadership within the mosques.

26.     Over the course of my work, I went to about ten mosques and conducted surveillance and audio recording in each one.  I spent the most time at ICOI, which I attended daily, but I spent significant time at other mosques, including the Orange County Islamic Foundation mosque in Mission Viejo, Durul Falah in Tustin, Omar al-Farouq mosque in Anaheim, Islamic Society of Orange County in Garden Grove, Al-Fatiha in the West Covina/Azusa area, the mosque in

9

DECLARATION OF CRAIG F. MONTEILH

1   Lomita, and King Fahd mosque in Culver City.  For about five or six months I

2   went at least once a week to each of these mosques.  I would go to as many as four

3   different mosques in a day.  Even if I didn't pray at each mosque, I would go to

4   the mosque and talk to people, or meet people at the mosque and go to the gym

5   with them.  I also went a few times to West Coast Islamic Center in Anaheim and

6   a mosque in Upland.

7        27.    Agent Armstrong told me that the FBI had every mosque — the ones

8   I went to and the ones I didn't go to — under surveillance.

9        28.    My handlers informed me that electronic surveillance equipment was

10  installed in at least eight area mosques including ICOI, and the mosques in Tustin,

11  Mission Viejo, Culver City, Lomita, West Covina, and Upland.  He told me at one

12  point that they could get in a lot of trouble if people found out what surveillance

13  they had in the mosques, which I understood to mean that they did not have

14  warrants.

15       29.    At times, if I was left alone in a mosque office, I would look in

16  drawers, which I understood to be consistent with my instructions to gather as

17  much information as possible.  I wrote these incidents up in my supplemental

18  reports, and was never told not to do this.

19       30.    My handlers instructed me to keep an eye out for people who tended

20  to attract young Muslims and to identify and gather information on such people.

21  They told me that they wanted to investigate anyone who had the attention of the

22  youth or influence over young people to see if they were radicalizing them.  For

23  example, there was a popular youth group on Tuesdays at ICOI run by the imam,

24  Sadullah Khan.  Students from the Muslim Student Union at the University of

25  California, Irvine ("UCI") would attend.  To implement my handlers' instructions,

26  on many occasions I recorded the youth group meetings at ICOI by leaving my

27  possessions, including my key fob, near where the group met in the prayer hall so

28  that all of their discussions could be recorded.  I did this by going into the prayer

1    hall during their meetings to pray, and then leaving behind my possessions, as if I

2    had forgotten them or just chosen to leave them there while I did other things.  I

3    would go to another part of the mosque or the courtyard, and return sometime

4    later to collect my things.  I told my handlers I did this in my written reports.  My

5    handlers never instructed me to stop this practice, and in fact discussed with me

6    the contents of the recordings obtained in this manner.

7        31.    Beginning in about September 2006, my handlers gave me a standing

8    task to gather information on Muslims' charitable giving.  My handlers instructed

9    me to collect any pamphlet or brochure at any mosque that concerned charitable

10   donations.  They also told me to inquire of Muslims about which charities and

11   *madrassas* to give to.  I did this, and gave the names of the charities and

12   *madrassas* to my handlers.  My handlers specifically told me to ask people about

13   *madrassas* or charities sympathetic to the *mujahideen* or *jihad*; to inquire about

14   charities providing money to Somalia, Yemen, Pakistan and Afghanistan; and to

15   inquire about money going to Lebanon and Palestine.  They also instructed me to

16   ask people how to avoid having my donations traced by the U.S. government.  My

17   handlers said that if a worshipper paid by check, the FBI could trace that check

18   from the person's bank account to the organization.  My handlers, in several

19   conversations, told me that the FBI would open a file on any person who wrote a

20   check to any Islamic charity they were interested in, not just those officially

21   designated as terrorist organizations.

22       32.    My handlers also instructed me to attend Muslim fundraising events,

23   to interact with the community and gather information, to identify people who

24   attended and who they came with, and, if there were any speakers, to record what

25   those speakers said.  On my handlers' instruction, I attended a benefit for ICOI at

26   a hotel in Irvine, where on their orders I purchased a vase for about $900 to

27   bolster my credibility among the community.

28       33.    My handlers also instructed me to attend lectures by Muslim scholars

11

DECLARATION OF CRAIG F. MONTEILH

1    and other guest speakers.  I attended lectures of Yusuf Estes, a white Muslim

2    scholar from Texas, and Hamza Yusuf, another white Muslim scholar from

3    Oakland.  My handlers wanted to know both what the lecturers said and who

4    attended these lectures, so they set me up with a video surveillance device that had

5    a camera in a shirt button.  I went early and got a seat in the front row where I

6    could clearly record the lecture.  Afterwards, when people were socializing, I

7    walked around filming attendees with my camera.  I also collected license plate

8    numbers from the parking lots to identify those who attended.

9          34.    During my time working on Operation Flex, I told people in the

10    Muslim community that I worked as a fitness consultant.  In about November

11    2006, Agent Allen instructed me to start going to the gym to work out with people

12    I met from the Muslim community in order to get close to them and obtain

13    information about them.  They did not limit the scope of their instructions; the

14    directive included anyone from any mosque without any specific target, for the

15    purpose of collecting as much information as possible about Muslim men in the

16    community.  I went to various 24-Hour Fitness and L.A. Fitness gyms around the

17    Orange County area.  These workouts provided an easy opportunity to talk with

18    people and to elicit a wide variety of information pursuant to my handlers'

19    instructions.  For example, I would talk to people about their lives and get

20    information about their problems that my handlers could use to pressure them to

21    provide information or become informants.  I also learned people's travel plans

22    and their political or religious views, and could elicit responses that the FBI might

23    use to justify further surveillance by asking pointed questions about Islam or

24    politics.  I recorded these conversations using the equipment on my key fob or cell

25    phone.  This surveillance was so fruitful that my handlers eventually told me they

26    were seeking approval to have me open a Muslim gym.

27          35.    During my regular meetings with my handlers, they showed me

28    photographs of Muslims from the community and asked me to identify the people

in them.  Frequently, these were photographs of people I worked out with taken at the entrance to the gym.  My handlers told me that they had an arrangement with the gyms to obtain photographs from the security cameras.  Other photographs came from parking lots, parks, restaurants, or other public places.  When I asked how they got the other photographs, they told me they had "assets in place."  They asked me to provide as much information as possible about each person — they told me to "empty my head" on the individuals.  They wanted to know, among other things, what mosque they attended, their ethnicity or country of origin, the languages they spoke, the people they associated with, what kind of car they drove, their occupation or whether they were a student, as well as any other information I could obtain.

36.    Agent Allen told me that Islamic restaurants in Anaheim and Irvine were under video surveillance, so they could see who associated with whom. Agent Allen also said they surveilled soccer and basketball games for the same reason.  I frequently met people in restaurants and cafés and recorded conversations there.

37.    I also had standing orders to enter and observe Muslim schools whenever possible.  When I first reported entering a Muslim school, my handlers questioned me intently on whether I had witnessed children chanting from the Quran.  When I said I hadn't, they asked me again and told me that if I had, that would take the case to a "new level."  My handlers more than once told me to look for Quranic reciters at the schools.  My handlers also instructed me to look for photos of extremists, books by extremists, and whether the children were learning subjects besides Islam, like math, English or history.  My handlers said that they did not want an Islamic school to be an "American *madrassa*."

38.    I attended an Arabic language class at ICOI from about December 2006 to March 2007.  My handlers instructed me to obtain the lists of the individuals who attended the class, which I provided to my handlers.  My handlers

13

DECLARATION OF CRAIG F. MONTEILH

1   told me that they retained the information about who took the class.

2       39.    I also attended a course in *fiqh*, or Islamic law which pertains to

3 morals and etiquette.  My handlers were interested in *fiqh* because parts of *fiqh*

4 address military training.  At my handlers' request, I got a copy of the list of

5 people who attended the class.  Because this list included the languages that class

6 members spoke, it provided a clear indication of their ethnicity or country of

7 origin as well.

8       40.    My handlers were only interested in Muslims, and set aside any non-

9 Muslims who were identified through surveillance I performed.  For example, on

10 several occasions when my handlers asked me to identify individuals from

11 photographs taken by surveillance cameras at the entrances to the gyms, they

12 would present me photographs of individuals who were not Muslim — usually

13 Latino — whom I might have spoken to or who had simply helped me lift

14 weights.  When I indicated to my handlers that the individual was not a Muslim,

15 the picture was discarded.

16       41.    My handlers were interested in websites that they believed were

17 jihadist, including *MissionIslam.com* and *CagePrisoners.com* (a site devoted to

18 raising awareness about the detainees at Guantanamo Bay).  Agent Allen told me

19 to encourage people I spoke with to go to these websites because they could

20 document people's visits to the website and use that either to pressure them to

21 become informants or to justify further surveillance on them.

22       42.    My handlers encouraged me to bring up Muslim scholars and

23 thinkers who they believed were extremist in my conversations with individuals in

24 the community.  This included Hassan al-Banna, Sayyid Qutb, Sheikh Suhaib

25 Webb, Yusuf al-Qaradawi, Yusef Estes, Ayman al-Zawahiri, Anwar al-Awlaki,

26 and others.

27 **Increasing Infiltration of the Muslim Community**

28       43.    The people I met at the mosques helped me learn how to pray, learn

how to dress, and learn Islamic culture and etiquette.  My handlers told me to allow Muslims I met to "radicalize" me gradually, and saw the help the community was giving me as the first steps toward such radicalization.  I felt the people who helped me were sincere in wanting me to develop in my Muslim faith and wanting to have me as part of the community and part of the mosque.  My handlers instructed me not to talk too openly about *jihad* at first, but to go to prayers at the mosque and be seen.  My handlers were very pleased that I developed a rapport with the community so quickly.

44.  As months went on and I was increasingly accepted by the Muslim community and the leadership at mosques, and I continued to work generally six or seven days a week, my handlers seemed to place increasing trust in me.  While at first they told me as little as possible about what else they knew about the community and what other intelligence efforts were ongoing, after several months they began to tell me more about what other kinds of surveillance they were undertaking, how they knew certain things, and how the intelligence I gathered was being used, so that I could understand how to work effectively.

45.  In about October 2006, on the instruction of Agent Allen, I began to try to appear more Muslim.  I went to the mosque early and prayed loudly, and wore traditional clothes that people at the mosque had given me.  My handlers told me that nobody in the community leadership, people of interest, or youth suspected that I was an informant.  I asked how he knew, and he eventually told me that they listened to a number of conversations in which people were discussing me outside.  I realized that these were conversations that I could not have recorded, which meant that my handlers were getting this information from other electronic surveillance.

46.  My handlers also instructed me to start attending *fajr* (dawn) prayers, which are held about 4 a.m., or *ishaa* (late) prayers, which are held about 9:30 p.m.  My handlers told me that people who attended prayers very early in the

15

DECLARATION OF CRAIG F. MONTEILH

1    morning or late at night, and especially both, were very devout and therefore more

2    suspicious.  They instructed me to obtain the names and the license plate numbers

3    of individuals who attended these prayers.  When I agreed to go to *fajr* prayer four

4    days a week, my pay increased substantially.

5        47.    My handlers instructed me to memorize certain *ayas* and *surahs*

6    (verses and chapters from the Quran) and to ask Muslims about them.  My

7    handlers told me that they had picked these verses because they believed them to

8    be susceptible to a jihadist interpretation, so that people's reactions to them would

9    help discern who was and was not a threat.  They told me that discussions about

10   these verses would elicit responses that could be used to justify additional

11   surveillance measures.  A true and correct copy of a tasking order in Agent

12   Allen's handwriting specifying certain verses is attached hereto as Exhibit A.

13       48.    My handlers also instructed me to elicit reactions from people by

14   talking provocatively about U.S. foreign policy —  for example, by raising the

15   issue of civilian Muslim men, women, and children killed in conflicts in Iraq,

16   Afghanistan, Palestine, and Lebanon.  By stirring people to speak out of anger,

17   they told me, I could again elicit responses that could be used to justify additional

18   surveillance measures against those people.

19       49.    Beginning in about January 2007, an individual who called himself

20   George began coming roughly every month to meetings with my handlers.

21   George said he was "from Langley," which I understood to mean that he worked

22   for the Central Intelligence Agency headquartered in Langley, Virginia.  When I

23   once mentioned him as working for the CIA, Agent Allen said something to the

24   effect, "We don't say that.  Say he is 'from Langley.'"  No one ever told me

25   George's last name.  George spoke Arabic very well and knew a great deal about

26   Islam — he would speak Arabic with me and comment on my improved fluency,

27   as well as ask me questions about Islam and the Quran to monitor my progress in

28   acquiring the appearance of being a devout Muslim.  George also instructed me on

DECLARATION OF CRAIG F. MONTEILH

1   my grooming and physical appearance to make it seem that I was increasingly

2   devout.  For example, at one point he instructed me to develop a sore on my

3   forehead from bending my head to the carpet in prayer, to make clear that I was

4   praying all the time.

5       50.     On about four different occasions, during the meetings with my

6   handlers at the hotel room, they showed me a huge photo array on a large board

7   consisting of the photos of around two hundred Muslims from the Orange

8   County/Los Angeles area.  My handlers used different sets of photographs for

9   each of these meetings, so showed me many hundreds of photographs over the

10  four meetings.  They instructed me to arrange the photos from the most dangerous

11  to the least based on my knowledge and experience.  The entire leadership of the

12  Islamic community were in the photos — sheikhs, imams, board members, prayer

13  leaders, leaders of civic organizations, and youth groups.  It took hours.  They also

14  asked me to assist them in organizing the photos according to categories such as

15  financial, operative, and leadership.  We also divided photos into possible cells

16  according to mosques and ethnicity or nationality.  I did not know all of the people

17  in the photographs, but my handlers had information on people I did not know

18  enough to place them in the various arrangements.  The first of these meetings

19  was in about March 2007, and the last was in about September 2007.

20      51.     Over the course of several conversations, my handlers told me that

21  they considered the leaders in the Muslim community — board members and

22  leadership at mosques and leaders of Muslim organizations — to be potential

23  threats and that they regularly surveilled them and maintained more detailed files

24  of information on their background and activities.  They told me that the

25  leadership of the community could give orders or *fatwas* that someone in the

26  community would carry out.

27      52.     Because I was single in my undercover identity, people in the

28  community considered me an eligible Muslim and various individuals wanted to

17

DECLARATION OF CRAIG F. MONTEILH

1   introduce me to Muslim women.  Agents Allen and Armstrong, and George from

2   Langley, wanted me to date as a way to get information.  When I asked how I

3   should go about dating, and what happened if things began to get intimate, my

4   handlers told me that if I was getting good information, I should let things "take

5   their natural course," and then they said "just have sex."  I had sexual

6   relationships with women in the Muslim community for the purposes of

7   information gathering pursuant to these instructions.

8       53.     My handlers were always interested in obtaining new informants

9   within the Muslim community.  They spoke to me about "MICE," an acronym for

10  Money Ideology Compromise Ego, or the various ways people can be convinced

11  to be informants.  They often focused on the element "compromise," which

12  consisted of obtaining information on potential informants that could be used

13  against them if they refused to inform.  Subjects that would potentially lead to

14  compromise included immigration issues, sexual activity, business problems, or

15  crimes like drug use.  My handlers instructed me to pay attention to people's

16  problems, to talk about and record them.  I reported problems that several

17  individuals told me about, including marital problems, business problems, and

18  petty criminal issues.  My handlers on several occasions talked to me about

19  different individuals that they believed might be susceptible to rumors about their

20  sexual orientation, so that they could be persuaded to become informants through

21  the threat of such rumors being started, even though my handlers had no evidence

22  that such rumors would be true.

23      54.     My handlers also often referred to the principle that "everybody

24  knows somebody."  They explained that if someone is from Afghanistan, that

25  meant that they would likely have some distant member of their family or

26  acquaintance who has some connection with the Taliban.  If they are from

27  Lebanon, it might be Hezbollah; if they are from Palestine, it would be Hamas.

28  By finding out what connections they might have to these terrorist groups, no

1  matter how distant, they could threaten the individuals and pressure them to

2  provide information, or could justify additional surveillance.

3       55.    On one occasion, my handlers instructed me to develop my

4  relationship with a person who told me that his father was sick in a foreign

5  country and in a lot of pain.  I had a significant amount of Vicodin, a prescription

6  pain reliever, left over from a surgery I had previously undergone.  I discussed

7  with Agent Allen that providing this person some Vicodin would help build the

8  relationship and build my reputation as a devout Muslim who had access to black

9  market items.  Agent Allen instructed me to provide the person with 60 tablets of

10  my leftover Vicodin, which I did.  On another occasion, Agent Allen instructed

11  me to provide prescription anabolic steroids to another two individuals to

12  similarly further my credibility, which I did.

13       56.    In about early spring of 2007, after I provided some information my

14  handlers believed was very valuable, my handlers told me, "You're gold in L.A.

15  You're gold in Washington."  They said that higher ranking officials wanted to

16  use me in other places as well.  Agent Allen told me several times that information

17  I provided had been used in presidential daily briefings.  They told me that my

18  work was followed by people "at the highest levels."  They told me that the

19  operation I was working on was among the ten most important intelligence

20  investigations going on in the country.  Agent Allen told me in about March or

21  April 2007 that he had meetings with Stephen Tidwell and one of his supervisors

22  from Washington, D.C., Joseph Billy, Jr., about the operation.  Around the same

23  time period, Agent Allen told me that he had to fly to D.C. with his supervisor, Pat

24  Rose, in part to meet with high-level FBI officials to get approval to open a gym

25  for Muslims that would function in part as a mosque with a prayer room, and that

26  I would run.  He called me from D.C. to tell me that the gym had been approved.

27       57.    During about spring 2007, Agent Allen told me that I needed to be

28  careful how I wrote my notes, and that I needed to be very precise and detailed,

19

DECLARATION OF CRAIG F. MONTEILH

1   because people in Washington were reading and summarizing the reports to make

2   things "sexier" than I had intended so as to accomplish their own goals.  He told

3   me that I needed to be careful always to use precise and detailed language so that

4   more could not be read into the reports than I intended.

5          58.    During the course of the operation, I learned there were a large

6   number of FBI informants in the Orange County Muslim community.  My

7   handlers told me at various times that the Muslim community was "saturated" or

8   "infested" with informants, and said it was like the societies of cold war East

9   Germany and Cuba, where everyone was informing on one another.  During the

10   meetings in the hotel room when my handlers and I arranged photographs of

11   people in the Muslim community, many of the photographs had asterisks by the

12   names.  Several of the people marked were people my handlers had already told

13   me were informants, so I asked my handlers if the asterisks indicated informants,

14   and they eventually confirmed that they did.  At each of the four meetings, there

15   were dozens of people labeled as informants, and I believe over the four meetings

16   I saw well over one hundred people marked as informants.  I personally interacted

17   with more than forty people my handlers told me were informants.  My handlers

18   told me that the other informants had been recruited from the community because

19   the FBI had pressured them in some fashion, and they told me that they did not

20   trust the informants they had recruited from within the Muslim community.

21          59.    As I continued as a constant presence at ICOI and the community

22   became more comfortable with me, I began to participate in the prayers to a

23   greater degree.  I gave the *adhan*, or call to prayer as well as the *al-Fatiha*, or

24   opening to the evening prayer.  On a few occasions, when prayer leaders went out

25   of town, I led the *dhuhr*, or midday prayers, and the *fajr*, or dawn prayers.  My

26   handlers were extraordinarily happy that I had been given the responsibility to

27   lead prayers, as they believed it showed an acceptance of me by the community.

28          60.    After several months of working, my handlers told me more about

DECLARATION OF CRAIG F. MONTEILH

how some aspects of their investigation worked.  Agent Armstrong told me that although the terrorist watchlist was maintained by the Department of Homeland Security, the information in that list was based on information collected by the FBI.  He told me that information I collected would get shared with Homeland Security and other agencies.  For example, my handlers were interested in travel plans of Muslims — after a while I asked why they wanted to know.  They eventually indicated that the reason they wanted to know this was to share it with Homeland Security to monitor or search people during their travels.

61.     My handlers also told me that information I obtained would be shared with other agencies.  They told me that information I obtained on finances or foreign assets was shared with the Treasury Department.  Several times when I had information about people's immigration issues, my handlers told me that they would send the information to immigration officials.  My handlers told me that they were "in the business of sharing information" about terrorism with other agencies.

62.     I also learned about the voluntary interviews the FBI would ask of people from the Muslim community.  My handlers told me that they would usually bring people in to an FBI interview only after I had obtained some useful background on the person — usually by recording some embarrassing personal information or a statement of political beliefs that they would not want to admit to the FBI.  They could then use that information to pressure the person to provide information, or could ask about that information in order to get the person to deny it, which would set up the allegation that they had lied to the FBI during the interview, which would in turn provide leverage to get the person to provide information.  They told me that they tried to put interviewees at ease by saying that they were investigating someone else.

63.     It became clear to me that there was audio surveillance either on the telephones or in offices of a large number of leaders in the Muslim community.

1   For example, on one occasion around when ICOI was attempting to get a

2   restraining order against me, some people were saying I was an informant.  At that

3   time, Agent Allen called me and said words to the effect, "You need to call

4   [Person A] right now.  He's on the fence about you and talking to [Person B] on

5   the phone right now.  Call him and break in and take him to dinner."  I could hear

6   the voices of the people he was talking about in the background.  Agent Allen

7   made similar calls to me several times about different people.

8         64.    During many conversations with my handlers over the course of my

9   work, my handlers told me that not everything our operation was doing was legal.

10   My handlers told me that because the U.S. was fighting an enemy that was not

11   sovereign, they had to carry out policies that were contrary to the Constitution.

12         65.    On several occasions in restaurants, I left my recording devices (a

13   key fob or my cell phone) in a place where it could record a conversation while I

14   went elsewhere.  Sometimes I did this with groups that met in the mosques:  if

15   there was a youth group or a group that met with a particular scholar, I went over

16   to put down my things, including the recording device, and greet people, then

17   went to a different part of the room to pray.  In restaurants or cafés, too, on more

18   than one occasion when I was speaking to one group and saw another group come

19   in, I moved to the new group while leaving my cell phone at the first so as to

20   record both conversations at once.  I stated that I did this in my notes to my

21   handlers and was never instructed to stop.

22         66.    On several occasions, I left my recording devices in locations in

23   mosques in the area.  For example, in King Fahd Mosque in Culver City, several

24   times I came in with a friend who changed in the office from business clothes to

25   more traditional dress before we went into the mosque to pray.  While he did so I

26   left my keys in the office so that the key fob would record staff and board

27   members who came in and talked.  I retrieved my keys from the office when we

28   were finished in the mosque.  I did this several times, and in several different

DECLARATION OF CRAIG F. MONTEILH

1    mosques.  I stated that I did this in my notes to my handlers and was never

2    instructed to stop.

3       67.    I once asked Kevin Armstrong about covert video recording

4    surveillance he had told me was being conducted at a local bookstore.  He said

5    that while you needed warrants for criminal investigations, "National security is

6    different.  Kevin is God."  I understood him to mean that he did not have warrants

7    for the surveillance at the bookstore.  Agent Armstrong also told me on more than

8    one occasion that they did not always need warrants, that if they did not have a

9    warrant they could not use the information in court, but that it was still useful to

10   have the information.  He mentioned that they could attribute the information to a

11   confidential source if they needed to.

12      68.    In about June 2007, my handlers told me the FBI was planning an

13   action to make a number of arrests based on intelligence that I had gathered.  My

14   handlers took me to the Anaheim Hilton hotel where I stayed out of contact for

15   several days at the FBI's expense.  My handlers told me that the operation would

16   soon be over.  My handlers told me that more than seventy agents had amassed in

17   the Santa Ana office to conduct pre-dawn arrests of twenty-seven people, but that

18   the office of FBI Director Mueller had called from Washington, D.C., and ordered

19   the agents to stand down and not go through with the arrests.  My handlers were

20   very upset about this.  After the aborted arrests, I returned to my role as an

21   undercover informant, doing exactly the same work as before.

22      69.    Both my handlers and other agents explicitly told me that Islam was a

23   threat to America's national security.

24      70.    One individual I made contact with had a pending federal criminal

25   case.  Agent Armstrong, who was a former Assistant U.S. Attorney, initially told

26   me to be careful not to discuss his case because there would be problems because

27   he was represented by counsel.  But he was overruled by others, including Agent

28   Allen, and I was then instructed to talk with him about his case.  I understand that

1  the information I gleaned was used in his criminal case.

2        71.    Over the course of fourteen months of working as an informant in the

3  Los Angeles and Orange County Muslim community, I estimate that, on my

4  handlers' instructions, I passed hundreds of phone numbers and thousands of

5  email addresses of Muslims to the FBI.  I provided background information on

6  hundreds of individuals.  I made hundreds of hours of video recordings that

7  captured the interiors of mosques, homes, businesses, and the associations of

8  hundreds of people.  I made thousands of hours of audio recording of

9  conversations I participated in and where I was not present, as well as recordings

10  of public discussion groups, classes, and lectures.

11  **Termination of My Assignment**

12        72.    In about March 2007, Agent Allen provided me a written letter from

13  an Assistant U.S. Attorney named Deirdre Eliot to engage in jihadist rhetoric and

14  to engage in other criminal activity with immunity.  I understand that this letter

15  gave me blanket immunity for all my conduct as an undercover informant.  I

16  signed the letter, but Agent Allen took the letter back and did not allow me to

17  keep a copy.

18        73.    My handlers had instructed me to ask general questions about *jihad*

19  from the beginning of my assignment.  In early 2007, my handlers instructed me

20  to start asking more pointedly about *jihad* and armed conflict, then to more openly

21  suggest my own willingness to engage in violence.  In one-on-one conversations, I

22  began asking people about violent *jihad*, expressing frustration over the

23  oppression of Muslims around the world, pressing them for their views and

24  suggesting that I might be willing or able to take action.  In about late spring of

25  2007, people at ICOI began to get concerned about me.  After one incident where

26  I said some extreme things in order to test the reaction of others, several

27  individuals reported me to local police and to the FBI.  When the authorities did

28  not respond with any urgency, people became suspicious that I might be working

DECLARATION OF CRAIG F. MONTEILH

for the FBI.  Congregants at ICOI brought an action for a restraining order to bar me from the mosque.  On June 19, 2007, I understand that there was a hearing in which testimony was presented and the restraining order issued barring me from entering the mosque.  I continued my undercover work at other mosques in the area, but the restraining order and the fact that various members of the community had become suspicious about me made it much more difficult to get close to people and to gather information.

74.     During the time ICOI was attempting to obtain a restraining order against me, Agent Allen instructed me to go back into the mosque.  I feared for my safety since I knew some people suspected I was an informant.  I told Agent Allen I would only go in if I was armed with a knife, and that I would defend myself if someone gave me reason to.  My handlers acknowledged what I said, but did nothing to stop me from doing so.  I went into ICOI on two subsequent occasions with a knife strapped to my leg.

75.     At some point during the spring of 2007, my handlers mentioned to me that the Assistant Director in Charge of the FBI's Los Angeles Field Office had told the Muslim community that there would be no undercover informants placed in mosques at a meeting held only about a month or so before I had taken *shahaddah*.  The Assistant Director in Charge at that time was Stephen Tidwell.  I was surprised, and my handlers said that, at that time, they had already been looking for someone to send into the mosques and Tidwell had approved recruitment of an informant.

76.     During the summer of 2007, around the time ICOI was seeking the restraining order and afterwards, I was repeatedly approached for an interview by a reporter from the Los Angeles Times named H.G. Reza.  My handlers disliked this reporter — they told me that he was an enemy of the United States and that he was under surveillance.  On one occasion, my handler called me to tell me not to go to a particular gym because Reza was waiting for me in the parking lot.  When

25

DECLARATION OF CRAIG F. MONTEILH

1   I asked him how he knew that, he said "We're the fucking FBI.  We know

2   everything."  In October 2007, FBI counsel Stephen Kramer paid me $25,000

3   cash to assure that I would not disrupt the rest of the case, and explicitly told me

4   that the payment was in part so I would not speak with Reza.

5        77.    In about June 2007, when some people in the community were

6   beginning to suspect I was an informant, I had discussions with my handlers about

7   being paid substantial additional sums of money to go to jail or prison to help

8   bolster my credibility in the community and convince people that I was not a

9   confidential informant.  We discussed having me very publicly arrested in the

10  parking lot of a mosque, and the details of the pay and arrangements to make life

11  tolerable in prison.  My handlers eventually told me that this plan failed because a

12  federal judge had refused to go along with it.

13       78.    During about the summer of 2007, my handlers told me that the

14  Assistant Special Agent in Charge in Santa Ana, Barbara Walls, did not trust me

15  and did not want me working any more.  They told me there was significant

16  conflict between Agent Walls and field agents over how to handle the operation,

17  and that there had been an audit team sent from Washington, D.C., to examine

18  Agent Walls' handling of one potentially valuable piece of information I provided.

19  Because of this conflict and complications surrounding the restraining order, my

20  handlers told me in about September 2007 that I would be going on "hiatus" from

21  my undercover work in the Orange County Muslim community.

22       79.     During one of my final meetings with my handlers, at which Agent

23  Walls was also present, she warned me to stay silent about my participation in the

24  operation.  She said that if word got out that the FBI had sent an informant into

25  mosques and the community, that it would destroy the relationship between the

26  Islamic community and the FBI.  She said that "we assured them" that the FBI

27  would not send undercover informants into mosques.

28       80.    In October 2007, I had a last meeting, where my handlers had

DECLARATION OF CRAIG F. MONTEILH

1  instructed me to bring back the laptop computer and surveillance equipment they

2  had issued me.  I said to them that I guessed the operation was over.  Agent Allen

3  said emphatically no, the operation had just begun.  He said that my role was over,

4  but that Operation Flex and the FBI's operations in Orange County and Los

5  Angeles would continue.  He also said that the information I had provided was an

6  invaluable foundation for the FBI's continuing work.  He also said that after some

7  down time, I would have the option of working in New York or other places.

8        81.  Prior to February 2009, I never confirmed to anyone outside of law

9  enforcement and my immediate family that I was working as an informant for the

10  FBI.  That month, FBI Agent Thomas Ropel III testified in a bail hearing in a

11  federal criminal case about information used in that prosecution that he said had

12  been provided by an undercover informant, and described the undercover

13  informant such that many people in the Muslim community could clearly identify

14  the informant as me.  Several days later, an article appeared in the Los Angeles

15  Times containing statements I made to a reporter about being an FBI informant.  I

16  am not aware of any information either publicly released by the FBI or otherwise

17  available to any member of the Orange County Muslim community prior to

18  February 2009 that would allow them to do anything more than speculate that I

19  might have been an FBI informant.

20  **Ongoing Surveillance**

21        82.  Between about December 2007 and August 2008, I was incarcerated

22  for reasons that are currently the subject of a federal civil action against the Irvine

23  Police Department, the FBI, and others.  Concerning that matter, my handlers told

24  me that their supervisors in the FBI office did not want me to be publicly

25  identified as an FBI informant, so I ended up pleading guilty on their instructions,

26  and spent eight months in jail as a result.

27        83.  After I got out of prison in about August 2008, I contacted the Irvine

28  Police Department to voice concerns about my safety from members of the

DECLARATION OF CRAIG F. MONTEILH

1  Muslim community that might suspect me of being an informant.  I was visited by

2  a detective, as well as a sergeant that I recognized as someone who had once

3  escorted me when I was undercover with my handlers.  The sergeant knew very

4  specific information about individuals I had surveilled who I had concerns about,

5  and told me in this meeting that he worked for JTTF.  He told me that several

6  individuals I asked him about were still under surveillance.  He also specifically

7  mentioned that surveillance was ongoing at gyms and at least two mosques.

8       84.    In recent months, I have begun returning to local gyms where

9  Muslims work out.  In one gym in Irvine, on two different occasions since about

10  September 2009, I saw a Muslim who I knew to be an informant, who looked at

11  me and quickly looked away guiltily.  Both times I saw the informant, when I

12  went out to the parking lot, I saw a white SUV with people inside who I

13  recognized as members of the JTTF that I saw when I worked undercover.  On

14  one of these occasions, I saw one of the individuals holding a camera in both

15  hands as if he were using it.  They saw me, looked surprised, and also looked

16  away.  I believe that they were actively engaged in surveillance of the gym,

17  perhaps through the informant.

18

19       I declare under penalty of perjury of the laws of the State of California and

20  the United States that the foregoing is true and correct.  Executed this 23rd day of

21  April, 2010 in Orange, California.

22  _____

23  Craig F. Monteilh

24

25

26

27

28

DECLARATION OF CRAIG F. MONTEILH

# Exhibit A

Purity   of   Unity → "SuFan Al Niah"

"Fitnah" rules   of   stopping   conflict

   Surah   2   ✓ 191 + 192
   Surah   8   ✓ 39

— — — — — — —

Rules   of   Engagement

   Surah   5   ✓ 33
                ✓ 34
                ✓ 55

— — — — — — —

- Hadith
- Fiqh

Declaration of Craig Monteilh (October 11, 2011) re Fazaga

## DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.      From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.      On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.      My handlers were interested in the mosque at Mission Viejo, the Orange County Islamic Foundation ("OCIF").  They considererd the imam of the mosque, Yassir Fazaga, to be a radical for several reasons:   My handlers told me Fazaga directed students on how to conduct demonstrations and encouraged them to speak out.  They told me that when the FBI Assistant Director in Charge of the Los Angeles Field Office, Stephen Tidwell, attended a meeting at an Orange County mosque in about spring 2006, Fazaga openly pressed Tidwell about FBI informants in mosques, and when Tidwell denied putting informants in mosques, Fazaga had openly said he did not believe Tidwell.  My handlers also told me Fazaga was a person of interest because he was a board member of "In Focus News," a prominent Muslim newspaper that was vocal in speaking out against U.S. government actions that negatively affected Muslims and which my handlers believed was anti-American and linked to Muslim civil rights groups.

4.     My handlers also believed that OCIF was linked to another mosque they were interested in, the Islamic Center of Irvine, because the two mosques held joint events and jointly organized foreign trips, including the *hajj* pilgrimage to Mecca.  They referred to OCIF as a "definite hotspot."

5.     My handlers also believed that the mosque was radical because it had certain religious scholars as guest speakers who my handlers believed were radical—particularly Yusef Estes, Suhaib Webb, and a local imam, Ahmad Sakr.  My handlers told me that a moderate mosque would not have chosen these guest speakers.   On my handlers' instructions, I attended the Yusef Estes lecture and video recorded the event using a camera hidden in a shirt button that my handlers provided.  On my handlers' instructions, I video recorded the entire lecture, the literature Estes had set out, and the people who attended.

6.     I attended OCIF a number of times to conduct surveillance.

7.     On my handlers' instructions, I used a video camera hidden in a shirt button that my handlers provided me to take video of the interior of OCIF.  My handlers instructed me to get a sense of the schematics of the place — entrances, exits, rooms, bathrooms, locked doors, storage rooms, as well as security measures and whether any security guards were armed.  I understood that this information would be used to place surveillance equipment inside the mosque.  I later asked Agent Armstrong if they had used the information I had gathered to enter the mosque, and he said that they had.

8.     On my handlers' instructions, I also made video recordings of an area in the back of the mosque where there were religious books available for congregants to use, so that my handlers could determine if any of the literature there was extremist.

9.     My handlers instructed me to make contacts within the Mission Viejo congregation.  I worked out on various different occasions with about 40 of their congregants, usually in groups.  For anyone I worked out with, I got their

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

1  email address and cell phone number and passed that information on to my

2  handlers.  I understood from my handlers that the FBI used this contact

3  information to further track these individuals' communications and conduct

4  surveillance of them.

5      10.    My handlers instructed me to gather additional information on a few

6  individuals within the congregation who seemed to have the most direct access to

7  Fazaga.  I talked to these individuals and obtained their email addresses, cell

8  phone numbers, and addresses, as well as basic background information such as

9  their occupation, whether they were married or had children, and what prayers

10  they attended.  I passed the information on to my handlers.

11      11.    My handlers instructed me to monitor Fazaga at the prayers he

12  conducted:  to record and report on what he said, to talk with him afterwards and

13  see who else talked to him afterwards, and to note individuals who appeared to be

14  close to him.   They wanted me to get into a circle of people close enough to

15  Fazaga that he would talk freely in front of me.  I also monitored what was said by

16  a member of the congregation who substituted for Fazaga during one of the

17  prayers I attended.

18      12.    It was significant to my handlers when a prominent member of the

19  community introduced me to Fazaga while I was recording with a hidden video

20  camera, in about April 2007.  At that meeting, I asked Fazaga to work out with me

21  and he agreed.  My handlers were excited by this prospect, but I never actually

22  worked out with him.  I obtained Fazaga's cell phone number and email address

23  (not through Fazaga, but through others) and passed these on to my handlers.  My

24  handlers told me they used the email addresses and telephone numbers I gathered

25  to monitor communications and conduct further surveillance.

26      13.    I also passed to my handlers the license plate numbers of cars Fazaga

27  traveled in and the people I saw him associate with.

28      14.    My handlers told me that there was another informant within the

3

Page 32

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

1   mosque with access to Fazaga, but that they did not fully trust him, so I was

2   tasked with getting close to him to establish his reliability.   My handlers also told

3   me there were a number of other informants at the mosque, but that they did not

4   have access to the imam.

5       15.    My handlers instructed me that whenever I saw Fazaga at another

6   mosque or anywhere outside OCIF, I should call them and let them know

7   immediately.  I did this at least once when I saw him at another mosque.

8       16.    On one occasion, during Friday afternoon prayer at OCIF, the

9   mosque had booth set up to collect donations for a cause — I believe for some

10  kind of relief for Muslims abroad.  Pursuant to my handlers' standing orders that I

11  monitor donations, I stood near the booth and used the hidden video camera I was

12  wearing to make video recordings of people who went up to the booth to

13  contribute money.

14      17.    I never observed anything that gave me any reason to believe that

15  Fazaga or any of the congregants or leadership of OCIF were involved in violence

16  or terrorism in any way.

17

18      I declare under penalty of perjury of the laws of the State of California and

19  the United States that the foregoing is true and correct.  Executed this 11th day of

20  October, 2010 in Los Angeles, California.

21

22                                          Craig F. Monteilh

23

24

25

26

27

28

4

Page 33

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

Declaration of Craig Monteilh (October 11, 2011) re Malik

## DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.      From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.      On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.      In some of my earliest meetings with my handlers, they showed me a picture of a young man named Ali Malik.  They told me he had been a surfer kid in Newport Beach who wore dyed hair, but had travelled to Yemen to attend a madrassa, and had returned to the U.S. wearing traditional Muslim dress and a full beard.

4.      My handlers told me Malik's change in behavior in embracing religion and traditional dress was highly suspicious and for that reason they needed to investigate him.  They also told me they were suspicious of Malik because he was involved with people from the "MSU."  "MSU" stands for "Muslim Student Union," which is the name of Muslim student groups at many colleges and universities, including U.C. Irvine.  My handlers told me that they were investigating several individuals who were part of the MSU at U.C. Irvine, because they thought these individuals had ties to extremists, they thought that an

1

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

1   imam who helped found the MSUs was radical, and they did not like the MSU's

2   activities because it organized demonstrations and was vocal in its criticisms of

3   U.S. foreign policy.  They mentioned several times a mock wall at U.C. Irvine that

4   the MSU had created that was supposed to represent the wall between Palestine

5   and Israel.  They said that the MSU was under surveillance and had its own

6   separate task force dedicated to that surveillance.  But they also used the term

7   "MSU" more broadly to include not just particular student groups on particular

8   campuses, but young Muslims who were active in the Muslim religious

9   community and who associated with other young Muslims who were MSU

10  members.  Malik was lumped in with the MSU because he associated with other

11  people from the MSU at Irvine and other young Muslims, even though he did not

12  go to U.C. Irvine.

13      5.      My handlers also told me Malik's father was a hero who had fought

14  against the Soviets in Afghanistan.  This background was another reason they

15  were suspicious of Malik.

16      6.      Agent Armstrong told me that before he was assigned to be my

17  handler, he had been assigned to investigate the MSUs and young Muslims,

18  including Ali Malik.

19      7.      My handlers told me that the way that Malik groomed his beard

20  indicated that he was a radical.

21      8.      My handlers already had a significant amount of information on

22  Malik and his family before I was assigned to do anything.  They wanted me to

23  get more information on one of his brothers; on another individual who Malik was

24  close to; on Malik's associations from the Irvine mosque, and on who Malik hung

25  out with at the gym.

26      9.      My handlers said that they knew Malik had been to a madrassa (an

27  Islamic religious school) in Yemen, but did not know the name of the school.

28  They also told me that they knew he had been blocked from entering Saudi Arabia

1    after he had traveled to Yemen, but they did not know why.  They tasked me with

2    finding out what school he had been to and why he had been denied entry into

3    Saudi Arabia.

4         10.    Very soon after I formally converted to Islam, I met Malik at the gym

5    and began talking to him.  I also spoke with him at the mosque.  Sheikh Sadullah

6    Khan saw me talking to him at the mosque and asked Malik to show me how to

7    pray.  Malik willingly helped me.  He also bought me a very basic book on Islam.

8    On the instructions of my handlers, I later used this book to ask Malik about the

9    sections of the book that mentioned *jihad*, in hopes of eliciting some response that

10   might incriminate Malik or justify further surveillance.  I recall that Malik told me

11   that the best interpretation of *jihad* was as "spiritual" *jihad,* or the personal

12   struggle to improve one's life.  On my handlers instructions, I also asked him

13   about certain imams and religious scholars in order to discern his religious views,

14   and pressed him on questions of U.S. foreign policy, in an attempt to record him

15   saying something that could be construed as extremist that would justify further

16   surveillance, or possibly be used to pressure Malik to give information to the FBI.

17   Malik seemed surprised by my questions during these conversations and

18   repeatedly urged me to concentrate on learning the basics of Islam.

19        11.    I saw Malik frequently during Ramadan in the fall of 2006, but after

20   that only about once a week, at mosque or at the gym, and often in passing.  My

21   handlers urged me to have a meal or tea with Malik, and I tried to make plans

22   several times, but he had a busy schedule and we never did.  I would sometimes

23   time my visits to a local gym to coincide with the time I knew he went there after

24   his classes, and would try to talk to him at the gym, on my handlers' instructions.

25        12.    Sometime in early 2007, Ali Malik suggested to me in some

26   conversations that he was having problems with his wife, who lived in Chicago.

27   When I reported this to my handlers, they told me that I should try to work out

28   with Malik at the gym and act as a comforting friend in order to have him open up

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

1  and offer information.  On my handlers' instructions, I did this and recorded

2  Malik talking about his marital problems.  I provided these recordings to my

3  handlers.  My handlers told me the recordings would be useful in pressuring Malik

4  to provide information, because they thought the recordings contained

5  embarrassing facts he would not want revealed.

6        13.    In about April 2007, my handlers started discussing the possibility of

7  sending me abroad to a madrassa to study Islam and Arabic, in hopes that I would

8  get sent from there to a terrorist training camp.  I started asking about a school to

9  go to, saying I wanted to go to Pakistan.  Malik told me that he had attended Dar

10  al-Mustafa in Tarim, outside Sana, in Yemen.   I reported this to my handlers, who

11  were very excited about the information.  Agent Allen moved quickly to

12  investigate and told me it was a radical school and that he believed that Malik did

13  not get into Saudi Arabia after his trip to Yemen because he had been studying at

14  a radical school.  My handlers also told me they thought people at the school

15  could refer students to terrorist training camps, so that if I went, they might refer

16  me to a camp.

17        14.    I found out from the Dar al-Mustafa brochure online that I needed an

18  imam's signature to apply.  I approached Sadullah Khan, in about early May 2007,

19  about going to the school in that summer.  Khan said he would provide a letter for

20  me, but I ended up not applying because people in the mosque got a restraining

21  order against me.

22        15.    My handlers thought Malik had ties to an organization, the "Islamic

23  Society of North America" ("ISNA"), because it was headquartered in Chicago,

24  where Malik's wife lived.  My handlers instructed me to ask Malik about ISNA,

25  which I did.  Malik said they were doing good things, but did not indicate he was

26  a part of it.   I recorded these conversations and reported them to my handlers.

27        16.    My handlers told me they thought Malik might be selling prescription

28  drugs, because he did not have a job and had money to go out with friends, and to

4

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

1    travel to see wife in Illinois.   My handlers told me they thought this might be true

2    of several young people at the Irvine mosque.  I never discovered anything in any

3    of my time undercover about Malik or any of the other young people selling

4    prescription drugs or engaging in other illegal activity to make money.

5         17.    On several occasions, I used the recording devices provided to me by

6    my handlers (disguised as a key fob or cell phone) to record groups of young

7    Muslims talking in the prayer hall after *ishaa* prayer.   On these occasions, I

8    greeted people, left my things — including the recording device — near to where

9    they were talking, then went to another part of the mosque or a different part of

10   the prayer hall to pray so that my recording device would capture their

11   conversation when they did not think I could hear.  Several times Ali Malik was

12   one of the people in the group I recorded.   I recorded his conversations when I

13   was not present, then gave my handlers notes that detailed the people I saw there

14   so they would be able to identify the voices.  I put in my notes to my handlers that

15   I did this to record conversations where I was not physically present, and they

16   never told me not to do this.

17        18.    Malik told me more than once that he heard I was going regularly to

18   *fajr*, or early morning prayer.  He commended me on my commitment — he said

19   that he had gotten into the routine of attending *fajr* prayers daily when he had

20   been studying abroad, but that it was easy to fall back in attending prayers only

21   when it was convenient and that he needed to get back to that kind of regimen.

22   My handlers thought this was significant information that indicated Malik was

23   returning to extremist beliefs, which justified further surveillance.

24        19.    I gave significant information on Malik to my handlers.  In addition

25   to the surveillance described above, including giving my handlers recordings of all

26   my conversations, my handlers several times showed me photos with people they

27   said had been seen with Malik and asked me to identify them.  The pictures

28   sometimes had Malik in them.

20.     Malik was one of the individuals who my handlers told me were to be arrested in raids in about June 2007 that were ultimately aborted.

21.     I never observed anything that gave me any reason to believe that Malik was involved in violence or terrorism in any way.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this **11**th day of October, 2010 in Los Angeles, California.

Craig F. Monteilh

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

Declaration of Craig Monteilh (August 11, 2011) re AbdelRahim

## DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.     From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.     On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.     A few weeks after I publicly made a declaration of faith and started attending mosque, a group of young men approached me at mosque and, impressed that I was still attending mosque so regularly, told me that most of the group lived together and invited me to socialize with them at their house.  My handlers were excited by this invitation.   They told me that the home on Carver Street where the young men lived was already under surveillance because it was shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and one who handled logistics — and my handlers believed they might be a Muslim Brotherhood cell.

4.     A few days after this invitation, I identified to my handlers that one of the young men who lived at the Carver street house, Yasser Abdel Rahim, was a person who seemed to attract and have influence with young Muslims.  My

1  handlers told me they thought Rahim was the leader of the cell, and that I should

2  spend time at the Carver street house and with Rahim in particular, and gather as

3  much information as I could.   I did so, and recorded all the conversations I had

4  with Rahim and the other members of the house.  I gave these recordings to my

5  handlers, along with notes about my observations.

6       5.    My handlers instructed me to get into every room in the Carver street

7  house to see what was in there, and include that information in my reports, which

8  I did.   Later, in about February or March of 2007, my handlers set me up with a

9  video camera hidden in a shirt button and instructed me to conduct video

10  surveillance of the layout and contents of the house, which I did.

11       6.    On my handlers' instructions, I spent a lot of time at the Carver street

12  house and with Rahim and his roommates.  I never observed anything that gave

13  me any reason to believe that Rahim or his roommates were involved in violence

14  or terrorism in any way.  They spent most of their time watching TV news (mostly

15  Al-Jazeera), sports (football – bowl season, basketball, and soccer), talking

16  politics, eating food, and playing X-box.

17       7.    Shortly after I first met them, Rahim and one of his roommates

18  bought me some books on Islam, and later asked me what I thought of them.

19  Some time after that, Rahim agreed to meet with me weekly to teach me various

20  prayers.  My handlers were excited by this because they thought Rahim was

21  radicalizing me and would want me to be part of the Muslim Brotherhood.  My

22  handlers asked for the first sheet of paper on which Rahim had written a prayer for

23  me to learn.  When they gave it back to me a few days later, they told me they had

24  lifted Rahim's fingerprints from it.

25       8.    I informed my handlers that Rahim always led prayer in the house.

26  This point interested them, because they said it showed leadership, and confirmed

27  that I should focus surveillance on him.

28       9.    My handlers said that Rahim had a criminal record, and they

2

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

1   suspected he might be dealing drugs, but never suggested any particular evidence

2   or investigation of narcotics activity, and I never observed any indication that any

3   members of the house engaged in criminal activity.

4          10.    I gathered and passed to my handlers information about Rahim's

5   travel plans, particularly when Rahim was going to or from Egypt to see his

6   family or his fiancé's family.  After one of these trips to Egypt, Rahim complained

7   that he had questioned for a long time when he re-entered the country – that he

8   expected some delay but this had been way too long.  I told one of my handlers

9   this and he said, "We're onto him," and indicated that they had been responsible

10  for that questioning.

11         11.    Rahim was very athletic.  He played pick-up soccer with other

12  Muslim youth.  I attended some of these games and took down the license plates

13  of people who attended, and once made a video recording with the hidden camera

14  my handlers provided me, in order to document who was attending and socializing

15  with one another.

16         12.    From my conversations with Yasser, I discovered that he traveled a

17  lot to Portland for his job.  I reported this information to my handlers, who were

18  interested.  They had a particular group of Muslims in Portland surveilled and

19  believed he went there to report or get instructions from this group.  I had a

20  standing order to report all travel plans, and would find out Rahim's travel plans

21  and tell my handlers.  My handlers several times told me that they had Rahim

22  surveilled in Portland after I had informed them he would be traveling there.

23         13.    Rahim offered to introduce me to Sheikh Suhaib Webb, a white

24  American religious scholar who studies in Cario.  My handlers knew Webb and

25  told me that although he portrayed himself as a moderate, he was an extremist, so

26  they were very interested and instructed me to pursue this.  Rahim gave me

27  Webb's telephone number and email address, and my handlers told me to call or

28  email Webb to make contact and establish a relationship, in hopes that Webb

3

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

1  might give me some instructions.  I called his cell phone and talked to a family

2  member and emailed with him, but my operation ended before I met him.

3      14.    Rahim's fiancée lived in Detroit.  I talked to Rahim about her and her

4  family, and transmitted what information I learned to my handlers.  I also got her

5  email address from emails he had forwarded that came from her, and passed that

6  on to my handlers. My handlers were suspicious of his fiancé's family because

7  they were prominent people who traveled to Egypt often.  They later told me his

8  fiancé's family in Detroit was under surveillance as well.

9      15.    On different occasions, my handlers told me that the FBI had

10  electronic listening devices in the house, as well as in Rahim's car and phone.  For

11  example, one day, one of my handlers called to tell me that a friend had driven up

12  to the house quickly in an agitated state and asked me to go down there to find out

13  what was going on.  When I asked how he knew this, he indicated they had video

14  outside the house.  Another time, my handlers asked me about something that

15  happened inside the house that I hadn't yet put in my notes.  I asked how they

16  knew, and they told me that they had audio surveillance in the home.

17      16.    My handlers told me that Rahim was donating money to a charitable

18  organization in Egypt.  They told me that these donations had been tracked by the

19  Treasury Department.  They told me that these donations were not unlawful, but

20  that they could make them seem suspicious in order to threaten him and pressure

21  him to provide information and become an informant.

22      17.    On many Tuesday nights, the imam from the Garden Grove mosque,

23  Mustafa Kamil, would give Arabic language teachings at the Islamic Center of

24  Irvine.  Rahim often attended.  On several occasions, I used recording devices

25  provided to me by my handlers to record these teachings and the discussions after.

26  On these occasions, I went into the prayer hall and listened to some of the

27  teaching.  Since I did not want to arouse suspicion by staying when I was just

28  starting to learn Arabic, I would leave my things — including the recording device

4

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

1 (disguised as a key fob or cell phone) — near to where the group was talking, and

2 then go to another part of the mosque or a different part of the prayer hall to pray.

3 My recording device would capture their conversation when they did not think I

4 could hear.  Rahim was part of the group I recorded on several occasions.

5     18.    On my handlers instructions, I asked Rahim questions about *jihad*

6 and pressed him on his views about religious matters and certain religious

7 scholars, particularly Egyptian ones, in order to get him to say something that

8 might be incriminating or provide a way to pressure him to provide information to

9 the FBI.  Rahim told me that there was more to Islam than *jihad*: that *jihad* is a

10 personal struggle, and that to the extent that there is such thing as a fighting *jihad*,

11 the Quran places very strict rules that prohibit harming plants or trees, infants,

12 elderly or women, and that terrorists who say they are engaged in *jihad* are not,

13 they are just committing murder.  When I asked about religious scholars like

14 Hassan al-Banna and Sayid Qutb, who my handlers told me to ask about because

15 they are considered extremist, he said that he did not agree with them, but thought

16 that the Egyptian government should not have executed them.

17     19.    Rahim was one of the individuals who my handlers told me was to be

18 arrested in the aborted raids of June 2007.

19

20     I declare under penalty of perjury of the laws of the State of California and

21 the United States that the foregoing is true and correct.  Executed this **11**th day of

22 August, 2010 in Orange, California.

23                                      _[signature]_

24                                     Craig F. Monteilh

25

26

27

28

5

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM