# EXHIBIT A



JOSE CHAVEZ, husband and MARIA ELENA CHAVEZ, wife, Plaintiffs-
Appellees, v. UNITED STATES OF AMERICA, Defendant, and JAMES W.
ZIGLAR; DAVID AGUILAR; RALPH HUNT; ALVARO OBREGON; FELIX
CHAVEZ; MICHAEL CAMPBELL, Border Patrol Agents, Defendants-Appellants.

No. 10-17659

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

2012 U.S. App. LEXIS 12555

January 10, 2012, Argued and Submitted, San Francisco, California
June 20, 2012, Filed

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the District of Arizona. D.C. No. 4:01-cv-00245-FRZ-JJM. Frank R. Zapata, Senior District Judge, Presiding.
*Chavez v. United States*, 2010 U.S. Dist. LEXIS 101209 (D. Ariz., Sept. 23, 2010)

**DISPOSITION:** AFFIRMED in part, and REVERSED in part.

**COUNSEL:** Barbara Herwig and Teal Miller (argued), Civil Division, Department of Justice, for the defendants-appellants.

Armand Salese (argued) and Ned Garn, Tucson, Arizona, for the plaintiffs-appellees.

**JUDGES:** Before: J. Clifford Wallace and Milan D. Smith, Jr., Circuit Judges, and Jed S. Rakoff, Senior District Judge.\* Opinion by Judge Jed S. Rakoff; Concurrence by Judge Wallace.

> \* The Honorable Jed S. Rakoff, Senior District Judge for the U.S. District Court for Southern New York, sitting by designation.

**OPINION BY:** Jed S. Rakoff

**OPINION**

RAKOFF, Senior District Judge:

Between 1995 and 2001, plaintiffs Jose and Maria Elena Chavez operated a shuttle service between Sesabe, Arizona and Tucson, Arizona. Plaintiffs allege that Border Patrol agents stopped their shuttle repeatedly and in violation of their *Fourth Amendment* rights. Based on these allegations, the plaintiffs bring claims not only against the agents who stopped them, but also against supervisors who they claim reviewed and directed the stops. We hold that plaintiffs' conclusory [*2] allegations fail to state a claim against all of the supervisors but one, a direct participant in the stops.

FACTUAL ALLEGATIONS

In December of 2001, Jose and Maria Elena Chavez filed a "*Bivens*" action alleging, among other things, that Border Patrol agents had violated their *Fourth Amendment* rights. According to the complaint, the plaintiffs operated a shuttle service that, beginning in the Fall of 1995, made two or three round trips each day between Sesabe, Arizona and Tucson, Arizona. The shuttle never crossed the border with Mexico. Both plaintiffs and the majority of their passengers are Hispanic. Plaintiffs have no training in identifying illegal aliens, and the Border Patrol, in response to an inquiry plaintiffs filed with their Congressman, allegedly informed the plaintiffs (through their Congressman) that the plaintiffs had no responsibility for assessing their passengers' immigration status.

Plaintiffs allege that, beginning in 1995, roving Border Patrol agents stopped their shuttle on "almost a daily basis." They allege that, because they traveled at speeds of up to sixty-five miles per hour, Border Patrol agents could not possibly have discerned "particular features of individual [*3] vehicles or their occupants reasonably probative of drug trafficking, alien smuggling or related wrongdoing, except, perhaps, in a small percentage of exceptional cases," and so the agents had no basis for making the stops. Instead, plaintiffs allege, the stops

were based principally on "the Latin, Hispanic or Mexican appearance of drivers and/or other occupants of vehicles." Plaintiffs allege that agents occasionally referred to passengers as "wetbacks" and used profanity. An agent also allegedly told plaintiffs that plaintiffs should be able to identify illegal aliens by their uncleanliness and offensive odor. The average stop, according to the complaint, lasted five to thirty minutes.

Plaintiffs also allege that the agents have threatened plaintiffs, demanded that plaintiffs refund their passengers' fares, required plaintiffs to reverse course, confiscated plaintiffs' van, and removed personal property from it. According to plaintiffs, agents became angry if they did not find illegal aliens aboard the shuttle. Agents allegedly did not ask for consent before searching the shuttle, and plaintiffs never gave such consent.

In addition to suing various border patrol agents, the plaintiffs [*4] also bring claims against supervisors within the Border Patrol, specifically, James Ziglar, the "Acting Commissioner" of the Immigration and Naturalization Service ("INS"), David Aguilar, the Chief Border Patrol Agent for the Tucson sector, and Ralph Hunt, Alvaro Obregon, Felix Chavez, and Michael Campbell, who all hold supervisory positions in the Border Patrol (collectively, the "supervisory defendants"). Plaintiffs allege that Ziglar, by virtue of his position as Acting Commissioner, bore responsibility for overseeing and supervising Border Patrol functions at the sector level. In the course of such supervision, Ziglar allegedly reviewed and approved each Chief Border Patrol Agent's enforcement program before allowing its implementation. As for Aguilar, as Chief Border Patrol Agent for the Tucson sector, he had direct responsibility for the ongoing activities of Border Patrol agents in that sector.

Plaintiffs allege that, "at various times," they complained about the frequent stops to Hunt, Obregon, Felix Chavez, and Campbell. Because the stops continued despite their complaints and the supervisory defendants' responsibilities, the plaintiffs allege that the supervisory defendants [*5] "personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted" the allegedly unconstitutional stops.

Finally, plaintiffs allege that Hunt and Obregon personally participated in stops. First, after a Border Patrol agent arrested Maria Elena Chavez, Obregon allegedly interrogated her for four to five hours. Next, plaintiffs claim that Hunt personally stopped them on at least two occasions. During one such stop in the Winter of 2000-2001, Hunt allegedly required Jose Chavez to refund the passengers' fares. During another stop in August of 2000, Hunt allegedly took the keys to plaintiffs' van after discovering that passengers did not have appropriate documentation. In connection with this same stop, a different Border Patrol agent allegedly transported Jose Chavez to the "Three Points area" and left him there.

PROCEDURAL BACKGROUND

In August of 2002, the district court dismissed the claims against Ziglar, Aguilar, Hunt, Obregon, Felix Chavez, and Campbell, concluding that plaintiffs had failed "to specifically allege that any Defendant Supervisor was personally involved or linked to any of Plaintiffs' alleged constitutional deprivations." This Court reversed. *Chavez v. United States*, 226 F. App'x 732, 736 (9th Cir. 2007). [*6] We concluded that:

> The complaint adequately alleges the personal involvement of the supervisors in the unconstitutional patrols. Specifically, it alleges that the defendants "personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted the roving patrol[s]." The complaint also alleges that the unconstitutional patrols were exacerbated by a lack of reporting requirements, and that the Chavezes complained to Hunt, Obregon, Chavez, and Campbell about the allegedly unlawful stops. Furthermore, the complaint alleges that Aguilar knew of the roving patrols and deliberately sanctioned them.
>
> An unconstitutional policy and practice can be inferred from the complaint's description of directed and repeated roving patrols, the allegation that the supervisors sanctioned them, and the allegation that the agents had supervisory authority.

*Id.* (quoting cmplt. ¶ 26).[1]

[1] Although the plaintiffs claim that they also have a valid *Fifth Amendment* claim against the defendants, the district court in 2002 dismissed plaintiffs' "*First, Fourth, Fifth, Eighth*, and *Fourteenth Amendment* Bivens claims," and plaintiffs in their first appeal challenged only the dismissal of their *Fourth Amendment* [*7] claims. *Chavez v. United States*, 226 F. App'x 732, 734 (9th Cir. 2007). Because this Court's earlier decision considered and reinstated only plaintiffs' *Fourth Amendment* claim, *id.* at 735-36, plaintiffs have no remaining *Fifth Amendment* claim, and the Court declines to consider any arguments based on the *Fifth Amendment*.

After the Ninth Circuit reinstated plaintiffs' *Bivens* claims against the supervisory defendants, the Supreme

Court decided *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. In light of *Iqbal*, the supervisory defendants filed a motion for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)*. The district court denied the motion, finding that the supervisory defendants failed to provide a plausible nondiscriminatory explanation for the alleged stops. Moreover, the district court held that plaintiffs did not need to allege that the supervisory defendants directly participated in constitutional violations. Instead, citing *Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991)*, the district court held that the plaintiffs had plausibly alleged that the supervisory defendants had either knowingly refused to terminate a series of acts they reasonably should [*8] have known would cause constitutional violations, acquiesced in constitutional deprivations by subordinates, or displayed reckless or callous indifference to others' rights.

The supervisory defendants now appeal from that decision. We have jurisdiction to hear this appeal because "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of *28 U.S.C. § 1291* notwithstanding the absence of a final judgment." *Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. While the district court here did not address the issue of qualified immunity, the supervisory defendants raised qualified immunity as a defense in their answer to the complaint, and both their motion under *Rule 12(c)* and their objections to the Magistrate Judge's Report and Recommendation made frequent reference to qualified immunity. Thus, by failing to address the question of qualified immunity, the district court denied the supervisory defendants' defense *sub silentio*.

Where an appellate court has jurisdiction to review the denial of a qualified immunity defense, it also has jurisdiction to review predominantly legal issues, such [*9] as the sufficiency of a complaint, that are "inextricably intertwined with" and "directly implicated by" the issue of qualified immunity. *Ashcroft v. Iqbal, 556 U.S. 662, 673, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Hartman v. Moore, 547 U.S. 250, 257 n.5, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006); Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 51, 115 S. Ct. 1203, 131 L. Ed. 2d 60 (1995))*. Accordingly, we have jurisdiction to review both whether the supervisory defendants have qualified immunity -- which turns on legal issues such as whether they allegedly violated "clearly established" rights, *Behrens v. Pelletier, 516 U.S. 299, 313, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)* -- and whether the complaint adequately alleges any claim against the supervisory defendants. We review both issues *de novo*. *Lyon v. Chase Bank USA, N.A., 656 F.3d 877, 883 (9th Cir. 2011); Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993)*.

DISCUSSION

Under *Federal Rule of Civil Procedure 12(c)*, "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." "Judgment on the pleadings is properly granted when[, accepting all factual allegations in the complaint as true,] there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of [*10] law." *Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009)*. Analysis under *Rule 12(c)* is "substantially identical" to analysis under *Rule 12(b)(6)* because, under both rules, "a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Brooks v. Dunlop Mfg. Inc., No. C 10-04341 CRB, 2011 U.S. Dist. LEXIS 141942, 2011 WL 6140912, at *3 (N.D. Cal. Dec. 9, 2011)*.

On a motion to dismiss under *Rule 12(b)(6)*, a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Mere conclusory statements in a complaint and "formulaic recitation[s] of the elements of a cause of action" are not sufficient. *Twombly, 550 U.S. at 555*. Thus, a court discounts conclusory statements, which are not entitled to the presumption of truth, before determining whether a claim is plausible. *Iqbal, 556 U.S. at 678*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*11] *Id*. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. at 679*.

Applying this standard to a claim alleging invidious discrimination in violation of the *Fifth Amendment*, the Supreme Court in *Iqbal* noted that officials violate the *Fifth Amendment* only when they act with a "discriminatory purpose." *Id. at 676*. Moreover, the Supreme Court acknowledged that *Bivens* claims cannot proceed on a theory of *respondeat superior*, but must instead plead that a supervisor, by her "own individual actions," violated the Constitution. *Id*. Putting these requirements together, the Supreme Court noted that, to state a discrimination claim against a supervising official under the *Fifth Amendment*, a complaint must allege that the supervisor acted with "purpose rather than knowledge." *Id. at 677*. Because the complaint at issue alleged only that the supervisors had approved a policy of detaining thou-

sands of Arab, Muslim men, it failed to plausibly suggest that they had acted with a discriminatory purpose. *Id. at 683-83*. Instead, the Court held that an "obvious alternative [*12] explanation" existed for approving the policy, namely a "nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts." *Id. at 682* (quoting *Twombly, 550 U.S. at 567*). Thus, the Supreme Court dismissed the complaint under *Rule 12(b)(6). Id. at 687.*

Relying on *Iqbal*, the supervisory defendants invite the Court to hold that the *Fourth Amendment*, like the *Fifth Amendment*, requires plaintiffs to allege that supervisors acted with a "discriminatory purpose." This argument, however, misreads *Iqbal*. In *Iqbal*, the Supreme Court did not require allegations of "discriminatory purpose" in order to render supervisors liable for any constitutional violation by their subordinates. Rather, the Supreme Court noted that plaintiffs cannot base a claim against supervisors on a theory of *respondeat superior*, and must instead show that the supervisors, "through [their] own individual actions, ha[ve] violated the Constitution." *Id. at 676*. Because a plaintiff claiming invidious discrimination under the *Fifth Amendment* must allege facts showing that officers acted with a "discriminatory purpose," allowing that [*13] *Fifth Amendment* claim to proceed against a supervisor in the absence of a particularized showing of such a purpose would, in effect, render the supervisor vicariously liable for her subordinates' intent. *Id. at 677*. The requirement that a plaintiff allege a "discriminatory purpose," then, derived from the *Fifth Amendment* rather than from the fact that the plaintiff pled claims against supervisors. We see nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law by adding a "discriminatory purpose" requirement to a *Fourth Amendment* claim against supervisors. *See Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011)* (reaching same conclusion for an *Eighth Amendment* claim).

The *Fourth Amendment*, unlike the *Fifth Amendment*, does not require a plaintiff to allege that an officer acted with any "subjective motivation." *Brigham City, Utah v. Stuart, 547 U.S. 398, 404, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)*. An officer conducting a roving patrol near the border violates the *Fourth Amendment* if she stops a vehicle in the absence of an objectively "reasonable suspicion" that the "particular vehicle may contain aliens who are illegally in the country" or is involved in some other criminal conduct. [*14] *United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)*. Even if an officer makes a stop that violates the *Fourth Amendment*, qualified immunity protects the officer from liability unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*.

Because *Iqbal* requires courts to apply an equivalent standard to supervisors and subordinates, we hold that, taking qualified immunity into account, a supervisor faces liability under the *Fourth Amendment* only where "it would be clear to a reasonable [supervisor] that his conduct was unlawful in the situation he confronted." A lower standard would impose vicarious liability on supervisors based on their subordinates' clearly unlawful conduct. Because the plaintiffs' complaint, as described below, does not come close to meeting this standard except with respect to defendant Hunt, who faces liability for his direct participation in the stops, we leave to future cases the determination of what conduct by supervisors may qualify as clearly unlawful.

Judged under the standard described [*15] above, plaintiffs' complaint fails to state a *Fourth Amendment* claim against any supervisory defendant except Hunt. Turning first to the supervisory defendants other than Hunt, even assuming *arguendo* that the plaintiffs have sufficiently alleged that Border Patrol agents conducted stops without reasonable suspicion, plaintiffs have not alleged facts that would allow a court to draw a reasonable inference that a reasonable supervisor in these defendants' situations would have found their conduct to be clearly unlawful. The Court discounts, as it must, the plaintiffs' wholly conclusory allegation that the supervisory defendants "personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted" the allegedly unconstitutional stops. Having done so, the remaining allegations do not plausibly suggest that these supervisors clearly should have regarded their conduct as unlawful.

First, the plaintiffs allege as to defendant James W. Ziglar only that Commissioner Ziglar, by virtue of his position, "reviews and must approve . . . operation plans and enforcement programs developed by the Chief Border Patrol Agents immediately in command of Sector forces." Nonetheless, plaintiffs [*16] do not suggest that the relevant plan and program for the Tucson sector indicated anything that would have informed Commissioner Ziglar that allegedly unconstitutional stops occurred, much less that his own conduct was, at least in the eyes of a reasonable supervisor, clearly unlawful. In the absence of any explanation of how Ziglar's review and approval of the Tucson sector's plans and programs -- something he apparently did for each sector in the country -- would have alerted him to the allegedly unconstitutional searches, the Court holds that there is no plausible suggestion that a reasonable supervisor would have

found it clear that Ziglar's "conduct was unlawful in the situation he confronted."

Second, the plaintiffs allege as to defendant David Aguilar only that Aguilar "had line authority over and direct responsibility for the ongoing activities and operations of Border Patrol agents assigned to field duty in the Tucson sector." Once again, however, plaintiffs fail to explain why, by virtue of these responsibilities, Aguilar would have had reason to know that Border Patrol agents, who presumably conduct numerous stops, had frequently stopped plaintiffs, much less that they did [*17] so without reasonable suspicion. Seemingly aware that they have no factual basis for imputing any such knowledge to Aguilar and the other supervisors, plaintiffs allege that the Border Patrol's failure to keep records of its stops during roving patrols constitutes a "deliberate pattern[ ] and practice[ ], designed to conceal or obfuscate" the alleged constitutional violations. Nonetheless, plaintiffs offer no factual support for their conspiratorial theories, and the Border Patrol might simply have decided not to record stops during roving patrols because maintaining such records would have imposed a substantial administrative burden that interfered with accomplishment of its other law enforcement objectives. *Cf. Iqbal*, 556 U.S. at 682 ("As between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." (citation omitted)). Accordingly, plaintiffs do not plausibly suggest that a reasonable supervisor would have found it clear that Aguilar's "conduct was unlawful in the situation he confronted."

Third, with respect to defendants Obregon, Felix Chavez, and Campbell, [*18] the plaintiffs allege only that, "at various times," they complained to these defendants about "the frequent stops." This allegation does not specify whether plaintiffs complained to any defendant more than once or whether they informed any defendant of their belief that the stops, in addition to being "frequent," were not based on reasonable suspicion. A reasonable supervisor would not find it clear that, by failing to investigate vague complaints of "frequent stops," which plaintiffs made at "various," unspecified times, Obregon, Felix Chavez, and Campbell acted unlawfully. Neither does Obregon's alleged interrogation of plaintiff Maria Chavez plausibly suggest that a reasonable supervisor would have found his actions clearly unlawful. Instead, the complaint makes clear that Obregon interrogated Ms. Chavez only after a subordinate agent had stopped the shuttle, found that no passenger had required documentation, arrested Ms. Chavez, and brought her to a Border Patrol station. Obregon cannot have been expected to infer from such incriminating circumstances that the agent making the initial stop lacked reasonable suspicion to do so, and the plaintiffs do not allege that he drew any [*19] such inference. Thus, the complaint fails to plausibly allege that a reasonable supervisor would have found it clear that Obregon, Felix Chavez, and Campbell acted unlawfully in the situations they confronted.

In contrast to the other supervisory defendants, Hunt faces liability not only as a supervisor, but also for his direct participation in the stops. As noted above, the *Fourth Amendment* prohibits an officer on roving patrol near the border from stopping a vehicle in the absence of an objectively "reasonable suspicion" that the "particular vehicle may contain aliens who are illegally in the country" or is involved in some other criminal conduct. *Brignoni-Ponce*, 422 U.S. at 881. Standing alone, "apparent Mexican ancestry," "even in the border area," justifies "neither a reasonable belief that [a vehicle's occupants are] aliens, nor a reasonable belief that the car conceal[s] other aliens who [are] illegally in the country." *Id.* at 885-86. Moreover, because "a search unlawful at its inception may [not] be validated by what it turns up," *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), discovery of undocumented individuals in a vehicle does not excuse an initial lack of reasonable [*20] suspicion. Nonetheless, even if an officer violates the *Fourth Amendment*, qualified immunity still protects him from liability unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Here, plaintiffs plausibly allege conduct by Hunt that would be a clear *Fourth Amendment* violation to a reasonable officer. Plaintiffs allege that, because they traveled at highway speeds, Border Patrol agents could not make the particularized observations necessary to form a reasonable suspicion that plaintiffs' shuttle contained aliens. They further allege that Border Patrol agents instead focused principally on "the Latin, Hispanic or Mexican appearance of drivers and/or other occupants of vehicles," a characteristic that, under *Brignoni-Ponce*, clearly does not give rise to reasonable suspicion. Plaintiffs allege that Hunt twice personally stopped the Chavez shuttle. On the first such occasion, Hunt allegedly demanded that Jose Chavez return his passengers' fares. When Hunt allegedly next stopped the shuttle, he took the keys to plaintiffs' van, and another officer involved in the stop transported Jose Chavez to the "Three [*21] Points area and left [him] there."

The facts alleged in the complaint do not indicate that, when Hunt made these two stops, any observable characteristics other than race could have provided a basis for reasonable suspicion. *See Brignoni-Ponce*, 422 U.S. at 886 ("At best the officers had only a fleeting glimpse of the persons in the moving car . . . ."). Indeed, although the supervisory defendants argue that Hunt's

knowledge that plaintiffs' shuttle had carried undocumented passengers on previous occasions would have supported reasonable suspicion, *but see United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994)* ("[K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to . . . reasonable suspicion."), the complaint indicates that, on one of the two occasions when Hunt stopped plaintiffs, plaintiffs drove a rental van because their usual shuttle was under repair. Based on the facts set forth in the complaint, we hold that plaintiffs have plausibly alleged that Hunt stopped them based solely on their and their passengers' "apparent Mexican ancestry," a characteristic that a reasonable officer clearly would have known [*22] did not create reasonable suspicion. Accordingly, the complaint adequately states a claim against Hunt for *Fourth Amendment* violations, and, at least on the facts alleged, qualified immunity does not shield Hunt from liability.

CONCLUSION

In sum, we hold that, to state a claim against supervising officers for causing their subordinates' purported violations of the *Fourth Amendment*, a complaint must allege facts that plausibly suggest that a reasonable supervisor would find it "clear" that the defendant's conduct was "unlawful in the situation he confronted." Applying that standard to this case, we hold that plaintiffs' complaint fails to state a claim against any supervisory defendant other than Hunt, who directly participated in the alleged underlying violations. Accordingly, we affirm the district court's ruling with respect to Hunt, but reverse it and direct the entry of final judgment with respect to Ziglar, Aguilar, Obregon, Felix Chavez, and Campbell.

**AFFIRMED in part, and REVERSED in part.**

**CONCUR BY:** J. Clifford Wallace

**CONCUR**

WALLACE, Senior Circuit Judge, concurring:

I fully concur in the opinion and judgment, but I would have preferred to resolve this appeal without addressing the effect of *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, [*23] on supervisory liability in the *Fourth Amendment* context. This is because even under the pre-*Iqbal* standard described in *Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991)*, plaintiffs' claims meet the same fate described in the panel's opinion for substantially the same reasons. Once we strip away plaintiffs' conclusory allegations as mandated by the section of *Iqbal* addressing general pleading standards, *556 U.S. at 678-79*, there are no factual allegations alleging that any of the supervisory defendants except Hunt knew or reasonably should have known that their conduct would cause others to inflict a constitutional injury. See *Larez, 946 F.2d at 646*.

Our court recently reasoned that it did not need to consider the debate regarding the extent to which the Ninth Circuit's pre-*Iqbal* supervisory liability standard remains good law because the complaint's allegations fell even under the old standard. *Moss v. United States Secret Serv., 675 F.3d 1213, 1231 n.6 (9th Cir. 2012)*. Similarly, at least eight opinions from other circuit courts have explicitly recognized that *Iqbal* might restrict supervisory liability, but have refused to rule on the extent of the restriction when [*24] the question could be avoided. See *Soto-Torres v. Fraticelli, 654 F.3d 153, 158 n.7 (1st Cir. 2011)*; *Argueta v. United States Immigration & Customs Enforcement, 643 F.3d 60, 70 (3d Cir. 2011)*; *Santiago v. Warminster Twp., 629 F.3d 121, 130 n.8 (3d Cir. 2010)*; *Mink v. Knox, 613 F.3d 995, 1002 n.5 (10th Cir. 2010)*; *Lewis v. Tripp, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010)*; *Parrish v. Ball, 594 F.3d 993, 1001 n.1 (8th Cir. 2010)*; *Bayer v. Monroe Cnty. Children & Youth Servs., 577 F.3d 186, 190 n.5 (3d Cir. 2009)*; *Maldonado v. Fontanes, 568 F.3d 263, 274 n.7 (1st Cir. 2009)*.

I would choose to follow an approach signaled by a prior Ninth Circuit opinion whenever we can because it makes good sense and assists us to keep our law intact. That so many other circuit opinions have also taken the same course strongly suggests that it would be a better practice to do so here. Although I do not disagree with the standard we adopt in our opinion, I would have preferred to follow the wisdom of prior circuit opinions (including our own) and resolve this case without adopting any new standard at all.