SACV 11-00301-CJC - 08/14/2012 - TUESDAY

1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3     **HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING**

4            # CERTIFIED TRANSCRIPT

5               - - - - - - -

6  YASSIR FAZAGA, ET AL,            )
                                    )
7            Plaintiff(s),          )
                                    )
8        vs.                        ) No. SACV 11-00301-CJC
                                    )      TUESDAY
9  FEDERAL BUREAU OF INVESTIGATION, )
                                    )
10           Defendant(s).          )
   _____ )
11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               SANTA ANA, California

16            TUESDAY, AUGUST 14, 2012

17

18
   *Maria Beesley-Dellaneve, RPR, CSR 9132*
19 *Official Federal Reporter*
   *Ronald Reagan Federal Building, room 1-053*
20 *411 West 4th Street*
   *Santa Ana, California 92701*
21 *(714) 564-9259*

22

23

24 2012-08-14

25

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

1   **APPEARANCES OF COUNSEL:**

2   FOR THE PLAINTIFF(S):

                        ACLU OF SOUTHERN CALIFORNIA
3                       BY:  AHILAN ARULANANTHAM, ESQ.
                        AND  PETER BIBRING, ESQ.
4                       1313 W. 8TH STREET
                        LOS ANGELES, CALIFORNIA 90017
5                       (213)977-5297

6   FOR THE PLAINTIFF(S):

                        COUNCIL ON AMERICAN-ISLAMIC RELATIONS
7                       BY:  AMEENA MIRZA QAZI, AAL
                        2180 W. CRESCENT AVENUE, SUITE F
8                       ANAHEIM, CALIFORNIA 92801

9   FOR THE PLAINTIFF(S):

                        HADSELL STORMER KEENY
10                      BY:  REEM SALAHI, AAL
                        128 NO. FAIR OAKS AVENUE, SUITE 204
11                      PASADENA, CALIFORNIA 91103
                        (626)585-9600
12  FOR THE DEFT(S) FBI:

                        U.S. DEPT. OF JUSTICE
13                      BY:  ANTHONY COPPOLINO, ESQ.
                        FEDERAL PROGRAMS BRANCH
14                      20 MASSACHUSETTS AVE. NW
                        ROOM 6102 883
15                      WASHINGTON DC 20001

16  FOR THE DEFT(S) FBI:  U.S. DEPT. OF JUSTICE
                        BY:  LYNN LEE, AAL
17                      CIVIL DIVISION
                        P.O. BOX 883
18                      WASHINGTON DC 20044
                        (202)305-0531

19

20  FOR THE DEFT(S) ROSE, ARMSTRONG, ALLEN:
                        SCHEPER KIM & HARRIS
21                      BY:  DAVID SCHEPER, ESQ.
                        and  ALEXANDER COTE, ESQ.
22                          ALEX LOWDER, ESQ.
                            ANGELEA MACHALA, AAL
23                      601 W. FIFTH STREET, 12TH FLOOR
                        LOS ANGELES, CALIFORNIA 90071-2025
24                      (213)613-4655

25

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

1   FOR THE DEFT. U.S.A.: U.S. DEPT. OF JUSTICE
                          BY:  STEPHEN HANDLER, ESQ.
2                         CIVIL DIVISION TORTS BRANCH
                          BENJAMIN FRANKLIN STATION
3                         P.O. BOX 888
                          WASHINGTON DC 20044
4
    FOR THE DEFT(S) TIDWELL, WALLS:
5                         WILMER CUTLER PICKERING
                          BY:  CARL NICHOLS, ESQ.
6                         AND  PATTY LEE, AAL
                              KATIE MORAN, AAL
7                         1985 PENNSYLVANIA AVENUE NW
                          WASHINGTON DC 20006
8                         (202)663-6226

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

1        **SANTA ANA, CALIFORNIA, TUESDAY, APRIL 14, 2012**

2                          **TUESDAY**

3                          (8:49)

09:03   4        THE CLERK:  Item one, SACV 11-00301-CJC.  Yassir Fazaga,

09:03   5   et al versus Federal Bureau of Investigation.

09:03   6        Counsel, please state your appearances for the record.

09:03   7        MR. COPPOLINO:  Good morning, Your Honor.  Anthony

09:03   8   Coppolino with the Department of Justice, civil division.  I

09:03   9   represent the Federal Bureau of Investigation, Director Mueller in

09:03  10   his official capacity, and the assistant director of the L.A.

09:04  11   field office in his official capacity.

09:04  12        THE COURT:  Good morning, sir.

09:04  13        MR. ARULANATHAM:  Good morning, Your Honor.  Ahilan

09:04  14   Arulanantham.  With me is Peter Bibring, Reem Salahi, and Ameena

09:04  15   Qazi.  We represent the plaintiffs.

09:04  16        THE COURT:  Good morning to all of you.

09:04  17        MR. HANDLER:  Good morning, Your Honor.  Steve Handler

09:04  18   on behalf of the United States.  I represent the United States

09:04  19   with regard to the claims under the Federal Tort Claims Act.

09:04  20        THE COURT:  Hello, sir.

09:04  21        MS. LEE:  Good morning, Your Honor.  Lynn Lee for the

09:04  22   United States, for FBI, and the official capacity defendants.

09:04  23        THE COURT:  Hello, ma'am.

09:04  24        MR. SCHEPER:  Good morning, Your Honor.  I'm David

09:04  25   Scheper.  And along with my colleagues Alex Lowder, Angela Machala

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:04  1    and Alex Cote we represent the individual defendants Pat Rose,

09:04  2    Kevin Armstrong and Paul Allen.  And Ms. Rose and Mr. Armstrong

09:04  3    are in court today.

09:04  4             THE COURT:  Hello.

09:04  5             MR. NICHOLS:  Good morning, Your Honor.  Carl Nichols on

09:04  6    behalf of defendants Tidwell and Walls.  And I have with me my

09:04  7    colleagues Patty Lee and Katie Moran.

09:05  8             THE COURT:  Full group.  We'll take as much time as we

09:05  9    need to discuss the issues and I'll hear arguments.

09:05  10            What I thought we would do is focus on the FISA claim

09:05  11   first because, candidly, given the allegations of the first

09:05  12   amended complaint and the Ninth Circuit's decision, that seems to

09:05  13   me to be straightforward.  I don't know if counsel disagree, but

09:05  14   when I looked at that Ninth Circuit's decision, I really thought

09:05  15   that they took the issue of sovereign immunity off the table in

09:05  16   this case.  Or maybe I should say it in the opposite way, that

09:05  17   sovereign immunity does apply, and so the government defendants on

09:05  18   the FISA claim would have to be dismissed.

09:05  19            With respect to the individual agents, when I look at

09:05  20   the allegations of the complaint, it seems to me that what is

09:06  21   being alleged is intentional wrongful conduct.  I have identified

09:06  22   a couple of those allegations.  But it sets forth detailed

09:06  23   allegations that defendants planted electronic listening devices

09:06  24   in one plaintiff's home and another's office; that their informant

09:06  25   left recording devices to capture intimate religious discussion at

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:06 1   the mosque; that the informant routinely took video in mosques and

09:06 2   in private homes, and that the informant acted pursuant to broad

09:06 3   instructions to gather as much information on Muslims as possible.

09:06 4   I don't know whether those allegations are true or not, but they

09:06 5   are certainly made.

09:06 6            And then further, the first amended complaint alleges

09:06 7   that the defendant Rose was, at all times relevant to this action,

09:06 8   employed by the FBI and acting in the scope of her employment as a

09:07 9   special agent.  Upon information and belief, she was assigned to

09:07 10  the FBI's Santa Ana branch office where she supervised the FBI's

09:07 11  Orange County national security investigations and was one of the

09:07 12  director supervisors of agents Allen and Armstrong.  Upon

09:07 13  information and belief, she was regularly apprized of the

09:07 14  information agents Armstrong and Allen collected through Monteilh;

09:07 15  directed the action of the FBI agents on various occasions based

09:07 16  on that information, and actively monitored, directed, and

09:07 17  authorized the actions of agents Armstrong and Allen and other

09:07 18  agents at all times relevant in this action for the purpose

09:07 19  surveilling plaintiffs and other putative class members because

09:07 20  they were Muslim.

09:07 21            Agent Rose also sought additional information to expand

09:07 22  the scope of the surveillance program described in the first

09:07 23  amended complaint in an effort to create a Muslim gym that the FBI

09:08 24  would use to gather yet more information about the class.

09:08 25            The first amended complaint further alleges that all the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:08 1    agent defendants, including Agent Rose, maintained extremely close

09:08 2    oversight and supervision of Monteilh, and because they made

09:08 3    extensive use of the results of his surveillance, they knew in

09:08 4    great detail the nature and scope of the operation, including the

09:08 5    methods of surveillance Monteilh used and their criteria used to

09:08 6    decide his targets and continually authorized their ongoing use.

09:08 7          Again, I think these allegations sufficiently allege

09:08 8    intention wrongful conduct on the part of the individual

09:08 9    defendants, but I'll keep an open mind on that.  But again, I

09:08 10   think the Ninth Circuit's decision in *Al-Haramain Islamic*

09:09 11   *Foundatin Inc. v. Obama* -- I think it just came down within the

09:09 12   last two weeks -- clearly held that Congress did not explicitly

09:09 13   waive sovereign immunity.  And they reversed the district court's

09:09 14   decision to the contrary.

09:09 15         Why don't we start off with that because I know the

09:09 16   state secrets privilege is not being asserted by the government

09:09 17   with respect to the FISA claim.  So I'd like to start off with the

09:09 18   FISA, and then once we hear argument on that, we can move to the

09:09 19   state secrets privilege.

09:09 20         So probably given it's the defendant's motion, why don't

09:09 21   I hear from the defendants first.

09:10 22         MR. COPPOLINO:  Good morning, Your Honor.  Again, I'm

09:10 23   Anthony Coppolino with the civil division representing the FBI and

09:10 24   the official capacity defendants.

09:10 25         Your Honor, with respect to the FISA claim, the FISA

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:10 1    claim was brought both against the government in its official

09:10 2    capacity and the individuals.  And I think you are absolutely

09:10 3    correct, *Al-Haramain* disposes of the claim against the government

09:10 4    in its official capacity.  It does not -- the Court of Appeals

09:10 5    found that section 1810 of the Foreign Intelligence Surveillance

09:10 6    Act does not waive sovereign immunity for a claim against the

09:10 7    government.

09:10 8         We briefed the issue, but that was prior to the

09:10 9    decision.  I actually handled *Al-Haramain* in district court.  And

09:10 10   so I hadn't planned to address it much further because I think the

09:10 11   Ninth Circuit's decision clearly disposes of the claim.  The Court

09:10 12   held there is no implicit waiver of sovereign immunity; that the

09:10 13   fact that the statute authorizes a suit against a person,

09:10 14   including federal officers or officials, does not extend to the

09:11 15   government in its sovereign or official capacity.

09:11 16        And so the effect of that decision is to eliminate that

09:11 17   one claim against the official capacity government defendants,

09:11 18   both FBI Director Mueller, as well as the United States under the

09:11 19   FTCA.  So I think that's really all I have to say about that.

09:11 20        Now, that doesn't resolve the claim entirely for this

09:11 21   lawsuit.  As you note, we did not assert state secrets -- we

09:11 22   didn't seek dismissal of that claim based on the state secrets

09:11 23   privilege at the outset, because the claim turns on allegations,

09:11 24   factual allegations that Mr. Monteilh collected audio when he was

09:11 25   a confidential source for the FBI, and that is not a secret.  That

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:11 1   was something that the FBI has acknowledged in prior years.  And

09:11 2   so we didn't assert the state secrets privilege, at least not yet,

09:11 3   over that claim.

09:11 4        There remains the possibility that to the extent the

09:11 5   claim is litigated, that is, if non-privileged grounds for

09:12 6   dismissal are not sufficient to get rid of that claim against the

09:12 7   individual capacity defendants, it's possible that some aspect of

09:12 8   litigating that case could intrude on state secrets, but that's

09:12 9   not presently before the Court.

09:12 10       I don't know how much more you want me to address on the

09:12 11  sovereign immunity issue.  I think that the judgment Cumis

09:12 12  decision was quite clear and quite correct.  Thank you.

09:12 13       THE COURT:  Okay.  Anybody else on the government side,

09:12 14  or I guess the individual agents' side dealing with qualified

09:12 15  immunity?

09:12 16       MR. SCHEPER:  Your Honor, is now the time to take on

09:12 17  qualified immunity on FISA as well as the First and Fourth

09:12 18  Amendment claims?  I want to go by the Court's intended --

09:12 19       THE COURT:  I appreciate that.  I was hoping we could

09:12 20  keep them separate; qualified immunity just on the FISA claim.

09:12 21  But if you think that's not possible, we can discuss that then

09:12 22  later.

09:13 23       MR. SCHEPER:  So discuss the whole qualified immunity

09:13 24  for agents Rose, Armstrong and Allen later?  Because on the

09:13 25  qualified immunity point, I think central to whether it's First

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:13 1    Amendment, Fourth Amendment or FISA is the notion that all

09:13 2    acknowledge that where an agent is sued in her individual capacity

09:13 3    in addition to the damage to reputation, there is the potential

09:13 4    invasion of the agent's purse or wallet, as the case may be, and

09:13 5    central to the qualified immunity defense, which is served up by

09:13 6    the pleadings, as a matter of law for Your Honor.  And we stress

09:13 7    this in our original brief and our reply paper.  And I recommend

09:13 8    those to your consideration, Your Honor.

09:13 9         But I wanted to add a way of thinking, Your Honor, that

09:13 10   goes beyond what we wrote in our papers.  What we wrote in our

09:14 11   papers was, as *Al-Kidd* says, if you are going to go after these

09:14 12   agents individually, harm their reputation, and possibly harm

09:14 13   their pocketbooks, it must be a matter that it is beyond question,

09:14 14   under the law, that when these agents went to work for the 14

09:14 15   months between June of 2006 and August of 2007, they were on fair

09:14 16   notice, as the law then existed, that their actions, in terms of

09:14 17   investigating, remember, not stopping and frisking, not arresting,

09:14 18   but in investigating the plaintiffs in this case were beyond the

09:14 19   pale of any arguable point under the law.

09:14 20        Now, in the First Amendment scenario, the law, the only

09:14 21   law on the use of religion playing any part, a part of a decision

09:14 22   to investigate was the Ninth Circuit's decision in *Vernon*.  And

09:15 23   *Vernon* is a very strong case for us, Your Honor, because in 2006

09:15 24   and 2007, *Vernon* taught that religion could be the sole factor in

09:15 25   deciding whether and whom to investigate.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:15  1          Here, it's conceded that religion was only a factor, but

09:15  2   *Vernon* provided very strong protection in the First Amendment

09:15  3   arena under the qualified immunity doctrine.

09:15  4          THE COURT:  Could you state the obvious?  Why was

09:15  5   religion just a factor in this case?

09:15  6          MR. SCHEPER:  I think the complaint indicates that there

09:15  7   is a compelling governmental interest in the investigation of

09:15  8   terrorism.  And that secular purpose is, we contend, conceded in

09:16  9   the paper.  This is not a case where the allegation is that the

09:16 10   only reason these three individuals went to work for the 14 months

09:16 11   was to target a religion.  They were investigating potential

09:16 12   criminal wrongdoing.

09:16 13          THE COURT:  I guess my question was more -- and maybe

09:16 14   now we're getting into a little bit of the state secrets argument

09:16 15   as well, but isn't it by the nature of the extremist that we have

09:16 16   to deal with, that religion is going to play a part?  Putting

09:16 17   aside the parties in this case and what happened, by definition do

09:16 18   you have to consider religion as one of the factors?

09:16 19          MR. SCHEPER:  Well, I remember, I think, Your Honor, I

09:16 20   was thinking about this case long and hard going back into my 25

09:16 21   years in federal criminal law, prosecution and defense.  And I

09:16 22   mean, Your Honor remembers that there were initiatives by the FBI

09:17 23   and other law enforcement agencies where some of the entities

09:17 24   targeted for investigation were, for instance, certain street

09:17 25   gangs which had an affiliation that sometimes was nationality and

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:17 1    sometimes it was race, but the investigations were investigations

09:17 2    of criminal conduct.  But where the predication was it's this

09:17 3    particular group, it's hard to take pieces of the yoke out of an

09:17 4    omelet, so to speak, of an investigation.

09:17 5            I think Your Honor is on to something there, that with

09:17 6    respect to organizationally in deciding how, whether, and where to

09:17 7    devote law enforcement resources, it's probably impossible if you

09:17 8    are in front of a congressional body to say here is why religion

09:17 9    played no role.

09:18 10           THE COURT:  This is not realistic.  For example,

09:18 11   Christianity played a role in the Crusades and no one would say

09:18 12   that was right.  That was a demented, twisted version of

09:18 13   Christianity.  The Klan uses Christianity.  That's again, a

09:18 14   demented, twisted area.

09:18 15           MR. SCHEPER:  And what, I think, gives our client great

09:18 16   protection against this lawsuit is that the *Vernon* case, the law

09:18 17   of the Ninth Circuit for the last 18 years, is that Christianity

09:18 18   and that particular assistant chief of the Los Angeles Police

09:18 19   Department's take on Christianity was the sole motivating factor

09:18 20   for the city of Los Angeles' decision to have him placed under

09:18 21   investigation and his conduct of the affairs of the LAPD.

09:18 22           Here, Your Honor, our point is simply this:  What was

09:18 23   the fair notice that this good lady and these two good men that we

09:19 24   represent had in June of 2006 that the allegations relating to

09:19 25   their First Amendment, Fourth Amendment, or FISA activities were

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:19  1  beyond the pale of what they could do when they went to work in

09:19  2  the morning?  And that's what is missing from the complaint.  And

09:19  3  they can't plead around it, Your Honor.  You can't plead that the

09:19  4  law should be changed.  You can't plead to Your Honor, as a

09:19  5  district court judge, that whatever the slate is before August 14

09:19  6  of 2012, from today and going forward, here is how law enforcement

09:19  7  agents ought to predicate their decisions whether, whom, and how

09:19  8  to investigate.

09:19  9         And that's the point I wanted Your Honor to -- I really

09:19 10  wanted to stress as a matter of oral argument.  I thought we wrote

09:19 11  it real well, but what I want Your Honor to take away from the

09:20 12  bench is you can't say that based upon the state of the law in

09:20 13  '06, through August of '07, that these men and this lady had any

09:20 14  basis at all to believe that they were intentionally violating a

09:20 15  federal statute or intentionally violating constitutional rights.

09:20 16         THE COURT:  And why is that not a factual dispute,

09:20 17  though, given the allegations of the complaint?  Let me try to

09:20 18  expand on that.  Isn't the focus on the allegations of the

09:20 19  surveillance?  And what is alleged in the complaint, I don't know

09:20 20  whether it's true, but what is alleged in the complaint is

09:20 21  unauthorized surveillance that the FBI directed from high levels

09:20 22  of people in their house, people in the mosque, in other areas

09:20 23  where the individuals had a reasonable expectation of privacy.

09:21 24         Now, I know there are a lot of other things that are

09:21 25  alleged, but just with respect to those allegations, I have to

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:21 1   assume that those allegations, for purposes of a motion to

09:21 2   dismiss, are true.  Why is that not good enough?  I didn't think

09:21 3   you had to worry about, okay, what is the ramifications of that

09:21 4   surveillance.  Is that a First Amendment violation?  Is that an

09:21 5   equal protection violation?  For purposes of qualified immunity,

09:21 6   doesn't it just focus on the underlying factual surveillance?

09:21 7         MR. SCHEPER:  Well, what I think Your Honor's inquiry

09:21 8   needs to be is, do the facts as pled, given the state of the law

09:21 9   at the time of the conduct in question show that there was -- that

09:21 10  it was beyond question that this was a constitutional violation?

09:21 11  And with respect to the informer, Monteilh, with respect to him

09:22 12  taking a bugging device and having it with him or conducting video

09:22 13  surveillance of his own under the cases we have cited in 2006 and

09:22 14  2007, the invited informer doctrine, we think, gave these agents

09:22 15  the protections of the qualified immunity.

09:22 16        Your Honor, the only place where I don't think we have a

09:22 17  slam-dunk on qualified immunity on the surveillance techniques is

09:22 18  there is an allegation that -- well, with respect to the bug,

09:22 19  there is a bug in a mosque.  And we have pointed out to Your Honor

09:22 20  in the papers that a bug in a mosque in the general area available

09:22 21  to the public in 2006 and 2007, highly distinguishable from the

09:23 22  instance of a bug placed, for example, in the confessional at St.

09:23 23  Anthony's or some other Catholic church.  And the cases point out

09:23 24  a difference between how private and how manifested is the desire

09:23 25  for privacy within a place.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:23 1         So the church assembly area is different

09:23 2    constitutionally from the confessional.  And even the private home

09:23 3    is different constitutionally and under the law of qualified

09:23 4    immunity if the blinds are shut versus the blinds are open.

09:23 5    That's the instruction the cases gave the agents in '06 and '07,

09:23 6    even assuming the allegations are true.

09:23 7         There is one allegation where it is that a bug

09:23 8    unattended was left in a private place.  I believe it was an

09:23 9    office.  A place where -- and the specific pleading there is not

09:24 10   that Monteilh did that.  The allegation is that Monteilh was told

09:24 11   by one of the agents that something like that had been done.

09:24 12        Our argument there is an *Iqbal*-based lack of

09:24 13   specificity, lack of ability to be able to defend yourself.  Who

09:24 14   is it alleged did what, where, when, under what circumstances.

09:24 15   And complicating Your Honor's mission a tiny bit here is that even

09:24 16   if the Court thought, well, the qualified immunity doesn't really

09:24 17   extend to leaving a bug unattended in somebody's private office,

09:24 18   you add to that under the state secrets that's going to be

09:24 19   asserted, these agents, in addition to not being informed in this

09:25 20   complaint who exactly did what that was wrongful, as opposed to

09:25 21   being told, Monteilh being told that something like that had been

09:25 22   done with no other specificity.

09:25 23        But as a practical matter you can't defend yourself,

09:25 24   because all you can do here is you can address factual allegations

09:25 25   that are based on Monteilh:  Were words said?  Did you utter words

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:25  1    back?  And that's a complaint and answer and let's hash out what

09:25  2    happened.  But to defend yourself, we're not allowed to go into

09:25  3    the manner, methods, means, and motivations under the government's

09:25  4    assertion of state secret.

09:25  5          So to summarize my argument, Your Honor, on FISA, First

09:25  6    Amendment and Fourth Amendment, qualified immunity says the law in

09:26  7    2006 and 2007 had to be crystal clear that the conduct alleged in

09:26  8    the best light to the plaintiff, crystal clear, that the conduct

09:26  9    alleged, beyond the pale, against the law.  Intentional violation

09:26 10    of Constitution.

09:26 11          The law wasn't even close to settled on all of the First

09:26 12    and Fourth Amendment conduct in question with that tiny exception

09:26 13    of the bug allegedly left, according to Monteilh, not an

09:26 14    eyewitness to it, an earwitness basically to a vague admission

09:26 15    where you have an *Iqbal* problem, and see our brief for the

09:26 16    discussion of that, and you have the practical impossibility of

09:26 17    these three agents defending themselves because of state secrets.

09:26 18          And obviously, Your Honor, if you have additional

09:27 19    questions that occur to you on the individual defendants, I'm just

09:27 20    right over here.  Thank you, sir.

09:27 21          THE COURT:  Appreciate it.

09:27 22          MR. NICHOLS:  Your Honor, Carl Nichols on behalf of

09:27 23    defendants Tidwell and Walls.

09:27 24          I just want to make two quick points on FISA, some of

09:27 25    which are relevant to what Mr. Scheper just talked about.  It's

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:27 1    the fact that under FISA, plaintiffs must allege that they are

09:27 2    aggrieved persons as a result of electronic surveillance.

09:27 3    Electronic surveillance is a defined term under FISA, and it is

09:27 4    defined as the use of an electronic device for monitoring to

09:27 5    acquire information under circumstances in which a person has a

09:27 6    reasonable expectation of privacy.

09:27 7         The result of that language, courts have held that FISA

09:27 8    is no more demanding than the Fourth Amendment for purposes of the

09:27 9    reasonable expectation of privacy analysis.  And so, to undertake

09:27 10   the FISA, qualified immunity requires you to undertake the precise

09:28 11   analysis that we have advocated you need to undertake on the

09:28 12   Fourth Amendment, which is to ask, in the circumstances alleged by

09:28 13   the plaintiffs -- and I won't go into the specifics, my colleague

09:28 14   has already done that -- did the plaintiffs have a reasonable

09:28 15   expectation of privacy in the communications that were allegedly

09:28 16   surveilled?

09:28 17        And to answer that question you have to ask, at the time

09:28 18   that the surveillance allegedly occurred, was it clearly

09:28 19   established that the plaintiffs had a reasonable expectation of

09:28 20   privacy?  And because of the invited informant doctrine and other

09:28 21   doctrines, our view is not only was it not clearly established at

09:28 22   the time that the plaintiffs had a reasonable expectation of

09:28 23   privacy in the vast majority of the communications that they

09:28 24   allege were surveilled, but, in fact, they did not under the law,

09:28 25   and so therefore it could not have been clearly established that

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:28  1    they had a reasonable expectation of privacy.  That's a general

09:28  2    FISA, Fourth Amendment overlay.

09:28  3          Then I have the specific issue about my clients.  As you

09:29  4    know, defendants Tidwell and Walls were not agents.  They were

09:29  5    supervisors.  And as to the FISA claim -- and I'll stick to the

09:29  6    FISA claim -- the allegations as to my clients' personal

09:29  7    involvement in the surveillance are incredibly thin at best.  In a

09:29  8    almost 300-paragraph complaint, defendant Tidwell is mentioned in

09:29  9    five paragraphs, defendant Walls is mentioned in four paragraphs.

09:29 10    One or two of those paragraphs overlap.  And the allegation as to

09:29 11    their involvement in any of the underlying actions that plaintiffs

09:29 12    allege here, including the so-called electronic surveillance, is

09:29 13    of the most general and conclusory nature.

09:29 14          So I would urge the Court to consider that, even if you

09:29 15    believe that there are some allegations that get past the

09:29 16    qualified immunity stage, as to the underlying alleged electronic

09:29 17    surveillance, the plaintiffs have not adequately alleged that our

09:30 18    clients participated in that electronic surveillance such that you

09:30 19    can say that defendants Tidwell and Walls intentionally violated

09:30 20    FISA by participating in the electronic surveillance.

09:30 21          I'd be happy to address other issues as we go, but I did

09:30 22    want to make those two points while we were discussing FISA, Your

09:30 23    Honor.

09:30 24          THE COURT:  Very well.  Okay.

09:30 25          MR. BIBRING:  Good morning, Your Honor.  Peter Bibring

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:30  1    from the ACLU of Southern California for plaintiff.

09:30  2            Before I begin, I wanted to explain a little bit about

09:30  3    how we'll be handling argument because of the volume of the

09:30  4    briefs.  My colleague Ahilan Arulanantham will be handling

09:30  5    essentially the government arguments, the claims against the

09:30  6    government, and I'll be handling the claims against the individual

09:30  7    defendants in their individual capacities.  So my colleague will

09:30  8    be generally addressing FISA against the government state secrets.

09:31  9            THE COURT:  The tough one is what you are telling me.

09:31 10            MR. BIBRING:  He likes to think so.

09:31 11            Although having said that, I'll start by addressing

09:31 12    *Al-Haramain*.  And we recognize that the Ninth Circuit's decision

09:31 13    last week forecloses the claim against the government on sovereign

09:31 14    immunity grounds today.  We don't waive that issue because we

09:31 15    would like to preserve it for review.  But with respect to the

09:31 16    individual defendants, the FISA claim is very much still alive as

09:31 17    the defense counsel just recounted.

09:31 18            FISA 1810 provides for cause of action against any

09:31 19    person who commits a violation of section 1809.  Basically

09:31 20    conducting electronic surveillance in a circumstance where an

09:31 21    individual has a reasonable expectation of privacy.  A person

09:31 22    obviously naturally understood to include a person, but is

09:31 23    specifically defined in 1801 section M as any individual,

09:32 24    including any officer or employee of the federal government.

09:32 25    Certainly 1810 has to apply to someone.  And the fact that it

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:32 1  doesn't apply to the government strongly suggests that it applies

09:32 2  to individuals in their individual capacity.

09:32 3      We certainly agree with the defense counsel that FISA

09:32 4  standards are the same as the Fourth Amendment.  It's not more

09:32 5  demanding.  So the question is, for the qualified immunity

09:32 6  analysis, were the defendants put on fair notice, in 2006 and

09:32 7  2007, that their actions would violate the Fourth Amendment?  And

09:32 8  here, and I think it's worth recounting some of the factual

09:32 9  allegations in the complaint.

09:32 10      THE COURT:  I agree.

09:32 11      MR. BIBRING:  First of all -- and I'll do so with

09:32 12  respect to the entire investigation.  Defendants are alleged to

09:32 13  have conducted an investigation in the name of counterterrorism

09:33 14  where they recruited a former convicted felon, trained him and

09:33 15  paid him to pose as a convert to Islam to publicly convert to

09:33 16  Islam in a mosque before hundreds of people in one of the biggest

09:33 17  and most diverse mosques in Orange County.  They did not give him

09:33 18  any targets.

09:33 19      It's alleged in paragraph 89 and 90 of our complaint

09:33 20  that he was provided no targets, but simply told to gather as much

09:33 21  information on as many members of the Muslim community as

09:33 22  possible.  His handlers told him that the United States was five

09:33 23  to 10 years behind Europe in the extent of the Islamic presence;

09:33 24  that they needed to get as many files on the Muslim community as

09:33 25  possible so that if something happened, they knew where to go.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:33  1         He was told to gather information about contact

09:33  2    information, people's personal history, job history, travel plans,

09:33  3    their information about their families.  He was given, in

09:34  4    paragraph 131, alleged, he was given by his handlers quotas of

09:34  5    numbers of Muslims on which to gather contact information.

09:34  6         His handler specifically told him that they believe that

09:34  7    Islam was a threat to national security.  They also told him to

09:34  8    target individuals who were more devout because those people would

09:34  9    be more dangerous.  So people who attended mosque more often, who

09:34  10   were leaders in the mosque, who had taken a leadership role, or

09:34  11   who seemed to be leaders in the Muslim community were targeted for

09:34  12   especially close scrutiny for additional surveillance.

09:34  13        With respect to the FISA claims, in addition to it being

09:34  14   alleged that the informant, because of his criminal background,

09:34  15   taped constantly, every time he was in contact with anybody in

09:34  16   this community he was recording with recording devices that the

09:35  17   agents had given him.  In addition to that constant recording, he

09:35  18   came to arrive at mosques early so that he could steal security

09:35  19   codes which he gave to his handlers.  They told him they had

09:35  20   entered the mosque and planted devices.  They told him they had

09:35  21   placed listening devices in plaintiff Fazaga's private office.

09:35  22   Fazaga was an iman in one of the mosques in Orange County.

09:35  23        They told him, for plaintiff Abdelrahim, they

09:35  24   occasionally called him and said -- they gave him instructions to

09:35  25   go over to Abdelrahim's house because something was happening.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:35 1   When he asked how they knew, they indicated that they had audio

09:35 2   surveillance inside the house.  That's at paragraph 209.

09:35 3          It's also alleged in the complaint that the informant

09:35 4   was given video, sophisticated video surveillance apparatus; that

09:35 5   he warned this person and took recordings not only in public

09:36 6   places of the mosque, but also inside Abdelrahim's home.

09:36 7          THE COURT:  The detail is helpful to me.  I appreciate

09:36 8   that.

09:36 9          MR. BIBRING:  Thank you, Your Honor.

09:36 10         So with respect to FISA -- and lastly, the allegations

09:36 11  are that defendant had this sophisticated listening device.  It

09:36 12  was a recorder that was on his key fob.  That he would go into the

09:36 13  mosque and, following evening prayers, there would be small

09:36 14  halakas, prayer discussion, religion discussion groups that would

09:36 15  meet in a corner of the prayer hall.  He would leave his

09:36 16  belongings, including his key fob, next to the halaka and go to a

09:36 17  different part of the mosque, effectively leaving a temporary bug

09:37 18  there to record conversations and would tell his agents who had

09:37 19  been present at that so that they could identify voices.

09:37 20         So the question is, in 2006 and 2007, and for purposes

09:37 21  of qualified immunity under both FISA and the Fourth Amendment,

09:37 22  what of this conduct -- and the First Amendment, too -- but what

09:37 23  of this conduct did defendants have fair notice would be unlawful

09:37 24  under the constitution?

09:37 25         First of all, I wanted to address an argument that comes

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:37  1   up throughout defendants' briefs that to the extent that it's not

09:37  2   clear that a particular cause of action exists under perhaps FISA,

09:37  3   that perhaps FISA applies to individuals as opposed to the

09:37  4   government, or that a *Bivens* action exists that is not a proper

09:37  5   subject for qualified immunity.  The question for qualified

09:37  6   immunity is whether the conduct is unlawful, not whether a

09:37  7   particular statute provides liability or not.

09:37  8         So if the conduct is clearly unlawful under the Fourth

09:38  9   Amendment and FISA, because there is a violation of a reasonable

09:38 10   expectation of privacy, whether or not it's clearly established

09:38 11   that liability exists through FISA, that's not a proper

09:38 12   consideration for this Court, because the purpose of qualified

09:38 13   immunity is to allow government officials some breathing room to

09:38 14   work in unsettled areas of law.  Where the substantive area of law

09:38 15   is settled, but the procedural hurdles are not, there is no reason

09:38 16   to confer liability.  There is no reason for a Court not to

09:38 17   dis-incentivize a clear violation of the constitution.

09:38 18         In 2006 and 2007, defendants would be hard-pressed to

09:38 19   argue that placing surveillance in a private office without a

09:38 20   warrant did not violate a reasonable expectation of privacy, first

09:38 21   of all.

09:39 22         There are the Ninth Circuit cases from *Taketa* and *Nerber*

09:39 23   which *Taketa* clearly establishes this.  I think that's enough.

09:39 24   And defendants haven't really contested that point.

09:39 25         With respect -- the same is true with respect to

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:39 1   Abdelrahim's home.  It's clear that the warrantless placement of a

09:39 2   audio surveillance device in a home is a violation of the

09:39 3   reasonable expectation of privacy.

09:39 4         In our briefs we cited *United States v. Yendes*, which is

09:39 5   a district court opinion from Southern District of California from

09:39 6   2007 which defendants take issue with arguing that it can't

09:39 7   clearly establish in 2007 what was unlawful in 2006.  That case

09:39 8   addresses warrantless placement of a bug in a hotel conference

09:39 9   room.  The point of *Yendes*, citing *Yendes*, is that that Court

09:39 10  decided based on *Taketa, Nerber*, and other precedents from more

09:39 11  than a decade before, that in 2007 it was clearly -- that as of

09:39 12  2007 it was clearly established that this warrantless placement of

09:40 13  bugs constituted a violation of privacy.  For the same reasons

09:40 14  that the *Yendes* Court reached that conclusion, this Court can.

09:40 15  It's not that *Yendes* clearly established it.  It's that the

09:40 16  precedent on which *Yendes* relied clearly established it.

09:40 17        With respect to the video surveillance, it's very clear

09:40 18  that the Ninth Circuit has treated video surveillance differently

09:40 19  than audio surveillance.  *Taketa* makes that point.  And in *United*

09:40 20  *States v. Nerber*, the Court is clear that, for example --

09:40 21  actually, the Court specifically says, in dicta, albeit, but

09:40 22  specifically says that it imagined -- although it upholds the use

09:40 23  of warrantless video surveillance placed on an informant in a

09:40 24  hotel room where the informant was not a resident of the hotel

09:40 25  room, was merely visiting for a drug transaction, it's very

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:40  1   cautious about that, and specifically says that it does not

09:41  2   imagine it would uphold the use of video surveillance even by an

09:41  3   informant inside a private home, a person's private home.  But

09:41  4   that's exactly what happened with respect to plaintiff Abdelrahim.

09:41  5   And it happened not only in the home, but video surveillance was

09:41  6   conducted at the mosque as well including in -- not just in large

09:41  7   public areas.

09:41  8          With respect to the invited informer doctrine on which

09:41  9   defendants rely, the invited informer doctrine requires that the

09:41 10   investigation be conducted in good faith.  It's a protection

09:41 11   against the very sweeping rule that an informer, in situations

09:41 12   where there is an otherwise or reasonable expectation of privacy,

09:41 13   that an informer can conduct warrantless video surveillance.  The

09:42 14   Ninth Circuit is very clear about this, most recently in *United*

09:42 15   *States v. Mayer*.

09:42 16          Defendants, I believe it's in Armstrong, Allen and

09:42 17   Rose's brief in reply, suggests that *United States v. Mayer* is a

09:42 18   Fifth Amendment case, but they actually reach that conclusion by

09:42 19   deleting with ellipsis the part that references the Fourth

09:42 20   Amendment.  They, in parenthetical, cite the quote, "Good faith

09:42 21   has been an implicit requirement for investigations under the

09:42 22   Fifth Amendment."  But the full sentence reads, "And searches

09:42 23   under the Fourth Amendment."

09:42 24          And it's clear *United States v. Mayer* is a Fourth

09:42 25   Amendment case.  It's a criminal case in which a criminal

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:42  1    defendant seeks an exclusion of evidence on grounds that the

09:42  2    recordings made by an informant do not satisfy the good faith

09:43  3    requirement of the invited informer doctrine.  So the invited

09:43  4    informer doctrine does not apply.

09:43  5          If you look at the case, the heading is Fourth

09:43  6    Amendment.  Subheading A is invited informer doctrine.  Subheading

09:43  7    B is the good faith requirement of the invited informer doctrine.

09:43  8    The case explicitly says that it's discussing the interactions

09:43  9    between the First and Fourth Amendment because the plaintiff

09:43 10    alleges that he was being targeted because of his First Amendment

09:43 11    associations, and holds that good faith must mean the

09:43 12    investigation must not be for the purpose of abridging First

09:43 13    Amendment freedoms.

09:43 14          Now, *Mayer* is in 2007, but *Mayer* relies strongly, and

09:43 15    largely, on the discussion of the good faith requirement.  In a

09:43 16    similar case, *United States v. Aguilar*, similar in procedural

09:43 17    posture in that the defendant was seeking the exclusion of

09:44 18    recordings made by informants on grounds that they were being

09:44 19    targeted because of their First Amendment activity and reaches the

09:44 20    same holding.  *United States v. Aguilar* puts defendants in 2006

09:44 21    and 2007 on notice that targeting individuals because of their

09:44 22    religion not only is unconstitutional in itself, but should waive

09:44 23    the invited informer doctrine and make the recordings that they

09:44 24    make, that they have their informer make when he is targeting

09:44 25    people on the basis of their religion, make that a violation of

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:44 1    the Fourth Amendment and FISA.

09:44 2              And Your Honor, I have plenty to say on the First

09:44 3    Amendment issue that defendants Allen, Armstrong, and Rose raised.

09:44 4    Actually, before I get to that, I wanted to address one further

09:44 5    issue, which is supervisory liability.

09:45 6              It is still the law in this circuit as set forth in

09:45 7    *Al-Kidd* and recently reaffirmed in *Mosque v. U.S. Secret Service*

09:45 8    this year, that supervisors are liable for setting in motion a

09:45 9    series of acts by others or knowingly refusing to terminate a

09:45 10   series of acts by others which they knew or reasonably should have

09:45 11   known would cause others to inflict constitutional injury.

09:45 12   They're liable for culpable inaction in training, supervision and

09:45 13   control of subordinates.  They're liable for acquiescence and

09:45 14   constitutional deprivation by subordinates, or for conduct that

09:45 15   shows reckless or callous indifference to the rights of others.

09:45 16             Now, the United States -- the Supreme Court in *Iqbal*

09:45 17   addressed supervisory liability in the context of religious

09:46 18   discrimination that was pled through a claim that an otherwise

09:46 19   facially neutral program showed discriminatory intent.  And the

09:46 20   Supreme Court held that in order to make out a claim of religious

09:46 21   discrimination under that theory for supervisors, the plaintiffs

09:46 22   had to show that the supervisors possessed the requisite intent.

09:46 23   That they discriminated on the basis of religion.

09:46 24             This case is a very different case than *Iqbal*.  This

09:46 25   case is not a case where we're asking the Court to conclude,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:46 1   because of a disparate impact on Muslims in this investigation,

09:46 2   that it must have been motivated by religion despite having

09:46 3   facially neutral characteristics.  This is a case where we, in our

09:46 4   pleadings, point to a facial policy that makes religion a

09:46 5   consideration of who to investigate and who not to investigate.

09:46 6   That is explicit facial discrimination.  And courts have been

09:46 7   clear that in *United Auto Workers v. Johnson Controls*, which is

09:47 8   cited in our brief, that the lack of a malicious motive does not

09:47 9   convert a facially discriminatory program into a neutral one.

09:47 10  This is facial discrimination.

09:47 11         For us to prevail on our discrimination claims, all we

09:47 12  need to show is that that facial discrimination existed.  Not that

09:47 13  it was for a malicious motive.  For us to prevail against

09:47 14  supervisors on this religious discrimination theory, all we need

09:47 15  to show is that they knew, approved of, and supervised an

09:47 16  operation where they knew that the primary purpose of it, the core

09:47 17  feature of it was to target people because they were Muslims.  Was

09:47 18  to make religious practice a criteria that the more religious you

09:47 19  are, the more you were focused on in this investigation.

09:47 20         The allegations do easily make that plausible, which is

09:47 21  all that we are required to do under *Iqbal*.  The complaint alleges

09:47 22  that defendant Tidwell approved the investigation in advance.

09:48 23  Approved of the hiring of the informant.  Read the daily notes

09:48 24  that Monteilh made about -- his handlers asked him to make notes

09:48 25  about everything he did.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:48  1          The complaint alleges that Tidwell read all those daily

09:48  2    notes.  The complaint alleges with respect to Walls -- so

09:48  3    defendant Tidwell was the assistant director in charge of the Los

09:48  4    Angeles field office.  Defendant Walls was the assistant special

09:48  5    agent in charge of the Orange County branch of the Los Angeles

09:48  6    field office.  She was a direct supervisor of the two agents who

09:48  7    were working out of the Orange County field office.  She was at

09:48  8    one point audited for -- the complaint alleges that she was

09:48  9    audited for her mishandling of leads from the investigation.  So

09:48 10    she was certainly in direct control enough that she bore

09:48 11    responsibility for mishandling leads that were coming out of the

09:48 12    investigation.

09:48 13          The complaint alleges that she eventually became

09:49 14    troubled by Monteilh, disliked him, and pushed for the termination

09:49 15    of the operation and was present at the final meeting where

09:49 16    Monteilh was essentially discharged.

09:49 17          That certainly shows a level of involvement with the

09:49 18    operation that would suggest she knew that its core feature was to

09:49 19    focus on Muslims.

09:49 20          Defendant Rose was in the Orange County office with the

09:49 21    direct supervisor of the two agents in charge.  It's alleged that

09:49 22    the notes went up the chain.  Certainly if Tidwell was reading all

09:49 23    the daily notes, one would expect that the direct supervisor would

09:49 24    be.  Also, specifically Rose was alleged to have gone to

09:49 25    Washington to seek approval for an expansion and scope of the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:49  1   program, the construction of a Muslim-only gym at which the

09:49  2   informant could collect more information on the Muslim community.

09:49  3        These allegations are very specific non-conclusory

09:49  4   allegations.  We are not alleging -- we're not making these

09:49  5   allegations up because they think this is so.  We're making these

09:50  6   allegations because the informant has said that his handlers told

09:50  7   him that.  And if his handlers told him that, it is plausible that

09:50  8   the reason they did so was because it was true.

09:50  9        In combination with all of those, his handlers said that

09:50 10   this operation was one of the most important operations in the

09:50 11   United States at the time.  That the information he was giving was

09:50 12   going to Washington.  That he was considered at one point gold in

09:50 13   Washington.  Given the importance of the operation, given the

09:50 14   direct role that the supervisors are alleged to have in overseeing

09:50 15   the day-to-day operations, it is more than plausible that they

09:50 16   knew about the central feature of this operation.  That it focused

09:50 17   on Muslims.  That Monteilh was instructed -- was not given

09:50 18   targets, but was instructed to find as much information as

09:50 19   possible on the Muslim community.  In fact, it's implausible that

09:51 20   they didn't know.

09:51 21        With respect to the First Amendment arguments, Your

09:51 22   Honor, I'm happy to address them now or to wait until defendants

09:51 23   have a chance, whatever the Court prefers.

09:51 24        THE COURT:  What you have argued so far is very helpful.

09:51 25   I'm not sure, candidly, I need much more from your side on the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:51  1    individual liability on the FISA claim.

09:51  2            Are you conceding the sovereign immunity does apply on

09:51  3    the government?

09:51  4            MR. BIBRING:  As of today, Your Honor, we certainly

09:51  5    concede that under *Al-Haramain* that plaintiffs' claim is

09:51  6    foreclosed on sovereign immunity grounds.  As we said, we don't

09:51  7    waive that claim because we would like to preserve it for review,

09:51  8    but we certainly concede that *Al-Haramain* forecloses it against

09:51  9    the government.

09:51 10            THE COURT:  Okay.  Is there anything more the government

09:51 11    would like to say on FISA?

09:52 12            MR. SCHEPER:  Yes, Your Honor.  FISA, Fourth Amendment,

09:52 13    view them together.

09:52 14            What I think, Your Honor, this seems like the kind of

09:52 15    case where you have read a lot of stuff, you have digested it, you

09:52 16    came out with some questions.  You have now heard words spoken

09:52 17    today.  And I thought I would point out to Your Honor the area of

09:52 18    agreement.  An area of agreement on behalf of the individual

09:52 19    defendants and the plaintiffs is that your decision as to whether

09:52 20    they remain in the lawsuit hinges on whether in 2006 there was

09:52 21    fair notice under FISA, Fourth Amendment jurisprudence, and the

09:52 22    First Amendment jurisprudence, was there fair notice to these

09:52 23    three individuals we represent, and also agents Tidwell and Walls,

09:53 24    was there fair notice that the activities in question were clear

09:53 25    violations of FISA/Fourth Amendment law and clear violations of

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:53  1   the First Amendment.

09:53  2           I'd urge Your Honor, in going back and thinking about

09:53  3   the words spoken today and the briefs and the cases, we would ask

09:53  4   you on the question of the Fourth Amendment or FISA, the cases

09:53  5   that even the plaintiffs point you to are *Aguilar* and *Mayer*, we

09:53  6   discuss those, Your Honor, at page 9 of our reply brief.  But I

09:53  7   was struck, and I know the Court was struck too, that the question

09:53  8   here is the effort by the plaintiffs to parachute into Fourth

09:53  9   Amendment jurisprudence a good faith requirement.

09:53 10          We think the cases and the notice our clients was on in

09:54 11   2006 under *Aguilar* and its progeny, was that the Fourth Amendment

09:54 12   is an objective test.  Not subjective, not good faith.  The fact

09:54 13   that Mr. Bibring talked about how, in 2006, when these agents went

09:54 14   to work, oh, it was clear for you to see that the good faith Fifth

09:54 15   Amendment is imposed on Fourth Amendment jurisprudence as well,

09:54 16   because look at the way, while it may say this, that Fourth

09:54 17   Amendment's objective, if you really take a good lawyer's reading

09:54 18   of it, you can sort of see that there is also a good faith Fifth

09:54 19   Amendment obligation imported on to that.

09:54 20          That's not fair notice if it takes a very eloquent

09:54 21   lawyer, in August of 2012, to go back six years and two months to

09:54 22   say that's what these agents should have had in their mindset.  We

09:54 23   would urge your court read our briefs again and our discussion at

09:55 24   page 9 of our reply on what the notice was at that time.

09:55 25          The other thing I wanted to respond to, Your Honor, is

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:55 1   Mr. Nichols spoke on the supervisory point about agents Walls and

09:55 2   Tidwell and the same arguments apply to Agent Rose.  So the way we

09:55 3   had broken down, he was going to discuss supervisory and I did not

09:55 4   mention Agent Rose earlier.

09:55 5       The final thing, Your Honor.  What I just said about the

09:55 6   fair notice on the invited informer, that's the *Aguilar* and that's

09:55 7   the *Mayer* discussion.  And, Your Honor, there is just no way in

09:55 8   June of 2006, fairly read, these folks were on notice that this

09:55 9   informer couldn't bring a bug with him and consent on behalf of

09:55 10  the government to recording or video.

09:56 11      Lastly, Your Honor, Mr. Bibring spoke about the

09:56 12  placement of a bug in a home and an office.  In real strict -- in

09:56 13  your reading of the allegations, Your Honor, and in deciding that

09:56 14  last piece, it's not alleged that Monteilh did that.  It's not

09:56 15  alleged that he has direct knowledge, and it's not alleged that we

09:56 16  did that.  It's only alleged that Monteilh heard that such a thing

09:56 17  was done from one of the agents.  That's the only FISA or Fourth

09:56 18  Amendment claim that is not squarely within the qualified immunity

09:56 19  protections that we discussed in our briefing, and that is

09:56 20  particularly the *Mayer* and *Aguilar* line of cases.

09:56 21      And with respect again, Your Honor, to the First

09:57 22  Amendment, I didn't hear the plaintiff counsel address the Court's

09:57 23  concern about whether it's realistic in the arena of investigating

09:57 24  terrorism to carve religion out as playing a role.  We don't need

09:57 25  to argue that point because *Vernon* told us, in 1994, that religion

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

09:57 1    could be the sole motivating impetus for an investigation.

09:57 2    Certainly in June of 2006 where it's conceded that there was the

09:57 3    purpose in play of trying to investigate terrorism, these agents

09:57 4    couldn't have thought it was against the law that in the scope of

09:57 5    their investigation was a particular religion.

09:57 6           I thank you, Your Honor.

09:57 7           THE COURT:  Thank you.  Okay.  I'd like to give the

09:57 8    court reporter a break.  Why don't we take about a 10 or 15-minute

09:58 9    break and then we'll deal with the state secrets privilege.

09:58 10          (Recess taken, from  9:58 to 10:14.)

10:15 11          THE COURT:  Let's move to the state secrets privilege.

10:15 12   It might seem like a softball question or issue, and I guess it's

10:15 13   how you characterize it, but from the defendant's standpoint, why

10:15 14   do you need privileged information to defend against the

10:15 15   plaintiff's claims?

10:15 16          And then from the plaintiff's standpoint, are you taking

10:15 17   the position that privileged information isn't needed to defend

10:15 18   against the claims?  Or are you saying if there is any privileged

10:15 19   information that needs to be disclosed, that's just the way it is

10:16 20   given the allegations of constitutional violations?

10:16 21          So again, why don't we start with the defendants because

10:16 22   it's their motion.

10:16 23          MR. COPPOLINO:  Thank you, Your Honor.  Again, for the

10:16 24   record, I'm Anthony Coppolino, Department of Justice, civil

10:16 25   division.  And in addition to representing the FBI in connection

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:16 1   with the injunction claims against them, I'm representing the

10:16 2   government with respect to the state secrets privilege issues.

10:16 3        Your Honor, your two questions, if might compliment you,

10:16 4   hit the issue right on the head.  Those are the two questions.

10:16 5   There are many issues in the case.  You have heard about some of

10:16 6   them, but the case really boils down to one question:  Can you

10:16 7   adjudicate what happened in a counterterrorism investigation in

10:16 8   federal court?  That's the, really, the sole issue in this case.

10:16 9        The plaintiffs make allegations about what happened in

10:16 10  this Operation Flex in 2006 and 2007, and they're just

10:17 11  allegations.  They should not be assumed to be true.  They allege

10:17 12  that Mr. Monteilh, the former confidential source of the bureau,

10:17 13  engaged in an indiscriminate investigation based on religion.  So

10:17 14  the lawsuit puts at issue what happened in that investigation.

10:17 15  What did the bureau do?  Who was being investigated?  Why and how?

10:17 16  That information is central to every issue in this case, certainly

10:17 17  all of the individual capacity -- all of the individual capacity

10:17 18  claims, all of the religious discrimination claims.

10:17 19        The plaintiffs need to know the answer to those

10:17 20  questions -- who was investigated, why and how -- in order to

10:17 21  establish their prima facie case.

10:17 22        The individual capacity defendants undoubtedly need that

10:17 23  information in order to defend.  This lawsuit says, you did

10:17 24  something illegal.  And their defense has to be, well, here is

10:17 25  what we did.  Here is who we were investigating, why and how.  And

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:18  1    even if both sides, even if the plaintiffs or the individual

10:18  2    capacity defendants could somehow muster a defense without

10:18  3    privileged information, the privileged information is clearly

10:18  4    intertwined in what happened.  The lawsuit is about what happened

10:18  5    in this investigation.

10:18  6            Now, as you undoubtedly have had a chance to see,

10:18  7    Attorney General Holder, with the support of the FBI, has set

10:18  8    forth why certain details of this investigation are highly

10:18  9    sensitive information and disclosure would cause -- would

10:18 10    reasonably be expected to cause significant harm to national

10:18 11    security.

10:18 12            This information is not at the periphery of the case.

10:18 13    It is central to resolving this lawsuit.  And that is because the

10:18 14    claims as issue clearly raise the question:  What was going on

10:18 15    here?  Who was being investigated?  Was there indiscriminate

10:18 16    surveillance?  Was it based solely on religion?  Which is what the

10:18 17    complaint alleges.  Or as the plaintiffs now seem to be arguing,

10:19 18    was religion merely a factor?

10:19 19            Whatever their allegation is, you have to know what is

10:19 20    going on.  And I think, as a threshold matter, the government has

10:19 21    demonstrated that particular categories of information are

10:19 22    properly protected.

10:19 23            Now, I should say, before I get into the specifics of

10:19 24    that, I acknowledge that the state secrets privilege and the

10:19 25    assertion of the states secrets privilege in a case like this

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:19 1    might be perceived as unfair or harsh.  And certainly I think the

10:19 2    courts have recognized it's a difficult proposition.

10:19 3         We saw in the *Jeppesen* case, which is the governing

10:19 4    precedent in this case, the Ninth Circuit observed that the state

10:19 5    secrets privilege presents the Court with a painful choice --

10:19 6    those were their words.  In that case you had allegations that an

10:19 7    individual had been subject to rendition and tortured and yet, in

10:19 8    the face of those very difficult allegations, the Ninth Circuit

10:19 9    had to conclude, based on the government's showing, that the need

10:20 10   to protect national security surmounted that.

10:20 11        And I think the *Casa* Court, another Ninth Circuit

10:20 12   opinion a few years earlier, put it very well.  Dismissal based on

10:20 13   the state secrets privilege may seem to be a harsh remedy, but the

10:20 14   results can be harsh in both sides.  And the state secrets

10:20 15   doctrine ultimately recognizes that the less remedy, the greater

10:20 16   public good, is to protect the national security interests that

10:20 17   are at stake.

10:20 18        Now, the law addresses concern as to whether the

10:20 19   government is proper asserting privilege, first of all, through

10:20 20   judicial review.  Contrary to what I think the plaintiffs have

10:20 21   suggested in their briefs, state secrets privilege does not

10:20 22   represent any kind of a surrender by the courts to the executive

10:20 23   branch's association of privilege.  This is a matter that has to

10:20 24   be reviewed by the courts.  Both *Jeppesen* and the government's own

10:20 25   policy require that the assertion be supported with a robust

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:21 1   submission to the Court.  And I believe we have made that -- such

10:21 2   a submission to this Court.

10:21 3        The government's own policy requires that this privilege

10:21 4   cannot be asserted other than by the head of the agency that is

10:21 5   responsible for the information.  In this case, by the attorney

10:21 6   general of the United States.  As it happens, the Department of

10:21 7   Justice also has a policy which is that the attorney general must

10:21 8   review every state secrets privilege assertion by any other

10:21 9   agency.  So we take very due care to insure that we do not seek to

10:21 10  protect information that doesn't require protection.  And we leave

10:21 11  that for the Court to evaluate.

10:21 12       Happy to address any questions about that.  Obviously we

10:21 13  can't get into the classified details here, but I think you'll

10:21 14  find, Your Honor, that the presentation we have made in support of

10:21 15  the privilege assertion demonstrates that disclosure of

10:21 16  information in the three categories that we have put at issue:

10:21 17  Who were the subjects of these investigations?  Why were they

10:21 18  being investigated?  And how?  That that's properly privileged

10:22 19  information.

10:22 20       THE COURT:  Let me ask you a question on that, and it is

10:22 21  a question.  I'm not trying to argue and don't imply anything from

10:22 22  my question, but given the passage of time, what is going to be so

10:22 23  detrimental to national security if the public is told who were

10:22 24  the subjects of Operation Flex, why were these people

10:22 25  investigated, and what were the methods and tactics used to

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:22  1    investigate them?

10:22  2         MR. COPPOLINO:  Your Honor, I can only address it in

10:22  3    general unclassified terms, and I don't think I can improve upon

10:22  4    the descriptions that were in the declarations of Attorney General

10:22  5    Holder and the FBI's assistant director Mr. Giuliano.  But with

10:23  6    respect to who was subject, who is a subject or who was a subject

10:23  7    or in fact, who may not be a subject, the disclosure of who is or

10:23  8    is not a subject of an investigation reveals a range of sensitive

10:23  9    information.

10:23 10         For example, if a person is, in fact, still subject of

10:23 11    an investigation, it should be obvious that you don't alert such

10:23 12    an individual to the fact that the FBI is conducting a

10:23 13    counterterrorism investigation on that person.  That would allow

10:23 14    that individual to avoid detection, perhaps leave the country and

10:23 15    take some other type of evasive step.  That's the fairly obvious

10:23 16    example of why you protect who is a subject of investigation.

10:23 17         THE COURT:  But I certainly can agree, conceptually, if

10:23 18    you are talking about an immediate threat or a threat in the

10:23 19    recent past.  But if you are talking about someone who is the

10:23 20    subject of an investigation 10, 15, 16 years ago, what is the harm

10:24 21    and the threat to national security being told now?

10:24 22         MR. COPPOLINO:  Well, the harm could vary in a

10:24 23    particular case if it is old.  So it's hard to address the

10:24 24    question just simply in a general term.  But even as to an old

10:24 25    investigation, revealing who was a subject, if that's not been

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:24 1    revealed before, for example, in a prosecution, would indicate,

10:24 2    particularly in a counterterrorism area, the concerns that the

10:24 3    government had; what particular matter was motivating the

10:24 4    government to investigate that person.

10:24 5         And that could involve significant intelligence

10:24 6    information, for example.  It could involve significant concerns

10:24 7    about that individual that may or may not have panned out, but

10:24 8    nonetheless, if revealed, would reveal how the FBI goes about

10:24 9    undertaking a counterterrorism investigation, the kinds of people

10:24 10   it might have of interest in a counterterrorism investigation.

10:25 11   And that information could cause harm for years to come.

10:25 12        I actually don't think 10 or 15 years is that long ago,

10:25 13   but in fact, the kinds of concerns we had 10 years ago, which was

10:25 14   September 11, 2001, are concerns that we still have today and the

10:25 15   need to protect the kind of information that's related to

10:25 16   counterterrorism investigations, such as who are the people we are

10:25 17   interested?  What are the problems and concerns that we're

10:25 18   interested in?  Those are still valid national security matters.

10:25 19        In this instance, Mr. Guiliano indicated to you that

10:25 20   this investigation was aimed at detecting and preventing a

10:25 21   terrorist attack.  Still, obviously, something of vital interest

10:25 22   and concern to the national security of the United States.  He

10:25 23   indicated it was a particular concern about identifying whether

10:25 24   particular individuals were involved in planning terrorist attacks

10:25 25   and engaged in extremism and either attacks in the United States

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:25  1    or abroad.  It was a concern 10 years ago, 20 years ago, it's a

10:26  2    concern today.

10:26  3           And so revealing the detail of counterterrorism

10:26  4    investigations, who is subject and why, in our view would expose

10:26  5    sensitive information that would allow adversaries to examine it

10:26  6    and determine, why does the FBI investigate certain things?  What

10:26  7    kind of things does it investigate?  Where does it focus its

10:26  8    concerns?  How does it go about doing it?

10:26  9           One of the reasons that the investigation of subjects in

10:26 10    particular is very important is that even if a particular person

10:26 11    is cleared as a subject, or even if we were to indicate that a

10:26 12    person was not a subject at all, that would tell people what the

10:26 13    focus of the investigation was, and it would tell people in

10:26 14    particular -- it might tell -- for example, people who are

10:26 15    associates of that subject might take a look at that and say they

10:26 16    may not have been interested in that particular person, but they

10:26 17    may have been looking at them because of me, or somebody else

10:26 18    that's associating with them.  And that's a very real serious and

10:27 19    significant problem.

10:27 20           And so, I think as I say, the declarations explain it

10:27 21    best, but the reason we protect who is subject to investigation is

10:27 22    not to alert adversaries as to who actually is being investigated

10:27 23    or the particular concerns that were at issue in a particular

10:27 24    case, such as Operation Flex.  It reveals the sources and methods

10:27 25    of the bureau, revealed the investigative focus, it reveals how we

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:27 1    go about doing counterterrorism here in the United States.

10:27 2         Now, the plaintiffs argue that this information isn't

10:27 3    properly protected, but I think *Jeppesen* and many other cases make

10:27 4    clear that courts should defer to the judgment of the executive

10:27 5    branch, a judgment that we document, a judgment that we have to

10:27 6    demonstrate to the Court is well-founded, and one in which we can

10:27 7    show that there is a reasonable danger of harm to national

10:27 8    security.

10:27 9         And by the way, I would add a couple of points apropos

10:27 10   to your question.  Not only do courts defer to the judgment of the

10:28 11   executive branch, again, as long as it's well-documented and

10:28 12   demonstrates that reasonable harm, but courts recognize that

10:28 13   certain bits of information, even if they seem innocuous -- for

10:28 14   example, somebody who was subject to investigation 10 years ago --

10:28 15   in the hands of a skilled adversary, an effective and intelligent

10:28 16   service that's undertaking intelligence activities against the

10:28 17   United States could demonstrate something highly significant.  It

10:28 18   could fill in the piece of the puzzle, or the mosaic as the cases

10:28 19   refer to it, that was missing, and demonstrate to our adversaries

10:28 20   precisely what the government was doing at that point in time

10:28 21   which could have continuing relevance on into the future.

10:28 22        The battle against terrorism is going on more than 10

10:28 23   years, and unfortunately will probably go on for much longer.  And

10:28 24   that's why judgments as to which bits information should be

10:28 25   protected are ones that are highly significant and ones to which I

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:28  1   think courts appropriately defer.

10:29  2          Now, I think the central issue in this case is not only

10:29  3   who was subject because if the evidence were that only particular

10:29  4   individuals were subject to investigation, and the government has

10:29  5   indicated in its declarations that fewer than 25 were subject to

10:29  6   Operation Flex, that alone would be evidence that a defendant

10:29  7   would need to demonstrate that this did not involve an

10:29  8   indiscriminate dragnet surveillance.

10:29  9          The second thing the defendants would need to

10:29 10   demonstrate is why were these folks investigated, whoever they

10:29 11   were, one, 10, 25, why were they subject to investigation?

10:29 12          The complaint alleges that it was based solely on

10:29 13   religion.  You heard Mr. Bibring get up and say his witness has

10:29 14   alleged that it was wholly indiscriminate.  That there were no

10:29 15   targets.  That it was entirely to collect files to catch up with

10:29 16   Europe.  That's at least the allegations.  But in fact, if you

10:29 17   look at the state secrets privilege assertion that we have put

10:30 18   forward, the reasons why particular individuals are subject to

10:30 19   investigation are highly sensitive.  For example, those reasons

10:30 20   could indicate that there was a particular concern that that

10:30 21   person was associated with someone who was associated with a

10:30 22   terrorist attack, or that there was some credible intelligence

10:30 23   that there was a terrorist attack being planned, for example, in

10:30 24   Southern California.  And we have indicated in our public

10:30 25   declaration that that, in fact, was the case in 2005, a planned

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:30  1    attack in San Monica and West Los Angeles, and that therefore the

10:30  2    reasons these agents acted could include highly significant

10:30  3    information that caused them concern that particular people may be

10:30  4    involved in planning a terrorist attack.

10:30  5         Now, it isn't the case that every investigation pans

10:30  6    out.  It may well be that individuals are not planning terrorist

10:30  7    attack.  But when you have credible information, you have to run

10:30  8    it to ground.  I think we would expect that of the FBI.  The FBI,

10:31  9    by charter of the President and Congress, is an intelligence

10:31 10    agency, among other things.  And after 9/11, the prevention and

10:31 11    detection of terrorist attacks is their number one priority.  So

10:31 12    they have to know what is going on out there.  That doesn't mean

10:31 13    engage in indiscriminate surveillance based on religion.  That's

10:31 14    contrary to FBI policy.

10:31 15         I was struck when I read the complaint in this case and

10:31 16    they cited what's called the DIOG, the Domestic Investigations

10:31 17    Operations Guide of the bureau.  And the DIOG has an entire single

10:31 18    space chapter which I submitted as an exhibit last year which

10:31 19    explains that investigations based solely on religion or First

10:31 20    Amendment freedoms are prohibited in the FBI.  They do not do

10:31 21    that.  At least it's contrary to FBI policy.

10:31 22         So insofar as they think there is some policy in which

10:31 23    the bureau goes about investigating folks based solely on

10:31 24    religion, that's contrary to FBI policy.  It's contrary to the

10:32 25    attorney general's policy.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:32 1             The FBI DIOG is supported by attorney general

10:32 2     guidelines, and those guidelines also ban investigations based

10:32 3     solely on religion.  Attorney General Holder has made repeatedly

10:32 4     clear that investigations cannot intrude on religious liberties.

10:32 5     Director Mueller, likewise, has made extensive efforts of outreach

10:32 6     to Muslim communities and other communities to ensure that FBI

10:32 7     practices do not raise these kinds of concerns.

10:32 8             And we have tried to avoid having to assert the state

10:32 9     secrets privilege in this case.  It's not something we like to do.

10:32 10    It's something that's prompted by the allegations that we face in

10:32 11    particular lawsuits.  One way we have tried to avoid it is to have

10:32 12    spent the last four months mediating this case.  And we thank you

10:32 13    for the opportunity you gave us to do that, and for giving us

10:32 14    Judge Bristow to work with.  We haven't conceded thus far, but we

10:32 15    are very sensitive to these concerns.  We take the concerns in the

10:33 16    Muslim community very seriously, and we have tried to have a

10:33 17    dialogue to address them.

10:33 18            Today, however, we're here on a motion.  And that brings

10:33 19    to the fore the legal issues.  And the central legal issue that we

10:33 20    face in this case is whether or not what happened in a

10:33 21    counterterrorism investigation can be disclosed.  And I think we

10:33 22    have demonstrated that particular facts cannot be disclosed, and

10:33 23    that those facts are centrally relevant to the lawsuit.  They're

10:33 24    certainly relevant to the defense of their clients over there.

10:33 25    They need this information or they can't defend themselves.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:33 1        Now *Jeppesen*, which again is the governing authority,

10:33 2   certainly allows the privilege to be asserted at any stage,

10:33 3   including the preceding stage.  It indicates that if the

10:33 4   government demonstrates that disclosure of information reasonably

10:33 5   could cause harm to national security, the information is to be

10:33 6   excluded from the case.  It is an absolute privilege.  The need of

10:33 7   the plaintiff for the information is not relevant.  If it's

10:34 8   properly protected, it's excluded.

10:34 9        The next question then the Court has to consider is,

10:34 10  what is the consequence of that if you exclude the information?

10:34 11  *Jeppesen* and other courts like to use the characterization that

10:34 12  it's as if the witness had died and the evidence is simply not

10:34 13  available.  And I think that's a fair enough characterization, but

10:34 14  what the Court really has to consider is if the government -- if

10:34 15  the information is properly privileged, and that's the first issue

10:34 16  you need to discuss, then what?  Then you have to look to see what

10:34 17  role that information plays in the lawsuit.

10:34 18       And I think you would find that here, it is not

10:34 19  peripheral.  It is central to this lawsuit.  You have to explain

10:34 20  what happened in this Operation Flex in order to defend.  You have

10:34 21  to throw open the books.

10:34 22       And certainly a person who is sued in their personal

10:34 23  capacity where personal financial liability is at stake, they're

10:34 24  not going leave a stone unturned.  They're going to want to

10:35 25  explain to you, the finder of fact, that there was some vital

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:35  1    information in the record which prompted them to act.

10:35  2            And so even if you tried to segregate just the most

10:35  3    sensitive stuff, you will find that that's not fair to the

10:35  4    defendants.  That it would allow for a litigation on a record that

10:35  5    is incomplete.  And we have seen cases in this area which say that

10:35  6    that's simply not proper.  That if, in fact, properly protected

10:35  7    national security information is needed to decide a case, the case

10:35  8    has to be dismissed.

10:35  9            Now, there are three separate inquiries on this, Your

10:35 10    Honor, and it's laid out in our brief and in *Jeppesen*.

10:35 11    Essentially three prongs:  One, do the plaintiffs need it to make

10:35 12    their prima facie case?  Second, do the defendants need it?  And

10:35 13    the third is, is it inherently at risk of disclosure?

10:35 14            We have a trifecta here.  They're all applicable here.

10:35 15    The plaintiffs surely need the information to carry their burden

10:36 16    of proof.  They have the statements of one witness.  But that one

10:36 17    witness may know what he thinks he knows, but he doesn't know what

10:36 18    the FBI did.  We have heard Mr. Scheper talking about some of

10:36 19    this.  He doesn't actually know how this investigation went down.

10:36 20    He may know a little bit about his interactions, and those

10:36 21    allegations may be true or false, but he certainly doesn't know

10:36 22    how the Bureau of Prisons went about conducting Operation Flex.

10:36 23            And for the plaintiffs to establish their ultimate

10:36 24    burden of persuasion, they would need that information.

10:36 25            THE COURT:  Are you sure of that?  Isn't there

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:36 1   allegations through Mr. Monteilh's, I assume testimony, that he

10:36 2   was specifically directed to leave bugs unattended in mosques,

10:36 3   home?  And if that's true, just on its face doesn't that make out

10:36 4   a prima facie case for the plaintiffs?

10:37 5        MR. COPPOLINO:  I think you said the magic words, Your

10:37 6   Honor.  "If that's true."  It has to be proven true in order to

10:37 7   make your prima facie case.  As I understand a prima facie case,

10:37 8   it's different from merely stating a claim in a complaint where

10:37 9   you have alleged certain facts.  A prima facie case has to carry

10:37 10  your burden of proof if unrebutted.  This is kind of harkening to

10:37 11  the Title VII area.  But if unrebutted, you have to have enough

10:37 12  evidence to win.

10:37 13       In most lawsuits a defendant is crazy not to try to

10:37 14  rebut.  But assuming, arguendo, that these allegations went

10:37 15  unrebutted, they don't establish a prima facie case.  And I think

10:37 16  they would concede that because they need to know what actually

10:37 17  happened.

10:37 18       They have the statements of one witness.  The

10:37 19  declarations are replete with hearsay.  And so what you would end

10:37 20  up having is a battle of he said/he said, or he said/she said,

10:37 21  Mr. Monteilh versus the FBI, and before the finder of fact to

10:37 22  demonstrate where is the truth.  And it's sorting out fact from

10:37 23  fiction that really is what creates the problem.

10:38 24       There is a terrific quote that I really would call your

10:38 25  attention to from the *Jeppesen* decision which is the governing

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:38  1    precedent.  And if you permit me, I'd like to quote it a little

10:38  2    bit here.  Page 1089, 614, F.3d 1089.  "Adversarial litigation,

10:38  3    including pretrial discovery of documents and witnesses and the

10:38  4    presentation of documents and testimony at trial, is inherently

10:38  5    complex and unpredictable.  Although district courts are

10:38  6    well-equipped to wall off isolated secrets from disclosure, the

10:38  7    challenge is exponentially greater in exceptional cases --" like

10:38  8    *Jeppesen*, and I would say like this one "-- where the relevant

10:38  9    secrets are difficult or impossible to isolate and even efforts to

10:38 10    define a boundary between privileged and unprivileged evidence

10:38 11    would risk disclosure by implication."

10:38 12          I think that's this case.  And I think it's this case

10:38 13    because of the nature of the allegations.  What happened, who was

10:39 14    being investigated, why and how.

10:39 15          THE COURT:  I'm not challenging you on that in that

10:39 16    defense will obviously want to put forth favorable evidence to

10:39 17    rebut what Mr. Monteilh says.  What I was challenging you on is

10:39 18    you said the plaintiffs need it, and the plaintiffs have

10:39 19    represented in their briefs, we don't need it.  We're ready to go.

10:39 20          MR. COPPOLINO:  We can perhaps disagree on that.  Our

10:39 21    position is that those declarations alone, because they are simply

10:39 22    the statement of a single witness and contain a lot of hearsay,

10:39 23    wouldn't do it.

10:39 24          But let's just assume that they would establish a prima

10:39 25    facie.  And in fact, *Jeppesen* talks about this.  *Jeppesen* says,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:39 1   assume the plaintiffs could establish a prima facie case based on

10:39 2   public evidence, the defendants obviously need to defend.  And so

10:39 3   that's the second prong of the analysis under the privilege

10:39 4   assertion that you would have to undertake in terms of the

10:40 5   consequences of upholding the privilege and excluding the

10:40 6   information.

10:40 7        There is no question these defendants would need that

10:40 8   information.  And I believe the third prong, which I actually

10:40 9   think is the most important, there is no question that that

10:40 10  information would be at risk even if these defendants could try to

10:40 11  come in and say, well, maybe we can just say this, and maybe we

10:40 12  can say that.  Maybe we can deny Mr. Monteilh's allegations.

10:40 13  Maybe we can offer this little bit of data.

10:40 14       The process of litigation, the adversarial process of

10:40 15  cross-examination where counsel have every incentive to probe, as

10:40 16  the courts point out in their decision, every incentive to probe

10:40 17  exactly what happened, that's where the harm to national security

10:40 18  comes.  So not only do they clearly need it, it would be at risk

10:40 19  even if they thought they could get by without it, and I don't

10:40 20  think they're arguing that.

10:40 21       This is information that is subject to the control of

10:40 22  the United States government.  Individual capacity claims are

10:40 23  against those folks in their personal capacity.  In a sense, we're

10:41 24  third parties.  The government is a third party in those lawsuits.

10:41 25  In fact, they need not have even sued the government.  They might

                    SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:41  1    have sued the individual agents.  And so we have a separate stake

10:41  2    in that lawsuit.  We have a stake as a defendant in protecting

10:41  3    information first, and we need that information as a government

10:41  4    defendant, but we have to protect it in this separate lawsuit

10:41  5    between the plaintiffs and the individual capacity defendants.

10:41  6    They want it, they want it, and we need to protect the national

10:41  7    security interests.

10:41  8            So the individual capacity claims present a particular

10:41  9    obstacle to proceeding in this case and a particularly acute

10:41 10    reason as to why the privilege has to be asserted, because there

10:41 11    is no question that those folks need this information.

10:41 12            One of the arguments they make, if I could turn to it

10:41 13    briefly, and this is an argument that I think Mr. Bibring alluded

10:41 14    to briefly in his brief discussion of the *Bivens* issues, and that

10:41 15    is, they say they don't need the reasons for the investigation.

10:42 16    They just need to know whether or not religion was a factor.  And

10:42 17    they argue that if it was a factor, then the investigation was, on

10:42 18    its face, discriminatory.

10:42 19            Well, I think as Mr. Scheper pointed out and as the

10:42 20    briefs point out, there is no law in support of that argument that

10:42 21    even considering religion as a factor is discriminatory.  But even

10:42 22    that's a fact question.  You have to know what happened.  Did they

10:42 23    consider religion at all?  How did they consider it?  Was it a

10:42 24    factor?  Was it the sole factor which the complaint alleges?  Or

10:42 25    was it not a factor at all?  Perhaps the bureau was simply focused

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:42 1 on people that they believed were involved in potentially plotting

10:42 2 terrorist attacks here in Southern California.

10:42 3          So I don't think the facial challenge theory helps them

10:42 4 at all.  In fact, I would say that I don't think this case has the

10:42 5 hallmarks of a facial challenge at all.  The DIOG is policy

10:42 6 guidance.  It doesn't create a right of private cause of action.

10:42 7 It's just simply the bureau directing its folks how to go about

10:43 8 undertaking an investigation.  And as I mention, it directs them

10:43 9 not to take religion into account as a sole basis.

10:43 10          It also directs them very clearly, and this is in our

10:43 11 papers, Your Honor, and it's in our exhibit, it tells the bureau

10:43 12 agents very specifically, you need an authorized purpose to

10:43 13 investigate folks.  You have to have a threat of a crime or a

10:43 14 threat to national security.  You can't do what they have alleged

10:43 15 was done here.  And the DIOG makes that very clear.  But this is a

10:43 16 case about a particular investigation and about the conduct of

10:43 17 particular agents and supervisors in that investigation.  That's

10:43 18 as applied a claim as I have ever seen.  You can't just decide by

10:43 19 looking at the DIOG and saying, well, I think that might be

10:43 20 unconstitutional.  You need to know what happened in this

10:43 21 investigation.  And so the facial challenge theory doesn't get

10:43 22 them very far.

10:43 23          But leaving that issue aside, the question of whether

10:43 24 religion was a factor, the sole factor, whether people were

10:44 25 purposefully targeted based on religion, whether there was

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:44 1   indiscriminate collection based on religion, they're all fact

10:44 2   questions.  And I think the plaintiffs, with respect, misapply law

10:44 3   and strict scrutiny.

10:44 4       We don't deny that ultimately if there was purposeful

10:44 5   targeting of religion, the government would have to show there was

10:44 6   a compelling governmental interest and that the means chosen were

10:44 7   narrowly tailored.  But there is a threshold inquiry.  And if you

10:44 8   look at all of these cases regarding the Free Exercise Clause

10:44 9   claim, the First Amendment claim, *Church of the Lukumi* I think is

10:44 10  the most, if not the most recent, the broadest pronouncement,

10:44 11  Justice Kennedy's decision, the first inquiry is, what happened?

10:44 12  Did the government purposefully target religion?  That was a

10:44 13  fairly easy case because it was a statute I think that barred

10:44 14  sacrificial animal killing, and the Court examined the record

10:44 15  closely and concluded that it was purposely targeted.  But that's

10:45 16  the first inquiry.

10:45 17      In the *Smith* case, Justice Scalia citing *Sherbert v.

10:45 18  Verner*, he said, "Governmental actions that substantially burden

10:45 19  religious practice must be justified by a compelling interest."

10:45 20  So the first inquiry is, did the governmental action substantially

10:45 21  burden religion?

10:45 22      Justice O'Connor, who was concurring in *Smith*, says,

10:45 23  "Once it has been shown that a governmental action burdens the

10:45 24  free exercise of religion, we look to whether there is a

10:45 25  compelling interest and narrow tailoring."  Once it has been

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:45 1    shown.  So you need to know those facts.

10:45 2           I think as Mr. Scheper pointed out, the *Vernon* case here

10:45 3    in the Ninth Circuit says the same thing, that you have to

10:45 4    establish there was a substantial burden on religion before you

10:45 5    get strict scrutiny.

10:45 6           I gotta quote one other source.  The plaintiff's brief,

10:45 7    their brief against the individual capacity defendants.  I think

10:45 8    this is an exact quote.  Page 31.  "Once a plaintiff shows that a

10:45 9    government official has made a facially discriminatory

10:46 10   classification on the basis of religion, that intentional

10:46 11   discrimination is subject to strict scrutiny."

10:46 12          Well, I don't disagree with that, but I think you have

10:46 13   to make the showing.  The showing is factual.  And the showing

10:46 14   would require disclosure of the information that's subject to the

10:46 15   state secrets privilege.

10:46 16          Let me call your attention to one more case on this.

10:46 17   When he was a circuit judge, Justice Scalia wrote a decision on

10:46 18   the state secrets privilege called *Molerio v. FBI*.  It's a bit of

10:46 19   a data case.  749 F.2d, 815.  Interestingly, when I reread that

10:46 20   case to prepare for this argument, I had read it a lot but I

10:46 21   hadn't realized that was a case in which the plaintiffs alleged

10:46 22   that one of the factors, a factor for denying him a job in a

10:46 23   security clearance at the FBI was that his father was accused of

10:46 24   being associated with the Socialist Workers Party.  And there was

10:46 25   some public record evidence which supported that as a factor.  And

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:46 1    in fact, Justice Scalia concluded that the plaintiff made a

10:47 2    circumstantial case that his father's political activities were a

10:47 3    motivating factor in denying his son a security clearance, which

10:47 4    was a First Amendment problem.  But the Court upheld the state

10:47 5    secrets privilege and it refused to proceed just based on a

10:47 6    partial record.

10:47 7            And I think this is really very important for this case.

10:47 8    It said, "Although there may be enough circumstantial evidence to

10:47 9    permit a jury to come to an erroneous conclusion, that would be a

10:47 10   mockery of justice where the Court, knowing the error, knowing the

10:47 11   full record, permitted that to go forward."

10:47 12           And the lesson of that is, where state secrets

10:47 13   information is at issue, you can't simply just slide by and say,

10:47 14   well, we'll go on half a record.  It's not fair to the defendants.

10:47 15   It's not a fair judicial process.

10:47 16           So, Your Honor, on this issue -- and I think I can wrap

10:48 17   up with this and entertain any of your questions -- there are

10:48 18   really two issues:  You have to look at our privilege assertion

10:48 19   and say has the government demonstrated a reasonable danger to

10:48 20   national security from the disclosure of this information?  If so,

10:48 21   it needs to be excluded.  Regardless of what you do with any of

10:48 22   these motions, it's a separate issue.  It's just simply a

10:48 23   privilege assertion if you reach it.  You need to decide whether

10:48 24   the information is properly excluded.  And then secondly, decide

10:48 25   its consequences.  And I believe you would fairly conclude that

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:48  1    that information is vital to the disposition of this case, is

10:48  2    properly protected and that as a result, the case cannot proceed.

10:48  3              Happy to address any questions.

10:48  4         THE COURT:  I do have one question.  Is it the

10:48  5    government's position that Mr. Monteilh was out of control and

10:48  6    acting outside his handlers' direction and supervision?

10:48  7         MR. COPPOLINO:  Your Honor, our position today is not

10:48  8    addressing the merits of the allegations.  And so I don't know

10:49  9    that I can answer your question.

10:49 10         THE COURT:  I'm not trying to be coy with you.  My

10:49 11    question is I need to understand how badly you need this

10:49 12    privileged information.  And I have read the First Amendment

10:49 13    complaint.  I find some of the allegations very troubling.  And at

10:49 14    heart and soul of those allegations are Mr. Monteilh.  Let's face

10:49 15    it, he is saying some pretty outrageous things that what the FBI

10:49 16    did and what his handlers were telling him to do.

10:49 17         MR. COPPOLINO:  Just make a couple of observations.  One

10:49 18    is that allegation isn't truth.  You need proof.  A second thing

10:49 19    is he is a private citizen.  He can say what he chooses to say,

10:49 20    but he doesn't speak for the government.  He doesn't waive the

10:49 21    privilege for the government.  And certainly anything he alleges

10:50 22    doesn't require the government to stand down from protecting

10:50 23    information it feels it needs to be protected.

10:50 24         We're not addressing allegations on the merits.  The

10:50 25    state secrets privilege submission is intended to demonstrate to

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:50  1   you why particular categories of information should be protected.

10:50  2   But I would be remiss if I didn't leave here without indicating

10:50  3   that he is simply making assertions, broad assertions about what

10:50  4   happened.  It's one person's story.  There is an entirely

10:50  5   different side of story.

10:50  6         And the problem is to contest those allegations, to

10:50  7   separate fact from fiction, half truth from maybe something that's

10:50  8   accurate, or something that's completely false, something that

10:50  9   might even be entirely misleading, to do that, for these agents to

10:50 10   do that, for the government to do that would require putting

10:50 11   forward information that we feel we need to protect under the law.

10:51 12         And that's what this motion is about.  It is not about,

10:51 13   yet, contesting what he says, because it is about trying to do

10:51 14   that would require these folks to come to the table with all of

10:51 15   the information that they have to counter it.  And I can assure

10:51 16   you, as you can see from our submissions including our classified

10:51 17   submission, that would require disclosure of highly sensitive

10:51 18   information that is properly protected as a matter of law.

10:51 19         So I think the way you have to look at this particular

10:51 20   motion is, first, is this information properly protected?  Second,

10:51 21   what is its impact on the lawsuit?

10:51 22         Let me say before I sit down, that we do take seriously

10:51 23   the concerns of the plaintiff in the Muslim community with respect

10:51 24   to these allegations.  We know they're broad and they're difficult

10:51 25   allegations.  And I have said a couple of times you should not

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:51 1    assume they're true.  But the attorney general has again said

10:51 2    repeatedly, investigations are not to be based solely on religion.

10:52 3    This is contrary to our policy.

10:52 4          And we have tried to have a good faith dialogue with

10:52 5    them to deal with these things.  We're still willing to do that.

10:52 6    We're not going to walk away from that if there is something to be

10:52 7    gained by further discussion.  But today, dealing with the legal

10:52 8    issues, I believe that the law requires the dismissal of those

10:52 9    claims because the information necessary to litigate them is

10:52 10   properly protected.

10:52 11         I did want to just say also there is a whole separate

10:52 12   array of issues whether they could get the expungement relief that

10:52 13   they have requested.  And perhaps we can deal with that before the

10:52 14   hearing is over.  That's a separate question.  The reason we raise

10:52 15   that defense is if you conclude that they cannot get expungement,

10:52 16   and I'm quite confident they cannot get expungement against the

10:52 17   government in its official capacity.  Now that at least limits the

10:52 18   number of claims that you have to decide would be affected by the

10:52 19   state secrets privilege.  Thank you, Your Honor.

10:52 20         THE COURT:  Appreciate it.  Thank you.

10:52 21         MR. BIBRING:  Your Honor, did you want to hear how the

10:53 22   state secrets privilege impacts the tort claims under the FTCA?

10:53 23         THE COURT:  This is the hearing where we're going to

10:53 24   hear all that.  So the only question is what order.  Do you want

10:53 25   to let all the defendants go first and then you have a complete

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:53 1    picture to respond to?

10:53 2            MR. ARULANATHAM:  Actually, Your Honor, my preference

10:53 3    would be to do the FTCA after, because I do I think it's a

10:53 4    discrete set of issues.  Also, I have time to give it to my

10:53 5    colleague, Mr. Bibring.

10:53 6            MR. NICHOLS:  We do, as the individual capacity

10:53 7    defendants have, of course, non-FTCA-related arguments that are

10:53 8    dependent on what Mr. Coppolino just said.  But of course, we have

10:53 9    a unique perspective because there are different kinds of claims

10:53 10   asserted against us, and it seems to me it would make more sense

10:53 11   for me to do a brief description of our position on that before

10:53 12   plaintiffs respond, but of course, whatever you prefer.

10:53 13           THE COURT:  Why don't you go first then?

10:54 14           MR. NICHOLS:  Thank you, Your Honor.  Carl Nichols on

10:54 15   behalf of individual capacity defendants Tidwell and Walls.

10:54 16   Although I think everything I'm going to say here about the state

10:54 17   secrets privilege would be equally applicable to all of the

10:54 18   individual capacity defendants.

10:54 19           I really just want to go back to the first question you

10:54 20   asked on the state secrets privilege and that is, why do you need

10:54 21   this privileged information?  Each of the individual capacity

10:54 22   defendants is alleged to have undertaken an indiscriminate conduct

10:54 23   of investigation as to Muslims in Orange County.  Three plaintiffs

10:54 24   have made damages claims against each of the five individual

10:54 25   capacity defendants.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:54  1           So the first question in the lawsuit against the

10:54  2   individual capacity defendants is, was any of, or were any of the

10:54  3   three plaintiffs the subjects or targets of an FBI investigation?

10:54  4   As Mr. Coppolino described this morning and as you have seen in

10:54  5   the declaration submitted by the United States, the question of

10:55  6   who is, or was, or had been the subject of this investigation is

10:55  7   subject to the attorney general's assertion of the state secrets

10:55  8   privilege.  As a result, it is not to be litigated in this case

10:55  9   whether any of the plaintiffs was the subject of an investigation.

10:55 10   As a result, our clients, the individual capacity defendants, are

10:55 11   foreclosed from testing plaintiffs' allegation that those three

10:55 12   plaintiffs were the subjects of this investigation.

10:55 13           As Mr. Coppolino said, though, even if you could cross

10:55 14   that hurdle, even if you could determine that each of the three

10:55 15   plaintiffs was the subject of an investigation, you would still

10:55 16   have to litigate the question of, why were they investigated, how

10:55 17   were they investigated, what the purposes of the investigation

10:55 18   were, and all of the associated questions that are relevant,

10:55 19   because plaintiffs have alleged that the sole purpose of the

10:56 20   investigation was to target Muslims.

10:56 21           Our clients have the right to contest what is, right

10:56 22   now, simply an allegation.  How would you test that allegation?

10:56 23   You would seek to testify about the reasons for the investigation,

10:56 24   the sources of the information that led to an investigation of a

10:56 25   particular person, or that led not to investigate someone else.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:56  1   You would testify about why a particular investigative method was

10:56  2   used or not.

10:56  3         For all I know, there may have been warrants either from

10:56  4   the FISA court or other courts to undertake investigations here,

10:56  5   and it would be in my defendants' interest to introduce that

10:56  6   evidence.  But, of course, all of those materials and all of that

10:56  7   information is privileged at the moment.  And so the result for my

10:56  8   clients and Mr. Scheper's clients is that they are foreclosed from

10:56  9   putting on a valid defense, from testing the allegations through

10:57 10   discovery, and from putting on, at trial, their story about what

10:57 11   really happened here.

10:57 12         Plaintiffs concede -- and this is at pages 22 and --

10:57 13         THE COURT:  You just said something.  So you are

10:57 14   contesting what Mr. Monteilh is alleging?

10:57 15         MR. NICHOLS:  I'm saying that my clients should have the

10:57 16   opportunity to contest it, but right now they are foreclosed from

10:57 17   doing so.

10:57 18         THE COURT:  Why would you want the opportunity to

10:57 19   contest it if it's true?

10:57 20         MR. NICHOLS:  Well, I think, first, we don't concede

10:57 21   that anything is true.  And second, the information that would

10:57 22   enable me to discuss whether the allegations are true is not is

10:57 23   classified.  And I actually don't know it.  The question is, can

10:57 24   my clients test the allegations through depositions or at trial in

10:57 25   light of the fact that the government has said that information is

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:57 1    off limits to all parties?

10:57 2              And with respect, the result of that means that my

10:57 3    clients are unable to tell their story, whatever it is, and to

10:58 4    contest those allegations that may be false or, as Mr. Coppolino

10:58 5    said, misleading or partially true or partially untrue.  The

10:58 6    difficulty, of course, is that we are foreclosed from doing that.

10:58 7    And as plaintiffs concede in their brief, they concede that

10:58 8    assertion of the privilege may lead to dismissal, or the privilege

10:58 9    deprives the defendant of information that would otherwise permit

10:58 10   the defendant to defend the claim.

10:58 11             This isn't just me talking.  If you look at paragraph

10:58 12   222 of the first amended complaint, the plaintiffs identify a

10:58 13   series of common questions of law and fact in this lawsuit.  It's

10:58 14   a pretty good summary of the sort of top level common questions of

10:58 15   law and fact.  First, whether defendants engaged in a program of

10:58 16   conducting surveillance of mosques in Orange County and the

10:58 17   plaintiffs and class members who attended those mosque.  That's

10:59 18   222(A).

10:59 19             So first question is, were the plaintiffs subject to

10:59 20   surveillance by the defendants?  That's clearly subject to the

10:59 21   government's assertion of the state secrets privilege.

10:59 22             Question two.  Whether defendants targeted plaintiffs

10:59 23   and class members for surveillance, through Monteilh, because they

10:59 24   were Muslims or because of their practice of Islam, thereby

10:59 25   putting into question in this case the reasons, the purposes, the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

10:59 1    scope, et cetera, of the investigation?

10:59 2          Question three.  This is actually questions three, four

10:59 3    and five.  I'll combine them because they're all related.  Whether

10:59 4    defendants' practice of targeting plaintiffs and class members for

10:59 5    surveillance because they were Muslim or because of their practice

10:59 6    of Islam constitutes impermissible religious discrimination,

10:59 7    violates the Equal Protection Clause of the Fifth Amendment, or

10:59 8    places a substantial burden on the religious exercise of

10:59 9    plaintiffs and class members?  And that's paragraphs 222(C,) (D)

10:59 10   and (E).

10:59 11         So, plaintiffs' complaint shows that at the very core of

11:00 12   their allegations is the question of who was surveilled or

11:00 13   otherwise investigated?  Who was subject of the investigation?

11:00 14   Why?  What bases were there for the investigation?  And how was

11:00 15   the investigation conducted?  But those are the very matters over

11:00 16   which the government has asserted the state secrets privilege.

11:00 17         If I can make one last point, and it goes to the

11:00 18   question of the Fourth Amendment and FISA claim here.  Of course

11:00 19   the government asserted the state secrets privilege only as

11:00 20   relevant to counts one through seven of the complaint.  They did

11:00 21   not assert the state secret privilege over the Fourth Amendment

11:00 22   and the FISA counts.

11:00 23         You heard this morning from plaintiffs their view that

11:00 24   in the context of an invited informant case, not only do you have

11:00 25   to undertake the traditional objective reasonableness inquiry

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:00  1    under the Fourth Amendment, but there is also a good faith

11:00  2    requirement.

11:00  3          I have two things to say in response to that.  The first

11:00  4    is I don't think that's right.  Under cases like *Al-Kidd* and

11:00  5    recent Supreme Court doctrine, Justice Scalia has repeatedly said

11:01  6    in a number of cases, including *Al-Kidd*, that the only relevant

11:01  7    inquiry and circumstances, with some limited exceptions not

11:01  8    applicable here, the relevant inquiry is an objective analysis

11:01  9    about the search.

11:01 10          So, in our view good faith is irrelevant on Fourth

11:01 11    Amendment and the state secrets privilege.  But if good faith were

11:01 12    relevant, in other words, if on the Fourth Amendment and FISA

11:01 13    claims the Court had to inquire into the good faith of the

11:01 14    individual capacity defendants in undertaking the alleged

11:01 15    surveillance, assuming it happened, then you would be right back

11:01 16    into the state secrets assertion, because you would have to

11:01 17    inquire into the reasons for the surveillance, how it was done,

11:01 18    was it properly admitted in time, scope, et cetera.  But again.

11:01 19    Those issues are at the core of the government state secrets

11:01 20    assertion.

11:01 21          So while the government hasn't formally asserted the

11:02 22    state secrets privilege, I think that's probably because of the

11:02 23    assertion that the Fourth Amendment claims would be adjudicated on

11:02 24    an objective reasonableness basis.  If that turns out not to be

11:02 25    the case, if some intent or good faith requirement is somehow

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:02  1    imported incorrectly, in my view, into the Fourth Amendment

11:02  2    analysis, then I think we would have to think very much -- the

11:02  3    government might have to think about whether the state secrets

11:02  4    privilege would have to be asserted there.

11:02  5            With that, Your Honor, thank you.

11:02  6            MR. SCHEPER:  On the same principle and the same point.

11:02  7    But I promise, Your Honor, I'm going to be very brief.

11:02  8            I'll start by saying I wish I had said it as well

11:02  9    earlier because I may not need to be up now as my two colleagues

11:02 10    did.  I wanted to say, Your Honor, as to the Fourth Amendment

11:02 11    piece, which obviously is very much on the Court's mind and is a

11:02 12    focus of the Court's concern, that, Your Honor, you can't view the

11:03 13    Fourth Amendment claims in an aggregate as, like, three plaintiffs

11:03 14    claim that these things happened.  What you need to do is, it is a

11:03 15    particular analysis which plaintiff claims to be aggrieved by,

11:03 16    which, allegedly -- in violation of the Fourth Amendment

11:03 17    technique.

11:03 18            I didn't point that out earlier.  You need to do it in

11:03 19    isolation rather than in the aggregate, is to look at the Fourth

11:03 20    Amendment claim.

11:03 21            Secondly, Your Honor, you posed the question, and it's

11:03 22    the most difficult thing here for us as counsel, for the

11:03 23    individual defendants, is you pose, essentially, was this

11:03 24    informant, Monteilh, very much off the reservation, so to speak?

11:03 25    Was he running amuck?  And how could this happen?  And is this

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:03 1    something that is properly a part of this federal lawsuit?

11:04 2            And I want to be able to answer the question about, is

11:04 3    this hooey?  Or is there something to it?  But not only can, as

11:04 4    counsel have pointed out, a trier of fact or Your Honor not

11:04 5    learned, we don't even know yet the whys, the wherefores, the

11:04 6    techniques, the ways to disprove because our clients literally are

11:04 7    defenseless to defend themselves because of the state secrets

11:04 8    privilege.

11:04 9            So I wanted, Your Honor, that's why that question can't

11:04 10   be answered directly.  It can be answered by me indirectly.  I

11:04 11   have known one of the clients for 25 years.  I have known the

11:04 12   others by reputation for many years.  It's a representation all

11:05 13   four of us are extraordinarily proud of, but it's just not a fair

11:05 14   fight in light of the state secrets privilege.  Thank you.

11:05 15           THE COURT:  I understand.

11:05 16           MR. ARULANATHAM:  Thank you, Your Honor.

11:05 17           Listening to Mr. Coppolino and the individual

11:05 18   defendants' attorneys, you would think that we were here on a

11:05 19   motion to compel discovery, and that we were here asking for

11:05 20   disclosure of some large amount of secret information, perhaps the

11:05 21   ex parte submission that they have already given Your Honor.  Or

11:05 22   maybe you think we were here on the merits.  And the question was

11:05 23   whether the attorney general actually has authorized

11:05 24   discrimination on the basis of religion, whether we can take his

11:05 25   promises at face value or instead our clients should believe their

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:05 1    experience when the defendant, Mr. Tidwell, came and told the same

11:05 2    things:  We don't send informants into mosques.  Obviously, just

11:06 3    at the same time that all of this information, all the allegations

11:06 4    that we have in this the complaint were actually happening.

11:06 5            But it's extremely premature.  We're not there yet.

11:06 6    We're not at any of that yet.  Mr. Coppolino keeps telling you

11:06 7    actually, ironically, I know he knows it's not correct to say you

11:06 8    shouldn't assume the allegations in the complaint are true.  But,

11:06 9    of course, you do have to assume the allegations in the complaint

11:06 10   are true, Your Honor.  You have to assume that -- and we have

11:06 11   witness accounts from other people, just not from Mr. Monteilh.

11:06 12   We haven't submitted them yet.  We only have Monteilh's

11:06 13   declaration so far, but you have to assume that Mr. Monteilh went

11:06 14   into the halakas, left his recording device there, and walked

11:06 15   somewhere else.

11:06 16           And so if you dismiss -- it's not just that.  That's

11:06 17   just sort of the tip of the iceberg, obviously.  You have to

11:06 18   assume that the defendants told him to gather information about

11:06 19   Muslims.

11:06 20           You asked, Your Honor, you asked Mr. Coppolino and the

11:06 21   other defendants' attorneys to disavow, can you just today, can

11:07 22   you disavow Mr. Monteilh?  And they won't do it.  They won't do

11:07 23   it.  Mr. Coppolino won't do it.

11:07 24           So if you dismiss the action today, Your Honor, then you

11:07 25   are saying that, without having refuted the allegations in the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:07 1    complaint, this case cannot be brought.  That the claim of

11:07 2    discrimination against religion is not cognizable in a civil

11:07 3    rights lawsuit brought on behalf of American citizens and lawful

11:07 4    permanent residents in Orange County, that that claim is not

11:07 5    cognizable as long as the government says it's done in the name of

11:07 6    counterterrorism investigation and Your Honor has determined that,

11:07 7    yes, the information is secret.  Not that it's legal.  Not that

11:07 8    it's legal.

11:07 9         And, of course, it would mean something so different to

11:07 10   our clients if Your Honor reviewed the evidence on the merits and

11:07 11   decided that it was lawful even with very little participation

11:07 12   from us.  Again, I want to say it's premature.  We're not there

11:08 13   yet, and I'll answer your questions, Your Honor.

11:08 14        But from a process standpoint, even if Your Honor's

11:08 15   answer was, we're going to do this case on an extremely ex parte

11:08 16   procedure, and there is going to be very limited adversarial

11:08 17   testing, but Your Honor and Your Honor's staff, or however you do

11:08 18   it, is going make a merits determination, which is what happens in

11:08 19   FISA cases, which I'll get to in a minute, think about what that

11:08 20   means for our clients compared to what the government wants you to

11:08 21   do, which is to look at the evidence; say, is this a secret?  Has

11:08 22   the government run a counterterrorism investigation program, and

11:08 23   is the program secret?  Yes.  Gone.

11:08 24        Those are so fundamentally different.  And today that's

11:08 25   all we're asking.  We haven't made a motion to compel.  They

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:08  1    haven't answered the complaint.

11:08  2            And I, too, would like, Your Honor, to quote a bit of

11:08  3    *Jeppesen*.  I'd like to quote from the conclusion at the end of the

11:08  4    6/5 decision.  "We expect our decision today to inform district

11:08  5    courts..." -- I'm going to ellipsis it -- "...that every effort

11:09  6    should be made to parse claims to salvage a case like this."

11:09  7    Using the *Reynolds* approach.  "That the standards for peremptory

11:09  8    dismissal are very high, and it is the district court's role to

11:09  9    use its fact finding and other tools to full advantage before it

11:09 10    concludes that the rare step of dismissal is justified."

11:09 11            Now, in that case, Your Honor, you have a private plane

11:09 12    company that has a contract with the CIA, and the subject matter

11:09 13    of the case is the extraordinary rendition program.  And of

11:09 14    course, as we have discussed extensively in our brief, it's a

11:09 15    damage action under the alien tort statute.

11:09 16            Here, today, this is a garden variety civil rights

11:09 17    litigation, Your Honor.  We are a Muslim community in Southern

11:09 18    California filled with citizens and residents not been accused of

11:09 19    any crime.  And the claim in the case is that the FBI is engaged

11:09 20    in religious discrimination.  And if you substitute "race" for

11:09 21    "religion," and you substitute any number of a bunch of state

11:10 22    actors or even federal actors, this case is the same as cases that

11:10 23    have been brought for at least a couple of decades, longer than

11:10 24    that, dozens of civil rights suits.

11:10 25            So when we dismiss this case, when we decide that -- and

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:10 1    of course, the claim is that today their rights are being violated

11:10 2    because the government is still maintaining information on these

11:10 3    individuals.  It's a condition of going to the mosque in 2006 or

11:10 4    2007, the government gathered information and they're still

11:10 5    holding it and still using it.  You dismiss this case, Your Honor,

11:10 6    it's a dramatic expansion of the state secrets doctrine.

11:10 7          Now, we're not here on the merits, and we're not here on

11:10 8    a motion to compel.  And the other question that Your Honor asked

11:10 9    was, well, can you bring your case -- can you litigate your case

11:10 10   without state secrets?  And the answer is, yes.  Or at least

11:10 11   certainly based on what has happened so far, the answer is yes, we

11:10 12   can make our case.

11:11 13         There is some confusion, I think, going on here on the

11:11 14   scope of the state secrets privilege.  We don't contend and we

11:11 15   don't need to contend that Mr. Fazaga, Malik and Abdelrahim were

11:11 16   subjects of investigation in some sense.  Our claim is that their

11:11 17   information about them was gathered by Monteilh and that it was

11:11 18   gathered on the basis of their religion.  That's in his

11:11 19   declaration that's been filed with the Court.  As I said, there

11:11 20   are numerous other individuals who we could bring to the Court as

11:11 21   well who could testify under oath what they saw him do.  They saw

11:11 22   him leave his keys, et cetera, et cetera.

11:11 23         And that's not state secret.  We filed the declaration

11:11 24   publicly.  There was no objection.  So that part of the case,

11:11 25   which is all we need to prove the First Amendment claim and chunks

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:11  1    of the Fourth Amendment claim as well, that's public information.

11:11  2    So the answer to your question is no, we don't need to.

11:11  3          Now, can the government answer and can the individual

11:11  4    defendants answer in a way that requires but avoids disclosure of

11:12  5    secrets?  It seems to me it's far too early to tell.  It depends

11:12  6    on what the Court's ruling is about the propriety of the use of

11:12  7    religion.  Our claim, and Mr. Coppolino sort of scoffs at it, but

11:12  8    our claim is that religion has to be treated like race.  That's

11:12  9    our claim.  We think there's lots of Supreme Court cases which

11:12 10    establish that.  Mr. Bibring, actually, is going to cover that,

11:12 11    and I hope the Court will allow us to be heard on the First

11:12 12    Amendment merits as well.

11:12 13          So we have two things.  We have expungement left, which

11:12 14    I'm covering.  But then we also have that.  I won't get into it in

11:12 15    detail to try and save time here, but that's our claim.  We think

11:12 16    there are lots of Supreme Court cases that establish it left and

11:12 17    right.  And an RFA to the government could answer the question, is

11:12 18    religion a factor that you use in deciding whom to target in this

11:12 19    investigation.

11:12 20          There could be a conversation -- and I still continue to

11:12 21    believe that the policy of the FBI, or the policy of the FBI in

11:13 22    the DIOG that Mr. Coppolino was talking about, it says that

11:13 23    religion cannot be the sole factor in choosing to initiate an

11:13 24    investigation.  To us, as we read that, that means Muslim men are

11:13 25    legitimate targets for investigation because religion is not the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:13 1    sole factor in that context, right?

11:13 2            So, we don't think that that resolves the question, but

11:13 3    an RFA to the government could establish, very easily, whether or

11:13 4    not their policy, as implemented in this case, was consistent with

11:13 5    our view of the Equal Protection Clause and the Establishment and

11:13 6    Free Exercise clauses in this context.

11:13 7            Now, maybe it will turn out their answers are so

11:13 8    complicated that it can't be actually done that way; that they

11:13 9    can't answer that in a simple admission.  But we don't know that

11:13 10   yet because we haven't propounded the request.  If Your Honor

11:13 11   looks at it, or they give you an ex parte submission that's more

11:13 12   complicated, well, then, there is more to decide at that point,

11:13 13   like, how could we approach this then?

11:14 14           You have to decide, Your Honor, with certainty, those

11:14 15   are the words of *Jeppesen*, you have to decide with certainty today

11:14 16   that there is no way to litigate these portions of the case

11:14 17   without divulging state secrets.  I don't see how that can

11:14 18   possibly be true given how preliminary this is.

11:14 19           One other very important point I want to make on that

11:14 20   question, Your Honor, and here I'm glad Mr. Nichols said this

11:14 21   because I think he is completely right about one aspect of his

11:14 22   presentation, which is that FISA and the FISA claims concerning

11:14 23   invited informer doctrine do implicate a large amount of the

11:14 24   underlying conduct that Monteilh and, therefore, that the FBI

11:14 25   engaged in.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:14 1        So, our claim with respect to invited informer is that

11:14 2  the individuals in our case had a reasonable expectation of

11:14 3  privacy.  So for example, plaintiff Fazaga, the state department

11:14 4  sent him to Romania to talk about Muslim extremism on behalf of

11:15 5  the United States.  And he is the imam at a mosque.  He has a

11:15 6  reasonable expectation of privacy that the same government that

11:15 7  sent him to Romania to represent the United States in its views on

11:15 8  Islam is not sending informants into his mosque to monitor his

11:15 9  sermons, and is not targeting him because of the speakers who he

11:15 10  brings to his mosque.  That's our invited informer claim.

11:15 11        So if, in fact, they are doing that, they're targeting

11:15 12  his First Amendment activity, bad faith; bad faith, because he is

11:15 13  a man who has the right to freely express his views.  That

11:15 14  violates the Fourth Amendment.  And our claim is that under

11:15 15  *Aguilar*, which was decided in 1989 and is explained in *Mayer*

11:15 16  through the Ninth Circuit cases, and *Aguilar* long predates the

11:15 17  conduct of this case, that that violates the Fourth Amendment,

11:15 18  violates reasonable expectation of privacy.

11:15 19        Now, if the Court is inclined, it sounded like you were

11:16 20  this morning, Your Honor, to let the FISA claims proceed because

11:16 21  the government has not asserted that the state secrets privilege

11:16 22  with respect to FISA, nor could it because FISA has a very clear

11:16 23  procedure for how to deal with that, if the Court is inclined to

11:16 24  let those proceed, then to answer that argument, to answer invited

11:16 25  informer to answer the argument about Monteilh leaving the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:16  1   listening device, to answer the video recording, all these things,

11:16  2   the government is going to have to present evidence to refute

11:16  3   these claims.

11:16  4          Under 1806(f) of FISA this Court shall use, as Congress

11:16  5   has directed, this Court shall employ ex parte procedures to

11:16  6   assess the validity, the legality of the warrantless

11:16  7   surveillance -- or excuse me, the electronic surveillance based on

11:16  8   the government's ex parte submission.  I suspect Your Honor has

11:16  9   done this before in criminal cases.  It's the same thing.  It's

11:16 10   the same section of the statute.  It's 1806(f) applies both to the

11:17 11   government's request to use evidence that is national security

11:17 12   information to motions to suppress in criminal cases and also in

11:17 13   1810 actions like this one.

11:17 14          In fact, if you think about it, if this were a criminal

11:17 15   -- imagine that Mr. Fazaga or Abdelrahim or Malik had actually

11:17 16   done something wrong, imagine they had done something wrong and

11:17 17   Mr. Monteilh had actually gathered some evidence of wrongdoing

11:17 18   against them, and they were being criminally prosecuted, then we

11:17 19   could bring a motion to suppress this same evidence by saying this

11:17 20   is bad faith investigation.  The purpose of this investigation was

11:17 21   not legitimate.  It violated the Fourth Amendment under these

11:17 22   doctrines, and then the Court would engage in an ex parte review

11:17 23   of that evidence to determine whether the motion to suppress

11:17 24   should be granted.  And in fact, we cited cases.  *Abu Jihad*.

11:18 25   There's a load of cases -- *Ott* -- where this is exactly what

                    SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:18  1   happened in FISA cases.

11:18  2            We're in that same position now except they didn't do

11:18  3   anything wrong.  They know that they were subject to surveillance.

11:18  4   They allege it was unlawful.  So we're bringing the civil action

11:18  5   which is in the kind of arts in this 1810.  It's just a couple

11:18  6   sections down in the statute.

11:18  7            So we know we're going to be doing this if the Court

11:18  8   agrees that the FISA claim survives.  If we're going to be doing

11:18  9   it any way, then what is the rationale for deciding that the

11:18 10   religion's discrimination claim, the free-standing First Amendment

11:18 11   claim which are not themselves cognizable under FISA, why would we

11:18 12   throw those out now?  Shouldn't we first see how the ex parte

11:18 13   process goes with respect to the FISA claims and then decide if

11:18 14   there is literally no way to vindicate the rights of our

11:18 15   plaintiffs?  That there is no way that the Court can assess the

11:18 16   legality of the government's conduct?

11:18 17            That's our basic point with respect to FISA preemption.

11:19 18   We think it's very important because the two are so closely

11:19 19   related because much of the same conduct at issue here with

11:19 20   respect to the FISA claims is also at play with respect to the

11:19 21   rest of the case.  And there is no plausible argument that the

11:19 22   state secrets privilege gets rid of the FISA claims because

11:19 23   Congress wrote in the statute exactly what you are supposed to do

11:19 24   with secret evidence -- national security protected information

11:19 25   when it come to FISA.

                    SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:19  1            Now, a few other points I wanted to make, Your Honor.

11:19  2            THE COURT:  Not to interrupt you unnecessarily, but I'd

11:19  3   like to give the court reporter another break.  So would you like

11:19  4   to talk for a few more minutes and take the break, or would you --

11:19  5   right now?

11:19  6            MR. ARULANATHAM:  Can I pick up when --

11:19  7            THE COURT:  Why don't we take another 10-minute break.

11:19  8                 (Recess taken, from  11:20 to 11:41.)

11:41  9            THE COURT:  All right, counsel, please proceed.

11:42 10            MR. ARULANATHAM:  Thank you, Your Honor.  Two sets of

11:42 11   arguments I guess I want to make.  The first concerns your

11:42 12   question to Mr. Coppolino about the nature of the national

11:42 13   security threat that's posed by the disclosure.

11:42 14            We are skeptical that litigating this case with

11:42 15   certainty is going to require the disclosure of certain

11:42 16   information which will threaten national security.  Of course, the

11:42 17   Court is required to assess the government's claims with a

11:42 18   skeptical eye.  That's what the doctrine says.

11:42 19            A few things I want to point out quickly.  Mr. Coppolino

11:42 20   says he can't add much to what is in the declarations.  I hope

11:42 21   that's a reference to a classified declaration because there is

11:42 22   virtually nothing in the public declarations that would give one

11:42 23   reason to believe that litigating this case is going to threaten

11:42 24   the national security.  I made an allusion to this in our briefing

11:42 25   papers as well, but the description just reads like FOIA

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:43 1    boilerplate.  That's what it reads like.  And we can't tell

11:43 2    anything from that.

11:43 3        But I think we have to remember -- so it's very

11:43 4    abstract.  It's a very abstract description.  We have to remember

11:43 5    we know, in the Muslim community in Southern California, our

11:43 6    clients, we know who Monteilh interacted with.  We know many of

11:43 7    the methods that he used.  So it can't be that everything that he

11:43 8    did is a secret.  So, as a sort threshold matter, I think there's

11:43 9    that to overcome.

11:43 10       It's also true that the government has, in other cases,

11:43 11   disclosed to us the subject of an investigation.  So you cannot

11:43 12   sort of -- and we give examples.  Brandon Mayfield is one example,

11:43 13   but there are many others that are in our papers.  You can't

11:43 14   categorically say that just because you are disclosing that

11:43 15   somebody either was or was not a target, that that necessarily by

11:43 16   definition is going to require -- is going to endanger national

11:43 17   security because the government has done it.

11:43 18       And again, here, I want to stress we don't care

11:43 19   necessarily whether or not they were subjects in some sense.  What

11:44 20   we care about is whether they were -- whether the government

11:44 21   collected information on them.  So if Mr. Malik wasn't the target,

11:44 22   but the government engaged in the collection of his e-mail and

11:44 23   cell phone and other information because of his religion, then

11:44 24   that states a constitutional violation.  Or if they did it in

11:44 25   violation of Fourth Amendment rules, that states a constitutional

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:44  1    violation.  And we don't necessarily care whether or not, under

11:44  2    some other definition, he was the target or instead he was just an

11:44  3    ancillary person.  So, we wouldn't need the disclosure of that

11:44  4    fact in order to litigate our case.

11:44  5         And the other thing Your Honor alluded to, the conduct

11:44  6    here is in 2006 and 2007.  And there weren't any criminal

11:44  7    prosecutions that arose.  At least thus far, five years later, six

11:44  8    years later there's nothing.  So when you are assessing the

11:44  9    national security threat and you're asking is there any way to

11:44 10    vindicate the rights of individuals who seek civil rights

11:44 11    protections in this case, what you are talking about is whether

11:44 12    they have the right to vindicate that based on violations that

11:45 13    arose initially six, five years ago.

11:45 14         THE COURT:  That's a tough issue.  That's a tough issue

11:45 15    and it's also difficult for the judicial branch to be

11:45 16    micromanaging the executive branch on that.  Let me give you an

11:45 17    example.

11:45 18         In drug distribution-type cases, drug cartels, passage

11:45 19    of time, I think, is critical.  And the government's, I guess,

11:45 20    need or interest in maintaining confidentiality, I'm not really

11:45 21    persuaded by it.  But on the opposite end, you have espionage

11:45 22    cases.  And I have had the experience of dealing with espionage

11:45 23    cases, and particularly spies from China, they can be what we call

11:45 24    sleeper agents.  They can be passive for 30, 40, 50 years and then

11:46 25    all of a sudden when they're in a position where they can take and

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:46 1   misappropriate national security information, they do so.  And in

11:46 2   the cases I have had, that's exactly what has happened.

11:46 3        This case, I definitely do not think it's like a drug

11:46 4   distribution case, but I don't know, is it like the espionage

11:46 5   cases where passage of time is not that big of a factor or not?

11:46 6        MR. ARULANATHAM:  It's impossible for us to know what

11:46 7   the government would try to show or maybe has already tried to

11:46 8   show.  With respect to that, Your Honor, I would just say let's

11:46 9   make a discovery request and then make them say that.

11:46 10       So if one of our three named plaintiffs is one of these

11:47 11  people whom the government says, even though they have never been

11:47 12  charged with a crime, Mr. Malik born and raised in Southern

11:47 13  California, surfs, that he is the one, then let them say that and

11:47 14  say that, no, religion wasn't a factor in the decision to target

11:47 15  him.  And if that's so, if that's really how it goes, maybe the

11:47 16  Court can make a decision on the merits then without our knowing

11:47 17  the reasons for why that happened.

11:47 18       If that's really what is going on, there are a lot of

11:47 19  alternatives short of dismissing the case now when we have three

11:47 20  named plaintiffs and many others in the Muslim community,

11:47 21  presumably not all of them are subject to this kind of national

11:47 22  security imperative.  Certainly not all the members of the

11:47 23  community.

11:47 24       I guess that gets into the last set of things I wanted

11:47 25  to talk about, Your Honor.  We do believe, and I have read -- I

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:47  1  think I have read every published state secrets case, and we do

11:47  2  believe there is a very serious constitutional problem that would

11:48  3  -- that is raised by the request to dismiss this case given the

11:48  4  claims that are pled here.

11:48  5        If you go back, it was very interesting to me.  If you

11:48  6  read *ACLU v. Brown*, *Guevara v. Webster*, and *Halkin v. Helms*, in

11:48  7  the 80s is when those got litigated.  And the underlying conduct

11:48  8  was -- in the 70s, it almost like a first wave of NSA wiretapping

11:48  9  going on.  And some of the cases the people knew they had been the

11:48 10  subject of surveillance.  Other times they didn't, but they

11:48 11  suspected it.  And the state secrets privilege was invoked in

11:48 12  those cases.  None of them got to the Supreme Court on the state

11:48 13  secrets question and none of them got to the Ninth Circuit so they

11:48 14  were litigated elsewhere.  And this case would be very different I

11:48 15  think if that had been resolved.

11:48 16        If you look at it, the courts are really struggling, and

11:48 17  there is huge amount of disagreement about whether or not we can

11:48 18  dismiss a claim for an ongoing constitutional violation, close the

11:49 19  courthouse door because the government has said the program is

11:49 20  secret.

11:49 21        And you can see why, Your Honor.  It's contrary to the

11:49 22  basic notion that the judiciary ultimately has to decide what the

11:49 23  law is and force the government to conform its conduct

11:49 24  accordingly.  Because if the government is just allowed to say

11:49 25  because it's secret, then the Court doesn't get to test the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:49 1    legality of it.  Not whether it's secret, but test the legality of

11:49 2    it, well, then we're exempting huge slots of government conduct

11:49 3    from oversight by the judiciary.

11:49 4            And in that respect, Mr. Coppolino doesn't sort of shy

11:49 5    away from the implications of that at all in his argument today.

11:49 6    He says if it's a counterterrorism investigation, then our

11:49 7    motives, why we have acted, is secret.  Is off the table.  Well,

11:49 8    motive is central to equal protection analysis.  And it's often

11:49 9    central to establishment clause analysis.  So that means that the

11:49 10   government counterterrorism behavior is essentially exempt from

11:50 11   judicial oversight with respect to the Equal Protection Clause.

11:50 12   That's the conclusion that you have to draw.

11:50 13           And that's really what's happening in this case.  We're

11:50 14   saying the government is discriminating on the basis of religion

11:50 15   and they're saying our motives, why we acted, whether we did it

11:50 16   for religion or, instead, for some other legitimate purpose,

11:50 17   cannot be litigated.

11:50 18           So that is a profound, very serious constitutional

11:50 19   question.  I think also in that respect, Your Honor, the

11:50 20   government says almost nothing about the Guantanamo cases.  Now,

11:50 21   the Guantanamo cases, all of them, from *Boumediene* in the Supreme

11:50 22   Court all the way right down to every district court case, they

11:50 23   are cases where -- the habeas ones are cases where individuals

11:50 24   have brought a lawsuit against the government alleging an ongoing

11:50 25   violation of their constitutional rights.  Many of those

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:50  1   individuals waged war against the United States, and many courts

11:50  2   have believed that they have almost no constitutional rights, very

11:51  3   few constitutional rights under the view of many courts.

11:51  4         But the government has never dismissed any of those

11:51  5   cases on state secrets privilege.  And they never even asked.  And

11:51  6   I don't think any court would find it even plausible that they

11:51  7   could do so.  Why?  Why?  It seems to me the reason has to be

11:51  8   because if that were acceptable, it would mean that the government

11:51  9   could violate the constitutional rights of individuals on an

11:51 10   ongoing basis without any judicial oversight.

11:51 11         What is the difference between that and us?  Our clients

11:51 12   are here in Southern California.  They haven't waged war against

11:51 13   the United States.  They're American citizens and lawful permanent

11:51 14   residents.  The claim is different in the sense that it's a First

11:51 15   Amendment claim rather than a due process claim or whatever it may

11:51 16   be, but there is no rule that places the First Amendment lower

11:51 17   down in a hierarchy of constitutional protection.

11:51 18         And I guess the other defense, it's not physical

11:51 19   liberty.  They're not imprisoned.  But again, Your Honor, there is

11:52 20   no rule that says that when the government chooses to discriminate

11:52 21   against people on the basis of their religion, that that somehow

11:52 22   gets subsidiary -- gets constitutional treatment.  This is a very,

11:52 23   very serious and complex constitutional problem.  And I think the

11:52 24   government hasn't in any way tried to minimize the effect of that

11:52 25   in its presentation today.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:52  1        And I would just submit that I think there are two ways

11:52  2  to avoid that.  You can address it, Your Honor.  You could decide

11:52  3  that question one way or the other.  We would hope if you do, that

11:52  4  you don't decide that the courthouse doors can be closed when

11:52  5  people are trying to vindicate their constitutional rights, like

11:52  6  under the Establishment Clause and the Equal Protection Clause.

11:52  7  But you can also avoid that question, which obviously if you can

11:52  8  avoid it, you should under the constitutional avoidance doctrine.

11:52  9        And there are two very straightforward ways to avoid it.

11:52 10  Way number one is rule that FISA and the procedures concerning ex

11:52 11  parte treatment of evidence governs the use of the secret evidence

11:53 12  in this case, whenever it comes.  Or that something like FISA

11:53 13  does, like CIPA.  I'm sure Your Honor is familiar with the rules

11:53 14  from criminal cases.  Or the procedures that were set forth in the

11:53 15  Guantanamo cases.  Our co-counsel, Mr. Stormer, who works with

11:53 16  Ms. Salhi, he was cleared to represent an individual in a

11:53 17  Guantanamo case.  I did a monitoring and was cleared to travel to

11:53 18  Guantanamo to monitor a military commission hearing.  Maybe there

11:53 19  is a way to deal with it that way or some other way.

11:53 20        THE COURT:  But if I do it that way, then you would be

11:53 21  giving up the plaintiff's right to a jury trial on the

11:53 22  constitutional claims.

11:53 23        MR. ARULANATHAM:  There is a lot of complexity there,

11:53 24  Your Honor.  Obviously that's true.  And there are actually CIPA

11:53 25  cases about that, about the tension between the jury trial rights

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:53  1   and the use of secret evidence.  I don't know the answer.  I'd

11:53  2   have to see the evidence.  We would have to brief it.  It's all

11:53  3   down the line.  All down the line.  And to decide with certainty

11:54  4   today that there is no way to solve that problem when we haven't

11:54  5   even seen the evidence yet I think is vastly premature.

11:54  6        I guess that's my point about the other way to resolve

11:54  7   it.  Just wait until the government has actually been forced to

11:54  8   produce some evidence.  Let them answer the complaint.  Let them

11:54  9   actually say whether they're willing to disavow Mr. Monteilh or

11:54 10   not.  Whether they use religion or not.  Let them at least say

11:54 11   that.

11:54 12        And I think the last thing I'll say on state secrets

11:54 13   today, Your Honor, I just want to come back to it.  For our

11:54 14   clients, for our clients and the people in the community, the

11:54 15   class and other members of the Muslim community in Southern

11:54 16   California, it is so fundamentally different -- I cannot emphasize

11:54 17   it enough -- it is so fundamentally different to have Your Honor

11:54 18   rule on the merits versus to have Your Honor dismiss this case

11:54 19   because it's a secret.  They believe they are being discriminated

11:54 20   against on the basis of their religion.  And there are now

11:55 21   declarations in this case which say that.

11:55 22        One of the defendants came and told them that there were

11:55 23   no informants in the mosque, and he was not telling the truth.  So

11:55 24   they have some sense that they want a judicial determination of

11:55 25   the legality of the program here.  And what the government is

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:55 1   asking you to do with respect to the state secrets privilege is

11:55 2   not decide whether they engaged in illegal discrimination on the

11:55 3   basis of religion.

11:55 4          And that difference, however you deal with the secret

11:55 5   evidence when it comes, however you deal with it, even if the way

11:55 6   you deal with it is everything happens ex parte, we just get to

11:55 7   submit some documents to you and Your Honor decides the merits,

11:55 8   even if it's that thin, that is vastly preferable to a dismissal

11:55 9   on the state secrets doctrine today when all we have are

11:55 10  allegations which are atrocious, which are alleged blatantly

11:55 11  illegal conduct, and it turns out that the government doesn't have

11:55 12  to answer, all the chance to get any vindication of those rights

11:56 13  is lost.

11:56 14          Thank you, Your Honor.

11:56 15          THE COURT:  Appreciate your argument.  Thank you.

11:56 16          MR. COPPOLINO:  Your Honor, can I have a few minutes?

11:56 17          THE COURT:  Yes, you may.

11:56 18          MR. COPPOLINO:  Thank you, Your Honor.  I just wanted to

11:56 19  respond to a couple of points that Mr. Arulanantham -- we've only

11:56 20  been across the table for six months and I'm still trying to

11:56 21  figure your name out.

11:56 22          So I started my argument by saying the privilege

11:56 23  assertion can and often does present some painful choices.  And

11:56 24  this is an instance where it does.  But I think you have to take

11:56 25  the law as it is.  And as I mentioned, *Jeppesen* is the governing

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:56  1  authority and it in no way countenances a lot of the things that

11:56  2  my distinguished colleague just argued.

11:56  3       For example, he said we're not here on a motion to

11:56  4  compel discovery.  And that's an effective rhetorical point.  I

11:57  5  have to concede that as a lawyer.  Except *Jeppesen* makes clear

11:57  6  that in certain circumstances you should not wait for a discovery

11:57  7  request.  You certainly can dismiss at the pleading stage.  The

11:57  8  question is, is this an occasion where you should?

11:57  9       And there's a quote in *Jeppesen*.  I'll cite it to you.

11:57  10 It's 614 F.3d at 1081.  He is right.  It says when a Court can

11:57  11 determine with certainty from the nature of the allegations and

11:57  12 the government's declaration in support of its claim of secrecy

11:57  13 that litigation must be limited or cut off in order to protect

11:57  14 state secrets, even before any discovery or evidentiary requests

11:57  15 have been made.  Waiting for specific evidentiary disputes to

11:57  16 arise would be both unnecessary and potentially dangerous.

11:57  17      Now, the question for you as a district judge in this

11:57  18 case is, does this apply here?  And I think it does.  And the way

11:57  19 for you to assess that is to look at our privilege assertion and

11:58  20 look ahead to the evidence and the information that's going to be

11:58  21 needed to decide the claim.

11:58  22      My colleague also said you have to assume truth of the

11:58  23 allegations.  That's not correct.  The state secrets privilege

11:58  24 assertion is not a motion that's based on the pleadings.  And so

11:58  25 you don't simply assume the truth of the allegations.  Rather, it

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:58 1  is a privilege assertion.  And in a privilege assertion you decide

11:58 2  whether the information should be protected and whether or not

11:58 3  it's needed for the case.

11:58 4       So it's a completely different question.  In fact, some

11:58 5  courts look at it as a summary judgment question.  If the evidence

11:58 6  is excluded, summary judgment should be granted to the party that

11:58 7  is prejudiced by that.  In this case, the defendants.  Because

11:58 8  they cannot defend.  It's really not an assumption of the

11:58 9  allegations as being true.  It's a question of, can the case

11:58 10 proceed with this evidence?

11:58 11      And I concede that's a judgment call, but I don't think

11:58 12 it's a very close one in this case when you look at the nature of

11:59 13 the information that we're seeking to protect.  They have to

11:59 14 concede they are putting at issue exactly what happened in this

11:59 15 investigation.  And we have presented a robust description of why

11:59 16 certain facts about the investigation are privileged.

11:59 17      Now, my colleague suggests -- I'm not sure what to make

11:59 18 of the suggestion, but he said we need one request for admission

11:59 19 to determine if religion was a factor.  But that can't possibly be

11:59 20 right.  Suppose the question was no, religion was not a factor.

11:59 21 Would they dismiss the lawsuit?  Suppose the answer was yes, it

11:59 22 was a factor.  Would we lose the case?

11:59 23      Obviously you cannot tell the story of this lawsuit

11:59 24 based on a single question, a single request for admission.  And I

11:59 25 can assure you, Your Honor, that in the first 15 minutes of the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

11:59  1   first deposition you will confront exactly the issue that we are

11:59  2   raising here.  What happened in this case?  Why did you send this

12:00  3   -- what did you task this person to do?  Was this an

12:00  4   indiscriminate collection?  What was exactly occurring?

12:00  5         That is not an avoidable issue.  It's the heart of the

12:00  6   case.  It's inextricably intertwined with the allegations and it

12:00  7   can't be avoided.  So kicking it down the road to a discovery

12:00  8   request serves no purpose.  We will have the exact same oral

12:00  9   argument in a month.  And I think that's the crux of the problem.

12:00 10         I have to address a couple of other points.  Mr.

12:00 11   Arulanantham suggests this is a radical expansion of the state

12:00 12   secrets privilege.  Not so.  It's an application of *Jeppesen*.  It

12:00 13   applies to a different situation, but the law has been established

12:00 14   in this circuit.

12:00 15         He argues that counterterrorism investigations would be

12:00 16   exempt from oversight.  Again, not so.  We have set forward to you

12:00 17   the specific facts that we feel we need to protect.  It is subject

12:00 18   to judicial review, and we invite you to look at it with a

12:01 19   skeptical eye.  That's what the law provides and we welcome that.

12:01 20         And I would say too, Your Honor, if you have questions,

12:01 21   if you are concerned about specific issues, we stand ready to try

12:01 22   to address them.  We would have to probably do it in a secure way,

12:01 23   but we have done that.  Because I want you to be assured about the

12:01 24   need to dismiss the case in order to protect vital national

12:01 25   security interests.  Because if you are assured of that, then I

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:01  1    don't think it is proper under the law to simply wait.

12:01  2         He argues that the privilege can't be applied to ongoing

12:01  3    claims for constitutional violations.  Zero authority in support

12:01  4    of that proposition.  Not so.  In fact, there is no ongoing

12:01  5    activity here except, as my distinguished colleague points out,

12:01  6    the maintenance of records.  But even in *Al-Haramain*, a Ninth

12:01  7    Circuit decision, constitutional claim, same relief sought,

12:01  8    expungement, state secrets privilege upheld.

12:01  9         There is no obstacle.  The other cases involving this,

12:02 10    *Halkin v. Helms* in the D.C. circuit, constitutional claim for

12:02 11    injunctive relief.  *Molerio*, constitutional and damages claim for

12:02 12    injunctive relief.  *ACLU v. NSA* in the Sixth Circuit,

12:02 13    constitutional claim for injunctive relief.  No impediment to

12:02 14    upholding state secrets privilege.

12:02 15         And I have laid this out further in my brief, Your

12:02 16    Honor.  I think their argument on that -- actually, it's been

12:02 17    rejected by the Supreme Court in *Tenet v. Doe*.  And they have made

12:02 18    some argument about how *Tenet* is different; how a *Tenet* dismissal

12:02 19    was different from a *Reynolds* dismissal.  I would just commend my

12:02 20    brief to you on that point because it's simply not correct.

12:02 21         I have to address this issue about FISA and FISA

12:02 22    preemptions.  They there has been a lot of discussion about these

12:02 23    Fourth Amendment FISA issues this morning.  And I want to just

12:02 24    clarify first a factual issue.  And I think Mr. Scheper did a

12:02 25    great job on this, this morning, but let me point out there are

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:02  1    two strains of allegations here going to a FISA violation.  One is

12:02  2    what did Mr. Monteilh do?  Did he collect audio without consent?

12:03  3    Did he leave a device unattended?

12:03  4          And we have not asserted privilege as to the facts

12:03  5    regarding the narrow issue of what did he do with this audio

12:03  6    device because the fact that he collected audio is not a secret.

12:03  7    It was disclosed in a criminal proceeding a few years ago in this

12:03  8    district.  So on the narrow question of what he did with his audio

12:03  9    device, we haven't asserted privilege because that may be

12:03 10    something that can proceed.  It doesn't involve ex parte

12:03 11    proceedings.  It's just simply a straight up Fourth Amendment

12:03 12    issue.

12:03 13          Now, I happen to agree with everything my colleague said

12:03 14    about the Fourth Amendment authority.  I read the Fourth Amendment

12:03 15    authority in this circuit and in the Supreme Court to be an

12:03 16    entirely separate issue from the good faith issue involving a

12:03 17    First Amendment claim.  I think the Ninth Circuit may smush them

12:03 18    together in *Aguilar* and *Mayer*, but I think they are separate

12:03 19    questions.  The Fourth Amendment issue simply goes to whether

12:03 20    information has been collected consensually or not.  Under the

12:03 21    *Hoffa* decision in the Supreme Court, that's fine.  There is no

12:04 22    Fourth Amendment violation.

12:04 23          If you ingraft on that a separate requirement of a good

12:04 24    faith investigation, you are back into all of the issues that are

12:04 25    implicated by the state secrets.  I happen to think that's a First

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:04 1   Amendment issue.  That's a separate issue that you could still

12:04 2   litigate a narrow Fourth Amendment issue on consensual or

12:04 3   non-consensual collection, and you can do it without the state

12:04 4   secrets privilege.  But if their position is that you have to

12:04 5   consider whether the entire investigation was in good faith in

12:04 6   order to decide the Fourth Amendment question, then that just

12:04 7   brings us full circle back to the state secrets privilege.

12:04 8        Let me also say on this issue of FISA and FISA

12:04 9   preemption, I have spent the last seven years briefing this issue

12:04 10  and I'm about to go back and brief it again.  I think I gave you a

12:04 11  couple of pages in one of my briefs on the issue, Your Honor, but

12:04 12  the first thing I would say is it really shouldn't apply here

12:04 13  because we haven't sought to dismiss the FISA claim based on the

12:04 14  state secrets privilege precisely for the reason I said.

12:05 15       The heart of the claim is what Mr. Monteilh allegedly

12:05 16  did with the device.  And their argument is that that may have

12:05 17  violated FISA.  If what he did with the device, that narrow issue,

12:05 18  doesn't involve any state secrets, it could be litigated as no

12:05 19  issue of state secrets privilege preemption.

12:05 20       But his citation to this FISA provision 1806(f) I would

12:05 21  suggest you go back and take a quick look at the brief we wrote on

12:05 22  this.  That provision applies solely in circumstances, in our

12:05 23  view, where the government is using FISA surveillance evidence

12:05 24  against someone.

12:05 25       You have probably had it in your criminal cases where

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:05  1   wiretap evidence is used against someone who has been indicted and

12:05  2   the government has to give notice under section 1806(c) that

12:05  3   they're going to use FISA surveillance.  And the plaintiff can

12:05  4   then move to suppress.  And 1806(f) is the procedure for

12:05  5   considering the motion to suppress in a criminal case, or any

12:05  6   other proceeding where the government seeks to use the evidence.

12:06  7           There is no reference to preempting the state secrets

12:06  8   privilege.  And the text of the statute, the legislative history,

12:06  9   there isn't a single case which says that.  In fact, he cited the

12:06 10   *Ott* case which is your standard criminal FISA 1806(f) suppression

12:06 11   hearing.  That's it.

12:06 12           It doesn't apply.  And there is no other authority that

12:06 13   permits a Court to have an ex parte merits adjudication.  *Jeppesen*

12:06 14   is the governing authority, and *Jeppesen* says if the information

12:06 15   is needed for the plaintiffs to establish their case, if it's

12:06 16   needed for the defendants to defend or if it's at risk of

12:06 17   disclosure, the remedy is dismissal.  It is not have a secret ex

12:06 18   parte merits hearing.  You will not find a single case which holds

12:06 19   that.  Not one.

12:06 20           He mentioned Guantanamo.  Guantanamo is wholly

12:06 21   different.  That is a situation where individuals have been

12:06 22   detained, their liberty interest is at stake.  The government

12:06 23   bears the burden of proof to keep them in detention.  And the

12:07 24   government, in that circumstance, has agreed to, in order to try

12:07 25   to litigate whether we can continue to hold these folks at

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:07  1    Guantanamo, we agreed to provide some security clearances to

12:07  2    defense counsel.  But it is not a state secrets case.

12:07  3          In fact, *Reynolds* draws the very distinction.  *Reynolds*

12:07  4    is the seminal Supreme Court case on the state secrets privilege.

12:07  5    And it says, in a criminal setting the government cannot

12:07  6    simultaneously seek to prosecute someone and assert privilege over

12:07  7    the information.

12:07  8          That's why CIPA was written; to work precisely around

12:07  9    that problem so that classified information at issue in a criminal

12:07 10    case where the government seeks to put someone in jail, that there

12:07 11    is a mechanism for dealing with that.

12:07 12          And while the habeas proceedings are civil proceedings,

12:07 13    they are analogous.  In fact, the D.C. Circuit has said in the

12:07 14    *Alota* case that they are analogous to criminal proceedings, and it

12:07 15    has specifically, therefore, looked to CIPA as ways of trying to

12:08 16    deal with classified information where the government has the

12:08 17    burden of proof to hold someone.

12:08 18          That's not the case, as *Reynolds* points out, when the

12:08 19    government is being sued as a defendant, let alone individual

12:08 20    capacity defendants, and the plaintiffs are the one seeking the

12:08 21    disclosure of the information.

12:08 22          And I think it's a very important definition, Your

12:08 23    Honor.  The Gitmo situation has no relevance here, nor is there

12:08 24    any other precedent for clearing opposing counsel in any state

12:08 25    secrets case in history that I'm aware of.  And in fact, several

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:08  1    cases, *Sterling* in the Fourth Circuit, *Ellsberg* and *Halkin* in the

12:08  2    D.C. Circuit squarely reject it.

12:08  3         I just would close by saying that, to come full circle,

12:08  4    you have to decide this based on the law and the record that

12:08  5    exists.  While I think it would be preferable if we could go

12:08  6    forward, the question is can we.  And I think that we have

12:08  7    demonstrated that the information necessary to go forward is

12:09  8    properly protected.  That's at least the first question.  And if

12:09  9    you have questions about that, we can try to address them.  But if

12:09 10    you just simply say let's kick the can down the road, let's wait

12:09 11    for a discovery request, you're going to run into some very

12:09 12    significant problems right away.

12:09 13         The very issues that we're debating right now will be

12:09 14    debated immediately and you will not get to first base.  For one

12:09 15    thing, he says, let them answer the complaint.  The complaint

12:09 16    can't be answered because the answer, the admission, or denial, or

12:09 17    explanation, or otherwise averment is wrapped up in what is

12:09 18    privileged.

12:09 19         How can an agent who knows the truth, but also knows the

12:09 20    truth is properly classified, how can he answer this complaint?

12:09 21    Because the complaint really asks a single question:  What

12:09 22    happened in this case?  There are several hundred allegations and

12:09 23    many pages, but that's what you have to know.

12:09 24         So there is no way to even answer.  In fact, the Ninth

12:09 25    Circuit has said, in that circumstance, you just identify the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:10 1   privilege in your answer.  So where does that get us?  We answer

12:10 2   the complaint by saying we can't answer the complaint because the

12:10 3   information is subject to the state secrets privilege.  I just

12:10 4   don't think the issue is avoidable, Your Honor.

12:10 5           If you have any questions on that --

12:10 6           THE COURT:  No.  Everything has been thorough.

12:10 7           MR. ARULANATHAM:  I don't think I have more to say about

12:10 8   *Jeppesen* to distinguish it.  It seems to me the whole subject

12:10 9   matter of that case is a secret.  It's about a CIA rendition

12:10 10  program.  And that's what the Court holds.  And I commend you

12:10 11  again to that last paragraph.  They're saying this is the last

12:10 12  resort.  And this case is not the same as *Jeppesen* for all the

12:10 13  reasons I have said.  It's about an ongoing constitutional

12:10 14  violation.  It's not about a program that's wholly secret.

12:10 15          We know already because of the scope of the government's

12:10 16  assertion that a portion of this case is going to proceed, or it's

12:10 17  not going to be dismissed on state secrets ground.  So it's

12:11 18  different.  To me, if *Jeppesen* is at or near the outer limit,

12:11 19  which is what the Court seems to be saying in the opinion, then we

12:11 20  are clearly within it.

12:11 21          With respect to whether -- how this case is going to be

12:11 22  litigated, there seem to be so many questions that are preliminary

12:11 23  before we get into a determination as to whether or not state

12:11 24  secrets really has to be invoked.  You asked, Your Honor, was the

12:11 25  FBI policy followed here.  Mr. Coppolino says they can't answer

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:11 1   the complaint.  They can't answer any of the allegations in the

12:11 2   complaint?

12:11 3          They have acknowledged that Mr. Monteilh was an

12:11 4   informant for the government.  We have submitted publicly

12:11 5   available information and declarations that verifies much of what

12:11 6   he says.  Of course, his statements are also, is it really true

12:11 7   there is nothing in the complaint that can be answered by which

12:11 8   they can say whether or not they used religion, and whether they

12:11 9   tasked him in that way in deciding whether to do this?

12:11 10         And again, as I have said already, even if that's really

12:11 11  true, it still could be done to the Court ex parte and decided on

12:12 12  the merits rather than being dismissed on secret grounds.

12:12 13         Now, Mr. Coppolino says there is zero authority for the

12:12 14  argument that we're making about injunctive relief claims.  I

12:12 15  agree it's an open question, but it's an open question because

12:12 16  there is a very serious problem here so it doesn't arise very

12:12 17  often.

12:12 18         I said earlier, Your Honor, that this came up in the

12:12 19  80s.  If you look at *Jabara v. Webster* and *ACLU v. Brown*, those

12:12 20  are two cases.  They're both in sort of a funny procedural

12:12 21  posture.  Both of them refused to dismiss on state secrets grounds

12:12 22  rather than looking at the merits.  And *ACLU v. Brown*, I think

12:12 23  they're remanding.  I can't remember what's happening in each

12:12 24  case, but I think if you take a careful look, you'll see, Your

12:12 25  Honor, they're disagreeing with what the Court is doing in *Halkin*

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:12  1    *v. Helms*.

12:12  2           *Halkin v. Helms* is the one case which I think does

12:12  3    resolve this for the government.  It's en banc, or there is a

12:12  4    motion for it en banc in the D.C. Circuit and there is dissents

12:13  5    from judges that are upset about exactly the issue that I'm

12:13  6    talking about here today.  They think it's unconstitutional for

12:13  7    the same reason that I'm talking about here today.  And it's not

12:13  8    the approach that was taken in the other circuits at that time.

12:13  9           With respect to the Guantanamo cases, my point is not --

12:13 10    I recognize that they don't say state secrets in them, Your Honor,

12:13 11    but the question is why.  Why is that?  The government surely

12:13 12    doesn't contend that there isn't highly sensitive national

12:13 13    security information at issue in those cases.  They say it's

12:13 14    different because liberty is at stake.  Is liberty not at stake in

12:13 15    this case?  Is liberty not a stake in this case about whether or

12:13 16    not our clients were surveilled on the basis of their religion and

12:13 17    whether the government is keeping files on them because they're

12:13 18    Muslim?

12:13 19           They also said the government bears the burden of proof.

12:13 20    Well, now the government bears burden of proof in this case.  If

12:13 21    we can make our claims without the use of the government's

12:13 22    evidence, which we have done, then -- and I just can't imagine why

12:13 23    that sort of trivial procedural distinction about who bears the

12:13 24    burden of proof could possibly be the reason why there hasn't been

12:14 25    an assertion of the state secrets privilege.  That doesn't make

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:14 1   any sense at all.

12:14 2          And I don't know -- habeas is analogous to criminal law

12:14 3   in the sense that you lock people up.  But it's a lawsuit brought

12:14 4   by an individual against the government alleging an ongoing

12:14 5   violation of constitutional rights.  And that is exactly what

12:14 6   we're doing here.

12:14 7          The last thing I'll say, Your Honor, the FISA arguments

12:14 8   the government is making, I don't understand -- Mr. Coppolino says

12:14 9   he doesn't think that purpose is at issue in Fourth Amendment

12:14 10  analysis, and I think the Ninth Circuit nudges them together.  We

12:14 11  live in the Ninth Circuit.  And if you read *Aguilar* and *Mayer*,

12:14 12  it's very clear that if there is bad faith conduct for the purpose

12:14 13  of getting information on First Amendment activity as the purpose

12:14 14  of the surveillance, that's actionable.

12:14 15         In addition, Your Honor, in FISA cases more generally

12:14 16  purpose is at issue.  If you can show that the purpose is not to

12:14 17  target a foreign power or an agent of a foreign power, the other

12:15 18  rules that are there, then you can suppress the evidence under the

12:15 19  Fourth Amendment.

12:15 20         And it's true that a lot of Fourth Amendment law is sort

12:15 21  of objective and not interested in purpose under cases like *Whren*,

12:15 22  but then there's whole branches of it which are different, which

12:15 23  do look at purpose.  The special needs cases, for example.  And

12:15 24  FISA is just another example of that.  And the invited informer

12:15 25  doctrine is also another example of that.  And that's what the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:15  1    Ninth Circuit has already held.

12:15  2            The last thing I'll say, Your Honor, last, but it's not

12:15  3    least, 1806(f), this is the provision of FISA that governs the use

12:15  4    of classified information of sort of secret national security

12:15  5    information when FISA is at issue, right?  It says, whenever a

12:15  6    Court, 1806(f), whenever a Court or other authority is notified,

12:15  7    this is going to be notification that you -- that there is

12:15  8    national security information that is at issue, right?  Is

12:16  9    notified pursuant to subsection C or D, that's when the U.S. or a

12:16 10    state wants to introduce evidence, or whenever a motion is made

12:16 11    pursuant to subsection E, that's a motion to suppress in a

12:16 12    criminal case, okay, or whenever any motion or request is made by

12:16 13    an aggrieved person pursuant to any other statute or rule of the

12:16 14    United States or any state before any court or other authority of

12:16 15    the United States, or any state, to discover or obtain application

12:16 16    or orders or other materials relating to electronic surveillance.

12:16 17    When that happens, the Court shall review in camera and ex parte

12:16 18    such other materials relating to the surveillance as may be

12:16 19    necessary to determine whether the surveillance of the aggrieved

12:16 20    person was lawfully authorized.

12:16 21            The text of the statute tells you that FISA applies not

12:16 22    only when the government seeks to introduce evidence or when there

12:17 23    is a motion to suppress, but also -- and this is the catch-all --

12:17 24    whenever any motion or request is made by an aggrieved person.

12:17 25            Well, what are they talking about, Your Honor?  They're

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:17 1    talking about the provision, four sections later, 1810, which

12:17 2    authorizes suits under FISA against, we have learned, individual

12:17 3    defendants for unlawful electronic surveillance.

12:17 4         So the reason why the government -- and Mr. Coppolino,

12:17 5    he's sort of hedging a bit here, but they have not asserted the

12:17 6    state secrets privilege with respect to the FISA claim.  And I

12:17 7    think the reason they haven't done it is because *Al-Haramain*

12:17 8    strongly suggested the first time that it would be preempted by

12:17 9    FISA, and the district court held that.

12:17 10        As you know, Your Honor, we started the hearing with

12:17 11   this.  It got reversed on another ground.  We presented those

12:17 12   arguments for you today, but it's clear as a bell from the text of

12:17 13   the statute that there is a procedure for dealing with secret

12:17 14   evidence in FISA cases.

12:17 15        So the question before Your Honor is just why not apply

12:17 16   those procedures to the other evidence in this case.  We know if

12:18 17   Your Honor agrees that some portion of the FISA is going to go

12:18 18   forward, these are the procedures that are going to govern the use

12:18 19   of secret evidence with respect to that set of evidence.  And so

12:18 20   why not just apply it to the rest of the evidence in the case, or

12:18 21   at least why not not decide that today and give us our day in

12:18 22   court.

12:18 23        Thank you, Your Honor.

12:18 24        THE COURT:  Thank you, sir.

12:18 25        Well, we have been going on at it now for a little over

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:18  1   three hours.  So I don't have much more left.  But is there any

12:18  2   other issues?  I think the Federal Tort Claims Act you wanted to

12:18  3   argue.  Is there any other issues besides that one we need to

12:18  4   discuss?

12:18  5               MR. BIBRING:  Your Honor, plaintiff would certainly like

12:18  6   to be heard on the First Amendment issues.

12:18  7               THE COURT:  Okay.  Why don't we deal with the First

12:18  8   Amendment first and then we'll end with the federal tort claims.

12:18  9               MR. COPPOLINO:  Your Honor, I suppose I can take five

12:18 10   minutes on the issue of expungement.  That's the only relief

12:18 11   sought against the FBI.  So if we could add that to the list.

12:18 12               THE COURT:  Okay.

12:19 13               MR. ARULANATHAM:  Your Honor, we believe can do that

12:19 14   very quickly.

12:19 15               THE COURT:  Good.  There is always that hope.

12:19 16               MR. BIBRING:  Thank you, Your Honor.  I wanted to start

12:19 17   by going back to the question Your Honor posed at the beginning of

12:19 18   this argument about whether the government has to, for some

12:19 19   reason, use religion in this kind of investigation.  And first of

12:19 20   all, I want to be clear that contrary to the characterization of

12:19 21   defendants' reply briefs, it is not our position that law

12:19 22   enforcement can never use religion, just like it's not the rule of

12:19 23   law that law enforcement can absolutely never use race in any of

12:19 24   its decisions.  The affirmative action cases tell us that, suspect

12:19 25   description cases tell us that.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:19  1         Our position is that a use of religion, like a use of

12:20  2    race, as the Supreme Court has clearly stated over and over and

12:20  3    over again through *Lukumi*, through *Smith*, dating back to footnote

12:20  4    4 of *Caroline Product* where the Court says that certain suspect

12:20  5    classifications such as racial, national, or religious minorities

12:20  6    should be subject to heightened scrutiny, that those explicit

12:20  7    classifications are subjected to strict scrutiny.

12:20  8         So for example, Your Honor raised the question about

12:20  9    whether religion might play a role in investigation into Ku Klux

12:20 10    Klan that was motivated by religion.  The Ku Klux Klan certainly

12:20 11    explicitly grounds its bigotry in religious doctrines.  And I

12:20 12    think the answer is maybe.  But it's a very different thing for,

12:21 13    for example, an investigation into a known Ku Klux Klan member to

12:21 14    include certain information about known violent incidents or

12:21 15    violent beliefs might be grounded in religion.

12:21 16         That's one thing.  It's a very different thing for the

12:21 17    government to say well, Ku Klux Klan grounds its beliefs in a

12:21 18    conservative version of Christianity, a violent version of

12:21 19    Christianity, so we're going to go out and collect all the names

12:21 20    of Christians in states where the Ku Klux Klan is active or -- I

12:21 21    mean, the list goes on.

12:21 22         So that's a very different proposition.  And that's what

12:21 23    is alleged here.  The dragnet operation.  The focus exclusively on

12:21 24    Muslims.  The focus on people because of their religion.  The

12:21 25    focus on people not because they're more violent or because there

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:21 1   is an indication of greater violence, but because there is an

12:21 2   indication of greater religiosity because they attend mosque more

12:21 3   often or follow certain doctrines of traditional Muslim dress or

12:22 4   appearance.

12:22 5         So first I want to address the question about whether --

12:22 6   and this was touched on earlier -- whether it was clear in 2006

12:22 7   that an investigation could not facially target a particular

12:22 8   religious minority.  Whether an investigation could go out and

12:22 9   say, we want to start our counterterrorism investigation by

12:22 10  looking at all Muslims, or our counterterrorism investigation into

12:22 11  JDL by looking at all Jews, or our counterterrorism investigation

12:22 12  into support for the IRA by looking at all Irish Catholics.  It's

12:22 13  absolutely clear.

12:22 14        Start with *Larson v. Valente*, which is cited over and

12:22 15  over again in our brief, which says that, "When a law or a

12:22 16  government action grants a denominational preference, our

12:22 17  precedence demand that we treat the law as suspect and that we

12:23 18  apply strict scrutiny in judging its constitutionality."  Cited by

12:23 19  the Ninth Circuit repeatedly in *Droves v. CIR*, *Grand v. CIR* during

12:23 20  our briefs.  Under the Free Exercise Clause, too.

12:23 21        The Supreme Court in *Employment Division v. Smith* which

12:23 22  Mr. Coppolino recently cited said, "Just as we subject to the most

12:23 23  exacting scrutiny laws that make classifications based on race or

12:23 24  on the content of speech, so too we strictly scrutinize government

12:23 25  classifications based on religion."  That's at note 3.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:23 1          And the section that Mr. Coppolino read about where the

12:23 2  Court said, under *Sherbert*, laws that impose substantial burdens

12:23 3  on religious conduct are subject to compelling the interest test,

12:23 4  well, that was true.  That's an accurate characterization of

12:23 5  *Sherbert*.  But the language of *Sherbert* explicitly only applies to

12:24 6  facially neutral laws.

12:24 7          That language, which the Court has repeated over and

12:24 8  over again, says, and is cited at page 36 of our brief, "A

12:24 9  regulation neutral on its face may, in its application,

12:24 10 nonetheless, offend the constitutional requirement for government

12:24 11 neutrality if it unduly burdens the free exercise of religion."

12:24 12         *Sherbert* addressed a facially neutral regulation that

12:24 13 said that in order to be eligible for unemployment insurance, a

12:24 14 person couldn't decline work without good cause.  Facially

12:24 15 neutral, but it was applied to a Seventh Day Adventist -- I'm

12:24 16 sorry, a Jehovah's Witness who didn't want to work on Saturday for

12:24 17 religious reasons.  And the Court said that that requirement,

12:24 18 neutral requirement applied in that fashion burdened her religion

12:25 19 and therefore required strict scrutiny.

12:25 20         And the portion of *Smith* which Mr. Coppolino has

12:25 21 described as just a recitation of that standard under *Sherbert*,

12:25 22 the Court in *Smith* actually substantially restricted the *Sherbert*

12:25 23 test, but it certainly, certainly did not purport to restrict the

12:25 24 general rule cited in footnote 3, that just as they subject to the

12:25 25 most exacting scrutiny classifications based on race or on speech,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:25 1    so too they subject to strict scrutiny facial classifications

12:25 2    based on religion.

12:25 3           In fact, the Supreme Court, this does not often arise,

12:25 4    such facially distinct treatment of individuals based on religion,

12:25 5    but if you go back to the Supreme Court's older cases in *Fowler v.*

12:25 6    *Rhode Island* and *Niemotko*, which are cited in our briefs, the

12:25 7    Supreme Court addressed circumstances where police officers, local

12:26 8    government, treated groups differently because of their religion.

12:26 9    Denied them access to parks for religious use.  And the Court, in

12:26 10   both those cases, held that where the distinction and treatment

12:26 11   was based on religion, that it was invalid.  Strict scrutiny

12:26 12   applied essentially.

12:26 13          These were cases in the 50s before the jurisprudence had

12:26 14   developed those terms.  But it's clear that there's no analysis of

12:26 15   a substantial burden there.

12:26 16          I think it's worth considering why this is; why we apply

12:26 17   strict scrutiny.  The Supreme Court in *County of Allegheny v.*

12:26 18   *ACLU*, explained that, "We have explicitly required strict scrutiny

12:26 19   of practices suggesting a denominational preference in keeping

12:26 20   with the unwavering vigilance that the constitution requires

12:26 21   against any violation of the Establishment Clause."

12:27 22          And in fact, in a case that's actually not cited in our

12:27 23   briefs, but I will commend to the Court for this reading, *Johnson*

12:27 24   *v. California*, 543, U.S. 499.  It's a 2005 case involving a

12:27 25   challenge to race-based segregation policies in California

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:27  1    prisons.  There, the Supreme Court applied strict scrutiny.  This

12:27  2    is race, not religion.  But it explained the purpose for strict

12:27  3    scrutiny in any of these cases.  And the Court said, "Absent

12:27  4    searching judicial inquiry into the justification for such race-

12:27  5    based measures, there is simply no way of determining what

12:27  6    classifications are, in fact, motivated by legitimate notions of

12:27  7    racial inferiority as simple racial politics.  We therefore apply

12:27  8    strict scrutiny to all racial classifications to smoke out

12:27  9    illegitimate uses of race by assuring that the government is

12:27 10    pursuing a goal important enough to warrant use of such a highly

12:27 11    suspect tool."

12:27 12         The same is true for religion.  That's what the cases

12:28 13    mean.  What *Smith* means when it says, "Just as we apply exacting

12:28 14    scrutiny to race, so too to religion."

12:28 15         And *Johnson* applies not just in the law enforcement

12:28 16    context, but inside prisons where the Supreme Court acknowledges

12:28 17    that the government's power is at its apex.  That's a quote.

12:28 18    Nonetheless, explicit classifications that are based on

12:28 19    constitutionally suspect characteristics, like race or religion,

12:28 20    are subjected to strict scrutiny.

12:28 21         So in answer to this, the defendants have pointed to

12:28 22    certain Ninth Circuit cases.  And I'll start with *Vernon* which the

12:28 23    Court has already heard some about this morning.  *Vernon*, the

12:28 24    defendants characterize as virtually indistinguishable from this

12:28 25    case.  Nothing could be further from the truth.  *Vernon* involved

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:28  1    an assistant police chief at the Los Angeles Police Department

12:29  2    that was -- that the city had received complaints and newspaper

12:29  3    articles had written that he was discriminating against women,

12:29  4    gays, and lesbians on the basis of his religious beliefs.  That he

12:29  5    had stated women should be -- that gays and lesbians were morally

12:29  6    wrong and that women should be subordinate, and that he was

12:29  7    discriminating by promoting people who shared -- who belonged to

12:29  8    his church; that he was inappropriately holding prayer meetings on

12:29  9    government property and the attaching religious symbols to

12:29 10    official communications.

12:29 11            Those are exactly the specific allegations of misconduct

12:29 12    that are missing in the allegations of this complaint.  In other

12:29 13    words, the city wasn't targeting *Vernon* because of his religious

12:29 14    beliefs.  They were targeting because of specific allegations of

12:29 15    misconduct.

12:30 16            Now, those allegations did have to do with *Vernon*'s

12:30 17    religious beliefs, but there are two things:  First of all, the

12:30 18    Ninth Circuit, in analyzing *Vernon*, held -- it was a motion for

12:30 19    summary judgment.  So although *Vernon* alleged that this was being

12:30 20    done to him only because of his religious beliefs, it's a

12:30 21    different posture.  The Court could evaluate evidence.  And the

12:30 22    Court held it was undisputed that the city was -- the defendants'

12:30 23    actions were aimed at determining whether *Vernon*'s alleged on-duty

12:30 24    conduct violated the Establishment Clause.

12:30 25            In other words, they were not -- there was no facial

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:30  1    distinction between different religious groups.  Nowhere in *Vernon*

12:30  2    is there -- does the Court say there is evidence of a facial

12:30  3    distinction between different religious groups.  The city is

12:30  4    investigating alleged on-duty violations.

12:30  5            And second, the one area where the cases allow

12:30  6    government to consider religion as a matter of kind of on the face

12:31  7    of statutes, on the face of policies, is in the area of tension

12:31  8    between Establishment and Free Exercise clauses when the

12:31  9    government is acting to prevent an Establishment Clause violation

12:31 10    or accommodate religion through free exercise.

12:31 11            If you look at *Corporation of the Presiding Bishop v.*

12:31 12    *Amos*, which itself addresses a carve-out from Title VII for

12:31 13    religious discrimination where -- for organizations that are

12:31 14    themselves religious organizations, well, that's something that

12:31 15    treats religion differently on its face.  But the Court said, we

12:31 16    don't apply *Larson* to -- the Court says, where a statute otherwise

12:31 17    neutral on its face, not discriminating between religious

12:31 18    provisions, acts for the proper government purpose of avoiding

12:31 19    burdening religious conduct, we're not going to subject it to

12:32 20    strict scrutiny.

12:32 21            And this is -- the Court, in these cases, where religion

12:32 22    is addressed in an attempt to avoid an Establishment Clause

12:32 23    violation, repeatedly says we don't look as closely there.

12:32 24            Again, in *Locke v. Davey* which involves a provision that

12:32 25    forbids the use of state funded scholarships for degrees in

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:32  1   devotional theology, even though that is a facial classification

12:32  2   based on religion, the Court says this is an area of the play in

12:32  3   the joints between the Establishment Clause and the Free Exercise

12:32  4   Clause.  The purpose here is to avoid an Establishment Clause

12:32  5   violation, so we do not look as closely.

12:32  6        That's what's going on in *Vernon*.  The city is

12:32  7   investigating to avoid an Establishment Clause violation.  That is

12:32  8   absolutely what is not what is going on here.  There is no -- the

12:32  9   plaintiffs here, they're not government actors.  They're not

12:32 10   alleged to have somehow engaged in an Establishment or Free

12:32 11   Exercise Clause violation, and the investigation is certainly not

12:33 12   targeted at that.  It's targeted at counterterrorism.

12:33 13        So making use of religion as an explicit classification

12:33 14   certainly receives strict scrutiny under the statute, and *Vernon*

12:33 15   does not say otherwise.  In fact, *Vernon* doesn't address *Larson*.

12:33 16   Doesn't even cite it.  And on one hand, certainly the Ninth

12:33 17   Circuit can't overrule binding Supreme Court precedent and can't

12:33 18   overrule *Larson*'s holding that where a denominational preference

12:33 19   is expressed on its face, that strict scrutiny applies.  It

12:33 20   certainly can't do it sub silentio by simply not acknowledging it

12:33 21   in the opinion.  There is a perfectly reasonable explanation for

12:33 22   why they didn't cite it, which is that it's not applicable in a

12:33 23   case where the government is acting to avoid a constitutional

12:33 24   violation under the religion clauses.

12:33 25        And defendants also cite some other cases that --

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:33  1   actually, one more thing on *Vernon*.  There is a footnote in which

12:34  2   the Court, in *Vernon*, says that *Smith* doesn't apply.  It does so

12:34  3   citing to *Hanna Boys* which is a case which limits *Smith* to

12:34  4   criminal cases rather than civil cases.  That case has since been

12:34  5   overruled by the Ninth Circuit.  And so it's essentially unclear

12:34  6   from that why *Vernon* would be even arguing that *Smith* applied

12:34  7   because *Smith* actually applied a more lenient standard, but to the

12:34  8   extent that he was -- that it was, the basis for that has since

12:34  9   been completely undermined.

12:34 10          So the defendants also cite some cases that builds on

12:34 11   *Vernon*.  *American Family Association*.  Again, the Court never

12:34 12   cites *Larson* in that case.  It simply goes on to apply *Lemon*, and

12:34 13   doesn't wrestle with the question of whether *Lemon* applies or

12:34 14   where a denominational preference is expressed, strict scrutiny

12:35 15   should apply from the beginning.

12:35 16          Again, the Ninth Circuit, by ignoring that issue, can't

12:35 17   overrule binding Supreme Court precedent.  But again, there is an

12:35 18   explanation, although I think it's different.

12:35 19          The Supreme Court has been clear that for government

12:35 20   speech cases, for religious display cases, and in that case which

12:35 21   involved a statement by -- a resolution by the San Francisco city

12:35 22   council denouncing certain religious city leaders for saying that

12:35 23   homosexuality was immoral, in those cases, courts have held that

12:35 24   *Larson* should not apply just for speech where it's not government

12:35 25   action.

*MARIA BEESLEY-DELLANEVE, OFFICIAL REPORTER*

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:35  1          I would point to *Corporation of the Presiding Bishop v.*

12:36  2  *Amos* -- I'm sorry, Your Honor.  Actually, to Judge O'Scannlain's

12:36  3  concurrence in *Separation of Church and State v. City of Eugene*.

12:36  4  That's at 93 F.3d 617, pages 622 to 24, where he explains that

12:36  5  *Larson* does not apply to cases involving religious display.  As

12:36  6  the Supreme Court has made clear, "*Larson*'s strict scrutiny

12:36  7  approach is limited to cases where government statute or practice

12:36  8  explicitly discriminates against a certain religious group," and

12:36  9  cites Judge O'Connor's concurrence in the *Curious Joel* case noting

12:36 10  that cases involving government speech on religious topics, unlike

12:36 11  cases such as *Larson*, require an analysis under the endorsement

12:36 12  test.

12:36 13          So, that line of cases doesn't apply.  It doesn't cite

12:36 14  *Larson*.  And for practices that facially discriminate between

12:37 15  religious sect, *Larson* still does apply and does govern.

12:37 16          We filed a notice of supplemental authority notifying

12:37 17  the Court of a decision in January by the Tenth Circuit in *Awad v.*

12:37 18  *Ziriax* which addresses a constitutional amendment in Oklahoma that

12:37 19  barred the courts from considering Sharia law.  Now, that decision

12:37 20  directly engages on whether *Lemon* or *Larson* is the appropriate

12:37 21  governing test for a government, in that case, law, that a

12:37 22  government law or action that singles out a particular religious

12:37 23  group, and remarkably tracks the arguments in our brief as to why

12:37 24  *Larson* governs and is subject to strict scrutiny.

12:37 25          Defendants also, in their briefs, cite -- make sweeping

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:37  1    assertion that law enforcement can use race in their

12:37  2    investigations relying on two cases:  *Brown v. City of Oneonta* and

12:37  3    *Monroe v. City of Charlottesville*, from the Second and Fourth

12:37  4    Circuit.  Both those cases deal with a very, very narrow use of

12:38  5    race; the use of race as part of a suspect description where there

12:38  6    was a particular crime committed, the victims describe their

12:38  7    suspect, including race, the race of the suspect, and the Court

12:38  8    and the police used race in conducting its investigation by

12:38  9    interviewing individuals.

12:38 10         And I think the *Monroe* opinion there is instructive.

12:38 11    First of all, *Monroe* suggests that it does not; that although

12:38 12    strict scrutiny does not apply, even if it did, that use would

12:38 13    pass strict scrutiny because it's narrow.  But *Monroe* goes to

12:38 14    great lengths to distinguish that case from exactly the situation

12:38 15    here, and takes great pains to explain that using race as a

12:38 16    physical description is not a facial classification under the

12:38 17    Equal Protection Clause.  It explains that the equal protection --

12:39 18    express racial classification occurs when the government

12:39 19    distinguishes between citizens on the basis of race and using a

12:39 20    victim's description of a suspect based on race doesn't involve

12:39 21    government action, government use of race and explicitly

12:39 22    distinguishes a dragnet situation.

12:39 23         This is not an example of a dragnet where the police

12:39 24    went and searched every black male, but only acted on specific

12:39 25    information, potentially linking individuals to that crime.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:39  1        So, the facts here obviously could not be more different

12:39  2   from that.  This is not a situation where the FBI has received a

12:39  3   report that somebody in traditional Muslim dressed has robbed a

12:39  4   bank and so they're looking for somebody in traditional Muslim

12:39  5   dress.  Rather, they're saying that the fact that somebody is

12:39  6   Muslim makes them more likely to be dangerous, more likely to be a

12:40  7   terrorist, so we're going to go and search for -- gather

12:40  8   information on all Muslims.  Those are the allegations of the

12:40  9   complaint that this Court must take as true.

12:40 10        And in light of the state secrets discussion, I would

12:40 11   briefly touch on that as it applies to the individual defendants.

12:40 12   It's far from clear to me at this -- it's far from clear at this

12:40 13   juncture that we will be getting into state secrets in defense of

12:40 14   the individual defendants.  If this Court agrees that the use of

12:40 15   race is subject to strict scrutiny, then the first threshold --

12:40 16   the use of religion in this investigation is subject to strict

12:41 17   scrutiny, first, the threshold question is:  Was religion a

12:41 18   factor?  And as my colleague said, that could be resolved to some

12:41 19   extent by discovery that, I presume, does not get into any of the

12:41 20   state secret submissions.  We don't know what they are, but first

12:41 21   of all, basic interrogatories about whether religion was a factor

12:41 22   might answer the question.

12:41 23        From the government's earlier discussion, it sounds as

12:41 24   if they're taking the position that everything that they told the

12:41 25   informant is a state secret including what they asked him to do.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:41 1      First of all, they told that to an informant who is not

12:41 2  a FBI agent, who is a convicted felon who has no classification,

12:41 3  and so I presume that's not a state secret.  And to the extent

12:41 4  that he acted on those tasking orders, everybody in the mosque,

12:41 5  everybody that he interacted with saw what he did.  And there's a

12:42 6  tremendous amount of knowledge about that.  They can't take what

12:42 7  everybody saw happen in Orange County and make that a state secret

12:42 8  by virtue of the fact that it was at the behest of a

12:42 9  counterterrorism operation.

12:42 10      And so most of the evidence on the first question here

12:42 11  of whether religion was actually a factor in the investigation,

12:42 12  most of that should be readily available in the public, and to the

12:42 13  extent that it involves testimony or documentary evidence, would

12:42 14  involve what was told to the informant, which is presumably not

12:42 15  the state secret that they're asserting.

12:42 16      One last point.  The defendants' briefs also cite

12:42 17  *Aguilar, U.S* v. *Aguilar and Presbyterian Church* as well as I

12:43 18  believe *Gerring* arguing that courts have previously endorse the

12:43 19  use of religion in law enforcement investigation.  Again those

12:43 20  cases are absolutely fundamentally different.  Both *Aguilar* and

12:43 21  *Presbyterian Church* grew out of INS surveillance of a church that

12:43 22  openly advertised its participation in the sanctuary movement in

12:43 23  the 1980s.  That openly advertised that it was sheltering

12:43 24  undocumented aliens in violation of federal law.

12:43 25      That church may have been doing that on the basis --

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:43  1    acting on that basis out of its religious beliefs, but the

12:43  2    investigation was aimed at known and particular allegations of

12:43  3    unlawful conduct.  That's very different than saying that because

12:43  4    one -- what happened here, which is saying that somebody is more

12:44  5    likely to engage in unlawful behavior because of their religion.

12:44  6    It might be analogous if, in *Presbyterian Church*, the INS had

12:44  7    infiltrated every Presbyterian church all across Arizona and

12:44  8    gathered information on every Presbyterian because one

12:44  9    Presbyterian church said that their religious beliefs led them to

12:44  10   violate federal law.  But that's not what happened there.  So

12:44  11   those cases are in apposite.

12:44  12            Unless the Court has any further questions --

12:44  13            THE COURT:  No.  You have been very thorough.

12:44  14   Appreciate it.

12:44  15            MR. SCHEPER:  Your Honor, very briefly.

12:44  16            Counsel's argument went, I think, squarely to the

12:44  17   qualified immunity of the individual agents.  And so as I was

12:44  18   hearing counsel's extremely thorough explanation of the law

12:44  19   governing Your Honor in deciding for the individuals, the role of

12:44  20   religion here, it was like when is he going to talk about *Vernon*.

12:45  21   He must hate *Vernon*.  Then he mentioned the *Vernon* case.  It's

12:45  22   clear the plaintiffs don't like the *Vernon* case.  They think it

12:45  23   was wrongly decided because it postdated *Smith*, it postdated

12:45  24   *Lukumi*, it postdated *Larson*, and how could the Ninth Circuit write

12:45  25   the words it wrote postdating those cases in applying the

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:45 1   standard.  But then I think they realized that it's the most

12:45 2   analogous case that a reasonable agent could look at in June of

12:45 3   2006 in deciding how to govern himself or herself in the

12:45 4   performance of their duties.  So then they say they may hate it,

12:45 5   but it was the law of the land, but now let me point out how

12:45 6   different it is from the case before this Court.

12:45 7         And I suspect Your Honor was struck by the complexity of

12:45 8   the argument as to how this case that the plaintiffs wish had

12:46 9   never been decided, which they deeply dislike the jurisprudence

12:46 10  of, but the athletic contortions and the mental contortions to

12:46 11  distinguish it from this case.

12:46 12        And again, we're not here August of 2012 to say was

12:46 13  *Vernon* rightly decided and how distinguishable is it really.  But

12:46 14  it's central to the First and Fourth Amendment and FISA claims to

12:46 15  ask how a reasonable agent in June of '06 would have viewed the

12:46 16  state of the law in this circuit as they went to work every day

12:46 17  for 14 months.

12:46 18        And the law of this circuit in June of 2006, at least

12:46 19  arguably, as they very well underscored in their argument, at

12:46 20  least arguably gave agents reasonably to believe that religion

12:47 21  could be part of, at least, the motivation for directing a covert

12:47 22  investigation into counterterrorism.  Period.  And if religion is

12:47 23  the bad intent, if we move back over to FISA and *Aguilar*, and any

12:47 24  use of religion is the bad intent that's parachuted in, well, in

12:47 25  2006 the jurisprudence, including *Vernon*, instructed these agents

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:47 1   that religion was not taboo or out of balance.

12:47 2          So circling back to the point I began with today in

12:47 3   deciding whether this action can be maintained against the

12:47 4   individual defendants, the Court must put itself in the position

12:47 5   of these agents back then, under the state of the law back then,

12:47 6   and consider whether, as the justice pointed out in *Al-Kidd*, it

12:48 7   was beyond dispute that this could be a motivation for law

12:48 8   enforcement investigatory activity.

12:48 9          Thank you, sir.

12:48 10         THE COURT:  Thank you.  All right.  The two other issues

12:48 11  we have.

12:48 12         MR. HANDLER:  Good afternoon, Your Honor.  Stephen

12:48 13  Handler.  I represent the United States with regard to the tort

12:48 14  claims brought against it under the Federal Tort Claims Act.  And

12:48 15  these claims are invasion of privacy under California Code section

12:48 16  52.1 and for intentional infliction of severe emotional distress.

12:48 17         Now, as been repeated numerous times during this

12:49 18  argument, the claims arise from, allegedly from the FBI's use of

12:49 19  Craig Monteilh as an informant who allegedly indiscriminately

12:49 20  collected information in an operation called Operation Flex simply

12:49 21  because the plaintiffs were Muslim and practicing their chosen

12:49 22  religion.

12:49 23         The claims based on the surveillance that were conducted

12:49 24  in Monteilh's presence and with his consent should be dismissed.

12:49 25  Pursuant to 28 U.S.C. 2674, the liability of the United States is

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:49  1    determined by the tort law of the state where the act or omission

12:49  2    occurred.  And the United States may assert any defense to which

12:49  3    it is entitled including state law defenses.

12:49  4           Law enforcement officers are commonly afforded a

12:49  5    privilege under state law to engage in conduct that would be

12:49  6    tortious if it was committed by a private citizen.  In such

12:50  7    instances, the conduct of law enforcement is considered

12:50  8    privileged.

12:50  9           In California, law enforcement officers are permitted to

12:50 10    overhear or record communications where a party has provided their

12:50 11    consent.  The amended complaint alleges that a substantial portion

12:50 12    of the communications Monteilh agreed to record occurred in his

12:50 13    presence and with his consent, particularly in the mosque, at

12:50 14    public events, and in places where he was invited.  Because law

12:50 15    enforcement officers in California are permitted to conduct

12:50 16    consensual monitoring of communications, the FBI's alleged audio

12:50 17    and video surveillance of the plaintiff's communications with

12:50 18    Monteilh's consent and in his presence are not actionable because

12:50 19    they're privileged.

12:50 20           The claims asserted under California Code section 52.1

12:51 21    should be dismissed because the complaint fails to allege that the

12:51 22    defendants acted violently or threatened violence which is a

12:51 23    prerequisite for asserting a claim under California Code section

12:51 24    52.1.

12:51 25           To prevail on this particular claim, plaintiffs must

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:51  1   prove that the defendants interfered with or attempted to

12:51  2   interfere with the plaintiff's legal rights by threats,

12:51  3   intimidation or coercion, and that the defendants did so other

12:51  4   than by speech unless the speech itself threatened violence.  The

12:51  5   violence or threat of violence element is congruent with the

12:51  6   purpose of a section 52.1 claim because it was part of a civil

12:51  7   rights hate crimes bill that was intended to deter violence.

12:51  8          Here, the section 52.1 claim alleges that the defendants

12:51  9   interfered or attempted to interfere with the plaintiffs' exercise

12:52 10   of their rights by threats, intimidation or coercion, in

12:52 11   conclusory terms, by subjecting them to constant surveillance and

12:52 12   publicly revealing that surveillance.  However, the complaint does

12:52 13   not allege that the surveillance was anything other than covert,

12:52 14   or that it involves any physical or verbal confrontations by the

12:52 15   defendants threatening the plaintiffs.

12:52 16          Other than conclusory statements, the amended complaint

12:52 17   does not allege that the FBI or any federal employee actually

12:52 18   committed a violent act or threatened violence against the

12:52 19   plaintiffs.  The emotional distress claims should be dismissed

12:52 20   because the amended complaint fails to allege facts that the

12:52 21   plaintiffs suffered severe emotional distress.

12:52 22          In California, a plaintiff must prove the following

12:53 23   elements to establish an emotional distress claim:  First,

12:53 24   defendants' extreme or outrageous conduct with the intent of

12:53 25   causing emotional distress.  Second, that the plaintiffs suffered

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:53  1   extreme or severe emotional distress and the actual and proximate

12:53  2   cause of the defendants' conduct caused the emotional distress.

12:53  3          The California Supreme Court has set a high bar with

12:53  4   regard to the severity element of this type of claim.  Severe

12:53  5   emotional distress means emotional distress of such substantial

12:53  6   quantity or enduring quality that no reasonable person in

12:53  7   civilized society could should be expected to endure it.  This

12:53  8   type of claim doesn't extend to insults, annoyances, the fact that

12:53  9   the plaintiffs' lives were made more difficult or other

12:53 10   trivialities.

12:53 11          The mere allegation that a plaintiff suffered emotional

12:53 12   distress without facts indicating the nature and quality of any

12:54 13   mental suffering is insufficient as a matter of law.  Here, the

12:54 14   amended complaint alleged that the plaintiffs' emotional distress

12:54 15   is based upon covert surveillance that occurred in 2006 and 2007,

12:54 16   and surveillance that may be ongoing and made their lives more

12:54 17   difficult.

12:54 18          All the plaintiffs allege in conclusory terms that they

12:54 19   suffered severe and ongoing anxiety and emotional distress, in

12:54 20   conclusory terms.  Individually, they allege that they had a

12:54 21   constant fear of being under surveillance, scrutiny during travel,

12:54 22   or having difficulties in their communities and with regard in

12:54 23   communicating with their family and friends.  Based upon the

12:54 24   California case law, these allegations are nothing more than

12:54 25   complaints of discomfort, worry, anxiety or agitation which does

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:54  1    not constitute -- does not satisfy the severity element of the

12:55  2    emotional distress claim under California law.

12:55  3            Now, the emotional distress claims are barred for two

12:55  4    independent reasons:  First, to the extent that the claims are

12:55  5    based upon Monteilh's conduct, they're barred by the FTCA's

12:55  6    two-year statute of limitations.  Here, the amended complaint is

12:55  7    replete with allegations regarding Monteilh's conduct and that the

12:55  8    plaintiffs were aware of that conduct in 2006 and in 2007.

12:55  9            Because the plaintiffs failed to file their

12:55 10    administrative claim which is a prerequisite for filing an action

12:55 11    against the United States under the FTCA until February 21, 2011,

12:55 12    the claims based upon Monteilh's conduct are barred by the

12:55 13    two-year statute of limitations.

12:55 14            Second, to the extent that the emotional distress claims

12:55 15    are based upon the audio and video surveillance, these claims are

12:55 16    defective because they're speculative.  The amended complaint

12:55 17    alleges that the surveillance occurred in 2006 and 2007 and it was

12:56 18    covert.  The plaintiffs did not know the surveillance was going

12:56 19    on, according to the complaint, until the end of February of 2009

12:56 20    which was several years after Monteilh allegedly left the Muslim

12:56 21    community.  Prior covert surveillance, by definition, could not

12:56 22    have caused them emotional distress.

12:56 23            Your Honor, I'd like to briefly touch on the state

12:56 24    secret.  I know a lot has been said about it, but it impacts the

12:56 25    FTCA with regard to two specific issues.  And I'll be brief, first

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:56  1   judicial review of the FBI's decision to initiate a

12:56  2   counterterrorism investigation and how those investigations were

12:56  3   handled, including decisions regarding whether or not to conduct

12:56  4   audio and video surveillance may be barred by the discretionary

12:56  5   function exception to the FTCA's -- one of the limitations on the

12:56  6   limited waiver of sovereign immunity under the act.

12:57  7          To determine whether or not the exception applies, the

12:57  8   inquiry is whether the challenged acts are of the nature and

12:57  9   quality that Congress intended to shield from tort liability.  And

12:57 10   to assist in the Court's determination, the Supreme Court has set

12:57 11   forth a two-part test.  First, the challenged conduct must involve

12:57 12   an element of judgment or choice.  Second, the challenged conduct

12:57 13   must be susceptible to policy considerations.

12:57 14          The first part of the test is satisfied where there are

12:57 15   no mandatory directives that prescribe specifically a course of

12:57 16   action for the federal employee to follow.  Here, the amended

12:57 17   complaint alleges the FBI violated the plaintiffs' constitutional

12:57 18   rights by engaging in impermissible counterterrorism

12:57 19   investigations simply because they're Muslims and that they were

12:57 20   surveilled solely based upon their religion.

12:58 21          Therefore, in order to litigate the question about

12:58 22   whether or not the discretionary function exception applies, facts

12:58 23   regarding the nature and the scope of the Operation Flex,

12:58 24   including who was the subject of that investigation and what

12:58 25   reasons they were being investigated and how the investigation was

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

12:58  1    undertaken, would be a risk of disclosure in order to assert this

12:58  2    particular defense.

12:58  3           Second, litigating the key issues of the invasion of

12:58  4    privacy and emotional distress claims would also risk the

12:58  5    disclosure of the privileged information.  For example, for the

12:58  6    invasion of privacy claim, the alleged intrusions, whether or not

12:58  7    they were highly offensive or constituted serious invasion of

12:58  8    privacy would depend upon the degree and setting of each invasion

12:58  9    and the justification, objectives, or the motives for each

12:58 10    invasion.

12:58 11           For the emotional distress claim, the first element that

12:59 12    the plaintiffs would be required to prove is whether or not the

12:59 13    defendants' conduct was extreme or outrageous with the intent of

12:59 14    causing emotional distress.  That may depend on an explanation or

12:59 15    justification for the defendants' alleged conduct.  Again, we

12:59 16    would have to get into the nature and the facts regarding

12:59 17    Operation Flex, including the subjects and the objections and the

12:59 18    motives for each individual conduct that's being challenged in the

12:59 19    complaint.

12:59 20           Thank you, Your Honor.

12:59 21           THE COURT:  Thank you.

12:59 22           MR. BIBRING:  Your Honor, just to respond extremely

12:59 23    briefly to that.  I'm going to respond to narrow points, although

01:00 24    I disagree with a lot of what the government counsel has said.  I

01:00 25    think the matter is set forth fairly directly in our briefs and I

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:00  1   won't repeat what is argued there.

01:00  2           I did want to draw the Court's attention to a few

01:00  3   things.  The government asserts in its briefs that there is a

01:00  4   threat of violence requirement under 52.1.  This has been

01:00  5   addressed and fully resolved by not only the California courts,

01:00  6   but the California legislature.  There was initially some

01:00  7   confusion in early jurisprudence between the threat of violence

01:00  8   requirement of 51.7 and 52.1, which is a separate cause of action.

01:00  9   Some courts did, in fact, import a threat of violence requirement

01:00 10   in.  The California legislature overruled those decisions by

01:00 11   statute AB2917.  The California Supreme Court discusses and

01:00 12   recognizes this in its *Venegas* opinion.  The Ninth Circuit

01:01 13   recognizes it in *Moreno v. Los Gatos*, both of which are cited in

01:01 14   our briefs, and that matter is fully put to rest.

01:01 15           In the reply, the government makes a half-hearted

01:01 16   argument that the violence provision should still apply based on

01:01 17   52.1(j) which does have a very narrow violence requirement where

01:01 18   the government conduct is based on speech alone, arguing that

01:01 19   somehow our claims are based on speech alone because the

01:01 20   government -- what we're saying is government told its informant

01:01 21   what to do.  But that's clearly not speech.  What is at issue here

01:01 22   is not that the government called the Muslim community nasty

01:01 23   names.  It's that the government subjected them to the very real

01:01 24   treatment of ongoing surveillance for over a year.

01:01 25           With respect to the IED claim, I think those are

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:01 1    addressed in our brief, but I will say I think that the

01:01 2    allegations of complaint more than render plausible the idea that

01:01 3    our plaintiffs have suffered emotional distress of the severe kind

01:02 4    contemplated by California courts.

01:02 5         Last, I did want to briefly respond to the arguments

01:02 6    about qualified immunity that Mr. Scheper made.  I just -- given

01:02 7    the Supreme Court's repeated pronouncement that religion, explicit

01:02 8    treatment of religion would be -- classification based on religion

01:02 9    would be subjected to strict scrutiny, I think it's abundantly

01:02 10   clear that an agent in 2006 would not think that was lawful to

01:02 11   tell an informant get as many files on Muslims as possible, here

01:02 12   is a quota of Muslims that I would like you to find out

01:02 13   information of, so many per day.  The more religious this person

01:02 14   is, the more I want their information.  That sort of treatment of

01:02 15   religion in 2006, I think it was abundantly clear and nothing in

01:02 16   the cases that they cite, *Vernon* and others, in any way dissuades

01:03 17   that.

01:03 18        And I think my colleague was going to respond to one

01:03 19   point, very narrow point on discretionary function.

01:03 20        MR. ARULANATHAM:  Just with respect to the question

01:03 21   whether the discretionary function exception would implicate the

01:03 22   state secrets privilege therefore requiring dismissal of the FTCA

01:03 23   claims now on the state secrets ground, Your Honor, the FTCA

01:03 24   claims all involve Fourth Amendment harm.  It's obvious from the

01:03 25   back and forth in the discussion here.  So since Attorney General

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:03  1    Holder has chosen not to the invoke the state secrets privilege

01:03  2    with respect to the Fourth Amendment issues in this case, this

01:03  3    intrusion right and harms arising from intrusion, it seems to

01:03  4    follow you can't dismiss the FTCA claims on state secrets grounds

01:03  5    as well with respect to the IED and the intrusion tort, Your

01:03  6    Honor.

01:03  7            Second, very clear Ninth Circuit law, and broader than

01:04  8    that, that there is no discretion to violate the constitution.  So

01:04  9    to the extent that the underlying -- *Nurse v. United States* is one

01:04 10    example of that, but there are a lot of cases which hold that,

01:04 11    Your Honor.  To the extent that our constitutional claims are

01:04 12    implicated, there wouldn't be any discretionary function exception

01:04 13    arising.

01:04 14            The last thing I would say is if the Court is concerned

01:04 15    about it, this seems like a classic example of the kind of issue

01:04 16    that should be addressed later on.  The government hasn't even

01:04 17    asserted that a discretionary function exception actually applies

01:04 18    yet.  So if they did, then we could decide then whether and how it

01:04 19    implicated the state secrets privilege.

01:04 20            MR. COPPOLINO:  Your Honor, may I?

01:04 21            THE COURT:  Very briefly.

01:04 22            MR. HANDLER:  In response to counsel's argument on the

01:04 23    52.1 claim, the claim consists of two parts:  One is the

01:04 24    interference with the plaintiffs' legal rights they brought.  And

01:05 25    the other part which we both agree on has to be by -- accompanied

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:05  1  by threats, intimidation, or coercion.  But if you look at the

01:05  2  complaint, all the allegations regarding the named defendants,

01:05  3  it's all about communications.  It's all about what they said to

01:05  4  Monteilh, what they said to their superiors or what was said in

01:05  5  court.  It's all regarding speech.  But even if Your Honor

01:05  6  construes that that's not part and parcel of the part of the

01:05  7  claim, then you have to look at what was the conduct.

01:05  8         There are no allegations that the named defendants, the

01:05  9  federal defendants or any federal employee had any physical or

01:05  10  verbal confrontations with the plaintiffs.  None.  And a 52.1

01:05  11  claim has to have some element of threats, intimidation or

01:05  12  coercion.  And without that element, the claim fails.

01:06  13         THE COURT:  Okay.

01:06  14         MR. BIBRING:  One very quick point.

01:06  15         Counsel raised the issue of a requirement of a threat of

01:06  16  violence in the opening papers, but the claim that we somehow

01:06  17  failed to adequately allege threats, intimidation or coercion

01:06  18  wasn't raised until the reply brief.  They shifted course, I

01:06  19  think, once they saw our arguments on the violence requirement.

01:06  20         We haven't actually had an opportunity to brief that.  I

01:06  21  believe its waived to the extent they're arguing the threats,

01:06  22  intimidation and coercion isn't satisfied.  And I would at least

01:06  23  like the opportunity to look at that further, if that becomes a

01:06  24  ground for decision.

01:06  25         MR. HANDLER:  Your Honor, I would contest that.  We did

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:06  1   cite the cases, and we did cite the statute, and made the

01:06  2   argument.

01:06  3          THE COURT:  Okay.  One last issue.

01:06  4          MR. COPPOLINO:  Your Honor, since it's way past

01:07  5   lunchtime, I'm going to condense a stack of complicated law into

01:07  6   about two minutes on the Privacy Act.

01:07  7          I think was it at least important to raise this with you

01:07  8   because as I mentioned, I represent the FBI and Director Mueller

01:07  9   in his official capacity.  And the sole relief sought against the

01:07 10   official capacity defendants is the expungement of records.  We

01:07 11   have set this out in our brief.  That remedy is not available as a

01:07 12   matter of law.  And if you were to agree to that, you could at

01:07 13   least get rid of those claims without reaching the state secrets

01:07 14   privilege.  And I think that's a worthwhile thing to do because

01:07 15   the privilege doesn't necessarily have to be applied to every

01:07 16   single claim in the case.

01:07 17          There are just four points that I want to make on this.

01:07 18   One is, Privacy Act is a complicated statute, but under the

01:07 19   Privacy Act if you bring a claim for access to records, which is

01:07 20   what the plaintiffs did, the remedy is access.  That's the

01:07 21   injunctive relief that the Court can give.  It is not destruction.

01:07 22   They brought an access claim, they said we want access to any

01:07 23   records pertaining to us, and then they said we want them

01:08 24   destroyed.  But that's not the statutorily authorized relief.

01:08 25   That's easy.  That's not a hard question.  You get no destruction

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:08  1    under their Privacy Act claim.

01:08  2           The second reason you don't get destruction under the

01:08  3    Privacy Act is that the bureau has exempted certain systems of

01:08  4    records from the access and amendment requirements of the Privacy

01:08  5    Act.  In theory, you could get expungement under an amendment

01:08  6    claim.  They didn't bring an amendment claim, but in theory,

01:08  7    courts can expunge inaccurate records under the Privacy Act.  They

01:08  8    did not bring the claim, but in any event, the bureau has exempted

01:08  9    the system of records in which these records reside from that

01:08 10    provision.  That's point two.

01:08 11           Point three, our view is that the Privacy Act remedy

01:08 12    governs.  Every single claim for the expungement of records is

01:08 13    based on the same allegation:  That records were collected

01:08 14    describing First Amendment activities without an authorized law

01:08 15    enforcement investigation.  Every claim against the official

01:09 16    capacity defendants.

01:09 17           And our view is that the Privacy Act remedy applies.

01:09 18    When Congress creates a comprehensive statutory scheme to govern a

01:09 19    remedy, it's applicable.  Their argument is that the Court has

01:09 20    inherent power under the Constitution to give them equitable

01:09 21    injunctive relief outside of the Privacy Act.  We think that's

01:09 22    wrong.  There are lots of areas where Congress has enacted

01:09 23    statutory remedies that apply even if they supplant constitutional

01:09 24    remedies.  We see it in *Brown v. GSA* and the Ninth Circuit progeny

01:09 25    which says that Title VII remedies can supplant equal protection

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:09  1    claims.

01:09  2              There are other examples.  In the *Bivens* area, Congress

01:09  3    can enact statutory remedies that supplant *Bivens* claims.  There

01:09  4    is no impediment to that.

01:09  5              So point three is the Privacy Act remedy governs as to

01:09  6    all of their claims.  However, point four, if you disagree with

01:09  7    what I said about point three and you think there is -- you think

01:09  8    the Court has inherent equitable power to issue an injunction

01:10  9    under the Constitution to destroy executive branch records, I

01:10 10    would urge you to take a look at cases which say that, because you

01:10 11    are going to find two things in those cases.  And they go back a

01:10 12    ways.  The seminal case is a case called *Maynard v. Sacksby* in the

01:10 13    D.C. Circuit.

01:10 14              All of the cases that discuss -- virtually all of the

01:10 15    cases that discuss this inherent judicial power to destroy records

01:10 16    concern arrest records, and they make two points:  One, they look

01:10 17    for a statutory remedy.  If there is a statutory remedy, that's

01:10 18    what the Court applies, including in the Ninth Circuit cases that

01:10 19    they have cited.  The *Fendler* case, the *Mauer* case.  The Court

01:10 20    says, is there a statutory remedy here?  Because I'm not going to

01:10 21    exercise whatever inherent power I have.  Here there is.  It's a

01:10 22    Privacy Act Remedy.

01:10 23              The second thing the courts do in cases in which a

01:10 24    plaintiff asks for the destruction of records based on a

01:10 25    constitutional claim, show me your irreparable harm.  In *Fendler*,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:10  1    a Ninth Circuit case, they cite a case called *Ruber* (phonetic) in

01:11  2    the D.C. Circuit, actually a concurring opinion by Judge Warwick

01:11  3    who says, correctly, I think, you have got to have irreparable

01:11  4    harm to get a record destroyed.  There have to be extreme

01:11  5    circumstances to get a record destroyed.  The Ninth Circuit cases

01:11  6    say essentially the same thing.  There have to be extreme

01:11  7    circumstances to get a record destroyed.

01:11  8         They have made no showing of harm.  They haven't even

01:11  9    put in a declaration.  We, on the other hand, put in a declaration

01:11 10    of a gentleman named Christopher Morin from our records division

01:11 11    who points out not only that the records are exempt from any

01:11 12    expungement requirement, but that they are important to the bureau

01:11 13    and that the destruction of records would cause the bureau harm.

01:11 14         Nothing.  They have offered nothing on summary judgment

01:11 15    on that issue.  And our view is something always beats nothing on

01:11 16    summary judgment, and that they have not demonstrated the harm

01:11 17    that they're required to demonstrate under the law to get

01:11 18    destruction.

01:11 19         So why is this important?  It's just important because

01:11 20    you don't have to reach the privilege on the claims against the

01:11 21    FBI, because the remedy they're seeking is simply not available as

01:12 22    a matter of law.

01:12 23         I think I did it.  In about two minutes, a ton of law

01:12 24    which says they can't get that relief against the bureau.

01:12 25         THE COURT:  Okay.

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:12  1              MR. ARULANATHAM:  I think I too can do this extremely

01:12  2      quickly, Your Honor.

01:12  3              In contrast, I think, to the -- many of the other

01:12  4      arguments Mr. Coppolino has raised, I think the Privacy Act

01:12  5      arguments -- the expungement arguments, I should say, that

01:12  6      government is raising are exceedingly weak and, as a result, I

01:12  7      think it's very likely that the Court will have to address state

01:12  8      secrets that -- at least with respect to the question of whether

01:12  9      the records can be expunged.

01:12 10              And we have two distinct claims.  There is a claim under

01:12 11      the Privacy Act under section E7, which is just for the

01:12 12      expungement of records of First Amendment Activity.  The Privacy

01:12 13      Act says the government can't collect and maintain, just for its

01:13 14      own sake, information of people's expressive activity.

01:13 15              And the legislative history is on point.  It's called

01:13 16      *McPherson*.  And the cases make very clear that if you can make

01:13 17      that showing that there's information that's been gathered and

01:13 18      collected of your First Amendment activity, then that information

01:13 19      can be expunged.  In *McPherson* they don't expunge it.  The only

01:13 20      reason they don't is because they find that under a balancing test

01:13 21      that they apply there, they think the information can legitimately

01:13 22      be kept.

01:13 23              In that situation it's an individual who was a tax

01:13 24      protester and they're giving a speech.  And actually his speech

01:13 25      was for sale.  You could buy the speech.  And they say, look,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:13  1   under these circumstances we don't think you have a sufficient

01:13  2   right under the balancing test to say this has to be destroyed

01:13  3   because you were selling your own speech.  It was very public and

01:13  4   you knew the government might be watching.

01:13  5          The government has not even made the argument here that

01:13  6   that exception, the law enforcement exception to E7 applies in

01:14  7   this case.  It's waived.  It's never been argued.  And I don't

01:14  8   think they could succeed.  Obviously, Mr. Fazaga, Mr. Malik, Mr.

01:14  9   Abdelrahim, they -- and certainly the other members of the

01:14 10   community had no reason to kind of expect that the government had

01:14 11   any legitimate right to keep general information about their First

01:14 12   Amendment activity.

01:14 13          The Privacy Act claims is limited to E7.  We're not

01:14 14   arguing expungement under the Fourth Amendment or First Amendment

01:14 15   generally based on the Privacy Act.  We're arguing that the

01:14 16   Constitution gives us the right to that separate expungement.  And

01:14 17   that explains why I think the -- all the government's Privacy Act

01:14 18   arguments really only apply to, for our purposes, to section E7.

01:14 19          And the government makes the argument essentially that

01:14 20   the only remedy you have got for an E7 violation, if the

01:14 21   government is collecting and hoarding lots of information about

01:14 22   people's First Amendment activities, the only remedy you have is I

01:14 23   think a damage action under subsection G, or you can correct the

01:15 24   records.  In other words, if the government misspelled my name,

01:15 25   then I can bring a lawsuit to get them to spell it correctly,

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:15  1    which believe me, Your Honor, is a serious problem in my case.

01:15  2         But in contrast, if the government is collecting

01:15  3    information on my religious practices, I can't bring an action to

01:15  4    get that information expunged under the Privacy Act.  That's

01:15  5    obviously not the law.  It's been rejected in the *Nagel* case by

01:15  6    the D.C. Circuit, by the Eleventh Circuit in *Clarkson*, and there's

01:15  7    not a case, there is not a single case which establishes

01:15  8    otherwise.

01:15  9         With respect to constitutional expungement, I can be

01:15 10    very quick there as well, Your Honor.  *Burnsworth v. Gunderson*, or

01:15 11    something like that.  *Burnsworth* is the name of it.  1999 Ninth

01:15 12    Circuit case.  It's long after the Privacy Act was enacted.  It

01:15 13    expunges a prison disciplinary record under the Constitution.

01:15 14    Because it's a constitutional violation, establishes very clearly

01:15 15    that the Constitution permits the courts, in exceptional

01:16 16    circumstances, to expunge records.

01:16 17         Where there is a constitutional violation, it's true

01:16 18    that the courts first look to see if there is another statutory

01:16 19    remedy.  But there wasn't one in that case and there isn't one

01:16 20    here because the Privacy Act doesn't afford a remedy for the

01:16 21    religious discrimination claims that we have here or for the

01:16 22    Fourth Amendment violations that we have here.

01:16 23         And there are a lot of other cases.  It's dicta in the

01:16 24    other cases, but so there's many of them.  *Sumner, Fendler*.  We

01:16 25    cited them all in our briefing.  You can see courts have

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:16  1    repeatedly, repeatedly said if there is a constitutional violation

01:16  2    and you can show -- it's -- under those circumstances you can get

01:16  3    an expungement.  You can show the record arose out of that

01:16  4    violation and the government had no right to collect, you can get

01:16  5    an expungement.

01:16  6         It's true that most of them are arrest cases but the

01:16  7    rationale isn't limited to that and *Burnsworth* is not; *Burnsworth*

01:16  8    is not an arrest case.

01:16  9         So I really I think that's -- Your Honor, we don't seek

01:17 10    access or seek amendment through the Privacy Act.  We seek the

01:17 11    expungement of records of First Amendment activity, and then we

01:17 12    seek separately under the Constitution expungement of the records

01:17 13    obtained in violation of the Constitution.

01:17 14         The last thing I'll say, just to update the Court, I

01:17 15    have copies here for everyone in case it's an issue.  Exhaustion.

01:17 16    We did after the briefing was completed in this case.  On

01:17 17    February 13 of this year the government denied the Privacy Act

01:17 18    request actually citing state secrets arguments that the

01:17 19    government made here.  We filed our appeals on April 11.  We got

01:17 20    acknowledgments on April 25 that the government had received the

01:17 21    appeals.  It's now been more than 20 days so it's ripe.

01:17 22         THE COURT:  All right.  Very thorough briefing and we

01:17 23    have had thorough argument.  I know everybody is anxious for my

01:17 24    decision.  I actually have had the advantage of working through

01:18 25    these issues for months now.  So I anticipate getting a decision

SACV 11-00301-CJC - 08/14/2012 - TUESDAY

01:18  1   out later today and you'll have it.  Okay.  Thank you.

01:18  2                    (Whereupon the proceedings were adjourned at 1:18.)

01:18  3

01:18  4                             -oOo-

01:18  5

01:18  6                           CERTIFICATE

01:18  7

01:18  8          I hereby certify that pursuant to Section 753, Title 28,

01:18  9   United States Code, the foregoing is a true and correct transcript

01:18 10   of the stenographically reported proceedings held in the

01:18 11   above-entitled matter.

01:18 12

01:18 13   Date:  NOVEMBER 28, 2012

01:18 14

01:18 15   /S/
01:18      _____
01:18 16   OFFICIAL COURT REPORTER
01:18
01:18 17

       18

       19

       20

       21

       22

       23

       24

       25