**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YASSIR FAZAGA; ALI UDDIN MALIK; YASSER ABDELRAHIM,<br>　　　　　*Plaintiffs-Appellees*,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; PAUL DELACOURT, Assistant Director in Charge, Federal Bureau of Investigation's Los Angeles Division, in his official capacity; PAT ROSE; KEVIN ARMSTRONG; PAUL ALLEN,<br>　　　　　*Defendants*,<br><br>and<br><br>BARBARA WALLS; J. STEPHEN TIDWELL,<br>　　　　　*Defendants-Appellants.* | No. 12-56867<br><br>D.C. No.<br>8:11-cv-00301-CJC-VBK |

2                          FAZAGA V. WALLS

| | |
|---|---|
| YASSIR FAZAGA; ALI UDDIN MALIK; YASSER ABDELRAHIM,<br><br>　　　　　*Plaintiffs-Appellees*,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; PAUL DELACOURT, Assistant Director in Charge, Federal Bureau of Investigation's Los Angeles Division, in his official capacity; J. STEPHEN TIDWELL; BARBARA WALLS,<br><br>　　　　　*Defendants*,<br><br>and<br><br>PAT ROSE; KEVIN ARMSTRONG; PAUL ALLEN,<br><br>　　　　　*Defendants-Appellants.* | No. 12-56874<br><br>D.C. No.<br>8:11-cv-00301-CJC-VBK |

| | |
|---|---|
| YASSIR FAZAGA; ALI UDDIN MALIK; YASSER ABDELRAHIM, *Plaintiffs-Appellants*, v. FEDERAL BUREAU OF INVESTIGATION; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; PAUL DELACOURT, Assistant Director in Charge, Federal Bureau of Investigation's Los Angeles Division, in his official capacity; J. STEPHEN TIDWELL; BARBARA WALLS; PAT ROSE; KEVIN ARMSTRONG; PAUL ALLEN; UNITED STATES OF AMERICA, *Defendants-Appellees*. | No. 13-55017 D.C. No. 8:11-cv-00301-CJC-VBK ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

4                          FAZAGA V. WALLS

Argued and Submitted December 7, 2015
Pasadena, California

Filed February 28, 2019
Amended July 20, 2020

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges and George Caram Steeh III,[*] District Judge.

Order;
Opinion by Judge Berzon;
Concurrence in Order by Judges Gould and Berzon;
Statement by Judge Steeh;
Dissent to Order by Judge Bumatay

---

[*] The Honorable George Caram Steeh III, United States District Judge for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### Constitutional Law / Foreign Intelligence Surveillance Act

The panel filed an amended opinion affirming in part and reversing in part the district court's judgment in favor of the United States, the FBI, and federal officials in a putative class action alleging that an FBI investigation involved unlawful searches and anti-Muslim discrimination; denied a petition for panel rehearing; and denied on behalf of the court a petition for rehearing en banc.

Plaintiffs are three Muslim residents of Southern California who alleged that the FBI paid a confidential informant to conduct a covert surveillance program that gathered information about Muslims based solely on their religious identity. Plaintiffs asserted eleven claims, which fell into two categories: claims alleging unconstitutional searches, and claims alleging unlawful religious discrimination. The district court dismissed all but one of plaintiffs' claims on the basis of the state secrets privilege, and allowed only the Foreign Intelligence Surveillance Act ("FISA") claim against the FBI Agent Defendants to proceed.

The panel held that some of the claims the district court dismissed on state secret grounds should not have been dismissed outright. The panel further held that the district court should have reviewed any state secrets evidence necessary for a determination of whether the alleged

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

surveillance was unlawful following the secrecy-protective procedure set forth in FISA.  *See* 50 U.S.C. § 1806(f).

Section 110 of FISA, codified at 50 U.S.C. § 1810, creates a private right of action for an individual subjected to electronic surveillance in violation of FISA's procedures. Concerning the FISA claim against the FBI Agent Defendants, the panel considered three categories of audio and video surveillance called in the complaint: recordings made by the FBI informant of conversations to which he was a party; recordings made by the informant of conversations to which he was not a party; and recordings made by devices planted by FBI agents.  The panel concluded that the FBI Agent Defendants were entitled to qualified immunity as to the first two categories of surveillance.  As to the third category of surveillance, the panel held that Agents Allen and Armstrong were not entitled to qualified immunity, but Agents Tidwell, Walls, and Rose were entitled to dismissal as to this category of surveillance because plaintiffs did not plausibly allege their involvement in this category of surveillance.

The panel next addressed the remaining claims, which were all dismissed pursuant to the state secrets privilege. First, the panel held that in determining *sua sponte* that particular claims warranted dismissal under the state secrets privilege, the district court erred.  Second, the panel held that in enacting FISA, Congress displaced the common law dismissal remedy created by the *United States v. Reynolds*, 345 U.S. 1 (1953), state secrets privilege as applied to electronic surveillance within FISA's purview.  The panel held that FISA's § 1806(f) procedures were to be used when an aggrieved person affirmatively challenges, in any civil case, the legality of electronic surveillance or its use in

litigation, whether the challenge is under FISA itself, the Constitution, or any other law.  Third, the panel held that the plaintiffs were considered "aggrieved" for purposes of FISA.

The panel next considered whether the claims other than the FISA § 1810 claim must be dismissed for reasons other than the state secrets privilege, limited to reasons raised by the defendants' motions to dismiss.

Addressing plaintiffs' Fourth Amendment search claims, the panel first held that the expungement relief sought by plaintiffs – the expungement of all records unconstitutionally obtained and maintained – was available under the Constitution to remedy the alleged constitutional violations. Because the government raised no other argument for dismissal of the Fourth Amendment injunctive relief claim, it should not have been dismissed.  Second, the panel held that in light of the overlap between plaintiffs' *Bivens* claim and the narrow range of the remaining FISA claims against the Agent Defendants that can proceed, it was not clear whether plaintiffs would continue to press this claim. The panel declined to address whether plaintiffs' *Bivens* claim remained available after the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), and held that on remand the district court may determine whether a *Bivens* remedy is appropriate for any Fourth Amendment claim against the FBI Agent Defendants.

Addressing plaintiffs' claims arising from their allegations that they were targeted for surveillance solely because of their religion, the panel first held that the First Amendment and Fifth Amendment injunctive relief claims against the official-capacity defendants may go forward. Second, concerning plaintiffs' *Bivens* claims seeking

monetary damages directly under the First Amendment's
Establishment and Free Exercise Clauses and the equal
protection component of the Fifth Amendment's Due Process
Clause, the panel concluded that the Privacy Act and the
Religious Freedom and Restoration Act ("RFRA"), taken
together, provided an alternative remedial scheme for some,
but not all, of their *Bivens* claims.  As to the remaining *Bivens*
claims, the panel remanded to the district court to determine
whether a *Bivens* remedy was available in light of the
Supreme Court's decision in *Abbasi*.  Third, concerning
plaintiffs' 42 U.S.C. § 1985(c) claims, alleging that the Agent
Defendants conspired to deprive plaintiffs of their First and
Fifth Amendment constitutional rights, the panel held that
under *Abassi*, intracorporate liability was not clearly
established at the time of the events in this case and the FBI
Agent Defendants were therefore entitled to qualified
immunity from liability under § 1985(c).  The panel affirmed
the district court's dismissal on this ground.  Fourth,
concerning plaintiffs' claims that the FBI Agent Defendants
and Government Defendants violated RFRA by substantially
burdening plaintiffs' exercise of religion, and did so without
a compelling government interest without the least restrictive
means, the panel held that it was not clearly established in
2006 or 2007 that defendants' covert surveillance violated
plaintiffs' freedom of religion protected by RFRA.  The panel
affirmed the district court's dismissal of the RFRA claim as
to the Agent Defendants because they were not on notice of
a possible RFRA violation.  Because the Government
Defendants were not subject to the same qualified immunity
analysis and made no arguments in support of dismissing the
RFRA claim, other than the state secrets privilege, the panel
held that the complaint stated a RFRA claim against the
Government Defendants.  Fifth, concerning plaintiffs'
allegation that the FBI violated the Privacy Act by collecting

and maintaining records describing how plaintiff exercised their First Amendment rights, the panel held that plaintiffs failed to state a claim because the sole requested remedy – injunctive relief – is unavailable for a claimed violation of 5 U.S.C. § 552a(e)(7). Sixth, concerning plaintiffs' claims under the Federal Tort Claims Act ("FTCA"), the panel held that the FTCA judgment bar provision had no application in this case. The panel further held that it could not determine the applicability of the FTCA's discretionary function exception at this stage in the litigation, and that the district court may make a determination of applicability on remand. The panel declined to discuss whether plaintiffs substantively stated claims as to the state laws underlying the FTCA claim would be premature.

The panel remanded for further proceedings. The panel held that on remand, the FISA and Fourth Amendment claims, to the extent the panel held they were validly pleaded in the complaint and not subject to qualified immunity, should proceed as usual. The district court should, using § 1806(f)'s *ex parte* and *in camera* procedures, review any materials relating to the surveillance as may be necessary, including the evidence over which the Attorney General asserted the state secrets privilege, to determine whether the electronic surveillance was lawfully authorized and conducted. The panel further held that once the district court used § 1806(f)'s procedures to review the state secrets evidence *in camera* and *ex parte* to determine the lawfulness of that surveillance, it could rely on its assessment of the same evidence – taking care to avoid its public disclosure – to determine the lawfulness of the surveillance falling outside FISA's purview, should plaintiffs wish to proceed with their claims as applied to that set of activity. The panel noted that the Government is free to raise a state secrets defense, which

10                         FAZAGA V. WALLS

the district court should consider anew.  The panel adopted
the D.C. Circuit's meaning of "valid defense" in the state
secrets context set forth in *In re Sealed Case*, 494 F.3d 139
(D.C. Cir. 2007).

Concurring in the denial of rehearing en banc, Judge
Gould and Judge Berzon wrote to highlight fundamental
misperceptions made by the dissent from the denial of
rehearing en banc.

In a separate statement regarding the denial of rehearing
en banc, Senior District Judge Steeh wrote that, as a visiting
judge sitting by designation, he was not permitted to vote on
the petition for rehearing en banc, but he agreed with the
views expressed by Judges Berzon and Gould in their
concurrence in the denial of rehearing en banc.

Dissenting from the denial of rehearing en banc, Judge
Bumatay wrote that the panel's opinion strained the meaning
of the Foreign Intelligence Surveillance Act and adopted a
virtually boundless view of 50 U.S.C. § 1806(f).  He wrote
further that the decision seriously degraded the Executive
Branch's ability to protect the Nation's secrets, and upset the
balance of power among co-equal branches of government by
abrogating the state secrets privilege.

## COUNSEL

Carl J. Nichols (argued) and Howard M. Shapiro, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Katie Moran, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; for Defendants-Appellants/Cross-Appellees Barbara Walls and J. Stephen Tidwell.

Alexander H. Cote (argued), Amos A. Lowder, Angela M. Machala, and David C. Scheper, Scheper Kim & Harris LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees Pat Rose, Paul Allen, and Kevin Armstrong.

Ahilan Arulanantham (argued), Peter Bibring (argued), Catherine A. Wagner, and Mohammad Tajsar, ACLU Foundation of Southern California, Los Angeles, California; Ameena Mirza Qazi and Fatima Dadabhoy, Council on American-Islamic Relations, Anaheim, California; Dan Stormer and Mohammad Tajsar, Hadsell Stormer Keeny & Renick LLP, Pasadena, California; for Plaintiffs-Appellees/Cross-Appellants.

Douglas N. Letter (argued), Daniel Tenny, Mark B. Stern, Mark R. Freeman, Sharon Swingle, and Joseph F. Busa, Appellate Staff; Nicola T. Hanna, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees Federal Bureau of Investigation, Christopher A. Wray, and Paul Delacourt.

Richard R. Wiebe, Law Office of Richard R. Wiebe, San Francisco, California; Thomas E. Moore III, Royse Law Firm PC, Palo Alto, California; David Greene, Andrew Crockner, Mark Rumold, James S. Tyre, Kurt Opsahl, Lee Tien, and

12                    FAZAGA V. WALLS

Cindy Cohn, Electronic Frontier Foundation, San Francisco, California; for Amicus Curiae Electronic Frontier Foundation.

## ORDER

The opinion filed on February 28, 2019, reported at 916 F.3d 1202, is hereby amended. An amended opinion is filed concurrently with this order. With these amendments, the panel has unanimously voted to deny appellees' petition for rehearing. Judges Berzon and Gould have voted to deny the petition for rehearing en banc and Judge Steeh so recommends.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for panel rehearing or rehearing en banc will be entertained. Judge Berzon's concurrence with and Judge Bumatay's dissent from denial of en banc rehearing are filed concurrently herewith.

14                          FAZAGA V. WALLS

**OPINION**

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . 20

    II.  Procedural History . . . . . . . . . . . . . . . . . . . . . . . 25

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    I.  The FISA Claim Against the Agent Defendants
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.  Recordings of Conversations to Which
        Monteilh Was a Party . . . . . . . . . . . . . . . . . . . 35

        B.  Recordings of Conversations in the Mosque
        Prayer Hall to Which Monteilh Was Not a Party
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        C.  Recordings Made by Planted Devices . . . . . . 44

    II.  The State Secrets Privilege and FISA Preemption
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        A.  The State Secrets Privilege . . . . . . . . . . . . . . 50

        B.  The District Court's Dismissal of the Search
        Claims Based on the State Secrets Privilege
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

C. FISA Displacement of the State Secrets Privilege
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D. Applicability of FISA's § 1806(f) Procedures to
Affirmative Legal Challenges to Electronic
Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . 66

E. Aggrieved Persons . . . . . . . . . . . . . . . . . . . . . 76

III.    Search Claims . . . . . . . . . . . . . . . . . . . . . . . . . 77

A. Fourth Amendment Injunctive Relief Claim
Against the Official-Capacity Defendants . . . 77

B. Fourth Amendment *Bivens* Claim Against the
Agent Defendants . . . . . . . . . . . . . . . . . . . . . . 81

IV.    Religion Claims . . . . . . . . . . . . . . . . . . . . . . . 83

A. First Amendment and Fifth Amendment
Injunctive Relief Claims Against the Official-
Capacity Defendants . . . . . . . . . . . . . . . . . . . . 83

B. First Amendment and Fifth Amendment *Bivens*
Claims Against the Agent Defendants . . . . . . 84

C. 42 U.S.C. § 1985(3) Claims Against the Agent
Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

D. Religious Freedom Restoration Act Claim
Against the Agent Defendants and Government
Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

E. Privacy Act Claim Against the FBI . . . . . . . . 97

16                     FAZAGA V. WALLS

F.  FTCA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 99

    1.  FTCA Judgment Bar . . . . . . . . . . . . . . . 100

    2.  FTCA Discretionary Function Exception
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

V.  Procedures on Remand . . . . . . . . . . . . . . . . . . . . 102

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

BERZON, Circuit Judge:

## INTRODUCTION

Three Muslim residents of Southern California allege that, for more than a year, the Federal Bureau of Investigation ("FBI") paid a confidential informant to conduct a covert surveillance program that gathered information about Muslims based solely on their religious identity. The three plaintiffs filed a putative class action against the United States, the FBI, and two FBI officers in their official capacities ("Government" or "Government Defendants"), and against five FBI agents in their individual capacities ("Agent Defendants"). Alleging that the investigation involved unlawful searches and anti-Muslim discrimination, they pleaded eleven constitutional and statutory causes of action.[1]

The Attorney General of the United States asserted the state secrets privilege with respect to three categories of evidence assertedly at issue in the case, and the Government moved to dismiss the discrimination claims pursuant to that privilege. The Government expressly did not move to dismiss the Fourth Amendment and Foreign Intelligence Surveillance Act ("FISA") unlawful search claims based on the privilege. Both the Government and the Agent Defendants additionally moved to dismiss Plaintiffs' discrimination and unlawful search claims based on arguments other than the privilege.

---

[1] Specifically, the Plaintiffs alleged violations of the First Amendment's Establishment Clause and Free Exercise Clauses; the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*; the equal protection component of the Fifth Amendment's Due Process Clause; the Privacy Act, 5 U.S.C. § 552a; the Fourth Amendment; the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1810; and the Federal Tort Claims Act, 28 U.S.C. § 1346.

The district court dismissed all but one of Plaintiffs'
claims on the basis of the state secrets privilege—including
the Fourth Amendment claim, although the Government
Defendants had not sought its dismissal on privilege grounds.
The district court allowed only the FISA claim against the
Agent Defendants to proceed. Plaintiffs appeal the dismissal
of the majority of their claims, and the Agent Defendants
appeal the denial of qualified immunity on the FISA claim.

We conclude that some of the claims dismissed on state
secrets grounds should not have been dismissed outright.
Instead, the district court should have reviewed any state
secrets evidence necessary for a determination of whether the
alleged surveillance was unlawful following the secrecy-
protective procedure set forth in FISA. *See* 50 U.S.C.
§ 1806(f). After addressing Defendants' other arguments for
dismissing Plaintiffs' claims, we conclude that some of
Plaintiffs' allegations state a claim while others do not.
Accordingly, we remand to the district court for further
proceedings on the substantively stated claims.

## BACKGROUND

At this stage in the litigation, we "construe the complaint
in the light most favorable to the plaintiff[s], taking all [their]
allegations as true and drawing all reasonable inferences from
the complaint in [their] favor." *Doe v. United States*, 419 F.3d
1058, 1062 (9th Cir. 2005). "Conclusory allegations and
unreasonable inferences, however, are insufficient to defeat
a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910
(9th Cir. 2007).

Plaintiffs are three Muslims who were residents of
Southern California: Sheikh Yassir Fazaga, Ali Uddin Malik,

and Yasser AbdelRahim. Fazaga was, at the times relevant to this litigation, an imam at the Orange County Islamic Foundation ("OCIF"), a mosque in Mission Viejo, California. Malik and AbdelRahim are practicing Muslims who regularly attended religious services at the Islamic Center of Irvine ("ICOI").

The complaint sought relief against the United States, the FBI, and two federal officials named in their official capacities, as well as five individual Agent Defendants—Kevin Armstrong, Paul Allen, J. Stephen Tidwell, Barbara Walls, and Pat Rose—named in their individual capacities. Armstrong and Allen were FBI Special Agents assigned to the Orange County areas; Tidwell was the Assistant Director in Charge of the FBI's Los Angeles Field Office from August 2005 to December 2007; Walls was the Special Agent in Charge of the FBI's Santa Ana branch office, a satellite office of the FBI's Los Angeles field office; and Rose was a Special Agent assigned to the FBI's Santa Ana branch office.

Because of the sensitivity of the issues in this case, we particularly stress the usual admonition that accompanies judicial determination on motions to dismiss a complaint: the facts recited below come primarily from Plaintiffs' allegations in their complaint.[2] The substance of those allegations has not been directly addressed by the defendants. At this point in the litigation, the truth or falsity of the allegations therefore is entirely unproven.

---

[2] In addition to the facts alleged in the complaint, this opinion at some points refers to facts contained in two public declarations submitted by the Government in support of its invocation of the state secrets privilege.

## I.  Factual Background

For at least fourteen months in 2006 and 2007, the FBI paid a confidential informant named Craig Monteilh to gather information as part of a counterterrorism investigation known as Operation Flex. Plaintiffs allege that Operation Flex was a "dragnet surveillance" program, the "central feature" of which was to "gather information on Muslims."[3]

At some point before July 2006, Stephen Tidwell, then the Assistant Director in Charge of the FBI's Los Angeles Field Office, authorized first the search for an informant and later the selection of Monteilh as that informant. Once selected, Monteilh was supervised by two FBI handlers, Special Agents Kevin Armstrong and Paul Allen.

In July 2006, Monteilh began attending ICOI. As instructed by Allen and Armstrong, Monteilh requested a meeting with ICOI's imam, represented that he wanted to convert to Islam, and later publicly declared his embrace of Islam at a prayer service. Monteilh subsequently adopted the name Farouk al-Aziz and began visiting ICOI daily, attending prayers, classes, and special events. He also visited "with some regularity" several other large mosques in Orange County.

---

[3] In a public declaration, the FBI frames Operation Flex differently, contending that it "focused on fewer than 25 individuals and was directed at detecting and preventing possible terrorist attacks." The FBI maintains that the goal of Operation Flex "was to determine whether particular individuals were involved in the recruitment and training of individuals in the United States or overseas for possible terrorist activity."

Armstrong and Allen closely supervised Monteilh during the course of Operation Flex, explaining to him the parameters and goals of the investigation. Monteilh was "to gather information on Muslims in general," using information-gathering and surveillance tactics. The agents provided him with the tools to do so, including audio and video recording devices. They also gave Monteilh general goals, such as obtaining contact information from a certain number of Muslims per day, as well as specific tasks, such as entering a certain house or having lunch with a particular person. Sometimes, Allen and Armstrong prepared photo arrays with hundreds of Muslim community members and asked Monteilh to arrange the photos from most to least dangerous.

Armstrong and Allen did not, however, limit Monteilh to specific targets. Rather, "they repeatedly made clear that they were interested simply in Muslims." Allen told Monteilh, "We want to get as many files on this community as possible." To the extent Allen and Armstrong expressed an interest in certain targets, it was in particularly religious Muslims and persons who might influence young Muslims. When Monteilh's surveillance activities generated information on non-Muslims, the agents set that information aside.

In accordance with his broad directive, Monteilh engaged with a wide variety of individuals. As instructed by his handlers, he attended classes at the mosque, amassed information on Muslims' charitable giving, attended Muslim fundraising events, collected information on community members' travel plans, attended lectures by Muslim scholars, went to daily prayers, memorized certain verses from the Quran and recited them to others, encouraged people to visit

"jihadist" websites, worked out with targeted people at a gym to get close to them, and sought to obtain compromising information that could be used to pressure others to become informants. He also collected the names of board members, imams, teachers, and other leadership figures at the mosques, as well as the license plate numbers of cars in the mosque parking lots during certain events.

Virtually all of Monteilh's interactions with Muslims were recorded. Monteilh used audio and video recording devices provided to him by the agents, including a cellphone, two key fobs with audio recording capabilities, and a camera hidden in a button on his shirt. He recorded, for example, his interactions with Muslims in the mosques, which were transcribed and reviewed by FBI officials. He also recorded meetings and conversations in the mosque prayer hall to which he was not a party. He did so by leaving his possessions behind, including his recording key fob, as though he had forgotten them or was setting them down while doing other things. Monteilh told Allen and Armstrong in written reports that he was recording conversations in this manner. The agents never told him to stop this practice, and they repeatedly discussed with Monteilh the contents of the recordings.

Armstrong and Allen occasionally instructed Monteilh to use his secret video camera for specific purposes, such as capturing the internal layout of mosques and homes. They also told Monteilh to obtain the contact information of people he met, and monitored his email and cellphone to obtain the email addresses and phone numbers of the people with whom he interacted.

Although Monteilh spent the majority of his time at ICOI, he conducted surveillance and made audio recordings in at least seven other mosques during the investigation. During Monteilh's fourteen months as an informant for Operation Flex, the FBI obtained from him hundreds of phone numbers; thousands of email addresses; background information on hundreds of individuals; hundreds of hours of video recordings of the interiors of mosques, homes, businesses, and associations; and thousands of hours of audio recordings of conversations, public discussion groups, classes, and lectures.

In addition to the surveillance undertaken directly by Monteilh, Allen and Armstrong told Monteilh that electronic surveillance equipment had been installed in at least eight mosques in the area, including ICOI. The electronic surveillance equipment installed at the Mission Viejo mosque was used to monitor Plaintiff Yassir Fazaga's conversations, including conversations held in his office and other parts of the mosque not open to the public.

At the instruction of Allen and Armstrong, Monteilh took extensive handwritten notes each day about his activities and the surveillance he was undertaking. Allen and Armstrong met with Monteilh roughly twice each week to discuss his assignments, give him instructions, receive his daily notes, upload his recordings, and give him fresh devices. Monteilh was also required to call either Allen or Armstrong each day to apprise them of his activities. They told Monteilh that his daily notes were read by their supervisors.

The operation began to unravel when, in early 2007, Allen and Armstrong instructed Monteilh to begin more pointedly asking questions about jihad and armed conflict and

to indicate his willingness to engage in violence. Implementing those instructions, Monteilh told several people that he believed it was his duty as a Muslim to take violent action and that he had access to weapons. Several ICOI members reported Monteilh to community leaders. One of the community leaders then called the FBI to report what Monteilh was saying, and instructed concerned ICOI members to call the Irvine Police Department, which they did. ICOI sought a restraining order against Monteilh, which was granted in June 2007.

Around the same time, Allen and Armstrong told Monteilh that Barbara Walls, then Assistant Special Agent in Charge of the FBI's Santa Ana office, no longer trusted him and wanted him to stop working for the FBI. In October 2007, Monteilh was told that his role in Operation Flex was over. At one of the final meetings between Monteilh and Agents Allen and Armstrong, Walls was present. She warned Monteilh not to tell anyone about the operation.

Monteilh's identity as an informant was revealed in February 2009 in connection with a criminal prosecution for naturalization fraud of Ahmadullah (or Ahmed) Niazi, one of the ICOI members who had reported Monteilh's statements to the Irvine Police Department. FBI Special Agent Thomas Ropel testified at a bail hearing in Niazi's case that he had heard several recordings between Niazi and a confidential informant, and that the informant was the same person Niazi had reported to the police. Ropel's statements thus indicated that Monteilh was a confidential informant and that he had recorded numerous conversations for the FBI.

Several sources subsequently confirmed that Monteilh worked for the FBI, including the FBI and Monteilh himself.

Although the FBI has disclosed some information about Monteilh's actions as an informant, including that he created audio and video recordings and provided handwritten notes to the FBI, the FBI maintains that "certain specific information" concerning Operation Flex and Monteilh's activities must be protected in the interest of national security.

## II. Procedural History

Plaintiffs filed the operative complaint in September 2011, asserting eleven causes of action, which fall into two categories: claims alleging unconstitutional searches ("search claims") and claims alleging unlawful discrimination on the basis of, or burdens on, or abridgement of the rights to, religion ("religion claims"). The religion claims allege violations of the First Amendment Religion Clauses, the equal protection guarantee of the Due Process Clause of the Fifth Amendment,[4] the Privacy Act, the Religious Freedom Restoration Act ("RFRA"), the Foreign Intelligence Surveillance Act ("FISA"), and the Federal Tort Claims Act ("FTCA").

Plaintiffs filed the complaint as a putative class action, with the class defined as "[a]ll individuals targeted by Defendants for surveillance or information-gathering through Monteilh and Operation Flex, on account of their religion, and about whom the FBI thereby gathered personally identifiable information." The complaint sought injunctive

---

[4] "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954)).

FAZAGA V. WALLS

relief for the individual Plaintiffs and the class, and damages for themselves as individuals.[5] The Agent Defendants moved to dismiss the claims against them on various grounds, including qualified immunity. The Government moved to dismiss the amended complaint and for summary judgment, arguing that Plaintiffs' statutory and constitutional claims fail on various grounds unrelated to the state secrets privilege.

The Government also asserted that the religion claims, but not the search claims, should be dismissed under the *Reynolds* state secrets privilege, *see United States v. Reynolds*, 345 U.S. 1 (1953), on the ground that litigation of the religion claims could not proceed without risking the disclosure of certain evidence protected by the privilege. The assertion of the state secrets privilege was supported with a previously filed public declaration from then-U.S. Attorney General Eric Holder; a public declaration from Mark Giuliano, then Assistant Director of the FBI's Counterterrorism Division; and two classified declarations and a classified supplemental memorandum from Giuliano. The Attorney General asserted the state secrets privilege over three categories of evidence: (1) "[i]nformation that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation"; (2) "[i]nformation that could tend to reveal the initial reasons (*i.e.*, predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained

---

[5] The proposed class has not been certified. In addition to its relevance to the merits of Plaintiffs' claims, the information over which the Government asserted the state secrets privilege may also be relevant to the decision whether to certify the class. In addition, the scope of privileged evidence needed to litigate the case likely will differ should class certification be granted.

during the course of such an investigation, and the status and results of the investigation"; and (3) "[i]nformation that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation."

In one order, the district court dismissed the FISA claim against the Government, brought under 50 U.S.C. § 1810, concluding that Congress did not waive sovereign immunity for damages actions under that statute. *See Al-Haramain Islamic Found., Inc. v. Obama* (*Al-Haramain II*), 705 F.3d 845, 850–55 (9th Cir. 2012). Plaintiffs do not challenge this dismissal. In the same order, the district court permitted Plaintiffs' FISA claim against the Agent Defendants to proceed, rejecting the argument that the Agent Defendants were entitled to qualified immunity.

In a second order, the district court dismissed all the other claims in the case on the basis of the *Reynolds* state secrets privilege—including the Fourth Amendment claim, for which the Government Defendants expressly did not seek dismissal on that ground. Relying "heavily" on the classified declarations and supplemental memorandum, the district court concluded "that the subject matter of this action, Operation Flex, involves intelligence that, if disclosed, would significantly compromise national security." It held that the Government Defendants would need to rely on the privileged material to defend against Plaintiffs' claims, and that the privileged evidence was so inextricably tied up with nonprivileged material that "the risk of disclosure that further litigation would engender [could not] be averted through protective orders or restrictions on testimony." The district court declined to use, as a substitute for dismissal, the *in camera*, *ex parte* procedures set out in § 1806(f) of FISA, on

the ground that FISA's procedures do not apply to non-FISA claims.

The Agent Defendants timely filed notices of appeal from the denial of qualified immunity on Plaintiffs' FISA claim. The district court then approved the parties' stipulation to stay all further proceedings related to the remaining FISA claim pending resolution of the Agent Defendants' appeal and, at Plaintiffs' request, entered partial final judgment under Federal Rule of Civil Procedure 54(b), allowing immediate appeal of the majority of Plaintiffs' claims. The Plaintiffs' appeal and the Agent Defendants' appeal from the denial of qualified immunity on the FISA claim were consolidated and are both addressed in this opinion.

## DISCUSSION

We begin with the only claim to survive Defendants' motions to dismiss in the district court: the FISA claim against the Agent Defendants. After addressing the FISA claim, we turn to Plaintiffs' argument that in cases concerning the lawfulness of electronic surveillance, the *ex parte* and *in camera* procedures set out in § 1806(f) of FISA supplant the dismissal remedy otherwise mandated by the state secrets evidentiary privilege. *See infra* Part II. We then proceed to evaluate Defendants' other arguments for dismissal of the search and religion claims. *See infra* Parts III–IV. Finally, we explain the procedures to be followed on remand. *See infra* Part V.

## I.    The FISA Claim Against the Agent Defendants

Section 110 of FISA, codified at 50 U.S.C. § 1810, creates a private right of action for an individual subjected to

electronic surveillance in violation of FISA's procedures. It provides, in pertinent part:

> An aggrieved person . . . who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation . . . .

50 U.S.C. § 1810.

This statutory text refers to another section, § 1809. That section, in turn, proscribes as criminal offenses two types of conduct: (1) "intentionally . . . engag[ing] in electronic surveillance under color of law except as authorized by [FISA, the Wiretap Act, the Stored Communications Act, or the pen register statute,] or any express statutory authorization," and (2) "intentionally . . . disclos[ing] or us[ing] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance" without authorization. 50 U.S.C. § 1809(a).

To determine whether Plaintiffs plausibly allege a cause of action under § 1810, we must decide (1) whether Plaintiffs are "aggrieved persons" within the meaning of the statute, (2) whether the surveillance to which they were subjected qualifies as "electronic surveillance," and (3) whether the complaint plausibly alleges a violation of 50 U.S.C. § 1809.

An "aggrieved person" is defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k).[6] Plaintiffs allege in extensive detail in the complaint that they were subjected to many and varied instances of audio and video surveillance. The complaint's allegations are sufficient if proven to establish that Plaintiffs are "aggrieved persons."

The complaint also adequately alleges that much of the surveillance as described constitutes "electronic surveillance" as defined by FISA. FISA offers four definitions of electronic surveillance. 50 U.S.C. § 1801(f). Only the fourth is potentially at stake in this case:

> the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which *a person has a reasonable expectation of privacy* and *a warrant would be required for law enforcement purposes.*

*Id.* § 1801(f)(4) (emphases added). The key question as to the presence of "electronic surveillance" under this definition is whether the surveillance detailed in the complaint was undertaken in circumstances in which (1) Plaintiffs had a reasonable expectation of privacy and (2) a warrant would be required for law enforcement purposes. If, as the complaint

---

[6] "'Person' means any individual, including any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power." 50 U.S.C. § 1801(m).

alleges, no warrant was in fact obtained, such electronic surveillance would constitute a violation of § 1809. *Id.* § 1809(a).

The parties, citing *ACLU v. NSA*, 493 F.3d 644, 657 n.16, 683 (6th Cir. 2007), agree that these legal standards from FISA—reasonable expectation of privacy and the warrant requirement—are evaluated just as they would be under a Fourth Amendment analysis. The Agent Defendants argue, however, that they are entitled to qualified immunity on Plaintiffs' FISA claim. Plaintiffs accept that qualified immunity can apply under FISA but maintain that the Agent Defendants are not entitled to immunity.[7]

The Agent Defendants are entitled to qualified immunity from damages unless Plaintiffs "plead[] facts showing (1) that the official[s] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We are permitted to "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because, as we conclude in *infra* Part II.E, the applicability of FISA's alternative

---

[7] We have found only one decision, unpublished, addressing whether qualified immunity is an available defense to a FISA claim. *See Elnashar v. U.S. Dep't of Justice*, No. CIV.03-5110(JNE/JSM), 2004 WL 2237059, at *5 (D. Minn. Sept. 30, 2004) (dismissing a FISA claim on grounds of qualified immunity because there was no evidence the defendant "would have known that the search of [plaintiff's] apartment would have required a warrant"), *aff'd on other grounds*, 446 F.3d 792 (8th Cir. 2006). As the issue is not contested, we do not decide it.

procedures for reviewing state secrets evidence turns on whether the surveillance at issue constitutes "electronic surveillance" within the meaning of FISA,[8] we will begin with the first prong, even though we conclude that the Agent Defendants are ultimately entitled to qualified immunity on the second prong.

For purposes of qualified immunity, a right is clearly established if, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

"The operation of [the qualified immunity] standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. Often, whether a right is "clearly established" for purposes of qualified immunity will turn on the legal test for determining whether that right has been

---

[8] Again, as we noted above, "electronic surveillance" as defined by FISA must fall under one of four types of government action. 50 U.S.C. § 1801(f). The relevant one for our purposes involves "the installation or use of an electronic, mechanical, or other surveillance device . . . under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes." *Id.* § 1801(f)(4).

violated. For claims of excessive force, for example, "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Saucier*, 533 U.S. at 205. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). By contrast, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no," *Kyllo v. United States*, 533 U.S. 27, 31 (2001), as "the Fourth Amendment has drawn a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 590 (1980). Thus, where the test for determining whether the right in question has been violated is framed as a standard, rather than a rule, officials are given more breathing room to make "reasonable mistakes." *Saucier*, 533 U.S. at 205. In those instances, we require a higher degree of factual specificity before concluding that the right is "clearly established." But where the right at issue is clear and specific, officials may not claim qualified immunity based on slight changes in the surrounding circumstances.[9]

---

[9] The Supreme Court made a similar observation in an analogous context—determining whether a state court has unreasonably applied clearly established federal law for purposes of habeas review under the Antiterrorism and Effective Death Penalty Act: "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. . . . Other rules are more general, and their meaning must emerge in application over the course of time." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

To properly approach this inquiry, we consider separately three categories of audio and video surveillance alleged in the complaint: (1) recordings made by Monteilh of conversations to which he was a party; (2) recordings made by Monteilh of conversations to which he was not a party (i.e., the recordings of conversations in the mosque prayer hall); and (3) recordings made by devices planted by FBI agents in Fazaga's office and AbdelRahim's house, car, and phone.[10]

We conclude that the Agent Defendants are entitled to dismissal on qualified immunity grounds of Plaintiffs' § 1810 claim as to the first two categories of surveillance. As to the third category of surveillance, conducted via devices planted in AbdelRahim's house and Fazaga's office, Allen and Armstrong are not entitled to qualified immunity. But Tidwell, Walls, and Rose are entitled to dismissal as to this category, because Plaintiffs do not plausibly allege their involvement in this category of surveillance, and so have not

---

[10] We note that, in their "Claims for Relief," under the FISA cause of action, Plaintiffs recite that "Defendants, under color of law, *acting through Monteilh*" violated FISA (emphasis added). But the complaint specifically recites facts relating to devices allegedly planted directly by the Agent Defendants. Under the Federal Rules of Civil Procedure, it is the facts alleged that circumscribe the reach of the complaint for purposes of a motion to dismiss. *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

We also note that there may be a fourth category of surveillance here at issue: video recordings of the interiors of individuals' homes. These recordings are not given meaningful attention in the parties' briefs, and we cannot determine from the complaint if Plaintiffs mean to allege that Monteilh video recorded the layouts of houses into which he was invited, or that he entered the houses without permission. Although at this stage we do not construe the complaint as asserting claims based on this fourth category of surveillance, our opinion does not foreclose Plaintiffs from clarifying these and other allegations on remand.

"pleaded facts showing . . . that [those] officials violated a statutory or constitutional right." *al-Kidd*, 563 U.S. at 735.

## A. Recordings of Conversations to Which Monteilh Was a Party

A reasonable expectation of privacy exists where "a person ha[s] exhibited an actual (subjective) expectation of privacy," and "the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *see, e.g.*, *California v. Ciraolo*, 476 U.S. 207, 211) (1986) (describing Justice Harlan's test as the "touchstone of Fourth Amendment analysis"). Generally, an individual "has no privacy interest in that which he voluntarily reveals to a government agent," a principle known as the invited informer doctrine. *United States v. Wahchumwah*, 710 F.3d 862, 867 (9th Cir. 2013) (citing *Hoffa v. United States*, 385 U.S. 293, 300–02 (1966)); *see also United States v. Aguilar*, 883 F.2d 662, 697–98 (9th Cir. 1989), *superseded on other grounds by statute*, Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, *as recognized in United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002). Plaintiffs contend, however, that the invited informer doctrine does not apply to the recordings made by Monteilh of conversations to which he was a party because the surveillance was conducted with discriminatory purpose and therefore in bad faith.

Bad faith of this sort does not, however, implicate the reasonable privacy expectation protected by the Fourth Amendment or violate the Fourth Amendment's warrant requirement. There is, to be sure, an important "limitation[] on the government's use of undercover informers to infiltrate an organization engaging in protected first amendment

activities": the government's investigation must not be conducted "for the purpose of abridging first amendment freedoms." *Aguilar*, 883 F.2d at 705. But that limitation on voluntary conversations with undercover informants— sometimes referred to as a "good faith" requirement,[11] *e.g.*, *United States v. Mayer*, 503 F.3d 740, 751 (9th Cir. 2007); *Aguilar*, 883 F.2d at 705—is imposed by the First Amendment, not the Fourth Amendment. As that constitutional limitation is not grounded in privacy expectations, it does not affect the warrant requirement under the Fourth Amendment.

Under the appropriate Fourth Amendment precepts, "[u]ndercover operations, in which the agent is a so-called 'invited informer,' *are not* '*searches*' under the Fourth Amendment." *Mayer*, 503 F.3d at 750 (emphasis added) (quoting *Aguilar*, 883 F.2d at 701). "[A] defendant generally has *no* privacy interest"—not merely an *unreasonable* privacy interest—"in that which he voluntarily reveals to a government agent." *Wahchumwah*, 710 F.3d at 867 (emphasis added). In other words, use of a government informant under the invited informer doctrine—even if not in good faith in the First Amendment sense—does not implicate the privacy interests protected by the Fourth Amendment. Because our inquiry under FISA is confined to whether a reasonable expectation of privacy was violated and whether a warrant was therefore required, *see ACLU*, 493 F.3d at 657 n.16, 683, the First Amendment-grounded good-faith limitation does not apply to our current inquiry.

---

[11] We use this term in the remainder of this discussion to refer to the constitutional limitation on the use of informants discussed in the text.

Under the invited informer doctrine, Plaintiffs lacked a reasonable expectation of privacy in the conversations recorded by Monteilh to which he was a party. The Agent Defendants are therefore not liable under FISA for this category of surveillance.

## B. Recordings of Conversations in the Mosque Prayer Hall to Which Monteilh Was Not a Party

Plaintiffs did have a privacy-grounded reasonable expectation that their conversations in the mosque prayer hall would not be covertly recorded by an individual who was not present where Plaintiffs were physically located and was not known to be listening in.[12] The Agent Defendants are, however, entitled to qualified immunity with respect to this category of surveillance under the second prong of the qualified immunity standard—whether "the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (quoting *Harlow*, 457 U.S. at 818).

Again, the relevant questions here on the merits of the FISA and Fourth Amendment issues are whether "a person ha[s] exhibited an actual (subjective) expectation of privacy," and whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring). To first determine whether an individual has "exhibited an actual expectation of privacy," we assess whether "he [sought] to preserve [something] as private." *Bond v. United States*, 529 U.S. 334, 338 (2000) (alterations

---

[12] We are not suggesting that the recording would have been impermissible under FISA and the Fourth Amendment if the Agent Defendants had obtained a warrant based on probable cause. Here, however, no warrant was obtained.

in original) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Based on the rules and customs of the mosque, and the allegations in the complaint, we have no trouble determining that Plaintiffs manifested an actual, subjective expectation of privacy in their conversations there.

The mosque prayer hall is not an ordinary public place. It is a site of religious worship, a place for Muslims to come together for prayer, learning, and fellowship. Plaintiffs allege that the prayer hall "is [a] sacred space where particular rules and expectations apply. Shoes are prohibited, one must be in a state of ablution, discussing worldly matters is discouraged, and the moral standards and codes of conduct are at their strongest." Notably, "[g]ossiping, eavesdropping, or talebearing (*namima*—revealing anything where disclosure is resented) is forbidden." And ICOI, which Malik and AbdelRahim attended, specifically prohibited audio and video recording in the mosque without permission. When, on a rare occasion, an outside entity did record an event or a speaker, ICOI put up signs to notify congregants. Furthermore, Plaintiffs explain in their complaint that *halaqas*, which are small group meetings during which participants "discuss theology or matters related to the practice of Islam," are understood by mosque attendees to be environments that "ensure some measure of confidentiality among participants."[13]

These privacy-oriented rules and customs confirm for us that Plaintiffs held a subjective expectation of privacy in their conversations among themselves while in the prayer hall.

---

[13] We understand that description to imply that Monteilh recorded conversations that occurred during *halaqas* in the mosque prayer hall.

That Plaintiffs were not alone in the mosque prayer hall does not defeat their claim that they manifested an expectation of privacy.[14] "Privacy does not require solitude." *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991). For example, "a person can have a subjective expectation that his or her home will not be searched by the authorities, even if he or she has invited friends into his or her home." *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1102 (C.D. Cal. 2006), *aff'd sub nom. Bernhard v. City of Ontario*, 270 F. App'x 518 (9th Cir. 2008). The same principle applies to certain other enclosed locations in which individuals have particular reason to expect confidentiality and repose.[15]

---

[14] The Agent Defendants cite *Smith v. Maryland*, 442 U.S. at 740–41, to support the proposition that the unattended recordings in the mosque prayer hall did not invade Plaintiffs' reasonable expectation of privacy. *Smith* and its progeny do not apply here. *Smith* concerned a pen register installed and used by a telephone company, and held that an individual enjoys no Fourth Amendment protection "in information he voluntary turns over to third parties." *Id.* at 743–44. But, as the Fourth Circuit has stressed, *Smith* and the cases relying on it are concerned with "whether the government invades an individual's reasonable expectation of privacy when it obtains, *from a third party*, the third party's records." *United States v. Graham*, 824 F.3d 421, 426 (4th Cir. 2016) (en banc) (emphasis added), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018). Cases "involv[ing] *direct* government surveillance activity," including surreptitiously viewing, listening to, or recording individuals—like the one before us—present a wholly separate question. *Id.*

[15] *Taketa*, for example, held that a state employee could hold an expectation of privacy in his office even though the office was shared with two others. 923 F.2d at 673. "[E]ven 'private' business offices are often subject to the legitimate visits of coworkers, supervisors, and the public, without defeating the expectation of privacy unless the office is 'so open to fellow employees or the public that no expectation of privacy is reasonable.'" *Id.* (quoting *O'Connor v. Ortega*, 480 U.S. 709, 717–18 (1987)).

Finally, the case law distinguishes between an expectation of privacy in a place and an expectation of privacy as to whether an individual's conversations or actions in that place would be covertly recorded by persons not themselves present in that place.[16] The Supreme Court has recently emphasized the significant difference between obtaining information in person and recording information electronically. *See Carpenter*, 138 S. Ct. at 2219 ("Unlike the nosy neighbor who keeps an eye on comings and goings, they are ever alert, and their memory is nearly infallible."). Here, given the intimate and religious nature of the space and the express prohibition on recording, Plaintiffs have adequately alleged that they subjectively believed their conversations would not be covertly recorded by someone not present in the prayer hall for transmission to people not present in the prayer hall.[17]

Having concluded that Plaintiffs exhibited a subjective expectation of privacy, we now consider whether it was "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring). In assessing whether

---

[16] *See also Taketa*, 923 F.2d at 676 ("Taketa has no general privacy interest in [his co-worker's] office, but he may have an expectation of privacy against being videotaped in it."); *Trujillo*, 428 F. Supp. 2d at 1102 (considering the secret installation and use of a video camera in a police department's men's locker room, and explaining that it was "immaterial" that the plaintiffs changed their clothes in the presence of others, because "[a] person can have a subjective expectation of privacy that he or she will not be *covertly recorded*, even though he or she knows there are other people in the locker room" (emphasis added)).

[17] The complaint alleges that Plaintiffs lost "confidence in the mosque as a sanctuary" after learning of Monteilh's surveillance. This feeling of the *loss* of privacy reinforces the conclusion that Plaintiffs exhibited an actual expectation of privacy in their conversations in the mosque before the alleged surveillance took place.

an individual's expectation of privacy is reasonable, context is key. *See O'Connor*, 480 U.S. at 715. "Although no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Carpenter*, 138 S. Ct. at 2213–14 (alteration in original) (footnote omitted) (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)). Relevant here is the principle that "the extent to which the Fourth Amendment protects people may depend upon *where* those people are." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (emphasis added). We thus "assess the nature of the location where [the] conversations were seized"—here, the mosque prayer hall. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1116–17 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006).

The sacred and private nature of the houses of worship Plaintiffs attended distinguishes them from the types of commercial and public spaces in which courts have held that individuals lack a reasonable expectation of privacy.[18] *United States v. Gonzalez*, 328 F.3d 543 (9th Cir. 2003), for example, held that the defendant had no reasonable expectation of privacy in "a large, quasi-public mailroom at a public hospital during ordinary business hours." *Id.* at 547. The mailroom had open doors, was visible to the outside via large windows, and received heavy foot traffic. *Id*. In addition to focusing on the physical specifics of the mailroom, *Gonzalez* emphasized

---

[18] *See, e.g.*, *In re John Doe Trader No. One*, 894 F.2d 240, 243–44 (7th Cir. 1990) (holding that a rule prohibiting tape recorders on the trading floor "aimed at various forms of distracting behavior" and explicitly "designed to protect 'propriety and decorum' not privacy" did not support a reasonable expectation of privacy).

that public hospitals, "by their nature . . . create a diminished expectation of privacy. The use of surveillance cameras in hospitals for patient protection, for documentation of medical procedures *and* to prevent theft of prescription drugs is not uncommon." *Id*. The mosque prayer halls in this case, by contrast, have no characteristics similarly evidencing diminished expectations of privacy or rendering such expectations unreasonable.[19] There are no urgent health or safety needs justifying surveillance. And the use of surveillance equipment at ICOI is not only uncommon, but expressly forbidden.

Our constitutional protection of religious observance supports finding a reasonable expectation of privacy in such a sacred space, where privacy concerns are acknowledged and protected, especially during worship and other religious observance. *Cf. Mockaitis v. Harcleroad*, 104 F.3d 1522,

---

[19] Again, the fact that many people worshiped at the mosque does not render the Plaintiffs' expectations of privacy in their conversations (or at the very least from, their expectations that their conversations would not be covertly recorded) unreasonable. In *Gonzalez, Inc.*, for example, we held that individuals who owned and managed a small, family-run business with up to 25 employees had "a reasonable expectation of privacy over the on-site business conversations between their agents." 412 F.3d at 1116–17. The Gonzalez family, whose phone calls were intercepted, were not alone in their place of business, and their calls could have been overheard by others who were present. But we concluded that they nonetheless had a reasonable expectation of privacy over their conversations because they owned the office, had full access to the building, and exercised managerial control over the office's day-to-day operations. *Id.* Similarly, *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978), rejected the argument that a police officer lacked a reasonable expectation of privacy over conversations had in his office because his office door was open and a records clerk worked nearby in an adjacent room. *Id.* at 1224. "A business office need not be sealed to offer its occupant a reasonable degree of privacy," we reasoned. *Id.*

1533 (9th Cir. 1997) (holding that, based in part on "the nation's history of respect for religion in general," a priest had a reasonable expectation of privacy in his conversation with an individual during confession), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). Thus, Plaintiffs' expectation that their conversations in the mosque prayer hall would be confidential among participants (unless shared by one of them with others), and so would not be intercepted by recording devices planted by absent government agents was objectively reasonable.

Finally, "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). "National security cases," like the one here, "often reflect a convergence of First and Fourth Amendment values not present in cases of 'ordinary' crime. *United States v. U.S. District Court* (*Keith*), 407 U.S. 297, 313 (1972). "Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy . . . ." *Id.* at 314.

Accordingly, we hold that Plaintiffs had a reasonable expectation of privacy that their conversations in the mosque prayer hall would not be covertly recorded by a government agent not party to the conversations.

As of 2006 and 2007, however, no federal or state court decision had held that individuals generally have a reasonable expectation of privacy from surveillance in places of worship. Our court had declined to read *Katz* as established authority "for the proposition that a reasonable expectation of privacy

attaches to church worship services open to the public." *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989). Noting that there was a lack of clearly established law so concluding, *Presbyterian Church* held that Immigration and Naturalization Service ("INS") officials were entitled to qualified immunity from a Fourth Amendment challenge to undercover electronic surveillance of church services conducted without a warrant and without probable cause. *Id.* No case decided between *Presbyterian Church* and the incidents giving rise to this case decided otherwise. And no case decided during that period addressed circumstances more like those here, in which there are some specific manifestations of an expectation of privacy in the particular place of worship. Arguably pertinent was *Mockaitis*, but that case concerned the confession booth, not the church premises generally. 104 F.3d at 1533. The circumstances here fall between *Presbyterian Church* and *Mockaitis*, so there was no clearly established law here applicable. The Agent Defendants are thus entitled to qualified immunity as to this category of surveillance.

## C.  Recordings Made by Planted Devices

It was, of course, clearly established in 2006 and 2007 that individuals have a reasonable expectation of privacy from covert recording of conversations in their homes, cars, and offices, and on their phones. *See, e.g.*, *Kyllo*, 533 U.S. at 31 (home); *New York v. Class*, 475 U.S. 106, 115 (1986) (cars); *Katz*, 389 U.S. at 360–61 (Harlan, J., concurring) (enclosed telephone booths); *Taketa*, 923 F.2d at 673 (office); *McIntyre*, 582 F.2d at 1223–24 (office). The Agent Defendants accept these well-established legal propositions. But they maintain that the complaint's allegations that the FBI planted electronic surveillance equipment in Fazaga's

office and AbdelRahim's house, car, and phone are too conclusory to satisfy *Iqbal*'s plausibility standard, and so do not adequately allege on the merits a violation of Plaintiffs' rights under FISA. *See al-Kidd*, 563 U.S. at 735; *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). We cannot agree.

Plaintiffs offer sufficient well-pleaded facts to substantiate their allegation that some of the Agent Defendants—Allen and Armstrong—were responsible for planting devices in AbdelRahim's house. Specifically, the complaint details one occasion on which Allen and Armstrong asked Monteilh about something that had happened in AbdelRahim's house that Monteilh had not yet communicated to them, and explained that they knew about it because they had audio surveillance in the house.

Plaintiffs also allege sufficient facts with regard to those two Agent Defendants in support of their allegation of electronic surveillance of Fazaga's office in the OCIF mosque in Mission Viejo: Allen and Armstrong told Monteilh that electronic surveillance was "spread indiscriminately" across "at least eight area mosques including ICOI, and mosques in Tustin, Mission Viejo, Culver City, Lomita, West Covina, and Upland," and that "they could get in a lot of trouble if people found out what surveillance they had in the mosques." They also instructed Monteilh to use a video camera hidden in a shirt button to record the interior of OCIF and "get a sense of the schematics of the place—entrances, exits, rooms, bathrooms, locked doors, storage rooms, as well as security measures and whether any security guards were armed." Armstrong later told Monteilh that he and Allen used the information he recorded to enter OCIF.

As to Tidwell, Walls, and Rose, however, the complaint does not plausibly allege their personal involvement with respect to the planted devices.[20] The complaint details Tidwell, Walls, and Rose's oversight of Monteilh, including that they read his daily notes and were apprised, through Allen and Armstrong, of the information he collected. But the complaint never alleges that *Monteilh* was involved in planting devices in AbdelRahim's house, car, or phone, or in Fazaga's office; those actions are attributed only to unnamed FBI agents.

The complaint also offers general statements that Tidwell, Walls, and Rose supervised Allen and Armstrong.[21] But "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. Plaintiffs have not done so as to this category of surveillance with regard to Tidwell, Walls, and Rose. The complaint does not allege that the supervisors knew of, much less ordered or arranged for, the planting of

---

[20] Because we concluded with respect to the first two categories of surveillance either that Plaintiffs had no reasonable expectation of privacy or that the expectation was not clearly established in the case law at the pertinent time, we reach the question whether Plaintiffs plausibly allege the personal involvement of Tidwell, Wall, and Rose only with respect to the third category of surveillance.

[21] The relevant allegations were only that Walls and Rose "actively monitored, directed, and authorized the actions of Agents Allen and Armstrong and other agents at all times relevant in this action, for the purpose of surveilling Plaintiffs and other putative class members because they were Muslim" and that Tidwell "authorized and actively directed the actions of Agents Armstrong, Allen, Rose, Walls, and other agents."

the recording devices in AbdelRahim's home or Fazaga's office, so the supervisors are entitled to qualified immunity as to that surveillance. *See, e.g.*, *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012); *Ortez v. Washington County*, 88 F.3d 804, 809 (9th Cir. 1996).

In sum, Plaintiffs allege a FISA claim against Allen and Armstrong for recordings made by devices planted by FBI agents in AbdelRahim's house and Fazaga's office. As to all other categories of surveillance, the Agent Defendants either did not violate FISA; are entitled to qualified immunity on the FISA claim because Plaintiffs' reasonable expectation of privacy was not clearly established; or were not plausibly alleged in the complaint to have committed any FISA violation that may have occurred.

## II.  The State Secrets Privilege and FISA Preemption

Having addressed the only claim to survive Defendants' motions to dismiss in the district court, we turn to the district court's dismissal of the remaining claims pursuant to the state secrets privilege.[22] Plaintiffs argue that reversal is warranted "on either of two narrower grounds." First, Plaintiffs argue that, at this preliminary stage, the district court erred in concluding that further litigation would require the disclosure of privileged information. Second, Plaintiffs maintain that the district court should have relied on FISA's alternative procedures for handling sensitive national security information. Because we agree with Plaintiffs' second

---

[22] Plaintiffs do not dispute at this juncture the district court's conclusion that the information over which the Attorney General asserted the state secrets privilege indeed comes within the privilege. We therefore assume as much for present purposes.

argument, we do not decide the first. We therefore need not review the Government's state secrets claim to decide whether the standard for dismissal at this juncture—whether the district court properly "determine[d] with certainty . . . that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made," *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1081 (9th Cir. 2010) (en banc)—has been met.

The initial question as to Plaintiffs' second argument is whether the procedures established under FISA for adjudicating the legality of challenged electronic surveillance replace the common law state secrets privilege with respect to such surveillance to the extent that privilege allows the categorical dismissal of causes of action. The question is a fairly novel one. We are the first federal court of appeals to address it. Only two district courts, both in our circuit, have considered the issue. Those courts both held that FISA "displace[s] federal common law rules such as the state secrets privilege with regard to matters within FISA's purview." *Jewel v. NSA*, 965 F. Supp. 2d 1090, 1105–06 (N.D. Cal. 2013); *accord In re NSA Telecomms. Records Litig.* (*In re NSA*), 564 F. Supp. 2d 1109, 1117–24 (N.D. Cal. 2008). We rely on similar reasoning to that in those district court decisions, but reach a narrower holding as to the scope of FISA preemption.

Our analysis of this issue proceeds as follows. First, we offer a brief review of the state secrets privilege. Second, we discuss one reason why the district court should not have dismissed the search claims based on the privilege. Third, we explain why FISA displaces the dismissal remedy of the common law state secrets privilege as applied to electronic

surveillance generally. Then we review the situations in which FISA's procedures under § 1806(f) apply, including affirmative constitutional challenges to electronic surveillance. Finally, we explain why the present case fits at least one of the situations in which FISA's procedures apply.

Before we go on, we emphasize that although we hold that Plaintiffs' electronic surveillance claims are not subject to outright dismissal at the pleading stage because FISA displaces the state secrets privilege, the FISA procedure is, not surprisingly, extremely protective of government secrecy. Under that procedure, Plaintiffs' religion claims will not go forward under the open and transparent processes to which litigants are normally entitled. Instead, in the interest of protecting national security, the stringent FISA procedures require severe curtailment of the usual protections afforded by the adversarial process and due process. *See, e.g.*, *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 545 (9th Cir. 2016) (holding that the district court's use of *ex parte*, *in camera* submissions to support its fee order violated defendants' due process rights); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 623 (9th Cir. 1993) (same); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (same). As it is Plaintiffs who have invoked the FISA procedures, we proceed on the understanding that they are willing to accept those restrictions to the degree they are applicable as an alternative to dismissal, and so may not later seek to contest them.[23]

---

[23] We discuss how the district court is to apply the FISA procedures to Plaintiffs' surviving claims on remand in *infra* Part V.

## A.  The State Secrets Privilege

"The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely." *Jeppesen*, 614 F.3d at 1077 (citing *Totten v. United States*, 92 U.S. 105, 107 (1876)). Neither the Supreme Court nor this court has precisely delineated what constitutes a state secret. *Reynolds* referred to "military matters which, in the interest of national security, should not be divulged." 345 U.S. at 10. *Jeppesen* added that not all classified information is necessarily privileged under *Reynolds*. 614 F.3d at 1082. The state secrets privilege has been held to apply to information that would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments, or where disclosure would be inimical to national security." *Black v. United States*, 62 F.3d 1115, 1118 (8th Cir. 1995) (citations and internal quotation marks omitted). But courts have acknowledged that terms like "military or state secrets" are "amorphous in nature," *id.* (citation omitted); the phrase "inimical to national security" certainly is. And although purely domestic investigations with no international connection do not involve state secrets, we recognize that the contours of the privilege are perhaps even more difficult to draw in a highly globalized, post-9/11 environment, where the lines between foreign and domestic security interests may be blurred.

We do not attempt to resolve the ambiguity or to explain definitively what constitutes a "state secret." But we note the ambiguity nonetheless at the outset, largely as a reminder that, as our court has previously noted, "[s]imply saying

'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." *Al-Haramain Islamic Found., Inc. v. Bush* (*Al-Haramain I*), 507 F.3d 1190, 1203 (9th Cir. 2007).

Created by federal common law, the modern state secrets doctrine has two applications: the *Totten* bar and the *Reynolds* privilege. The *Totten* bar is invoked "'where the very subject matter of the action' is 'a matter of state secret.'" *Id.* at 1077 (quoting *Reynolds*, 345 U.S. at 11 n.26). It "completely bars adjudication of claims premised on state secrets." *Id.*; *see also Totten*, 95 U.S. at 106–07. The *Reynolds* privilege, by contrast, "is an evidentiary privilege rooted in federal common law." *Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998); *see also Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 485 (2011). It "may be asserted at any time," and successful assertion "will remove the privileged evidence from the litigation." *Jeppesen*, 614 F.3d at 1079–80.

Here, after the Attorney General asserted the *Reynolds* privilege and the Government submitted both public and classified declarations setting out the parameters of its state secrets contention, the Government Defendants requested dismissal of Plaintiffs' religion claims in toto—but not the Fourth Amendment and FISA claims—at the pleading stage. "Dismissal at the pleading stage under *Reynolds* is a drastic result and should not be readily granted." *Jeppesen*, 614 F.3d at 1089. Only "if state secrets are so central to a proceeding that it cannot be litigated without threatening their disclosure" is dismissal the proper course. *Id.* at 1081 (quoting *El-Masri v. United States*, 479 F.3d 296, 308 (4th Cir. 2007)). Because there is a strong interest in allowing otherwise meritorious litigation to go forward, the court's inquiry into the need for

the secret information should be specific and tailored, not vague and general. *See id.* at 1081–82; *In re Sealed Case*, 494 F.3d 139, 144–54 (D.C. Cir. 2007).

Specifically, the *Reynolds* privilege will justify dismissal of the action in three circumstances: (1) if "the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence"; (2) if "the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim"; and (3) if "privileged evidence" is "inseparable from nonprivileged information that will be necessary to the claims or defenses" such that "litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083 (citations omitted). The district court assumed that Plaintiffs could make a prima facie case without resorting to state secrets evidence, but determined that the second and third circumstances exist in this case and require dismissal.

## B. The District Court's Dismissal of the Search Claims Based on the State Secrets Privilege

As a threshold matter, before determining whether FISA displaces the state secrets privilege with regard to electronic surveillance, we first consider which of Plaintiffs' claims might otherwise be subject to dismissal under the state secrets privilege. Although the Government expressly did not request dismissal of the Fourth Amendment and FISA claims based on the privilege, the district court nonetheless dismissed the Fourth Amendment claim on that basis. That was error.

The Government must formally claim the *Reynolds* privilege. *Reynolds*, 345 U.S. at 7–8. The privilege is "not

simply an administrative formality" that may be asserted by any official. *Jeppesen*, 614 F.3d at 1080 (quoting *United States v. W.R. Grace*, 526 F.3d 499, 507–08 (9th Cir. 2008) (en banc)). Rather, the formal claim must be "lodged by the head of the department which has control over the matter." *Reynolds*, 345 U.S. at 8. The claim must "reflect the certifying official's *personal* judgment; responsibility for [asserting the privilege] may not be delegated to lesser-ranked officials." *Jeppesen*, 614 F.3d at 1080. And the claim "must be presented in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege." *Id.* Such unusually strict procedural requirements exist because "[t]he privilege 'is not to be lightly invoked,'" especially when dismissal of the entire action is sought. *Id.* (quoting *Reynolds*, 345 U.S. at 7).

Here, although the Government has claimed the *Reynolds* privilege over certain state secrets, it has not sought dismissal of the Fourth Amendment and FISA claims based on its invocation of the privilege. In light of that position, the district court should not have dismissed those claims. In doing so, its decision was inconsistent with *Jeppesen*'s observation that, "[i]n evaluating the need for secrecy, 'we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena.'" 614 F.3d at 1081–82 (quoting *Al-Haramain I*, 507 F.3d at 1203). Just as the Executive is owed deference when it asserts that exclusion of the evidence or dismissal of the case is necessary to protect national security, so the Executive is necessarily also owed deference when it asserts that national security is not threatened by litigation.

Indeed, *Jeppesen* cautioned that courts should work "to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary." *Id.* at 1082 (quoting *Ellsberg v. Mitchell*, 709 F.2d 51, 58 (D.C. Cir. 1983)). Dismissing claims based on the privilege where the Government has expressly told the court it is not necessary to do so—and, in particular, invoking the privilege to dismiss, at the pleading stage, claims the Government has expressly told the court it need not dismiss on grounds of privilege—cuts directly against *Jeppesen*'s call for careful, limited application of the privilege.

Although the Government Defendants expressly did not request dismissal of the search claims under the state secrets privilege, the Agent Defendants did so request. In declining to seek dismissal of the search claims based on the state secrets privilege, the Government explained:

> At least at this stage of the proceedings, sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive motions to dismiss on non-privilege grounds. The FBI has previously disclosed in a separate criminal proceeding that Monteilh collected audio and video information for the FBI, and some of that audio and video information was produced in that prior case. The FBI has been reviewing additional audio and video collected by Monteilh for possible disclosure in connection with further proceedings on the issue of whether the FBI instructed or permitted Monteilh to leave recording devices unattended in order to collect non-consenting

communications. The FBI expects that the majority of the audio and video will be available in connection with further proceedings. Thus, while it remains possible that the need to protect properly privileged national security information might still foreclose litigation of these claims, at present the FBI and official capacity defendants do not seek to dismiss these claims based on the privilege assertion.

The Agent Defendants note that the Government focuses on the public disclosure of recordings collected by Monteilh, and point out that Plaintiffs also challenge surveillance conducted without Monteilh's involvement—namely, the planting of recording devices by FBI agents in Fazaga's office and AbdelRahim's home, car, and phone. Allegations concerning the planting of recording devices by FBI agents other than Monteilh, the Agent Defendants argue, are the "sources and methods" discussed in the Attorney General's invocation of the privilege. The Agent Defendants thus maintain that because the Government's reasons for not asserting the privilege over the search claims do not apply to all of the surveillance encompassed by the search claims, dismissal as to the search claims is in fact necessary.

The Agent Defendants, however, are not uniquely subject to liability for the planted devices. The Fourth Amendment claim against the Government Defendants likewise applies to that category of surveillance. *See infra* Part III.A. The Agent Defendants—officials sued in their individual capacities—are not the protectors of the state secrets evidence; the Government is. Accordingly, and because the Agent Defendants have not identified a reason they specifically

require dismissal to protect against the harmful disclosure of state secrets where the Government does not, we decline to accept their argument that the Government's dismissal defense must be expanded beyond the religion claims.[24]

In short, in determining *sua sponte* that particular claims warrant dismissal under the state secrets privilege, the district court erred. For these reasons, we will not extend FISA's procedures to challenges to the lawfulness of electronic surveillance to the degree the Government agrees that such challenges may be litigated in accordance with ordinary adversarial procedures without compromising national security.

## C.  FISA Displacement of the State Secrets Privilege

Before the enactment of FISA in 1978, foreign intelligence surveillance and the treatment of evidence implicating state secrets were governed purely by federal common law. Federal courts develop common law "in the absence of an applicable Act of Congress." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 (1981). "Federal common law is," however, "a 'necessary expedient' and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *Id.* (citation omitted). Once "the field has been made the subject of

---

[24] Although the Government may assert the state secrets privilege even when it is not a party to the case, *see Jeppesen*, 614 F.3d at 1080, we have not found—and the Agent Defendants have not cited—any case other than the one at hand in which a court granted dismissal under the privilege as to non-Government defendants, notwithstanding the Government's assertion that the claims at issue may be litigated with nonprivileged information.

comprehensive legislation or authorized administrative standards," federal common law no longer applies. *Id.* (quoting *Texas v. Pankey*, 441 F.2d 236, 241 (10th Cir. 1971)).

To displace federal common law, Congress need not "affirmatively proscribe[] the use of federal common law." *Id.* at 315. Rather, "to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). As we now explain, in enacting FISA, Congress displaced the common law dismissal remedy created by the *Reynolds* state secrets privilege as applied to electronic surveillance within FISA's purview.[25]

We have specifically held that because "the state secrets privilege is an evidentiary privilege rooted in federal common law . . . the relevant inquiry in deciding if [a statute] preempts the state secrets privilege is whether the statute '[speaks] *directly* to [the] question otherwise answered by federal common law.'" *Kasza*, 133 F.3d at 1167 (second and third alterations in original) (quoting *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236–37 (1985)).[26] Nonetheless, the Government maintains, in a vague and short paragraph in its brief, that Congress cannot displace the state secrets

---

[25] Our holding concerns only the *Reynolds* privilege, not the *Totten* justiciability bar.

[26] Applying this principle, *Kasza* concluded that section 6001 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6961, did not preempt the state secrets privilege as to RCRA regulatory material, as "the state secrets privilege and § 6001 have different purposes." 133 F.3d at 1168.

evidentiary privilege absent a clear statement, and that, because Plaintiffs cannot point to a clear statement, "principles of constitutional avoidance" require rejecting the conclusion that FISA's procedures displace the dismissal remedy of the state secrets privilege with regard to electronic surveillance.

In support of this proposition, the Government cites two out-of-circuit cases, *El-Masri v. United States*, 479 F.3d 296, and *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991). *El-Masri* does not specify a clear statement rule; it speaks generally about the constitutional significance of the state secrets privilege, while recognizing its common law roots. 479 F.3d at 303–04. *Armstrong* holds generally that the clear statement rule must be applied "to statutes that significantly alter the balance between Congress and the President," but does not apply that principle to the state secrets privilege. 924 F.2d at 289. So neither case is directly on point.

Under our circuit's case law, a clear statement in the sense of an explicit abrogation of the common law state secrets privilege is not required to decide that a statute displaces the privilege. Rather, if "the statute '[speaks] *directly* to [the] question otherwise answered by federal common law,'" that is sufficient. *Kasza*, 133 F.3d at 1167 (second and third alterations in original) (quoting *Oneida*, 470 U.S. at 236–37); *see also Texas*, 507 U.S. at 534. Although we, as a three-judge panel, could not hold otherwise, we would be inclined in any event to reject any clear statement rule more stringent than *Kasza*'s "speak directly to the question" requirement in this context.

The state secrets privilege may have "a constitutional 'core' or constitutional 'overtones,'" *In re NSA*, 564 F. Supp.

2d at 1124, but, at bottom, it is an evidentiary rule rooted in common law, *not* constitutional law. The Supreme Court has so emphasized, explaining that *Reynolds* "decided a purely evidentiary dispute by applying evidentiary rules." *Gen. Dynamics*, 563 U.S. at 485. To require express abrogation, by name, of the state secrets privilege would be inconsistent with the evidentiary roots of the privilege.

In any event, the text of FISA does speak quite directly to the question otherwise answered by the dismissal remedy sometimes required by the common law state secrets privilege. Titled "In camera and ex parte review by district court," § 1806(f) provides:

> Whenever a court or other authority is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter, *the United States district court or, where the motion is made before another authority, the United States district court in the same district as the authority, shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that*

*disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted.* In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

50 U.S.C. § 1806(f) (emphasis added).

The phrase "notwithstanding any other law," the several uses of the word "whenever," and the command that courts "*shall*" use the § 1806(f) procedures to decide the lawfulness of the surveillance if the Attorney General asserts that national security is at risk, confirm Congress's intent to make the *in camera* and *ex parte* procedure the exclusive procedure for evaluating evidence that threatens national security in the context of electronic surveillance-related determinations. *Id.* (emphasis added). That mandatory procedure necessarily overrides, on the one hand, the usual procedural rules precluding such severe compromises of the adversary process and, on the other, the state secrets evidentiary dismissal option. *See* H.R. Rep. No. 95-1283, pt. 1, at 91 (1978) ("It is to be emphasized that, although a number of different procedures might be used to attack the legality of the

surveillance, it is the procedures set out in subsections (f) and (g) 'notwithstanding any other law' that must be used to resolve the question.").[27]

The procedures set out in § 1806(f) are animated by the same concerns—threats to national security—that underlie the state secrets privilege. *See Jeppesen*, 614 F.3d at 1077, 1080. And they are triggered by a process—the filing of an affidavit under oath by the Attorney General—nearly identical to the process that triggers application of the state secrets privilege, a formal assertion by the head of the relevant department. *See id.* at 1080. In this sense, § 1806(f) "is, in effect, a 'codification of the state secrets privilege for purposes of relevant cases under FISA, as modified to reflect Congress's precise directive to the federal courts for the handling of [electronic surveillance] materials and information with purported national security implications.'" *Jewel*, 965 F. Supp. 2d at 1106 (quoting *In re NSA*, 564 F. Supp. 2d at 1119); *see also In re NSA*, 564 F. Supp. 2d at 1119 (holding that "the *Reynolds* protocol has no role where section 1806(f) applies"). That § 1806(f) requires *in camera* and *ex parte* review in the exact circumstance that could otherwise trigger dismissal of the case demonstrates that § 1806(f) supplies an alternative mechanism for the consideration of electronic state secrets evidence. Section 1806(f) therefore eliminates the need to dismiss the case entirely because of the absence of any legally sanctioned

---

[27] Whether "notwithstanding" language in a given statute should be understood to supersede all otherwise applicable laws or read more narrowly to override only previously existing laws depends on the overall context of the statute. *See United States v. Novak*, 476 F.3d 1041, 1046–47 (9th Cir. 2007) (en banc). Here, the distinction does not matter, as the *Reynolds* common law state secrets evidentiary privilege preceded the enactment of FISA.

mechanism for a major modification of ordinary judicial procedures—*in camera*, *ex parte* decisionmaking.

This conclusion is consistent with the overall structure of FISA. FISA does not concern Congress and the President alone. Instead, the statute creates "a comprehensive, detailed program to regulate foreign intelligence surveillance in the domestic context." *In re NSA*, 564 F. Supp. 2d at 1118. FISA "set[s] out in detail roles for all three branches of government, providing judicial and congressional oversight of the covert surveillance activities by the executive branch combined with measures to safeguard secrecy necessary to protect national security." *Id.* at 1115. And it provides rules for the executive branch to follow in "undertak[ing] electronic surveillance and physical searches for foreign intelligence purposes in the domestic sphere." *Id*.

Moreover, FISA establishes a special court to hear applications for and grant orders approving electronic surveillance under certain circumstances. *See* 50 U.S.C. § 1803. FISA also includes a private civil enforcement mechanism, *see id.* § 1810, and sets out a procedure by which courts should consider evidence that could harm the country's national security, *see id.* § 1806(f). The statute thus broadly involves the courts in the regulation of electronic surveillance relating to national security, while devising extraordinary, partially secret judicial procedures for carrying out that involvement. And Congress expressly declared that FISA, along with the domestic law enforcement electronic surveillance provisions of the Wiretap Act and the Stored Communications Act, are "the exclusive means by which electronic surveillance . . . may be conducted." 18 U.S.C. § 2511(2)(f).

The legislative history of FISA confirms Congress's intent to displace the remedy of dismissal for the common law state secrets privilege. FISA was enacted in response to "revelations that warrantless electronic surveillance in the name of national security ha[d] been seriously abused." S. Rep. No. 95-604, pt. 1, at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3908. The Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, a congressional task force formed in 1975 and known as the Church Committee, exposed the unlawful surveillance in a series of investigative reports. The Church Committee documented "a massive record of intelligence abuses over the years," in which "the Government ha[d] collected, and then used improperly, huge amounts of information about the private lives, political beliefs and associations of numerous Americans." S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 290 (1976). The Committee concluded that these abuses had "undermined the constitutional rights of citizens . . . primarily because checks and balances designed by the framers of the Constitution to assure accountability [were not] applied." *Id.* at 289.

Urging "fundamental reform," *id.* at 289, the Committee recommended legislation to "make clear to the Executive branch that it will not condone, and does not accept, any theory of inherent or implied authority to violate the Constitution," *id.* at 297. Observing that the Executive would have "no such authority after Congress has . . . covered the field by enactment of a comprehensive legislative charter" that would "provide the exclusive legal authority for domestic security activities," *id.* at 297, the Committee recommended that Congress create civil remedies for unlawful surveillance,

64                      FAZAGA V. WALLS

both to "afford effective redress to people who are injured by improper federal intelligence activity" and to "deter improper intelligence activity," *id.* at 336. Further, in recognition of the potential interplay between promoting accountability and ensuring security, the Committee noted its "belie[f] that the courts will be able to fashion discovery procedures, including inspection of material in chambers, and to issue orders as the interests of justice require, to allow plaintiffs with substantial claims to uncover enough factual material to argue their case, while protecting the secrecy of governmental information in which there is a legitimate security interest." *Id.* at 337.

FISA implemented many of the Church Committee's recommendations. In striking a careful balance between assuring the national security and protecting against electronic surveillance abuse, Congress carefully considered the role previously played by courts, and concluded that the judiciary had been unable effectively to achieve an appropriate balance through federal common law:

> [T]he development of the law regulating electronic surveillance for national security purposes has been uneven and inconclusive. This is to be expected where the development is left to the judicial branch in an area where cases do not regularly come before it. Moreover, the development of standards and restrictions by the judiciary with respect to electronic surveillance for foreign intelligence purposes accomplished through case law threatens both civil liberties and the national security because that development occurs generally in ignorance of the facts, circumstances, and techniques of foreign

> intelligence electronic surveillance not present in the particular case before the court. . . . [T]he tiny window to this area which a particular case affords provides inadequate light by which judges may be relied upon to develop case law which adequately balances the rights of privacy and national security.

H. Rep. No. 95-1283, pt. 1, at 21. FISA thus represents an effort to "provide effective, reasonable safeguards to ensure accountability and prevent improper surveillance," and to "strik[e] a fair and just balance between protection of national security and protection of personal liberties." S. Rep. No. 95-604, pt. 1, at 7.

In short, the procedures outlined in § 1806(f) "provide[] a detailed regime to determine whether surveillance 'was lawfully authorized and conducted,'" *Al-Haramain I*, 507 F.3d at 1205 (citing 50 U.S.C. § 1806(f)), and constitute "Congress's specific and detailed description for how courts should handle claims by the government that the disclosure of material relating to or derived from electronic surveillance would harm national security," *Jewel*, 965 F. Supp. 2d at 1106 (quoting *In re NSA*, 564 F. Supp. 2d at 1119). Critically, the FISA approach does not publicly expose the state secrets. It does severely compromise Plaintiffs' procedural rights, but not to the degree of entirely extinguishing potentially meritorious substantive rights.

### D. Applicability of FISA's § 1806(f) Procedures to Affirmative Legal Challenges to Electronic Surveillance

Having determined that, where they apply, § 1806(f)'s procedures displace a dismissal remedy for the *Reynolds* state secrets privilege, we now consider whether § 1806(f)'s procedures apply to the circumstances of this case.

By the statute's terms, the procedures set forth in § 1806(f) are to be used—where the Attorney General files the requisite affidavit—in the following circumstances:

> [w]henever a court or other authority is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter.

50 U.S.C. § 1806(f). From this text and the cross-referenced subsections, we derive three circumstances in which the *in camera* and *ex parte* procedures are to be used: when (1) a governmental body gives notice of its intent "to enter into evidence or otherwise use or disclose in *any* trial, hearing, or other proceeding in or before *any* court, department, officer,

agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance," *id.* § 1806(c) (emphases added);[28] (2) an aggrieved person moves to suppress the evidence, *id.* § 1806(e); or (3) an aggrieved person makes "any motion or request . . . pursuant to *any* other statute or rule . . . to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter," *id.* § 1806(f) (emphasis added).

The case at hand fits within the contemplated circumstances in two respects. First, although the Government has declined to confirm or deny in its public submissions that the information with respect to which it has invoked the state secrets privilege was obtained or derived from FISA-covered electronic surveillance of Plaintiffs, *see id.* § 1806(c), the complaint alleges that it was. The Attorney General's privilege assertion encompassed, among other things, "any information obtained during the course of" Operation Flex, the "results of the investigation," and "any results derived from" the "sources and methods" used in Operation Flex. It is precisely because the Government would like to use this information to defend itself that it has asserted the state secrets privilege. The district court's dismissal ruling was premised in part on the potential use of state secrets

---

[28] The text of § 1806(f) refers to notice "pursuant to subsection (c) *or* (d) of this section." 50 U.S.C. § 1806(f) (emphasis added). Section 1806(d) describes verbatim the same procedures as contained in § 1806(c), except as applied to States and political subdivisions rather than to the United States. *Id.* § 1806(d). For convenience, we refer only to § 1806(c) in this opinion, but our analysis applies to § 1806(d) with equal force.

material to defend the case. Because the district court made
the ruling after reviewing the surveillance materials, it is
aware whether the allegations in the complaint concerning
electronic surveillance are factually supported. Of course, if
they are not, then the district court can decide on remand that
the FISA procedures are inapplicable. For purposes of this
opinion, we proceed on the premise that the Attorney
General's invocation of the state secrets privilege relied on
the potential use of material obtained or derived from
electronic surveillance, as alleged in the complaint.

Second, in their prayer for relief, Plaintiffs have requested
injunctive relief "ordering Defendants to destroy or return any
information gathered through the unlawful surveillance
program by Monteilh and/or Operation Flex described above,
and any information derived from that unlawfully obtained
information." Plaintiffs thus have requested, in the
alternative, to "obtain" information gathered during or
derived from electronic surveillance. *See id.* § 1806(f).

The Government disputes that FISA applies to this case.
Its broader contention is that § 1806(f)'s procedures do not
apply to any affirmative claims challenging the legality of
electronic surveillance or the use of information derived from
electronic surveillance, whether brought under FISA's private
right of action or any other constitutional provision, statute,
or rule. Instead, the Government maintains, FISA's
procedures apply only when the government initiates the legal
action, while the state secrets privilege applies when the
government defends affirmative litigation brought by private
parties.

The plain text and statutory structure of FISA provide
otherwise. To begin, the language of the statute simply does

not contain the limitations the Government suggests. As discussed above, § 1806(f)'s procedures are to be used in any one of three situations, each of which is separated in the statute by an "or." *See id.* The first situation—when "the Government intends to enter into evidence or otherwise use or disclose information obtained or derived from an electronic surveillance . . . against an aggrieved person" in "*any* trial, hearing, or other proceeding," *id.* § 1806(c) (emphasis added)—unambiguously encompasses affirmative as well as defensive challenges to the lawfulness of surveillance.[29] The conduct governed by the statutory provision is the Government's intended entry into evidence or other use or disclosure of information obtained or derived from electronic surveillance. "[A]gainst an aggrieved person" refers to and modifies the phrase "any information obtained

---

[29] In full, § 1806(c) reads:

> Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this subchapter, the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

50 U.S.C. § 1806(c). Again, we refer to the text of § 1806(c) because § 1806(f)'s procedures apply "[w]henever a court or other authority is notified pursuant to subsection (c) or (d) of this section." *Id.* § 1806(f).

or derived." *Id*. As a matter of ordinary usage, the phrase "against an aggrieved person" cannot modify "any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States." *Id.* Evidence—such as "any information obtained or derived from an electronic surveillance"—can properly be said to be "against" a party. *See, e.g.*, U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be *a witness against himself* . . . ."); *Miranda v. Arizona*, 384 U.S. 436, 460 (1966) ("[O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce *the evidence against him* by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." (emphasis added)). But a "trial, hearing, or other proceeding" is not for or against either party; such a proceeding is just an opportunity to introduce evidence. Also, as the phrase is set off by commas, "against an aggrieved person" is grammatically a separate modifier from the list of proceedings contained in § 1806(f). Were the phrase meant to modify the various proceedings, there would be no intervening comma setting it apart.

The third situation—when a "motion or request is made by an aggrieved person pursuant to any other statute or rule . . . before any court . . . to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter," *id.* § 1806(f)—also by its plain text encompasses affirmative challenges to the legality of electronic surveillance. When an aggrieved person makes such a motion or request, or the government notifies the aggrieved person and the court that it intends to use or disclose information

obtained or derived from electronic surveillance, the statute requires a court to use § 1806(f)'s procedures "to determine whether the surveillance . . . was lawfully authorized and conducted." *Id*. In other words, a court must "determine whether the surveillance was authorized and conducted in a manner which did not violate any constitutional or statutory right." S. Rep. No. 95-604, pt. 1, at 57; *accord* S. Rep. No. 95-701, at 63.

The inference drawn from the text of § 1806 is bolstered by § 1810, which specifically creates a private right of action for an individual subjected to electronic surveillance in violation of FISA. FISA prohibits, for example, electronic surveillance of a U.S. person "solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 50 U.S.C. § 1805(a)(2)(A). Here, Plaintiffs allege they were surveilled solely on account of their religion. If true, such surveillance was necessarily unauthorized by FISA, and § 1810 subjects any persons who intentionally engaged in such surveillance to civil liability. It would make no sense for Congress to pass a comprehensive law concerning foreign intelligence surveillance, expressly enable aggrieved persons to sue for damages when that surveillance is unauthorized, *see id.* § 1810, and provide procedures deemed adequate for the review of national security-related evidence, *see id.* § 1806(f), but not intend for those very procedures to be used when an aggrieved person sues for damages under FISA's civil enforcement mechanism. Permitting a § 1810 claim to be dismissed on the basis of the state secrets privilege because the § 1806(f) procedures are unavailable would dramatically undercut the utility of § 1810 in deterring FISA violations. Such a dismissal also would undermine the overarching goal of FISA more broadly—"curb[ing] the practice by which the Executive

Branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it." S. Rep. No. 95-604, pt. 1, at 8.

FISA's legislative history confirms that § 1806(f)'s procedures were designed to apply in both civil and criminal cases, and to both affirmative and defensive use of electronic surveillance evidence. The Senate bill initially provided a single procedure for criminal and civil cases, while the House bill at the outset specified two separate procedures for determining the legality of electronic surveillance.[30] In the end, the conference committee adopted a slightly modified version of the Senate bill, agreeing "that an *in camera* and *ex parte* proceeding is appropriate for determining the lawfulness of electronic surveillance in both criminal and civil cases." H.R. Rep. No. 95-1720, at 32.

In the alternative, the Government suggests that § 1806(f)'s procedures for the use of electronic surveillance in litigation are limited to affirmative actions brought directly under § 1810. We disagree. The § 1806(f) procedures are expressly available, as well as mandatory, for affirmative claims brought "by an aggrieved person pursuant *to any . . .*

---

[30] Under the House bill, in criminal cases there would be an *in camera* proceeding, and the court could, but need not, disclose the materials relating to the surveillance to the aggrieved person "if there were a reasonable question as to the legality of the suveillance [sic] and if disclosure would likely promote a more accurate determination of such legality, or if disclosure would not harm the national security." H.R. Rep. No. 95-1720, at 31 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 4048, 4060. In civil suits, there would be an *in camera* and *ex parte* proceeding before a court of appeals, and the court would disclose to the aggrieved person the materials relating to the surveillance "only if necessary to afford due process to the aggrieved person." *Id.* at 32.

*statute or rule* of the United States . . . before any court . . . of the United States." 50 U.S.C. § 1806(f) (emphasis added). This provision was meant "to make very clear that these procedures apply *whatever* the underlying rule or statute" at issue, so as "to prevent these carefully drawn procedures from being bypassed by the inventive litigant using a new statute, rule or judicial construction." H.R. Rep. No. 95-1283, pt. 1, at 91 (emphasis added).

Had Congress wanted to limit the use of § 1806(f)'s procedures only to affirmative claims alleging lack of compliance with FISA itself, it could have so specified, as it did in § 1809 and § 1810. Section 1810 creates a private right of action only for violations of § 1809. 50 U.S.C. § 1810. Section 1809 prohibits surveillance not authorized by FISA, the Wiretap Act, the Stored Communications Act, and the pen register statute. *Id.* § 1809(a). That § 1809 includes only certain, cross-referenced statutes while § 1810 is limited to violations of § 1809 contrasts with the broad language of § 1806(f) as to the types of litigation covered—litigation "pursuant *to any . . . statute or rule* of the United States." *Id.* § 1806(f) (emphasis added).

Furthermore, if—as here—an aggrieved person brings a claim under § 1810 and a claim under another statute or the Constitution based on the same electronic surveillance as is involved in the § 1810 claim, it would make little sense for § 1806(f) to require the court to consider *in camera* and *ex parte* the evidence relating to electronic surveillance for purposes of the claim under § 1810 of FISA but not permit the court to consider the exact same evidence in the exact same way for purposes of the non-FISA claim. Once the information has been considered by a federal judge *in camera* and *ex parte*, any risk of disclosure—which Congress

necessarily considered exceedingly small or it would not have permitted such examination—has already been incurred. There would be no point in dismissing other claims because of that same concern.

We are not the first to hold that § 1806(f)'s procedures may be used to adjudicate claims beyond those arising under § 1810. The D.C. Circuit expressly so held in *ACLU Foundation of Southern California v. Barr*, 952 F.2d 457 (D.C. Cir. 1991):

> When a district court conducts a § 1806(f) review, its task is not simply to decide whether the surveillance complied with FISA. Section 1806(f) requires the court to decide whether the surveillance was "lawfully authorized and conducted." The Constitution is law. Once the Attorney General invokes § 1806(f), the respondents named in that proceeding therefore must present not only their statutory but also their constitutional claims for decision.

*Id.* at 465; *accord United States v. Johnson*, 952 F.2d 565, 571–73, 571 n.4 (1st Cir. 1991) (using § 1806(f)'s *in camera* and *ex parte* procedures to review constitutional challenges to FISA surveillance).

In sum, the plain language, statutory structure, and legislative history demonstrate that Congress intended FISA to displace the state secrets privilege and its dismissal remedy with respect to electronic surveillance. Contrary to the Government's contention, FISA's § 1806(f) procedures are to be used when an aggrieved person affirmatively challenges,

in any civil case, the legality of electronic surveillance or its use in litigation, whether the challenge is under FISA itself, the Constitution, or any other law.[31]

---

[31] The Agent Defendants suggest that using the § 1806 procedures would violate their Seventh Amendment jury trial right and their due process rights.

Any Seventh Amendment argument is premature. Any hypothetical interference with a jury trial would arise only if a series of contingencies occurred on remand. First, given our various rulings precluding certain of Plaintiffs' claims and the narrow availability of *Bivens* remedies under current law, there are likely to be few, if any, remaining *Bivens* claims against the Agent Defendants. *See infra* Part I; *supra* Part III.B; *supra* Part IV.B. Second, as to any remaining claims against the Agent Defendants, the district court might determine that there was no unlawful surveillance after reviewing the evidence under the *in camera*, *ex parte* procedures, or the Agent Defendants may prevail on summary judgment. Moreover, it is possible that the district court's determination of whether the surveillance was lawful will be a strictly legal decision—analogous to summary judgment—made on the record supplied by the government. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) (noting that procedural devices like summary judgment are not "inconsistent" with the Seventh Amendment).

Should the various contingencies occur and leave liability issues to be determined, the Agent Defendants are free at that time to raise their Seventh Amendment arguments on remand. But, as the Seventh Amendment issue was not decided by the district court, may never arise, and, if it does, may depend on the merits on exactly how it arises, we decline to address the hypothetical constitutional question now.

With respect to the Agent Defendants' due process arguments, we and other courts have upheld the constitutionality of FISA's *in camera* and *ex parte* procedures with regard to criminal defendants. *See United States v. Abu-Jihaad*, 630 F.3d 102, 117–29 (2d Cir. 2010); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *United States v. Ott*, 827 F.2d 473, 476–77, 477 n.5 (9th Cir. 1987); *United States v. Belfield*, 692 F.2d 141, 148–49 (D.C. Cir. 1982); *United States v. Nicholson*, 955 F. Supp.

### E.  Aggrieved Persons

We now consider more specifically whether FISA's § 1806(f) procedures may be used in this case. Because the procedures apply when evidence will be introduced "against an aggrieved person," 50 U.S.C. § 1806(c), and when "any motion or request is made by an aggrieved person," *id.* § 1806(f), Plaintiffs must satisfy the definition of an "aggrieved person," *see id.* § 1801(k).

We addressed the "aggrieved person" requirement in part in the discussion of Plaintiffs' § 1810 claim against the Agent Defendants. As we there explained, because Fazaga had a reasonable expectation of privacy in his office, and AbdelRahim had a reasonable expectation of privacy in his home, car, and phone, Plaintiffs are properly considered aggrieved persons as to those categories of surveillance. *See supra* Part I.C. And although we noted that the Agent Defendants are entitled to qualified immunity on Plaintiffs' FISA § 1810 claim with respect to the recording of conversation in the mosque prayer halls, Plaintiffs had a reasonable expectation of privacy in those conversations and thus are still properly considered aggrieved persons as to that category of surveillance as well. *See supra* Part I.B.

Again, because Plaintiffs are properly considered "aggrieved" for purposes of FISA, two of the situations referenced in § 1806(f) are directly applicable here. The Government intends to use "information obtained or derived from an electronic surveillance" against Plaintiffs, who are

---

588, 590–92, 590 n.3 (E.D. Va. 1997) (collecting cases). Individual defendants in a civil suit are not entitled to more stringent protections than criminal defendants.

"aggrieved person[s]." 50 U.S.C. § 1806(c). And Plaintiffs are "aggrieved person[s]" who have attempted "to discover or obtain applications or orders or other materials relating to electronic surveillance." *Id.* § 1806(f).

\*       \*       \*       \*

We next turn to considering whether the claims other than the FISA § 1810 claim must be dismissed for reasons independent of the state secrets privilege, limiting ourselves to the arguments for dismissal raised in Defendants' motions to dismiss.

## III.   Search Claims

In this part, we discuss (1) the Fourth Amendment injunctive relief claim against the official-capacity defendants; and (2) the Fourth Amendment *Bivens* claim against the Agent Defendants.

### A. Fourth Amendment Injunctive Relief Claim Against the Official-Capacity Defendants

The Government's primary argument for dismissal of the constitutional claims brought against the official-capacity defendants, including the Fourth Amendment claim, is that the injunctive relief sought—the expungement of all records unconstitutionally obtained and maintained—is unavailable under the Constitution. Not so.

We have repeatedly and consistently recognized that federal courts can order expungement of records, criminal

and otherwise, to vindicate constitutional rights.[32] The Privacy Act, 5 U.S.C. § 552a, which (1) establishes a set of practices governing the collection, maintenance, use, and dissemination of information about individuals maintained in records systems by federal agencies, and (2) creates federal claims for relief for violations of the Act's substantive provisions, does not displace the availability of expungement relief under the Constitution.[33] Previous cases involving

---

[32] *See, e.g.*, *United States v. Sumner*, 226 F.3d 1005, 1012 (9th Cir. 2000) ("A district court has the power to expunge a criminal record under . . . the Constitution itself."); *Burnsworth v. Gunderson*, 179 F.3d 771, 775 (9th Cir. 1999) (holding that expungement of an escape conviction from prison records was an appropriate remedy for a due process violation); *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) (explaining that expungement of unconstitutionally obtained medical records "would be an appropriate remedy for the alleged violation"); *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) (per curiam) (explaining that "recognized circumstances supporting expunction" include an unlawful or invalid arrest or conviction and government misconduct); *Fendler v. U.S. Parole Comm'n*, 774 F.2d 975, 979 (9th Cir. 1985) ("Federal courts have the equitable power 'to order the expungement of Government records where *necessary* to vindicate rights secured by the Constitution or by statute.'" (quoting *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975))); *Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982) ("It is well settled that the federal courts have inherent equitable power to order 'the expungement of local arrest records as an appropriate remedy in the wake of police action in violation of constitutional rights.'" (quoting *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973))); *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) ("It is established that the federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights." (quoting *United States v. McMains*, 540 F.2d 387, 389 (8th Cir. 1976))).

[33] The cases cited by the Government to the contrary are inapposite. *See City of Milwaukee*, 451 U.S. at 314–16 (addressing the congressional displacement of federal common law through legislation, not the elimination of injunctive remedies available under the Constitution); *Bush*

claims brought under both the Privacy Act and the Constitution did not treat the Privacy Act as displacing a constitutional claim, but instead analyzed the claims separately.[34] And the circuits that have directly considered whether the Privacy Act displaces parallel constitutional remedies have all concluded that a plaintiff may pursue a remedy under both the Constitution and the Privacy Act.[35]

In addition to its Privacy Act displacement theory, the Government contends that even if expungement relief is otherwise available under the Constitution, it is not available

_v. Lucas_, 462 U.S. 367, 386–88 (1983) (discussing preclusion of a _Bivens_ claim for damages where Congress had already designed a comprehensive remedial scheme, not whether a statute can displace a recognized constitutional claim for injunctive relief); _Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice_, 331 F.3d 918, 936–37 (D.C. Cir. 2003) (discussing the displacement of a common law right of access to public records by the Freedom of Information Act in a case not involving the Privacy Act or a claim for injunctive relief from an alleged ongoing constitutional violation).

[34] _See Hewitt v. Grabicki_, 794 F.2d 1373, 1377, 1380 (9th Cir. 1986) (addressing separately a claim for damages under the Privacy Act and a procedural due process claim); _Fendler_, 774 F.2d at 979 (considering a prisoner's Privacy Act claims and then, separately, his claim for expungement relief under the Constitution).

[35] _See Abdelfattah v. U.S. Dep't of Homeland Sec._, 787 F.3d 524, 534 (D.C. Cir. 2015) ("We have repeatedly recognized a plaintiff may request expungement of agency records for both violations of the Privacy Act and the Constitution."); _Clarkson v. IRS_, 678 F.2d 1368, 1376 n.13 (11th Cir. 1982) ("[W]e of course do not intend to suggest that the enactment of the Privacy Act in any way precludes a plaintiff from asserting a constitutional claim for violation of his privacy or First Amendment rights. Indeed, several courts have recognized that a plaintiff is free to assert both Privacy Act and constitutional claims.").

here, as Plaintiffs "advance no plausible claim of an ongoing constitutional violation." Again, we disagree.

This court has been clear that a determination that records were obtained and retained in violation of the Constitution supports a claim for expungement relief of existing records so obtained. As *Norman-Bloodsaw* explained:

> Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing "effect" of the allegedly unconstitutional and discriminatory testing, and expungement of the test results would be an appropriate remedy for the alleged violation. . . . At the very least, the retention of undisputedly intimate medical information obtained in an unconstitutional and discriminatory manner would constitute a continuing "irreparable injury" for purposes of equitable relief.

135 F.3d at 1275; *see also Wilson v. Webster*, 467 F.2d 1282, 1283–84 (9th Cir. 1972) (holding that plaintiffs had a right to show that records of unlawful arrests "should be expunged, for their continued existence may seriously and unjustifiably serve to impair fundamental rights of the persons to whom they relate").

In short, expungement relief is available under the Constitution to remedy the alleged constitutional violations.[36] Because the Government raises no other argument for dismissal of the Fourth Amendment injunctive relief claim, it should not have been dismissed.

## B. Fourth Amendment *Bivens* Claim Against the Agent Defendants

Alleging that the Agent Defendants violated the Fourth Amendment, Plaintiffs seek monetary damages directly under the Constitution under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Id.* at 70.

*Bivens* itself concerned a Fourth Amendment violation by federal officers. As we have recognized, a Fourth Amendment damages claim premised on unauthorized electronic surveillance by FBI agents and their surrogates "fall[s] directly within the coverage of *Bivens*." *Gibson v. United States*, 781 F.2d 1334, 1341 (9th Cir. 1986); *see also Mitchell v. Forsyth*, 472 U.S. 511, 513 (1985) (considering, under *Bivens*, an alleged "warrantless wiretap" conducted in violation of the Fourth Amendment). Recent cases, however, have severely restricted the availability of *Bivens* actions for

---

[36] We do not at this stage, of course, address whether Plaintiffs are actually entitled to such a remedy.

new claims and contexts. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1856–57 (2017).[37]

Here, the substance of Plaintiffs' Fourth Amendment *Bivens* claim is identical to the allegations raised in their FISA § 1810 claim. Under our rulings regarding the reach of the § 1806(f) procedures, almost all of the search-and-seizure allegations will be subject to those procedures. Thus, regardless of whether a *Bivens* remedy is available, Plaintiffs' underlying claim—that the Agent Defendants engaged in unlawful electronic surveillance violative of the Fourth Amendment—would proceed in the same way.

Moreover, if the Fourth Amendment *Bivens* claim proceeds, the Agent Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment *Bivens* claim to the same extent they are entitled to qualified immunity on Plaintiffs' FISA claim. In both instances, the substantive law derives from the Fourth Amendment, and in both instances, government officials in their individual capacity are subject to liability for damages only if they violated a clearly established right to freedom from governmental intrusion where an individual has a reasonable expectation of privacy. *See supra* Part I.B. Under our earlier rulings, the FISA search-and-seizure allegations may proceed against only two of the Agent Defendants, and only with respect to a narrow aspect of the alleged surveillance.

In light of the overlap between the *Bivens* claim and the narrow range of the remaining FISA claim against the Agent Defendants that can proceed, it is far from clear that Plaintiffs

---

[37] The parties have not briefed before us the impact of *Abbasi* on the *Bivens* claims.

will continue to press this claim. We therefore decline to address whether Plaintiffs' *Bivens* claim remains available after the Supreme Court's decision in *Abbasi*. On remand, the district court may determine—if necessary—whether a *Bivens* remedy is appropriate for any Fourth Amendment claim against the Agent Defendants.

## IV.    Religion Claims

The other set of Plaintiffs' claims arise from their allegation that they were targeted for surveillance solely because of their religion.[38] In this part, we discuss Plaintiffs' (1) First and Fifth Amendment injunctive relief claims against the official-capacity defendants; (2) First and Fifth Amendment *Bivens* claims against the Agent Defendants; (3) § 1985(3) claims for violations of the Free Exercise Clause, Establishment Clause, and equal protection guarantee; (4) RFRA claim; (5) Privacy Act claim; and (6) FTCA claims. Our focus throughout is whether there are grounds for dismissal independent of the Government's invocation of the state secrets privilege.

### A. First Amendment and Fifth Amendment Injunctive Relief Claims Against the Official-Capacity Defendants

Plaintiffs maintain that it violates the First Amendment's Religion Clauses and the equal protection component of the Fifth Amendment for the Government to target them for surveillance because of their adherence to and practice of

---

[38] The operative complaint alleges as a factual matter that Plaintiffs were surveilled solely because of their religion. We limit our legal discussion to the facts there alleged.

Islam. The Government does not challenge the First and Fifth Amendment claims substantively. It argues only that injunctive relief is unavailable and that litigating the claims is not possible without risking the disclosure of state secrets. We have already concluded that injunctive relief, including expungement, is available under the Constitution where there is a substantively viable challenge to government action, *see supra* Part III.A, and that dismissal because of the state secrets concern was improper because of the availability of the § 1806(f) procedures, *see supra* Part II. Accordingly, considering only the arguments put forward by the Government, we conclude that the First and Fifth Amendment claims against the official-capacity defendants may go forward.

## B. First Amendment and Fifth Amendment *Bivens* Claims Against the Agent Defendants

Plaintiffs seek monetary damages directly under the First Amendment's Establishment and Free Exercise Clauses and the equal protection component of the Fifth Amendment's Due Process Clause, relying on *Bivens v. Six Unknown Named Agents*.

We will not recognize a *Bivens* claim where there is "'any alternative, existing process for protecting' the plaintiff's interests." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1120 (9th Cir. 2009) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). The existence of such an alternative remedy raises the inference that Congress "'expected the Judiciary to stay its *Bivens* hand' and 'refrain from providing a new and freestanding remedy in damages.'" *Id.* (quoting *Wilkie*, 551 U.S. at 550, 554); *see also Abbasi*, 137 S. Ct. at 1863; *Schweiker v. Chilicky*, 487 U.S. 412, 423

(1988). Accordingly, we "refrain[] from creating a judicially implied remedy even when the available statutory remedies 'do not provide complete relief' for a plaintiff that has suffered a constitutional violation." *W. Radio Servs.*, 578 F.3d at 1120 (quoting *Malesko*, 534 U.S. at 69). As long as "an avenue for some redress" exists, "bedrock principles of separation of powers forclose[s] judicial imposition of a new substantive liability.'" *Id.* (alteration in original) (quoting *Malesko*, 534 U.S. at 69).

Here, we conclude that the Privacy Act, 5 U.S.C. § 552a, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, taken together, provide an alternative remedial scheme for some, but not all, of Plaintiffs' First and Fifth Amendment *Bivens* claims. As to the remaining *Bivens* claims, we remand to the district court to decide whether a *Bivens* remedy is available in light of the Supreme Court's decision in *Abbasi*.

As to the collection and maintenance of records, Plaintiffs could have, and indeed did, challenge the FBI's surveillance of them under the Privacy Act's remedial scheme. Again, the Privacy Act, 5 U.S.C. § 552a, creates a set of rules governing how such records should be kept by federal agencies. *See supra* Part III.A. Under § 552a(e)(7), an "agency that maintains a system of records shall maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."[39] When an agency fails to comply with

---

[39] The term "maintain" is defined to mean "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3).

§ 552a(e)(7), an individual may bring a civil action against the agency for damages. *Id.* § 552a(g)(1)(D), (g)(4). Thus, § 552a(e)(7) limits the government's ability to collect, maintain, use, or disseminate information on an individual's religious activity protected by the First Amendment's Religion Clauses.

We have not addressed the availability of a *Bivens* action where the Privacy Act may be applicable. But two other circuits have, and both held that the Privacy Act supplants *Bivens* claims for First and Fifth Amendment violations. *See Wilson v. Libby*, 535 F.3d 697, 707–08 (D.C. Cir. 2008) (holding, in response to claims alleging harm from the improper disclosure of information subject to the Privacy Act's protections, that the Privacy Act is a comprehensive remedial scheme that precludes an additional *Bivens* remedy); *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696 & n.7 (6th Cir. 2002) (holding that the Privacy Act displaces *Bivens* for claims involving the creation, maintenance, and dissemination of false records by federal agency employees). We agree with the analyses in *Wilson* and *Downie*.

Although the Privacy Act provides a remedy only against the FBI, not the individual federal officers, the lack of relief against some potential defendants does not disqualify the Privacy Act as an alternative remedial scheme. Again, a *Bivens* remedy may be foreclosed "even when the available statutory remedies 'do not provide complete relief' for a plaintiff," as long as "the plaintiff ha[s] an avenue for *some* redress." *W. Radio Servs.*, 578 F.3d at 1120 (alteration in original) (emphasis added) (quoting *Malesko*, 534 U.S. at 69). Thus, to the extent that Plaintiffs' *Bivens* claims involve improper collection and retention of agency records, the Privacy Act precludes such *Bivens* claims.

As to religious discrimination more generally, we conclude that RFRA precludes some, but not all, of Plaintiffs' *Bivens* claims. RFRA provides that absent a "compelling governmental interest" and narrow tailoring, 42 U.S.C. § 2000bb-1(b), the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." *Id.* § 2000bb-1(a). The statute was enacted "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* § 2000bb(b)(2). It therefore provided that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c). RFRA thus provides a means for Plaintiffs to seek relief for the alleged burden of the surveillance itself on their exercise of their religion.

RFRA does not, however, provide an alternative remedial scheme for all of Plaintiffs' discrimination-based *Bivens* claims. RFRA was enacted in response to *Employment Division v. Smith*, 494 U.S. 872 (1990), which, in Congress's view, "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4). Accordingly, "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened," *id.* § 2000bb(b)(1), RFRA directs its focus on "rule[s] of general applicability" that "substantially burden a person's exercise of religion," *id.* § 2000bb-1(a).

Here, many of Plaintiffs' allegations relate not to neutral and generally applicable government action, but to conduct

motivated by intentional discrimination against Plaintiffs because of their Muslim faith. Regardless of the magnitude of the burden imposed, "if the object of a law is to infringe upon or restrict practices *because* of their religious motivation, the law is not neutral" and "is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (emphasis added). It is the Free Exercise Clause of the First Amendment—not RFRA— that imposes this requirement.

Moreover, by its terms, RFRA applies only to the "free exercise of religion," 42 U.S.C. § 2000bb(a)(1); indeed, it expressly disclaims any effect on "that portion of the First Amendment prohibiting laws respecting the establishment of religion," *id.* § 2000bb-4. But intentional religious discrimination is "subject to heightened scrutiny whether [it] arise[s] under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (citations omitted). Here, Plaintiffs have raised religion claims based on all three constitutional provisions. Because RFRA does not provide an alternative remedial scheme for protecting these interests, we conclude that RFRA does not preclude Plaintiffs' religion-based *Bivens* claims.

We conclude that the Privacy Act and RFRA, taken together, function as an alternative remedial scheme for protecting some, but not all, of the interests Plaintiffs seek to vindicate via their First and Fifth Amendment *Bivens* claims. The district court never addressed whether a *Bivens* remedy is available for any of the religion claims because it dismissed the claims in their entirety based on the state secrets privilege. In addition, *Abbasi* has now clarified the standard for

determining when a *Bivens* remedy is available for a particular alleged constitutional violation. And, as we have explained, the scope of the religion claims to which a *Bivens* remedy might apply is considerably narrower than those alleged, given the partial displacement by the Privacy Act and RFRA. If asked, the district court should determine on remand, applying *Abbasi*, whether a *Bivens* remedy is available to the degree the damages remedy is not displaced by the Privacy Act and RFRA.

## C. 42 U.S.C. § 1985(3) Claims Against the Agent Defendants

Plaintiffs allege that the Agent Defendants conspired to deprive Plaintiffs of their rights under the First Amendment's Establishment and Free Exercise Clauses and the due process guarantee of the Fifth Amendment, in violation of 42 U.S.C. § 1985(3).

To state a violation of § 1985(3), Plaintiffs must "allege and prove four elements":

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983). The Defendants attack

these claims on various grounds, but we reach only one—whether § 1985(3) conspiracies among employees of the same government entity are barred by the intracorporate conspiracy doctrine.

*Abbasi* makes clear that intracorporate liability was not clearly established at the time of the events in this case and that the Agent Defendants are therefore entitled to qualified immunity from liability under § 1985(3). *See* 137 S. Ct. at 1866.

In *Abbasi*, men of Arab and South Asian descent detained in the aftermath of September 11 sued two wardens of the federal detention center in Brooklyn in which they were held, along with several high-level Executive Branch officials who were alleged to have authorized their detention. *Id.* at 1853. They alleged, among other claims, a conspiracy among the defendants to deprive them of the equal protection of the laws under § 1985(3).[40] *Id.* at 1853–54. *Abbasi* held that, even assuming these allegations to be "true and well pleaded," the defendants were entitled to qualified immunity on the § 1985(3) claim. *Id.* at 1866–67. It was not "clearly established" at the time, the Court held, that the intracorporate conspiracy doctrine did not bar § 1985(3) liability for employees of the same government department who conspired among themselves. *Id.* at 1867–68. "[T]he fact that the courts are divided as to whether or not a § 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on the point is not well established." *Id.* at 1868. "[R]easonable

---

[40] Specifically, Plaintiffs alleged that these officials "conspired with one another to hold respondents in harsh conditions because of their actual or apparent race, religion, or national origin." *Abbasi*, 137 S. Ct. at 1854.

officials in petitioners' positions would not have known, and
could not have predicted, that § 1985(3) prohibited their joint
consultations." *Id.* at 1867. The Court declined, however, to
resolve the issue on the merits. *Id.*

*Abbasi* controls. Although the underlying facts here differ
from those in *Abbasi*, the dispositive issue here, as in *Abbasi*,
is whether the Agent Defendants could reasonably
have known that agreements entered into or agreed-upon policies
devised with other employees of the FBI could subject them
to conspiracy liability under § 1985(3). At the time Plaintiffs
allege they were surveilled, neither this court nor the Supreme
Court had held that an intracorporate agreement could subject
federal officials to liability under § 1985(3), and the circuits
that had decided the issue were split.[41] There was therefore,
as in *Abbasi*, no clearly established law on the question. As
the Agent Defendants are entitled to qualified immunity on
the § 1985(3) allegations in the complaint, we affirm their
dismissal on that ground.

---

[41] Two circuits have held that the intracorporate conspiracy doctrine
does not extend to civil rights cases. *See Brever v. Rockwell Int'l Corp.*,
40 F.3d 1119, 1127 (10th Cir. 1994); *Novotny v. Great Am. Fed. Sav. &
Loan Ass'n*, 584 F.2d 1235, 1257–58 (3d Cir. 1978) (en banc), *vacated on
other grounds*, 442 U.S. 366 (1979); *see also Stathos v. Bowden*, 728 F.2d
15, 20–21 (1st Cir. 1984) (expressing "doubt" that the intracorporate
conspiracy doctrine extends to conspiracy under § 1985(3)). The majority
of the circuits have reached a contrary result. *See Hartline v. Gallo*,
546 F.3d 95, 99 n.3 (2d Cir. 2008); *Meyers v. Starke*, 420 F.3d 738, 742
(8th Cir. 2005); *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761,
767–68 (11th Cir. 2000); *Benningfield v. City of Houston*, 157 F.3d 369,
378 (5th Cir. 1998); *Wright v. Ill. Dep't of Children & Family Servs.*,
40 F.3d 1492, 1508 (7th Cir. 1994); *Hull v. Cuyahoga Valley Joint
Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509–10 (6th Cir. 1991);
*Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985).

### D. Religious Freedom Restoration Act Claim Against the Agent Defendants and Government Defendants

Plaintiffs allege that the Defendants violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, by substantially burdening Plaintiffs' exercise of religion, and did so neither in furtherance of a compelling governmental interest nor by adopting the least restrictive means of furthering any such interest. The Government Defendants offer no argument for dismissal of the RFRA claim other than the state secrets privilege. The Agent Defendants, however, contend that they are entitled to qualified immunity on the RFRA claim because Plaintiffs failed to plead a substantial burden on their religion, and if they did so plead, no clearly established law supported that conclusion at the relevant time.[42]

To establish a prima facie claim under RFRA, a plaintiff must "present evidence sufficient to allow a trier of fact rationally to find the existence of two elements." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). "First, the activities the plaintiff claims are

---

[42] The parties do not dispute that qualified immunity is an available defense to a RFRA claim. We therefore assume it is. *See Padilla v. Yoo*, 678 F.3d 748, 768 (9th Cir. 2012); *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012).

Tidwell and Walls also contend that Plaintiffs' RFRA claim was properly dismissed because RFRA does not permit damages suits against individual-capacity defendants. Because we affirm dismissal on another ground, we do not reach that issue. We note, however, that at least two other circuits have held that damages are available for RFRA suits against individual-capacity defendants. *See Tanvir v. Tanzin*, 894 F.3d 449, 467 (2d Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 302 (3d Cir. 2016).

burdened by the government action must be an 'exercise of religion.'" *Id.* (quoting 42 U.S.C. § 2000bb-1(a)). "Second, the government action must 'substantially burden' the plaintiff's exercise of religion." *Id.* Once a plaintiff has established those elements, "the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a 'compelling governmental interest' and is implemented by 'the least restrictive means.'" *Id.* (quoting 42 U.S.C. § 2000bb-1(b)).

"Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions . . . ." *Id.* at 1069–70; *see also Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016). An effect on an individual's "subjective, emotional religious experience" does not constitute a substantial burden, *Navajo Nation*, 535 F.3d at 1070, nor does "a government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion," *id.* at 1063.

Plaintiffs do allege that they altered their religious practices as a result of the FBI's surveillance: Malik trimmed his beard, stopped regularly wearing a skull cap, decreased his attendance at the mosque, and became less welcoming to newcomers than he believes his religion requires. AbdelRahim "significantly decreased his attendance to mosque," limited his donations to mosque institutions, and became less welcoming to newcomers than he believes his religion requires. Fazaga, who provided counseling at the mosque as an imam and an intern therapist, stopped

counseling congregants at the mosque because he feared the conversations would be monitored and thus not confidential.

But it was not clearly established in 2006 or 2007 that covert surveillance conducted on the basis of religion would meet the RFRA standards for constituting a substantial religious burden on individual congregants. There simply was no case law in 2006 or 2007 that would have put the Agent Defendants on notice that covert surveillance on the basis of religion could violate RFRA. And at least two cases from our circuit could be read to point in the opposite direction, though they were brought under the First Amendment's Religion Clauses rather than under RFRA. *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1394 (9th Cir. 1994); *Presbyterian Church*, 870 F.2d at 527.[43]

*Presbyterian Church* concerned an undercover investigation by INS of the sanctuary movement. 870 F.2d at 520. Over nearly a year, several INS agents infiltrated four churches in Arizona, attending and secretly recording church services. *Id*. The covert surveillance was later publicly disclosed in the course of criminal proceedings against individuals involved with the sanctuary movement. *Id*. The four churches brought suit, alleging a violation of their right to free exercise of religion. *Id*. We held that the individual

---

[43] *Presbyterian Church* predates *Employment Division v. Smith*, which declined to use the compelling interest test from *Sherbert v. Verner*, 374 U.S. 398 (1963). *Smith*, 494 U.S. at 883–85. The other case, *Vernon*, postdates RFRA, which in 1993 restored *Sherbert*'s compelling interest test. *See* 27 F.3d at 1393 n.1; *see also* 42 U.S.C. § 2000bb(b). Although the compelling interest balancing test was in flux during this period, the notion that a burden on religious practice was required to state a claim was not. RFRA continued the same substantial burden standard as was required by the constitutional cases. *See Vernon*, 27 F.3d at 1393.

INS agents named as defendants were entitled to qualified immunity because there was "no support in the preexisting case law" to suggest that "it must have been apparent to INS officials that undercover electronic surveillance of church services without a warrant and without probable cause violated the churches' clearly established rights under the First . . . Amendment[]." *Id.* at 527.

In *Vernon*, the Los Angeles Police Department ("LAPD") investigated Vernon, the Assistant Chief of Police of the LAPD, in response to allegations that Vernon's religious beliefs had interfered with his ability or willingness to fairly perform his official duties. 27 F.3d at 1389. Vernon filed a § 1983 action, maintaining that the preinvestigation activities and the investigation itself violated the Free Exercise Clause. *Id.* at 1390. In his complaint, Vernon alleged that the investigation "chilled [him] in the exercise of his religious beliefs, fearing that he can no longer worship as he chooses, consult with his ministers and the elders of his church, participate in Christian fellowship and give public testimony to his faith without severe consequences." *Id.* at 1394. We held that Vernon failed to demonstrate a substantial burden on his religious observance and so affirmed the district court's dismissal of his free exercise claim. *Id.* at 1395. We noted that Vernon "failed to show any concrete and demonstrable injury." *Id*. "Vernon complain[ed] that the existence of a government investigation has discouraged him from pursuing his personal religious beliefs and practices—in other words, mere subjective chilling effects with neither 'a claim of specific present objective harm [n]or a threat of specific future harm.'" *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)).

*Vernon* and *Presbyterian Church* were decided before the surveillance Plaintiffs allege substantially burdened their exercise of religion. Both cases cast doubt upon whether surveillance such as that alleged here constitutes a substantial burden upon religious practice. There is no pertinent case law indicating otherwise. It was therefore not clearly established in 2006 or 2007 that Defendants' actions violated Plaintiffs' freedom of religion, protected by RFRA.[44]

As to the Agent Defendants, therefore, we affirm the dismissal of the RFRA claim. But because the Government Defendants are not subject to the same qualified immunity analysis and made no arguments in support of dismissing the RFRA claim other than the state secrets privilege, we hold that the complaint substantively states a RFRA claim against the Government Defendants.[45]

---

[44] These cases may not, however, entitle the Agent Defendants to qualified immunity as to claims involving *intentional* discrimination based on Plaintiffs' religion. As we noted, *see supra* Part IV.B, we are not deciding whether there is an available *Bivens* action for those claims. As we decline to anticipate whether Plaintiffs will pursue their *Bivens* claims on the religious discrimination issues and, if so, whether the claims will be allowed to go forward, we leave any surviving qualified immunity issue for the district court to decide in the first instance.

[45] We do not address any other defenses the Government Defendants may raise before the district court in response to Plaintiffs' RFRA claim.

## E.  Privacy Act Claim Against the FBI

Plaintiffs allege that the FBI violated the Privacy Act, 5 U.S.C. § 552a(e)(7),[46] by collecting and maintaining records describing how Plaintiffs exercised their First Amendment rights. As a remedy, Plaintiffs seek only injunctive relief ordering the destruction or return of unlawfully obtained information. *Cell Associates, Inc. v. National Institutes of Health*, 579 F.2d 1155 (9th Cir. 1978), which interpreted the scope of Privacy Act remedies, precludes such injunctive relief.

The "Civil remedies" section of the Privacy Act, 5 U.S.C. § 552a(g), lists four types of agency misconduct and the remedies applicable to each. The statute expressly provides that injunctive relief is available when an agency improperly denies a request to amend or disclose an individual's record, *see* 5 U.S.C. § 552a(g)(1)(A), (2)(A), (1)(B), (3)(A), but provides only for damages when the agency "fails to maintain any record" with the "accuracy, relevance, timeliness, and completeness" required for fairness, *id.* § 552a(g)(1)(C), or if the agency "fails to comply with any other provision" of the Privacy Act, *id.* § 552a(g)(1)(D). *See id.* § 552a(g)(4). *Cell Associates* concluded that this distinction was purposeful—that is, that Congress intended to limit the availability of injunctive relief to the categories of agency

---

[46] The header to Plaintiffs' Eighth Cause of Action reads broadly, "Violation of the Privacy Act, 5 U.S.C. § 552a(a)–(*l*)." As actually pleaded and briefed, however, the substance of Plaintiffs' Privacy Act claim is limited to § 552a(e)(7). The complaint states that "Defendant FBI . . . collected and maintained records . . . in violation of 5 U.S.C. § 552a(e)(7)." And Plaintiffs' reply brief states that they "seek expungement . . . under 5 U.S.C. § 552a(e)(7)."

misconduct for which injunctive relief was specified as a remedy:

> The addition of a right to injunctive relief for one type of violation, coupled with the failure to provide injunctive relief for another type of violation, suggests that Congress knew what it was about and intended the remedies specified in the Act to be exclusive. While the right to damages might seem an inadequate safeguard against unwarranted disclosures of agency records, we think it plain that Congress limited injunctive relief to the situations described in 5 U.S.C. § 552a(g)(1)(A) and (2) and (1)(B) and (3).

579 F.2d at 1161.

A violation of § 552a(e)(7) falls within the catch-all remedy provision, applicable if the agency "fails to comply with any other provision" of the Privacy Act. 5 U.S.C. § 552a(g)(1)(D). As the statute does not expressly provide for injunctive relief for a violation of this catch-all provision, *Cell Associates* precludes injunctive relief for a violation of § 552a(e)(7).

Plaintiffs attempt to avoid the precedential impact of *Cell Associates* on the ground that it "nowhere mentions Section 552a(e)(7)." That is so, but the holding of *Cell Associates* nonetheless applies directly to this case. The Privacy Act specifies that injunctive relief *is* available for violations of some provisions of the Act, but not for a violation of § 552a(e)(7). Under *Cell Associates*, Plaintiffs cannot obtain

injunctive relief except for violations as to which such relief is specifically permitted.[47]

Plaintiffs' complaint expressly provides that "[t]he FBI is sued for injunctive relief only." Accordingly, because their sole requested remedy is unavailable, Plaintiffs fail to state a claim under the Privacy Act.

## F.  FTCA Claims

The FTCA constitutes a waiver of sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "State substantive law applies" in FTCA actions. *Liebsack v. United States*, 731 F.3d 850, 856 (9th Cir. 2013). If an individual federal employee is sued, the United States shall, given certain conditions are satisfied, "be substituted as the party defendant." 28 U.S.C. § 2679(d)(1).

Plaintiffs allege that the United States is liable under the FTCA for invasion of privacy under California law, violation of the California constitutional right to privacy, violation of California Civil Code § 52.1, and intentional infliction of emotional distress. We first consider Defendants' jurisdictional arguments, and then discuss their implications for the substantive FTCA claims.

---

[47] Plaintiffs also argue that *MacPherson v. IRS*, 803 F.2d 479 (9th Cir. 1986) is "binding Ninth Circuit authority . . . [that] makes clear that courts have authority to order expungement of records maintained in violation of its [§ 552a(e)(7)] requirements." But *MacPherson* does not state whether the plaintiff there sought injunctive relief and so is unclear on this point.

### 1. *FTCA Judgment Bar*

The FTCA's judgment bar provides that "[t]he judgment in an action under [the FTCA] shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. The judgment bar provision has no application here.

The judgment bar provision precludes claims against individual defendants in two circumstances: (1) where a plaintiff brings an FTCA claim against the government and non-FTCA claims against individual defendants in the same action and obtains a judgment against the government, *see Kreines v. United States*, 959 F.2d 834, 838 (9th Cir. 1992); and (2) where the plaintiff brings an FTCA claim against the government, judgment is entered in favor of either party, and the plaintiff then brings a subsequent non-FTCA action against individual defendants, *see Gasho v. United States*, 39 F.3d 1420, 1437–38 (9th Cir. 1994); *Ting v. United States*, 927 F.2d 1504, 1513 n.10 (9th Cir. 1991). The purposes of this judgment bar are "to prevent dual recoveries," *Kreines*, 959 F.2d at 838, to "serve[] the interests of judicial economy," and to "foster more efficient settlement of claims," by "encourag[ing plaintiffs] to pursue their claims concurrently in the same action, instead of in separate actions," *Gasho*, 39 F.3d at 1438.

Neither of those two circumstances, nor their attendant risks, is present here. Plaintiffs brought their FTCA claim, necessarily, against the United States, and their non-FTCA claims against the Agent Defendants, in the same action. They have not obtained a judgment against the government. *Kreines* held that "an FTCA judgment in favor of the

government did not bar the *Bivens* claim [against individual employees] when the judgments are 'contemporaneous' and part of the same action." *Gasho*, 39 F.3d at 1437 (quoting *Kreines*, 959 F.2d at 838). By "contemporaneous," *Kreines* did not require that judgments on the FTCA and other claims be entered simultaneously, but rather that they result from the same action.

The FTCA's judgment bar does not operate to preclude Plaintiffs' claims against the Agent Defendants.

### 2.  FTCA Discretionary Function Exception

The discretionary function exception provides that the FTCA shall not apply to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, . . . or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "[G]overnmental conduct cannot be discretionary if it violates a legal mandate." *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (quoting *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000)). Moreover, "the Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply." *Id.* (quoting *Nurse*, 226 F.3d at 1002 n.2).

We cannot determine the applicability of the discretionary function exception at this stage in the litigation. If, on remand, the district court determines that Defendants did not violate any federal constitutional or statutory directives, the discretionary function exception will bar Plaintiffs' FTCA claims.[48] But if the district court instead determines that Defendants did violate a nondiscretionary federal constitutional or statutory directive, the FTCA claims may be able to proceed to that degree.

Because applicability of the discretionary function will largely turn on the district court's ultimate resolution of the merits of Plaintiffs' various federal constitutional and statutory claims, discussing whether Plaintiffs substantively state claims as to the state laws underlying the FTCA claim would be premature. We therefore decline to do so at this juncture.

## V.  Procedures on Remand

On remand, the FISA and Fourth Amendment claims, to the extent we have held they are validly pleaded in the complaint and not subject to qualified immunity, should proceed as usual. *See supra* Part II.B. In light of our conclusion regarding the reach of FISA § 1806(f), the district court should, using § 1806(f)'s *ex parte* and *in camera* procedures, review any "materials relating to the surveillance as may be necessary," 50 U.S.C. § 1806(f), including the evidence over which the Attorney General asserted the state secrets privilege, to determine whether the electronic

---

[48] We note that the judgment bar, 28 U.S.C. § 2676, does not apply to FTCA claims dismissed under the discretionary function exception. *See Simmons v. Himmelreich*, 136 S. Ct. 1843, 1847–48 (2016).

FAZAGA V. WALLS                    103

surveillance was lawfully authorized and conducted. That determination will include, to the extent we have concluded that the complaint states a claim regarding each such provision, whether Defendants violated any of the constitutional and statutory provisions asserted by Plaintiffs in their complaint. As permitted by Congress, "[i]n making this determination, the court may disclose to [plaintiffs], under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.*[49]

The Government suggests that Plaintiffs' religion claims cannot be resolved using the § 1806(f) procedures because, as the district court found, "the central subject matter [of the case] is Operation Flex, a group of counterterrorism investigations that extend well beyond the purview of electronic surveillance." Although the larger *factual* context of the case involves more than electronic surveillance, a careful review of the "Claims for Relief" section of the complaint convinces us that all of Plaintiffs' *legal* causes of action relate to electronic surveillance, at least for the most part, and in nearly all instances entirely, and thus require a determination as to the lawfulness of the surveillance. Moreover, § 1806(f) provides that the district court may

---

[49] Our circuit has not addressed the applicable standard for reviewing the district court's decision not to disclose FISA materials. Other circuits, however, have adopted an abuse of discretion standard. *See United States v. Ali*, 799 F.3d 1008, 1022 (8th Cir. 2015); *United States v. El-Mezain*, 664 F.3d 467, 567 (5th Cir. 2011); *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005); *United States v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987); *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982).

consider "other materials *relating* to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted," thereby providing for consideration of all parties' factual submissions and legal contentions regarding the background of the surveillance. *Id.* (emphasis added).

We did explain in Part I, *supra*, that not all of the surveillance detailed in the complaint as the basis for Plaintiffs' legal claims constitutes electronic surveillance as defined by FISA. *See id.* § 1801(k). Also, two of Plaintiffs' causes of action can be read to encompass more conduct than just electronic surveillance. Plaintiffs' RFRA claim, their Fifth Cause of Action, is not limited to electronic surveillance. Plaintiffs broadly allege that "[t]he actions of Defendants substantially burdened [their] exercise of religion." The FTCA claim for intentional infliction of emotional distress, the Eleventh Cause of Action, is also more broadly pleaded. It is far from clear, however, that as actually litigated, either claim will involve more than the electronic surveillance that is otherwise the focus of the lawsuit.[50]

At this stage, it appears that, once the district court uses § 1806(f)'s procedures to review the state secrets evidence *in camera* and *ex parte* to determine the lawfulness of that surveillance, it could rely on its assessment of the same evidence—taking care to avoid its public disclosure—to

---

[50] For example, whether the official-capacity defendants targeted Plaintiffs for surveillance in violation of the First Amendment will in all likelihood be proven or defended against using the same set of evidence regardless of whether the court considers the claim in terms of electronic surveillance in the mosque prayer hall or conversations to which Monteilh was a party.

determine the lawfulness of the surveillance falling outside FISA's purview, should Plaintiffs wish to proceed with their claims as applied to that set of activity. Once the sensitive information has been considered *in camera* and *ex parte*, the small risk of disclosure—a risk Congress thought too small to preclude careful *ex parte*, *in camera* consideration by a federal judge—has already been incurred. The scope of the state secrets privilege "is limited by its underlying purpose." *Halpern v. United States*, 258 F.2d 36, 44 (2d Cir. 1958) (quoting *Roviaro v. United States*, 353 U.S. 53, 60 (1957)). It would stretch the privilege beyond its purpose to require the district court to consider the state secrets evidence *in camera* and *ex parte* for one claim, but then, when considering another claim, ignore the evidence and dismiss the claim even though it involves the exact same set of parties, facts, and alleged legal violations.

Should our prediction of the overlap between the information to be reviewed under the FISA procedures to determine the validity of FISA-covered electronic surveillance and the information pertinent to other aspects of the religion claims prove inaccurate, or should the FISA-covered electronic surveillance drop out of consideration,[51] the Government is free to interpose a specifically tailored, properly raised state secrets privilege defense. Should the Government do so, at that point the district court should consider anew whether "simply excluding or otherwise walling off the privileged information may suffice to protect the state secrets," *Jeppesen*, 614 F.3d at 1082, or whether dismissal is required because "the privilege deprives the defendant[s] of information that would otherwise give the

---

[51] As could happen if, for instance, Plaintiffs are unable to substantiate their factual allegations as to the occurrence of the surveillance.

defendant[s] a valid defense to the claim[s]," *id.* at 1083 (quoting *Kasza*, 133 F.3d at 1166), or because the privileged and nonprivileged evidence are "inseparable" such that "litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets," *id.*

Because *Jeppesen* did not define "valid defense," we briefly address its meaning, so as to provide guidance to the district court on remand and to future courts in our circuit addressing the implications of the Government's invocation of the state secrets privilege.

The most useful discussion of the meaning of "valid defense" in the state secrets context is in the D.C. Circuit's decision in *In re Sealed Case*, 494 F.3d 139, cited by *Jeppensen*, 614 F.3d at 1083. We find the D.C. Circuit's definition and reasoning persuasive, and so adopt it. Critically, *In re Sealed Case* explained that "[a] 'valid defense' . . . is meritorious and not merely plausible and would require judgment for the defendant." 494 F.3d at 149. The state secrets privilege does not require "dismissal of a complaint for any plausible or colorable defense." *Id.* at 150. Otherwise, "virtually every case in which the United States successfully invokes the state secrets privilege would need to be dismissed." *Id.* Such an approach would constitute judicial abdication from the responsibility to decide cases on the basis of evidence "in favor of a system of conjecture." *Id.* And the Supreme Court has cautioned against "precluding review of constitutional claims" and "broadly interpreting evidentiary privileges." *Id.* at 151 (first citing *Webster v. Doe*, 486 U.S. 592, 603–04 (1988), and then citing *United States v. Nixon*, 418 U.S. 683, 710 (1974)). "[A]llowing the mere prospect of a privilege defense," without more, "to thwart a citizen's efforts to vindicate his or her constitutional rights would run

afoul" of those cautions. *Id*. Thus, where the government contends that dismissal is required because the state secrets privilege inhibits it from presenting a valid defense, the district court may properly dismiss the complaint only if it conducts an "appropriately tailored *in camera* review of the privileged record," *id.*, and determines that defendants have a legally meritorious defense that prevents recovery by the plaintiffs, *id.* at 149 & n.4.

## CONCLUSION

The legal questions presented in this case have been many and difficult. We answer them on purely legal grounds, but of course realize that those legal answers will reverberate in the context of the larger ongoing national conversation about how reasonably to understand and respond to the threats posed by terrorism without fueling a climate of fear rooted in stereotypes and discrimination. In a previous case, we observed that the state secrets doctrine strikes a "difficult balance . . . between fundamental principles of our liberty, including justice, transparency, accountability and national security," and sometimes requires us to confront "an irreconcilable conflict" between those principles. *Jeppesen*, 614 F.3d at 1073. In holding, for the reasons stated, that the Government's assertion of the state secrets privilege does not warrant dismissal of this litigation in its entirety, we, too, have recognized the need for balance, but also have heeded the conclusion at the heart of Congress's enactment of FISA: the fundamental principles of liberty include devising means of forwarding accountability while assuring national security.

Having carefully considered the Defendants' various arguments for dismissal other than the state secrets privilege, we conclude that some of Plaintiffs' search and religion

allegations state a claim, while others do not. We therefore affirm in part and reverse in part the district court's orders, and remand for further proceedings in accordance with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

GOULD and BERZON, Circuit Judges, joined by WARDLAW, FLETCHER, and PAEZ, Circuit Judges, concurring in the denial of rehearing en banc:

Judge Bumatay's dissent from the denial of rehearing (the "dissent") is a veritable Russian doll of nested mistakes and misleading statements—open one, and another stares back at you. The panel opinion itself belies most of the accusations. For brevity, we pay particular attention here to the dissent's most fundamental misperceptions of the panel's holdings.

I

At the core of this case lies a series of interwoven statutory interpretation issues surrounding the application of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801 *et seq*, in a civil action. The panel opinion concluded that a provision of that statute, 50 U.S.C. § 1806(f), supersedes the common law state secrets evidentiary privilege's limited dismissal remedy—not the protection of state secrets from disclosure—with regard to evidence or information related to electronic surveillance, and that the secrecy-protective procedures established by 50 U.S.C. § 1806(f), designed precisely for matters

implicating national security concerns, apply to the plaintiffs' claims in this case against the government.

In concluding that § 1806(f)'s procedures apply, the panel opinion decidedly did *not*, as the dissent asserts, second guess the Executive's capacity to determine that certain evidence related to electronic surveillance is classified or touches on issues of national security, and therefore deserves protection from disclosure to litigants or the public. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1081–82 (9th Cir. 2010) (en banc). Instead, the panel opinion resolved the discrete issue of what should happen in a civil case that involves such information: Need the case be dismissed, as it sometimes is to implement the common law state secrets privilege, or can it go forward but *without* disclosure of the information to the plaintiffs, under specially tailored litigation procedures that would in other contexts be impermissible as violative of the plaintiffs' rights as litigants?

Critically for present purposes, the classified material at issue is protected from disclosure under § 1806(f), just as it is under the state secrets privilege's dismissal option—it is just protected differently. To ensure that sensitive information is not inadvertently disclosed to the public, the § 1806(f) procedures require the district court to consider the material *ex parte* and *in camera*. The government uses these very same procedures all the time when prosecuting suspected terrorists; the government does so by choice, and without any evident handwringing over whether the use of the § 1806(f) procedures might lead to the disclosure of state secrets. And the same *ex parte* and *in camera* review takes place when the state secrets privilege is invoked, to ascertain whether it is properly applicable and, if so, whether the case can go forward without the sensitive evidence or must be dismissed;

that is exactly what happened in this case in the district court.[1]

II

The dissent's misleading assertions about the nature of the § 1806(f)'s procedures underpin its two major legal propositions, neither of which is rooted in the facts of this case, the text of FISA, or any binding precedent.

A

The dissent insists that the panel should have applied a "clear statement" rule to the question whether the § 1806(f) *ex parte*, *in camera* method of litigation displaces the state secrets evidentiary privilege's dismissal remedy.

The panel could not have applied a "clear statement" analysis. Our Circuit's binding precedent required the panel to ask whether FISA's § 1806(f)'s procedures "speak[]

---

[1] The dissent notes § 1806(f) and (g)'s disclosure provisions, which are available only in exceptional circumstances. As far as we are aware, there has *never* been a disclosure under FISA. And, as the panel opinion noted: "As it is Plaintiffs who have invoked the FISA procedures, we proceed on the understanding that they are willing to accept those restrictions to the degree they are applicable as an alternative to dismissal, and so may not later seek to contest them." Amended Opinion at 49. In the unprecedented event that a district court *does* order disclosure, nothing in the panel opinion prevents the government from invoking the state secrets privilege's dismissal remedy as a backstop at that juncture. Finally, the panel does not, as the dissent asserts, "warn" district judges that failure to disclose evidence could constitute an abuse of discretion. Dissent at 134 n.9. The panel does not take any position on the appropriate standard of review for a district court's decision regarding the disclosure of FISA materials. Rather, we merely note the approach adopted in other circuits.

directly" to the question otherwise answered by the dismissal remedy in cases involving classified material related to electronic surveillance. *See Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998) (internal quotation marks and emphasis omitted). As the panel opinion explained, the text, practice, purpose, and history of FISA and § 1806(f) all quite clearly demonstrate that the *ex parte* and *in camera* review established by § 1806(f) squarely answers the "speak directly" question.

The dissent maintains the "speaks directly" standard adopted in *Kasza* is wrong, because the state secrets evidentiary privilege has constitutional origins. *See* Dissent at 119, 129. The proposed new "clear statement" requirement—effectively, that Congress had to name the state secrets privilege, including its contingent dismissal remedy, to replace that remedy—is improper in the current context for two reasons.

First, no matter the origins or role of the state secrets privilege, at issue here is only the *dismissal remedy* that sometimes follows the successful invocation of the state secrets evidentiary privilege, when the case cannot as a practical matter be litigated without the privileged evidence. *Jeppesen Dataplan, Inc.*, 614 F.3d at 1082–83. "Ordinarily, simply excluding or otherwise walling off the privileged information may suffice to protect the state secrets," but, "[i]n some instances . . . application of the privilege may require dismissal of the action." *Id.*

The dissent portrays the state secrets privilege as a magic wand that the Executive may wave to remove certain information from litigation or, if necessary, end the case. Not so. "The privilege belongs to the Government and must be

asserted by it," but "[t]he court itself must determine whether the circumstances are appropriate for the claim of privilege." *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953); *see also El-Masri v. United States*, 479 F.3d 296, 312 (4th Cir. 2007). And the role of the court is especially pronounced when it must determine whether dismissal is necessary. *See Jeppesen Dataplan, Inc.*, 614 F.3d at 1082–83. So the dismissal remedy is not the state secrets privilege itself but a procedural exigency, sometimes imposed by the courts to prevent unfairness to the litigants once the evidentiary exclusion privilege is invoked and recognized with regard to certain evidence. Dismissal in the state secrets context is thus not grounded in separation of powers concerns.

Second, and more generally, as the panel opinion recounts, at heart the state secrets privilege is an *evidentiary* privilege, not a constitutional one. Amended Opinion at 58–59; *see In re United States*, 872 F.2d 472, 474–75 (D.C. Cir. 1989). *Reynolds*, which the dissent recognizes as the wellspring of "the modern state secrets doctrine," Dissent at 128, itself made this point:

> We have had broad propositions pressed upon us for decision. On behalf of the Government it has been urged that the executive department heads have power to withhold any documents in their custody from judicial view if they deem it to be in the public interest. Respondents have asserted that the executive's power to withhold documents was waived by the Tort Claims Act. Both positions have constitutional overtones which we find it unnecessary to pass upon, there being a narrower ground for decision.

345 U.S. at 6. As *General Dynamics Corp. v. United States*, 563 U.S. 478, 485 (2011), summarized, "*Reynolds* was about the admission of evidence. It decided a purely evidentiary dispute by applying evidentiary rules: The privileged information is excluded, and the trial goes on without it."

Or the trial doesn't go on, if the district court decides that dismissal is necessary. But in the narrow context of classified information related to electronic surveillance, FISA's procedures do away with the need for dismissal, by allowing the court to consider the relevant materials during the course of the litigation in the truncated and secrecy-protective manner established by § 1806(f).

B

The dissent also strives to insulate the government from suit by paring back the coverage of § 1806(f) and related provisions so as not to cover at all suits against the government. The dissent thus presents FISA, and specifically § 1806(f), as single-mindedly concerned with protecting the government's ability to prosecute criminal defendants without revealing national security secrets.

FISA is decidedly not so one-sided. The dissent never mentions a FISA provision, 50 U.S.C. § 1810, which authorizes affirmative actions against the government challenging electronic surveillance material as unlawfully obtained. Ignoring § 1810, the dissent puts forward a view of the reach of § 1806(f)'s procedures much too narrow to accommodate the statute's provision for affirmative relief. Were the dissent's one-way-ratchet position correct, in a § 1810 affirmative suit, the need to consider the same evidence that was or should have been excluded in a

prosecution of a defendant (because the surveillance used to collect the evidence is alleged to have been unlawful) could lead to dismissal of a § 1810 suit seeking damages for that same illegal surveillance.

To position these procedures as a one-way ratchet for the government, the dissent takes every opportunity to shrink the reach of § 1806(f) and related provisions to a scope much more circumscribed than their terms and purpose support. To highlight four of the dissent's efforts:

- To fit the dissent's narrative that § 1806(f) applies only when the government is on the offensive, the dissent maintains that the government does not intend to "use" the relevant information over which it has asserted the state secrets privilege—a requisite for the application of § 1806(f)'s procedures. But here, the government's primary reason for invoking the state secrets privilege's dismissal remedy *is* its asserted need to use classified information to defend itself if the case went forward. The government submitted, alongside the Attorney General's invocation of the state secrets privilege, an unclassified declaration stating that "[a]ddressing plaintiffs' allegations in this case will risk or require the disclosure of certain sensitive information concerning counterterrorism investigative activity in Southern California, including in particular the nature and scope of Operation Flex."

- The dissent also takes the word "use" out of context. FISA's procedures apply "[w]henever the Government intends to enter into evidence or *otherwise use* or disclose in any trial, hearing, or other

proceeding . . . any information obtained or derived from an electronic surveillance[.]" 50 U.S.C. § 1806(c) (emphasis added). In other words, the procedures apply whenever the government uses the information in "another way" or "any other way" than entering it into evidence. *See Otherwise,* The Oxford English Dictionary Online, https://www.oed.com/view/Entry/133247?redirectedFrom=otherwise#eid (last visited June 22, 2020).

- The dissent argues that, to trigger FISA's review procedures, "an aggrieved person" must be the defendant. Dissent at 138–139. But the statute is not unidirectional. The dissent takes the "against an aggrieved person" phrase out of context to suit the dissent's preferred ends. The statutory scheme establishes that § 1806(f)'s procedures apply "[w]henever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person." § 1806(c). A "trial, hearing, or other proceeding" involves two parties, providing either an opportunity to introduce evidence—it is the *evidence* that is "against" someone.

- The dissent states that "§ 1806(f) authorizes the review of only a limited set of documents: the FISA 'application, order, and such other materials.'" Dissent at 132. But that is not what the statute says, and the full text of the relevant phrase tells an entirely

different story: § 1806(f) authorizes the district court to review the "application, order, and *such other materials relating to the surveillance as may be necessary* to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." § 1806(f) (emphasis added). As used in the actual statute as opposed to the dissent's truncated version, "such" does not, as the dissent erroneously claims, refer only backwards to "application" and "order;" it also, and most prominently, applies forward to "materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." §?1806(f); *see Such*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/such (last visited June 22, 2020) (defining "such" principally to mean "of a kind or character *to be* indicated or suggested") (emphasis added).

In conjunction with misreading the statute in these and other respects, the dissent avows that the panel opinion gives "unintended breadth" to FISA. Dissent at 142 (quoting *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015)). But the only way to know what "breadth" is "intended" is to read the statute. Section 1806(f) speaks in the broadest language possible. The procedures apply "*whenever* the Government intends to enter into evidence or otherwise use or disclose in *any* trial, hearing, or proceeding. . . *any* information obtained or derived from an electronic surveillance" or "*whenever any* motion or request is made . . . pursuant to *any other* statute or rule of the United States or *any* State before *any* court or *other* authority." (Emphases added). If that capacious language were not enough to maximize the provision's reach,

every conceivable clause is separated by a disjunctive "or." Rather than "jam a square peg into a round hole," Dissent at 143, or "hide elephants in mouseholes," Dissent at 142 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)), the panel opinion acknowledged that, when statutes use expansive language, we should understand that Congress did not mean for us to read in limitations that are not there.

\*\*\*

The dissent is replete with quotations from Washington, Hamilton, and Jefferson, all making the indisputable point that, to protect our national interest, our government must be able to keep certain information secret. Neither the Founding Fathers' concerns about governmental secrecy nor broad issues of executive authority are at issue in this case. The question presented to the panel here was not whether the government should be able to keep classified material secret but how. The procedures established by § 1806(f) (which the government leans on heavily when it is the prosecutor) ensure secrecy. Under any reasonable reading of the statute, these procedures, when otherwise applicable, supersede the state secrets privilege's contingent dismissal remedy and apply to the information at issue in this case.

For the forgoing reasons, we concur in the denial of rehearing en banc.

STEEH, Senior District Judge, statement regarding the denial of rehearing en banc:

Although, as a visiting judge sitting by designation, I am not permitted to vote on a petition for rehearing en banc, I agree with the views expressed by Judges Berzon and Gould in their concurrence in the denial of rehearing en banc.

BUMATAY, Circuit Judge, with whom CALLAHAN, IKUTA, BENNETT, R. NELSON, BADE, LEE, VANDYKE, Circuit Judges, join, and COLLINS and BRESS, Circuit Judges, join except for Section III.A.2, dissenting from the denial of rehearing en banc:

From the earliest days of our Nation's history, all three branches of government have recognized that the Executive has authority to prevent the disclosure of information that would jeopardize national security. Embodied in the state secrets privilege, such discretion lies at the core of the executive power and the President's authority as Commander in Chief. Indeed, these powers were vested in a single person precisely so that the Executive could act with the requisite "[d]ecision, activity, *secrecy*, and d[i]spatch." The Federalist No. 70 (Alexander Hamilton) (emphasis added).

In contrast to the broad constitutional design of the state secrets privilege, Congress passed the Foreign Intelligence Surveillance Act ("FISA") for a limited function—to establish procedures for the lawful electronic surveillance of foreign powers and their agents. Among other things, FISA provides a mechanism for in camera, ex parte judicial review of electronic surveillance evidence when the government tries

to use such evidence, or a surveilled party tries to suppress it. *See* 50 U.S.C. § 1806(f).[1]

By its plain text and context, § 1806(f) provides procedures to determine the *admissibility* of electronic surveillance evidence—a commonplace gatekeeping function exercised by courts throughout this country. When the provision is triggered, courts review only a limited set of documents, the FISA application, order, and like materials, and may generally only suppress the evidence if it was unlawfully obtained. § 1806(f), (g). Thus, § 1806(f) coexists with the state secrets privilege by providing judicial oversight over the government's affirmative use of electronic surveillance evidence, while preserving the Executive's constitutional prerogative to protect national security information.

But today, the Ninth Circuit, once again, strains the meaning of a statute and adopts a virtually boundless view of § 1806(f). Under the court's reading, this narrow provision authorizes judicial review of any evidence, on any claim, for any purpose, as long as the party's allegations relate to electronic surveillance. With this untenably broad interpretation, the court then rules that the judicial branch will not recognize the state secrets privilege over evidence with

---

[1] All statutory references are to Title 50 of the United States Code. In relevant part, § 1806(f) provides, when triggered, "the United States district court . . . shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted."

any connection to electronic surveillance. Most alarming, this decision may lead to the disclosure of state secrets to the very subjects of the foreign-intelligence surveillance. With this, I cannot agree.

Our court's decision ignores that Congress articulated no directive in FISA to displace the state secrets privilege—even under the most generous abrogation standards. More fundamentally, the court should have ensured that Congress was unmistakably clear before vitiating a core constitutional privilege. When the Supreme Court confronts a legislative enactment implicating constitutional concerns—federalism or separation of powers—it has commonly required a clear statement from Congress before plowing ahead. It has done so out of a due respect for those constitutional concerns. The state secrets privilege deserves the same respect.

In discovering abrogation of the state secrets privilege more than 40 years after FISA's enactment, our court disrupts the balance of powers among Congress, the Executive, and the Judiciary. We have previously recognized that the state secrets doctrine preserves the difficult balance among "fundamental principles of our liberty, including justice, transparency, accountability and national security." *Mohamed v. Jeppesen Dataplan, Inc*., 614 F.3d 1070, 1073 (9th Cir. 2010) (en banc). Our refusal to reexamine this case now tips that balance in favor of inventive litigants and overzealous courts, to the detriment of national security. Moving forward, litigants can dodge the state secrets privilege simply by invoking "electronic surveillance" somewhere within the Ninth Circuit. And in defending such cases, the government may be powerless to prevent the disclosure of state secrets. For this reason, I respectfully dissent from the denial of rehearing en banc.

## I.

In this case, Yassir Fazaga and his co-plaintiffs sued the United States, the FBI, and FBI special agents, for using an informant to gather information from the Muslim community in Southern California. Their complaint asserted numerous constitutional and statutory causes of action alleging unlawful searches and surveillance and violations of their religious liberty.

Soon after the suit was filed, the FBI asserted the state secrets privilege over information related to its investigation. Through a declaration of the Attorney General, the government warned that proceeding on the claims risked the disclosure of state secrets.[2] Accordingly, the government moved to dismiss the religious liberty claims.

After scrutinizing the government's classified and unclassified declarations, the district court validated its assertion of the privilege. The court found that the litigation involved intelligence that, if disclosed, would significantly compromise national security. Because the risk of disclosure could not be averted through protective orders or other restrictions, the court dismissed all but one of the claims.

On appeal, a panel of this court reversed. The panel first held that FISA abrogated the state secrets privilege. It thought that § 1806(f) "speaks directly" to the same concerns

---

[2] Specifically, the government sought to withhold evidence that would (1) confirm or deny the particular targets of the investigation; (2) reveal the initial reasons for opening the investigation, the materials uncovered, or the status and results of the investigation; and (3) reveal particular sources or methods used.

as the state secrets privilege and, thus, displaced it—despite recognizing that the privilege "may" have a "constitutional core" or "constitutional overtones." Am. Op. at 58–59. Next, the court held that § 1806(f)'s review procedures were triggered in this case. As a result, the court instructed the district court to use those procedures to review *any* evidence relating to the alleged electronic surveillance—even the evidence that the government asserted constituted state secrets.

Because each of these holdings is erroneous, we should have reviewed this case en banc.

## II.

Abrogation of ordinary common law is rooted in due respect for Congress. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois*, 451 U.S. 304, 312 (1981). Accordingly, once "the field has been made the subject of comprehensive legislation," federal common law must yield to the legislative enactment. *Id.* at 314. In the ordinary case, Congress need not affirmatively proscribe the use of federal common law, but it must "speak directly" to the questions previously addressed by common law. *Id.* at 315.

Yet this is no ordinary case. Here, the court didn't abrogate run-of-the-mill, judicially created common law—it displaced an executive privilege. And it did so while summarily dismissing the constitutional and separation-of-powers implications of its holding. Before supplanting a privilege held by a co-equal branch of government, courts would be wise to consider the Constitution and the history of

the privilege at issue. As Justice Scalia recognized, "a governmental practice [that] has been open, widespread, and unchallenged since the early days of the Republic" deserves special deference. *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring) (citations omitted). This approach should guide our analysis here.

## A.

Article II of the Constitution commands that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. And the President is also designated as the "Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2.

By these terms, the Constitution was originally understood to vest the President with broad authority to protect our national security. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The Founders intended that the President have primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations."). As Hamilton observed, a single Executive could better act with "[d]ecision, activity, secrecy, and d[i]spatch" as would be required to respond to the national security crises of the day. The Federalist No. 70 (Alexander Hamilton).

Secrecy, at least at times, is a necessary concomitant of the executive power and command of the Nation's military. As commander of the Continental Army, George Washington explained to Patrick Henry that "naturally . . . there are some Secrets, on the keeping of which so, depends, oftentimes, the salvation of an Army: Secrets which cannot, at least ought not

to, be [e]ntrusted to paper; nay, which none but the Commander in Chief at the time, should be acquainted with."[3]

Given the Executive's inherent need for secrecy, it comes as no surprise that early presidents regularly asserted a privilege over the disclosure of sensitive information.[4]  In 1792, when President Washington found himself faced with the first-ever congressional request for presidential materials, he recognized an executive privilege to avoid disclosure of secret material.  *See* Abraham D. Sofaer, *Executive Power and the Control of Information: Practice Under the Framers*, 1977 Duke L.J. 1, 5–6.  Washington's Cabinet, including Hamilton and Jefferson, agreed "that the executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public." *Id.* at 6 (quoting The Complete Jefferson 1222 (S. Padover ed. 1943)); *see also* Mark J. Rozell, *Restoring Balance to the Debate over Executive Privilege: A Response to Berger*, 8 Wm. & Mary Bill Rts. J. 541, 556 (2000).

---

[3] Letter from George Washington to Patrick Henry (Feb. 24, 1777), Library of Congress, https://www.loc.gov/resource/mgw3h.001/?sp=26 &st=text.

[4] Although this history recounts executive privileges in general, the state secrets privilege has been described as a "branch of the executive privilege." *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1307 (Fed. Cir. 2006).  To the extent there are distinctions among executive privileges, the state secrets privilege is more inviolable.  *See United States v. Nixon*, 418 U.S. 683, 706 (1974) (distinguishing between privileges based "solely on the broad, undifferentiated claim of public interest in the confidentiality of such conversations" with those asserted from the "need to protect military, diplomatic, or sensitive national security secrets").

President Jefferson, even as a prominent critic of an overly strong executive branch, held the same view on the need for secrecy.  As he put it in 1807, "[a]ll nations have found it necessary, that for the advantageous conduct of their affairs, some of these proceedings, at least, should remain known to their executive functionary only.  He, of course, from the nature of the case, must be the sole judge of which of them the public interests will permit publication."[5] Similarly, Jefferson wrote to the prosecutor of the Aaron Burr case to explain that it was "the necessary right of the President . . . to decide, independently of all other authority, what papers, coming to him as President, the public interests permit to be communicated, & to whom."[6]

Founding-era Presidents were not alone in their view. Members of Congress also respected some degree of executive privilege.    When Washington refused a congressional request for materials, then-Representative James Madison disagreed with Washington's refusal, but also recognized that "the Executive had a right, under a due responsibility, also, to withhold information, when of a nature that did not permit a disclosure of it at the time." 5 Annals of Cong. 773 (1796); Sofaer, *supra* at 12.  Others went further, asserting, for example, that the President "had an undoubted Constitutional right, and it would be his duty to exercise his discretion on this subject, and withhold any papers, the

---

[5] Letter from Thomas Jefferson to George Hay (June 17, 1807), Library of Congress, https://www.loc.gov/resource/mtj1.038_0446_0446/?st=text.

[6] Letter from Thomas Jefferson to George Hay (June 12, 1807), Library of Congress, https://www.loc.gov/resource/mtj1.038_0446_0446/?st=text.

disclosure of which would, in his judgment, be injurious to the United States."  5 Annals of Cong. 675 (1796) (remarks of Rep. Hillhouse).

Congress's early actions also reflected a deference to the Executive's authority to limit disclosures.  When seeking information from the President, Congress narrowed its requests to such presidential papers "of a public nature," 3 Annals of Cong. 536 (1792), or "as he may think proper," 4 Annals of Cong. 250–51 (1794), and excluded "such [papers] as he may deem the public welfare to require not to be disclosed."  16 Annals of Cong. 336 (1807).  Thus, early Congresses "practically always" qualified their requests for foreign-affairs information to those documents that "in [the President's] judgment [were] not incompatible with the public interest."  Henry M. Wriston, *Executive Agents in American Foreign Relations* 121–22 (1929).

Like the Executive and Congress, the Judiciary has long recognized an executive privilege over sensitive information. Chief Justice Marshall suggested that if the Attorney General "thought that any thing was communicated to him in confidence he was not bound to disclose it" in the litigation. *Marbury v. Madison*, 5 U.S. 137, 144 (1803); *see also* Robert M. Chesney, *State Secrets and the Limits of National Security Litigation*, 75 Geo. Wash. L. Rev. 1249, 1271 (2007).  And in response to President Jefferson's objection to producing a letter in the Burr trial, Chief Justice Marshall explained that there was "nothing before the court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety," but "[t]hat there may be matter, the production of which the court would not require, is certain."  *United States v. Burr*, 25 F. Cas. 30, 37 (C.C.D. Va. 1807); *see also* Chesney, *supra* at 1272–73 (arguing that

the Burr trial is significant for Marshall's introduction of the idea that "risk to public safety might impact discoverability of information held by the government"). Perhaps anticipating the modern-day state secrets privilege, Marshall made clear "that the remedy he contemplated for executive withholding would be dismissal of the prosecution, rather than an order directing the President to appear or punishing any executive officer." Sofaer, *supra* at 17.

The Supreme Court also recognized that President Lincoln "was undoubtedly authorized during the war, as commander-in-chief of the armies of the United States, to employ secret agents to enter the rebel lines and obtain information respecting the strength, resources, and movements of the enemy[.]" *Totten v. United States*, 92 U.S. 105, 106 (1875). In *Totten*, the Court dismissed a contract claim where the very existence of the alleged contract needed to be concealed. *Id.* Such concealment was a reality "in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent." *Id.*

Consistent with early historical practice and Founding-era understandings, modern courts have recognized the Article II dimension of executive privileges. *See Nixon*, 418 U.S. at 711 (explaining that when a privilege against disclosure relates to the "effective discharge of a President's powers, it is constitutionally based"); *Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1498–99 (2019) (identifying the "executive privilege" as one of the "constitutional doctrines" that are "implicit in the [Constitution's] structure and supported by historical practice"); *see also Dep't of Navy v.*

*Egan*, 484 U.S. 518, 527 (1988) ("The authority to protect [national-security] information falls on the President as head of the Executive Branch and as Commander in Chief.").[7]  As Justice Jackson succinctly put it: "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world." *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948).

This brings us to the modern state secrets doctrine, articulated in *United States v. Reynolds*, 345 U.S. 1 (1953). In *Reynolds*, the Court recognized the Executive's "well established" privilege against revealing military and state secrets.  *Id*. at 7–8.  The Court held that "even the most compelling necessity cannot overcome the claim of privilege" if state secrets are at stake.  *Id*. at 11; *see also El-Masri v. United States*, 479 F.3d 296, 303 (4th Cir. 2007) ("Although the state secrets privilege was developed at common law, it performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities.").  As an en banc court, we've respected the ability of the government to seek to "completely remove[]" state secrets from litigation or even seek "dismissal of the action." *Jeppesen*, 614 F.3d at 1082–83.  And in evaluating the assertion of the privilege, we "defer to the Executive on matters of foreign policy and national security." *Id.*

---

[7] None of this is to say that the Executive has an absolute privilege to prevent the disclosure of material under any circumstance.  I explore this history only insofar as it bears on the particular issue in this case—the proper standard to apply before abrogating the state secrets privilege.

## B.

Given this constitutional and historical background, courts ought to tread carefully before jettisoning the state secrets privilege. Here, we should have done so by requiring a clear congressional statement before displacing the privilege. By waiting for a clear statement, we would have avoided assuming that Congress has "by broad or general language, legislate[d] on a sensitive topic inadvertently or without due deliberation." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion). Instead, the court today undermines a longstanding executive privilege by finding abrogation lurking in FISA's murky text.

Unlike abrogation of ordinary common law, which shows our deference to Congress, the displacement of the state secrets privilege creates a tension between Congress and the Executive because we elevate a statute over a constitutionally based privilege. As the Court advises, we should be "reluctant to intrude upon the authority of the Executive in military and national security affairs" until "Congress specifically has provided otherwise." *Egan*, 484 U.S. at 530. Thus, whether FISA merely "speaks directly" to the same concerns as the privilege should not be sufficient to deprive the Executive of a constitutionally derived right. Instead, we should have constrained ourselves to respecting the privilege unless and until a statute unmistakably and unquestionably dictates otherwise.

This is not a novel idea. When a matter implicates constitutional concerns, the Court has regularly required a clear statement. *See, e.g.*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989) (requiring Congress to be "unmistakably clear" before altering the "usual constitutional

balance between the States and the Federal Government"); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (requiring an express statement before subjecting presidential action to APA review "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). The Court has likewise required a clear statement before abrogating Indian treaty rights, out of a respect for tribal sovereignty. *See United States v. Dion*, 476 U.S. 734, 739 (1986) (explaining the reluctance to find abrogation absent "explicit statutory language").

Applying such a standard is also consistent with the constitutional-avoidance canon. *See United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."). Thus, when "a particular interpretation of a statute invokes the outer limits of Congress' power," as is the case here, we should "expect a clear indication that Congress intended that result." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299 (2001).

All in all, we should be "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989). But the court here is undeterred. It reads FISA as abrogating the privilege despite the lack of any firm evidence that Congress sought to do so. And rather than consulting the Constitution or the history of the state secrets privilege, the court simply waves off the privilege as something that "may" have a "constitutional core" or "constitutional overtones." Am. Op. at 58–59. Respectfully, when we suspect that an

executive privilege "may" have a "constitutional core," we should do more before tossing it aside.  Had we done so here, perhaps we would've recognized that the Article II roots of the privilege and its long history require that Congress be unmistakably clear before we simply replace it with a congressional enactment.  And because FISA makes *no* mention of the state secrets privilege, the statute would fall pitifully short of this standard.

## C.

Even if we should stick with the run-of-the-mill, "speaks directly" standard for displacement, FISA still falls short. Demonstrating that a statute speaks directly to the same questions as the common law is no low bar.  *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 535 (1993) (holding that silence in a statute "falls far short of an expression of legislative intent to supplant the existing common law in that area").  The court's analysis does not clear this bar.

At the outset, the court's opinion critically fails to recognize the circumscribed purpose of § 1806(f)—to provide a mechanism to review the admissibility of electronic surveillance evidence.  *See infra* section III.  Determining the admissibility of evidence is an everyday function of courts. Section 1806(f) merely adds extra precautions in the case of electronic surveillance evidence.  Nothing more.  The statute's design is in stark contrast to the constitutional purpose of the state secrets privilege—to ensure our "defer[ence] to the Executive on matters of foreign policy and national security" and to prevent courts from "second guessing the Executive in this arena."  *Jeppesen*, 614 F.3d at 1081–82. Contrary to the court's interpretation, § 1806(f) and the state secrets privilege stand side by side, maintaining

the Judiciary's control over the admissibility of evidence on one hand while deferring to the Executive's authority to protect national security information on the other.

Relatedly, the court also overlooks a significant limitation on § 1806(f)'s scope of review.  Section 1806(f) authorizes the review of only a limited set of documents: the FISA "application, order, and such other materials."  The court's decision treats this language as allowing review of "any" materials tangentially related to electronic surveillance. Am. Op. at 102–103.  But the phrase "such other materials" cannot be read so boundlessly.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.").  Even without this canon, ordinary users of the English language understand the word "such" to mean "something similar," "of the same class, type, or sort," or "of the character, quality, or extent previously indicated or implied." *Such*, Webster's Ninth New Collegiate Dictionary (1986).[8]

Thus, the phrase "such other material" refers to documentary evidence like the "application" and "order"; in other words, materials containing information necessary to authorize the surveillance. *See, e.g.*, § 1804(c) ("The judge may require the applicant to furnish *such other information*

---

[8] Continuing to ignore this longstanding canon of interpretation, the concurrence to the denial of rehearing en banc doubles down on a boundless reading of this phrase.  But this reading treats the word "such" as if it meant "any."  We should apply the statute as Congress wrote it, not as we might wish it to be.

as may be necessary to make the determinations required [to authorize the surveillance under § 1804].") (emphasis added). It does not broadly reach *any* evidence related to electronic surveillance as the court's decision assumes. It certainly does not reach the evidence over which the government asserted the privilege—which goes far beyond FISA documents. *See supra* note 2.

Furthermore, § 1806(f) didn't create anything novel to suggest displacement of the state secrets privilege. The court's opinion treats § 1806(f) as enacting "an alternative mechanism" of ex parte, in camera review, which shows Congress's intent to "eliminate[] the need to dismiss the case entirely" under the state secrets privilege. Am. Op. at 61–62. Not so. Pre-FISA courts already conducted in camera and ex parte review with regularity. *See United States v. Belfield*, 692 F.2d 141, 149 (D.C. Cir. 1982) (recognizing that prior to FISA courts had "constantly" and "uniformly" held that "the legality of electronic, foreign intelligence surveillance may, even should, be determined on an in camera, ex parte basis"). Given that ex parte, in camera review procedures coexisted with the state secrets privilege before FISA, there's no reason to construe Congress's codification of such procedures as an intent to eliminate the privilege.

Nor does § 1806(f)'s triggering process—the filing of an affidavit under oath by the Attorney General—support abrogation. The court views the superficial similarity between the assertion of the state secrets privilege by the head of a department, *see Jeppesen*, 614 F.3d at 1080, and § 1806(f)'s affidavit requirement as evidence that Congress intended abrogation. Such evidence actually cuts the other way. Under FISA, the definition of "Attorney General" permits a number of lower-ranked Department of Justice

officials to invoke FISA's judicial review procedures, *see* § 1801(g), which makes sense given its main use in criminal prosecutions.  By contrast, the head of *any* department has the *non-delegable* authority to assert the state secrets privilege. *Jeppesen*, 614 F.3d at 1080.  Nothing in FISA's text suggests that Congress sought to remove the privilege from the hands of the Secretary of State, the Director of National Intelligence, and other cabinet heads, and simply transfer it to the Attorney General and his subordinates.  Contrary to the court's assessment, the difference between who can assert the privilege and who can invoke § 1806(f) reaffirms that FISA coexists with, rather than displaces, the state secrets privilege.

Finally, the court's view of FISA as a replacement for the state secrets privilege ignores that the provision not only authorizes but *mandates* disclosure.  *See* § 1806(g) (requiring the court to disclose evidence "to the extent that due process requires discovery or disclosure"); *see also* § 1806(f) (authorizing the court to disclose evidence to the aggrieved person when "necessary to make an accurate determination of the legality of the surveillance").   And under the court's broad reading, FISA may very well authorize disclosure of state secrets to the very subjects of the surveillance.  *See* Am. Op. 68 (holding that plaintiffs' request for electronic surveillance evidence triggers § 1806(f) review).[9]

---

[9] For the first time, Judge Berzon announces that the panel's opinion is actually limited to the state secrets privilege's dismissal remedy and that the government is free to reassert the privilege if the district court orders disclosure. *See* Concurrence at 110 n.1.  This is news to anyone reading the panel opinion, which explicitly authorizes the district court to "disclose" state secrets evidence to the "plaintiffs."  *See* Am. Op. at 103.  The opinion goes so far to warn that "*not*" disclosing such evidence could constitute an abuse of discretion. *Id.* at 103 n.49 (emphasis added).

But the state secrets privilege does not tolerate *any* disclosure—not even in camera and ex parte—if it can be avoided. *See Reynolds*, 345 U.S. at 10 ("[T]he court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers."). Such disclosures, when involving national security secrets, are inimical to the secrecy afforded to the Executive under Article II. Thus, FISA fails to speak directly to the paramount concern for the secrecy at the heart of the state secrets privilege.

Given the silence of the statutory text, it's unsurprising that the court's opinion resorts to legislative history to support abrogation. But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018). We "have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point." *Shannon v. United States*, 512 U.S. 573, 584 (1994) (cleaned up). Even so, from hundreds of pages of legislative history, the court excavates only vague quotes describing FISA as a "fundamental reform" aimed at curbing unchecked executive surveillance. *See* Am. Op. at 63–64. The court can't even muster up a single floor statement mentioning the state

---

Nevertheless, that the panel needs to amend its opinion through a nonbinding concurrence is reason enough for us to have reheard this case en banc. We owe the district courts and litigants a clear statement of the law—especially in a case implicating national security concerns. More fundamentally, this newly crafted limitation of the court's holding doesn't alter any of the concerns raised in this dissent and in many ways exacerbates them. The court's holding, even as purportedly limited, impinges on a constitutionally based privilege based on a misreading of FISA. And if raising concerns about the court's degradation of separation of powers and our constitutional design makes me a "veritable Russian doll" maker, *see* Concurrence at 108, then bring on the dolls.

secrets privilege. Even for those who would rely on legislative history, this alone should end the inquiry.

Nevertheless, the legislative history shows that—contrary to the court's view—the state secrets privilege coexists with FISA. For example, a committee report notes that preexisting "defenses against disclosure," which would include the state secrets privilege, were intended to be undisturbed by FISA. *See* H.R. Rep. No. 95-1283, at 93 (1978). Another report explained that even when § 1806(f) applied, the government could still "prevent[]" the court's "adjudication of legality" simply by "forgo[ing] the use of the surveillance-based evidence" where disclosure of such evidence "would damage the national security." S. Rep. No. 95-701, at 65 (1978). And another explains that § 1806(f) was crafted "to prevent these carefully drawn procedures from being bypassed by the inventive litigant." H.R. Rep. No. 95-1283, at 91.

Ultimately, despite the lengthy excursion into FISA's legislative history, the court simply ignores material that undermines its interpretation. We're instead offered only generic, cherry-picked quotes about FISA—proving yet again that relying on legislative history is "an exercise in looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (cleaned up). But if § 1806(f) was not meant for "inventive litigants," it was equally not meant for inventive courts.

### III.

Most frustrating about our court's decision here is that § 1806(f) *doesn't even apply* to plaintiffs' case. Section 1806(f) isn't a freestanding vehicle to litigate the merits of any case involving electronic surveillance. FISA's review

procedures are triggered only to determine the admissibility of the government's electronic surveillance evidence. In this case, the government never sought to admit and plaintiffs never sought to suppress any such evidence. Accordingly, § 1806(f) wasn't invoked. Yet the court creatively interprets two clauses of the statute to foist FISA's review mechanism into this case. We should have corrected this misinterpretation through en banc review.

## A.

Section 1806(f)'s review procedures are triggered if the government gives notice that it "intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding . . ., against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person[.]" § 1806(c), (f). The court held that when the government asserted the state secrets privilege it effectively gave notice that it intended to "use*"* the evidence against plaintiffs. This is wrong for two separate reasons.

## 1.

First, § 1806(c) doesn't apply because the government isn't seeking to *use* the state secrets as evidence. By asserting the privilege, the government is not *using* evidence in any reasonable sense of the word. Quite the opposite: the government seeks to remove this evidence to avoid disclosing state secrets. *See Jeppesen*, 614 F.3d at 1079 ("A successful assertion of privilege under *Reynolds* will remove the privileged evidence from the litigation."). The court suggests that it "is precisely because the Government would like to use this information to defend itself that it has asserted the state secrets privilege." Am. Op. at 67. But this is precisely

backwards. It transforms the government's expressed *inability to use* evidence into an expressed intent to use it. Such upside-down logic should not stand.

And no matter what tortured conception of "use" the court conjures up here, to "use" something means to do so for its intended purpose. *Smith v. United States*, 508 U.S. 223, 242 (1993) (Scalia, J., dissenting). "When someone asks, 'Do you use a cane?,' he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane." *Id.* So too here: the government is not "using" the evidence merely by asserting the privilege over it. Evidence is "used" when it is being offered for admission or disclosed for some other evidentiary purpose.

## 2.

Second, it's doubtful that § 1806(c) could apply here since there was no proceeding against "an aggrieved person." By its terms, this provision applies only to a "trial, hearing, or other proceeding" "against an aggrieved person." § 1806(c). This interpretation flows from the nearest-reasonable-referent canon. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 140–41 (2012) ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent."). It's also consistent with ordinary usage. Although the court now proclaims the opposite, *see* Am. Op. at 70, we commonly refer to trials, hearings, and proceedings as being

"against" a party.[10]   Instead, the court curiously views "against an aggrieved person" as modifying the phrase "information obtained or derived."   But under that odd interpretation, this phrase would be modified *twice* by "aggrieved person."   The statute would be triggered by the government's use of "any information obtained or derived [against the aggrieved person] from an electronic surveillance of that aggrieved person."   § 1806(c).   That is not a sensical reading.[11]

## B.

Perhaps sensing the weakness of its § 1806(c) reasoning, the court serves an alternative explanation for how FISA's review procedures were triggered.   Section 1806(f) also provides that its procedures are invoked:

---

[10] *See, e.g.*, *Paine v. City of Lompoc*, 265 F.3d 975, 986 (9th Cir. 2001) ("trial against these two defendants"); *United States v. Branch*, 368 F. App'x 842, 844 (9th Cir. 2010) ("misconduct hearing against the government"); *Lopez-Aguilar v. Barr*, 948 F.3d 1143, 1146 (9th Cir. 2020) ("removal proceedings against Lopez-Aguilar").

[11] The phrase "against an aggrieved person" also doesn't modify "enter into evidence or otherwise use or disclose."   For adherents to the familiar surplusage canon, this reading would render the phrase completely superfluous.   After all, who else is the government going to use the evidence against but the aggrieved person?   Additionally, in ordinary English, we don't often speak about "disclos[ing]" information "against" someone.   And if this construction was intended, we would have expected Congress to make this point clear by placing the phrase closer to the verbs it modifies.   *See United States v. Nader*, 542 F.3d 713, 717–18 (9th Cir. 2008) ("A prepositional phrase with an adverbial or adjectival function should be as close as possible to the word it modifies to avoid awkwardness, ambiguity, or unintended meanings.") (quoting The Chicago Manual of Style ¶ 5.167 (15th ed. 2003)).

> whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule . . . to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter[.]

§ 1806(f).

By its context, this clause is designed to funnel an aggrieved person's evidentiary motions and requests—which could be brought under a myriad of preexisting statutes or rules—into § 1806(f)'s admissibility review procedures. It is not an independent grant of authority to force government disclosure under § 1806(f) anytime, for any reason, for any evidence, as long as a party has some claim relating to electronic surveillance.

But the court holds that the clause was triggered because the plaintiffs' complaint requested injunctive relief ordering the government to destroy or return any unlawfully obtained materials. According to the court, by asking for the "return" of electronic surveillance, the complaint's *prayer for relief* serves as a "request[]" to "obtain" that information within the meaning of § 1806(f). Am. Op. 68.

Contrary to the court's expansive interpretation, this clause is limited to procedural motions pertaining to the admissibility of evidence, like the familiar "motion[s]" to "discover, obtain, or suppress." § 1806(f). The clause's use of the word "request" does not change this analysis since it must be read alike with "motion." *See Freeman v. Quicken*

*Loans, Inc.*, 566 U.S. 624, 634–35 (2012) (applying the "commonsense canon" that "a word is given more precise content by the neighboring words with which it is associated"). In this context, these two terms refer to procedural actions such as a "production request" or a "motion to discover evidence," not substantive requests for relief.[12]

We're also not to read "motion or request" in a vacuum. The provision refers to motions and requests "[made] pursuant to any other statute or rule . . . to discover, obtain, or suppress evidence or information." § 1806(f). This context makes clear that that the provision covers only procedural motions or requests, not plaintiffs' substantive claims for relief. It likewise confirms that the clause is not an independent grant of authority, but relies on other statutes and rules—which would remain subject to evidentiary privileges.

In treating plaintiffs' complaint as a request sufficient to trigger § 1806(f), the court reads too much into the word "obtain," which must be read in the context of "the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Here, "obtain" is spliced between "discover" and "suppress," both of which are procedural, evidentiary actions having nothing to do with substantive claims or injunctive relief. Accordingly, "obtain" is similarly limited to pretrial actions aimed at evaluating the admissibility of evidence. *See, e.g.*,

---

[12] Seemingly whenever the phrase "motion or request" appears it refers to a procedural action. *See, e.g.*, 17 U.S.C. § 803(b)(6)(C)(v) ("motion or request to compel production"); Fed. R. Crim. P. 29, Advisory Comm. Notes to 2005 amendments ("motion or request" for an extension of time); Charles A. Wright et al., Federal Practice and Procedure: Criminal § 261 (4th ed. 2020 Update) (Rule 12(c) authorizes time for "making of pre-trial motions or requests").

Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]").

FISA's structure also confirms the clause's limitation to pretrial motions relating to the admissibility of evidence. All of the other triggering mechanisms of § 1806(f)—subsections (c), (d), and (e)—are pretrial, procedural actions to secure a ruling on the admissibility of evidence. This clause must be read in a similar light to avoid "giving unintended breadth to the Acts of Congress." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015). It would be odd for Congress to ambiguously bury a substantive right for plaintiffs to "obtain" national security secrets in the muddled language of § 1806(f). We know that this can't be the case because Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Additionally, FISA does not recognize injunctive relief. *ACLU Found. of S. California v. Barr*, 952 F.2d 457, 470 (D.C. Cir. 1991) ("Not only does § 1806(f) not create or recognize a cause of action for an injunction or for a declaratory judgment, but the scheme it sets up makes clear that nothing in FISA can be read to create such a cause of action."). It can't be the case that § 1806(f) is triggered by a request for substantive relief that FISA itself does not contemplate.[13]

---

[13] The concurrence makes much ado over § 1810, which authorizes a cause of action for FISA violations. But the fact that the privilege "could" lead to a dismissal of a § 1810 suit, Concurrence at 113–114, is largely irrelevant. The same is true of any other cause of action. And just because claims *could* be dismissed after a valid privilege assertion doesn't

Finally, this clause must be read in context of FISA's single remedy after § 1806(f) review—the "suppress[ion of] the evidence" or *otherwise* grant[ing] the motion of the aggrieved person." § 1806(g) (emphasis added). Thus, these motions and requests, however styled, all lead down the same road—suppression of evidence, or relief in aid of that remedy. *Cf. James v. United States*, 550 U.S. 192, 218 (2007) (Scalia, J., dissenting) (recognizing that "'otherwise' is defined as '[i]n a different manner' or 'in another way,'" so the use of the word signals other ways of doing something of the same *character* as what preceded it). As the heading of this provision confirms, the district court's review can result in either "[s]uppression of evidence" or "denial of motion." § 1806(g) (heading). Thus, whether they're to "discover, obtain, or suppress," these motions and requests only relate to the ultimate determination of the admissibility of evidence. Here, plaintiffs have neither a "motion to suppress," nor any other motion to "otherwise grant," should the district court rule in their favor after the § 1806(f) review. Accordingly, try as it might, the court can't jam a square peg into a round hole. Section 1806(f) doesn't apply here.

## IV.

The court's decision today seriously degrades the Executive's ability to protect our Nation's secrets and I fear it is only a stepping stone to further erosions. By abrogating the state secrets privilege, we not only upset the balance of power among co-equal branches of government, but we also

---

mean all of them will be. Look no further than *this very case*: the government did not move to dismiss Plaintiffs' § 1810 claim based on the privilege and the claim is going forward (and would've gone forward even without the panel's abrogation of the privilege).

144          FAZAGA V. WALLS

do damage to a right inherent in the constitutional design and acknowledged since our Nation's founding.  And we do so without clear evidence that this is the result Congress sought. For these reasons, I respectfully dissent from the denial of rehearing en banc.