**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YASSIR FAZAGA; ALI UDDIN MALIK; YASSER ABDELRAHIM, | No. 12-56867 |
| *Plaintiffs-Appellees*, | D.C. No. 8:11-cv-00301-CJC-VBK |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; PAUL DELACOURT, Assistant Director in Charge, Federal Bureau of Investigation's Los Angeles Division, in his official capacity; PAT ROSE; KEVIN ARMSTRONG; PAUL ALLEN, | OPINION |
| *Defendants*, | |
| and | |
| BARBARA WALLS; J. STEPHEN TIDWELL, | |
| *Defendants-Appellants*, | |

YASSIR FAZAGA; ALI UDDIN
MALIK; YASSER ABDELRAHIM,

            *Plaintiffs-Appellees*,

  v.

FEDERAL BUREAU OF
INVESTIGATION; CHRISTOPHER
A. WRAY, Director of the Federal
Bureau of Investigation, in his official
capacity; PAUL DELACOURT,
Assistant Director in Charge, Federal
Bureau of Investigation's Los Angeles
Division, in his official capacity; J.
STEPHEN TIDWELL; BARBARA
WALLS,

            *Defendants*,

 and

PAT ROSE; KEVIN ARMSTRONG;
PAUL ALLEN,

            *Defendants-Appellants*.

No. 12-56874

D.C. No.
8:11-cv-00301-
CJC-VBK

---

YASSIR FAZAGA; ALI UDDIN
MALIK; YASSER ABDELRAHIM,

            *Plaintiffs-Appellants*,

  v.

No. 13-55017

D.C. No.
8:11-cv-00301-
CJC-VBK

FAZAGA V. FBI                                    3

FEDERAL BUREAU OF
INVESTIGATION; CHRISTOPHER
A. WRAY, Director of the Federal
Bureau of Investigation, in his official
capacity; PAUL DELACOURT,
Assistant Director in Charge, Federal
Bureau of Investigation's Los Angeles
Division, in his official capacity; J.
STEPHEN TIDWELL; BARBARA
WALLS; PAT ROSE; KEVIN
ARMSTRONG; PAUL ALLEN;
UNITED STATES OF AMERICA,

                    *Defendants-Appellees*.

On Remand from the United States Supreme Court

Argued and Submitted June 8, 2023
Seattle, Washington

Filed December 20, 2024

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and George Caram Steeh III,* District Judge.

Opinion by Judge Berzon

---

* The Honorable George Caram Steeh III, United States District Judge
for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### *Bivens* / **State Secrets Privilege**

On remand from the United States Supreme Court in a case involving constitutional and statutory claims arising out of the FBI's alleged improper surveillance of Muslims in Southern California, the panel (1) affirmed the district court's dismissal of *Bivens* claims asserted by Yassir Fazaga and other Muslim residents of Southern California against individual defendants; and (2) reversed the district court's dismissal, under the state secrets privilege, of Fazaga's claims alleging that defendants improperly targeted Fazaga and other Muslims because of their religion.

The panel held that *Egbert v. Boule*, 596 U.S. 482 (2022), foreclosed a *Bivens* remedy for any of Fazaga's *Bivens* claims against FBI agents in their individual capacities. Applying *Egbert*, the panel concluded that no *Bivens* remedy was available for Fazaga's First and Fifth Amendment claims because the claims arose in a new context and several factors weighed against expanding *Bivens* to reach Fazaga's claims. For similar reasons, a *Bivens* remedy was not available for Fazaga's Fourth Amendment claim.

The remaining issue concerned the effect of the government's assertion of the state secrets privilege under *United States v. Reynolds*, 345 U.S. 1 (1953), on Fazaga's religion claims. Rather than just seeking exclusion of the assertedly privileged information, the government requested

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

dismissal at the pleading stage, which the district court granted.

Reviewing the district court's dismissal, the panel held that the government properly invoked the *Reynolds* privilege, and that the information in the identified categories was in fact privileged. However, although at least some of the information at issue was privileged, the district court did not apply the proper standard or use the proper process when it held that Fazaga's religion claims should be dismissed outright on the grounds that privileged information gives defendants a valid defense, and that litigation would present an unacceptable risk of disclosing state secrets. The district court has not yet conducted the detailed and fact-intensive inquiry required to dismiss a claim based on a valid defense under *Reynolds*, nor did the district court's dismissal of Fazaga's claims on the basis that litigation would present an unacceptable risk of disclosing state secrets meet the stringent standard for such dismissals. The panel remanded this case to the district court for further proceedings.

---

## COUNSEL

Peter Bibring (argued), Mohammad Tajsar, and Catherine A. Wagner, ACLU of Southern California, Pasadena, California; Ahilan T. Arulanantham, UCLA School of Law, Center for Immigration Law and Policy, Los Angeles, California; Dan Stormer and Shaleen Shanbhag, Hadsell Stormer & Renick LLP, Pasadena, California; Amr Shabaik, Fatima Dadabhoy, Ameena M. Qazi, and Dina Chehata,

Council on American-Islamic Relations, Anaheim, California; for Plaintiffs-Appellees.

Joseph F. Busa (argued), Sharon Swingle, Daniel Tenny, Mark B. Stern, and Douglas N. Letter, Appellate Staff Attorneys; Stephanie Yonekura, Former Acting United States Attorney; Martin Estrada, United States Attorney; Benjamin C. Mizer, Former Deputy Assistant Attorney General; Sarah E. Harrington, Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Washington, D.C.; Catherine M.A. Carroll (argued), Howard M. Shapiro, Carl J. Nichols, David G. Beraka, Allison M. Schultz, Charlie Johnson, and Daniel Volchok, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Alexander H. Cote, Angela M. Machala, Amos A. Lowder, and David C. Scheper, Winston & Strawn LLP, Los Angeles, California; Katie Moran, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; for Defendants-Appellants.

Richard R. Wiebe, Law Office of Richard R. Wiebe, San Francisco, California; Thomas E. Moore III, Royse Law Firm PC, Palo Alto, California; Cindy Cohn, Lee Tien, Kurt Opsahl, James S. Tyre, Mark Rumold, Andrew Crocker, and David Greene, Electronic Frontier Foundation, San Francisco, California; for Amicus Curiae Electronic Frontier Foundation.

Elizabeth Wydra, Brianne J. Gorod, and Brian R. Frazelle, Constitutional Accountability Center, Washington, D.C., for Amicus Curiae Constitutional Accountability Center.

**OPINION**

BERZON, Circuit Judge:

This case involves constitutional and statutory claims arising out of the FBI's alleged improper surveillance of Muslims in Southern California. We revisit it after a remand from the Supreme Court. The Court reversed our prior conclusion that the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(f), displaced the state secrets privilege and its dismissal remedy with respect to electronic surveillance. *See Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), *rev'd*, 595 U.S. 344, 355, 359 (2022). The issues before us now are (i) whether to address the *Bivens* claims asserted against the individual defendants, which we declined to do in our earlier opinion, and if we do so, how to resolve them, and (ii) whether the state secrets privilege requires dismissal of Fazaga's religion claims at the motion to dismiss stage.

We hold this time around that the *Bivens* claims should be dismissed. The Supreme Court's jurisprudence since our earlier consideration of this case establishes that no *Bivens* cause of action is cognizable on the facts alleged.

As to the religion claims, we affirm the district court's determination that the government properly invoked the state secrets evidentiary privilege under *United States v. Reynolds*, 345 U.S. 1 (1953), and that at least some of the information the government describes is privileged. But we conclude that the application of that privilege does not warrant dismissal of the claims at this juncture. The government has not demonstrated that excluding the privileged information would deprive it of a valid defense or that the privileged information is so intertwined with the relevant nonprivileged information that further litigation

unacceptably risks disclosing state secrets. We therefore
reverse the dismissal of the religion claims and remand those
claims to the district court to consider how the case should
proceed.

**I.**

Here is a brief summary of the factual background of this
case:

The plaintiffs—Yassir Fazaga, Ali Malik, and Yasser
AbdelRahim (collectively, "Fazaga")—are three Muslim
residents of Southern California. They allege that, as part of
a counterterrorism investigation known as "Operation Flex,"
the FBI paid a confidential informant, Craig Monteilh, to
gather information about Muslims. The operative complaint
states that Operation Flex was a "dragnet surveillance"
program that targeted them and other Muslims "solely due
to their religion." In accordance with an expansive directive
to gather information on Muslims generally, Monteilh
engaged with a broad range of Muslim people at mosques,
community events, gyms, and other settings, and recorded
virtually all of his interactions.

Fazaga filed a putative class action against the United
States, the FBI, and two FBI leaders in their official
capacities (collectively, "the government"), and against five
FBI agents in their individual capacities ("the agent
defendants").[1] The operative complaint asserts eleven
causes of action of two types: (i) claims alleging
unconstitutional searches in violation of the Fourth

---

[1] The putative class includes "[a]ll individuals targeted by Defendants
for surveillance or information-gathering through Monteilh and
Operation Flex, on account of their religion, about whom the FBI thereby
gathered personally identifiable information."

Amendment and the Foreign Intelligence Surveillance Act
(FISA), and (ii) claims alleging religious discrimination,
burdens on religion, and other violations of Fazaga's
religious freedom rights under the First and Fifth
Amendments, the Privacy Act, the Religious Freedom
Restoration Act (RFRA), and the Federal Tort Claims Act
(FTCA). Fazaga seeks an injunction "ordering Defendants
to destroy or return any information gathered through the
unlawful surveillance program," as well as compensatory
and punitive damages against the agent defendants.

Central to Fazaga's case is Monteilh, whom the
government acknowledges was a confidential informant.
The record contains extensive public declarations by
Monteilh detailing his interactions with Fazaga and others.
Fazaga's complaint also references news reporting on
Monteilh's activities. The government does not maintain
that the information in Fazaga's complaint or Monteilh's
declarations is privileged or classified. This case thus arises
with a considerable amount of information related to
Fazaga's religious discrimination claims already public and
unprivileged.

The Attorney General of the United States invoked the
state secrets privilege with respect to three categories of
potential evidence. In support of its privilege assertion, the
government filed public declarations from the Attorney
General and from the Assistant Director of the FBI's
Counterterrorism Division. It also provided two classified
declarations from the Assistant Director and a classified
supplemental memorandum, which the district court, and
we, reviewed *ex parte* and *in camera*.

The government moved to dismiss Fazaga's religion
claims pursuant to the state secrets privilege, as well as on

other grounds. The agent defendants moved to dismiss all
the claims against them on various grounds. The district
court dismissed all of Fazaga's non-FISA claims on the basis
of the state secrets privilege—including the Fourth
Amendment claim, although the government had not sought
its dismissal on privilege grounds.

On appeal, we reversed the district court's dismissal of
certain claims and affirmed the dismissal of others. Relevant
here, we held that FISA's procedures for challenging
electronic surveillance, 50 U.S.C. § 1806(f), applied in lieu
of the state secrets privilege and its dismissal remedy with
respect to such surveillance. *Fazaga*, 965 F.3d at 1052.
Having done so, we concluded that certain of the religion
claims against the government defendants could go
forward.[2] *Id.* at 1064–65. We declined to address whether
the *Bivens* claims against the agent defendants survived. *Id.*
at 1055–59.

The Supreme Court reversed the case on the "narrow"
ground that FISA "does not displace the state secrets
privilege" and remanded. *Fazaga*, 595 U.S. at 355, 359. The
Court expressly did not "decide whether the Government's
evidence is privileged or whether the District Court was
correct to dismiss respondents' claims on the pleadings." *Id.*
And the Court did not address any aspect of our opinion not
involving the state secrets doctrine.

---

[2] Specifically, we reversed the dismissal of the First and Fifth
Amendment and RFRA claims. 965 F.3d at 1056–64. We did not address
on the merits Fazaga's FTCA claims because the "applicability of the
discretionary function exception [to the FTCA] will largely turn on the
district court's ultimate resolution of the merits of Plaintiffs' various
federal constitutional and statutory claims." *Id.* at 1065.

We ordered, and the parties filed, supplemental briefing addressing, among other things, which issues should be considered by this panel on remand. The remaining issues have narrowed considerably, to (i) whether the *Bivens* claims against the agent defendants may go forward in light of the Supreme Court's recent *Bivens* jurisprudence, and (ii) whether the remaining religion claims should be dismissed on the basis of the state secrets privilege. We address each issue in turn.

## II.

In our earlier opinion we declined to reach the *Bivens* claims. We now revisit that decision in light of later case law.

Relying on *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), Fazaga seeks monetary damages against the agent defendants for the alleged Fourth Amendment search violation and for his First and Fifth Amendment religious discrimination claims. In our previous opinion, we held with respect to the search issues that, "[i]n light of the overlap between the [Fourth Amendment] *Bivens* claim and the narrow range of the remaining FISA claim against the Agent Defendants that can proceed, it is far from clear that Plaintiffs will continue to press this claim." *Fazaga*, 965 F.3d at 1056. And as to the First and Fifth Amendment *Bivens* claims, we held that only those claims premised on alleged "conduct motivated by intentional discrimination against Plaintiffs because of their Muslim faith" could proceed.[3] *Id.* at 1058–59. We remanded the issue to the

---

[3] We held earlier that no *Bivens* remedy was available for Plaintiffs' religion claims to the extent they were premised on the agent defendants' alleged improper collection and retention of information about the

district court to determine whether a *Bivens* remedy is available for any of the surviving claims. *Id.* at 1056, 1059.

The Supreme Court has, since our earlier opinion, clarified the limited availability of *Bivens* remedies, obviating the need to remand to the district court. *See Egbert v. Boule*, 596 U.S. 482 (2022). *Egbert* forecloses a *Bivens* remedy for any of the remaining *Bivens* claims against the agent defendants. "[U]nder *Egbert* in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts. This case is not the rare exception." *Mejia v. Miller*, 61 F.4th 663, 669 (9th Cir. 2023) (internal quotation marks and citation omitted).

Before *Egbert*, the Supreme Court had set out a two-step inquiry for evaluating a *Bivens* claim. "First, we ask whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action."[4] *Egbert*, 596 U.S. at 492 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017)) (internal quotation marks and alterations omitted). Second, if the context is new, we consider whether "there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Ziglar*, 582 U.S. at 136). If so, no *Bivens* remedy is available.

---

Plaintiffs, or on the burden of that surveillance on Plaintiffs' exercise of religion. *Fazaga*, 965 F.3d at 1057–58. The Privacy Act and RFRA, "taken together, function as an alternative remedial scheme" for those claims, we held, *id.* at 1059, so a *Bivens* remedy is unavailable, *id.* at 1057; *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017).

[4] Namely, *Bivens*, 403 U.S. 388; *Davis v. Passman*, 442 U.S. 228 (1979); and *Carlson v. Green*, 446 U.S. 14 (1980). *See Ziglar*, 582 U.S. at 131.

*Egbert* explained that these two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." 596 U.S. at 492. Since *Bivens* was decided, "expanding the *Bivens* remedy" to other contexts has become "a disfavored judicial activity." *Ziglar*, 582 U.S. at 135 (quotation marks omitted). Under *Egbert*, "*any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action" precludes a *Bivens* claim. 596 U.S. at 496 (internal quotation marks omitted).

## A.

Applying *Egbert*, we are constrained to conclude that no *Bivens* remedy is available for Fazaga's First and Fifth Amendment religion claims.

First, these claims arise in an entirely new context. The Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Egbert*, 596 U.S. at 498 (internal quotation marks omitted). And, although the Supreme Court recognized a *Bivens* remedy for violations of the Fifth Amendment's Equal Protection Clause in *Davis v. Passman*, 442 U.S. 228 (1979), that case involved a "meaningfully different" context. *Egbert*, 596 U.S. at 492 (internal quotation marks and alterations omitted). In *Davis*, the Supreme Court inferred a damages claim against a member of Congress who allegedly terminated the plaintiff because of her gender. 442 U.S. at 248–49. In contrast, this case involves FBI agents who conducted a counterterrorism investigation that allegedly discriminated on the basis of religion.

A case presents a new *Bivens* context when it "is different in a meaningful way from previous *Bivens* cases

decided by this Court"—for example, if it involves a "new category of defendants" or if "the statutory or other legal mandate under which the officer was operating" differs. *Ziglar*, 582 U.S. at 135, 139–40 (internal quotation marks omitted). Applying a case about an employment decision made by a Congressman to investigative decisions made by law enforcement agents carrying out a national security program in the executive branch would undoubtedly extend *Bivens* to a new context. *Harper v. Nedd*, 71 F.4th 1181, 1187 (9th Cir. 2023), for example, held that a challenge to adverse employment actions by the Bureau of Land Management is a meaningfully different context from *Davis*, although the context, an employment dispute, was considerably closer to *Davis* than here. Not only does this case involve a new category of defendants, but the agent defendants' conduct was carried out under distinct legal mandates to investigate threats to national security, including the Intelligence Reform and Terrorism Prevention Act, 50 U.S.C. § 401 *et seq.*, and Executive Order No. 12,333, 46 Fed. Reg. 59941 (Dec. 4, 1981). Further, the discrimination alleged was on the basis of religion, rather than on the basis of gender as in *Davis*.

Second, given this new context, several factors weigh against expanding *Bivens* to reach Fazaga's claims—or, put in *Egbert* terms, there is at least one rational reason to believe that Congress is better suited than the judiciary to determine the availability of a damages remedy. Chiefly, "a *Bivens* cause of action may not lie where, as here, national security is at issue." *Egbert*, 596 U.S. at 494; *see Hernandez v. Mesa*, 589 U.S. 93, 105–09 (2020). Fazaga's claims that he was impermissibly targeted for surveillance on the basis of his religion "challenge more than standard law enforcement operations." *See Ziglar*, 582 U.S. at 142

(internal quotation marks omitted). These claims concern the
FBI's counterterrorism operations and so involve "major
elements of the Government's whole response to the
September 11 attacks, thus of necessity requiring an inquiry
into sensitive issues of national security." *See id.* Such
"[j]udicial inquiry into the national-security realm raises
concerns for the separation of powers in trenching on matters
committed to the other branches." *Id.* (internal quotation
marks omitted). "[F]ear of personal monetary liability and
harassing litigation" may "unduly inhibit officials in the
discharge of their duties," *Egbert*, 596 U.S. at 499 (internal
quotation marks omitted), presenting a serious concern
regarding national security decisionmaking. In that context,
FBI agents may need to "tak[e] urgent and lawful action in a
time of crisis." *Ziglar*, 582 U.S. at 145.

For these reasons, "the Judiciary is not undoubtedly
better positioned than Congress to authorize a damages
action in this national-security context." *See Egbert*, 596
U.S. at 495. Under *Egbert*, a *Bivens* remedy for Fazaga's
religious discrimination claims is precluded.

**B.**

For similar reasons, a *Bivens* remedy is not available for
Fazaga's Fourth Amendment claim.

This claim too arises in a new context. *Bivens* concerned
a Fourth Amendment violation by federal officers. But "our
understanding of a 'new context' is broad." *Hernandez*, 589
U.S. at 102. "A claim may arise in a new context even if it is
based on the same constitutional provision as a claim in a
case in which a damages remedy was previously
recognized." *Id.* at 103. *Bivens* involved an allegedly
unconstitutional arrest and physical search of the plaintiff's
home. *Bivens*, 403 U.S. at 389. "There is a world of

difference" between those claims and Fazaga's Fourth
Amendment claim about unlawful surveillance conducted
pursuant to the FBI's counterterrorism strategies, "where the
risk of disruptive intrusion by the Judiciary into the
functioning of other branches is significant." *See Hernandez*,
589 U.S. at 103 (internal quotation marks omitted).

Applying *Hernandez*, we conclude that the national
security concerns we've discussed preclude expanding
*Bivens* to this new Fourth Amendment context. A *Bivens*
remedy against individual FBI agents could have
"systemwide consequences" for the FBI's execution of its
mandate to protect the United States against terrorist attacks.
*See Egbert*, 596 U.S. at 493 (internal quotation marks
omitted). The "uncertainty" of the effects of expanding
*Bivens* in this manner "alone is a special factor that
forecloses relief." *Id*.

Moreover, we previously noted that "the substance of
Plaintiffs' Fourth Amendment *Bivens* claim is identical to
the allegations raised in their FISA § 1810 claim." *Fazaga*,
965 F.3d at 1055. Thus, an "alternative remedial structure"
exists that counsels against fashioning a *Bivens* remedy here.
*Egbert*, 596 U.S. at 493 (internal quotation marks omitted).

For these reasons, we affirm the dismissal of the *Bivens*
claims.

## III.

The remaining issue before us concerns the effect of the
government's assertion of the state secrets privilege under
*United States v. Reynolds* on Fazaga's religion claims.

The state secrets privilege arises from "the sometimes-
compelling necessity of governmental secrecy" to protect
national security, which the Supreme Court has recognized

"by acknowledging a Government privilege against court-ordered disclosure" of secret "information about . . . military, intelligence, and diplomatic efforts." *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 484 (2011). The privilege has two distinct applications. The first, set forth in *Totten v. United States*, 92 U.S. 105 (1875), forbids courts to adjudicate claims directly premised on state secrets. This "unique and categorical . . . bar," *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005), applies only where "the very subject matter of the action" is itself "a matter of state secret," *Reynolds*, 345 U.S. at 11 n.26. If *Totten* applies, the result is always dismissal. In *Totten*, for example, the Supreme Court affirmed dismissal of a suit against the United States to recover compensation allegedly promised to a Civil War spy, noting that the "existence" of the contract was "itself a fact not to be disclosed" and that litigation would "inevitably lead to the disclosure of matters which the law itself regards as confidential." 92 U.S. at 105–07.

Acknowledging the harshness of categorical dismissal, the Supreme Court recently explained that the *Totten* rule "captures what the *ex ante* expectations of the parties were or reasonably ought to have been. Both parties 'must have understood' . . . that state secrets would prevent courts from resolving many possible disputes under the . . . agreement." *Gen. Dynamics*, 563 U.S. at 490 (quoting *Totten*, 92 U.S. at 106). So the *Totten* bar is rooted in the plaintiff's choice to participate in a matter involving a state secret, the secret nature of which precludes judicial review of ensuing disputes.

The second version of the state secrets privilege, set forth in *Reynolds*, is an evidentiary one. Unlike the *Totten* bar, which always requires dismissal, the *Reynolds* privilege ordinarily requires only that a court "apply[] evidentiary

rules: The privileged information is excluded, and the trial goes on without it." *Gen. Dynamics*, 563 U.S. at 485.

Here, the government asserts only the *Reynolds* evidentiary privilege. It seeks to keep secret information that could tend to "confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation"; "reveal the initial reasons . . . for an FBI counterterrorism investigation of a particular person . . . , any information obtained during the course of such an investigation, and the status and results of the investigation"; or "reveal whether particular sources and methods were used in a counterterrorism investigation."

But rather than just seeking exclusion of the assertedly privileged information, the government requested dismissal of the case at the pleading stage, which the district court granted. To review the dismissal, we must decide (a) whether the government has properly invoked *Reynolds* privilege, (b) whether information in the identified categories is in fact privileged, and (c) if it is privileged, whether Fazaga's religion claims must be dismissed as a result, as the government maintains is necessary to protect the information.[5] *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2010) (en banc). We review *de novo* the interpretation and application of the state secrets

---

[5] The district court dismissed Fazaga's Fourth Amendment claims under the state secrets privilege, although the government expressly did not seek dismissal on that ground. *See Fazaga*, 965 F.3d at 1042–43. We previously held that this dismissal was erroneous because the government had not formally invoked the state secrets privilege as to those claims. *See id.* The Supreme Court did not address this portion of our holding and the parties do not now challenge it, so it remains in effect.

doctrine and review for clear error the district court's
underlying factual findings. *Id.* at 1077.

**A.**

First, did the government properly invoke the *Reynolds*
privilege? Doing so requires a "formal claim . . . by the head
of the department which has control over the matter, after
actual personal consideration by that officer." *Reynolds*, 345
U.S. at 7–8 (footnote omitted). "To ensure that the privilege
is invoked no more often or extensively than necessary," the
claim must be a "serious" and "considered" one and "reflect
the certifying official's *personal* judgment." *Jeppesen*, 614
F.3d at 1080 (quoting *United States v. W.R. Grace*, 526 F.3d
499, 507–08 (9th Cir. 2008) (en banc)). It must include
"sufficient detail for the court to make an independent
determination of the validity of the claim of privilege and the
scope of the evidence subject to the privilege." *Id.*

The government has met these requirements. In a public
declaration, then-Attorney General Eric Holder asserted the
privilege over three categories of information that "could
reasonably be expected to cause significant harm to the
national security" if disclosed, based on his "personal
consideration of the matter." We are satisfied that this
declaration and the supporting public and classified
declarations by an FBI counterterrorism official include
sufficient detail for this courts' review.[6]

---

[6] In 2022, after the Justice Department supplemented the internal
procedures for invoking the state secrets privilege in effect at the time of
the privilege assertion in this case, the government informed us that,
based on another round of review, it had again "concluded that
invocation of the privilege and dismissal of certain claims remained

Fazaga challenges this privilege assertion because the Attorney General declared that he had considered "the matter" but did not say that he had reviewed the underlying source material. This argument fails. The declaration reflects *Reynolds*' instruction that the privilege must be claimed "by the head of the department which has control over *the matter*, after actual personal consideration." 345 U.S. at 8 (emphasis added) (footnote omitted). The official need not have reviewed every piece of information to validly invoke the privilege. "[O]nce [an official] has . . . adequately identified categories of privileged information, [she] cannot reasonably be expected personally to explain why each item . . . responsive to a discovery request affects the national interest." *Kasza v. Browner*, 133 F.3d 1159, 1169 (9th Cir. 1998).

In sum, the Attorney General properly invoked the *Reynolds* privilege.

**B.**

Next, was the information at issue in fact privileged? The state secrets privilege has been held generally to apply to information that would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments, or where disclosure would be inimical to national security." *Fazaga*, 965 F.3d at 1040–41 (quoting *Black v. United States*, 62 F.3d 1115, 1118

---

necessary to protect national security." *See* Memorandum from the Att'y Gen. on Policies & Procedures Governing Invocation of the State Secrets Privilege (Sept. 23, 2009), perma.cc/FRX3-5U5J; Memorandum from Att'y Gen. on Supplement to Policies & Procedures Governing Invocation of the State Secrets Privilege (Sept. 30, 2022), perma.cc/25QX-6PLL.

(8th Cir. 1995)). We will sustain a privilege claim if we determine "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. Though "*in camera* review is not always required," *United States v. Zubaydah*, 595 U.S. 195, 205–06 (2022), "[s]ufficient detail must be . . . provided for us to make a meaningful examination," *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007).

Fazaga does not dispute that the identified categories encompass at least some privileged information. But "we must make an independent determination whether the information is privileged" and "assure [ourselves] that an appropriate balance is struck between protecting national security matters and preserving an open court system." *Jeppesen*, 614 F.3d at 1081 (quoting *Al-Haramain*, 507 F.3d at 1202–03).

As we have explained, the government here asserts the state secrets privilege over three categories of information pertaining to FBI counterterrorism investigations: (i) "[i]nformation that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation"; (ii) "[i]nformation that could tend to reveal the initial reasons (i.e., predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation"; and (iii) "[i]nformation that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation." These categories of information "indisputably are matters that the state secrets privilege may cover." *See Jeppesen*, 614 F.3d at

1086. We have carefully examined the government's public
and classified declarations and classified supplemental
briefs in support of its privilege claim, all of which were
reviewed by the district court as well.[7] We also held an *ex
parte*, *in camera* argument with the government defendants'
counsel immediately after the public argument regarding the
assertedly privileged information. Having done so, we are
convinced that the disclosure of at least some information
within the three identified categories would seriously harm
legitimate national interests and so is privileged.

## C.

Finally, given our conclusion that at least some of the
information at issue in this case is privileged, how should
this case proceed?

### 1.

Normally the *Reynolds* privilege operates like any other
evidentiary privilege: the privileged information does not
come in and the case goes on without it. "Ordinarily, simply
excluding or otherwise walling off the privileged
information . . . suffice[s] to protect the state secrets and the
case will proceed accordingly, with no consequences save
those resulting from the loss of evidence." *Jeppesen*, 614
F.3d at 1082 (internal quotation marks and citation omitted).
In *Reynolds*, for example, the Supreme Court concluded that
an Air Force report sought during discovery was privileged
and remanded the case to the district court to allow the
plaintiffs to establish their claims without the privileged
report. *See* 345 U.S. at 10–12. As with other evidentiary
privileges, an opposing party remains free to seek

---

[7] The government's classified disclosures to the court do not include the
underlying source material but provide detailed accounts of that material.

nonprivileged evidence or go forward based on accessible information. *See Zubaydah*, 595 U.S. at 255–56 (Gorsuch, J., dissenting); *see also* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1280 (4th ed. 2023) (privilege against self-incrimination); 3 Weinstein's Federal Evidence § 511.05 (attorney-client privilege).

In this case, however, the government maintains that protecting state secrets requires dismissing Fazaga's religion claims outright rather than just excluding the privileged information. The government invokes two of the "exceptional circumstances" which this court in *Jeppesen* recognized as requiring dismissal rather than just excluding evidence when the *Reynolds* privilege is properly invoked.**[8]** *Jeppesen*, 614 F.3d at 1077; *Fazaga*, 965 F.3d at 1041. The first exceptional circumstance is "if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim." *Jeppesen,* 614 F.3d at 1083 (quoting *Kasza*, 133 F.3d at 1166); *see also In re Sealed Case*, 494 F.3d 139, 149 (D.C. Cir. 2007); *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991). The second is if it is "impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses—litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen,* 614 F.3d at 1083; *see also Sakab Saudi Holding Co. v. Aljabri*, 58 F.4th 585, 597

---

[8] A third exceptional circumstance—if "the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence," *Jeppesen*, 614 F.3d at 1083 (quoting *Kasza*, 133 F.3d at 1166)—is not at issue in this case. Fazaga maintains that he can establish his *prima facie* case without privileged evidence.

(1st Cir. 2023); *Wikimedia Found. v. Nat'l Sec.
Agency/Cent. Sec. Serv.*, 14 F.4th 276, 303 (4th Cir. 2021).[9]

### a.

Fazaga's primary response to the government's
invocation of the *Jeppesen* exceptions is that *Jeppesen* is
"clearly irreconcilable" with the Supreme Court's
subsequent decision in *General Dynamics Corp. v. United
States*. After *General Dynamics*, Fazaga maintains, the
invocation of the *Reynolds* evidentiary privilege results in
the dismissal of a claim at the pleading stage only if the
plaintiff cannot make a *prima facie* case without the
privileged evidence.[10] *See Miller v. Gammie*, 335 F.3d 889,

---

[9] We previously noted that the "modern state secrets doctrine," including
both the *Totten* bar and the *Reynolds* privilege, is "[c]reated by federal
common law." *Fazaga*, 965 F.3d at 1041. The *Reynolds* court noted that
the existence of a "privilege against revealing military secrets" was "well
established in the law of evidence," looking to both American and
English historical precedent. 345 U.S. at 6–7. But the *effect* of the
privilege in *Reynolds*—that the privileged evidence could not be
compelled—was created by the Federal Rules of Civil Procedure, which
exempt privileged material from disclosure. Outright dismissal, by
contrast—whether because the entire subject matter of a case is a state
secret as in *Totten* or because the case cannot be litigated without
unacceptable risk of disclosing privileged material—is a remedy not
provided by rule or statute and was created entirely as a matter of federal
common law.

[10] The government asserts that Fazaga forfeited the argument that
*Jeppesen* has been abrogated because the argument was not raised in the
original briefing on appeal. But Plaintiffs raised and argued this same
issue before the Supreme Court, which expressly reserved it, *see Fazaga*,
595 U.S. at 357, and it has been fully addressed in the parties'
supplemental briefs before us now. As there is no prejudice to the
defendants, we are comfortable addressing this purely legal issue on its
merits. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988,
992 (9th Cir. 2010).

900 (9th Cir. 2003) (en banc). We do not agree that *Jeppesen* and *General Dynamics* are at odds in this respect.

*General Dynamics* involved a contract dispute between the Navy and two aerospace companies. 563 U.S. at 480–81. The parties disagreed about how application of the state secrets privilege under *Reynolds* should affect the case. *Id.* at 485. Noting that "*Reynolds* has less to do with these cases than the parties believe," the Supreme Court dismissed the case under the *Totten* bar. *Id.* at 485, 489–90. In reasoning that *Totten* applied, *General Dynamics* differentiated between the "common-law authority to fashion contractual remedies in Government-contracting disputes" under *Totten*, and the "power to determine the procedural rules of evidence" under *Reynolds*. *Id.* at 485. The Court also stated that, because the *Reynolds* privilege concerns evidentiary rules, "[t]he privileged information is excluded and the trial goes on without it." *Id.*

Like *General Dynamics*, *Jeppesen* had explained that the dismissal that results from *Totten*'s justiciability bar is distinct from the consequences of the *Reynolds* evidentiary rule. 614 F.3d at 1087 n.12. So the two cases are the same in this regard. Because the dispute in *General Dynamics* was not resolved under *Reynolds*, the Supreme Court did not go on to address whether and in what circumstances the invocation of the *Reynolds* privilege justifies dismissing a case entirely. *Jeppesen* did address that question, before *General Dynamics* was decided. And in this case, decided after *General Dynamics*, the Supreme Court expressly declined to "delineate the circumstances in which dismissal is appropriate" or "determine whether dismissal was proper in this case" under the *Reynolds* privilege. *Fazaga*, 595 U.S. at 357. In other words, the Court recognized that the availability of dismissal as a remedy where the *Reynolds*

privilege applies is an open question at the Supreme Court level.

The upshot is that *General Dynamics*' recognition that *Reynolds* applied an evidentiary rule does not contradict *Jeppesen*'s instruction that in certain "rare" circumstances, the invocation of the *Reynolds* evidentiary privilege may lead to dismissal. *Jeppesen*, 614 F.3d at 1092. The *General Dynamics* declaration thus did not wash out our own decision on that issue in *Jeppesen*, and *Jeppesen*'s parameters for dismissal under *Reynolds* remain binding in this circuit.

**b.**

Proceeding, then, to the question whether dismissal at the pleading stage was appropriate in this case, we begin with some background principles. We have made clear that "it should be a rare case" in which the *Reynolds* evidentiary privilege leads to dismissal—especially "at the outset of a case." *Jeppesen*, 614 F.3d at 1092. "Dismissal at the pleading stage under *Reynolds* is a drastic result and should not be readily granted." *Id.* at 1089.

These cautions reflect that ordinarily, an evidentiary privilege is invoked to prevent the disclosure of *specific* evidence sought in discovery. *Reynolds*, for example, involved an assertion of the state secrets privilege over a particular government report alleged to contain state secrets. 345 U.S. at 3–4. Similarly, *Zubaydah* involved an assertion of the privilege to quash subpoenas to two former contractors requesting thirteen specific categories of documents related to a Central Intelligence Agency detention facility in Poland and to Zubaydah's treatment there. *See* 595 U.S. at 198–99. When the government asserts its state secrets privilege over particular evidence sought in

discovery, the need for the assertion and its impact on the parties can be concretely evaluated and refined through discovery processes that serve to narrow and clarify the evidentiary issues in dispute between the parties. *See Hickman v. Taylor*, 329 U.S. 495, 501 (1947); *see also* 5 C. Wright & A. Miller, Federal Practice and Procedure §§ 1202, 1261 (4th ed. 2023). This "detailed *Reynolds* analysis," focused on specific evidence, helps to "ensure that the [state secrets] privilege is invoked no more . . . extensively than necessary" and to "improve the accuracy, transparency, and legitimacy of the proceedings." *Jeppesen*, 614 F.3d at 1080, 1084.

At the pleading stage, in contrast, any invocation of secrecy is necessarily broad and hypothetical. The plaintiff has not had an opportunity to pursue her theory of the case and so has not determined what specific evidence she needs for it to succeed. The defendant also likely does not yet know in detail the defense to be asserted nor the evidence that will need to be relied on to support the defenses chosen. Dismissal at this preliminary stage travels far afield from the ordinary principles of evidentiary privilege and risks unnecessarily compromising access to the courts and foreclosing meritorious claims.

So, when the government seeks early dismissal based on the *Reynolds* privilege, we conduct a "searching examination," *Jeppesen*, 614 F.3d at 1092, with "a very careful, indeed a skeptical, eye," *Al-Haramain*, 507 F.3d at 1203, before concluding that dismissal is required. This inquiry does not detract from our firm "acknowledge[ment] [of] the need to defer to the Executive on matters of foreign policy and national security and surely [not] find ourselves second guessing the Executive in this arena." *Al-Haramain*, 507 F.3d at 1203. At the same time, the court's duty to

"decide for itself whether the occasion is appropriate for claiming the privilege," *Zubaydah*, 595 U.S. at 205, is of paramount importance when the consequence of recognizing the privilege is outright dismissal at the pleading stage of a possibly meritorious lawsuit.

\*     \*     \*

Here, after reviewing the government's classified materials *ex parte* and *in camera*, the district court dismissed Fazaga's claims under *Reynolds* and *Jeppesen* because (i) "privileged information gives Defendants a valid defense," and (ii) litigation "would present an unacceptable risk of disclosing state secrets." We address each rationale for dismissal in turn.

**2.**

One of the "exceptional circumstances" in which the *Reynolds* privilege can require dismissing a claim is if the state secrets privilege "deprives the defendant of information that would otherwise give the defendant a valid defense to the claim." *Jeppesen*, 614 F.3d at 1083 (quoting *Kasza*, 133 F.3d at 1166). We first address the proper standard and procedures for concluding that privileged information establishes a valid defense that requires dismissal, which the parties dispute, and then consider whether that standard has been met in this case.

**a.**

Although *Jeppesen* briefly restated the "valid defense" ground for dismissal, it did not dismiss any claims on that

basis and so did not elaborate on the standard for doing so.[11]
We addressed the "valid defense" standard in some detail in
our earlier opinion in this case, adopting the D.C. Circuit's
approach as set forth in *In re Sealed Case*, 494 F.3d at 149,
and explaining that a "valid defense" is one that "is
meritorious and not merely plausible and would *require*
judgment for the defendant," *Fazaga*, 965 F.3d at 1067
(emphasis added). Addressing the implementation of this
concept, we explained that "where the government contends
that dismissal is required because the state secrets privilege
inhibits it from presenting a valid defense, the district court
may properly dismiss the complaint only if it conducts an
'appropriately tailored *in camera* review of the privileged
record,' and determines that defendants have a legally
meritorious defense that prevents recovery by the plaintiffs."
*Fazaga*, 965 F.3d at 1067 (citation omitted) (quoting *In re
Sealed Case*, 494 F.3d at 151).

We discussed the meaning of "valid defense" in our
earlier opinion because we recognized that the district court
might need to evaluate privilege claims involving
information not covered by FISA's alternate procedure (as
we interpreted it) to determine whether dismissal was

---

[11] None of the cases to which *Jeppesen*'s "valid defense" language can
be traced actually applied the stated rule that "if the privilege deprives
the defendant of information that would otherwise give the defendant a
valid defense to the claim, then the court may grant summary judgment
to the defendant." *Jeppesen*, 614 F.3d at 1083 (quoting *Kasza*, 133 F.3d
at 1166). *Jeppesen* quoted this language from *Kasza*, which similarly
stated but did not apply the rule. *See Kasza*, 133 F.3d at 1166, 1170.
*Kasza* quoted this language from *Bareford v. General Dynamics Corp.*,
973 F.2d 1138, 1141 (5th Cir. 1992). But the *Bareford* language was not
a holding: *Bareford* recognized but expressly declined to adopt other
courts' conclusions that dismissal was warranted "if privileged
information would establish a valid defense." *Id.* at 1143.

required under *Jeppesen*. *Fazaga*, 965 F.3d at 1067. The Supreme Court reversed our resolution under FISA of the state secrets challenge but did not address our articulation of the valid defense standard. *Fazaga*, 595 U.S. at 357–59.

Contrary to the government's argument, our definition of "valid defense" in our earlier opinion in this case was not dicta and remains circuit law. "Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (quoting *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004)). In particular, "direction to the district court on how to proceed continues to be binding precedent." *California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1176 (9th Cir. 2007) (quoting *Operating Eng'rs Pension Tr. v. Charles Minor Equip. Rental, Inc.*, 766 F.2d 1301, 1304 (9th Cir. 1985)). Regardless of whether it was "in some technical sense 'necessary,'" our definition of "valid defense" was intended to govern this case as it went forward, and so is the "law of the circuit." *See Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc) (per curiam).[12]

In any event, we remain of the view that our earlier explanation of the "valid defense" ground for dismissal was

---

[12] We reject the government's invocation of the "clear error" exception to the *law of the case* doctrine. "[E]xceptions to the law of the case doctrine are not exceptions to our general 'law of the circuit.'" *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc). As we have explained, our explanation of "valid defense" is circuit law that "must be followed unless and until overruled." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).

correct.**13** To see why, we begin by outlining the rationales for sanctioning dismissals in rare circumstances when the state secrets privilege is invoked by a government defendant, and then explain why those rationales do not justify expanding the exception to defenses that may be meritorious but may not be.

*First*, to repeat, dismissal because privileged information supports a valid defense turns the normal principles of evidentiary privilege on their head; normally, "privileged information is excluded and the trial goes on." *Gen. Dynamics*, 563 U.S. at 485. But most evidentiary privileges, like the attorney-client privilege or the marital privilege, protect *private* interests, either of the litigants themselves or of other people. In such instances, if a claim or defense depends on privileged information, the privilege holder "has a choice" between waiving the privilege to pursue the claim or defense and waiving the claim or defense to keep the privileged information confidential. *United States v. Gonzalez*, 669 F.3d 974, 982 (9th Cir. 2012). For evidentiary privileges that protect private interests, allowing the privilege holders to decide for themselves whether to forfeit a claim or defense so as to keep the privileged information private suffices; there is no need for the court to decide

---

[13] None of the cases the government cites in arguing that our "valid defense" standard is foreclosed substantively addressed that ground for dismissal or dismissed a claim on this basis. *See Reynolds*, 345 U.S. at 11 (remand); *Jeppesen*, 614 F.3d at 1087 (dismissal "because there is no feasible way to litigate . . . without creating an unjustifiable risk of divulging state secrets"); *Gen. Dynamics*, 563 U.S. at 486–89 (*Totten* dismissal); *Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005) (dismissal where "object of the suit . . . is to establish a fact that is a state secret"); *El-Masri v. United States*, 479 F.3d 296, 308–10 (4th Cir. 2007) (dismissal where privileged evidence necessary to the plaintiff's *prima facie* case).

whether the case should go forward despite the privilege invocation.

The state secrets privilege is different. It protects a *public* interest in safeguarding information that, if disclosed, would harm the nation's defense, intelligence-gathering, or foreign-relations interests. So the dangers of proceeding with the case may transcend the impairment of the government's private interest in defending the litigation; that interest, standing alone, might counsel waiving any privilege so as to enhance the defense. The "valid defense" ground for dismissal absolves the government, in the interest of national security, from having to choose between waiving the state secrets privilege to assert a defense and keeping the privileged materials private by abandoning any defense that relies on them.**[14]**

*Second*, a related reason the valid defense ground for dismissal has been justified is to protect the integrity of the judicial process. In *Molerio v. FBI*, for example, the plaintiff alleged that the FBI had decided not to hire him because of his father's political activities. 749 F.2d 815, 818–20 (D.C. Cir. 1984). The D.C. Circuit concluded that the plaintiff had made out a "circumstantial case" that the FBI had violated the First Amendment because the political activities were a substantial or motivating factor in the FBI's failure to hire the plaintiff. *Id.* at 825. But the court had reviewed a

---

[14] There is an analogous tension in cases involving claims against individual defendants. *Ellsberg v. Mitchell*, for example, discussed how officials sued in their individual capacities could be "trapped by the government's assertion of its state secrets privilege" in cases where excluding privileged information "[d]eprived [them] of the ability in practice to adduce the evidence necessary to mount a defense to the plaintiffs' *prima facie* case." 709 F.2d 51, 69–70 (D.C. Cir. 1983). The valid defense ground for dismissal mitigates this risk as well.

privileged submission from the government *ex parte* and *in camera*. *Id.* As a result of that review, "the court [knew] that the reason [the plaintiff] was not hired had nothing to do with [his father's] assertion of First Amendment rights." *Id.* The court recognized that if the privileged information were excluded as required under *Reynolds*, "there may be enough circumstantial evidence to permit a jury to come to [the] erroneous conclusion" that the reason the FBI didn't hire Molerio was his father's protected speech. *Id.* The court in *Molerio* specifically distinguished the situation before it from that in *Ellsberg v. Mitchell*, where the court's review of the privileged information "*did not* ipso facto disclose to the court the validity of the defense." *Id.* (emphasis added). As the *Molerio* court "kn[ew] that further activity in this case would involve an attempt . . . to convince the jury of a falsehood," it concluded that "it would be a mockery of justice for the court—knowing the erroneousness—to participate in that exercise." *Id.*

Crucially, these rationales for the "valid defense" ground for dismissal are not linked to the generalized risk that privileged information might be disclosed if the litigation moves forward. That concern is instead analyzed and protected under the rubric of *Jeppesen*'s unacceptable-risk-of-disclosure dismissal ground. Rather, the "valid defense" ground protects against the unfairness that would result if there exists evidence that is factually and legally sufficient to establish an actually meritorious defense but cannot be introduced without endangering national security.

With that background, we reiterate that a valid-defense dismissal is warranted only if the privileged information establishes that the defense is legally meritorious and would require judgment against the plaintiff. In other words, the privileged information must establish a legally and factually

valid defense. Any lesser standard could foreclose potentially meritorious claims based on conjecture and so would go beyond protecting defendants from any unfairness caused by protecting state secrets and the court from ratifying a result it knows to be incorrect. "Just as it would be manifestly unfair to permit a presumption of unconstitutional conduct to run against the defendant when the privilege is invoked, it would be manifestly unfair to a plaintiff to impose a presumption that the defendant has a valid defense that is obscured by the privilege." *In re Sealed Case*, 494 F.3d at 150 (internal quotation marks, alterations, and citation omitted).

We note as well that there is a risk that the state secrets privilege can be invoked not to protect the public interest in national security but to shield the government from embarrassment or unwanted scrutiny. In *Reynolds*, for example, courts allowed the government to invoke the state secrets privilege to withhold the report plaintiffs had requested, doing so "without even pausing to review the report independently in chambers or asking a lower court to take up that task." *Zubaydah*, 595 U.S. at 251 (Gorsuch, J., dissenting). Decades later, the report was declassified and was revealed to detail the Air Force's negligence rather than state secrets. *See* Louis Fisher, *In the Name of National Security: Unchecked Presidential Power and the* Reynolds *Case* 165–69 (2006). *Reynolds*—and, with it, the modern state secrets doctrine—was thus based on the government's misrepresentation in court that the report contained secret information. *See id.* at 193; *Zubaydah*, 595 U.S. at 251 (Gorsuch, J., dissenting).

We stress that we have no reason whatever to think that the government here is misleading this court. But the inherent tension when the government is both a litigating

party and the caretaker of national security secrets further
cautions against dismissing a potentially viable lawsuit. As
with conflicts of interest generally, the problem is not that
the litigant or its attorney will consciously claim a privilege
or make representations that prove to be unjustified or
exaggerated. The problem is rather that the competing
pressures will lead to unacknowledged and unintentional
compromises of the countervailing interest in court access
for potentially meritorious cases, especially cases like this
one charging violations of constitutional rights. Given this
tension—and without suggesting that the government actors
in this case or any other are not proceeding with the utmost
good faith in their state secrets assertions—courts are
obliged to scrutinize independently the government's
invocations of the state secrets privilege, and to do so at the
appropriate stage of the litigation and with sufficiently
detailed support, rather than accepting them at the outset and
at face value.

For these reasons, it is not enough to articulate a
*potentially* valid defense, or to suggest that mounting a
defense *might* require privileged evidence. Put another way,
if the defense would *in fact* fail, there would be no prejudice
to a government defendant from excluding the privileged
evidence and allowing the case to proceed, nor any sense in
which the courts were sanctioning an unfair result.

**b.**

That conclusion raises the question how courts are to
determine whether privileged information establishes "a
legally meritorious defense that prevents recovery by the
plaintiffs." *Fazaga*, 965 F.3d at 1067. The inquiry is
necessarily a factual one. The district court must make
"factual judgments," *Ellsberg*, 709 F.2d at 69, and consider

potentially disputed issues of material fact, *see Molerio*, 749
F.2d at 824. Because this inquiry focuses on potential
*defenses* and other material beyond the pleadings rather than
just the allegations of the complaint, valid-defense dismissal
is not ordinarily appropriate under Rule 12(b)(6). As
*Jeppesen* observed, "*Reynolds* necessarily entails
consideration of materials outside the pleadings . . . . That
fact alone calls into question reliance on Rule 12(b)(6)." 614
F.3d at 1093 n.16.

So, if dismissal based on a valid defense usually cannot
be granted under Rule 12(b)(6), what process is appropriate
for a court to use to determine whether privileged
information establishes a legally meritorious defense? In
*Jeppesen*, we stated that "if the [*Reynolds*] privilege deprives
the defendant of information that would otherwise give the
defendant a valid defense to the claim, then the court may
grant *summary judgment* to the defendant." 614 F.3d at 1083
(quoting *Kasza,* 133 F.3d at 1166) (emphasis added). But the
Rule 56 summary judgment standard is not a perfect fit for
this determination either. *See Molerio*, 749 F.2d at 824. After
all, the *ex parte* nature of a court's review of privileged
submissions means that the plaintiff will not have the chance
to "dispute . . . material fact[s]." *See* Fed. R. Civ. P. 56(a).

Still, even if not in technical compliance with Rule 56,
the practicalities of the situation counsel that both sides must
be given an opportunity to offer evidence supporting their
positions concerning whether the proffered defense is valid
before a court can dismiss a claim because privileged
information establishes a valid defense. The invocation of a
defense premised on assertedly privileged material,
combined with a request to dismiss the case so as to protect
the privileged material, can only be fairly evaluated if the
district court itself reviews the defendant's evidence, *in*

*camera* and *ex parte* to the extent the material is covered by the assertion of the state secrets privilege; concomitantly, the plaintiff must be given the opportunity to submit actual evidence to prove up a *prima facie* case and refute the defense. Unlike in a typical summary judgment, the task of evaluating each party's evidence and resolving any disputes or inconsistencies to determine whether the defendant has a meritorious defense necessarily falls on the court. But the unusual nature of this procedure and the lack of transparency built into it is the price of protecting the defendant's ability to mount a defense without exposing state secrets while preserving for the plaintiffs both court access and the ability meaningfully to litigate their case to the extent feasible.**[15]**

When the government seeks only to exclude privileged information, it can sometimes invoke the *Reynolds* privilege without making "a complete disclosure," and a court need not "insist[] upon an examination of the evidence." *Reynolds*, 345 U.S. at 10. But to justify dismissing a claim outright rather than simply excluding privileged information, the government must be prepared to disclose to the court the specific information that establishes its defense. The form and specificity of the government's submission will of course depend on "the circumstances of the case" and the nature of the information. *See id.* But the submission must be detailed enough to make "clear" to the reviewing

---

[15] Our holding that the valid defense ground for dismissal ordinarily cannot be resolved at the pleading stage under Rule 12 does not mean that plaintiffs will be allowed to seek discovery of privileged information. The Federal Rules exclude privileged material from the scope of discovery. Fed. R. Civ. P. 26(b)(1). And *Jeppesen*'s unacceptable-risk-of-disclosure dismissal ground protects against the risk that the process of discovery could itself disclose privileged information.

court that "dismissal is *required*" because the privileged information clearly shows the defendant's entitlement to judgment. *Jeppesen*, 614 F.3d at 1089 (emphasis added).

We recognize that the procedure we envision is unorthodox, as it melds summary judgment procedures with an expanded, nontransparent factfinding role for judges. But the alternative is also unorthodox: closing the courthouse door to potentially meritorious lawsuits because of a defense that may or may not be viable once examined. Faced with that dilemma, the procedure we have described is the best option.

**c.**

We now consider whether Fazaga's claims must be dismissed at this juncture because privileged information establishes a valid defense. We conclude that, although at least some of the information at issue is privileged, the district court did not apply the standard we have enunciated, or use the process we have described, when it decided that the case should be dismissed because the government has a "valid defense."

The district court stated tersely at the outset of its valid defense analysis that "the privileged information gives [the government] a valid defense." But in explaining its valid defense ruling, the district court reasoned only that the defenses the government would try to mount against Fazaga's various claims would all need to rely in part on privileged information. The court noted that defending against the discrimination claims would require the government to demonstrate that its investigations "were properly predicated and focused," which would "require" the government "to summon privileged evidence related to Operation Flex." Similarly, the district court explained that

the government could defend against Fazaga's First
Amendment claims by demonstrating that its actions were
narrowly tailored to achieve a compelling government
interest—questions the district court noted were "fact
intensive" and would "necessitate a detailed inquiry into the
nature, scope, and reasons for the investigations under
Operation Flex." Finally, the district court stated that the
government "may have a valid defense" against Fazaga's
FTCA claim under the discretionary-function exception, but
stated that establishing such a defense would require the
government to "marshal facts that fall within the three
privileged categories of information related to Operation
Flex."

This summary demonstrates that the district court did not
conduct the factual review required to conclude that
Fazaga's claims must be dismissed on the valid defense
ground. As we have explained, the government is not
entitled to dismissal simply because it *may* assert a defense
that *could* require introducing privileged information. The
district court's analysis here went only that far: The court
speculated that defending against Fazaga's claims *could*
require the government to "marshal" privileged information
and would necessitate a "fact-intensive" and "detailed
inquiry" into Operation Flex. But the district court dismissed
Fazaga's claims because such an inquiry into privileged
information would be eventually required; it did not conduct
that inquiry and conclude that the privileged information
submitted established a defense that is "meritorious and not
merely plausible," such that it "would *require* judgment for
the defendant." *Fazaga*, 965 F.3d at 1067 (quoting *In re
Sealed Case*, 494 F.3d at 149) (emphasis added).

In addition, the district court did not give Fazaga an
opportunity to submit evidence to prove up his *prima facie*

case, as we have held is required. Fazaga maintains that he can build such a case based on publicly available and nonprivileged evidence about Monteilh's activities and the information he gathered, without any discovery.[16] Fazaga might well, for example, be able to offer nonprivileged evidence from Monteilh, a percipient witness, regarding the government's surveillance instructions. The district court, however, weighed the government's evidentiary submissions against Fazaga's *allegations*, without giving him a parallel opportunity to provide actual evidence. As we have explained, a court may not "grant summary judgment to the defendant" on the basis that the state secrets "privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim," *Jeppesen*, 614 F.3d at 1083, without considering factual submissions from each party.

In sum, the district court has not yet conducted the detailed and fact-intensive inquiry required to dismiss a claim based on a valid defense under *Reynolds*. We cannot sustain its dismissal of Fazaga's religion claims on the "valid defense" ground.

We therefore remand this case so that the district court can undertake the factual inquiry required to determine

---

[16] Fazaga goes on to suggest that if the government provides evidence, in court or *in camera*, to rebut the *prima facie* claim, "extremely limited discovery" into information that Fazaga maintains is not privileged would be sufficient to resolve the issue. As we explain later, *infra* p. 44–45 and note 20, the government has indicated that considerably more unprivileged material will be available on remand than previously, including with regard to the instructions Monteilh received. The result may be that Fazaga will not request even "extremely limited discovery." We comment later on the appropriate approach if he does. *See infra* p. 46.

whether dismissal based on a valid defense is warranted. On
remand, the district court should provide Fazaga an
opportunity to prove his *prima facie* case without privileged
information. The government should have the chance to
show that specific privileged information establishes a valid
defense.[17] The district court will be able to review the
privileged information *in camera* and consider, based on the
submissions from each party, whether the privileged
information establishes a valid defense and so requires
dismissing Fazaga's claims.

**3.**

Another "exceptional circumstance" in which the
*Reynolds* privilege can require dismissing a claim is if the
privileged information is so "inseparable from nonprivileged
information that will be necessary to the claims or defenses"
that "litigating the case . . . would present an unacceptable
risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083.
The district court's dismissal of Fazaga's claims on this basis
does not meet the stringent standard for such dismissals.

"[W]henever possible, sensitive information must be
disentangled from nonsensitive information to allow for the

---

[17] If the government's prior submissions (which summarize but do not
actually include the underlying classified source material) are not
detailed and reliable enough to support this inquiry, the district court can
request a more robust record. If the submissions are detailed and reliable
enough, the district court can carefully consider *which* of the
government's evidentiary submissions is (i) privileged, and
(ii) necessary to prove a valid defense. If the valid defense can be proven
without privileged information, dismissal is not warranted; if only some
of the information is privileged, the unprivileged material relied upon
should be provided to the plaintiffs, as in an ordinary summary judgment
proceeding (subject to the other *Jeppesen* ground for dismissal,
discussed next).

release of the latter." *Kasza*, 133 F.3d at 1166 (quoting
*Ellsberg*, 709 F.2d at 57). District courts generally "are well
equipped to wall off isolated secrets from disclosure."
*Jeppesen*, 614 F.3d at 1089. But in certain "exceptional
cases," the secret information may be "impossible to isolate
and even efforts to define a boundary between privileged and
unprivileged evidence would risk disclosure by
implication." *Id.* In those cases, a court may "restrict the
parties' access not only to evidence which itself risks the
disclosure of a state secret, but also those pieces of evidence
or areas of questioning which press so closely upon highly
sensitive material that they create a high risk of inadvertent
or indirect disclosures." *Id.* at 1082 (quoting *Bareford v.
Gen. Dynamics Corp.,* 973 F.2d 1138, 1143–44 (5th Cir.
1992)). In the rare instance in which the risk of disclosure
cannot be averted through the protective measures routinely
used by courts, the case must be dismissed, leaving the
plaintiff without a remedy for a possibly meritorious claim.
The government here has not at this stage established "either
a certainty or an unacceptable risk" that proceeding with
litigation will reveal state secrets. *Jeppesen*, 614 F.3d at
1087–88 n.12.

Fazaga's core allegation is that the defendants
improperly targeted Fazaga and other Muslims because of
their religion. The government argues that "[t]here is no way
to litigate that core allegation without examining state
secrets: the government's actual reasons for conducting the
FBI counterterrorism investigations at issue here and the
nature and scope of those investigations." But, in the unique
posture of this case, it is, for several reasons, not apparent at
the pleading stage that "the facts underlying plaintiffs'
claims are so infused with these secrets" that this litigation

cannot proceed with appropriate protective measures in place. *See Jeppesen*, 614 F.3d at 1088.

*First*, the district court did not consider all of the potential protective measures or explain why they would not be sufficient to protect the privileged information if litigation were to proceed. The district court referred generally to "protective procedures available to the [c]ourt," specifically mentioning only "protective orders or restrictions on testimony." But district courts have other tools to handle sensitive information. Moreover, even those two mechanisms are broad categories, and the district court did not disaggregate them.

Various procedures that could allow this case to proceed further have been proposed during the course of this litigation. One is the possibility of the *ex parte* and *in camera* proceeding described above in which the government would furnish privileged source material, and the district court could then determine whether the government has a valid defense based on its review of the underlying information.

There are other options, too. Federal courts have long used *in camera* review, protective orders, and other procedures to enable judges to review sensitive information. Congress has codified some of these procedures for specific circumstances. For example, FISA contemplates *in camera*, *ex parte* review of extremely sensitive information, along with the use of protective orders to bind nongovernment parties. 50 U.S.C. § 1806(f). The Classified Information Procedures Act allows courts to permit "statement[s] admitting relevant facts that the specific classified information would tend to prove" or "a summary of the specific classified information" to substitute for classified information. 18 U.S.C. App. § 6(c)(1). The district court

might also consider appointing a special master with a security clearance to examine the assertedly privileged material. That master could (i) curate for the court a representative sample of the classified documents and (ii) summarize specific legal arguments each party could make based on the classified information, especially possible defenses. *See In re U.S. Dep't of Def.*, 848 F.2d 232, 234, 236 (D.C. Cir. 1988); *see also* Fed. R. Civ. P. 53(a)(1)(B)(i).[18] Alternatively, the government (or a neutral third party) could reformat the most sensitive privileged material—for example by providing the court classified documents with targeted redactions.[19]

*Second*, the unusual circumstances of this case particularly counsel against early dismissal. Those circumstances are these: The government revealed Monteilh's role as a confidential informant in an unrelated criminal case. It also recognizes that there is substantial relevant nonprivileged evidence that could be (and to a degree has been) disclosed in this litigation. Monteilh has provided extensive nonclassified declarations discussing his role in Operation Flex and his interactions with Fazaga and others, and some of the recordings from Monteilh's

---

[18] A special master with a security clearance may be an efficient way to review a large body of classified material, given the logistical difficulties of clearing term judicial law clerks. *See In re Dep't of Def.*, 848 F.2d at 236, 238–39.

[19] If the dismissal issue arises again in this case, the district court should consider these alternatives, and others that may be suggested, to determine after a careful, detailed inquiry whether there is a real and unmitigable risk that privileged information could be revealed if the case proceeds.

informant work are now public.[20] The government has
informed us that it "expects that, on remand, it will be able
to . . . make the substantial majority of the audio and video
[collected by Monteilh] available for further proceedings,
subject to an appropriate Privacy Act protective order" and
redactions.    The    government's    recognition    that
circumstances have changed to some degree suggests that
the district court's generalized assessment should be
replaced by individualized consideration of the need for
specific pieces of defensive evidence after Fazaga has the
chance to present an evidence-based *prima facie* case and
sharpen the issues that remain.

Further, Fazaga emphasized that he does not "need any
discovery into the secret evidence" and "disclaim[ed] any
need for it." As noted, Fazaga maintains that he can build a
*prima facie* case based on nonprivileged evidence about
Monteilh's activities and without any discovery. *See supra*
p. 40 and note 16. The government defendants *may* be able
to defend against those claims without relying on privileged
information—by, for example, demonstrating on the
evidence Fazaga presents that there was a compelling reason
for investigating these individuals and no less restrictive
alternative, or that the challenged conduct falls within the
FTCA's discretionary function exception.

---

[20] The government informed the court in a letter after oral argument that
the FBI has reviewed the audio and video collected by Mr. Monteilh and,
as the FBI previously expected, the FBI has determined that the
substantial majority of the audio and video will be available for further
proceedings in this case. The FBI has made preliminary redactions and
expects that, on remand, it will be able to make the substantial majority
of the audio and video at issue available, subject to an appropriate
Privacy Act protective order.

*Third*, the government's assertion that *any* further litigation poses an unacceptable risk of disclosure is undercut by the detailed classified disclosures it has already presented to the district court, our court, and the Supreme Court. This case has proceeded for more than a decade without any classified or privileged information being made public. We therefore hesitate to credit vague fears that unspecified classified information could be revealed if the case goes forward, rather than allowing this case to proceed to the point where it is possible to focus on the need to protect specific pieces of information. To justify dismissal, the government would have to specify why, even though state secrets have so far in this case been communicated *ex parte* and *in camera* to three levels of court without issue, there remains a danger that particular privileged information will be disclosed if proceedings continue.

We emphasize that if the case is to proceed, discovery, if any, will need to be extremely limited and closely monitored to avoid disclosing privileged information. The government appears to have acknowledged earlier in the case that, with such monitoring, further proceedings are possible. In its motion to dismiss, the government suggested that, "[t]o the extent that the Court wishes to assess the impact of the privilege assertion as to claims against the Government Defendants, it should require plaintiffs to proffer in proceedings under Rules 16 and 26 precisely what discovery it intends to seek against the Government" and allow the government to assert the privilege at that point. The government has not heretofore shown that such protective measures would not sufficiently reduce the risk of disclosing secret information in the future.

The "broad sweep" of the state secrets privilege "requires that the privilege not be used to shield any material

not strictly necessary to prevent injury to national security and counsels that whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter." *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (internal citations and quotation marks omitted). We are not convinced that the significant amount of nonprivileged information in this case, including information that will be newly available on remand, cannot be disentangled from privileged national security secrets. If it does become clear that the court cannot disentangle nonprivileged information that is necessary for its case from privileged information, the government will remain free to seek dismissal; the district court will then evaluate the government's request based on the specific information then available.

We conclude that the dismissal was not appropriate at this stage. The district court can determine on remand what safeguards are required to protect privileged information as the case goes forward; and, if asked to do so, reconsider a dismissal request based on new developments in the case.

## IV.

We close our state secrets privilege discussion with two observations and some further reflections.

First, more than thirteen years have passed since the government first asserted the state secrets privilege in this case. Since then, new revelations have informed the public about increasingly bygone government actions. Ten additional people have served as Attorney General. It is far from certain that every piece of information over which the government asserted the state secrets privilege in 2011 need remain secret today. And pieces of information that remain privileged may now be easier to disentangle from non-secret

information. The government has made clear that its approach to classification is, commendably, dynamic. The upshot is that much more information might now be made available either to Fazaga or, if necessary, *in camera* to the court, without endangering national security.

Second, we are convinced that there are concrete possibilities for proceeding in this case. We remand with the expectation that the district court will consider the viability of procedures that will enable this litigation to move forward and facilitate some degree of interaction with the underlying source material, perhaps with the benefit of additional briefing by the parties as to such means. Again, any discovery will need to be closely monitored. But as we have said, we are not convinced that the full panoply of measures that could protect secret information has yet been exhausted. We leave it to the district court to employ the appropriate tools both to evaluate particularized invocations of state secrecy under *Reynolds* and to ensure that privileged information is appropriately handled.

The national security concerns in this case are serious. If it becomes evident that this case cannot be litigated without endangering national security, Fazaga's private interest will have to yield. We emphasize that nothing in this opinion forecloses the government from asserting the privilege over specific pieces of evidence that become pertinent in the course of litigation, as the government did in *Reynolds* and *Zubaydah* and as it suggests it intends to do here, or from seeking dismissal because specific privileged evidence is essential to an articulated defense and cannot feasibly and safely be presented only *in camera*. But we emphasize as well that we should not cross that bridge until we have no choice but to do so. The record and disclosures before us at this early stage of litigation demonstrate that dismissal of

Fazaga's claims at this juncture prematurely barred the courthouse door without assurance that there is no alternative to doing so.

## CONCLUSION

For the foregoing reasons, we **DISMISS** the remaining *Bivens* claims. Because the grounds specified by the district court do not warrant dismissal of the religion claims at this juncture, we **REVERSE** and **REMAND** those claims to the district court, along with the FISA claims and the Fourth Amendment claims for injunctive relief that we held cognizable in our prior opinion, for further proceedings in accord with this opinion and, to the degree still applicable, the earlier one.