BRETT A. SHUMATE
Assistant Attorney General
JAMES R. POWERS
Chief Litigation Counsel
JESSICA A. LUNDBERG
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-4688
Email: jessica.a.lundberg@usdoj.gov

*Counsel for the Government Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| YASSIR FAZAGA, et al.<br>Plaintiffs,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, et al.<br>Defendants. | No. CV 8:11-cv-00301-DOC-VBKx<br><br>**JOINT BRIEFING RE DEFENDANTS' MOTION TO STRIKE**<br><br>Honorable David O. Carter |

The parties respectfully submit this joint briefing pursuant to the Court's Order of April 24, 2026, ECF No. 229.

## I. Government Defendants' Argument

This case is based on Craig Monteilh's prior allegations that he was instructed by the FBI to indiscriminately gather information on Muslims simply because they were Muslim, First Am. Compl. ¶¶ 1-3, and his claims that his handling agents had engaged in or allowed

him to conduct illegal electronic surveillance. First Am. Compl. ¶¶ 94-95, 127, and 209. But Monteilh has since recanted, explaining that he engineered this lawsuit as a bid for revenge against the FBI. Plaintiffs and their counsel have been aware of this recantation for more than a year but have refused to take the necessary step of asking Monteilh which statements he still stands behind and which he does not and amend their Complaint accordingly. This is Plaintiffs' burden, not Defendants'. By signing the Amended Complaint, Plaintiffs' counsel certify that "to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the complaint is "(1) not being brought for an improper purpose; . . . [and] (3) the factual contentions have evidentiary support . . . ." Fed. R. Civ. P. 11(b). Monteilh has stated several times now that the complaint was brought for the improper purpose of seeking revenge on the FBI and that most of his declarations consist of lies. Ex. B at CM-0004, CM-0007; ECF No. 205-1. Plaintiffs and their counsel have an obligation to ensure they have not brought a lawsuit that is based on falsehoods put forward by an individual who has stated plainly that he wished to perpetrate fraud upon the court. This Court has the inherent authority to investigate this apparent fraud on the judicial process and to strike Monteilh's declarations and the portions of the pleadings that are based on Monteilh's declarations. It should do so now, consistent with the Supreme Court's direct instruction to consider recent factual developments regarding Monteilh's recantation. The stakes in this case—which implicates the state secrets privilege and which has now resulted in two Supreme Court orders—are far too high to do otherwise.

## A. <u>Background</u>

### 1. Litigation Context

Plaintiffs filed this lawsuit in 2011, alleging two categories of claims against the FBI and certain FBI agents: claims alleging unlawful searches ("search claims") and claims alleging unlawful discrimination on the basis of, or burdens on, or abridgement of the rights to, religion ("religion claims"). These claims are based on Monteilh's alleged activities as part of "Operation Flex," a "group of counterterrorism investigations" that

"was directed at detecting and preventing possible terrorist attacks." Giuliano Decl. ¶ 11, ECF No. 34. In Plaintiffs' telling, Operation Flex was a "dragnet investigation" that, from 2006 to 2007, "used [Monteilh] to collect personal information on hundreds and perhaps thousands of innocent Muslim Americans." First Am. Compl. ¶¶ 2-3. Plaintiffs contend that the "central feature of the FBI agents' instructions to Monteilh was their directive that he gather information on Muslims, without any further specification." *Id.* ¶ 89. This purported directive allegedly "ensured" that people were "target[ed]" "solely due to their religion." *Id.* ¶ 86. Furthermore, Plaintiffs rely on Monteilh to allege that his handling agents told him that they had placed surveillance equipment in Plaintiff Fazaga's office and Plaintiff Abdelrahim's home, First Am. Compl. ¶¶ 94-95, 209, and that he notified his handling agents that he recorded conversations to which he was not a party, First Am. Compl. ¶ 127.

In moving to dismiss the Complaint, the Government invoked the state secrets privilege over information that could tend to: (1) confirm or deny whether a particular individual was the "subject" of "an FBI counterterrorism investigation, including in Operation Flex"; (2) reveal "the initial reasons (*i.e.*, predicate)" for, information obtained during, and the status and results of an FBI counterterrorism investigation of a particular person; and (3) reveal whether particular "sources and methods" were used in a counterterrorism investigation of a particular subject. Gov't Defs.' Mot. to Dismiss at 60, ECF No. 55. In addition to a public declaration from the Attorney General, ECF No. 32, the Government submitted public FBI declarations and additional "comprehensive and detailed" classified declarations, ECF Nos. 33, 35, 55, 56, explaining why disclosure of each category of information could reasonably be expected to cause significant harm to national security. Notably, the FBI's public declaration disputes Plaintiffs' assertion of dragnet surveillance, explaining that Operation Flex was focused on determining whether "particular individuals" were involved in "recruit[ing] and training" others for "terrorist activity." Giuliano Decl. ¶ 11. It also explained that applicable policy forbade the FBI from "undertaking investigative activity based solely on First Amendment activities." *Id.*

¶ 4.

**2. <u>Recent Procedural Background</u>**

This case has a long procedural history beginning with the filing of the original complaint in 2011. Defendants set forth only the recent history following this Court's 2012 order dismissing all claims except the FISA claims against the individual defendants. On December 20, 2024, the Court of Appeals affirmed the dismissal of the Bivens claims but reversed the dismissal of claims which this Court had dismissed based on Defendants' assertion of the state secrets privilege. ECF No. 185.

After the remand, on June 30, 2025, the Government Defendants notified the Court that they had received a letter from Craig Monteilh in which he stated the declarations he submitted in support of the Plaintiffs' case were "not accurate information," and characterized "most of the information" as having been "made up." ECF No. 192.

On July 10, 2025, in a Joint Status Report, Government Defendants proposed submitting a motion to strike in response to Monteilh's recantation. ECF No. 193. Plaintiffs opposed this proposal and asked the Court to stay the case until after the Supreme Court decided whether it would grant review of the Ninth Circuit's decision. *Id.*

On July 14, 2025, the Court held a status conference, in which Monteilh voluntarily appeared. The Court had Monteilh authenticate the three letters he had sent to the Parties up until the date of the hearing. The Government Defendants filed the three authenticated letters on September 4, 2025. ECF No. 205. Thereafter, on September 19, 2025, they filed three additional letters sent by Mr. Monteilh after the hearing. ECF No. 206.

On October 8, 2025, the Government filed its petition for a writ of certiorari. In its petition, the Government argued that if the Court declined to grant certiorari outright, it should grant, vacate, and remand based on Monteilh's recent statements. *FBI, et al., Petitioners, v. Fazaga, et al.*, 2025 WL 2888814, at *27. On April 6, 2026, the Supreme Court granted the Government's petition for certiorari, vacated the judgment, and "remanded to the United States Court of Appeals for the Ninth Circuit with the instruction to remand the case to the district court for reconsideration in light of recent factual

developments pertinent to this case and the government's motion to dismiss." *Fazaga v. FBI*, No. 25-430, 2026 WL 922539 (Apr. 6, 2026), ECF No. 227-1.

On April 7, 2026, the Ninth Circuit "remanded to the District Court for the Central District of California for proceedings consistent with the order of the Supreme Court in *Fazaga v. FBI*, No. 25-430, 2026 WL 922539 (Apr. 6, 2026)." ECF No. 227.

The Parties filed a Joint Status Report on April 16, 2026. ECF No. 228. The Government Defendants proposed that Plaintiffs amend their Complaint to account for Monteilh's recantations or, in the alternative, that the parties brief the Government Defendants' motion to strike. Plaintiffs opposed both proposals. The Court ordered joint briefing on the matter and set a hearing for August 24, 2026.

**3. Centrality of Monteilh's Statements to the First Amended Complaint**

Monteilh's statements and declarations about his alleged activities on behalf of the FBI are foundational to Plaintiffs' case. The very first sentence of their First Amended Complaint states that this case "concerns an FBI-paid agent provocateur," which is Monteilh. First Am. Compl. ¶ 1. He is referenced 368 times in the First Amended Complaint and Plaintiffs define the putative class on whose behalf they filed the complaint as individuals targeted for surveillance or information-gathering "through Monteilh and Operation Flex." First Am. Compl. ¶ 219. The First Amended Complaint was based on, and mirrors, four declarations Monteilh had previously executed for Plaintiffs that purport to describe his activities and the orders, instructions, and information he claims to have received from the FBI. *See* Decls. of Craig Monteilh Submitted by Pls. in Support of Their Opp. to Mot. To Dismiss, ECF No. 66.[1] The First Amended Complaint emphasizes that "Monteilh himself confirms many of the [Complaint's] details." First Am. Compl. ¶ 167.

---

[1] These declarations are all dated before the filing of the FAC. Monteilh's main declaration is dated April 23, 2010; his declarations focusing on Plaintiffs Fazaga and Malik are dated October 11, 2010; and his declaration focusing on Plaintiff AbdelRahim is dated August 11, 2010. However, in their index to the filing of his declarations, ECF No. 66, Plaintiffs' counsel labeled the three declarations focusing on the individuals as being dated in 2011.

And in opposing the Government Defendants' motion to dismiss, Plaintiffs argued that they needed "no discovery at all to establish a *prima facie* case that Defendants surveilled them because of their religion," citing only Monteilh's declarations. *See* Pls.' Opp'n to Gov't Defs.' Mot. to Dismiss at 21, ECF No. 64. As the prior presiding district judge in this case put it, "the heart and soul of [Plaintiffs'] allegations are Mr. Monteilh." 8/14/2012 Hr'g Tr. 56.

**4. Monteilh's Recantation**

As the Court is aware, and as noted above, Monteilh sent six letters to counsel for the parties between June and September 2025, some of which expressly disclaimed the foundation of Plaintiffs' lawsuit—that the FBI unlawfully conducted surveillance that targeted members of the Muslim community in Southern California based solely on their religion. *See generally* ECF Nos. 205 and 206. These letters were submitted with the Government's certiorari petition and comprise the "factual developments" the Supreme Court instructed this court to consider on remand. *See Fazaga v. FBI*, Order, No. 25-430, 2026 WL 922539 (Apr. 6, 2026).

In his first letter sent June 10, 2025, Mr. Monteilh makes the following statements:

- "As for *Fazaga v FBI,* the time has come to end this charade. The declarations that ACLU attorney Peter Bibring and I put together were not necessarily the truth." Ex. B at CM-0007; ECF No. 205-1.
- "To be clear, the declarations I signed for the purpose of *Fazaga v FBI* is not accurate information. *Most of the information the ACLU (Peter Bibring and Ahilan Arulanantham) and I made up.* I do not stand by that information and I will not cooperate with the ACLU to advance 50-60% lies." *Id.* (emphasis added).
- "If the government moves to disqualify those declarations I would cooperate and reveal the plan that ACLU attorney Peter Bibring and I agreed to." *Id.* at CM-0008.
- "I orchestrated the lawsuits as my revenge against the FBI." *Id.* at CM-0002.

In his fifth letter sent August 19, 2025, Mr. Monteilh makes the following statements:

- "Through the declarations the ACLU and CAIR sought to portray Operation Flex as an illegal and unconstitutional operation that trampled on the civil rights of Muslim Americans. I want to be clear about this, *that portrayal is not true. It is the furthest from the truth*." Ex. B at CM-0025; ECF No. 206-2 (emphasis added).
- "[T]he ACLU and CAIR devised a plan (with my assistance) to control the narrative through the media by portraying Operation Flex as a failed operation that produced no arrests, revealed no terrorist activity and wasted tax payer money while targeting innocent Muslim Americans. *Again, that narrative is not true and is the furthest from the truth.*" *Id.* (emphasis added).
- "Mr. Bibring asked me if I would be willing to meet with Mr. Niazi's attorneys for the purpose of testifying on Mr. Niazi's behalf stating that I willfully entrapped their client. As a result the case would ultimately be dismissed and Operation Flex would appear to be an operation entrapping innocent Muslims." *Id.* at CM-0027.

In his sixth letter sent on September 9, 2025, Mr. Monteilh makes the following statements:

- "I am abundantly confident that I am able to intelligently articulate to the Court along with my evidence that *the surveillance was indeed lawful* and that the above accusations are justified while protecting and preserving the Constitutional rights of Muslim Americans. *The FBI's main priority on Operation Flex was to protect and preserve the Constitutional rights of the Muslim community* while investigating some members." Ex. B at CM-0030; ECF No. 206-3 (emphases added).
- "I am extremely confident that I am able to intelligently articulate to the Court that the surveillance of Operation Flex did not 'target' the Muslim community. But rather lawfully followed specific evidence while at the same time

protecting the religious rights of the Muslim community." *Id.* at CM-0031.

Monteilh has more recently emailed a number of statements to counsel for the parties and, at times, the Court. Exhibit B. Most of these statements are not directly relevant to the present motion or simply reiterate the points stated above; however, Monteilh's most recent statement, dated June 27, 2026, avers that he intends to invoke his Fifth Amendment right against self-incrimination if called as a witness at any hearing on this matter. Ex. B at CM-0086. He further refers to this litigation as "a bogus lawsuit that the ACLU, CAIR and I invented," claiming that he "successfully manipulated the entire federal court system." *Id.* at CM-0087.

**B. Argument**

This Court has inherent authority to investigate whether there has been an abuse of the litigation process and to impose appropriate remedies. "It is well established that district courts have inherent power to control their docket." *Ready Transp., Inc. v. AR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (quoting *Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998) (alterations and quotation marks omitted)). That inherent power includes the power to "dismiss entire actions" or "less drastic measures such as striking documents from the docket." *Id.* This Court's exercise of that inherent power now is particularly warranted here, because the Supreme Court has specifically directed this Court to account for Monteilh's recantations in the context of reconsidering the Government's motion to dismiss. *See* ECF No. 227-1 (ordering this case remanded to this Court "for reconsideration in light of recent factual developments pertinent to the case and the government's motion to dismiss").

Monteilh's letters raise a substantial basis to believe that there has been an abuse of the litigation process. Monteilh states that he "invented" this lawsuit, Ex. B at CM-0087, and intentionally submitted false testimony to the Court, in the form of declarations that are "not accurate information," "most[ly] . . . made up," and "50-60% lies." *Id.* at CM-0007. Monteilh also explains that this was done in bad faith, for the purpose of exacting "revenge" on the FBI, *id.* at CM-0004, and to "waste[] the time, resources, and money of

the ACLU, CAIR, the FBI and the entire federal court system." Ex. B at CM-0087. District courts are empowered to police such abuse. *See Coston-Moore v. Medina*, 2012 U.S. Dist. LEXIS 105966, *5 (E.D. Cal July 27, 2012) (striking from the record declarations found to be falsified); *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005) (upholding a district court's grant of a motion to strike a declaration as a sanction when a party had violated Fed. R. Civ. P. 30(e)); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (dismissal was appropriate sanction where party knowingly concealed, and actively avowed to the contrary, that documents requested during discovery had survived in legible form a warehouse fire by claiming the fire destroyed those documents).

Plaintiffs argued in a Joint Status Report, ECF No. 228, that Monteilh's recantations should be given little weight, referencing inapposite criminal law regarding the recantation of trial testimony. Plaintiffs cite *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014), in which the petitioner had been convicted of sexual assault of his sister. The district court subsequently granted a habeas petition on actual innocence grounds after his victim sister, his father, and another sister all recanted their trial testimony. In reversing the district court's ruling, the Ninth Circuit stated that because the recantations were from the petitioner's family, their weight and reliability were reduced. *Jones*, 763 F.3d at 1249. The Ninth Circuit also found that recantations were insufficient to demonstrate actual innocence, even putting aside the fact that the recantations may have been the result of the family's ulterior motives. *Id.* at 1249-50. Specifically, the victim sister was nine years old at the time of the alleged abuse, and by the time she recanted thirteen years later her memory had likely faded. The father and other sister were not witnesses to the abuse, so their recantation carried little weight. *Id.*

Monteilh's recantation has nothing in common with the recantations in *Jones*. The habeas petitioner's burden to show actual innocence in *Jones* was "extraordinarily high," *id.* at 1246, given the gravity of judicial relief that could result in the release of a person convicted of a serious violent offense. Unlike the context of a post-trial recantation, where

the factfinder has itself already determined the facts based on the trial record, this case has yet to resolve any relevant factual questions. The circumstances of the recantation are also far different. Whereas the family's recantations in *Jones* were intended to *exculpate* their brother/son, Monteilh's recantation *inculpates himself* in perjury and serious fraud upon the court. And whereas the family provided no credible explanation as to why their trial testimony was false, Monteilh explains that he was motivated to lie to exact revenge upon the FBI for what he perceives as mistreatment. Ex. B at CM-0002.

In short, this Court has expansive inherent authority to police the conduct of litigants and witnesses, authority that has been bolstered in this case by the Supreme Court's explicit instruction to account for recent factual developments, *i.e.* Monteilh's recantation and allegations of bad faith manipulation of the litigation process. *Fazaga v. FBI*, No. 25-430, 2026 WL 922539 (Apr. 6, 2026). The Court should accordingly take the following remedial measures.

**1. The Court Should Strike Monteilh's Declarations.**

First, the Court should strike all four of Monteilh's declarations, filed at ECF No. 66, because they are entirely unreliable—admittedly riddled with "lies"—and executed for an improper purpose. The Court should do so even though Monteilh contends that the declarations contain some unspecified true statements. *See* ECF Nos. 205-1, 206-3. As Monteilh acknowledges, his assertions about the core issue in this case—alleged religious targeting—are wholly without any basis. Ex. B at CM-0031; ECF No. 206-3 (stating that "the surveillance of Operation Flex did not 'target' the Muslim community"). And in any event, the Court should treat the declarations as categorically unreliable as they contain intentionally false statements. At a minimum, it should be Plaintiffs' burden, as the party that submitted and relied on the declarations, to sift through the declarations, sort truth from falsehood, and amend the complaint accordingly. Indeed, Plaintiffs already should have done so, once Monteilh recanted his prior declarations. *See* Fed. R. Civ. P. 11; *Est. of Randall v. First Solar, Inc.*, 711 F. App'x 410, 411 (9th Cir. 2018) (affirming district court's finding that counsel improperly "continu[ed] to advocate" discredited position that

"the lawyers should have known…lacked merit"); *Sofaly v. Portfolio Recovery Assocs., LLC*, 155 F.4th 289, 294 (3d Cir. 2025) (affirming district court's finding that counsel improperly "later advocated" in district court the complaints filed in state court). But they have refused to do so. They posit that the truth and falsity of Monteilh's allegations should be litigated in the ordinary course. But that would ignore the admitted abuse of the legal process that has already occurred, the Supreme Court's instruction that this Court take account for that abuse, and the significant government interest in protecting information subject to the state secrets privilege.

**2. The Court Should Strike the Paragraphs of the First Amended Complaint That Rely on Monteilh's Declarations.**

Mr. Monteilh's statements recanting his declarations are also sufficient grounds to strike all portions of the First Amended Complaint that are premised on his declarations. As discussed above, the declarations are plainly the basis for the central allegations in the First Amended Complaint. Indeed, the allegations of the First Amended Complaint mirror or otherwise closely track Monteilh's declarations. *See, e.g.*, First Am. Compl. ¶ 98 and First Decl. of Craig Monteilh, ECF No. 66, ¶ 30. They are also often based on alleged conversations and events to which only Monteilh and the FBI were parties—conversations and events about which plaintiffs would have no other source except Monteilh. *See, e.g.*, First Am. Compl. ¶¶ 90, 94-96, 98, 174, 209. There is no basis to maintain such allegations in the First Amended Complaint once their only apparent source is struck. These allegations should thus be stricken for the same reasons that the declarations should be stricken—the allegations are based on avowedly false testimony that was proffered in bad faith. In sum, the Court should strike the allegations as an exercise of its inherent authority to police the conduct of witnesses and litigants.

In the table accompanying this joint brief, Exhibit A, the Government Defendants have identified particular paragraphs and portions thereof in the Complaint that should be stricken. Consistent with the Court's order, they have stated, paragraph by paragraph, the basis for striking each statement. Plaintiffs' position for each paragraph is also provided.

Defendants have been judicious in identifying specific statements in Exhibit A that should be struck. But to be unequivocal, Defendants do not concede that any particular remaining allegation in the Amended Complaint is true. Defendants have simply selected the statements that most directly relate to Plaintiffs' claims that the FBI targeted individuals solely because they are Muslim and that the FBI unlawfully surveilled individuals solely because they are Muslim, a category of statements that Monteilh has now disavowed. Ex. B at CM-0031. Plaintiffs also appear to indicate that the allegations that remain in the Amended Complaint would support their claims in any event and that they have other evidence, beyond Monteilh's now admittedly false statements, to support those allegations. Defendants disagree. But that dispute is no basis to deny this motion to strike or to permit discovery now. Instead, the Court should strike all allegations in the Complaint that rely directly on Monteilh's testimony. The parties can then propose next steps, including potential briefing on a renewed motion to dismiss addressing the basic pleading failures of a complaint unsupported by Monteilh's groundless allegations.

## II. Defendants Kevin Armstrong and Paul Allen's Argument

Defendants Kevin Armstrong and Paul Allen join in the Government's argument above, but write separately to emphasize the following points. This suit has been pending against Armstrong and Allen for fourteen years. After a tortured procedural history, including two trips to the Supreme Court and three decisions from the Ninth Circuit, all *Bivens* claims against the individual defendants have been dismissed, and only one claim remains against Allen and Armstrong: that portion of Plaintiffs' Tenth Cause of Action alleging "a FISA claim against Allen and Armstrong for recordings made by devices planted by FBI agents in AbdelRahim's house and Fazaga's office." *See Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1039 (9th Cir. 2020). The Ninth Circuit has dismissed (or affirmed this Court's dismissal of) all other claims against Armstrong and Allen. *Id.*, *see also Fazaga v. Fed. Bureau of Investigation*, 124 F.4th 637, 653 (9th Cir.

2024).[2]

This FISA claim depends entirely on declarations provided by Mr. Monteilh to Plaintiffs' counsel. *First*, the Ninth Circuit held that Plaintiffs adequately alleged surveillance in AbdelRahim's house based on Mr. Monteilh's statement that on "one occasion on which Allen and Armstrong asked Monteilh about something that had happened in AbdelRahim's house that Monteilh had not yet communicated to them, [they] explained that they knew about it because they had audio surveillance in the house." *See Fazaga*, 965 F.3d at 1038 (referencing FAC ¶ 209). But that alleged conversation is one of several fabrications in Monteilh's declarations submitted to Plaintiffs. *See* Docket No. 66 at 51 ¶ 15.

*Second*, the Ninth Circuit held that Plaintiffs adequately alleged a FISA claim concerning devices in Fazaga's office at the Orange County Islamic Foundation, based on Mr. Monteilh's statement that "Allen and Armstrong told Monteilh that electronic surveillance was 'spread indiscriminately' across 'at least eight area mosques including [the Islamic Center of Irvine], and mosques in Tustin, Mission Viejo, Culver City, Lomita, West Covina, and Upland,' and that 'they could get in a lot of trouble if people found out what surveillance they had in the mosques.'" *Fazaga*, 965 F.3d at 1038 (referencing FAC ¶¶ 94–95). This too comes from a Monteilh Declaration. Docket No. 66 at 14 ¶¶ 27-28.

*Third*, the Ninth Circuit relied on Mr. Monteilh's statement that "Armstrong later told Monteilh that he and Allen used the information he recorded to enter" the Orange County Islamic Foundation. *Fazaga*, 965 F.3d at 1038 (referencing FAC ¶ 174). This is

[2] Plaintiffs correctly point out that the Supreme Court reversed both Ninth Circuit decisions. They also claim that the Supreme Court also reversed this Court's 2012 dismissal order. The latter assertion is wrong: the Supreme Court plainly vacated *only* the Ninth Circuit, not this Court. But the dispute is also immaterial, because (a) the Ninth Circuit's reasoning dismissing all non-FISA claims remains correct, was never challenged in the Supreme Court, and thus should guide any further proceedings in this Court and (b) Plaintiffs already agreed in writing that they would no longer pursue the *Bivens* claims against the individual defendants. Indeed, Plaintiffs have already acquiesced in the dismissal of the three other individual defendants originally named in this case—a recognition that only the limited FISA claim against Allen and Armstrong survives. *See* ECF No. 199. Thus, Allen and Armstrong discuss only the limited FISA claim preserved by the Ninth Circuit's 2020 decision herein.

another Monteilh Declaration story. Docket No. 66 at 37 ¶ 7.

But now that Mr. Monteilh has recanted his declarations, the sole remaining claim against Kevin Armstrong and Paul Allen has no factual basis. The Court should thus strike these four paragraphs from the FAC (¶¶ 94, 95, 174, 209) and dismiss Paul Allen and Kevin Armstrong from this suit. Fourteen years of baseless litigation against these individual defendants is enough.

## III. Plaintiffs' Statement

## I. INTRODUCTION

Plaintiffs agree that this Court should investigate the factual allegations implicated by Monteilh's recent unsworn letters, but it should do so by requiring Defendants to file a new motion to dismiss as the Supreme Court's order clearly contemplates. Defendants' bizarre request that this Court strike allegations in the complaint based on unsworn allegations in several letters has no basis in the Supreme Court's order, the rules of civil procedure, or any applicable precedent. This Court should reject it for several reasons.

First, Defendants' entire motion presupposes that Monteilh's recent unsworn letters are true and his prior sworn declarations—which were executed far closer in time to the challenged events—are false. But Defendants never explain why this Court should credit the former rather than the latter at this preliminary stage of the case. Whether this Court should believe the letters rather than the declarations must turn on a factual assessment, and that factual assessment cannot be made in the context of a motion to strike. Indeed, it requires examining corroborating material that Defendants have yet to produce, and which only Defendants are in the possession of.

Striking the complaint's allegations by crediting Monteilh's recent letters would be particularly inappropriate given that he recently stated, in yet another letter, that he intends to invoke the Fifth Amendment. *See* Ex. B at CM-0086 (" . . . I am invoking my 5th Amendment privilege against self-incrimination). This Court obviously should not credit unsworn letters over prior sworn declarations made by a witness who apparently

does not intend to testify.

Second, contrary to Defendants' suggestion, nothing in the Supreme Court's remand order licenses the radical departure from normal procedural rules the government seeks here. Instead, that order makes plain that this Court should deem its prior motion to dismiss ruling vacated, and now order Defendants to file their motion to dismiss anew. The Supreme Court vacated the Ninth Circuit's decision with instructions for this Court to "reconsider[]" its order granting the government's motion to dismiss. The Supreme Court offered no other explanation for its order. As Plaintiffs explain below, the most logical reading of it therefore is that this Court's prior motion to dismiss ruling should be deemed vacated, and Defendants should now file a new motion to dismiss. Upon doing so, this Court should then decide that motion in light of the new factual context, as the Supreme Court clearly intended.

Third, even if a motion to strike were somehow appropriate under these highly irregular circumstances, Defendants' request fails on its own terms. The challenged allegations in the operative pleading do not rest exclusively on Monteilh's declarations, and therefore cannot be stricken even if the Court were to assume—contrary to existing case law—that the later-in-time, unsworn letters are to be given more weight than the earlier-in-time sworn declarations. And the fact that Defendants have *not* attacked dozens of specific allegations that themselves corroborate and lend plausibility to the challenged allegations further counsels against granting the Motion.

At bottom, Defendants have filed an improper Motion that does not effectuate the intent of the Supreme Court. It should be denied, and the factual controversy at issue here should be investigated in the ordinary course. It is all too common that, "[a]s the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside as legally or factually unsupported." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–59 (9th Cir. 2007). "This rarely means that those allegations were brought in bad faith or that the pleading that contained them was a sham. . . .We do not call this process sham pleading; we call it litigation." *Id.*

Accordingly, Defendants' Motion should be denied.

## II. BACKGROUND

### A. Factual summary

Plaintiffs are Sheikh Yassir Fazaga, formerly an imam at the Orange County Islamic Foundation, and Ali Uddin Malik and Yasser AbdelRahim, practicing Muslims who regularly attended services at the Islamic Center of Irvine, California nearly twenty years ago. On behalf of a putative class of Muslim Americans from Orange County, California, Plaintiffs challenge a well-publicized set of incidents in 2006 and 2007 that arose when the FBI enlisted a paid informant, Craig Monteilh, to pose as a convert to Islam and infiltrate the Muslim community in Orange County, California.

Plaintiffs allege that the FBI directed Monteilh to gather information about Muslims throughout the region during that period, making clear "that they were interested simply in Muslims" and "told him to gather as much information on as many people in the Muslim community as possible." First Am. Compl., ECF 49 ("FAC"), at ¶¶ 89, 90. The FBI gave him daily quotas for the number of Muslims he should receive contact information from, *id.* at ¶ 131, and tasked him with gathering information on Muslims' charitable activities, travel plans, and programming conducted at mosques, *id.* at ¶¶ 105-09, 133. He was told to target Muslims who appeared more devout because they were "more suspicious." *Id*. at ¶ 110; see also *id*. at ¶¶ 89, 96, 104. They told him that "Islam is a threat to our national security." *Id*. at ¶¶ 121, 162.

With those instructions in hand, Monteilh successfully gathered information on thousands of Muslims, captured hundreds of hours of video recordings of the interiors of mosques, businesses, and homes, and made thousands of hours of audio recordings of discussion groups, classes, and lectures at Muslim religious and cultural events. FAC at ¶¶ 127-29, 137, 202, 209. Monteilh also repeatedly recorded religious conversations inside mosques to which he was not a party by leaving behind a secret recording device hidden in his car keys. *Id.* at ¶¶ 124-26. Similarly, he planted audio-listening devices in Mr. Fazaga's office and Mr. AbdelRahim's house. *Id*. at ¶¶ 120, 125, 129, 135, 201. The

FBI discarded information Monteilh inadvertently gathered on non-Muslims. *Id*. at ¶ 120.

Monteilh's surveillance activities lasted for over a year until community members reported him to the FBI for attempting to incite Muslims to violence, eventually winning a restraining order against him. FAC ¶¶ 147-49. In separate federal court proceedings, the FBI revealed it had employed Monteilh as a confidential informant. *Id.* at ¶¶ 155-59.

**B. Procedural history**

Following the public fallout from this domestic spying operation, Plaintiffs filed suit in 2011. Relying on publicly available sources, including the government's own public statements and documents obtained through the Freedom of Information Act, the complaint describes in detail an FBI surveillance operation that explicitly targeted Muslims because of their religion. For instance, the pleading attached a court transcript confirming his status as an informant and a letter from the Department of Justice that does the same. FAC ¶¶ 157-166 (describing confirmations of Monteilh's status as an FBI informant by citing news article and attaching court transcript and letter).[3]

Plaintiffs named as defendants the United States, the FBI (collectively "the government"), and several individual FBI agents, and broadly alleged two types of misconduct: unconstitutional searches and unlawful religious discrimination or burden on religious practice. Plaintiffs sought damages, declaratory relief, and expungement or disclosure of the records of unlawful surveillance, under the First Amendment and the Religious Freedom Restoration Act, the Fourth Amendment, the Privacy Act, and several California state-law torts brought under the Federal Tort Claims Act. FAC ¶¶ 226-60.

The government moved to dismiss Plaintiffs' claims on various grounds, including by invoking the state-secrets privilege on a limited basis to support dismissal of the religion claims. ECF 55 at 45-52. The government explicitly did not assert the privilege

[3] During this litigation, the government again confirmed his role as a confidential informant, including when it declassified and publicly filed a document memorializing an agreement between Monteilh and the FBI to have Monteilh wear a recording device. *See* Mot. for Leave to File Superseding Briefs, *Fazaga v. Fed. Burea of Investig.*, No. 13-55017 (9th Cir. June 25, 2015), ECF 72-1.

with respect to much of the information Monteilh collected, including "audio and video information" that the government itself had produced in other proceedings. *Id.* at 4. It stated that it "expect[ed] that the majority of the audio and video will be available in connection with further proceedings" in this case. *Id*. at 4-5. Instead, the government argued it needed to rely on privileged information—evidence in its exclusive possession—to assert a defense to the religion claims, and that because it was unable to introduce that evidence without divulging secret information, it was entitled to dismissal. *Id*. at 46-52.

As to the search claims, the government did not move to dismiss them on privilege grounds because, it represented, "sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive motions to dismiss on non-privilege grounds." ECF 55 at 4.

In response to Defendants' motions to dismiss, Plaintiffs filed four separate declarations signed by Monteilh under penalty of perjury. *See* ECF 66. Monteilh signed the declarations on April 23, 2010, October 11, 2011, and August 11, 2011, long after he revealed his role as an informant publicly. The sworn declarations describe in detail his work on Operation Flex, including the instructions given by his handlers, the nature of the surveillance he conducted of Plaintiffs and others in the Muslim community, and how he targeted individuals for scrutiny and investigation based on their religion and perceived religiosity. Plaintiffs introduced the declarations at the motion to dismiss stage to establish the plausibility of their claims, and to establish that the case could be litigated without reference to the information in the government's possession over which it asserted the state-secrets privilege. *See* ECF 64 at 21:20-23 (citing the declarations).

This Court granted the government's motion to dismiss the religion claims on privilege grounds and also dismissed nearly all the search claims on the same grounds (even though the government had not moved to dismiss them on that basis). ECF 101. After examining an ex parte classified memorandum and accompanying declarations in camera, this Court concluded dismissal was warranted both because the government would require the privileged information to defend itself and because privileged and

non-privileged information were inextricably intertwined. *Id*. In a separate order, the Court denied the Defendants' motion to dismiss as to Plaintiffs' FISA claim under 50 U.S.C. § 1810, as to the individual FBI agents. ECF 102.

The Ninth Circuit affirmed in part, reversed in part, and remanded. As relevant here, it held this Court erred when it dismissed Plaintiffs' search claims on privilege grounds because the government had not sought dismissal on that basis. *Fazaga v. Fed. Bureau of Investig.*, 965 F.3d 1015, 1042-43 (9th Cir. 2020). It reversed the dismissal of Plaintiffs' religion claims because it held that FISA displaced the state secrets privilege, at least at the pleading stage. *Id.* at 1043-52.

The government then successfully petitioned the Supreme Court for review of the Ninth Circuit's holding that FISA displaced the state secrets privilege. The Supreme Court reversed on the FISA issue, resolving "only the narrow question whether § 1806(f) displaces the state secrets privilege." *Fed. Bureau of Investig. v. Fazaga*, 595 U.S. 344, 359 (2022).

On remand, the Ninth Circuit reaffirmed its prior holding that this Court erred by not affording Plaintiffs an opportunity to make their case using non-privileged information. *Fazaga v. Fed. Bureau of Investig.*, 124 F.4th 637 (9th Cir.), *vacated* ______ *FBI v. Fazaga*, --- U.S. --- (Apr. 6, 2026). It also reaffirmed its prior "valid defense" holding, *id*. at 656-63, and then provided the district court with instructions for how to apply it, *id.* at 663-66. The panel held the government cannot win a valid defense dismissal on the pleadings, but instead must present at least some information, in some form, to demonstrate its defense would have merit. *Id*. at 659-63. The Ninth Circuit authorized this Court on remand to consider a variety of options for the government to make such a submission, including in camera, ex parte review of privileged material by the district court; unclassified summaries of information and statements admitting relevant facts as occurs under Classified Information Procedures Act, *id*. at 667 (citing 18 U.S.C. app. III § 6(c)(1)); and the use of a special master with the requisite security clearance, among others, *id*. It further authorized the government to reassert its argument

for dismissal if it concluded these options were insufficient to protect its interests in secrecy. *Id*. at 667 n.19.

**C. Monteilh's recent unsigned letters**

After the Ninth Circuit's second decision in this case, Monteilh authored the first of his many unsworn letters to counsel that have become the basis for this Motion. Importantly, prior to the filing of this action, Monteilh shared his experience as an FBI informant widely with the press, which ran stories covering Operation Flex and describing the discriminatory tactics the FBI instructed him to carry out. *See, e.g.*, Teresa Watanabe and Scott Glover, "Man says he was an FBI informant," Los Angeles Times, Feb. 26, 2009, https://www.latimes.com/archives/laxpm-2009-feb-26-me-informant26-story.html; Doug Irving, Salvador Hernandez, and Sean Emergy, "Man says he informed on Muslims for FBI," Orange County Register, Feb. 26, 2009, https://www.ocregister.com/2009/02/26/man-says-he-informed-on-muslims-for-fbi/; Alexandra Marks, "FBI and American Muslims at odds," The Christian Science Monitor, March 25, 2009, https://www.csmonitor.com/USA/Society/2009/0325/p02s01-ussc.html.

Nevertheless, Monteilh sent the first of the subject letters on June 10, 2025, to various individuals, including counsel for both the government and Plaintiffs. *See* Ex. B at CM-0001 to CM-0008. In it, he made a series of claims purporting to recant some unspecified portion of the original assertions he had made about Operation Flex, his role in it, and the sworn declarations he had previously signed. *Id*. In a follow-up email dated July 11, 2025 and entitled "Clarification and Verification," he sent another unsigned letter that stated that "40-50%" of his sworn statements were true, while the remaining 50-60% were "half truths and lies." *Id.* at CM-0015. He did not discuss which specific portions of the sworn declarations were true or false.

Since then, Monteilh has continued to send various letters to counsel—16 as of the time of this filing. *See generally* Ex. B (collecting communications from Monteilh to counsel). In his most recent letter, delivered June 27, 2026, Monteilh declared that he would refuse to participate in further proceedings in the Court. *See* Ex. B at CM-0086 ("I

will not be answering any questions, participating, or complying with the Court in any way regarding the case of Fazaga v FBI. My role in this particular case is finished."). He also indicated his intent to assert his Fifth Amendment right against self-incrimination, writing: "I, Craig Monteilh, am invoking the 5th motherfuckers!!!!!! And you can't do shit about it." *Id.* at CM-0088.

**D. Recent Supreme Court proceedings**

In the meantime, on October 8, 2025, the government once again filed a petition seeking a writ of certiorari. It requested that the United States Supreme Court review the Ninth Circuit's December 20, 2024 opinion that had again reversed this Court's order dismissing this case on state-secrets privilege grounds. Alternatively, the government asked the Supreme Court to grant its petition, "vacate the court of appeals' judgment, and remand with specific instructions that the court of appeals remand to the district court to reconsider the state-secrets issues in light of Monteilh's recantation." Brief for Petitioner, *Fed. Bureau of Investig. v. Fazaga*, No. 25-430 (U.S. Oct. 8, 2025), 25-26. Although the government did not provide a roadmap for the process it envisioned the district court would take were the Supreme Court to issue the alternative relief, the government's alternate request sought a remand with instructions to the district court "to further investigate Monteilh's recantation and to reconsider the relevant state-secrets issues on a record cleaned of misrepresentations attributable to Monteilh." *Id.* at 29.

On April 6, 2026, the Supreme Court granted the government's alternative request. In a brief and unreasoned order, the Court vacated the Ninth Circuit's judgment and remanded "the case to the District Court for reconsideration in light of recent factual developments pertinent to this case and the Government's motion to dismiss." ECF 227.

## III. ARGUMENT

**A. A motion to strike is an improper vehicle through which to investigate Monteilh's recent statements.**

Plaintiffs of course agree that this Court must now investigate Craig Monteilh's recent statements in light of the Supreme Court's remand order, but Defendants' Motion to Strike is a plainly improper vehicle through which the Court can do so. Defendants

provide no warrant for treating the recent unsworn letters as true. Nor do they cite any case authorizing a court to strike allegations in a complaint based merely on a contested determination regarding their veracity. The federal rules permit the striking of allegations only in certain narrow circumstances: either under Rule 12(f) or, even more rarely, under a district court's inherent authority to sanction a litigant for judicial misconduct. Neither is appropriate here.

1. <u>A motion to strike under Rule 12(f) is not an appropriate alternative to a Rule 12(b)(6) motion in this context.</u>

The legal rules governing motions to strike pleadings make clear that such motions are generally disfavored, as pleadings are of limited importance in federal practice, and such motions are often used as a delaying tactic. *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). A court may nonetheless grant a motion to strike if there is a possibility that issues will be unnecessarily complicated or that superfluous pleadings will cause the trier of fact to draw "unwarranted" inferences at trial, prejudicing the moving party. *California Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002). Ordinarily motion to strike are brought under Rule 12(f), which authorizes a court to strike from any pleading (1) an insufficient defense or any (2) redundant, (3) immaterial, (4) impertinent, or (5) scandalous matter. Fed. R. Civ. P. 12(f). Whether to grant a motion to strike is within the discretion of the court. *Alco Pac., Inc.*, 217 F. Supp. 2d at 1033. In exercising its discretion, the court views the pleadings in the light most favorable to the non-moving party and resolves any doubt as to the relevance of the challenged allegations in favor of the plaintiff. *Id.* And a court will not exercise its discretion to strike a pleading unless the challenged matter has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party. *Id.*; *see also Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991), *on reconsideration*, No. CIV. 90-20610 SW, 1991 WL 207480 (N.D. Cal. July 1, 1991) (where the court denied a motion to strike, finding that the challenged paragraphs were relevant to other allegations in the complaint).

Defendants have shown no valid reason to strike any allegations of the FAC under Rule 12(f). Most obviously, their entire motion is premised on the *truth* of Monteilh's recent unsworn statements, but they provide no reason for this Court to credit the statements at this stage of the case. Moreover, even if Defendants could definitively establish that the allegations in the complaint they seek to challenge were false, that would not be a permissible basis on which to *strike* them under Rule 12(f). As set forth above, there are five bases to strike allegations under Rule 12(f). That they are allegedly false is not among them.

Defendants' motion plainly does not satisfy any of the five recognized bases to strike under Rule 12(f). The first two—an insufficient defense or redundancy—are plainly irrelevant. The third and fourth bases—immateriality and impertinence—are likewise inapplicable here. Immaterial matter has no essential or important relationship to the claim for relief or the defenses being pleaded. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *reversed on other grounds*, 510 U.S. 517 (1994); *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 967 (9th Cir. 2014). Impertinent matter includes statements that do not pertain and are not necessary to the issues in question. *Fogerty*, 984 F.2d at 1527. Here, Defendants do not wish to strike the declarations or allegations because they are irrelevant, unnecessary, or immaterial to the claims—to the contrary, Defendants acknowledge that these allegations bear directly on Plaintiffs' religious discrimination and unlawful search challenges. The final recognized basis for striking allegations in a complaint is that that they are scandalous, defined as "cast[ing] a cruelly derogatory light on a party or other person." *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000). Defendants cannot claim that any allegation contained in the pleading is "scandalous" in this sense. They merely charge, as plaintiffs often do, that these defendants violated the law. And certainly there is no argument that Plaintiffs have made such a statement "cruelly."

2. Defendants also cannot invoke the Court's inherent authority to strike any allegations.

Defendants also cannot avail themselves of this Court's inherent equitable authorities to strike any of Plaintiffs' allegations upon which they principally rely. While courts possess inherent authority to manage proceedings and control their dockets, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), this "inherent authority" is subject to limitations. The Supreme Court has laid out two principles: "(1) an inherent power must be a reasonable response to a specific problem, and (2) the power cannot contradict any express rule or statute." *Dietz v. Bouldin*, 579 U.S. 40, 46 (2016). To the extent that Defendants ask this Court to strike allegations even though they are not "redundant, immaterial, impertinent, or scandalous" under Rule 12(f), such a request is improper.

Whatever residual power courts otherwise enjoy to manage their dockets cannot be lightly invoked, especially in the context of a motion to strike pleadings. The primary aspect of a court's inherent authority is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Nonetheless, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. Courts can deploy this inherent authority where available remedies are inadequate to address misconduct or resulting prejudice. *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021).

Defendants' primary argument in support of this Motion appears to be that Plaintiffs have aided in committing an abuse of the judicial process through reliance on sworn declarations the veracity of which are now disputed by Monteilh's recent unsworn letters. That claim is baseless. Defendants cite no case for the proposition that unsworn partial recantations can provide a Court sufficient basis to exercise inherent authority to strike allegations in a complaint. And it should be obvious that such a step, were it ever appropriate, could not occur before a complete investigation into the unsworn assertions. The contradictions, such as they are, between Monteilh's recent, unsworn letters and his earlier-filed sworn declarations fall far short of what would be required to conclude that

Plaintiffs have committed some form of misconduct so egregious to warrant exercise of any inherent authority to strike allegations in a pleading. As the Ninth Circuit has held:

> As the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside as legally or factually unsupported. This rarely means that those allegations were brought in bad faith or that the pleading that contained them was a sham. . . .We do not call this process sham pleading; we call it litigation.

*PAE Gov't Servs., Inc.*, 514 F.3d at 858-59. Even if Monteilh's unsworn letters could eventually be credited as true—an assumption that would be wildly premature at this stage—that fact alone would not render Plaintiffs' First Amended Complaint a "sham pleading" or otherwise subject to being struck, rather than merely tested through normal forms of adversarial process.

**B. Under the Supreme Court remand order, Defendants should now refile for dismissal.**

Rather than litigate a baseless motion to strike, Defendants should comply with the Supreme Court's remand order by refiling their motion to dismiss, after which this Court can assess the new factual developments to which the Supreme Court referred in its remand order. The Supreme Court's April 6, 2026 order functionally vacates this Court's 2012 order dismissing Plaintiffs' claims on state-secrets grounds. Defendants' motion to strike implicitly recognizes as much, as it would make no sense to strike allegations in a complaint that has been dismissed. With the case now remanded to district court, Defendants have two options for how to respond anew to Plaintiffs' operative First Amended Complaint: they can either move again to dismiss Plaintiffs' pleadings, or answer them. What they cannot do, however, is request that this Court strike well-pled allegations by invoking equitable authority this Court can only exercise in extraordinary situations not present here.

1. <u>The Supreme Court's April 6, 2026 Order vacated this Court's ruling on Defendants' Motions to Dismiss.</u>

The Supreme Court's order formally vacated the Ninth Circuit's December 20, 2024 opinion. *See Fazaga v. Fed. Bureau of Investigation*, 124 F.4th 637 (9th Cir. 2024),

*cert. granted, judgment vacated*, -- S.Ct. --, 2026 WL 922539 (Apr. 6, 2026). It also functionally vacated *this Court's* 2012 order on the government's motion to dismiss on state-secrets grounds. *See* ECF 101. The government sought both outcomes when it asked the Supreme Court for a GVR that, in its words, would require this Court to "reconsider the relevant state-secrets issues." Brief for Petitioner, *Fed. Bureau of Investig. v. Fazaga*, No. 25-430 (U.S. Oct. 8, 2025), 25-26. The Supreme Court obliged, ordering a remand to this Court for "reconsideration [… of] the Government's motion to dismiss." ECF 227-1. As a result, this Court's order dismissing all but the FISA claim on state secrets should be treated as vacated.

In addition to being what Defendants themselves sought, treating this Court's prior dismissal order as vacated is the only logical way to read the Supreme Court's decision. There is no other way for an order to be, in the Supreme Court's words, "reconsider[ed]." Under both the ordinary and legal definition of the word, reconsideration necessarily requires altering or eliminating the original action. *See Reconsider*, Oxford English Dictionary (2026), https://www.oed.com/dictionary/reconsider_v (last visited July 17, 2026) ("to consider (a matter or thing) again," or "to consider (a decision, conclusion, opinion, or proposal) a second time, with a view to changing or amended it; to rescind, alter."); *Reconsider,* Black's Law Dictionary (12th ed. 2024) ("To discuss or take up (a matter) again."). The Supreme Court's instruction to "reconsider" the relevant state-secrets issues must therefore require rescinding the 2012 state-secrets order and considering it again with the benefit of new information available to the parties.

Any other interpretation of the Supreme Court's decision would lead to an untenable result. If the Supreme Court did *not* vacate this Court's 2012 order, the effect of the April 6 GVR order would be to return the parties to the position they were in prior to the Ninth Circuit's decisions: namely, with Defendants having successfully dismissed all but the FISA claims. If that were the case, what would this Court do next? Could the Supreme Court have intended for this Court to issue *another* ruling on the motion to dismiss even though Defendants had already secured dismissal? What would be the

outcome of such an unnecessary inquiry other than to force this Court into issuing an improper advisory opinion? *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041, 1047 (9th Cir. 2019) (describing the prohibition on advisory opinions). And if this Court were to (appropriately) decline to issue an advisory opinion leaving the motion to dismiss already in place, would Plaintiffs have to file a new appeal, which would presumably lead the Ninth Circuit to issue exactly the same opinion that the Supreme Court just vacated, since nothing material would have changed? None of this would make any sense, and this Court should not impute to the Supreme Court a desire to bring forth such a bizarre result.

Thus, the only sensical reading of the Supreme Court's decision is that it returns the parties to the place they were in *before* this Court's order granting the motion to dismiss, which is the order that the Supreme Court has directed this Court to "reconsider." In plain terms, that means this Court's motion to dismiss order is now vacated.

2. Vacatur of the Court's earlier decision requires Defendants to answer or move to dismiss the pleading.

Because this Court's 2012 dismissal order must be deemed vacated, Defendants should move to dismiss it (unless they wish to forego that option and simply answer). This Court should then adjudicate Defendants' motion anew, informed by relevant factual and legal developments over the last fourteen years. Note that any such developments may prove advantageous for Defendants. For instance, they will surely avail themselves of a more favorable landscape on the issue of *Bivens* relief in 2026 than when they originally sought dismissal of those claims against the individual defendants in 2012. However the legal chips fall, the Supreme Court's GVR decision forces them to re-assert their arguments in favor of dismissal.

Rather than follow that logical path, Defendants have brought this Motion seeking to strike allegations on the grounds that they are implausible and contradicted by Monteilh's recent statements. In other words, Defendants ask this Court to look outside the four corners of the pleading, credit the veracity of unsworn statements, discredit the

truth of sworn declarations signed much closer in time to the challenged incidents, and strike whole allegations based on untested factual assumptions about their plausibility. As explained above, that request is meritless on every level, and particularly so when raised through a motion to strike rather than in a properly filed motion under Rule 12(b)(6).

### C. This Court cannot assess Monteilh's credibility based only on his recent letters.

Apart from the various legal defects described above, Defendants' motion fails because it is premised on the veracity of Monteilh's recent unsworn letters, which this Court cannot assess without receiving additional information that is currently in Defendants' possession about the nature of Monteilh's work on Operation Flex. To be clear, Plaintiffs agree that this Court should assess the veracity of Monteilh's recent letters and his earlier declarations. But it cannot do so *now*, for four reasons.

First, Monteilh's original sworn declarations are reliable on their face, and more than suffice to establish the plausibility of the allegations contained in the FAC. As Plaintiffs have previously explained, while they look forward to proceedings testing the truth of Monteilh's statements—including by obtaining information from the government that would either corroborate or refute his allegations—his recent letters do not cast any doubt on the *plausibility* of Plaintiffs' allegations, which is all they need establish at the motion to dismiss stage. Moreover, Monteilh's declarations are already corroborated by other sources, including extensive public reporting and the government's public statements confirming Monteilh's status as an informant. And once subject to adversarial testing they could be further corroborated by still more sources, including the government's non-privileged notes, recordings, and tasking orders, as well as Plaintiffs' and community members' own testimonies. *See* ECF 203 at 3-4 (explaining that "Mr. Monteilh's declarations are not the sole evidence demonstrating that he worked for the government as an undercover informant, and that his work was part of a pattern of unlawful surveillance of Plaintiffs").

Second, Monteilh's recent partial recantations do not automatically invalidate either his sworn statements (which were made closer in time to the challenged operation) or the well-plead allegations of the FAC. Under well-established law, an individual's recantation of their prior statements does not automatically render the initial statements false. *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005). Generally, "[r]ecantat[ed] testimony is properly viewed with great suspicion." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J., dissenting from denial of certiorari); *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (Kozinski, J., dissenting) ("[r]ecanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial."). Further, unsworn letters are obviously afforded less weight than sworn declarations, *see Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (sworn testimony not considered a sham if contradicted by later unsworn letters), while specific and detailed testimony is more reliable than the generalized disavowals found in Monteilh's more recent letters. *Cf. F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). And testimony made closer in time is more likely to be truthful than letters authored nearly 20 years after the incidents. *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012) ("We caution that newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham.").

In any event, if this Court wanted to evaluate the truth or falsity of Monteilh's sworn statements as against his more recent missives, it would have to consider the *entire* context of the statements—not merely one slice of it, as represented by the few unsworn statements Defendants rely upon here. *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) ("When assessing the likely impact it would have on jurors," a court must consider a witness' recantation in the context of their initial testimony and the context in which they recanted); *Christian v. Frank*, 595 F.3d 1076, 1084 n. 11 (9th Cir. 2010) (considering the timing of the witness' recantation and the contents of his earlier

testimony in assessing the weight of the recantation). In other words, this is a factual dispute that can only be resolved *after* denial of a motion to dismiss.

Defendants cite cases in which courts have struck certain documents, but those occurred only after such factual disputes have been investigated and resolved, situations that are wholly inapplicable here. *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005) upheld the striking of a declaration purporting to amend deposition testimony after a magistrate judge investigated the corrections and determined them to be a sham, a proportionate sanction for misconduct found to have been made for tactical advantage. Similarly, in *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337 (9th Cir. 1995), the Ninth Circuit affirmed a district court's dismissal sanction imposed "[o]n the basis of considerable evidence" that a litigant committed intentional discovery misconduct and made material misrepresentations of fact, a sanction that came only after thorough investigation and the consideration of less drastic alternatives. And in *Coston-Moore v. Medina*, 2012 U.S. Dist. LEXIS 105966, *5 (E.D. Cal July 27, 2012), declarations were stricken only after the presiding magistrate judge held an evidentiary hearing into them and determined they were falsified. No such investigations, hearings, or findings have been made here, and no such misrepresentations or "sham" evidence is apparent from the record—at least not without further investigation that Plaintiffs welcome. *Cf. Van Asdale v. Intil Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009) (requiring a district court to make specific factual findings to justify striking an affidavit due to inconsistencies with prior testimony).

Third, at whatever point the Court begins to explore the veracity of Monteilh's recent letters, it should order limited expedited discovery to obtain context for all of Monteilh's statements. Plaintiffs anticipate filing a motion seeking such discovery on July 27, 2026, as Defendants have resisted this discovery, even though it will be necessary to establish a complete record upon which this Court may act in compliance with the Supreme Court's remand instruction. The Supreme Court has called on this Court to look into the facts underlying Monteilh's recent letters. To do so, this Court must review *all* non-privileged information relevant to the alleged recantations. The

government possesses information that will surely be useful in determining whether the contested allegations are true. Given that, Defendants cannot demand that this Court determine the truth or falsity of those allegations while shielding from discovery the information needed to make such a factual determination.

Finally, and irrespective of the above, Defendants' request to strike various paragraphs of Plaintiffs' pleadings fails on its own terms. As discussed in the Plaintiffs' portions of the accompanying chart at Exhibit A, the allegations Defendants seek to strike can be corroborated outside of Monteilh's declarations, including by reference to other statements Monteilh made to the press. *See, e.g.*, "O.C. man says FBI hired him to spy on Muslims," ABC7 (Dec. 1, 2019), https://abc7.com/archive/7146168/ ("Agent Armstrong informed me that although my work was a great service to my country**,** it was also unconstitutional and highly illegal."). Given that the allegations Defendants now contest may also be corroborated by Plaintiffs' and witness' testimony; the surveillance records Defendants previously confirmed could be made available in discovery; and non-privileged tasking orders given to Monteilh information, there is every reason to believe the allegations will be supported by other evidence as the litigation proceeds.

Indeed, Defendants' motion is notable for what it does *not* seek to strike from the complaint. Defendants do not seek to strike multiple paragraphs concerning the FBI's undue focus on Islamic religiosity, FAC ¶¶ 24-27, its shift in policy after September 11 allowing investigations into Muslim religious activity that were based in part on discriminatory trainings, *id.* at ¶¶ 28-39, and its intense interest in surveilling Muslims in Orange County, *id.* at ¶¶ 40-46. Nor do Defendants seek to strike allegations concerning Monteilh's role in working for the government, how he came to be hired as an informant, how he ingratiated himself with community members (including Plaintiffs), and how they became alarmed at his attempts to incite them to violence. FAC ¶¶ 47, 49-54, 59-62, 69-79, 81-85. They also do not seek to strike allegations detailing the expansive nature of the surveillance operation that the FBI hired Monteilh to conduct, *id*. ¶¶ 91-93, and how the agency targeted devout Muslims it viewed as inherently suspicious, *id*. ¶¶ 109-111. Defendants also do not move to strike specific allegations about electronic

surveillance, including how the FBI tasked Monteilh with using secret recording devices. *Id*. ¶¶ 108, 115-16, 123-26, 28-29. Nor do they challenge the allegation describing the extraordinary tranche of information Monteilh collected as an informant, including "thousands of hours of audio recordings" and "hundreds of hours of video recordings." FAC ¶ 137. And Defendants do not challenge many of the allegations of detailed conversations Monteilh had with his handlers, including their specific instructions to surveil Plaintiffs. *See, e.g.*, *id.* at ¶¶ 141-48, 151-54, 168-173, 175-178, 186-191, 193-195, 201-05. Against the many dozens of detailed allegations describing the breadth and scope of the FBI's operation, it is difficult to imagine how Defendants can credibly segregate those allegations they view as categorically false and those they have conceded should remain. And of those allegations that they do not challenge, the question arises: if Defendants claim that the disputed allegations are "foundational" to Plaintiff's case and have now been disproven, do they concede the truth of those that they do *not* wish to strike? And how is this Court supposed to appraise these weighty factual disputes on the pleadings, without the benefit of any discovery at all? These unanswered questions leave little doubt that Defendants' motion should be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion should be denied. Plaintiffs request the Court formally vacate its motion to dismiss order and set a deadline by which Defendants must respond to Plaintiffs' First Amended Complaint anew.

Dated: July 22, 2026

Respectfully submitted,

/s/ *Mohammad Tajsar*
*Attorney for Plaintiffs*

Mohammad Tajsar
*mtajsar@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081

CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, CALIFORNIA

HADSELL STORMER RENICK & DAI, LLP

*Counsel for Plaintiffs*

BRETT A. SHUMATE
Assistant Attorney General

*/s/ Jessica A. Lundberg*

JAMES R. POWERS
Chief Litigation Counsel
JESSICA A. LUNDBERG
Trial Attorney (WA Bar No. 60100)
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-4688
Email: jessica.a.lundberg@usdoj.gov

*Counsel for the Government Defendants*

/s/ Alexander H. Cote
David C. Scheper (Bar No. 120174)
David.Scheper@winstontaylor.com
Alexander H. Cote (Bar No. 211558)
Alexander.Cote@winstontaylor.com
Megan K. Arian (Bar No. 358584)
Megan.Arian@winstontaylor.com
WINSTON & TAYLOR LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: +1 213-615-1700
Facsimile: +213-615-1750

*Counsel for Defendants Kevin Armstrong and Paul Allen*